John F. KNIGHT, Jr., Alma S. Freeman, John T. Gibson, Susan Buskey, Carl Petty, Dennis Charles Barnett by his father Arthur D. Barnett, Vonda Cross, Tammi Palmer, Alease S. Sims, Stacey Levise Sims by her parents Levi Sims and Alease S. Sims, Gary Mitchell, Jr., Grover L. Brown, Frederick Carodine, Frankie Patricia Yarbrough, Dr. Charles Edwards McMillan, Horace W. Rice, Anthony Y. Lavonne Thompson by his mother Lois N. Thompson, Kreslyon Lynette Valrie by her mother Georgia S. Valrie, Dr. Taylor Byrd, and Dan Tibbs, Jr., individually and on behalf of others similarly situated, Plaintiffs and Plaintiffs–Intervenors,

v.

The STATE of ALABAMA; Guy Hunt, Governor of the State of Alabama; the Alabama State Board of Education; John M. Tyson, Jr., Steadman S. Shealy, Jr., Isabelle B. Thomasson, Ethel H. Hall, Willie J. Paul, Spencer Baccus, Victor P. Poole, and Evelyn Pratt, as members of the Alabama State Board of Education; Wayne Teague, State Superintendent of Education; the Ala-

bama Commission on Higher Education; Jane McDonald, Clyde Foster, Katie Espy, Dr. James D. Grady, III, Charles F. Horton, Ken Lott, Steve Means, Borden Morrow, Frank A. Nix, Richard A. Pizitz, Sr., Philip A. Sellers, and Bob Word, as members of the Alabama Commission on Higher Education; the Alabama Public School and College Authority; G. Robin Swift, as State Finance Director and member of the Alabama Public School and College Authority; the Board of Trustees for Alabama A & M University; Franklin Perry, Eddie Player, Wayman Sherrer, George Miller, Chris McNair, W. Troy Massey, Robert Hughes, Thomas Fuller, Wayne Dean, Walter Carter, Dinsimore Robinson, and Dr. Oscar Tucker, as members of the Board of Trustees for Alabama A & M University; the Board of Trustees for Alabama State University; Richard Arrington, Jr., Ross Dunn, Tommy Gallion, Larue W. Harding, Andrew M. Hayden, Lillian Ann Hope, Larry H. Keener, Michael Onderdonk, Patsy B. Parker, Joe L. Reed, James A. Smith, and Mrs. Frankye Underwood, as members of the Board of Trustees of Alabama State University; Auburn University; R.C. Bamberg, Dr. Emory Cunningham, John V. Denson, Dr. Bessie Mae Holloway, Robert E. Lowder, Michael B. McCartney, William F. Nichols, W. James Samford, Jr., Morris W. Savage, and James T. Tatum, Jr., as members of the Board of Trustees of Auburn University; Troy State University; Harold R. Collins, R. Douglas Hawkins, Robert E. Kelly, Jack W. Wallace, John A. Teague, C.J. Hartley, Wallace D. Maline, Jr., Robert T. Wilson, Charles B. Martin, and Russ Campbell, as members of the Board of Trustees for Troy State University; the University of Alabama; Winton Blount, Aaron Aronov, Massey Bedsole, Frank Bromberg, Jr., O.H. Delchamps, Jr., Garry Neil Drummond, Sandral Hullett, William Henry Mitchell, John T. Oliver, Jr., Thomas E. Rast, Yetta G. Samford, Jr., George S. Shirley, Martha H. Simms, Cleophus Thomas, Jr., Cordell Wynn, John B. Hicks, and Dr. Thomas A. Bartlett, as members of the Board of Trustees for the University of Alabama, Defendants.

UNITED STATES of America, Plaintiff,

v.

The STATE OF ALABAMA; Guy Hunt, Governor of the State of Alabama; the Alabama State Board of Education; Wayne Teague, State Superintendent of Education; Alabama A & M University, a public corporation; Alabama State University, a public corporation; Auburn University, a public corporation; Jacksonville State University, a public corporation; Livingston University, a public corporation; Troy State University, a public corporation; the University of Montevallo, a public corporation; the University of Alabama, a public corporation; the University of North Alabama, a public corporation; the University of South Alabama, a public corporation; Athens State College, an educational institution; Calhoun State Community College, an educational institution; the Alabama Commission on Higher Education; and the Alabama Public School and College Authority, Defendants.

No. CV 83–M–1676–S.

United States District Court,
N.D. Alabama, S.D.

Dec. 30, 1991.

Donald V. Watkins, James U. Blacksher, Leslie Proll, Demetrius C. Newton, Birmingham, Ala., for John F. Knight, Jr., et al.

Frank W. Donaldson, U.S. Atty., Caryl P. Privett, Asst. U.S. Atty., Craig M. Crenshaw, Jr., Nathaniel Douglas, Dept. of Justice, Washington, D.C., for U.S.

Robert D. Hunter, John E. Grenier, Rebecca S. Dunnie, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., Richard N. Meadows, State Dept. of Educ., Mark Montiel, Office of the Governor, Ira De Ment, Jeffery A. Foshee, Jim R. Ippolito, Jr., Office of General Counsel, State Dept. of Educ., Montgomery, Ala., for State of Ala., Guy Hunt, Alabama State Bd. of Educ. and Wayne Teague.

Joe R. Whatley, Cooper, Mitch & Crawford, Birmingham, Ala., Kenneth L. Thomas, Tyron C. Means, Montgomery, Ala., John C. Falkenberry, Birmingham, Ala., for Alabama A & M University.

Solomon S. Seay, Jr., Montgomery, Ala., Armand Derfner, Charleston, S.C., Fred D. Gray, Gray, Langford, Sapp, McGowan & Gray, Tuskegee, Ala., Terry G. Davis, Montgomery, Ala., for Alabama State University.

Thomas W. Thagard, Jr., David R. Boyd, Robin G. Laurie, Balch & Bingham, Montgomery, Ala., Edward S. Allen, J. Richard Carrigan, M. Stanford Blanton, Balch & Bingham, Birmingham, Ala., Thomas D. Samford, III, Auburn, Ala., for Auburn University.

Walter J. Merrill, Merrill, Porch, Doster & Dillon, Anniston, Ala., for Jacksonville State.

J. Fredric Ingram, Burr & Forman, Birmingham, Ala., for Livingston University.

William F. Murray, Jr., Burr & Forman, Birmingham, Ala., Richard F. Calhoun, Calhoun, Watkins & Clower, Troy, Ala., for Troy State University.

Carl E. Johnson, Jr., J. Scott Greene, Bishop, Colvin & Sweeney, Birmingham, Ala., for University of Montevallo.

C. Glenn Powell, Stanley J. Murphy, Norman Lemley, Tuscaloosa, Ala., Robert W. Rieder, Cindy S. Waid, Ina B. Leonard, Huntsville, Ala., Joseph J. Levin, Jr., Colton and Boykin, Washington, D.C., for University of Alabama.

Ernest N. Blasingame, Jr., Florence, Ala., for University of North Alabama.

Mylan R. Engel, Engel, Walsh & Zoghby, Maxey J. Roberts, University of South Alabama, Mobile, Ala., Danny R. Farnell, Montgomery, Ala., for University of South Alabama.

Jeffrey Foshee, State Bd. of Educ., Montgomery, Ala., for Athens State College, Calhoun State Community College.

Robert D. Hunter, John E. Grenier, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for Alabama Com'n on Higher Educ. and Alabama Public School and College Authority.

## TABLE OF CONTENTS

*INTRODUCTION* .................................................. 1045
*STATEMENT OF THE CASE* ................................... 1047
*CONTENTIONS OF THE PARTIES* ......................... 1051
 A. *Knight Plaintiffs* .................................... 1051
 B. *The United States Government* ................... 1053
 C. *State Defendants* ..................................... 1055
 D. *Auburn University* .................................. 1055
 E. *The University of Alabama System* ............. 1060
 F. *The Troy State University System* .............. 1060
 G. *State Board of Education* .......................... 1061
 H. *The University of North Alabama* ............... 1061

## FINDINGS OF FACT

*GENERAL OVERVIEW OF HIGHER EDUCATION IN ALABAMA* ............ 1061
 A. *Enrollments* .......................................... 1061
 B. *Federal Financial Assistance For Alabama's Higher Education System* 1065

SUMMARY OF THE HISTORICAL EVIDENCE ............................ 1065
 A. The Nineteenth Century .......................................... 1066
 1. The Antebellum Period ...................................... 1066
 2. The Reconstruction Period ................................... 1067
 3. The Early Establishment of the Board of Trustees for the University of
 Alabama and Auburn University ............................... 1072
 i. Auburn University ........................................ 1072
 ii. The University of Alabama ............................... 1072
 4. Blacks' Early Efforts for Equality Through Education .............. 1073
 5. Blacks' Early Efforts to Establish Colleges ....................... 1074
 i. Alabama State University ................................. 1074
 a. The State's Nineteenth Century Promise of a University Edu-
 cation for Blacks at Alabama State University ............ 1082
 ii. Alabama Agricultural & Mechanical University ............... 1084
 6. Educational Access and Black Political Power: The End of the Nine-
 teenth Century ............................................. 1089
 B. The Twentieth Century ........................................... 1090
 1. Disenfranchisement's Impact on Black Education ................. 1090
 2. Black Higher Education and the Progressive Period ............... 1091
 3. The Period Between the World Wars .......................... 1095
 4. Alabama's Response to Federal Enforcement of Separate But Equal 1097
 5. Massive Resistance to Integration ............................. 1103
 i. The Legislature .......................................... 1103
 ii. The University of Alabama ............................... 1105
 iii. Auburn University 1950–1965 ............................. 1109
 6. Four Year Teachers' Colleges ................................. 1112
 i. The Use of the ACT and Heightened Admissions Requirements 1112
 a. University of Alabama .................................. 1113
 b. Auburn University ..................................... 1115
 ii. Decentralizing Governance of the Traditionally White Teacher
 Colleges .............................................. 1116
 7. Importance of Alabama's HBU's to the Civil Rights Movement ...... 1117
 8. The History of Branch Campus Development .................... 1119
 i. The University of Alabama at Huntsville ..................... 1119
 a. Origin and Development ................................ 1119
 b. Extension Center Movement ............................ 1119
 c. Early Growth ......................................... 1120
 d. Federal Government Support ........................... 1121
 ii. University of Alabama at Birmingham ...................... 1126
 iii. Troy State University at Montgomery ...................... 1126
 iv. Auburn University at Montgomery ......................... 1127
 a. Origin and Development ................................ 1127
 b. Early History ........................................ 1128
 c. The ASTA Decision .................................... 1130
 d. AUM In the Present ................................... 1133
 9. The History and Development of the Alabama Commission on Higher
 Education ................................................. 1136
 i. Origins ................................................. 1136
 ii. Statutory Responsibilities ................................ 1137
 10. Creation of the ASU and AAMU Boards of Trustees .............. 1139
 C. History of the Early Land Grant System in Alabama ................. 1140
 1. The 1862 Morrill Act ........................................ 1140
 2. The 1890 Morrill Act ........................................ 1145
 3. The Hatch Act .............................................. 1146
 4. The Smith–Lever Act ........................................ 1147
CURRENT ADMISSIONS STANDARDS ................................. 1153
 A. The ACT Examination ........................................... 1153
 1. Background of the ACT College Admission Test .................. 1153
 2. The ACT Test is Used to Examine Students' Academic Preparation .. 1153
 B. The Development of the ACT Test ................................ 1154
 C. The ACT is not a Racially Discriminatory Examination ............. 1155

D. The Use of the ACT by Colleges and Universities in Alabama ........ 1156
 1. Admission Requirements for Regularly Admitted Freshmen .......... 1156
 i. The University of Alabama System ........................... 1156
 ii. Auburn University ........................................ 1157
 iii. Troy State University ...................................... 1158
 2. Alabama's HBU's Use of the ACT ............................... 1158
E. Non-traditional College Admissions .................................. 1159
 1. Conditional Admissions at the University of Alabama System ........ 1159
 i. University of Alabama at Huntsville ........................ 1159
 ii. University of Alabama at Birmingham ...................... 1160
 iii. University of Alabama at Tuscaloosa ...................... 1160
 2. Conditional Admissions at Auburn University ..................... 1161
 i. Main Campus ........................................... 1161
 ii. Auburn University at Montgomery ........................ 1161
 3. Conditional Admissions at the Troy State University System ........ 1162
 i. Main Campus ........................................... 1162
 ii. Troy State University at Montgomery ..................... 1162
 4. Admission by Transfer ........................................ 1162
 i. University of Alabama System ............................ 1162
 ii. Auburn University Main and Montgomery Campuses ........... 1163
 iii. Troy State University Main and Montgomery Campuses ........ 1163
 iv. Alabama A & M University ............................... 1163
 v. Alabama State University ................................ 1163
F. Impact of Regular Admission Criteria on Blacks Applying to HWUs 1163
G. Auburn University's Admissions Requirements Have a Disproportionate
 Impact on Black Applicants .................................... 1165
LAND GRANT ISSUES ..................................................... 1167
A. The National Land Grant Model ..................................... 1167
B. Alabama's Land Grant System ...................................... 1168
 1. Alabama's Agricultural Experiment Station ..................... 1168
 2. Alabama's Cooperative Extension Service ....................... 1169
C. AAMU's Land Grant Expansion and Changing Appropriations ....... 1170
D. Alabama's Land Grant System is not Currently a Vestige of Discrimina-
 tion ......................................................... 1171
RACIAL COMPOSITION OF FACULTY AND ADMINISTRATIVE POSITIONS 1172
A. Contentions and Defenses ......................................... 1172
B. Auburn University ................................................ 1173
 1. Black Faculty Recruitment .................................... 1173
 2. Black Faculty Employment .................................... 1173
 3. Black Administrative Employment .............................. 1174
C. Auburn University at Montgomery .................................. 1175
 1. Black Faculty Recruitment .................................... 1175
 2. Black Faculty Employment .................................... 1175
 3. Black Administrative Employment .............................. 1176
D. The University of Alabama System ................................. 1176
 1. University of Alabama Main Campus ............................ 1176
 i. Black Faculty Recruitment ............................... 1176
 ii. Black Faculty Employment ............................... 1177
 iii. Black Administrative Employment ........................ 1178
 2. University of Alabama at Birmingham .......................... 1178
 i. Black Faculty Recruitment ............................... 1178
 ii. Black Faculty Employment ............................... 1180
 iii. Black Administrative Employment ........................ 1181
 3. University of Alabama at Huntsville ........................... 1181
 i. Black Faculty Recruitment ............................... 1181
 ii. Black Faculty Employment ............................... 1182
 iii. Black Administrative Employment ........................ 1183
E. Troy State University System ...................................... 1183
 1. Troy State University Main Campus ............................ 1183
 2. Troy State University at Montgomery .......................... 1183
F. University of North Alabama ...................................... 1184
G. Alabama State University ......................................... 1184
H. Alabama A & M University ........................................ 1184

 I. Calhoun State Community College ................................... 1184
 J. Athens State College ............................................. 1185
 K. Jacksonville State University ...................................... 1185
 L. Livingston University ............................................ 1185
 M. The University of Montevallo ..................................... 1186
 N. University of South Alabama ..................................... 1186
 O. Comparative Chart .............................................. 1186
FACULTY AND ADMINISTRATIVE EMPLOYMENT ......................... 1187
 A. The Appropriate Labor Pool for Faculty Positions ............... 1188
 B. Utilization of Faculty Recruitment Procedures ................... 1190
 1. Auburn University ......................................... 1190
 2. Montevallo and Livingston Universities ..................... 1191
 C. Administrative Employment ...................................... 1191
BLACK FACULTY PROMOTION AND RETENTION .......................... 1192
THE ALABAMA COMMISSION ON HIGHER EDUCATION'S FUNDING FORMU-
 LAE ................................................................. 1192
 A. The Components of ACHE's Funding Formula ..................... 1192
 B. Comparison of Alabama's Funding Formula with other States' Formu-
 lae ....................................................... 1200
 C. Description of How ACHE's 1990–1991 RAP Formula Works .......... 1202
 D. Comments on Alabama's Funding Formula ........................ 1205
STATE FUNDING FOR HIGHER EDUCATION ............................. 1208
 A. Background ..................................................... 1208
 B. Importance of Funding to a University or College ............... 1209
 C. Historical Funding Patterns ...................................... 1209
 D. Historical Differences Cannot Be Made Up Overnight ............... 1227
 E. Headcount Funding 1941–1969 ..................................... 1232
 F. Funding of Institutions per FTE ................................. 1234
 G. Costs of Instructional Programs .................................. 1259
 H. The "$4 Million" and Its Impact on the Funding Comparisons ....... 1268
 I. Current Method of Funding ...................................... 1270
THE ADEQUACY OF CAMPUS FACILITIES ON THE HBU'S ................. 1271
 A. Facilities and Higher Education ................................... 1271
 B. The Plaintiffs' Allegations ....................................... 1272
 C. Capital Funding Process ......................................... 1272
 1. State Funding Process ....................................... 1272
 2. Non–State Funding Process .................................. 1273
 D. ACHE's Capital Needs Recommendations ........................... 1273
 E. Legislative Capital Outlay ....................................... 1274
 F. Institutional Autonomy Regarding Capital Development ............... 1275
 G. The Plaintiffs' Evidence ........................................ 1276
 H. Comparison of Capital Funding at Selected Institutions .............. 1276
 1. Facility Appearance at the Six Comparison Campuses .............. 1278
 2. The Era of Expanding Enrollments and State Support .............. 1279
 I. The State Has Inadequately Funded the Capital Development of Its
 HBU's ...................................................... 1281
STUDENT CHOICE: MAKING ENROLLMENT DECISIONS.................... 1283
 A. Student Choice In General ....................................... 1283
 B. ACT Scores and Student Choice .................................. 1284
 C. Factors Other Than Academic Preparation Have An Influence On Stu-
 dent Choice ................................................ 1286
STUDENT ENROLLMENT: THE RACIAL COMPOSITION OF ALABAMA'S
 COLLEGES AND UNIVERSITIES ...................................... 1286
 A. Contentions of the Parties ....................................... 1286
 B. Knight Plaintiffs' Evidence ...................................... 1287
 C. The Defendants' Enrollment Evidence ............................. 1288
 1. Auburn University ......................................... 1288
 2. Auburn University at Montgomery ........................... 1288

3. The University of Alabama System ............................... 1288
 i. **General Enrollment Data** ....................................... 1288
 ii. **Dr. George Borjas' Testimony** ............................... 1289
 *a. Borjas' Conclusions Regarding Black Student Enrollment At UA* ................................................ 1289
 *b. Borjas' Conclusions Regarding Black Student Enrollment At UAB.* .............................................. 1289
 *c. Borjas' Conclusions Regarding Black Student Enrollment At UAH* .............................................. 1289
4. Enrollment In the State's HBU's ................................ 1291
5. Troy State University and Troy State at Montgomery ............. 1291
6. The University of North Alabama ............................... 1291
 D. *Student Enrollment and Plaintiffs' Claim of Vestiges of Segregation* 1291
UNDERGRADUATE STUDENT RECRUITMENT .............................. 1291
 A. *Auburn University Recruitment* .............................. 1292
 B. *The University of Alabama System Recruitment* ............... 1293
 1. University of Alabama at Huntsville ....................... 1293
 2. University of Alabama at Birmingham ....................... 1293
 3. University of Alabama at Tuscaloosa ....................... 1294
 i. **Minority recruitment efforts in the UA Admissions Office** ...... 1294
 ii. **Recruitment by UA Students** ......................... 1295
 iii. **Minority recruitment efforts in the College of Engineering** ..... 1296
 *a. SECME and High School outreach efforts* .................... 1296
 *b. NAMEPA* ......................................... 1296
 *c. Minority Engineering program* ......................... 1297
 *d. Scholarships to support minorities in Engineering* .......... 1297
 *e. Engineering student enrollment facts* ...................... 1297
 iv. **UA's BioPrep Program** .............................. 1298
BLACK UNDERGRADUATE RETENTION RATES ............................ 1299
 A. *The University of Alabama System* ............................ 1299
 1. UA's Various Retention Programs .......................... 1299
 2. Financial Aid at UA ...................................... 1300
 B. *Auburn University* .......................................... 1301
 C. *Other Predominately White Colleges and Universities* .......... 1302
 D. *Retention and Graduation Rates at the HBU's* ................. 1302
 1. Alabama A & M University ................................. 1302
 2. Alabama State University ................................. 1302
GRADUATE AND PROFESSIONAL SCHOOL ADMISSION AND RECRUIT-MENT ............................................................ 1303
 A. *Knight Plaintiffs' and Allied Defendants' Allegations* .......... 1303
 B. *The University of Alabama System* ............................ 1304
 1. Graduate and Professional School Enrollment ............... 1304
 2. Graduate and Professional School Recruitment .............. 1304
 3. Admissions Requirements .................................. 1306
 C. *Auburn University* .......................................... 1307
 1. Graduate School Enrollment ............................... 1307
 2. Graduate School Recruitment .............................. 1307
 D. *Auburn University at Montgomery* ............................ 1307
INSTITUTIONAL CLASSIFICATION AND PROGRAM APPROVAL ............. 1308
 A. *Introduction* ............................................... 1308
 B. *Classifying Institutions According to Role* ................... 1308
 C. *Instructional Role Matrices* ................................. 1311
 D. *Program Approval* .......................................... 1312
ACADEMIC PROGRAM DUPLICATION ................................. 1313
 A. *Dr. Conrad's Analysis* ...................................... 1313
 B. *Defendants' Critique of Dr. Conrad's Testimony* .............. 1316
 C. *Dr. Conrad's Program Duplication Testimony is Unpersuasive* ... 1317
 D. *The Court's Analysis of the Program Duplication Claims* ....... 1319
 1. The University of Alabama at Huntsville ................... 1321
 i. **Institutional Comparison between UAH and AAMU** ........ 1321
 ii. **Program Comparison** ................................ 1322
 *a. Education* ........................................ 1322
 *b. Business* ......................................... 1324

2. Athens State College, Calhoun State Community College and Alabama
A & M University ............................................................. 1328
 i. **Institutional Profile** .................................................. 1328
 *a. Calhoun State Community College* ........................ 1328
 *b. Athens State College* ........................................ 1328
 ii. **Program Comparison** ............................................. 1328
 *a. Calhoun State Community College* ........................ 1328
 *b. Athens State College* ........................................ 1329
3. Alabama State University and Auburn University at Montgomery .... 1329
 i. **Institutional Comparison between ASU and AUM** .............. 1329
 ii. **Program Comparison** ............................................. 1330
4. Troy State University at Montgomery and Alabama State University 1331
E. *ACHE and New Program Approval* ..................................... 1331
THE RACIAL CLIMATE ON THE HWU'S ..................................... 1331
MULTICULTURALISM AND THE UNIVERSITY ............................. 1332
THE BOARDS OF TRUSTEES ................................................ 1333
 A. *Powers Given the Boards of Trustees* ............................ 1333
 B. *Plaintiffs' Allegations* ............................................. 1333
TRANSFERS OF ACADEMIC CREDIT BETWEEN JUNIOR AND SENIOR COL-
LEGES .......................................................................... 1335
TECHNACENTER ............................................................. 1336
ALABAMA'S SYSTEM OF HIGHER EDUCATION ........................... 1340
COOPERATIVE PROGRAMS BETWEEN THE PROXIMATE INSTITUTIONS .. 1341
 A. *Alabama State University and Auburn University at Montgomery* .... 1341
 B. *Troy State University at Montgomery and Alabama State University* 1341
 C. *Alabama A & M University and the University of Alabama at Huntsville* 1341
 D. *Alabama A & M University and Athens State College/Calhoun State
 Community College* ............................................... 1343
 E. *Extension of Previously Executed Consent Decrees* .................. 1343
REMEDIAL OBJECTIVES OF THE KNIGHT PLAINTIFFS .................... 1343
 A. *Knight Plaintiffs' Remedial Issues* ................................. 1344
 B. *Knight Plaintiffs' Proposed Remedial Decree* ....................... 1348

## CONCLUSIONS OF LAW

THE MEANING OF "VESTIGES" ............................................. 1352
THE CONSTITUTIONAL DUTY TO DESEGREGATE HIGHER EDUCATION .. 1353
 A. *The Parties' Contentions* ........................................... 1353
 1. Plaintiffs .......................................................... 1353
 2. Defendants ........................................................ 1353
 B. *An Introduction to the Court's View of the Law* .................... 1354
 C. *The Scope of the Constitutional Duty to Desegregate* ............... 1354
 D. *The Constitution Requires Alabama To Eliminate Vestiges of Discrimi-
 nation Root and Branch to the Extent Practicable* ............... 1356
 E. *Ayers v. Allain* ..................................................... 1358
 F. *Student Choice and the "Root and Branch" Remedy* ................ 1359
 G. *ASTA* ............................................................... 1360
THE EQUAL PROTECTION CLAUSE AND MIXED MOTIVE DECISIONS .... 1360
DUTY TO DESEGREGATE UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF
1964 ............................................................................ 1361
 A. *Title VI and Its Regulatory Framework* ........................... 1361
 B. *Program–Specific Proof For Title VI Enforcement and the Civil Rights
 Restoration Act* .................................................... 1363
THE DEFENSES OF RES JUDICATA AND COLLATERAL ESTOPPEL ...... 1365
 A. *Res Judicata* ....................................................... 1365
 B. *Collateral Estoppel* ................................................. 1366
 C. *Auburn's Defense Is Of No Avail* ................................... 1367
 D. *Lee v. Macon Does Not Prevent The Claims Against The SBE* ........ 1367
SUMMARY OF THE ACTIONABLE VESTIGES OF DISCRIMINATION SURVIV-
ING IN ALABAMA ........................................................... 1368

THE ELEVENTH AMENDMENT AND THE COURT'S REMEDIAL POWERS . . 1368
 A. Eleventh Amendment Jurisprudence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1368
 B. The State's Duty To Erradicate Vestiges Existing at the HBU's Facilities 1370
THE CONSTITUTIONALITY OF ALABAMA CODE SECTION 16–50–20(a) . . . . . 1372
THE SCOPE OF THE COURT'S REMEDIAL POWER . . . . . . . . . . . . . . . . . . . . . . . 1377

REMEDIAL DECREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1377

---

HAROLD L. MURPHY, District Judge.

## ABBREVIATIONS

The following abbreviations are used in the Findings of Fact and Conclusions of Law.

AAMU – Alabama A & M University;
ACHE – Alabama Commission on Higher Education;
APSCA – Alabama Public School and College Authority;
ASC – Athens State College;
ASU – Alabama State University;
AU – Auburn University;
AUM – Auburn University at Montgomery;
CSCC – Calhoun State Community College;
HBU – historically black university;
HWU – historically white university;[1]
JSU – Jacksonville State University;
K – Knight Plaintiffs;
LU – Livingston University;
SBE – Alabama State Board of Education;
ST – State of Alabama Defendants;
TSU – Troy State University;
TSUM – Troy State University at Montgomery;
UA – University of Alabama, Tuscaloosa campus;
UAB – University of Alabama at Birmingham;
UAH – University of Alabama at Huntsville;
UAS – University of Alabama System;
UM – University of Montevallo;
UNA – University of North Alabama;
US – United States of America;
USoA – University of South Alabama.

Record citations will be abbreviated as follows:

Trial Transcripts—[Witness] (date) [page]; e.g., Jones (10/10/90) 13.

Exhibits—[Party]X [no.], p. —; e.g., UASX 1000, p. 13. Party abbreviations will be same as above.

Stipulations of fact—SOF ¶ [number]; e.g., SOF ¶ 103.

## INTRODUCTION

More than three hundred and fifty years ago, Africans were first brought to this country to be sold into slavery. Forbidden formal education, slaves served at the pleasure of their white masters and learned only the anguish of unrewarded toil. The "self-evident" truth contained within the Declaration Of Independence that all persons are created equal had no application to the slave. The slave was neither free nor equal. Commenting on whether the Framers of the Constitution considered slaves to be included within the phrase "We the People," Chief Justice Taney, penned the following remarks in the *Dred Scott* case:

> We think they are not, . . . [and] were not intended to be included . . . .
>
> . . . .
>
> They had for more than a century before been regarded as beings of an inferior order; and altogether unfit to associate with the white race . . .; and so far inferior, that the negro might justly and lawfully be reduced to slavery for his benefit.
>
> . . . .
>
> [A]ccordingly, a negro of the African race was regarded . . . as an article of property, and held, and bought and sold as such . . . .

1. The term "Historically White University" includes all schools which are predominately Caucasian whether they were established before or after the *de jure* period of forced racial segregation in Alabama's system of higher education.

*Scott v. Sandford,* 60 U.S. (19 How.) 393, 405, 407–08, 15 L.Ed. 691 (1857) *quoted by,* Marshall, The Constitution's Bicentennial: Commemorating the Wrong Document? 40 Vand.L.Rev. 1337, 1340 (1987).

The emancipation of the African American as property was accomplished at the conclusion of the Civil War with the ratification of the Thirteenth Amendment to the United States Constitution. The prize of freedom was effectively denied however, by the enactment of the Black Codes whose intent was the continued subordination of the newly freed slave. One of the forms of subordination was the rigid control by whites of black education. Most whites wanted blacks educated, if at all, only to the minimum level necessary to provide semi-skilled labor. Black educational institutions were under the complete control of white officials who, for the most part, shared the paternalistic view that black subordination was a natural condition that worked for the betterment of both races.

The history of black higher education in Alabama following the Civil War is not atypical. Strict white control was the hallmark of black higher education in the state until the 1970's. For many years blacks were effectively denied the benefits of a collegiate education by the operation of two interrelated practices: the uncompromising segregation of the state's white institutions and the limited educational mission assigned to the state's black colleges. Concomitant to these two practices, there arose a host of policies and laws designed to institutionalize segregation while assuring the inferior status of black education. The case at bar is in large measure, about identifying and eliminating those segregative policies and practices which survived federally mandated integration.

These surviving policies and practices, referred to as vestiges of the *de jure* period of segregation, must be abolished root and branch if the mandate of the Constitution is to be satisfied. The obligation of the Court is to ensure that a student is free to choose any institution of higher education in Alabama unencumbered by the segregative practices which arose during the period of *de jure* discrimination. As a related element, the Court must be certain that students who choose to attend the state's predominately black institutions are not, as a result, stamped with the badge of inferiority resulting from the history of segregation. The Court can accomplish its obligation by ordering actions which will remove the aura of mediocrity and eliminate the stigma of segregation. The Court, at least in part, can do this by ensuring adequate facilities and funding, and where necessary by ensuring that academic programs at the state's historically black institutions are not unnecessarily duplicated by proximately located predominately white institutions.

The Court must also ensure that those African–American students who elect to attend one of the state's predominately white institutions may do so without having to overcome barriers remaining from the dual system of higher education whose purpose was then the continuation of racial segregation and whose impact continues to be an impediment to full desegregation.

The issue is not whether the state universities to which African Americans have traditionally turned for college education in Alabama have limited missions because of prior state-sponsored discrimination, undoubtedly they do; rather, the issue is how does that limitation affect students who choose to attend the state's predominately black institutions. The desire to use this litigation as a means of securing for the state's predominately black universities educational missions comparable in size and content to those of the state's largest institutions is unavailing. This case is not about institutional enhancement. If one attends an institution which does not have a full panoply of graduate and professional programs it does not mean that the education received there is inferior. The Constitution does not teach that because a historically black institution has suffered discrimination that it is entitled to an elevated academic mission. The danger of creating parallel universities in mission, one predominately black the other predominately white, cuts too close to the doctrine repudiated by *Brown v. Board of Education,*

when the only reason for so doing·is the racial discrimination suffered by the historically black institution. The Court must guarantee that the educational system in Alabama is nondiscriminatory and integrated, not that any particular institution has a certain educational mission.

Alabama has an extensive system of higher education. Many of the institutions within that system serve unique and vital roles. Alabama's historically black universities have a long history of service to the state and country for which they and the state can justly be proud. Alabama State University and Alabama A & M University were on the cutting edge of the Civil Rights Movement of the 1950's and 1960's, and stood as beacons in the night, broadcasting the promise of the Constitution to millions of American citizens who were denied its protections.

Today these universities continue to serve the state and its citizens in numerous ways. They provide an educational environment in which students of not only the highest academic caliber can study, but also those who have been educationally deprived. Well developed remedial programs provide the educationally disadvantaged students with the opportunity and training necessary to successfully complete a college curriculum.

Likewise, many of the state's predominately white schools also serve the nation and state well. The ignominious image of Governor George Wallace barring black enrollment at the University of Alabama is emblazoned on the American consciousness as a memorial to all that is wrong and pernicious with racial segregation. That image is, however, beginning to fade, not because of the passage of time, but because of the university's affirmative efforts to deal positively with its segregative past. The university has made giant strides towards eliminating the policies defended by Governor Wallace's "stand in the school-house door" and is today, in many respects, on the fore of university race relations nationwide.

Other universities and colleges in Alabama which have not been under the glare of national attention like the University of Alabama have not fared as well, and there yet remain certain actions which these institutions must take to assure that all citizens, regardless of race, may choose a college whose segregative practices have been eliminated.

Finally, it must be noted, that great effort was exerted to move the parties towards a settlement in this action. The Court took the extraordinary step of holding a settlement conference during the middle of trial and ordered the attendance of the Governor, chief executive officer of each Defendant and representatives of the Plaintiffs. Unfortunately, the conference proved unsuccessful. Throughout the trial, the parties were reminded that the least desirable resolution of this action would be for the Court to develop a remedy. Many of the issues involved in this case essentially require political solutions. Alas, the failure of politics has left this matter with the Court.

## STATEMENT OF THE CASE

This case commenced in 1978 when the Office of Civil Rights ("OCR") of the United States Department of Health, Education and Welfare (now the Department of Education) began a Title VI compliance investigation of public higher education in Alabama ("the 1978 OCR investigation").

The OCR case control card for the 1978 investigation identified the recipient of federal financial assistance under investigation as the "State Department of Education (University System)." No investigation was undertaken to determine what types of federal financial assistance were received by particular institutions in Alabama. No determination was made that the State Department of Education was the "recipient" in that investigation.

The procedure to be followed in the 1978 OCR investigation of public institutions of higher education in Alabama was set out in a memorandum from Cynthia Brown ("the Cynthia Brown memo") to regional directors, including Regional Director William H. Thomas in the Atlanta Office of

OCR, which had responsibility of the State of Alabama.

The Cynthia Brown memo set out the procedures to be followed in examining certain subject areas, including student admissions, financial aid, counseling and tutoring, athletics, and program duplication.[2]

Public senior-level institutions of higher education in Alabama received letters from Louis O. Bryson, an official with the OCR in Atlanta, identifying certain subjects on which OCR would like to focus during the "on-site" portion of the compliance review.

In November, 1980, the "Higher Education Desegregation Working Group" was established in the Department of Education to issue letters of finding for Alabama and several other states by mid–January, 1981. The "Higher Education Desegregation Working Group" did not include any persons who had been involved in the 1978 OCR field investigations of public higher education in Alabama. The "Higher Education Desegregation Working Group" operated primarily on the basis of "briefing books" which summarized some of the information developed in the OCR 1978 investigation.

The 1978 OCR investigation did not find discrimination in admissions policy nor did it identify a problem with respect to recruitment.

The letter of findings ultimately issued January 7, 1981, was addressed to Governor Fob James, with copies to the presidents of several public institutions of higher education in the state. The letter from the Department of Education, notified the Governor and the various university and college presidents that vestiges of the former *de jure* system allegedly remained in Alabama's public institutions of higher education in violation of Title VI. The state was directed to submit to the Government a plan to assure future compliance with Title VI.

After months of unsuccessful negotiations between a representative of the governor and representatives of OCR, Assist-

ant Secretary of Civil Rights for the Department of Education Clarence Thomas—now an Associate Justice on the United States Supreme Court—sent a "ten-day letter" to Governor James stating if within ten days Alabama did not submit a plan to eliminate the alleged vestiges of the dual system the matter would be referred to the Department of Justice for litigation. No plan was ever submitted.

On January 15, 1981, John F. Knight, Jr., and other alumni, students and faculty members of Alabama State University filed suit in the Middle District of Alabama attacking alleged vestiges of segregation in public higher education. *Knight v. James,* 514 F.Supp. 567 (M.D.Ala.1981), alleged that the desegregation of ASU was impeded by duplicative educational programming at AUM and TSUM, in violation of Title VI and the Fourteenth Amendment. On May 20, 1981, the District Court granted the motion of Governor James and ACHE to stay all further action in *Knight v. James* pending resolution of Title VI administrative proceedings between the State of Alabama and the U.S. Department of Education aimed at desegregating public higher education statewide. This stay was dissolved on April 6, 1982, when the District Court was informed that the Department of Education had referred the Title VI enforcement proceedings to the Department of Justice.

On October 24, 1982, the Middle District certified a plaintiff class consisting of graduates of ASU and African American citizens of Alabama who were eligible for employment by or who attended or may attend public institutions of higher education in the Montgomery, Alabama area.

On July 11, 1983, the Department of Justice filed the instant action in the Northern District of Alabama, alleging that the defendants were maintaining vestiges of *de jure* segregation throughout their system of public higher education. The District Court on April 18, 1983, granted the motion

---

**2.** The procedure established by the Cynthia Brown memo for the examination of program duplication deliberately omitted consideration of any justification for similar programs, although it recognized that such justifications may exist. SOF ¶ 226.

of John F. Knight, *et al.*, to intervene in *U.S. v. Alabama*, on the ground that its outcome would be determinative of the issues in *Knight v. James*. On January 3, 1984, the court certified the Knight intervenors to represent essentially the same Montgomery-related class the Middle District had certified.

The Middle District Court stayed all further proceedings in *Knight v. James* (by then, *Knight v. Wallace*) "until a final judgment or order is reached in *United States v. Alabama....*" *Knight v. Wallace*, CA No. 81–52–N (M.D.Ala., June 12, 1984). No trial was ever conducted in *Knight v. Wallace*, and on December 12, 1990, the court dismissed *Knight v. Wallace* (now *Knight v. Hunt*) without prejudice, in light of pending proceedings in the instant action.

Immediately after the United States Attorney General filed this action in 1983, Alabama State and Alabama A & M universities separately moved for realignment as plaintiffs, or in the alternative, to file cross claims. The District Court granted both motions to realign and AAMU and ASU thereafter sought to leave to file amended complaints. The District Court granted the institutions' request. AAMU asserted Title VI and Fourteenth Amendment claims against UAS, AU, and the state. ASU asserted similar claims against AU/AUM, TSU/TSUM, and the state.

In September 1983 Auburn University and the State Superintendent of Education moved District Judge U.W. Clemon to disqualify himself. Judge Clemon denied the motions on two separate occasions. *United States v. Alabama*, 571 F.Supp. 958 (N.D.Ala.1983); *United States v. Alabama*, 574 F.Supp. 762 (N.D.Ala.1983).[3] Auburn University then petitioned the court of appeals for a writ of mandamus. The Eleventh Circuit granted the writ in part and remanded the matter to the Northern District of Alabama with directions that another judge be assigned to

hear the recusal motion. *In re Auburn University*, No. 83–7557 (11th Cir. Nov. 10, 1983).

Senior District Judge Hobart Grooms was assigned the recusal proceedings. After taking evidence, Judge Grooms, on December 19, 1983, issued an order granting the motions to disqualify Judge Clemon. One month later, Judge Grooms on a motion for rehearing vacated his order and recused himself from any further proceedings. Senior Circuit Judge David Dyer then heard the Defendants' disqualification motion and denied the same. *United States v. Alabama*, 582 F.Supp. 1197 (N.D.Ala.1984). The subsequent request to certify the issue for interlocutory appeal was denied. The case then proceeded to trial.

The first trial of this matter began on July 1, 1985, and concluded on August 2, 1985. Before the start of the trial Judge Clemon bifurcated the proceeding so that the only issue heard concerned the liability of the Defendants. On December 9, 1985, the District Court entered an order and memorandum of opinion in which it found that a racially dual system of higher education previously had been operated by the State of Alabama until at least 1967 and that the state had failed to dismantle the vestiges of the prior *de jure* dual system. *United States v. Alabama*, 628 F.Supp. 1137 (N.D.Ala.1985). Judge Clemon then ordered the "State of Alabama, [the Governor, ACHE and APSCA]" to submit a plan to eliminate all vestiges of the dual system of higher education in Alabama. 628 F.Supp. at 1173.

An issue that had been severed from the main case involving the recertification by the SBE of certain teacher education programs at ASU, was heard by Judge Clemon immediately after the conclusion of the main case. On August 20, 1985, the District Court enjoined the SBE from decertifying ASU's educational programs. An ap-

---

**3.** Two separate bases for recusal were argued by Auburn University and the State Superintendent. The first was that Judge Clemon was allegedly biased or prejudiced concerning one of the parties and second, that the Judge's impartiality

might reasonably be questioned. Each of these issues was addressed by the district court separately thus accounting for the two reported opinions.

peal to the Eleventh Circuit was taken, which affirmed the injunction on behalf of the Knight Plaintiffs but also held that ASU had no right to sue the state or its agencies under Title VI or the Fourteenth Amendment. *United States v. Alabama,* 791 F.2d 1450 (11th Cir.1986). ASU filed with the Court of Appeals petitions for rehearing and suggestions for rehearing *en banc,* which were denied. 796 F.2d 1478 (11th Cir.1986). ASU then unsuccessfully petitioned the United States Supreme Court for certiorari. 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987).

Meanwhile, the District Court overruled motions by several of the Defendants under 28 U.S.C. § 1292(b) seeking immediate appellate review of the District Court's original findings concerning the existence of a dual system of higher education based on race. Thereafter the Defendants filed a notice of appeal to the Eleventh Circuit Court of Appeals under 28 U.S.C. §§ 1291 and 1292(a). On February 13, 1986, AU and the University of Alabama System moved the Court of Appeals to stay the remedy phase of the trial. Before the Plaintiffs had an opportunity to reply, the Circuit granted the stay on February 14, 1986. The Knight Plaintiffs, ASU and AAMU filed separate motions to dissolve the stay which were denied by the Circuit.

On May 16, 1986, the Knight Plaintiffs, AAMU and ASU, petitioned the United States Supreme Court for a writ of certiorari seeking a dissolution of the stay entered by the Eleventh Circuit and a ruling that the appeal from the District Court order was premature. While the petition for certiorari was pending the Knight Plaintiffs and the state's predominately black schools also filed an Application with Justice Powell to dissolve the stay entered by the Court of Appeals. Justice Powell denied the Application and the Supreme Court shortly thereafter denied the petition for a writ of certiorari.

On October 6, 1987, the Eleventh Circuit reversed and remanded the judgment of the District Court. It held that the complaint of the United States should be dismissed without prejudice, the Knight Plain-tiffs' Title VI claim should also be dismissed without prejudice, that Judge Clemon be removed from the cases and that a new trial be had if the United States and the Knight Plaintiffs refile their claims. *United States v. Alabama,* 828 F.2d 1532 (11th Cir.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). The Court of Appeals affirmed the Knight Plaintiffs' right to challenge vestiges of segregation under the Fourteenth Amendment. 828 F.2d at 1551.

After six other district judges were recused on their own motion or by order of the Eleventh Circuit, the Chief Judge for the Northern District of Alabama certified that a need existed for a judge from another district to preside over this case. The undersigned, a United States District Judge for the Northern District of Georgia was designated by then Chief Judge Paul H. Roney of the Eleventh Circuit to perform all judicial duties relating to this action. *In re John F. Knight, Jr.,* No. 88–7764 (11th Cir. Apr. 12, 1989).

On remand, John F. Knight, Jr., *et al.,* were designated lead plaintiffs, and both they and the United States filed amended complaints. On March 12, 1990, this Court entered a lengthy order disposing of all pending motions to dismiss. Among other things, the Court denied all motions to dismiss the statewide Title VI claims of the United States and Knight Plaintiffs relying on the Civil Rights Restoration Act of 1987, which legislatively overturned the Supreme Court's ruling in *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). Motions to dismiss the Knight Plaintiffs' Fourteenth Amendment claims and the intervention of the United States to assert its own Fourteenth Amendment claims were also denied.

The Court did grant motions to dismiss the Knight Plaintiffs' Section 2 Voting Rights Act claim. The Court also dismissed the Knight Plaintiffs' vote dilution allegations premised on the First, Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States. These counts were dismissed on the grounds that the factual predicate

plead in the complaint did not constitute a cognizable claim concerning voting or voting strength as a matter of law. *Knight v. Alabama*, No. 83–M–1676–S, slip. op. at 52–63 (N.D.Ala. Mar. 12, 1990). Finally, the Court dismissed the cross claims of ASU and its Board of Trustees on the grounds that they lacked standing to pursue the interest of third parties who were already adequately represented by the Knight Plaintiffs. *Id.* 38–51.

On June 15, 1990, following a hearing at which most of the named plaintiffs and plaintiffs-intervenors testified, the Court conditionally certified John F. Knight, Jr., *et al.*, and Alease S. Sims, *et al.*, to represent a class of "all black citizens of Alabama and all past, present and future students, faculty, staff and administrators of Alabama State University and Alabama A & M University." *Knight v. Alabama*, No. 83–M–1676–S, slip op. at 9 (N.D.Ala. June 15, 1990). The class was thereafter denominated as the "Knight Plaintiffs."

Before the start of this trial, and over the objection of the Knight Plaintiffs, the Court reaffirmed several consent decrees previously approved by Judge Clemon. The reaffirmed decrees were between the United States and the University of South Alabama, the University of Montevallo, Jacksonville University, and Livingston University. This Court also approved consent decrees entered into for the first time between the United States and Troy State University, and the United States and the State Board of Education, Athens State College and Calhoun State Community College. These decrees were also objected to by the Knight Plaintiffs. The Government considers the consent decrees to disposes of all claims which it makes against these parties.

In approving the consent decrees, the Court clearly indicated that in the event there was a finding of liability and a judicial remedy required, those schools who had entered into consent decrees with the Government might well have to participate in the remedy regardless of their independent agreements with the United States. The Court specifically indicated it would retain jurisdiction over all settling parties as to any remedy following a trial on the merits. *Knight v. Alabama*, No. 83–M–1676–S, slip op. at 2–3 (N.D.Ala. June 28, 1990).

By Order of the Court, the 1985 trial record and transcript was specifically incorporated into the current proceedings. The parties were given an opportunity to object to any portion of the 1985 trial record which was, in their opinion, improperly introduced into evidence. The parties were also allowed to object to the introduction of testimony from the 1985 trial if it was felt that the cross examination had been unduly restricted.

Finally, the Court chose not to bifurcate this case between liability and remedy. The Court believed that the best use of judicial and financial resources would be to hear both issues during a single trial.

Trial began October 29, 1990, and, except for holiday recesses, continued uninterrupted to April 16, 1991. The Court heard from approximately 200 witnesses, received hundreds of thousands of pages of exhibits and produced a transcript well in excess of 22,000 pages.

### CONTENTIONS OF THE PARTIES

What follows are the contentions of the various parties to this case. The Court takes these contentions directly from the submissions of the parties with only minor changes.

### A. Knight Plaintiffs

The Knight Plaintiffs contend that segregation was only one aspect of a broader official state policy of white supremacy and that many of the current institutions, policies and practices of public higher education in Alabama are designed with the specific intent of subordinating black citizens. Higher education is the gateway to the professions, technology, business and most other aspects of middle class American society. Alabama's official policy was and is that public higher education should afford full access to these middle class roles only to its white citizens and that the higher education of black citizens should be

restricted so as to limit blacks to subordinate roles in the state's political, social and economic order. Plaintiffs contend that this official policy of white supremacy in higher education has been implemented historically and in the present through the following policies:

The continuing restriction of the missions of ASU and AAMU to those of the traditionally white regional/teacher colleges was established and maintained for the purpose of discriminating against black citizens.

Black Alabamians were promised in 1873 and afterwards that ASU would provide for them the same liberal arts, graduate and professional educational opportunities as UA provided whites. The fraudulent and racially discriminatory repudiation of this promise to black people has been repeated throughout Alabama's history and is ongoing.

AAMU was designated Alabama's black land grant university in 1890, but it received no state funding for land grant functions until 1982, when small appropriations began, and the state continues to this day denying AAMU any share of federal funds proceeding from the 1862 Morrill Land Grant Act, the 1887 Hatch Act and the 1914 Smith–Lever Act. As a result, black farmers were forced off the land in disproportionate numbers. Today, the black community, with its unique needs and interests, is still denied equal access to and participation in modern agricultural and engineering technologies that land grant funding is intended to support.

The denial to ASU and AAMU of graduate, professional and research programs intentionally restricts the development of their undergraduate programs as well.

Physical separation of blacks and whites in public education was maintained by law. *De jure* segregation was imposed in a variety of historical ways, ranging from policies of the Reconstruction era State Board of Education, to constitutional prohibitions in 1875 and 1901, to massive resistance policies of governors and HWU boards of trustees in the twentieth century.

Since Alabama became a state, it has maintained through a variety of historical circumstances a steadfast policy of imposing white control over the public education of black people. This racially motivated policy was crucial to the regime of white supremacy for two purposes: (1) to make sure the content, values and style of blacks' education prepared them for subordinate roles in society, and (2) to ensure that white persons would never be forced to submit to the authority of black persons. African Americans have always understood that their educational opportunities depended on the extent to which they could gain a measure of control over their own institutions, and that their ability to combat the policy of white control directly depended on the extent to which black citizens could gain a share of effective political power. Among the earliest achievements of blacks elected as a result of the 1965 Voting Rights Act and federal court legislative reapportionment decrees were creation of independent, majority-black boards for ASU and AAMU and corresponding increases in their state appropriations.

Alabama's historical policy of subordinating its African American citizens through public higher education persists to the present. It is accomplished by limiting blacks' access to many undergraduate and most graduate and professional programs to those afforded by HWUs. Various admission criteria cause the number of blacks in HWU programs to be disproportionately low to begin with. Those black students who do enter the HWUs encounter white administrators, staff and students who don't expect them to succeed on the same basis as white students. Whites' underexpectations of blacks are precisely the attitudes of white superiority and black subordination that for generations the State of Alabama has officially promoted.

The exclusion of African Americans from or their underrepresentation on the governing boards, administrations and faculties of the HWUs is a manifestation of Alabama's historical policy of preventing black persons from exercising authority or even significant influence over the education of white persons. Black underrepresentation

in positions of authority at HWUs is the main current mechanism of massive resistance at these schools. It ensures that the educational values, content and styles of the African–American community will not share genuine influence on HWU campuses with the educational values, content and styles of the white community.

The small pool of African Americans who already have the doctoral and professional degrees demanded for university faculty positions today is a proximate result of at least two current racially motivated policies: (1) the restriction of HBUs' missions with respect to graduate and professional programs and (2) blacks' continued inability to overcome institutionalized massive resistance at HWU graduate and first professional schools. Unless *both* racially discriminatory policies are corrected, the black community will continue to be denied equal access to the leadership and resources needed for its political, social and economic development.

The creation, expansion and maintenance of HWU branch campuses in Montgomery and Huntsville were and are manifestations of Alabama's intentionally discriminatory policies of (1) restricting the HBU missions, (2) ensuring that white persons would not be forced to submit to the educational authority of black persons and (3) denying historically black institutions the opportunity to provide educational and developmental support for the social and economic growth of the state and the region in which they are located. These HWU branches are important institutional mechanisms in the current strategy of massive resistance, and their continued duplication of programs that already are or ought to be offered at ASU and AAMU perpetuate segregation and its official stigma on the black community.

Defendants, except for ASU and AAMU, deny plaintiffs' claims and contend that the State and its agencies have taken sufficient steps to eliminate historical and continuing discrimination against black citizens in public higher education. ASU and AAMU agree with plaintiffs' contentions.

### B. The United States Government [4]

The basic contention of the United States is that the vestiges of racial segregation have not been eradicated "root and branch" from public higher education in the State of Alabama and that the Court should direct the formation of a plan calculated to eliminate such vestiges. All of the following contentions are subsidiary to this basic premise.

(a) Alabama required absolute segregation in all public education until the middle of the 1960's.

(b) The Legislature and executive branches actively and resolutely opposed any and all attempts to change these requirements of absolute segregation until otherwise required by federal court order.

(c) In keeping with this overall policy, at the four-year level, public higher education in Alabama in 1954 was absolutely segregated with two four-year schools (AAMU and ASU), limited to black students and black faculty, which were substantially inferior to the four-year schools established and operated for whites only.

(d) The Legislature and Governor, as well as the white schools themselves, actively opposed the attendance of blacks at the white four-year institutions until these schools were required to admit black students by federal court order.

(e) Alabama is under a constitutional obligation to take action to eliminate "root and branch" all vestiges of the racially dual system of public higher education which it established.

(f) Alabama has failed to take the necessary steps to compel either the disestablishment of the dual system in state higher education or to establish the conditions necessary to allow this racial duality to disappear over the course of time.

(g) The Defendant universities themselves have failed to take the constitution-

---

**4.** The Government did not list its contentions when it submitted its post-trial argument. Consequently, the Court has looked at the Government's statement of issues for trial filed September 6, 1990, wherein the Government articulates its contentions.

ally necessary steps to make the transition from "white" schools and "black" schools to "just schools."

(h) The white schools have affirmatively hindered the black schools from attracting white students, primarily through course and program offerings at geographically proximate institutions.

(i) The white schools have failed to hire qualified black faculty members and to appoint qualified black administrators with the reciprocal effect of maintaining their own identification as white schools and cementing the identification of the black schools.

(j) The white schools have adopted admission policies which result in fewer black students enrolling in these schools and operating their institutions so that black students are less likely to graduate once in attendance at the white schools, continuing their identification as white schools.

(k) The black schools have failed to take steps to attract white students and do not appoint and retain white faculty as to eliminate their identity as black schools and make the transition from "historically black schools."

(*l*) The state of Alabama has failed to disestablish its dual system of public higher education by not taking steps to make the black schools sufficiently attractive in terms of facilities to attract white students.

(m) Alabama has failed to disestablish its dual system of higher education by not providing sufficient funding to the black schools to enable them to eradicate the past neglect of the state and thus compete on a level playing field for all students, both white and black.

(n) The failure of the state to eliminate program duplication and to continue operating two agricultural schools, one overwhelmingly white and supported by disproportionate resources, one black and simply incomparable.

(*o*) The state has failed to disestablish its dual system by not taking steps to eliminate program duplication and by not offering unique, attractive programs at all schools so that other-race students will not be discouraged from attending schools they were once absolutely precluded from attending by state action.

(p) The state and its four year institutions of higher education have no plan, policy, or design to eliminate absolutely the racially dual structure of public higher education at the four year level and, with the exception of black schools and those institutions which have entered into consent decrees with the United States in this action, no concrete plan to foster the conditions which will allow this racially dual structure to dissipate and eventually disappear.

The United States and the Knight Plaintiffs contend that they are entitled to relief based on the following:

a. Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d *et seq.*

b. The Fourteenth Amendment to the Constitution of the United States.

In addition, the Knight Plaintiffs seek relief under the following theories:

a. Third party beneficiary contract rights of plaintiffs and the class they represent accruing from agreements entered into by Defendants with the United States under Title VI.

b. Rights of Plaintiffs and the class they represent as beneficiaries of a constructive trust created by the defendants' receipt of monies from the federal government under Title VI agreements.

c. The Fifteenth Amendment to the Constitution of the United States.[5]

d. The Civil Rights Act of 1866, 42 U.S.C. § 1981.

e. The Second Morrill Act, 26 Stat. 417 *et seq.*, 7 U.S.C. § 321 *et seq.*

f. Rights of plaintiffs and the class they represent as beneficiaries of a constructive trust created by the defendants' receipt of

---

**5.** The vote dilution claim based on the fifteenth amendment was dismissed by Order entered March 12, 1990. *Knight v. Alabama,* No. 83–M– 1676–S (N.D.Ala. Mar. 12, 1990) (Memorandum and Order, pp. 52–63).

monies from the United States under the Second Morrill Act.

g. The Civil Rights Act of 1871, 42 U.S.C. § 1983.

## C. State Defendants

The State Defendants' contentions are as follows:

(a) The State Defendants are not subject to Title VI of the Civil Rights Act of 1964. The state supported institutions in Alabama are governed by individual boards of trustees rather than by a central governing board. Alabama has no public system of higher education within the meaning of Title VI. Neither the State of Alabama, the Governor, APSCA, nor the State Finance Director are programs or activities receiving federal financial assistance within the meaning of Title VI.

(b) The State Defendants have fulfilled any constitutional or statutory requirement to eradicate vestiges of segregation.

(c) The State Defendants cannot be held liable for matters beyond their control such as institutional admissions standards, tuition schedules, employment practices, expenditures and the like.

(d) The Federal Constitution does not require that the state remedy pre–1964 exclusion of black students from comprehensive post-secondary education by establishing and operating predominately black institutions comparable in funding and programs to Auburn University and the University of Alabama.

(e) The difference between AU and UA on the one hand and AAMU and ASU on the other are not vestiges of *de jure* or *de facto* segregation. Such differences exist because AU and UA have broader missions and roles than do the predominately black schools.

(f) Expansion of AU and UA into the state's urban areas is not a vestige of segregation. Rather, AU and UA were pursuing their mission of providing broad-based education to large numbers of students.

(g) No dual system of higher education exists in Alabama. More black students attend and are awarded degrees by state-supported, predominantly white institutions than state-supported predominantly black institutions. If state resources are channeled away from predominately white institutions toward predominately black institutions, then state resources will be channeled away from a majority of black students.

## D. Auburn University

Defendant Auburn University denies the material allegations of the amended complaint of the Knight Plaintiffs and has asserted several affirmative defenses including:

(a) That plaintiffs fail to state a claim upon which relief can be granted in the sixth cause of action based on 42 U.S.C. § 1981, and the seventh cause of action which seeks 42 U.S.C. § 1983 injunctive relief based on state allocation of appropriations pursuant to the Morrill Act of 1890.

(b) The claims based on the establishment and operation of AUM are barred by the doctrines of collateral estoppel and *res judicata* because of the previous decision of the United States Supreme Court in *Alabama State Teacher's Association v. Alabama Public School and College Authority*, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) ("ASTA").

(c) The claims of the plaintiffs, to the extent they involve AUM, are barred by the doctrine *stare decisis*, as the establishment and operation of AUM as an institution open to students of all races was sanctioned by the United States Supreme Court in previous litigation, *ASTA*, 289 F.Supp. 784 (M.D.Ala.1968), *aff'd* per curiam, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969).

(d) That AUM has never been and is not now a *de jure* or *de facto* segregated institution and is not, and has never been, part of any racially segregated system of higher education.

(e) That neither Title VI nor its implementing regulations impose any obligations on AUM beyond non-discrimination, be-

cause AUM is not a program in which previous discrimination took place.

(f) That any claims concerning the organization of and administrative responsibility for the Alabama Cooperative Extension Service ("ACES") are barred by the doctrines of prior action pending, collateral estoppel and *res judicata* based on the pending case of *Strain v. Philpott*, 331 F.Supp. 836 (1971) in the United States District Court for the Middle District of Alabama, which has been pending for approximately twenty years and remains active as to pending motions for relief concerning modification of the organization of the ACES and other issues related to its desegregation and non-discriminatory operation.

(g) That the continued existence of racially identifiable institutions of higher education does not violate the Constitution or laws of the United States or of the State of Alabama to the extent continued racial identifiability of defendant institutions is a result of choice by black students, faculty, administrators, and staff to become associated with such institutions.

(h) That the claims of plaintiffs are barred by the applicable statutes of limitations, the doctrines of laches, waiver, estoppel and unclean hands.

(i) That AU's responsibility for agricultural education, agricultural extension, and agricultural research resulted from factors other than race, and that statewide responsibility for agricultural extension and research would have developed in the state's largest land grant university for reasons unrelated to race.

Auburn University denies the material allegations contained in the United States' Complaint and in addition to the affirmative defenses asserted as to the claims of the plaintiff class, avers:

(a) That the United States and the Knight Plaintiffs have failed to comply with procedural prerequisites to claims brought under Title VI and claims under the fourteenth amendment.

(b) That the federal agency responsible for Title VI compliance with respect to funds for agricultural education, extension, and research is the United States Department of Agriculture, and that the United States and other plaintiffs have not complied with necessary procedures for enforcement of Title VI in this action as to programs administered by the U.S. Department of Agriculture.

(c) That the federal government is barred from the relief it seeks in this action by the equitable doctrine of unclean hands, in that it has encouraged, and continues to encourage, preservation of the racial identifiability of AAMU, ASU, and other predominantly black institutions through federal subsidies based on the racial identifiability of such institutions and by selective failure to enforce Title VI as to AAMU and ASU.

AU contends that it has accepted responsibility for, and has carried out, desegregation in all of its programs and activities. AUM, established in 1967, was never segregated, and has at all times since its inception been operated on a non-discriminatory basis.

AU contends that since the admission of the first black student at AU in 1964, AU has desegregated each of its programs and activities. No person is excluded on the ground of race, color or national origin from participation in, or denied the benefits of, or subjected to discrimination under any program or activity of AU, as defined by Title VI of the Civil Rights Act of 1964. AU has taken affirmative steps including the recruitment of black students and faculty to disestablish vestiges of segregation.

AU contends that each of the public institutions of higher education in Alabama is governed by a separate and independent board of trustees, and no public institution of higher education is part of a "system" which is governed by some single entity with higher authorization than the institutions' respective boards of trustees. There is no "system" of higher education in Alabama so that one institution can be judged vicariously liable for the transgressions of some other institution which is autonomous and separately governed.

In Alabama, there has never been a "system" which governed all public institutions

of higher education. The governance of public higher education has been highly decentralized, with each autonomous university responsible for its own management and control by its own board of trustees.

AU contends that ASU and AAMU, which have continued to grow since the end of segregation, now seek judicial license to duplicate the missions and programs of UA and AU and, thereby, to create a racial duality in 1990 that did not exist prior to 1964. Moreover, the Knight Plaintiffs seek to establish "separate but equal" programs for ASU and AAMU because of the black identity of those universities, in a manner completely inconsistent with their constitutional and statutory obligations.

AU contends that the constitutional autonomy of its board of trustees began in the Alabama Constitution of 1875, and that race was not a factor in that decision. Continuation of this status in the 1901 Constitution was not influenced by race, nor was the passage of Amendment 161 to the 1901 Constitution which currently provides for AU's constitutional autonomy.

AU denies that the plaintiffs state any recognizable cause of action in asserting that ASU and AAMU suffer from a "stigma of inferiority" which must be remedied by the state and the other defendants in this action.

Alabama's public institutions of higher education differ in size, academic program offerings and responsibilities for research and public service in ways that are typical throughout the United States. Such variations in size and mission are not the result of segregation; similar patterns are found in states in which racial segregation was never practiced.

AU contends that at least during the past sixteen years, AAMU and ASU have received a greater share of state appropriations for functions associated with students than the other public universities in Alabama. When comparing these institutions to the other former normal schools or state teachers' colleges JSU, LU, TSU, UNA, Alabama A & M University and Alabama State University have received a greater percentage share of state appropriations than their fair share.

AU contends that during the last 25 years, AAMU and ASU have received more state revenues for physical facilities than any other institution of comparable enrollment, program and mission, and that to the extent AAMU or ASU were ever disadvantaged with respect to physical facilities as compared to other institutions of comparable enrollment, program and mission, those disadvantages have been erased over the past 25 years as a result of the over-funding of AAMU and ASU. No vestiges of segregation exist in Alabama's institutions of higher education with respect to facilities.

AU contends that its admission standards were adopted for non-discriminatory reasons. They are applied in a non-discriminatory manner. Use of the American College Test ("ACT") is justified because both the ACT and high school grade average are valid predictors of first-year academic performance at AU. ACT scores, used alone or in conjunction with high school grades, are reasonably good predictors of success in college as measured by freshman grade point average, and are valid predictors for both blacks and whites.

AU contends that AUM's admission policies have neither the purpose nor effect of discriminating against blacks; and do not, because of the availability of a special admissions program which does not require any ACT score, disqualify disproportionately more black than white high school graduates in Alabama.

AU contends that black students in Alabama select colleges on the same basis as students elsewhere in the nation, in that students tend to choose a college whose difficulty level is commensurate with their own ability. Black high school students in Alabama perceive predominantly white colleges to be accessible to them, and better prepared black students tend to select predominantly white colleges as their first choice. A substantial majority of black students attending publicly supported colleges in Alabama attend colleges and universities which are predominantly white.

Black and white students in Alabama and nationwide are affected in their college choice by the average level of preparation of the students enrolled in particular colleges, as measured by test scores such as ACT.

AU contends that neither its main campus nor AUM discriminate in the recruitment, employment or advancement of black candidates for faculty, administrative, or other positions. Competition for qualified black candidates for faculty and administrative positions at AU is nationwide and intense, and the availability of qualified black candidates in many disciplines is very low. Availability of qualified black candidates is particularly low in fields such as agriculture, architecture, engineering, veterinary medicine, and other technical fields in which AU specializes. AUM has generally had a higher percentage of blacks among its faculty than any other predominantly white institution in Alabama.

The ASTA court found that AUM was conceived as neither a black school nor a white school, but rather as "just a school;" and that there were legitimate, non-discriminatory reasons for establishing AUM. 289 F.Supp. at 789. Any contention that AUM's creation was racially inspired is foreclosed by the *stare decisis,* collateral estoppel and *res judicata* effects of the *ASTA* decision.

AUM has never been, and is not now, a *de jure* or *de facto* segregated institution and is not, and has never been, part of any racially segregated system of higher education. AUM has operated at all times since its creation as a race-neutral institution of higher education, equally open in all respects, including admissions and employment decisions, to all persons without regard to race. Operation in this fashion is all that is required of AUM under Title VI or the Constitution of the United States.

Neither Title VI nor its implementing regulations impose any obligations on AUM beyond non-discrimination, because AUM is not a program in which previous discrimination took place.

The academic programs offered by AUM are essentially the programs envisioned at the time of AUM's creation, and made known to the *ASTA* court. These programs are viable programs consistent in all respects with AUM's mission. These programs do not unnecessarily duplicate programs at ASU as a matter of fact or law. The existence of certain academic programs at AUM does not unlawfully impede the ability of ASU to attract white students. There is no merit to the plaintiffs' contentions that AUM's existence and its offering of certain academic programs impedes ASU's ability to attract white students.

AUM is not responsible for the racial identity of ASU, nor for any failure to desegregate, or failure to eliminate vestiges of segregation in that institution. AUM is not guilty of any violation of Title VI or the Constitution, and cannot have liability or a remedy imposed on it because of conditions which may exist in some other institution, such as ASU.

Alabama, like 49 other states of the United States,[6] has a single agricultural experiment station (AAES) and a single extension service (ACES), both of which are under the highly centralized control of the "1862" land grant university (AU), and have statewide missions that cover all counties in the state. The AAES and ACES, as presently constituted, are the result of many historical and economic forces, unrelated to race, that have combined to produce the same agricultural structure in the other states of the United States. It is not feasible, either from the standpoint of economics or the efficient provision of services, for a state to maintain more than one agricultural experiment station or one extension service or to duplicate already existing experiment stations or extension services. Neither is it feasible for a state to divide or fragment research and extension between more than one institution.

In accordance with the terms of the First Morrill Act (1862), AU was established and designated as the "1862" land grant university in Alabama. Likewise, in accordance

---

6. The single exception is Connecticut which has two research stations.

with the terms of the Hatch Act (1887), the AAES was established and placed under the administrative control of AU. Finally, in accordance with the terms of the Smith–Lever Act (1914), the ACES was established and placed under the administrative control of AU.

If considerations of race played any role in making AU the 1862 land grant institution and in assigning it exclusive administrative control of AAES and ACES, the same decisions would have been made for compelling reasons unrelated to race. Politics, economics, geography, and religion—not race—were the overriding considerations in establishing AU and in making it the "1862" land grant institution in Alabama. Since AU had already become the major agricultural research university in the state and had already established an experiment station before the passage of the Hatch Act, it inevitably followed that when the experiment station was created in 1887, it was placed in Auburn under the control of AU. By the same token, since the primary mission of the extension service was to disseminate the knowledge generated by the experiment station, it was logical when the extension service was established in 1914 to locate it in close proximity to the experiment station at Auburn under the administrative control of AU. These reasons, among others unrelated to race, dictated the decisions to place the "1862" land grant institution, along with the experiment station and the extension service, at the same location under the administrative control of the same institutional entity.

AAMU's designation under the Morrill Act of 1890 entitled AAMU to receive an equitable portion of the annual appropriations under the Second Morrill Act (so long as AU did not admit blacks), but such funds were restricted for instruction in agriculture and the mechanic arts. The Second Morrill Act provided funds neither for agricultural research nor extension, nor conferred upon AAMU any mission in agricultural research or extension. In accordance with the administrative procedures of the Second Morrill Act, the Secretary of the Interior (and each successor in authori-

ty to the Secretary) was required to certify as a prerequisite to distribution of the appropriations under that act that the division of Second Morrill Act funds was equitable. During the period that the equitable division provision was effective, the division of funds in Alabama was never determined by the appropriate federal officials to be inequitable. After 1954, when *Brown v. Board of Education* foreclosed duality, the provisions of the Second Morrill Act, which provided an equitable distribution of funds for the black 1890 institutions, by its own terms became inoperative.

Agricultural research was not, in 1954, conducted on a racially dual basis in Alabama. The AAES, under the direction of AU, provided statewide agricultural research on a unitary basis. Since 1964, the AAES has been operated on a desegregated basis, utilizing scientists of all races with benefits available to people of all races. The question of Title VI compliance by the AAES has been the responsibility of the United States Department of Agriculture, which has never found the AAES to be out of compliance with Title VI.

AAMU's current role in agricultural research, and its funding for agricultural research, are a result of initiatives by the federal government (both the executive and legislative branches) after the passage of the Civil Rights Act of 1964 to establish an agricultural research role for AAMU and other "1890" institutions. This research obviously cannot be a vestige of segregation which existed prior to 1964, since it was created after that time. The existence of a separate agricultural research role for AAMU as an "1890" institution on a lesser financial scale than that of the "1862" institution at Auburn, neither offends Title VI nor the Fourteenth Amendment.

Prior to 1964, extension services by and for blacks were provided on a segregated basis through the ACES under the responsibility of AU. The ACES was required to desegregate, both with respect to employment and the provision of services to its clientele, by virtue of the Fourteenth Amendment and Title VI in proceedings filed in the United States District Court for

the Middle District of Alabama, in an action entitled *Strain, et al. v. Philpott, et al.* Both the United States and a class of "all black citizens of Alabama" are plaintiffs in that case, which has been pending for over 20 years—and still remains—under the supervisory jurisdiction of that Court. The U.S. Department of Agriculture, the agency responsible for monitoring Title VI compliance of the ACES, has found the ACES to be in full compliance with Title VI in its most recent review.

The Government did not satisfy statutory and administrative requirements for the institution of this action as it relates to programs under the authority of the United States Department of Agriculture, nor did the United States satisfy such requirements to pursue Title VI claims against AU.

This action is barred by applicable statutes of limitations and the doctrine of laches as to claims for the events of the nineteenth century, the 1960's and the 1970's, and by the doctrines of *res judicata* and collateral estoppel; and by *stare decisis* as to claims concerning the desegregation and non-discriminatory operation of the ACES.

There is no private right of action under the Morrill Act of 1890, and that Act does not confer rights upon AAMU. *See, Wyoming Agricultural College v. Irvine,* 206 U.S. 278, 27 S.Ct. 613, 51 L.Ed. 1063 (1907); *Brown Univ. v. Rhode Island College of Agric. & Mechanic Arts,* 56 F. 55 (Cir.Ct., D.R.I.1893).

The constructive trust claims against the state or AU based on alleged misuse of land grant funds in the past are barred by the Eleventh Amendment.

### E. The University of Alabama System [7]

The University of Alabama denies that vestiges of a dual system of higher education remain in Alabama. Black students are admitted and enrolled in every institution of the UA system on the same basis as white students.

To the extent that the state's predominately black schools still remain virtually segregated, they remain that way because many of their students, faculty and staff publicly express their preference to remain predominantly black institutions.

UA denies that ASU and AAMU were or are substantially inferior to schools in the state with comparable missions. According to the University of Alabama, their is not a racially dual system of education in Alabama.

There is not a "system" of public education in the state within the meaning of the term contemplated by Title VI.

The University of Alabama denies that it has failed to take the constitutionally necessary steps to desegregate. Racial imbalance alone does not constitute a violation of Title VI or of any constitutional provision. In the absence of an objective standard, equally and fairly applied to all states and to all independent institutions of higher education within those states, a desegregated institution cannot be held in violation of Title VI and the Fourteenth Amendment to the Constitution simply for failing to achieve or attain an unspecified level of racial composition for its student body, faculty, and staff.

It is UA's contention that as long as the Knight Plaintiffs continue to emphasize the need to structure the makeup of ASU and AAMU around black culture and traditions, and continue to demand black control of the governing boards, these schools will never desegregate.

If the Knight Plaintiffs' position is approved by the Court, it will in practice result in the creation of "separate-but-equal" institutions and totally negate the desegregation efforts resulting from *Brown v. Board of Education.*

### F. The Troy State University System

Troy State University and Troy State University at Montgomery deny each of the material allegations of the Plaintiffs' Complaints, and contend that they have violated neither the Fourteenth Amendment nor Ti-

---

**7.** The University of Alabama System has not set out its contentions in a single location in its post-trial filings. Consequently, as with the Government, the Court turns to UAS's statement of contentions filed before trial and reproduces its most salient parts here.

tle VI of the Civil Rights Act of 1964. TSU and TSUM further maintain that: (a) TSU and TSUM have discharged their duty under the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964 to disestablish the formerly de jure segregated "system" of higher education in the State of Alabama; (b) TSU and TSUM are not vicariously liable under the Fourteenth Amendment and Title VI for discriminatory acts by other institutional defendants; (c) TSU and TSUM have eliminated—to the extent practicable—all vestiges of segregation in higher education in the State of Alabama; (d) the Plaintiffs cannot maintain their claims because there is no public system of higher education in the State of Alabama, as that term is used in Title VI and the accompanying regulations. In addition, TSUM has always operated as a racially-neutral institution, and has no history as a *de jure* or *de facto* segregated institution; (e) the Plaintiffs' claims under Title VI fail because the Plaintiffs have failed to offer any evidence of discrimination by TSU or TSUM. TSU and TSUM do not discriminate against blacks in terms of student recruitment, admissions, retention, financial aid, student life and faculty hiring; (f) there is no discrimination in the assignment of institutional missions, funding, facilities or program duplication; (g) the Plaintiffs' Title VI claims fail because they have failed to "pinpoint" or to specifically identify any discriminatory activities or practices by TSU and TSUM; (h) the Plaintiffs' Title VI claims also fail because the Plaintiffs have failed to identify those federal funds which TSU and TSUM are allegedly using in a discriminatory fashion; (i) the Plaintiffs have not offered any evidence that TSU and TSUM have discriminated in the employment of black faculty members in violation of Title VI; (j) Plaintiffs' suggestion that the black population of the city or state in which TSU and TSUM is located is an appropriate benchmark for employment of black faculty is contrary to the law; (k) the Plaintiffs have failed to prove that TSU and TSUM's employment of black faculty members has a disparate impact upon blacks; (*l*) the Revised Criteria do not establish any duty on the part of TSU and TSUM; (m) the Plaintiffs have failed to show the elements for the imposition of a constructive trust. A constructive trust is inconsistent with Title VI; and (n) the Plaintiffs have failed to state a viable claim under Section 1983.

## G. State Board of Education

The SBE denied all the allegations of the Knight Plaintiffs and maintains that its consent decree with the United States provides full and complete relief to the Knight Plaintiffs.

The SBE also asserts the defense of *res judicata* and collateral estoppel based upon *Lee v. Macon County Board of Education.* This Defendant also denies that the programs at Athens State College or Calhoun State Community College unnecessarily duplicate programs available at AAMU or impair the ability of AAMU to attract white students.

With respect to Athens State College, it is contended that it is not and could not be a vestige of segregation since it did not come under state control until 1975.

## H. The University Of North Alabama

UNA denies the material allegations of the Plaintiffs' Complaints for the reasons asserted by the other Defendants.

### FINDINGS OF FACT

### GENERAL OVERVIEW OF HIGHER EDUCATION IN ALABAMA

## A. Enrollments

1. Alabama has 16 separately accredited public institutions that grant bachelors degrees. The names of the institutions, and their fall 1990 headcount enrollments follow:

| | |
|---|---|
| Auburn University | 21,537 |
| University of Alabama | 19,794 |
| University of Alabama at Birmingham | 15,356 |
| University of South Alabama | 11,584 |
| Jacksonville State University | 8,448 |
| University of Alabama in Huntsville | 8,139 |
| Auburn University in Montgomery | 6,261 |
| University of North Alabama | 5,622 |
| Troy State University | 5,024 |
| Alabama A & M University | 4,886 |
| Alabama State University | 4,587 |
| University of Montevallo | 3,250 |
| Troy State University in Montgomery | 2,736 |
| Athens State College | 2,770 |
| Troy State University in Dothan | 1,933 |
| Livingston University | 1,921 |
| Total | 123,848 |

STX 202.1.

2. The locations of these institutions are shown on the map marked and introduced as State Exhibit 85 and attached as appendix "A" to this Memorandum.

3. The University of Alabama is located in Tuscaloosa. It was chartered in 1819 and began operating in 1831. The University of Alabama System is governed by a self-perpetuating Board of Trustees, whose appointees must be confirmed by the State Senate. The UAS Board also governs two relatively independent branch campuses: The University of Alabama at Birmingham, which began in the late 1940's as a medical school, and The University of Alabama at Huntsville which began in 1950 as an extension center of UA.

4. Auburn University is located in Auburn. It was founded by state statutes in 1872 and designated the sole land grant college of Alabama under the 1862 Morrill Act. In 1899 its name was changed to the Alabama Polytechnic Institute and in 1960 its name was again changed to its current form, Auburn University. AU is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate. AU's Board also governs one branch campus, Auburn University at Montgomery which began operations in 1969.

5. The University of North Alabama is located at Florence. It was founded in 1873 as a normal school. It is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate.

6. Livingston University was founded in 1883 as a normal school for white females. It is located in Livingston and is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate.

7. Jacksonville State University was founded in 1883 as a normal school for white males and females. It is located in Jacksonville and is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate.

8. Troy State University was founded in 1887 as a teachers' college for white males and females. It is located in Troy and is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate. TSU has branch campuses in Montgomery and Dothan.

9. The University of Montevallo located in Montevallo was established by statute in 1893 as a school for white girls. It is now coeducational. It is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate.

10. The University of South Alabama was established by statute in 1963 and is located in Mobile. It grew out of an extension center of UA, but it is now governed by its own Board of Trustees appointed by the Governor and confirmed by the State Senate.

11. Athens State College, a public institution that provides junior and senior level curricula exclusively, had originated as a private college operated by the Methodist Church until 1975, when the Church offered it to the state because of financial losses. Over the objection of ACHE, ASC was accepted by the State Board of Education subject to the appropriation of operating funds by the Legislature. The Legislature appropriated funds and authorized ASC to function as an upper level (junior and senior year) college. In 1981 the Legislature placed ASC and CSCC under a single administration with the President of CSCC being the President of ASC.

12. Calhoun State Community College which offers first- and second-year college curricula, and ASC, which offers third- and fourth-year college curricula, are under the general supervision and control of the SBE. CSCC is part of the post-secondary system of community, junior and technical colleges operated by the Alabama State Board of Education.

13. Alabama State University is located in Montgomery. It was made a public institution for black students by an 1873 statute. It is governed by a Board of Trustees appointed by the Governor and confirmed by the State Senate.

14. Alabama A & M University is located in Normal, a suburb of Huntsville. It was chartered in 1873 and began operating in 1875. It is governed by a Board of

Trustees appointed by the Governor and confirmed by the State Senate.

15. All public senior institutions offer undergraduate courses leading to a bachelor's degree.

16. Most of the students who attend ASU and AAMU are black. All other senior institutions have majority-white student bodies.

17. The following table shows the number and percentages of black students at each public senior institution for fall term, 1976 (the earliest year for which ACHE has data) and fall term, 1990:

| | Fall 1976 | | | Fall 1990 | | |
|---|---|---|---|---|---|---|
| | Total | Black | % Black | Total | Black | % Black |
| AAMU | 4,564 | 3,229 | 70.7 | 4,886 | 3,763 | 77.0 |
| ASU | 4,163 | 4,133 | 99.5 | 4,587 | 4,469 | 97.4 |
| ASC | 1,068 | 58 | 5.4 | 2,770 | 176 | 6.4 |
| AU | 17,523 | 390 | 2.2 | 21,537 | 847 | 3.9 |
| AUM | 3,857 | 295 | 7.6 | 6,261 | 1,046 | 16.7 |
| JSU | 6,995 | 693 | 9.9 | 8,448 | 1,387 | 16.4 |
| LU | 1,403 | 276 | 19.7 | 1,921 | 527 | 27.4 |
| TSU | 4,194 | 538 | 12.8 | 5,024 | 800 | 15.9 |
| TSUD | 1,771 | 152 | 8.6 | 1,933 | 135 | 7.0 |
| TSUM | 2,223 | 318 | 14.3 | 2,736 | 642 | 23.5 |
| UA | 16,529 | 1,357 | 8.2 | 19,794 | 1,762 | 8.9 |
| UAB | 12,010 | 2,235 | 18.6 | 15,356 | 2,354 | 15.3 |
| UAH | 3,833 | 159 | 4.1 | 8,139 | 410 | 5.0 |
| UM | 3,306 | 198 | 6.0 | 3,250 | 238 | 7.3 |
| UNA | 5,054 | 345 | 6.8 | 5,622 | 421 | 7.5 |
| USoA | 6,855 | 592 | 8.6 | 6,957 | 1,115 | 16.0 |
| TOTAL | 98,633 | 14,968 | 15.2 | 123,848 | 20,133 | 16.3 |

STX 97, P. 7; 202.1, 202.3.

---

18. Alabama also has 39 two-year public institutions of higher education that do not grant bachelors degrees. Ten are junior colleges, seventeen are technical colleges, and twelve are community colleges which offer both junior college courses and technical college courses. SOF ¶ 188.

19. About 73,000 students attended Alabama's two-year institutions in the fall of 1990. STX 202.1.

20. In Alabama, participation in public higher education (as a percent of age 18–24 population) is higher than in any neighboring state and also higher than the national average. McKeown (2/13/91) 19–20; AUX 281, p. 13. Table 1.8.

21. About 20,000 black students[8] attended Alabama's public senior institutions in the fall of 1990. STX 202.3. They constituted 16.3% of the students attending those institutions. Id. 202.1; 202.3.

22. Enrollment of black students at the public senior institutions increased 35% between 1976 and 1990. The increase for all students during the same period was 26 percent. STX 202.1; 202.3.

23. About 14,600 black students attended Alabama's public two-year institutions in the fall of 1990. STX 202.3. They constituted 20% of the students attending those institutions.

24. Enrollment of black students at the two-year institutions increased 83% from 1976 to 1990. This figure was substantially greater than the 26% increase for all students. STX 202.1; 202.3.

25. A substantial majority—59 percent, in 1990—of black students attending public senior institutions in Alabama attend predominantly white institutions. STX 202.5.

26. In the years for which both enrollment and graduation data were reported by

8. Black Hispanic students are not included in these figures. STX 202.3.

race, the graduation rates for African American students at the HWUs have approximated or exceeded the enrollment rates of black students at those institutions:

| | 1982–3 | 1984–5 | 1986–7 | 1988–9 | 1990–1 |
|---|---|---|---|---|---|
| HBUs % of Total | | | | | |
| Black Enrollment | 40.6 | 39.6 | 38.2 | 40.1 | 40.9 |
| Bachelors Degrees Awarded Blacks [9] | 43.7 | 38.9 | 42.6 | 35.2 | 27.3 |
| HWUs % of Total | | | | | |
| Black Enrollment | 59.4 | 60.4 | 61.8 | 59.9 | 59.1 |
| Bachelors Degrees Awarded Blacks [10] | 56.3 | 61.1 | 57.4 | 64.8 | 72.7 |

These data generally show that both the HBUs and the HWUs graduate black students in proportion to their enrollment.

27. According to 1990 federal decennial census data published in early 1991, KX 3691, blacks are present in Alabama's population as follows:

| | TOTAL | BLACKS | % BLACK |
|---|---|---|---|
| Total persons | 4,040,587 | 1,020,705 | 25.26 |
| Age 18+ | 2,981,799 | 677,681 | 22.73 |

28. Graduation figures for 1988–89 reported by the public four-year institutions to the Legislative Fiscal Office, show the following (includes bachelors and graduate degrees):

| UNIVERSITY | TOTAL DEGREES | % BLACK | NO. DEGREES TO BLACKS |
|---|---|---|---|
| UA | 3,029 | 7.1 | 215 |
| UAB | 2,458 | 9.3 | 228 |
| UAH | 778 | 4.4 | 34 |
| ASC | 694 | 6.0 | 41 |
| AU | 4,207 | 2.4 | 101 |
| AUM | 796 | 9.7 | 77 |
| JSU | 1,301 | 9.4 | 122 |
| LU | 249 | 19.3 | 48 |
| UM | 422 | 4.9 | 20 |
| UNA | 877 | 4.1 | 36 |
| USoA | 1,501 | 8.7 | 130 |
| TSU | 1,026 | 13.4 | 137 |
| ASU | 361 | 92.2 | 333 |
| AAMU | 641 | 60.0 | 384 |
| | 18,340 | | 1,906 |

Percentage of all degrees awarded to blacks = 10.4 percent.
KX 901–13; 3664.

9. STX 217.

10. STX 217.

*B. Federal Financial Assistance For Alabama's Higher Education System*

29. The University of Alabama System receives substantial federal financial assistance through direct grants and contracts as well as indirectly through student loans and grants. UAS has received substantial federal financial assistance each year since 1964 and continues to receive such assistance today. SOF ¶¶ 93–95.

30. Auburn University receives substantial federal financial assistance through direct grants and contracts as well as indirectly through student loans and grants. It has received substantial federal financial assistance each year since 1964 and continues to receive such assistance today. SOF ¶ 96.

31. The University of North Alabama receives substantial federal financial assistance through direct grants and contracts as well as indirectly through student loans and grants. SOF ¶ 97.

32. Troy State University receives federal financial assistance through direct grants and contracts as well as indirectly through student loans and grants. It has received federal financial assistance each year since 1964 and continues to receive such assistance today. SOF ¶ 98.

33. Athens State College and Calhoun State Community College receive federal financial assistance through direct grants as well as indirectly through student loans and grants. They have received federal financial assistance each year since 1964 and continue to receive such assistance today. SOF ¶ 99.

34. Alabama A & M University receives substantial federal financial assistance through direct grants and contracts as well as indirectly through student loans and grants. It has received substantial federal financial assistance each year since 1964 and continues to receive such assistance today. SOF ¶ 100.

35. Alabama State University receives substantial federal financial assistance through direct grants and contracts as well as indirectly through student loans and grants. It has received substantial federal

financial assistance each year since 1964 and continues to receive such assistance today. SOF ¶ 101.

36. The Alabama State Board of Education receives substantial federal financial assistance through direct grants. It has received substantial federal financial assistance each year since 1964 and continues to receive such assistance today. SOF ¶ 102.

37. ACHE receives federal financial assistance through direct grants. It has received federal financial assistance in the past and continues to receive such assistance today. Federal financial assistance committed to ACHE from July 1, 1988, through March 31, 1989, was at least $89,-000. SOF ¶ 103.

SUMMARY OF THE HISTORICAL
EVIDENCE

38. The expert historians called to testify in this matter are perhaps the leading authorities in their respective fields.

39. Dr. J. Mills Thornton, born and reared in Montgomery, Alabama, is probably the preeminent living authority on the social and political history of Alabama. His doctoral dissertation at Yale (concerning antebellum Alabama) was supervised by C. Vann Woodward, the most respected Southern historian living. Thornton (11/5/90) 4–5. Dr. Thornton presently is full professor of history at the University of Michigan, one of the five leading history departments in the United States. *Id.* at 6–7. He has published extensively over the whole scope of Alabama history up to and including the Civil Rights Movement. KX 3116.

40. Dr. James D. Anderson, born and reared in Eutaw and Greene County, Alabama, is Professor of American History at the University of Illinois. Dr. Anderson has particular expertise on the history of American education in the South with an emphasis on the education of blacks. Dr. Anderson has published extensively and received national recognition for his work. Anderson (11/27/90) 10–17.

41. Auburn University's expert land grant historian is Dr. William W. Rogers. Dr. Rogers is a full professor of American History at The Florida State University in Tallahassee, Florida, and a native of the

State of Alabama. Dr. Rogers, who received his doctorate from Auburn University testified primarily about the development of Alabama's land grant system. Dr. Rogers publishes extensively in the area of Alabama history and serves as a referee of many scholarly journals.

42. This Court must address the intensely factual questions about whether vestiges of historical racial discrimination persist in Alabama's system of public higher education. These questions cannot be answered accurately without a clear exposition and understanding of exactly what those historical policies of discrimination were—their specific forms and content, how they were intended to disadvantage black people and what effects they actually had. As Dr. Thornton testified:

> [W]e are creatures of history and ... everything we are, everything we think, everything we can possibly believe is shaped by our past and on our experiences, and without understanding those experiences and the way in which history fundamentally creates our ways of looking at the world, we would fail to understand human beings.

Thornton (11/5/90) 27–28. And, as Dr. Anderson testified, an entire academic field was created, the History of Education,

> because of the recognition that both teachers, as well as researchers and educators, needed to understand ... the origin and development of educational institutions, that history was necessary for them to understand institutions in which they worked, how they developed, how they had obtained their shape and character and to also understand the broader political, economic and social forces which shaped education.

Anderson (11/27/90) 11.

43. Consideration of the present conditions without laying this historical predicate would either require uninformed speculation about events in the past, or the presumption that historical antecedents are universally known. In either case, there is no rational way for the Court to assure itself that a common basis exist from which to examine the present day practices which the Plaintiffs allege are tainted by Alabama's history of racial discrimination. Thus, the Court makes the following historical findings of fact.[11]

### A. The Nineteenth Century

#### 1. The Antebellum Period

44. Except at Mobile, which was founded by the French in the early eighteenth century, there were no whites in what is now Alabama until the Tombigbee settlement was founded in 1800 in southwest Alabama and the Big Bend settlements in modern Madison County in 1810. After Andrew Jackson's Tennessee militia defeated the Creek Indians in 1814, the United States began selling land in what was then the western territories of Georgia. Settlers poured into Alabama by the thousands during the period between 1816 and 1819. In fact the growth was so rapid that by 1819 Alabama had enough settlers in its territory to petition the Congress for statehood which was granted that same year. The settlers brought slaves with them to the newly open territory in contravention of the Northwest Ordinance. Upon the admission of Alabama into the Union, the provision of the Northwest Ordinance prohibiting the importation of slaves was removed. Thornton (11/5/90) 24–33.

45. Until after the Civil War, the only public institution of higher education in Alabama was the "State University" or University of Alabama in Tuscaloosa. When Alabama was admitted to the union in 1819, the U.S. Government granted the state land to support a university. Proceeds from the sale of this land were deposited in the Bank of Alabama and became an endowment for the university. By

---

**11.** In making historical determinations concerning the development of the state's educational, political and social institutions, this Court is crossing over into the domain of the historian. Historians of good faith fervently disagree over many of the issues that this Court is forced to decide. The Court makes no pretense that it is schooled in the principles of historiography, or that it can conclusively resolve facts over which historians differ. However, the historical findings which this Court must now make are based on the weight of the evidence within the record.

1821 the endowment had grown large enough for the Alabama Legislature to establish a board of trustees for UA. Its members were appointed by the state Senate and House of Representatives sitting in joint session. UA did not actually begin operating until 1831. At its opening, UA admitted only white students.

46. The land grant funds accepted in trust by the state were lost when the Bank of Alabama went bankrupt in the panic of 1837. But the state accepted the land grant amount as a permanent debt against the state and agreed in the future to pay "interest" on that imaginary amount. This interest constituted the sole support for UA during much of the nineteenth century. Thornton (11/5/90) 34–37.

47. Alabama adopted a slave code similar to Georgia's immediately upon its admission to the Union in 1819. In 1832, the year following Nat Turner's bloody insurrection in Virginia, the Legislature of Alabama, like those in most other Southern states, enacted a statute making it a crime to instruct any black person, free or slave, in the arts of reading and writing. KX 653, 1832 Ala.Acts, sec. 10, p. 16. In addition, among other things, the act provided criminal penalties, in the form of "lashes on the bare back" and being sold into slavery, for free blacks who wrote passes or free paper for slaves, sec. 11, who sold to or bought from a slave "any article or commodity whatsoever, without a written permission from the master," sec. 13, or who was found in the company of a slave without written permission of the master, sec. 14. Any person distributing "any seditious papers, pamphlets or writing, tending to produce conspiracy or insurrection or rebellion among the slaves or colored population" could be put to death. Sec. 13. Thornton (11/5/90) 37–39.

48. Dramatically evincing the resolve of whites during this period to totally control the thoughts and attitudes of all blacks, slave or free, the 1832 act even made it a crime for any slave or free person of color to "preach to, exhort, or harangue any slave or slaves, or free persons of color, unless in the presence of five respectable slave holders." KX 653, sec. 24, p. 18. On the other hand, the law was not to "be so construed ... as to prevent free persons of color and slaves from attending places of public worship held by white persons." *Id.*, sec. 22, p. 18. Thornton (11/5/90) 38–39.

49. With the possible exception of a creole school in Mobile, there is no record of a school for black children in the State of Alabama prior to 1860.

50. At the outbreak of the Civil War, there were about 1,900 public schools and 200 private schools serving Alabama's white school-age children. Thornton (11/5/90) 42. There were seventeen private colleges, and only one public college—UA.[12] *Id.* at 44.

2. The Reconstruction Period

51. The blood letting of the Civil War ended in April 1865, but the pain of Reconstruction was just beginning. During Reconstruction, the issue of access of newly freed black people to all levels of education was central to the political debate that characterized this historical period in Alabama. Blacks were able to vote for the first time, and the Black Belt [13] counties in particular elected black men and their white Republican allies to the Legislature. Thornton (11/5/90) 125.

52. During Reconstruction it is not possible to separate issues of partisan politics from the over-arching issues of race.

[T]he Democratic Party was a white supremacist party, and the Republican—and all blacks were Republicans, or essentially all blacks were Republicans. Now, there were elements within the Republican Party who were hostile to their black fellow Republicans, but all blacks were Republicans and all Democrats were white supremacists, so in that sense

---

**12.** Approximately 200 students were enrolled at UA at the outbreak of the Civil War.

**13.** The "Black Belt" counties are located in south Alabama and are so named because the soil in that region of the state is dark in color. Additionally, during the period immediately following the Civil War, the majority population in that area of the state was black.

... what you have is the overlay of ordinary American political forms of election and passage of legislation over what is, in effect, a revolutionary situation over a deep seated division within the electorate over the nature of the polity and so there is not that consensus about aims or common set of presumptions about the goals of democracy and the welfare of the republic that ordinarily informs and surrounds the competition between the parties.

In fact, the parties are deeply divided over the most fundamental philosophical issues and those issues, the issues that chiefly divide them are racial, that is to say the structure of the society, what the society is going to look like now that the blacks have been freed.

Thornton (11/5/90) 124–25.

53. The white supremacist attitude of this period is one which

desire[s] to preserve blacks in a subordinate position within the society. And as those whites, who held this idea would have understood it, to preserve civilization in the republic, ..., they understand themselves to be fighting to preserve the essence of the republic.

Thornton (11/5/90) 128.[14]

54. The dilemma for the Republican Party was always gaining and holding the support of enough white voters to parlay solid black support into electoral victory. The Democrats used the Ku Klux Klan and other means of violence, intimidation and social ostracism against those white persons who aligned with the Republican Party. Even white Republicans openly hostile to blacks' interests were ostracized merely for appearing on the same ticket with black candidates or for sitting in the Legislature with black Republicans.

And of course, in the case of some scalawags, that has the effect of driving them to ostentatious desire to demonstrate that they ... do not accept black goals and eventually it has the effect in some cases of simply driving them out of the Republican party and they join the Democratic party. By 1874 that had happened on quite a broad front and that's what we mean by drawing the color line, forcing all whites on one side and leaving the other side essentially black.

Thornton (11/5/90) 126–27.

55. As described by historian William Warren Rogers, any white politician who consents to appear before black politicians was looked upon

as a time-serving, degraded carpet-bagger, willing to accept office from a negro constituency.... The white man who would submit to be summoned by a few negro politicians and made to render an account of his stewardship, and eat his own words, is a stigma on his color, and is beneath the respect of the blackest and most ignorant negro in the United States.

Thornton (11/5/90) 127–28, *quoting* The Butler *Courier*, October 14, 1882, from W. Rogers, *August Reckoning: Jack Turner and Racism in Post–Civil War Alabama* 153 (1973).[15]

56. On September 12, 1865, a state constitutional convention opened in Montgomery with 99 elected delegates, all of them whites. The 1865 Convention consisted mostly of unionists; they differed with other native whites about secession, but they shared the deep-seated social and racial attitudes of other native whites. "All of

14. Dr. Adon Morris, an expert witness for the Knight Plaintiffs, and sociologist on the faculty at Northwestern University defined the current parameters of "white supremacy" in a sociological sense in the following manner:
[White supremacy] ... is a belief and practice which suggests that white people are superior to black people, number one. Two, that the experiences and viewpoints of whites are superior to the experiences and viewpoints of black people, That Europeans in general are superior to nonwhites, [noneuropeans], that western civilization is superior to nonwestern civilizations, and that black people are to serve white people.
Morris (12/5/90).

15. On numerous occasions, the Court allowed the parties to introduce excerpts from authoritative sources relied upon by the expert witnesses into the record. This procedure was applied throughout the trial without objection and with the consent of the parties. *See,* Thornton (11/7/90) 317–19 (discussing the admission of such exhibits).

[them] believed that even though freed, the blacks had to be carefully regulated and controlled by the state government in order to preserve social order and the safety of the white population." Thornton (11/5/90) 46–49.

57. The 1865 Alabama Constitution drafted by this convention denied blacks the right to vote, as had the Constitutions of 1819 and 1860, and it took no steps to provide them with educational opportunities. It apportioned representation in the General Assembly on the basis of white population. The all-white legislature elected under the 1865 Constitution enacted the so-called "Black Codes" for the regulation and control of black labor, refused to ratify the Fourteenth Amendment [16], and rejected proposals to give blacks the right to vote. Governor Patton said:

> We shall not only extend to the freedmen all their legitimate rights, but shall throw around them such effectual safeguards as will secure them in their full and complete enjoyment. At the same time it must be understood that politically and socially ours is a white man's government.

Thornton (11/5/90) 49–56 *quoting*, Bond, *Negro Education in Alabama: A Study in Cotton and Steel* 23, (1969).

58. On March 2, 1867, the First Reconstruction Act was passed by Congress over the veto of President Johnson. It abolished the provisional governments of the Southern states and established districts under the control of the Union Army. The Second Reconstruction Act, adopted March 23, 1867, provided for the registration of prospective voters "without distinction as to race, creed, or color," and for the holding of a Constitutional Convention to establish a new state government. A prerequisite to registration was subscription to the "Test Oath," a proviso that effectively disfranchised all persons who had held office before the Civil War and then had supported the Confederacy. Thornton (11/5/90) 56–57.

59. Of the 100 delegates to the 1867 Constitutional Convention, 19 were black, at least 26 were "carpetbaggers" (white Republicans who came to Alabama after 1865), and at least 48 were "scalawags" (white Republicans who were in Alabama before the Civil War), and three were Democrats. Four Republicans cannot be further identified. Thornton (11/5/90) 58–60.

60. The 1867 Constitution enfranchised blacks and apportioned representation in the General Assembly on the basis of total population, including blacks. After the re-registration, there were about 90,000 black and 75,000 white registered voters in the state. Thornton (11/5/90) 57–58. The previous three Alabama constitutions (1819, 1861 and 1865) had simply been declared in effect by their respective conventions. But the Military Reconstruction Acts required the new constitution to be ratified by the voters.

61. The election to ratify the 1867 Alabama Constitution was held in February 1868, along with elections to state offices. White conservatives adopted a strategy of defeating the 1867 Constitution by refraining from voting, since the Reconstruction Act of March 2, 1867, provided that the Constitution should not be declared in force until ratified by a majority of voters. The vote was 70,812 for and 1,005 against the Constitution, which was less than half the approximately 170,000 registered voters. But the conservative strategy failed when Congress admitted Alabama as a reconstructed state in spite of the fact that the original proviso had not been met. Thornton (11/5/90) 61–68.

62. All the conservative boycott accomplished was a Republican sweep of nearly all state offices. The Senate was composed of 32 Republicans, only one of whom was black, 10 were carpetbaggers, 21 were scalawags, and one was a democratic conservative. The House of Representatives had 97 Republicans, at least 26 of whom were black, and 3 Democrats. Thornton (11/5/90) 68–69.

---

**16.** Thirteenth Amendment was ratified by the Alabama Legislature during the Constitutional Convention of 1865. Thornton (11/5/90) 50.

63. Reflecting the importance blacks and Republicans placed on education, the 1867 Constitution completely centralized the entire state school system by delegating full legislative power over all education matters to the State Board of Education, ("SBE") including governance of the University of Alabama. Following the model of the Iowa constitution, the 1867 Alabama Constitution set up a procedure whereby the SBE would pass education laws, which then had to be signed or vetoed by the governor, with the SBE retaining the authority to override the governor's veto. In addition, the Legislature retained the authority to declare any act of the SBE void. Thornton (11/5/90) 80–82.

64. In the 1870 elections, the Democrats won the governorship, a majority of the House of Representatives, and elected the State Superintendent of Education. The Republicans retained control of the Senate (whose members served for four years) and the elected State Board of Education. Thornton (11/5/90) 69–70. By then, Congress had removed the civil disabilities of most former Confederates, allowing them to register and vote. *Id.* at 58–59. So many Democrats participated in the 1870 election, amid considerable Ku Klux Klan activity, particularly in the western Black Belt. Most of the white counties in the northern hill counties and the southeastern wiregrass counties voted democratic. *Id.* at 69.

65. One reason the incumbent Republican Governor, William H. Smith, was defeated by Democrat Robert B. Lindsey in 1870, was the presence of a black candidate for Secretary of State on the Republican ticket, James Rapier. Most whites, including Republicans, were infuriated over the prospect of a black state officer sitting in authority over white people. If Rapier had been elected, he would have been the first black person ever to hold statewide office. Even though Smith ran a close race with Lindsey, Rapier finished dead last among all Republican candidates. Thornton (11/5/90) 70–71.

66. One black man, Peyton Finley of Montgomery, was elected from his congressional district to the State Board of Education. After the election, lots were drawn to divide up the seats into two-year and four-year terms, and Finley drew a two-year term. He therefore served from 1870 to 1872. Thornton (11/5/90) 72–73.

67. The Republicans regained the offices of Governor and State Superintendent of Education and a majority of the House of Representatives in the 1872 elections. The Democrats, however, controlled the Senate by one vote. Thornton (11/5/90) 74–75. Republican rule would be short-lived.

68. In 1874 the Democrats drew the color line in order to eliminate the Republican threat to white supremacy once and for all. There was considerable intimidation and violence directed at both black and white Republicans, and outright fraud was used to stuff ballot boxes in the Black Belt. The Democrats circulated "massive fright propaganda" claiming that Republicans might seek racially mixed schools to win over whites in North Alabama, many of whom previously had voted with the Republicans. The Democrats won all the statewide offices and both houses of the legislature in 1874. Thornton (11/5/90) 75–76.

69. This Democratic victory led to adoption of the 1875 "Redeemer" Constitution, which

redeemed . . . white rule. Redemption in all of the southern states is a term which essentially means the tossing out of Republicans and particularly blacks from public life, and the conversion of all offices to white Democratic incumbency.

Thornton (11/5/90) 79.

70. The Democratic white conservatives who took control of the Alabama State House in 1874 spun a web of subordination around black schools sufficient to ensure adequate white control of black educational aspirations. Thornton (11/5/90) 139–40. While *de facto* segregation existed from the beginning of Alabama's public school system, the Constitution of 1875 made segregated schools part of Alabama's basic law. The members of that constitutional convention understood that this constitu-

tional segregation applied to all levels of public education. Thornton (11/5/90) 140–146.

71. The full scope and depth of the forms of racism created by post-Redemption white supremacy in Alabama is vividly described by Dr. Rogers in the preface to his book, *August Reckoning: Jack Turner and Racism in Post–Civil War Alabama* (1973):

The decades of [powerful Democratic] ascendancy came after 1874, as Alabama became a state whose institutions were frankly, admittedly, unashamedly, and triumphantly dominated by whites. The theory of white supremacy and black inferiority found daily expression and constant application. If Caucasian dominance became legally fixed and formalized (as it did), Anglo–Saxon superiority was no less manifest in unstated ways. If a white man and a black man met face to face on a narrow walk, it was the black who stepped aside to let the other pass; a white man's surname was always prefaced with "Mister," or some sort of title, a Negro's never; purchases paid for in cash primarily involved the color green until a merchant was confronted simultaneously with two customers whom he must accommodate according to black or white.

White superiority was no less evident in a verbal folklore spawned by, repeated by, and believed by whites: Negro men were naturally lazy and without ambition, desirous of having sexual relations with white women, incapable of higher reasoning, uncontrollable when under the influence of liquor, and cursed forever with an offensive body smell. And yet with all his negative qualities, the black, according to the Southern mystique, given proper guidance by his white mentors was carefree, musical, naive, gentle, mercurial, anatomically limber, religious (in an outlandish way), and humorous. Still, the black race, as everyone knew, *was* inferior, and all things proceeded from this basic premise.

KX 3129 (emphasis in original).

72. Emmet O'Neal, who attended the 1875 and 1901 Constitutional Conventions and who was elected Governor of Alabama in 1910, said in a 1917 address to the Alabama State Bar Association:

The constitution of 1875 placed no restriction on negro suffrage. The Federal government was under the complete control of the Republican Party, which was bitterly hostile to the South. The fear of Federal interference, therefore, prevented any effort on the part of the framers of the constitution of 1875 from undertaking to restrict negro suffrage or lessen its admitted evils.

The negro vote constituted an overwhelming majority in that portion of the state known as the black belt, and it was sufficiently large in many other portions of the state, in combination with the white republicans, to constantly threaten white supremacy, which was the chief tenet of the Democratic Party. The fear of negro rule, with the misgovernment which would follow, and the race conflicts which it would create, constantly threatened the state and checked its progress. White supremacy was maintained by methods which could only find their justification in the imperious necessity of self-defense and self-protection. Negro rule meant that the white man must surrender his home and lands or remain under conditions which were intolerable. The white race had settled Alabama and owned its lands and hence was determined not to surrender to an alien and inferior race, which had been brought to Alabama as slaves and which had acquired the right of suffrage only by grant from the victorious North, and as one of the results of the war.

KX 3240, pp. 9–10.

73. The SBE was very unpopular with white Democrats and scalawag Republicans "because it aggressively sought educational opportunities for blacks and it cooperated with the schools that had been established in Alabama by white northern missionaries during the years after 1865." Thornton (11/5/90) 83.

74. During the period of Redemption the SBE faced the wrath of the Democrats.

The 1875 Constitution abolished the SBE both as the governing body of the University of Alabama and as the governing body of the public schools, in large part because it had sought to further equal educational opportunities for blacks. There would be no State Board of Education in Alabama from 1875 until 1919. Thornton (11/6/90) 130.

75. The 1875 Constitution retained the State Superintendent of Education as an elected official and gave him the authority to appoint all county superintendents of education. Thornton (11/5/90) 130.

3. The Early Establishment of the Board of Trustees for the University of Alabama and Auburn University

i. *Auburn University*

76. In 1872, following the decision to make Auburn University the 1862 land grant college [17] the state Legislature established a separate gubernatorially appointed Board of Trustees for AU rather than placing Auburn under the authority of the SBE. Thornton (11/5/90) 123, 132.

77. The decision to structure the governance of AU under its own Board is at least as much political as it is racial. Thornton (11/5/90) 123. In 1872 there was a strong desire on the part of the Democrats in the Alabama House of Representatives to weaken Republican control of the SBE. Indeed, much of the Democratic hostility against the SBE proceeded from the fact that it was a Republican controlled branch of government. *Id.* at 123–24. While the state Senate is still under Republican control during this time, it is populated by a great many Republican scalawags "who are worried about racial supremacy, and so the racial element and the political element are linked together inextricably

... in the hostility to give administration of [land grant] funds to the [SBE]." *Id.* at 124.

78. The result of Democratic animosity to Republican control is the establishment of a gubernatorially chosen Board for AU. At the time Auburn was given its own Board, the governor of Alabama, Robert B. Lindsey, was a Democrat, and thus the effect of the decision is two-fold. First, the considerable moneys coming into the state through the Morrill Act of 1860 would not be under the control of the Republican SBE; and second, the University's Board of Trustees would be all Democratic and consequently all white.

79. In 1875, Auburn University's Board of Trustees is given constitutional status. Thornton (11/5/90) 132.

80. Upon review of the evidence, the Court is left with the firm impression that state partisan politics more than race played the major factor in the decision to give Auburn University a separate board of trustees in 1872.[18]

ii. *The University of Alabama*

81. Following the decision in 1875 to remove the University of Alabama from under the control of the SBE, UA was given a gubernatorial Board in the same manner as Auburn University. Thornton (11/5/90) 132. The University of Alabama operated with this form of governance until 1901 when a new constitution was debated and ratified.

82. The 1901 Constitution radically changed the manner of appointment to the UA Board, Thornton (11/5/90) 205. Instead of a gubernatorially appointed Board,

---

17. *See* infra, ¶¶ 534–607 and 750–761 for a discussion of Alabama's land grant system and AU's role in its development.

18. At least two historians expressly testified that one cannot easily separate politics from the issue of race in Alabama. *See generally,* Thornton (11/5/90) 124–126; Rogers (3/13/91) 17. Apparently, race and racial issues to some degree permeated every partisan political decision in post-war nineteenth century Alabama. Be that as it may, this Court in reviewing the evidence cannot and should not paint with as

broad a brush as the historian might himself or herself feel comfortable in doing. In situations where the Court is called upon to determine those instances where current practices are vestiges of past racial discrimination, this Court will require a more direct corollary between the "race factor" and the challenged practice than exist in this instance. Any thing less would put an onerous burden on the Defendants not susceptible to refutation within the normal confines of the judicial process.

the Board becomes self-perpetuating and the members of the Board themselves elect the successors when a vacancy occurs. The newly chosen member is, however, subject to confirmation by the state Senate. *Ibid.*

83. The impetus for the constitutional change of status for the Board of Trustees was essentially political. The change to a self-perpetuating Board was brought about at the instance of UA's alumni to minimize the influence of then sitting governor, Joseph Forney Johnston. Thornton (11/5/90) 205–10.

84. As governor in 1899, Johnston, maneuvered the legislature into repealing the call for a constitutional convention it had passed in 1898. This became a heated political issue in Johnston's unsuccessful campaign in 1900 to unseat longtime U.S. Senator John Tyler Morgan. Morgan attacked Johnston not only for canceling the previously authorized convention, but also for not enthusiastically supporting the disfranchisement of blacks. There was generally a deep hostility to Governor Johnston by the delegates to the Convention. This political animosity resulted in a number of constitutional provision which were directly intended as an affront to Governor Johnston's power. One of those provisions prevented a governor from running for U.S. Senate until a year after he left the governor's office. Another anti-Johnston provision was the self-perpetuating board of trustees for UA. Thornton (11/5/90) 205–10.

85. Part of the enthusiasm at the constitutional convention for the self-perpetuating board was that it eliminated the possibility that governors like Johnston would be able to manipulate the university's Board.

86. Prior to the change in the UA Board, Governor Johnston had been involved in the questionable sale of coal lands belonging to the University for his own pecuniary benefit. Governor Johnston accomplished this sale by manipulating and brow beating the Board into approving the sale. Thornton (11/5/90) 208. There was apparently considerable hostility toward Governor Johnston by many of those in the General Assembly—and in particular by UA alumni—who felt that his involvement in the sale of UA's coal lands rendered him unfit to designate board members to the university. There was also considerable disgust with the Governor over the strong arm manner in which he cancelled the 1899 constitutional convention. Thornton (11/5/90) 205–10.

87. Upon review of the evidence, the Court is left with the firm impression that state partisan politics and factors other than race played the major role in the decision to give the University of Alabama's Board of Trustees the right of self-perpetuation, subject to senate confirmation.

### 4. Blacks' Early Efforts For Equality Through Education

88. After the Civil War, during Congressional Reconstruction, a great struggle ensued over how much and what type education blacks in Alabama would have access to. The freedmen, who made up nearly half the state's population, laid all their hopes for social equality on education, and they flocked in great numbers to every school available to them. Blacks' aspirations were supported by Northern white missionaries, who opened schools that taught blacks liberal curricula and equal rights. They were opposed by most native whites, who used violence to discourage any kind of education for blacks.

89. The hostile attitude of white Alabamians toward the northern missionary schools for blacks during Reconstruction was succinctly stated by one of the Knight Plaintiff's expert historians, Dr. J. Mills Thornton.

[The northern missionary schools] were highly unpopular with considerable number of whites who regarded the education of blacks as a threat and particularly were unpopular because it was thought that these missionaries were teaching blacks false notions. They were teaching them equality of the races, they were teaching them to be assertive. They were encouraging them not to continue a subservient role in the economy as part of the labor force. And white

Democrats were also, particularly those allied with the Ku Klux Klan, were very hostile also to the history books that were used in these schools, because they thought that they presented a northern view of American history. Thornton (11/5/90) 83–84.

90. Access to higher education was particularly important to the freedmen's program of achieving full citizenship socially and economically. Higher education was the doorway to the many middle class social roles from which blacks had been excluded. "[T]he establishment of a black college therefore seemed to be essential to the general liberation of the freedmen." Thornton (11/5/90) 108.

91. The main pressure on Alabama's whites to establish black schools came from Northern missionaries, who taught the newly freed blacks such "alien" values as equality, brotherhood, and citizenship for all, along with the traditional three R's. Thornton (11/5/90) 83–84.

92. Whether the newly freed blacks were to be taught in integrated schools was an issue that consumed considerable debate but whose outcome was never seriously in question.

93. Among white Republicans, only some carpetbaggers favored school integration; very few of the native white scalawags did. In fact, 23 of the scalawag delegates to the 1867 constitutional convention had repudiated the constitution adopted by the convention because it failed explicitly to require segregated schools and prohibit miscegenation. Thornton (11/5/90) 63–64.

94. The Democratic charges in the 1874 elections that Republicans would promote school integration were outright lies. "[T]he scalawag element in the Republican party was strongly opposed to integration of the public schools. Very few scalawags would have accepted integration of schools or for that matter any other facilities." Thornton (11/5/90) 76.

95. In order to gain access to the education they so desperately desired, Alabama's black citizens compromised with conservative whites on two major issues: segregation and white control.

96. Black political leaders sought to require racially integrated schools. Black members of the 1867 Constitutional Convention promoted a requirement of integration, but white scalawags tried to write segregation into the constitution. As a compromise, the 1868 Constitution ended up requiring the SBE to establish "one or more" public schools in each township or school district. KX 655, 1868 Ala. Const., Art. XI, sec. 6. Then at its first session the SBE passed a law requiring each township to have a school for whites and a school for blacks, unless every white parent in the township was willing to have one racially integrated school. This provision had the necessary result of requiring segregated schools. Thornton (11/5/90) 85–86.

### 5. Blacks' Early Efforts To Establish Colleges

#### i. *Alabama State University*

97. The Reconstruction SBE in 1868 first provided education for blacks in the form of normal schools.[19] The 1868 action of the SBE did not require racially separate classes, but in 1869 the SBE provided for four normal schools, including Marion and Huntsville, each of which was to have one department for white students and one department for black students. Since there

---

**19.** In response to a question from the Court concerning the meaning of the term "normal school" Dr. Thornton gave the following reply:

[W]hen we hear the term normal school today, we usually think of it in terms of a collegiate setting. But in the 19th Century, the term normal education—it does indeed mean to train people to be school teachers, but it is not the same thing as saying that they would end up with a college degree, and in fact, in the case of most of the normal schools in Alabama, they don't end up with a college degree. They do end up with a teaching certificate. But a very large percentage of the teachers in Alabama don't have college degrees and among the black teachers, a considerable number don't have high school degrees.

Thornton (11/5/91) 195.

When discussing historical events it is apparently the practice of historians to speak in the present tense. Consequently, much of Dr. Thornton's testimony concerning the history of Alabama is delivered in the present tense.

were American Missionary Association schools at each of these places, the black normal classes probably met in conjunction with the AMA schools. Thornton (11/5/90) 89–90.

98. ASU's predecessor, the Lincoln School in Marion, was founded by black citizens with help from the AMA. In January 1867, the AMA sent a young white teacher from Ohio, Thomas C. Steward, to begin a school for blacks in Marion. Two white women were sent to teach as well, Miss. H.F. Treadwell of Massachusetts and Miss. May Senderling. Some 425 black students enrolled immediately, and Steward petitioned the Freedman's Bureau for assistance in building a larger facility.

99. General Wager Swayne, Commissioner of the Freedmen's Bureau in Alabama, agreed to help if black citizens themselves raised $500 and purchased the land. On July 18, 1867, nine black men, constituting the first governing board of ASU's predecessor, filed papers with the Probate Judge of Perry County incorporating "The Lincoln School of Marion." They were led by Alexander H. Curtis, a former slave who had purchased his own freedom in 1859. Curtis represented Marion and Perry County in the General Assembly for several years. The Lincoln School was wholly owned by the black people of Marion. The incorporation papers called for the election of the trustees by all black male residents of Marion over the age of twenty-one. The board had authority to hire and fire teachers and to manage the building and grounds. The $500 was raised among black people by private subscriptions, church contributions and two ladies' fairs. Local whites in Marion contributed $250 to the building fund. The land was purchased for $400. The freedmen cleared the ground and built the school. The Lincoln School was not supported by the Perry County School Board, but by black citizens, student tuition and the AMA. Steward was appointed principal, and was assisted by Miss. Treadway, the only other teacher. The Lincoln School opened with 113 students, all black. With overwhelming black voter support, Thomas Steward was elected Senator from Perry County in 1868. Thornton (11/5/90) 89–94.

100. To obtain needed funds, the black trustees agreed in September 1868 to lease the Lincoln School for ten years to the AMA. Thornton (11/5/90) 90. The black citizens of Marion, however, retained ownership of the property, and the all-black Board of Trustees continued to function even after the AMA assumed control of Lincoln. *Ibid.*

101. By the end of 1869, the Lincoln School faced its first financial crisis. The AMA's funds were running out, and the Freedmen's Bureau was phasing out as well. Even though Republicans controlled state government, they could not afford to offend too directly the system of white supremacy. Most white people in Marion were opposed to the Lincoln School because of the egalitarian style and content of education Steward and the AMA were affording blacks. In an attempt to force public funding of Lincoln, Senator Steward succeeded in getting a bill through the legislature on February 16, 1870, requiring Marion to levy a property tax of one-half of one percent to support education. Thornton (11/5/90) 91–92.

102. Whites were furious that their property would be taxed to support blacks' education, and a lawsuit was filed by a white citizen of Marion, Elias Dunkin. The court enjoined collection of the tax and was applauded by the white newspaper in Marion:

> It was a bare-faced attempt to rob the white people for the benefit of soap-eyed Steward, and as such it ought at least to have secured the condemnation at the hands of every white man in the town.

KX 3130.

103. During his two years of service on the SBE (1870–1872), Peyton Finley—the first elected black member of the SBE—was a strenuous advocate for the establishment of a university for blacks in Alabama. At the time of his election the University of Alabama was under SBE control. Finley's interest in a black university did not extend to the idea that the University of Alabama should be integrated. Thornton (11/5/90)

101. In fact Finley never advocated racial integration in education. To this end, he is quoted to have said: "the colored race have no desire or inclination, nor would they under any circumstances attempt to interfere with the action of the State University, by any claim or pretext of right thereto...." Thornton (11/5/90) 104, *quoting* Bond, *Negro Education in Alabama: A Study in Cotton and Steel,* 107 (1969). Instead, black political leaders—including Finley—pursued a policy of establishing separate educational institutions for blacks. Thus, the struggle for a black university must be seen as an effort to establish a uniquely distinct and separate black institution.

104. Desirous of achieving his dream, Finley, during his first session on the SBE, presented a resolution authorizing the State Superintendent to apply to Congress for the grant of additional public lands, like those used to fund the University of Alabama in 1819, to support the "establishment in this state of a university for the education of the colored race of this State." Thornton (11/5/90) 105.

105. The SBE accepted Finley's resolution, but nothing came of it as Congress did not act on the State Superintendent's memorial. Thornton (11/5/90) 105.

106. Whites had refused to attend UA while it was governed by the "radical" Republican SBE. Peyton Finley's election to the SBE gave credence to Democratic warnings that the Republicans intended to integrate the University of Alabama. Egged on by Ryland Randolph, editor of the Tuscaloosa *Monitor* and one of the few Democratic members of the Legislature, the Ku Klux Klan harassed and intimidated students who dared attend UA in 1871. There were fewer than a dozen students enrolled when the 1870–71 term began. Thornton (11/5/90) 97–100.

107. The assurance in Finley's resolution that blacks would not demand integration of UA was sufficient to restore white support for the University of Alabama. Thornton (11/5/90) 103–04. In fact, the Republican-controlled SBE had never intended to integrate UA, and it took steps to reassure white Alabamians. Finley's resolution was introduced at a joint meeting of the SBE and UA's alumni at the commencement exercises in Spring 1871, and apparently was part of a compromise that brought back alumni support and the new students that depended on it. Thornton (11/5/90) 102–04.

108. As a result of financial difficulties, the Marion school was ultimately forced to accept white control by the SBE. Nevertheless, due to the unrelenting efforts of Peyton Finley the 1873 law establishing ASU's predecessor as a state-supported school expressly said: "the intent and purpose of this Act [is] to provide for the liberal education of the colored race in the same manner as is already provided for education of the white race in our Universities and Colleges."

109. On December 5, 1873, the SBE passed a bill accepting the donation of the AMA's Lincoln Normal School in Marion on the condition that Alabama would make the school: "A State Normal School and University for Colored Teachers and Students." 1874 Ala.Acts, pp. 176–79. The act stipulated that state funding was contingent on the AMA and Lincoln's trustees turning over complete control of the building and grounds to the SBE. The act established the oldest liberal arts state college for blacks in the United States.[20]

110. Following the state's takeover of the Lincoln School, the SBE, appointed a Board of Commissioners to oversee the institution. The Commission, which was majority white, removed Mr. Steward and replace him with George Card, a white man whose racial views were more satisfactory to the majority of whites in Marion. Thornton (11/5/90) 96.

111. George Card was himself replaced as president by another white man, William Burns Paterson, in July 1878. Like Card—and unlike Steward, Paterson was well received by the white citizens of Perry Coun-

---

**20.** Lincoln University in Missouri and Alcorn College of Mississippi, established in 1866 and 1871 respectively, while older, are agricultural and mechanical colleges.

ty, having already demonstrated to whites in Greensboro, where he previously operated the Tullibody Academy for blacks, that his style of education would not offend the racial status quo. Paterson would develop a good relationship with the whites in Marion and would even invite them to the school's commencement exercises. He would assure them that "there will be nothing in the speeches, essays, or any of the exercises, which will be in the least offensive to anyone." Thornton (11/5/90) 146–47, 157–58; KX 3130, pp. 62–63.

112. Lincoln Normal School contributed significantly to the economy of Marion, and it quieted black opposition to the rule of white Democrats. Stephen Child, the only black member of the Board of Directors and spokesman for the blacks of Marion, stated:

> The action of the school board inspired our people with confidence in their management, and we were grateful for the interest manifested in our education and improvement.... Most of us have abandoned politics and have devoted our time and labor to securing homes, making an honest living, and educating our children.

KX 3130, p. 63, *quoting* Child's letter to the editor of the *Marion Standard,* January 12, 1887.

113. President Paterson and the Board of Directors for Lincoln never gave up their demands that the state fulfill the promise made in 1873 to provide black citizens university education. In the school's annual report in October 1886, John Moore, treasurer of the school, made this appeal:

> Again I desire to call attention to the fact that this institution was founded mainly for higher education of colored young men and women in the State. It was intended, as stated in the charter, to give them the same advantages as the whites have in their schools and colleges. So far it has been so conducted as to supply the colored race with just such training as was needed.... It is to be

hoped that the State of Alabama will fulfill the pledge it has already made to establish a university department on a liberal basis, so that its colored citizens may be able to receive here a liberal education.... The State Normal School and University is a distinctively Alabama institution.... There is much to be done yet to adapt this school to the wants of its patrons.

KX 3130, p. 64.

114. For the next ten years ASU existed in Marion without incident and is allowed to operate a university department.[21] Thornton (11/5/90) 136–37. In 1887, however, all that changes.

115. In 1887, Howard College, a white Baptist school in Marion was considering moving to Birmingham. Many of the white citizens were desirous of retaining Howard in the town and thought that if ASU were not located in Marion that the Baptist State Convention would not move Howard. Thornton (11/5/90) 171. Consequently, tension developed between Marion and ASU that spilled over into the student bodies of the two schools. Eventually there was a violent confrontation between white students from Howard and black students from Alabama State. The resulting furor apparently sparked a white outburst against the Lincoln school. *Ibid.*

116. In December 1886 a petition was circulated by some white citizens of Marion seeking Lincoln's removal "in the interest of the good people here...." KX 3130. The petition denied

> any prejudice toward the education of the Negro, for should this school remain here, it would inevitably close four institutions now fostered by our town. It has proven a stumbling block to our progress, by standing off those who would locate here to educate their children in our schools.

*Ibid.*

117. President Paterson gave this account of the precipitating altercation to Booker T. Washington:

---

**21.** Dr. Thornton testified "that the [teacher education] program at ASU's predecessor was considerably larger than the university program and the total number of graduates from the university department was small. But it was, nevertheless, every year two or three diplomas would be granted from the university department." Thornton (11/5/90) 137.

The real facts are that twenty to thirty of the Howard cadets surrounded one of our students, because he would not get off the sidewalk to let them pass. They clubbed him and would have killed him, but for his agility and bravery, he defended himself heroically and no one knowing the truth can blame him. There was great excitement for a few days, and we were prepared to repel an attack by Howard Boys.... This question of self-defense must be settled and the sooner, the better. An educated man will not and cannot take the abuse that an ignorant one will....

KX 3130, p. 68.

118. The blacks retaliated against the whites who wanted Lincoln removed with a boycott which drove three white merchants into bankruptcy. Stephen Child stated the position of black citizens:

We want the school to remain as it is. There are about three hundred children of school age around Marion. We are not able to send them off and we must try to educate them here. It will be hard for us to do it, if the school is moved; but believing as we do, that education is about all that this generation can give their children, we are determined to do our duty.

KX 3130, p. 69, *quoting Standard*, Jan. 12, 1887.

119. On February 9, 1887, C.D. Hogue, Representative from Perry County, introduced a bill in the legislature requiring the school to be located elsewhere and to be called the "Alabama Colored People's University." KX 654; Thornton (11/5/90) 172-73.

120. The state legislature passed the bill requiring "the State normal school and university" at Marion to be relocated, effective August 1887, without a dissenting vote. KX 654, Ala.Acts 1886-87, pp. 198-201, Feb. 25, 1887, sec. 5. In the Senate, R.H. Sterrett, from Jefferson County, had attached an amendment providing that the university "shall not be located in any community ... without the consent of the citizens of said community." *Ibid.* The 1887 Act "created and established a university

for the education of the colored people of Alabama, to be called The Alabama Colored People's University." *Id.*, sec. 1. The "Colored People's University Act" contained provisions intended to limit blacks' education and ensure it would not threaten white supremacy by encouraging blacks to covet social roles beyond menial laborer, including a prohibition against instruction in Latin and other classical languages and an emphasis on practical instead of academic training. Thornton (11/5/90) 174-75.

121. The Act required the Governor to appoint a board of trustees consisting of nine members plus the Governor and state superintendent as *ex officio* members. *Id.*, sec. 2. The first task of the new board of trustees would be to find another location for "The Alabama Colored People's University." *Id.*, sec. 3.

122. Governor Seay appointed an all-white board of trustees for the Colored People's University. Black citizens around the state protested and demanded at least a black majority on the board. Thornton (11/5/90) 173-74.

123. One black newspaper said that Governor Seay

made a serious mistake in ignoring entirely the colored citizens of the State in making his appointments of ... Trustees of the State Colored University. We fail to see the justice or equity of policy in appointing an exclusively white body of Trustees over a colored Institution. On the contrary, it is plainly evident that colored trustees or at least a mixed body would be better adapted to such an institution, would know its wants and needs better, and therefore be the better able to manage its affairs successfully.

KX 3130, Caver, p. 80, *quoting Gazette* (Huntsville), June 25, 1887.

124. Moderate whites thought the all-white board was needed to save the school. Fleming Law, a future white trustee from Union Springs, wrote to Seay opposing appointment of any blacks to the board, because it was "doubtful ... that any colored man you might appoint would be of any advantage to the board." KX 3130, Caver,

p. 76. Law contended that white board members would know the "character and wants of the Negro in mental or educational" needs, and that "the intelligent portion of the Negroes ... would have more confidence in the judgement and ability of the whites, than of their own color." *Ibid.;* Thornton (11/5/90) 175–77.

125. One of the new white trustees of ASU, Speaker of the House Thomas Goode Jones said:

> The absolute control of the Trustees over the institution ought to convince anyone that it could never become a hot bed of rudeness and insult. Education controlled and directed by our own people will repress not merely the expression but thought ... and produce on the contrary, politeness, good will, respect for authority and good deportment.

KX 3128, p. 11.

126. ASU's white board looked for a place to relocate the school. Black citizens in Birmingham, Mobile, Tuscaloosa, Brewton, Selma and Montgomery offered substantial donations of land and money to attract the school to their cities. But whites in most of those places (Brewton appears to have been an exception) bitterly resisted location of the black school in their town. When the Mayor of Tuscaloosa suggested it made sense to put the Colored University in the same vicinity as UA, the *Tuscaloosa Times* reacted vehemently:

> Some of our colored fellow-citizens have been making efforts to secure the location of the colored university for Tuscaloosa. We hope they will not succeed. We would consider such success the greatest calamity.... THE COLORED UNIVERSITY MUST NOT BE LOCATED AT TUSCALOOSA.

KX 3130, p. 81, *quoting Tuscaloosa Times,* March 16, 1887.

127. When Mobile, Tuscaloosa and Brewton were ruled out, the *Mobile Register* expressed its pleasure, saying Montgomery's advantage was that the "colored student ... can learn much about the noble art of 'shine em up, sir' in his leisure moments. We believe there are more boot-blacks in Montgomery to the square foot than any city in the country." KX 3130, p. 86, *quoting Mobile Register,* May 26, 1887. Thornton (11/5/90) 177–78.

128. The Board chose Montgomery, overcoming opposition both by some whites and by Booker T. Washington, who was concerned about the state institution's proximity to Tuskegee. The board selected Montgomery on condition that its citizens raise $5,000 and purchase title to the land by August 15, 1887. Virtually all this money and land was raised by blacks in Montgomery, led by James Hale, a wealthy black contractor. Thornton (11/5/90) 102.

129. The advocates of Montgomery as the site for ASU almost suffered a fatal setback in June 1887, when William Hooper Councill, President of Alabama A & M's predecessor in Huntsville, tried to ride in a first-class railroad car and was thrown off the train. As had been the case over the Howard incident in Marion, the Councill incident rekindled the ever present fear among whites that too much education would undermine the subordinate social status assigned to blacks. The Democratic newspaper in Montgomery raised the issue explicitly:

> The *Advertiser* has been throwing the doors of Montgomery wide open to the Colored State University. Nay more. We have been urging the white people to help the Negroes to help themselves. It is a good policy, it is humanity, it is business.
>
> Lately we are confronted with the question, "Might not the president of this same university march his school into the cars reserved for white people, leaving the colored coach empty, thus reenacting at our own depot the scenes of Saturday at Huntsville?" This fellow Council is doing his race more harm than he dreams of perhaps.

KX 3130, pp. 94–95, *quoting* Montgomery *Advertiser,* June 8, 1887.

130. To those white citizens of Montgomery who were concerned about the black school moving there, the local trustee, T.G. Jones, issued reassurance that the white board would totally control the school and that the school would be "an

industrial school." As late as 1876 the superintendent of education could say that the school was to give blacks "collegiate and University education," by 1887 a definite change had occurred. Jones, quoting from the act creating the university, emphasized that the purpose of the school was "that the students may be taught in the best manner possible, the things they are to live by; preferring always the English language and the industries to an education for culture only." KX 3128, p. 12.

131. Nevertheless, vigorous white opposition to the Colored University was aroused in Montgomery. Jesse C. Duke, editor of the black newspaper, the *Herald*, wrote an article on August 13, 1887, about the lynching of a black boy accused of raping a white girl:

> Every day or so, we read of the lynching of some Negro for the outraging of some white woman. Why is it that white women attract Negro men now more than in former days? There was a time when such a thing was unheard of. There is a secret to this thing, and we greatly suspect it is the growing appreciation of the white Juliet for the colored Romeo, as he becomes more intelligent and refined.

KX 3130, pp. 101–02.

132. Duke's editorial had an immediate explosive effect. Duke was run out of town, barely escaping lynching himself. And the uproar was quickly linked to the proposed Colored People's University. Thornton (11/5/90) 179–80.

133. On August 17, 1887, about one hundred white citizens met in Montgomery and adopted a resolution against location of ASU in Montgomery:

> [S]ince the *Herald*, an infamous sheet, published in this city by colored men and owned and edited by the most intelligent and educated of their race, who are signers to calls for aid to assist in bring[ing] to our city the colored university, has seen fit to express in the columns sentiments relative to the elevation and education of the colored man being an attraction and a preference toward him by the white ladies of this community; that as citizens of Montgomery, we depreciate

[sic] any further efforts being made to introduce any such 'educated' Romeos in our midst, and request that all subscriptions among the white people of this city withdraw their [support] or other countenance or aid in any matter whatever at once for the building of or bring to this city any such university.

KX 3130, pp. 102–03, *quoting Mobile Daily Register,* August 18, 1887.

134. On August 30, 1887, the *Montgomery Daily Dispatch* published an editorial that explicitly linked blacks' educational, political and social rights:

> What of all this recent ado about 'cuffy' and his college in the city of Montgomery? Have we so recently taken the wind out of the political sails of the radical party in becoming the fostering parent of co-education of the races in our midst, and elevated the Negro already to the conspicuous standard of Duke, McEwen and company? This demonstrates the aptness of the Negro for progressive retrogression and exemplified the natural effect of education on the colored race. Will not good result from the vile sentiments published to the world by these editors through the columns of this Negro sheet issued in the capital city of the State of Alabama? Duke is doubtless a true representative of his race and has demonstrated to some extent the effect which co-education would have upon the balance of his race.... I am a true friend to the Negro while he is in his proper place, and advocate the protection of his personal rights of life, liberty and property under the laws of the state and have no objection to the education of their race at their own expense, and separate and apart from the education of the white, and to let them work out the problems of their future destiny themselves.

KX 3130, pp. 104–05.

135. James Hale protested that his whole race should not be punished for Duke's intemperate views. Hale presented a series of resolutions adopted by some of the prominent black men "disclaiming sympathy with Duke or his paper, and con-

demning in the strongest terms the article" Duke had written. KX 3130, p. 107.

136. Some Montgomery whites filed suit to block location of ASU in their city. The plaintiffs argued that establishment of a black school would lead to social equality and the breakdown of white supremacy, and that the ASU board's decision to locate in Montgomery violated section 3 of the 1887 Act: *"Provided,* that no place shall be selected against the wishes of the people of said place." Thornton (11/5/90) 180–81.

137. The Alabama Supreme Court ruled for the white plaintiffs without expressly addressing their white supremacist argument. But the court's ruling had the same effect as if it had accepted plaintiffs' contention that university education for blacks was against state policy. In *Elsberry v. Seay,* 83 Ala. 614, 3 So. 804 (1887), the court held that the 1887 Act violated the 1875 Alabama Constitution by funding a university out of the common school fund. Since there was no chance the Democratic Legislature was going to appropriate other state monies for a black university, the ruling meant that, ASU was constitutionally restricted to the role of a normal school, the only kind of higher education that could be funded by the common school fund. KX 700; Thornton (11/5/90) 180–84.

138. The *Elsberry* court reasoned that the legislature was constitutionally bound "by the conservative principle" of the 1875 Constitution that public schools should provide "at least elementary" education, and that "the term, public schools, was employed in the constitution in its popular meaning and sense—the system of public schools to which the people of the State had been accustomed, and as they understand it, in adopting the constitution." 83 Ala. at 617–18, 3 So. 804, KX 700.

> Though separate schools for the children of the two races are wisely provided, equal benefit enures and is preserved by the apportionment of the aggregate school fund between the races, in proportion to the number of children of each race. The system may consist of graded schools—from the primary to the high school, and of higher grades; but provision should be made, when requisite, in each school for the education of all the children, within the constitutional ages, in the same branches; age, capacity and advancement only being regarded. The intention is, that education in the same branches shall be equally accessible to all the children of the State.

> The act in question, not only does not purport, but negatives the idea, that the University thereby established should constitute a part of the system of common schools. It establishes a University, with the implied privileges and powers appertaining to such institutions of learning, and as contra-distinguished from high schools, and even colleges. It is not subject to the supervision of the Superintendent of Education, in whom the constitution vests the supervision of the public schools. It provides for the appointment of trustees, who are empowered to elect a faculty, and such officers and agents as they deem necessary; to discharge any member of the faculty, or officer or agent, at their pleasure; to prescribe their duties, and fix their compensation; and, generally, to govern and control the faculty and the University, "so that the students therein may be taught in the best manner possible the things they are to live by, preferring always the English language and the industries, to an education for culture only." The act authorizes the trustees, in the event no suitable lands or buildings are given for the location of the University, to buy not exceeding forty acres of land, and, for the purpose of buying the land and erecting suitable buildings thereon, appropriates the sum of ten thousand dollars, payable on the order of the Governor, in amounts, and at times specified; and also appropriates for the support and maintenance of the University the sum of seven thousand and five hundred dollars annually, to be paid to the treasurer in equal installments, on the first days of January, April and October of every year; and further provides that these several sums so appropriated shall be set apart and

appropriated from the school fund for the education of the colored race.

83 Ala. at 618–19, 3 So. 804. The court recognized the authority of the legislature to establish universities separate from the public schools, provided they were not paid for out of the common fund. 83 Ala. at 619, 3 So. 804, KX 700.

> But the legislature is unauthorized, by express or implied repeal, to disturb or destroy the equality of the apportionment of the sum appropriated for public schools, between the respective races, and devote a portion of the amount apportioned exclusively to one race, to another foreign and distinct purpose, leaving the amount apportioned to the other race intact.

83 Ala. at 619–20, 3 So. 804.

139. The court then rejected the argument that its ruling effectively declared all the normal schools (including white normal schools) unconstitutional. "Normal schools may or may not be regarded a part of the system of public schools, and as adjuncts thereto, according to the provisions of the creating acts." 83 Ala. at 620, 3 So. 804.

140. The author of the *Elsberry v. Seay* opinion was Justice David Clopton, who formerly had been a law partner of the Chief Justice, George W. Stone. Both justices were "much less open to the advancement of blacks than either [Thomas G.] Jones or [Governor] Seay or the more moderate elements within the Democratic Party. . . ." Thornton (11/5/90) 185. Clopton had been a leading secessionist in Alabama and in the U.S. Congress during the years leading up to the Civil War. An extreme Southern rights advocate within the national Democratic Party during the 1850's, Clopton would later serve in the Confederate Congress during the southern rebellion. *Ibid.*

141. Chief Justice Stone vacated his seat on the Alabama Supreme Court in 1865 in response to the South's defeat in the Civil War. While Stone was off the court, he and Clopton formed a law firm in Montgomery that "became the principal law firm of the Democratic Party. It was very deeply involved in Democratic party politics and in the efforts to overthrow Republican rule." Thornton (11/5/90) 186; Thornton (11/7/90) 257–58. According to Dr. Thornton,

> there is no question that both Stone and Clopton had particularly aggressive white supremacist views and were . . . particularly dedicated during reconstruction to drawing the color line and were particularly hostile to Republicans, to the Republican party and all the things for which it stood.

Thornton (11/5/90) 187–88.

142. The black press across the United States berated the *Elsberry v. Seay* decision. The Cleveland *Gazette* said the Alabama Supreme Court's decision was an attempt "to defeat the Negro; to crush him out; to keep him in subjection; to prevent any more independent thinkers like Duke from rising up in their midst." Caver 110–11, *quoting Gazette* (Cleveland), March 31, 1888; Thornton (11/5/90) 189.

143. Of $7500 provided by the Legislature to support ASU, only $2500 had been received prior to the Supreme Court's decision. The school was forced to survive on this, a $500 gift from the Peabody Fund, and limited tuition, along with the money that had been raised by the black community. ASU went into debt, and had to be rescued by an act adopted February 20, 1889, appropriating public school funds for ASU to be operated strictly as a normal school. Thornton (11/5/90) 188.

144. By 1880, ASU is chiefly a high school dedicated strictly to a normal school function. It will be forty years before ASU will again grant four-year college degrees. "Indeed, Alabama State is going to remain essentially a black high school in Montgomery until 1921 when it is elevated to junior college status, and then in 1929, when it is once again restored to the status as a four year degree granting institution of higher learning." Thornton (11/5/90) 198.

*a. The State's Nineteenth Century Promise Of A University Education For Blacks At ASU*

145. The Court has examined the events leading up to the resolution of the SBE

adopting ASU's predecessor as a state supported institution. The resolution provided that the SBE would take control of ASU on the condition that Alabama would make the school "[a] State Normal School and University for Colored Teachers and Students" designed to "provide for the liberal education of the colored race in the same manner as is already provided for the education of the white race in our Universities and Colleges." 1874 Ala.Acts, pp. 176–179.

146. Much, though not all of the Knight Plaintiffs' argument in support of the enhancement of ASU is based on the state's failure to create at Marion (the location of ASU's predecessor) an institution which provided university level education to blacks. The historical repudiation of this "promise" is manifested in the early limitation of ASU's mission to that of a normal school. According to the Knight Plaintiffs the mission limitation continues to this day. The private Plaintiffs believe that the essence of the promise by the state acting through the SBE was that Alabama State would be the black counterpart of UA. It is contended that since the state has never fulfilled its promise, ASU is currently entitled to enhancement to achieve the original objectives of the state.

147. There is more than ample evidence to substantiate the Knight Plaintiffs' assertion that the state refused for discriminatory reasons to allow ASU to carry out a university mission starting in the late nineteenth century. Nevertheless, this repudiation does not entitle ASU as an institution to any redress against the state. The failure of the state to initially allow ASU its promised university mission is no more a basis of liability today than would a claim that Alabama State was not made the equivalent of UA or any other state institution during the era of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). Such arguments are constitutional anathema.

148. At the conclusion of the evidence the Court posed a series of questions to the parties and asked that they be briefed. One of the questions asked the Knight Plaintiffs was as follows:

Let me pose another question that the Court will have to face if there is a finding of liability, and that is simply how can the Court order the state to implement a full range of graduate and first professional programs at ... [Alabama State University] without running afoul of the Constitution of the United States, if the Court accepts the position ... that [ASU] ... [was] supposed to be [a] comparable institution[ ] with ... [the] University of Alabama?

Court's concluding remarks (4/16/91) 58. The Plaintiffs never addressed the Court's concern directly.

149. The legal quandaries faced by the Knight Plaintiffs on this issue are substantial. For example, the Eleventh Circuit has clearly held that neither ASU or any other state instrumentality has standing to sue the state under the Fourteenth Amendment or Tile VI. *United States v. State of Alabama*, 791 F.2d 1450, 1456 (11th Cir.1986). Of course, this is a claim brought by the Knight Plaintiffs who, in most respects are not the alter ego of either ASU or AAMU. Notwithstanding the clear lines of demarcation which usually delineate the Knight Plaintiffs from their Allied Defendants, their claims in this instance are indistinguishable from, and wholly dependent upon their close symbiosis with the ASU. In short, the claim is not one properly belonging to the Knight Plaintiffs. It is a claim based purely on the state's omission with regard to one of its instrumentalities. The objective of the claim is to secure for ASU institutional enhancement.

150. To the extent there was a promise, it offered no more than to "provide for a liberal education of the colored race in the same manner as provided" white college and university students by Alabama standards in 1874.

151. The Court has alluded to another difficulty with the Knight Plaintiffs' position, and that is, that the very nature of the state's "promise" is itself unconstitutional. It is illogical to believe that the Court can—or should—impose liability on the state today because of the state's failure to perform an obligation in the past, which

had it done so today would be unconstitutional. If the Knight Plaintiffs are asking the Court to obligate the state to comply with a prior unconstitutional legislative enactment, then this, the Court will not do.

152. The Court may be reading to narrowly the objective of the Knight Plaintiffs in raising the arguments which they have with regard to the SBE's actions and the failure of the state to follow through. The Court therefore emphasizes that its ruling on this issue is a very narrow one and concerns *only* the apparent claims which emanate directly from the breach of the state's "promise" to provide racially segregated university education for black students at the end of the nineteenth century. *On this issue*, the Court finds as a matter of law that the state has no liability and consequently it is not a basis upon which the Knight Plaintiffs may argue that they are entitled to relief.

153. Finally, to the extent there was a promise, it offered no more than to provide for the liberal university education of black students "in the same manner" as that provided white students in Alabama in 1874. Assuming that the promise had validity when made, there is certainly no indication that it was intended to last in perpetuity.

ii. *Alabama Agricultural & Mechanical University*

154. AAMU also began as an AMA teacher training school in the late 1860's under the name Huntsville Normal School. Thornton (11/5/91) 164. The Republican SBE, at the urging of its black member, Peyton Finley, accepted AAMU as a state normal school in 1873, although the school did not actually open until 1875. Thornton (11/5/90) 158–59.

155. The founding and survival of AAMU were largely functions of the political influence and vision of its first and longstanding President, William Hooper Councill. Councill, a self-educated, emancipated slave from North Alabama, became active in Reconstruction politics and won election as enrolling clerk for the Alabama Legislature, from 1872–74. Councill was responsible for the Huntsville school being included in the normal school legislation adopted by the SBE on December 9, 1873, and he obtained the principalship of the school. When the school did not open in 1874, Councill won a competitive examination to become principal of the Huntsville City School. Then, on May 1, 1875, he became principal of the state normal school in Huntsville, and, except for one year, he remained in that position until his death in April 1909. Thornton (15/90) 159–60.

156. Councill's career at AAMU was tumultuous. Councill paid the price of hostility from his own people when he decided to trust the promises of native whites to support black education and threw in with the Democrats. In 1874 he campaigned for the successful Democratic Governor, George Smith Houston. "During this time Councill's life was threatened and many attempts were made to do him bodily harm but always he escaped without any serious injury." KX 3128, p. 33, *quoting* Hopkins, "Founder's Day Address," pp. 153–55. Fear of alienating whites dominated Councill's early political thought, and he warned blacks that if they continued to oppose white Democrats, they would "come into power and take from you the ballot which you continue to cast against them." KX 3128, p. 34.

157. In 1882, the only black person from Madison County to serve in the Alabama General Assembly after Reconstruction cosponsored an unsuccessful bill to abolish Councill's school. Whether or not this intimidated Councill, in 1884 he withdrew from active participation in politics and stopped trying to convert black citizens to the Democratic Party. KX 3128, p. 34.

158. Councill devoted himself to AAMU. He gave all his own personal property to the school and encouraged the faculty to donate part of their salaries to support building needs.

Councill was largely responsible for the school's success and longevity. Huntsville was the only black normal school that was established during reconstruction under a black principal to survive under Conservative Democrats. By

cooperating with Republicans Councill received the appointment as principal. By becoming a Democrat he preserved his position and the very existence of the school.

. . . . .

Councill opened his school in "a little shanghai building" on Eustice Street in Huntsville on May 1, 1875, with an assistant, Rev. Alfred Hunt, and sixty-one students. By 1878 C.R. Donegar joined the staff in teaching an average of sixty-six pupils per month. The school spent $1,102.50 in 1878. On February 6, 1879, the legislature increased the school's appropriation from $1,000 to $2,000 per year. The average attendance for 1878–1879 decreased to fifty-one, but when Washington began Tuskegee in 1881, Councill's school enrolled 133 pupils, with an average attendance of ninety-four. Excepting bookkeeping, there was no evidence that Councill espoused industrial education at any time during his six years as president of a normal school before Washington came to Alabama.

Lacking the contact with Northern philanthropists enjoyed by Washington, Councill and his early faculty members built the buildings of the school through self-sacrifice. In 1881 Councill took the school's glee club on a tour of the country to raise money for land and buildings and to attract new students. By these means, augmented by private donations, $500 from the Peabody Fund, and "the strictest frugality in the application of the State's appropriation," the Board of Commissioners, in September, 1882, bought a lot for $3,000 and deeded it to the State. The Commissioners also remodeled a two-story building on the lot for use as a school building. Before this purchase the school rented several houses since it owned no property. The Commissioners also began collecting books for a library and reading room. Private individuals, Departments at Washington, and several Northern publishing firms "contributed to the project."

KX 3128, pp. 36–37.

159. In 1885, the school's commissioners persuaded the legislature to increase its appropriation to $4,000.

Along with the increased appropriation in 1885, the Huntsville school also received a new name, "The Huntsville State Colored Normal and Industrial School." This addition of "industrial" to the title of the school indicated a basic change in purpose from the original bill in 1873, to establish "a normal school for the education of colored teachers." The legislature did not add such a provision for industrial training to Tuskegee's charter until 1893.

KX 3128, p. 37.

160. Gradually, pressed by the need to attract funds from private philanthropic sources—the Slater Fund in particular—Councill added industrial classes to the Huntsville school's curriculum. "By the late 1880's both Councill and Washington were pushing for industrial education, while other teachers felt that blacks should have the same kind of education as the whites." KX 3128, p. 38; Thornton (11/5/90) 160–61, 165.

161. In the summer of 1887, the same year when ASU students were involved in a dispute with students from Howard College, AAMU had its own controversy when a few of its students sat in a first class railroad car near Huntsville reserved for whites.

In 1887 Councill and his students made mistakes that almost destroyed the school and did cost Councill the presidency for one year. In two separate incidents Councill and Normal students sat in a "white" railroad car. The incident involving just Councill might have caused no real trouble by itself because it occurred on a train from Tennessee to Atlanta. The incident with the students, however, occurred in Alabama and immediately stirred up a hornets' nest.

Actually, the first incident was far more significant outside Alabama, for it led to the first case decided by the newly created Interstate Commerce Commission. In the summer of 1887, while riding in a first-class car from Tennessee to Atlanta, Councill was handled roughly

and evicted. Councill sued for $25,000 damages and $1,500 lawyers' fee in *William H. Council [sic] v. The Atlantic Railroad Company.* The Interstate Commerce Commission received the case on July 23, 1887, and handed down its decision on December 3, 1887. The ICC refused to rule on damages, but, using the dictum of separate but equal, ruled that Councill had not been treated equally (since he had been refused first-class service for a first-class ticket) and directed the railroad to provide equal if separate service in the future.

Then on June 4, 1887, several of Councill's students entered the first-class car on the train from Huntsville to Decatur. One of these students, H.C. Hopkins, later recalled, "the affair was an entirely innocent one on the part of all concerned.... I don't think one of us had though [thought] about the matter at all. I know I had not." Councill was busy loading the students' baggage on the train and two lady teachers were helping some girls get on another car, so they knew nothing about what was going on. The students did not realize the seriousness of their action until they returned from Decatur. Some of the students went to Councill and "told him ... of a little friction with the porter and the conductor [that] took place when we attempted to put some girls in the first class coach." Hopkins remembered finding Councill in his office, "his face buried in his hands and crying as if his very heart would break.... He raised his head from his hands, and said to me in agony, 'Well, you all have ruined me.'"

The outcry against Councill and his school was so great after this incident that Councill submitted a letter of resignation.... The commissioners accepted his resignation and appointed [a white man,] Peter H. Clark of Ohio as principal.

Immediately the commissioners began receiving petitions for Councill's restoration from churches, Sunday Schools, teachers institutes, and other religious, educational, and fraternal organizations. Letters and petitions came from other states bearing notes of sympathy and support and sometimes containing donations to further the work of the school. This outpouring of support for Councill persuaded the commissioners to restore him as principal.

KX 3128, pp. 38–39; Thornton (11/5/90) 165.

162. The railroad car incidents triggered fears among some whites that higher education for blacks would lead them to make demands undermining the social order of white superiority and black subordination.

[These incidents] seemed clear proof to a number of whites that even the rather limited education that was being afforded at the school at Huntsville had been sufficient to give blacks, Councill himself, and his students, ideas above their station in life, that is had begun to demand for themselves rights, the granting of which might in the long term undermine white supremacy....

Thornton (11/5/90) 166–67.

163. Councill won one last major political victory in 1891, when he captured for AAMU designation as the state's 1890 Morrill Act land grant institution.

[O]nly four years after being forced out of his job for supposedly advocating "social equality," Councill defeated both a white man, W.B. Paterson [President of ASU], and Booker T. Washington [President of Tuskegee] in the contest for the black share of the money Alabama received under the second Morrill Land Grant Act.

In 1890 the Alabama Legislature appointed a special commission to visit the three black normal schools and then to recommend the best school to receive the land grant money. Considerations other than quality of instruction alone were important. After a brief attempt at cooperation, the heads of the three black normal schools began serious political competition for the funds upon learning that all the money would have to go to one school. In this game, Tuskegee seemed to hold most of the high cards. Of the three schools, only Tuskegee had

no serious disturbances. Although its appropriation from Alabama was lowest, Tuskegee had the largest total income (largely from Northern philanthropists), the most buildings, and the most students.

Tuskegee also had the support of Alabama's Senators, James Lawrence Pugh and John Tyler Morgan. In 1890 Pugh introduced an amendment to the Morrill Act to permit the land grant funds to go to schools which did not have "college" in their names. Senator Morgan was even more specific. Ignoring Councill's school altogether, Morgan said that there were two black normal schools in Alabama. The Montgomery school was "a fine literary college ... with a fine faculty," but Tuskegee had "done more good for the youthful colored population in that State than can be claimed by almost any other State in the South." Without Pugh's amendment, the money would go to the Montgomery school. Morgan believed it was "necessary therefore ... [to] avoid the feature of the bill which gave [the money] to colleges of like kind and give it to another institution which is called a normal agricultural and mechanical school at Tuskegee."

There are two basic explanations for Councill's being able to jerk the land-grant award out of Washington's eagerly outstretched hand. Since 1874, Councill had carefully cultivated Alabama's white leaders. He had intensified this campaign of conciliation after his restoration as Normal's head in 1889. His board of commissioners consisted of former Confederate officers while Washington's included many Northerners. Councill sought most of his school's funds in the South while Washington went North for Tuskegee's main support. Also, Councill had been a Democrat since 1874, while Washington was a nominal Republican. This does *not* mean that Councill "could out-Booker Booker." Both men shaped their rhetoric and developed their schools to please whites: Washington—Northern industrialists, Councill—Southern politicians. Councill's error was betting on the wrong horse, not gambling.

But it might be more accurate to say that Washington lost the land-grant money as much as Councill won it. In a speech to a Colored Convention in Montgomery on February 3, 1891, Washington attacked the 1891 school fund apportionment law and the practice of providing separate railroad cars for blacks. The inflammatory report of this speech in the local paper probably ensured that Tuskegee would not get the land-grant money when the legislature awarded it ten days later, February 13, 1891.

This did not explain why Paterson at Montgomery did not get the money. In the conflict with Paterson, Councill showed no scruples.... [He] urged the Alabama Legislature not to grant the funds to a black school headed by a white man. Evidently Councill knew his men, for he won the grant.

KX 3128, pp. 40–41; Thornton (11/5/90) 167–69.

164. After winning the land-grant designation for AAMU, Councill shifted the school's emphasis more to literary curricula.

Without totally ignoring industrial training, he then planned to emphasize "moral and literary [education] ... to the highest degree. there must first be a good literary and moral foundation or no substantial industrial structure reared—before any honest and intelligent work can be performed."

Councill's shift from industrial training to literary education came when he had lost hope in the promises of white Americans. In a speech in 1893, Councill noted that blacks "had met every condition of civilization to a degree commensurate with [their] opportunities, and yet there are and ever will be limitations to [their] development in this country." White prejudice would keep blacks out of all high political offices. Instead of diminishing this racism, civilization, Christianity, and black education "but intensify it." Councill saw only one viable option—migration to Africa....

When Councill began urging blacks at least to prepare their children to realize

their full potentialities, he also shifted from stressing industrial training to emphasizing literary education. While Councill believed that blacks primarily needed literary education, he had turned to industrial training, 1883–1893, to get money from the Peabody, Slater, and Morrill Funds to keep his school open. From 1874 to 1893, Councill had tried to work with Southern whites, trusting them to accept blacks when they "proved" themselves. By 1893, Councill realized that white racism made this impossible and turned in despair to the "Back to Africa" movement and to emphasizing literary education.

KX 3128, pp. 42–43.

165. Councill's association with the Back to Africa movement lost him support in the Legislature. As a result, in 1896 Tuskegee, not AAMU, began receiving $1,500 a year for an agricultural experimentation station. By now, white lawmakers were impressed by Booker T. Washington's famous "Atlanta Compromise" speech in October 1895 at the Cotton States and International Exposition urging blacks to attain economic security before seeking social and political equality. Also, Washington was friendly with the Secretary of Agriculture, James Wilson.

Of the three black, state normal schools, only Councill's failed to increase its income steadily up to 1901 (excepting the period of transfer of Paterson's school from Marion to Montgomery). By 1899 Normal reached its peak income, $34,414.32. In 1900, its income fell to $32,288.73; whereas Tuskegee's income in 1900 reached $197,630.69. Tuskegee passed Normal in enrollment in 1886. Paterson's school in Marion passed Normal by 1885. By 1900 Normal's enrollment was 509 in all departments, compared to 928 at Montgomery and 1,231 at Tuskegee. Normal was the only black normal school in 1900 which did not receive money from either Alabama's Agricultural Fund or from the Peabody Fund, which the legislature usually distributed.

Councill's policy of accommodation, trust, and cooperation with Southern whites had proved, in many ways, to be a failure. The tragedy was not just for Councill and his school, but for the white Southerner; for Councill had trusted the white South's promises of justice and equality for blacks and had shaped his career and the development of his school accordingly.

KX 3128, pp. 43–44.

166. Councill died with the bitter realization that he had been betrayed by the white state officials with whom he had cooperated in hopes of advancing the fortunes of AAMU.

For one so devoted to a school, "it was the disappointment of his life" that Alabama did not "rescue ... [AAMU] during his failing years." While [AAMU] did receive $4,000 annually out of the [public] school fund after 1885, and from $11,000 to $18,000 annually from the United States Government's [1890] Morrill Fund, [AAMU] never received "a special appropriation for debts or buildings or to buy stock, or equipment." In 1907 [AAMU] desperately needed $30,000 to repair its buildings. Councill, then "confined to a wheel chair most of the time and requir[ing] careful watching all the time ..., asked the state for $10,000.... He got nothing." Buchanan, Councill's successor, concluded a bit rhetorically that Councill died two year [years] later, in April, 1909, "a diabetic, we know, but perhaps with a broken heart."

KX 3128, p. 35, *quoting* Buchanan, "Founders Day Address," p. 11.

167. Thus AAMU went through three stages during the nineteenth century. As indicated, it began as a normal school. After Booker T. Washington's Tuskegee Institute was founded in 1881 as an industrial school, the state turned AAMU into an industrial school in 1883, although AAMU's president, William Hooper Councill, never fully embraced the model of education advocated by Washington and kept a liberal arts curriculum as part of AAMU's program. AAMU was given the name Huntsville Normal and Industrial Institute, and it continued to have a normal department as well as an industrial school. Following passage of the Second Morrill Act in 1890,

AAMU was designated the state's black land grant college by the state Legislature, and in 1896 its name was changed to the Agricultural and Mechanical College for Negroes. After its designation under the Morrill Act of 1890, AAMU was not considered to be one of the state's normal schools, even though it continued to train teachers of manual skills. From 1891 onward, AAMU was an agricultural and mechanical college for blacks with a normal program. Thornton (11/5/90) 161–62.

### 6. Educational Access and Black Political Power: the End of the Nineteenth Century

168. Educational opportunity for blacks in the nineteenth century is directly tied to their political empowerment. Both Alabama State and Alabama A & M were founded during Reconstruction, when, for the first time, blacks were allowed to vote and to serve in the State Legislature. From 1868 to 1874, blacks and their white Republican allies actually exercised majority control of state government. Nevertheless, native white Alabamians considered racial integration of the schools unthinkable and thought sharing political power with blacks was dangerous and demeaning. The University of Alabama remained all white and almost closed its doors in 1872 rather than submit to governance by a State Board of Education that had a Republican majority, including one black member, Peyton Finley. Funding for Alabama State and Alabama A & M had to come out of the blacks' share of the state's public school fund used to finance elementary and secondary education. Even this modest progress toward education of the black population was reversed in 1874–75, when the Democrats "redeemed" the state from "black rule" and constitutionally installed the structures of official white supremacy. The "Redeemer" Constitution of 1875 was the first Alabama constitution explicitly to forbid attendance of black and white children in the same schools.

169. Black educational opportunities declined directly in proportion to the decline of black political power after 1875.

[T]he absence of black participation and particularly the absence of black office holders really meant that the black community was at the mercy of Democratic politicians whose commitment was first and foremost to white supremacy.

Thornton (11/5/90) 190–91.

170. Black political influence did not disappear immediately, however, since not until the 1901 Constitution were most blacks disfranchised. Thornton (11/5/90) 193.

171. Along with the loss of political power came ever tighter, more oppressive white control of black educational institutions.

The white control, white Democratic and white supremacist control of black education in Alabama shaped the content of the curriculum because the schools were always to teach within the limits imposed by the knowledge that the kind of education which they imparted could never be permitted to challenge the supremacy of whites within the state, the existing social order and the subordinate position of the black race in the state.

Thornton (11/5/90) 191.

172. In Dr. Thornton's opinion, the limitation of ASU's mission to that of a normal school by the Alabama Supreme Court in *Elsberry v. Seay* was racially motivated:

I think that there were racially discriminatory motives in the minds of justices of the Supreme Court who rendered the decision, and I think that the elimination of the university function of Alabama State which had been permitted all of those years was a reflection of the growing maturity of white supremacy within the state. And certainly, the idea of not permitting blacks collegiate education was something that was congenial to white supremacists.

Thornton (11/5/90) 192.

173. Black Alabamians fully understood the direct relation between their political powerlessness, white control of their schools, and the inferiority of public education made available to them. They constantly made known their desire for autonomy with respect to black institutions—but

the first half of the twentieth century would bring black education no repose.

### B. The Twentieth Century

#### 1. Disenfranchisement's Impact on Black Education

174. The systematic disenfranchisement of blacks, accomplished by the 1901 Alabama Constitution was a main plank in the platform of Southern Progressivism culminating defeat of efforts in the 1890's to form political coalitions between Hill Country white Populists and black voters. According to Dr. Thornton, such a coalition threatened to undermine the color line of wite supremacy that had been drawn in 1874 with the ascendancy of the Democrats. Thornton (11/5/90) 200–04.

175. The 1901 Constitution [22] embodied a major compromise between white political forces in various parts of the state. Hill Country whites, Black Belt land owners, Bourbon whites and their "Big Mule" industrial allies, agreed that the Hill Country whites would control election of the governor through direct primary elections, while the Bourbons and Big Mules would preserve their interests by creating and maintaining a malapportioned state legislature that overrepresented Black Belt counties. Rogers (3/13/91) 48–58.

> Ever pragmatic in their approach to politics, the majority of the Bourbon elite took the lesson of the populist period to heart. Without the Negro vote, they could not maintain themselves in power. But as long as Negroes remained legal voters, there was always the danger that a dissident white group might capture the Negroes' confidence, and with these allies go on to effect a complete revolution in state government. Clearly, the way to prevent such an eventuality was to admit to some degree of power the excluded white groups from whose ranks

dissident movements had time and again arisen, while concurrently eliminating the Negro from politics. Of course, such a program meant a considerable diminution of power for the Bourbons, but, "half a loaf was better than none." The result was the Constitution of 1901. The Bourbons contented themselves with disproportionate power in the malapportioned legislature, while largely—through the institution of the direct primary—abandoning executive offices to the formerly excluded white groups. The Negro was removed as a possible bone of contention between the two segments of the white electorate by his disfranchisement.

176. Ironically, ratification of the 1901 Constitution would have failed if the Black Belt whites had not fraudulently stuffed the ballot boxes with captive black votes. Incredulously, the returns show that blacks voted for their own disenfranchisement. Thornton (11/5/90) 203–04.

177. As a practical matter, blacks had been denied a fair vote and a fair count even before the 1901 Constitution, because the Black Belt Bourbon white politicians used fraud and intimidation to manipulate the black vote to support conservative Democratic candidates. The threat of black political influence gave blacks the potential of determining election outcomes and thus some leverage—albeit minimal— to demand fair treatment. For example, the U.S. House of Representatives threw out the declared Democratic winners for congressional seats after the 1892, 1894 and 1896 elections and seated their Populist opponents based on the evidence of fraud with respect to the black vote.

> So that kind of intervention from outside could give blacks some sense that there was something to be gained by holding

---

**22.** The 1901 Alabama Constitution institutionalized and legitimized white supremacy. The delegates to the all-white convention fully support the doctrine of white supremacy. John B. Knox, president of the constitutional convention, stated in his inaugural address to the convention:

> And what is it that we want to do? Why it is within the limits imposed by the Federal Con-

stitution, to establish white supremacy in this State.

*Hunter v. Underwood,* 471 U.S. 222, 229, 105 S.Ct. 1916, 1921, 85 L.Ed.2d 222 (1985), *quoting,* 1 Official proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940).

on to this legal right to vote, even though it only in certain occasions never [sic] (ever) became a practical ... thing. After 1901 that hope is gone.

Thornton (11/5/90) 202–03.

178. The 1901 Alabama Constitution not only disenfranchised the black population but entrenched a system of educational funding that was designed to improve white schools by raiding black students' portion of the public school fund. This constitutional policy of racial discrimination in education was a hallmark of the so-called "Progressive" period in Alabama, as it was throughout the South.

> Vann Woodward in his *Origins of the New South* calls the chapter on progressivism For Whites Only. And that really is accurate, indeed one of the ways in which increased funding for white schools is achieved by the progressives is transferring of financial resources out of the black schools and towards the white schools.... [B]etween 1891 and 1908, the percentage that the black children are getting from the common school funds falls from 38 percent to 12 percent.

Thornton (11/5/90) 196–97. The gap between state funds received by white and black students grew at all school levels, including higher education. Thornton (11/5/90) 197.

179. Alabama's program of racial segregation in all aspects of society, especially with respect to education, received favorable comment from President Warren G. Harding who, in 1921 when in Alabama said the Negro should be allowed to vote

> "when he is fit to vote. I would insist upon equal educational opportunity" both for white and for black. Both should "stand uncompromisingly against every suggestion of social equality." this was because of a "fundamental, eternal, inescapable difference." ...

> There should be equal educational opportunity; but "this does not mean that both would become equally educated within a generation or two generations or ten generations." Negroes should not, by implication, necessarily receive the same education that white people receive.

> When I speak of education as a part of this race question, I do not want the States or the nation to attempt to educate people, whether black or white, into something they are not fitted to be. I have no sympathy with the half-baked altruism that would overstock us with doctors and lawyers, of whatever color, and leave us in need of people fit and willing to do the manual work of a workaday world.

KX 3131, pp. 243–44.

180. The combined action of disenfranchising blacks through the 1901 Constitution while requiring racially separate school systems, at the post-secondary as well as the elementary and secondary schools, left black universities such as AAMU without any political constituency or support. Trueheart (7/11/85) 2021.

### 2. Black Higher Education and the Progressive Period

181. The diversion of funds from blacks' share of the common school fund to the education of white students greatly accelerated during the Progressive Period (roughly 1900–1919). A cardinal element of the Progressive program was improvement of public education—but only for whites. The plundering of blacks' educational resources was a ready means to fund white educational improvements without raising taxes. ASU and AAMU, which were funded out of the common school fund, suffered this deprivation along with black elementary and secondary schools. Thornton (11/5/90) 196–97.

182. Full-fledged higher education for blacks had no place in the Progressives' scheme.

> Black colleges, while numerous, suffered from discrimination in the allocation of state appropriations and from private neglect in the wake of the decision by northern philanthropists to support the southern education movement for whites and programs of vocational education. Writing in 1903, William E.B. Du Bois warned that "the best of the Negro colleges are poorly equipped and are today

losing support and countenance...." Without a few strong, well-equipped black colleges, Du Bois wrote, "the forces of social regeneration will be fatally weakened, for the college to-day among Negroes is, just as truly as it was yesterday among whites, the beginning and not the end of human training, the foundation and not the capstone of popular education."

KX 3127, p. 269.

183. It was not just white Southerners who

insisted on a second-class education to prepare blacks for subordinate roles in the southern economy. The northern philanthropists insisted on the same. White supremacists themselves, northern reformers were not perturbed by the southern racism per se. They also viewed black Americans as an inferior and childlike people.... These philanthropists also shared the white southern belief in negro disfranchisement, even though they opposed movements to repeal the Fifteenth Amendment.... Some white southern leaders, particularly the "progressive" industrialists of the urban South, found virtually no conflict between their own political and economic views and those of the philanthropists. Thus the philanthropists were not a group of anti-racist, democratic northerners challenging southern racism by goodwill, tact, and hard work. Rather, white superiority seems to have been one of the few things upon which virtually all of the northern philanthropists and white southerners agreed.

KX 3133, pp. 92–94.

184. Where most white Southerners disagreed with northern philanthropists was with respect to their divergent opinions about the effects even industrial education would have on the continued political and social subordination of the black community. For example, the *New Orleans Picayune* charged that "just as soon as all the Negroes in the State shall be able to read and write they will become qualified to vote, and it is not to be doubted that they will demand their rights in the primaries with the 14th Amendment to back them up." KX 3133, p. 95.

185. Throughout the first half of the twentieth century, the northern philanthropy that had the greatest impact on public education in Alabama was the General Education Board ("GEB"), which was established by John D. Rockefeller in 1902 for the explicit purpose of supporting the development of education in the South. The GEB was by far the best endowed of these philanthropies. Rockefeller donated $1 million to start it in 1902, another $53 million in 1909, and an additional $120 million by 1921. Anderson (11/27/90) 58–59.

186. The Rockefeller Archives in New York houses the papers of the GEB, which are the most reliable, comprehensive source anywhere of primary materials concerning the history of twentieth century southern education in general and southern black education in particular. Anderson (11/27/90) 60, 65. Much of the testimony Dr. Anderson gave was based on primary sources from the Rockefeller Archives.

187. The members of the GEB and its agents in the South shared with Southerners a fundamental belief in white supremacy. The GEB worked almost exclusively through the state departments of education, even to the extent of paying the salary of the state officer in charge of black education. Historically black institutions desirous of financial assistance from the GEB had to be in good standing with the Southern whites who controlled the state educational agencies. Anderson (11/27/90) 66–67.

188. For example, William Hooper Council's requests for funding from the GEB typically would include endorsements from prominent white people. KX 740, (letter to John D. Rockefeller, dated March 17, 1904). The flyers Council sent to potential white donors suggested agreement that the subordinate positions of blacks and their educational institutions were ordained by God. Anderson (11/27/90) 91; KX 741.

189. Like the Slater and Peabody Funds before it, the GEB vigorously supported the Hampton–Tuskegee philosophy of education for blacks. Anderson (11/27/90) 79–

80. There remains much misunderstanding about the nature of the Hampton–Tuskegee model, which began at Hampton, Virginia in 1868. It was invented in Hawaii by Richard Armstrong, a missionary who thought special educational methods were needed to educate the

uncivilized and savage people, [of Polynesia], ... He was convinced that the first principle of civilization was hard work and what uncivilized people needed to be taught more than anything else was how to work hard....

Anderson (11/27/90) 67–68.

190. In 1868, Armstrong's son, Samuel, replicated his father's educational model at Hampton Institute in Virginia. He thought African Americans "were much like the dark skinned people in Hawaii ... uncivilized." Anderson (11/27/90) 68–69. Even though blacks had worked hard in slavery for 250 years, Armstrong thought they had not internalized the ethic of hard work. He also thought the post-Civil War prosperity of the South depended on the availability of blacks trained for and contented with hard manual labor. *Id.* at 69.

191. The Hampton model, later transported by Dr. Booker T. Washington to Tuskegee, actually was a normal school program, where blacks were taught to be teachers of manual laborers. "The great misconception about Hampton and later about Tuskegee is that they were designed primarily to teach trades or to teach agriculture. They were not." Anderson (11/27/90) 69–70. The Hampton–Tuskegee method developed the proposition that the best way to train black teachers was to teach them to do hard manual labor themselves. Classical academic subjects like Greek and Latin were forbidden, because it was feared the black students would acquire "high flung notions about themselves" and become discontented with unskilled and semi-skilled labor. In other words, educated black people would be injurious to the agriculture and industry of the "New South." Anderson (11/27/90) 69–70.

192. Under the Hampton–Tuskegee model, black students would work in the fields or shops from dawn to dusk, then attend classes in rudimentary subjects from 7:00 to 9:00 p.m. This was how Dr. Washington himself was educated and was the regimen he established at Tuskegee in 1881. Anderson (11/27/90) 71–72.

193. With over $130 million to spend, the GEB dominated Southern state educational agencies, which were desperately short of funds. Not only did the GEB pay the salaries of state school officials, it contributed the funds for development of the county training schools for blacks and paid the "Jeannes," teachers who supervised the county training schools. Since the early founders and administrators of the GEB were also trustees of Hampton and Tuskegee, they were particularly enamored of the Hampton–Tuskegee model of education and supported such programs with considerable sums of money. Consequently, all black institutions had to at least pretend they were operating the Hampton–Tuskegee model in order to survive. Anderson (11/27/90) 72–73, 76, 113, 193, 271–72.

194. What Southern white officials and the GEB considered to be the fundamental educational interests of blacks in the South "differ[ed] very sharply from blacks' own interest in education." Anderson (11/27/90) 77. These white interests were "pervasive and intruded into almost every aspect, every decision made regarding black education in the late 19th century until well into the 20th century." *Id.* at 79.

195. Blacks resisted the government's educational plan for them, but were largely powerless to oppose it.

Booker T. Washington stood alone virtually in his advocacy of the normal school industrial education in Alabama at that time. That almost all of the black educators and all of the black institutions stood against this model. It became increasingly difficult, however, to fight that model because the GEB was one of three foundations that supported it.

Anderson (11/27/90) 79.

196. William Burns Paterson, one of the early presidents of ASU was a staunch opponent of the industrial education model. Paterson retained Latin and the classics in

his teacher training curriculum, which made the GEB and Slater Funds hostile to ASU. But it endeared Paterson to other black educators, who recognized in Paterson a champion of blacks' own educational interests, as opposed to those of whites, and who elected him the first President of the all-black Alabama State Teachers Association in 1882. Anderson (11/27/90) 81, 216–20; KX 762, 762.1.

197. Paterson's graduates performed as well or better than whites on the state teacher examination and went on to become successful educators. In 1904, an agent of the GEB reported that President Paterson

has been influential in Negro education in Ala. for a number of years, and still has a large and devoted following among the teachers of the State. He is not a blind follower of industrialism, however, and to this, in a certain way, is due his unpopularity at Tuskegee.... Mr. Patterson's [sic] school is very popular in Montgomery. His students come from the best class of the people. He has done a great deal to supplement the education of the Negroes in this locality.

KX 762.3, p. 4; Anderson (11/27/90) 226–28.

198. John W. Beverly, a charter member of the ASU faculty when it started in Marion, succeeded Paterson to become the first black President of ASU. Beverly published a history of Alabama that includes one of the first histories of blacks in the state. For a time it was used in the public schools. Anderson (11/27/90) 229–30, 251–52; KX 3645. Beverly maintained ASU as a normal school with a liberal arts base. Anderson (11/28/90) 255.

199. One of the white trustees of ASU reported in 1903 that "this school receives $13.00 per pupil, or ⅓ of the amount received by the next lowest white Normal School in Alabama, and ⅒ of the amount received by the white Normal School in Ala. receiving the largest financial income." KX 762.2.

200. In 1906, ASU was receiving only $8500 from the state, $3500 from the Slater Fund, $2000 from the Peabody Fund, and $3000 in tuition, paid mostly by students in the elementary school. $1000 had been donated by the black community in Montgomery to fit the school with desks. Anderson (11/28/90) 233–34; KX 762.4, p. 9.

201. In 1916, one of ASU's white trustees represented to the GEB:

Although an institution owned and controlled by the State of Alabama, this school is in every good and proper sense, the property of the negro race.

The negroes gave the land to the State, and to say nothing of many improvements made by them from time to time, they contribute anywhere from $3,000.00 to $5,000.00 annually in tuition towards its support....

The State gives the school $16,000.00 per annum for running expenses. This is used almost wholly for teachers salaries and for maintenance.

KX 762.7, p. 1; Anderson (11/28/90) 258.

202. Following the 1901 disfranchisement, black higher education in Alabama entered its bleakest period. Anderson (11/28/90) 248–49.

203. William Dorsey Jelks, who was Governor of Alabama from 1901 to 1906, believed that even teaching blacks to read was a "curse" on the material interests of the South. KX 3239, p. 391. He thought education had failed to teach blacks the "love of work." Id. at 393. He regretted that the principles of free speech prevented white state government from controlling the black church, but he insisted that white control of black education should ensure that blacks were taught their menial place in society. Id. at 393–94. He wished there were some "air ship" that could simply transport Alabama's black population to Africa or the Philippines. Id. at 390. Anderson (11/29/90) 463–68.

204. At AAMU, William Hooper Councill hoped to provide his students a classical academic education, but once his school was designated the black land grant college for Alabama, he had no choice but to conform AAMU's curriculum to the industrial education model in order to obtain funding. Anderson (11/27/90) 82. Never-

theless, the land grant designation enabled Councill to retain a small college department at AAMU well into the twentieth century, at a time when ASU had been reduced to non-collegiate, normal school training that was more on a high school level. *Id.* at 85, 90, 115–16; KX 740.

205. Throughout the Progressive Period, ASU, AAMU and members of the black community continued to express disappointment about the nature of the educational offering available to blacks. Anderson (11/27/90) 92, 242–43; KX 742. The GEB agent reported in 1906:

> Many of the more intelligent men about the city who were among the early supporters of [ASU] are disappointed in it, because it is so elementary in character. They thought they were going to get an institution that would give collegiate training. Nevertheless they even approve of it as far as it goes and send their children accordingly.

KX 762.4, pp. 10–11. In 1916 and 1919, President Beverly of ASU was reminding the GEB that, from its founding in 1873 as the Lincoln Normal University, ASU "was intended for a Normal School, and a school for higher education of the colored race." KX 762.6, p. 2; KX 762.10.

3. The Period Between the World Wars

206. In 1917 the Alabama Legislature passed a compulsory attendance law that placed even greater demands on the already grossly under-funded HBUs. President Beverly of ASU reported "a great dearth of teachers in the Colored Schools of the State of Alabama. And most of these, more than two thousand, hold third grade license, the lowest grade issued by the State." KX 762.9, p. 1; Anderson (11/28/90) 266–67.

207. In 1919, ASU and AAMU, along with the white teacher colleges, were placed under the governance of the State Board of Education, as part of a larger restructuring of the public education system. KX 762.11. Both HBUs were restricted to junior college curriculums. Until now, AAMU had maintained a small college department despite the hostility expressed toward it by state officials and the GEB. ASU actually was upgraded by being authorized to operate a junior college; since the *Elsberry v. Seay* decision in 1887, it had been gradually reduced to elementary and high school grades. Anderson (11/27/90) 115–16.

208. As part of the general educational reforms of the progressive period, the state was beginning to open county training schools for blacks in many parts of Alabama, which in turn increased pressure on the black normal schools. Alabama already had the highest student-to-teacher ratio for black schools among the Southern states. KX 746, Table VII. As high school curricula began to be installed in the counties, black teachers with bachelor degrees were required by SBE regulations to staff them. Anderson (11/27/90) 116–18. Since none of the black state institutions in the south were offering full collegiate programs, it was necessary to hire black teachers from the North with bachelor degrees. These Northerners were more likely to resist the structure of white supremacy in Southern society.

> The question is more serious because of the increasing number of teachers from the North and West. An institution is likely to get in more at a time than it can assimilate. We are going to have more of them simply because we are demanding teachers [with] ... academic and professional training which can at the present time be secured by colored people only in the Northern universities. To a white visitor it is no unusual experience to meet in these state institutions teachers with an air of condescension and reserve which make him feel that he is unwelcome.

KX 746, p. 30; Anderson (11/27/90) 106–14.

209. With the increased demand, state officials and the GEB began modifying their educational policies for blacks by restoring enough collegiate programs at the HBUs to provide a pool of black high school teachers trained in the South. Though on the whole the pool remained

inadequate. Anderson (11/27/90) 114, 123–24.

210. In 1921 the GEB made its first grant to ASU, $30,000 for the construction of a dormitory, which was conditioned on a $20,000 appropriation by the state legislature. KX 762.12; Anderson (11/28/90) 264. The GEB also gave ASU the funds to open a summer school for black teachers in 1921. KX 762.12, letter dated Jan. 17, 1925. It was mainly through this summer school that black teachers were able to upgrade their certifications. Over 400 students enrolled at ASU in the Summer 1921, and 842 were enrolled by 1924. In this way, ASU's summer school becomes an operation of major importance for Alabama's black teachers for years to come. *Ibid.;* Anderson (11/28/90) 281–82.

211. By 1926, state government "had started to come full circle" with respect to the historical missions of ASU and AAMU.

It established A & M as a land grant in 1891, and of course it established Alabama State as a college in 1873. And now after years of restricting these institutions to something far less than a college, the demands on the state with respect to its own regulations, the education of the black population, the pressing needs in the state, by this time it is starting again to view A & M in the way it was envisioned when it was established in 1891 and also starting to view Alabama State with respect to higher education and the way that it was envisioned when it was established in 1873. So this is a period when they began to talk about these institutions as Negro institutions of higher learning....

Anderson (11/27/90) 137–38, 140–41.

212. In 1928, State Superintendent of Education R.E. Tidwell made the following representation to the GEB about AAMU's official mission:

The school is designed to serve the entire negro population of the State, providing opportunities for those interested in agricultural and mechanical vocations. At the same time, this institution serves as a center where pre-professional training may be secured by those who desire to enter the schools of medicine and law open to negro students. Incidentally, it is training an increasing number of young men and women for the teaching profession, though this is not its primary function.

KX 748, letter dated 10/11/28, p. 1; Anderson (11/27/90) 139–40.

213. In pursuit of the new policy, the State Superintendent applied to the GEB for money to construct buildings on the AAMU campus. But the new policy retained the old restrictions with respect to the occupations blacks would be permitted to hold and the corresponding programs AAMU could offer. The proposed new mechanic arts building, for example, would only provide

training in a number of occupations in which negroes are engaged, or may engage in successfully. Auto mechanics, carpentry, brick laying and numerous others could be mentioned ... in which may be found many prosperous and successful negro citizens.

KX 748, Exhibit A, p. 3. There would be no black engineers. Unions would not hire blacks in the engineering trades, so the state would not train blacks in those areas, "because it would only present race friction." Anderson (11/27/90) 168.

214. During the first administration of Governor Bibb Graves there was a considerable increase in funding for public institutions of higher education, including the HBUs. Anderson (11/27/90) 148–49.

215. The twelfth grade was made available to (a few) black students for the first time in 1924–25. There were only 199 black students enrolled in the 12th grade in Alabama's public schools. Prior to this time, blacks had to find private schools to complete high school. Anderson (11/28/90) 308; KX 762.19, pp. 11–12.

216. In 1931, the General Education Board was told by its agent that the black land grant colleges

will need the financial cooperation of educational foundations for many years to come. They are not yet competent to walk alone, and their State governments

have not yet reached the point of seeing and responding to their needs and their opportunities on a basis which guarantees the gradual, systematic development which the requirements and capacities of the Negro populations warrant. KX 753, p. 3.

217. By 1930, with a black population over 900,000, Alabama had only 1,189 black students in college, ranking the state twelfth lowest among Southern states with respect to per capita black college attendance. (Louisiana, South Carolina, Georgia, Arkansas and Mississippi, in that order, were even lower.) KX 762.18, p. 18. With the state now demanding a college degree for high school teachers, there is a great shortage in Alabama, and ASU and AAMU "began to really feel the pinch, and there was increasing demand for admissions to college at that time." Anderson (11/28/90) 300.

218. By 1940, Alabama still was not providing elementary school training for all its black children, and only 16 percent of eligible black children were enrolled in high school. Anderson (11/28/90) 295–97.

219. The absence of public high schools for blacks in Alabama meant the HBUs had to provide high school training, not only for their local black communities, but for the college students who enrolled. Anderson (11/28/90) 296–97.

### 4. Alabama's Response To Federal Enforcement of Separate But Equal

220. The state was forced to modify its strategy of black subordination in education after the 1938 decision of the U.S. Supreme Court in *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938). This decision held that states practicing segregation in education had to provide equal undergraduate and graduate programs for their black citizens. *Gaines* particularly frightened white state government in Alabama "because Alabama did not have graduate and professional

schools to which blacks in the state could go." Thornton (11/5/90) 220.

221. In response to *Gaines*, Governor Chauncey Sparks' administration and the State Legislature began substantially increasing the budgets of ASU and AAMU in an effort to gain them academic accreditation and satisfy the Supreme Court's mandate. Neither the Governor nor the Legislature considered integration of the state's colleges and universities an option. The state's campaign of institutional enhancement resulted in both ASU and AAMU receiving accreditation in 1946 by the Southern Association of Colleges and Universities. Thornton (11/7/90) 234.

222. In 1948 ASU's name is changed from Alabama State Teachers College to Alabama State College for Negroes, in order to emphasize its broadly collegiate function. In addition, the state implemented a plan to pay a percentage of the tuition for black students who could not get graduate or professional training at ASU, AAMU or Tuskegee so that they could attend graduate schools out of state.[23] This practice continued until 1966. SOF ¶ 120.

223. In response to the *Gaines* decision, the Alabama Legislature in 1940 created an Educational Study Commission charged with determining what "level of higher education for blacks ... would be sufficient to satisfy the standards set up by the Supreme Court...." Thornton (11/7/90) 228.

224. The Educational Study Commission in turn contracted with Dr. Edgar W. Knight of the University of North Carolina at Chapel Hill to conduct an investigation and prepare a staff report. Dr. Knight was a prominent Southern historian of education, who tended to be very conservative with respect to his views on race. Anderson (11/28/90) 303–04. Dr. Knight headed a staff composed of representatives of the SBE, UA, AU and the ACES. This "Knight report" was submitted to the Com-

---

**23.** The changes wrought by *Gaines* would be short lived. After *Brown v. Board of Education* in 1954, it became apparent that the separate-but-equal strategy of Alabama would not fore-

stall federal desegregation efforts, and no further funding increases were given the HBUs. Eventually, ASU and AAMU lost their accreditation and did not regain it until the mid–1960s.

mission on June 5, 1940. KX 762.19; Thornton (11/7/90) 227–29.

225. The Knight report took what was at the time a moderate position on racial issues and the higher education of blacks. It summarized the economic position of the black community:

Half of the Negroes gainfully employed in Alabama are in agriculture. Approximately 20 per cent are in domestic and personal service, 14 per cent in manufacturing, 5 percent in transportation, and 3.95 [%] in mining. For the most part the Negro workers in Alabama, therefore, are in occupations classified as "unskilled" and "semi-skilled." In the nation as a whole, 75 percent of the Negro workers are classified in these two groups.

KX 762.19, p. 4.

226. The Knight report candidly described how white Alabama state government viewed blacks' education in terms of whites' economic interests:

In considering the importance of Negroes in the future of the state, it is significant that, concentrated in agriculture and in domestic and personal service, they are the custodians of two basic resources: land and children.

KX 762.19, p. 4; Anderson (11/28/90) 306. The report went on to encourage the state to consider how a better educated black population would assist the state in "increasing the productivity of its farms," in improving "the care of children, the preparation of food, and the care of the household...." KX 762.19, p. 5. It remonstrated against the same white supremacist attitude white Alabama had defended during Reconstruction: "The idea that a trained Negro is a handicap to whites with training is false." *Ibid.*

227. Instead of thinking of a "trained Negro" as a "handicap," the Knight report urged white Alabama think of him as a commodity that was important for whites' hopes of economic advancement:

The Negro is an integral part of our way of life. Whether he will be an increasing asset or a liability in the development of the state is not for him alone to decide.

That is a matter which the state authority, the people as a whole, and each individual white person is deciding from day to day.

KX 762.19, p. 7.

228. The educators and staff who drafted the Knight report and the members of the Alabama Educational Survey Commission, who acted on the Knight report's recommendations, all were white. No mention was made nor consideration given to allowing black citizens to share in the governance and control of their own institutions or any other aspect of public education. In other words, "this is a continuation of a process of white control of black education that has characterized the whole of the 20th Century to this point." Anderson (11/28/90) 335.

229. The Knight report squarely confronted the *Gaines* requirement that Alabama provide equal graduate and professional opportunities for its black citizens:

The decision of the Supreme Court of the United States in December, 1938, reversing a decision of the Supreme Court of Missouri, has direct bearing upon graduate and professional work for Negroes in Alabama (and sixteen other Southern States).

Between 1914 and 1936 the master's degree was conferred on 1476 Negroes. But only 25 per cent of these degrees were conferred by Negro colleges.

During the same period, the doctorate was received by 139 Negroes, all of which were conferred by institutions outside the South.

No Negro institution now offers work beyond the master's degree.

No Negro institution in Alabama now offers any graduate work.

Eighty per cent of the 13 million Negroes in the United States reside in the South, but this region has trained less than 25 per cent of its Negro leaders during the past 25 years.

KX 762.19, p. 28.

230. The report conceded the need for black graduate programs would be increasing, but, opined that "the number of Ne-

groes in Alabama (or in any one of the other sixteen southern states) who will desire graduate and professional training, is likely to be small for several years." *Id.* at 29. The report also indicated that "[t]he maintenance in separate institutions of graduate and professional educational facilities equal to such facilities now provided for the whites would impose on each of the southern states very heavy financial burdens." *Ibid.*

231. Dr. Anderson testified that this section of the Knight report reflected the basic racial conservatism of its authors. It simply was not true that blacks did not desire graduate education: "at all levels of education as opportunities become available, the demand continues, ... the demand outstrips the opportunities at any point in this time." Anderson (11/28/90) 324.

> This is their view of both the pool of blacks that are qualified as well as their judgment as to the desire for graduate and professional work on the part of blacks and that's not uncommon, not only in that period, but throughout the 20th Century, that because ... of a lack of understanding of the history of black education, many have failed to realize the deep seated value that education has within the black community. So when they make judgments about the desire for education, they are repeatedly wrong in those judgments.

*Id.* 334.

232. The Knight report summarized its findings about the condition of higher education for African Americans in Alabama as of 1940:

> The facts set out in ... this report show that higher educational facilities for Negroes in Alabama, under public support and control, are far from adequate. State appropriations for the higher education of Negroes in Alabama constitute only approximately 6.24 per cent of the total public appropriations for all higher educational purposes in Alabama. Lack of adequate public support has prevented the Agricultural and Mechanical Institute in Normal [AAMU], and the

State Teachers College for Negroes at Montgomery [ASU], from developing as well as the higher educational institutions for the whites have developed.

> Library and laboratory facilities in these two State Negro institutions are very inadequate, and so are the number and the training of the staffs, who are poorly paid. The Agricultural and Mechanical Institute is the only Negro Land–Grant institution in the United States that is not a four-year college and the only one through which the extension work for Negroes is not directed. It is apparent that the institution has done well with the meager resources on which it has had to operate. So, also, has the State Teachers College for Negroes. Both of these institutions should be greatly strengthened by the State of Alabama, by providing more liberal financial support.

> Only twenty-five per cent of Negro leadership in the entire South has been trained in the South. For the most part, Negroes have had to go outside the South for their graduate and professional training. It is highly important that provision be made for the training of Negro leaders and it is believed that such training should be provided in the South. Need for this provision is very conspicuous in Alabama.

KX 762.19, p. VI.3.

233. The Knight report made a number of recommendations about action needed to comply with *Gaines.* In addition to the improvements in libraries, laboratory facilities, personnel and salaries suggested above, it recommended for ASU "graduate work in education, in those liberal arts and sciences, and in allied professional fields for which there is or may be legitimate demand." KX 762.19, p. VI.5. It advised against transferring federal land grant funds from AAMU to Tuskegee and recommended for AAMU:

> The institution should not attempt any graduate work. Its main emphasis should be on general agricultural courses, general courses in home economics and home making, and upon the

practical training of Negro youth for such vocational opportunities, including teaching, as may be open to them. The Institute should also function as a service institution for the region in which it is located and should devote some of its energies to "short courses."

. . . . .

Its library and laboratories should be substantially improved; its instructional staff should be strengthened; and, the salaries of its instructional staff should be increased.

*Id.* at VI.6. The report recommended state financing of agricultural graduate work at Tuskegee. *Ibid.* And, finally:

In those graduate and professional fields which are not offered at either State Teachers College for Negroes or Tuskegee Institute, funds for the purchase of instruction in other institutions should be appropriated.

*Id.* at VI.7; Thornton (11/7/90) 229–32.

234. The recommendation that ASU begin graduate programs in 1940, at a time when none of the school's faculty had a Ph.D., contemplated educational services ASU was not yet capable of providing. Anderson (11/28/90) 317.

235. The recommendation that the State of Alabama increase its support of a private school rather than develop fully its black land grant college reflected the continuing anomalies of Tuskegee's unique history. For half a century, Alabama's policies for educating blacks had been formulated as much if not more by the GEB as it had by state government. The GEB had a tremendous financial investment in Tuskegee as a regional resource of its Southern strategy, but now it was abandoning the Hampton–Tuskegee model in favor of true collegiate programs adequate for the post-*Gaines* era. The dilemma was that Tuskegee's private endowment and other philanthropic support were insufficient to allow the school to offer the full range of educational services as inexpensively as could a state and federally funded land grant college. So the GEB marketed Tuskegee to Alabama in pieces. When state officials questioned why they should continue pumping state money into Tuskegee at the same time they were being forced by the federal government vastly to increase support of AAMU, the GEB and other allies of Tuskegee would point out how it would be cheaper to continue limited state support of Tuskegee in return for graduate agriculture and veterinary services than for the state to invest in AAMU the kind of money the GEB had already pumped into Tuskegee in order to elevate AAMU to full land grant college status. KX 758; Anderson (11/27/90) 192–98.

236. The fourth year of college was added at AAMU in the Fall of 1940, with 38 students enrolling. In another year AAMU would be granting bachelor degrees for the first time since 1919—but only in the teacher training program. In the technical fields, AAMU remained restricted to trades in printing, tailoring, shoe repair, woodwork, carpentry, plumbing, electricity, heating and auto mechanics. KX 756; Anderson (11/27/90) 180–82.

237. The state began appropriating enough funds for the HBUs to obtain accreditation from the Southern Association of Schools and Colleges, which in 1930 had established a separate body to rate and accredit black institutions. The accreditation standards for HBUs were lower than those for HWUs. According to Dr. Anderson, it would have "made no sense to rate black institutions by the same scale [applied to white colleges] because they simply could not meet those standards given the lack of funding and the underdevelopment of those institutions." Anderson (11/27/90) 185–87; Anderson (11/29/90) 446–59; KX 3229–36.

238. From the time Alabama began to upgrade higher education for blacks until the present, a continuing problem has been the small pool of black Ph.Ds. In the 1940s, before federal desegregation was imposed, this problem was visited on ASU and AAMU, who could not compete financially for the five hundred or so blacks with Ph.D.s in the country. Nor did these black Ph.D.s educated outside the South want to return to the region. Anderson (11/27/90) 187–88. By the 1950's, the competition for

black Ph.D.s had become even stiffer. Alabama's historically black universities were unable to compete with the higher salaries offered not only by northern white universities but by better funded black institutions in other states. Anderson (11/28/90) 348–49; KX 762.21.

239. During his 1942–46 administration, Governor Sparks followed only some of the Knight report's recommendations in implementing a three-prong program to respond to the *Gaines* decision:

(1) A program was established to supplement the tuition of black students required to leave Alabama to pursue graduate and professional education.

(2) In return for the state gaining the right to appoint five members of its board of trustees, a deal was struck with Tuskegee for it to provide blacks training in the areas of veterinary medicine and agriculture. *See* Ala.Code § 16–57–1.

(3) Resources were substantially increased for ASU and AAMU in order to gain them accreditation "and become acceptable alternatives in the eyes of the federal courts for the white colleges." Thornton (11/5/90) 220–21.

240. With respect to graduate and professional educational opportunities for black Alabamians, Sparks declined to authorize all the graduate programs recommended by the Knight report and limited ASU's graduate offerings to the Master's in Education. Sparks was the principal advocate of a Southern governors' initiative to establish

south wide graduate and professional schools for blacks through which each of the southern states would contribute to the support of a single institution of law or medicine or other kinds of professional or graduate training that would then serve as graduate institutions for all of the southern states.

Thornton (11/7/90) 229, 232.

241. The Alabama Educational Survey Commission referred to the *Gaines* decision in its 1945 report and acknowledged that Alabama law mandated segregation in public higher education:

Educational leaders in Alabama are aware of the requirements of recent decisions of the United States Supreme Court to the effect that a state which requires segregated education of Negroes must furnish the same scope and quality of education for qualified Negro students as for white students.

USX 13, pp. 333–34.

242. The 1945 report of the Alabama Educational Survey Commission expressed the opinion that

one of the greatest needs of Alabama in the field of higher education is the improvement of facilities for Negro students. State leaders and officials recognize this need, and should be commended for the efforts that have been put forth to meet it in recent years. Despite the improvement resulting from these efforts, however, the facilities for Negro students are still below the quality that should be maintained. Although the two institutions for Negro students that have long operated under state control have competent leadership, they have insufficient funds to build up adequate executive staffs and to employ and hold faculty members of the highest levels of competence. The physical facilities of these institutions need immediate improvement and extension. Equally as important as the physical plant requirements is the need for strengthening the instructional facilities, particularly the libraries.

USX 13, p. 333.

243. The Educational Survey Commission also acknowledged the deprivation suffered by the HBUs with respect to operational funding by the state:

Table 52 reveals the limited extent to which the state is providing support to its institutions for Negro students. Montgomery State Teachers College obtains a smaller percentage of its income from state sources than any of the state teachers colleges for white students. The State Agricultural and Mechanical Institute has a markedly smaller percentage of its income from state sources than any other state-supported institution in Alabama; this institution also has a

smaller total income than any of the other institutions in the list.

USX 13, p. 364.

244. In 1949 the Governor appointed a Committee on the Higher Education of Negroes. E.G. McGehee, the state agent for Negro education was on the committee. Among the questions McGehee posed to the committee were the following:

3. Shall A & M College be advanced to a full Land Grant College?

a. For almost sixty years, this institution has served Alabama as a Land–Grant College for Negroes, but it has never been adequately supported by the state.

b. A & M College's relatively limited development has been the result of meager support which did not change significantly until the present decade.

KX 759, p. 3. And he asked "To what institution or institutions should appropriations be made for engineering and related work?" *Ibid.* McGehee listed the number of tuition grants given to black graduate students for out-of-state study over a three-year period and asked:

10. What shall be the order of priority in meeting the graduate and professional demands in recognition of the fact that TIME as well as MONEY will be required to develop the facilities?

*Id.* at 4–6. Anderson (11/27/90) 198–201.

245. By the 1949–50 school year, ASU's enrollment had grown to 6,057, which constituted 5.4% of the 120,211 black college students in the country and made ASU first among black colleges nationally with respect to enrollment. ASU also awarded 4.3% of all baccalaureate degrees given blacks in the United States, ranking it first in that category as well. It ranked fifth among the seventeen black colleges in the country who had graduate enrollments. KX 762.20, p. 5; Anderson (11/28/90) 341. Dr. Anderson testified this data refuted the assertion of the 1940 Knight report that not many blacks desired graduate education: "The Alabama State College is overrun with a demand for graduate training by black students." Anderson (11/28/90) 342.

246. In 1951 President Trenholm of ASU reported to the GEB:

The students enrolled at Alabama State College suffer significant disadvantage and disproportion because the rapid growth in enrollment has not been accompanied by proportionate appropriation-support with the result that this institution with the largest enrollment is at the bottom in the ranking of 34 Negro colleges as to the per-student appropriation support.

. . . . .

This college has been warned (in December 1950) by the Southern Association of Colleges and Secondary Schools [that] because of its below-standard per pupil expenditure for educational purposes [it is in serious danger of losing its accreditation].

KX 762.20, p. 6–7; Anderson (11/28/90) 343–44.

247. Trenholm made this appeal for ASU to the GEB:

The cause of the higher education of Negroes will be forwarded through improved instructional provision at this institution in which is concentrated the largest assemblage of Negro college students of any Negro college in the United States (1 of every 20 Negro students and 1 of every 25 graduates in 1949–50).

Even if the State of Alabama would now do the improbable of granting the requested 120 percent advance in our annual appropriation, an overwhelming need will lie in the area of adequate and comparably-paid personnel. . . .

KX 762.20, p. 12.

248. Trenholm made a desperate appeal in 1952 to state officials for increased funding to save ASU's accreditation.

The Alabama State College has glaringly disproportionate appropriation support. Actual computations would substantiate the observation that its average-per-pupil appropriation is lower than that of either of the other eight state institutions. Based on the 1950 Fall Quarter enrollment alone, its per-student appropriation of $145.69 is not only the

LOWEST of the 34 state Negro colleges but $87 below the next lowest and $300 below the median appropriation of $450 per student in the 34 state Negro colleges....

The Alabama State College is in a critically-serious plight. Not enough staff can be employed. The college cannot compete either with other Negro colleges nor even with the public school system of Alabama for needed staff services. The college cannot qualify for accreditment by the Association of Colleges of Teacher Education (by which Alabama's teachers colleges are accredited). This past December, the college has been "warned" by the Southern Association of Colleges and Secondary Schools because of its "below-standard" per-student [appropriation].

KX 762.23, p. 1.

249. President Trenholm failed to get the required state funding, even though he told the Legislature that the requisite number of Ph.D.s could be employed with a relatively small increase in appropriations of $50,000. ASU and AAMU eventually lost their accreditation. Thornton (11/26/90) 13–14.

250. Trenholm proposed an "urgently-imperative curriculum expansion" for ASU if "the State of Alabama proposes to provide a parallel and equal education opportunity for all its youth as a sound investment in its future." KX 762.23, p. 1. He made special reference to a recent announcement that Tennessee A & M State College would become a university with schools of engineering, education, arts and sciences and a graduate school. *Id.* at 5.

251. Rather than adequately fund its two historically black colleges and ensure expanded curricula, the state decided to pay its black citizens to go out of state. As adopted February 17, 1948, and amended on July 18, 1951, the SBE rules and regulations provided:

2. STATE SCHOLARSHIP AID will be considered for Negro residents of Alabama who desire to study and can qualify for a graduate, professional, or technical field which is offered at University of Alabama or Alabama Polytechnic Institute but is not offered at the Alabama State College for Negroes, or at the Alabama State Agricultural and Mechanical College, or at Tuskegee Institute.

USX 8j, 8L. This scholarship paid the out-of-state tuition in excess of the tuition at UA or AU, room and board in excess of that charged at ASU, and the cost of one round-trip railroad ticket to school. The SBE regulations were authorized by a 1945 law passed by the Legislature. KX 651.

252. More than ten years after the Knight report Alabama's Education Committee in 1958 was still concerned about the relative deprivation of Alabama's HBU:

Special attention is directed to the needs of our Negro institutions of higher learning. This study has considered the needs of all institutions of higher learning in the state without reference to the race they serve. There have, nevertheless, developed in the course of the study certain particular requirements which should be met to provide adequate facilities at our Negro institutions:

a) The physical plants and faculties of our Negro institutions are not sufficient to admit all those who presently are applying for admission and should be increased.

b) Better buildings and equipment are greatly needed for the teaching of science.

c) Programs should be developed for co-operation with industry in combined or alternating study-work plans.

d) Standards need elevation to meet the requirements of adequate education and accreditation.

USX 14, p. 162.

5. Massive Resistance to Integration

i. *The Legislature*

253. Following World War II, Alabama's policy of segregation began to be attacked through the federal courts. Thornton (11/7/90) 247–49. A growing number of black war veterans were applying for admission to the University of Alabama, whose officials rejected the applications on the ground that the same pro-

grams were available to blacks at Alabama State or Alabama A & M. Thornton (11/7/90) 260.

254. In 1952 a special committee of the all-white Alabama Bar Association was appointed by the Legislature to help design the state's master plan for massive resistance to anticipated federally mandated desegregation. It was chaired by Birmingham lawyer, Joseph F. Johnston, the grandson and namesake of Governor Johnston, who defeated the Populist candidate in 1896. The bar committee's membership included Gessner T. McCorvey, leader of Alabama's Dixiecrat revolt of 1948, and others, all of whom were characterized by Johnston as "lifetime staunch segregation advocates." KX 3672.

255. The four desegregation cases from South Carolina, Kansas, Virginia and Delaware were argued before the U.S. Supreme Court in December 1952 and reargued in December 1953. On September 21, 1953, the Alabama Senate, anticipating rulings in the pending Supreme Court desegregation cases, appointed an Interim Joint Legislative Committee to work with the state bar on a massive resistance plan. The committee resolution was sponsored by J.M. Bonner of Wilcox County, and the chair of the committee was State Senator Albert B. Boutwell. Boutwell "was genuinely convinced that segregated schools were the proper arrangement for Alabama and that the system had to be maintained." KX 3672, p. 7. The same resolution directed the Alabama Attorney General to file a brief in the Supreme Court defending segregation. KX 3672, pp. 4–5.

256. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 was handed down May 17, 1954. The Alabama Interim Legislative Committee responded to the *Brown* decision in its report issued October 18, 1954. KX 600. The committee's report contained the main outlines of Amendment 111 to the Alabama Constitution, which would be adopted in 1956. KX 3672, p. 6.

257. The Interim Legislative Committee recommended abandonment of legally explicit racial segregation of the schools in light of the Supreme Court's new ruling, but it proposed a new strategy for maintaining as much segregation as possible by means of seemingly neutral educational policies. A centerpiece of this massive resistance strategy was the adoption of scholastic achievement standards that would exclude blacks. The Committee expressed confidence in an academic standards-based strategy, because it shared the conviction of most white Southerners, instilled by a century of legal discrimination, that blacks are intellectually inferior to whites. According to the Interim Committee's report:

> There are profound psychological and cultural differences, including differences in aptitudes, between the white and negro races in Alabama which should not be ignored in dealing realistically with as sensitive a problem as that of education. Those differences will not be ignored except by those determined on mechanical social integration as a dominant end however punitive or disastrous its consequences.

KX 600, p. 65.

258. But this new, "qualifications"-based strategy did not seem necessary to white university officials until the NAACP targeted the University of Alabama for litigation.

259. Amendment 111 to the Alabama Constitution, adopted by the Legislature and ratified by the voters in 1956, adopted most of the recommendations of the 1954 Interim Legislative Committee report for the racially discriminatory purpose of preserving segregation in the public elementary and secondary schools of the state.[24] KX 3672.

260. When it became clear that its separate-but-equal defense of segregation would fail, the state government withdrew the financial support that had allowed Ala-

---

**24.** The Circuit Court for Montgomery County, Alabama recently found Amendment 111 to the Alabama Constitution void in its entirety since it violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See, Alabama Coalition for Equity Inc. v. Guy Hunt, Governor,* No. CV–91–117–R (August 13, 1991).

bama State and Alabama A & M to gain accreditation briefly. Both black colleges lost their accreditation in the early 1960's, despite pleas by their presidents for the additional funding needed to prevent it. Thornton (11/7/90) 192–93; (11/26/90) 13–14. It was not until several years later that ASU and Alabama A & M regained full collegiate accreditation.

261. The March 22, 1967, order in *Lee v. Macon County Board of Education,* 267 F.Supp. 458 (1967), reinitiated the campaign of massive resistance orchestrated by the Governor and Legislature. The *Lee v. Macon* order required the desegregation of all elementary and secondary schools and a start towards the desegregation of the junior colleges and state colleges administered by the SBE, including ASU, AAMU, TSU, JSU and UNA. Following the court's order, the SBE immediately went into executive session with George and Lurleen Wallace.[25] SOF ¶ 55.

262. A week later, Governor Lurleen Wallace announced to the Legislature in a televised speech a five-point plan of open resistance to the federal court. The Legislature was to resolve itself into a committee of the whole, receive testimony about the damage compliance with the court order would do, issue a "cease and desist" resolution, and if a stay was denied turn the whole education system over to the Governor, who would interpose the state's sovereignty. On the same day as Governor Wallace's speech, five state university presidents signed a resolution urging appeal of the March 22nd decree and the seeking of a stay of the decree's effects pending the appeal. SOF ¶ 56.

263. President Philpott of AU and President Rose of UA urged appeal of the *Lee*

v. *Macon* order, even though it was addressed to neither of their institutions. SOF ¶ 57.

264. When the March 1967 *Lee v. Macon* order was appealed, one of the Governor's chief legal arguments against the statewide disestablishment of the dual system of elementary and secondary education was that the state government lacked authority to control local school boards to the extent needed to comply with federal court orders. This was a tactic advocated by the experts who were counselling Southern states involved in school desegregation cases. John Satterfield of Yazoo City, Ms., the Governor's lawyer, explained it to members of the Alabama Legislature.

### ii. *The University of Alabama*

265. Raymond Ross Paty was a racial moderate who, as President of UA, in 1943 supported Governor Sparks' policy of appropriating funds to upgrade conditions at ASU and AAMU to comport with the *Gaines* standards. Thornton (11/7/90) 237–38. However, Paty was replaced as President of UA by Ralph Adams in 1946 and by John Gallalee in 1948. Both Adams and Gallalee were strong segregationists. *Id.* at 246.

266. The ground breaking black applicants were mostly veterans of World War II. For example, Nathaniel S. Colley, a 1941 honor graduate of Tuskegee, wrote in 1946 from an Army hospital in California to apply to the UA Law School. Thornton (11/7/90) 260. Ralph Adams sent out his standard form letter that chastised Colley for bringing "pressure on behalf of members of the colored race in an effort to gain admission to institutions maintained by the state for members of the white race." *Id.*

---

**25.** The March 22, 1967, injunction issued by the three judge court in *Lee v. Macon* directed:

No person shall be denied admission to any trade school, junior college, or state college administered by the Alabama State Board of Education upon the ground of race, nor shall he be subjected to racial discrimination in connection with his application for enrollment in or his attendance at any such trade school, junior college or state college. Dual attendance zone based on race for such trade schools, junior colleges, and state colleges

shall be abolished. The State Department of Education shall direct such trade schools, junior colleges, and state colleges to recruit, hire, and assign teachers so as to desegregate faculty and to accomplish some faculty desegregation in each trade school, junior college and state college by September 1967.

*Lee v. Macon,* 267 F.Supp. 458, 484 (M.D.Ala. 1967), *aff'd sub nom. Wallace v. United States,* 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

at 262. Demonstrating his understanding that the fundamental purpose of *de jure* segregation was maintenance of blacks' inferior social status, Adams wrote the President of the Alabama Bar Association:

> You and I know, of course, that the negro in the graduate school is just as black as the negro in the freshman class, and I do not believe that we Southerners are going to permit our children to eat and sleep with negroes, which will inevitably follow their admission to our classrooms.

Thornton (11/7/90) 262–63, *quoting* KX 3126, exhibit. 1.

267. At the July 9, 1954, SBE meeting, Governor Gordon Persons introduced a massive resistance resolution that was unanimously adopted. At this same meeting, Rev. S.S. Seay appeared and appealed for a peaceful end to segregation. The SBE minutes include this statement by Rev. Seay:

> He said also that after his daughter had applied three times for admittance to the University of Alabama to get her degree, he advised against it, and that now she was a student in a women's medical college in Philadelphia. But, even so, he thought that it might be worked out peacefully whereby his daughter and others of his race could enter state institutions without creating any problems.

USX 8i.

268. In 1952, attorney Arthur Shores, began to press UA to admit Polly Ann Myers and Autherine Lucy. Assisted by the Birmingham Branch of the Alabama NAACP and by the NAACP Legal Defense Fund ("LDF") Myers and Lucy had written for application forms for admission to UA's graduate school. Because of a clerical mistake, the office of admissions headed by Dean Adams, notified the women they would be accepted before their applications were completed and thus before UA officials knew they were black. When the race of the applicants was discovered, Adams tried unsuccessfully to persuade them to apply instead for what UA maintained were similar graduate programs at ASU. Myers and Lucy refused to withdraw their applications and the university resisted their enrollment. Consequently, Shores and LDF filed suit in federal court in Birmingham in 1952, on behalf of Myers and Lucy to gain their admission to the University of Alabama. Thornton (11/7/90) 264–68.

269. In 1952, the UA Board of Trustees was controlled by a number of gentlemen who, by all accounts were strong segregationists and committed to the segregation of UA. Thornton (11/7/90) 265–67.

270. Oliver Cromwell Carmichael, a native Alabamian whose career in Washington and New York had made him a nationally respected academician, became UA President in 1953. His ambition was to raise the academic standing of UA. Dr. Carmichael was, however, aware that unfavorable publicity about segregation would damage the institution in the eyes of the national academic community. Thornton (11/7/90) 268–69.

271. A racial progressive, Carmichael tried to persuade the UA Board of Trustees to admit Myers and Lucy quietly. Thornton (11/7/90) 269. At the May 29, 1954, meeting of the UA Board of Trustees, President Carmichael said: "The recent Supreme Court decision on Segregation suggests the need for consideration of its immediate and long range effect upon the historic policy of the University with respect to the coeducation of the races." USX 9a.

272. But Carmichael's efforts were for naught, squelched by a Board of Trustees bent on preserving the University of Alabama's tradition of segregation. In June 1953 the Board established a policy to stop or delay desegregation by all legal means. Thornton (11/7/90) 269.

273. It was Hill Ferguson, acting for UA's Board of Trustees who hired the Bodeker Detective Agency to investigate the private backgrounds of Polly Ann Myers and Autherine Lucy. Thornton (11/7/90) 270. The detective agency uncovered information that Myers had conceived a child out of wedlock and that her husband had a criminal record. When the Fifth Circuit finally affirmed Judge Grooms' order to

admit Myers and Lucy, the UA Board ordered the administration to exclude Myers on the "grounds of [an] absence of the kind of moral character that was expected of female students at the University of Alabama." *Ibid.* The Board hoped that denying admission to Myers, who was the more aggressive of the two black applicants, would discourage Lucy as well. But Autherine Lucy persisted. On August 26, 1955, Judge Grooms ordered the UA officials to admit Ms. Lucy, and the Court of Appeals affirmed on February 1, 1956. *Lucy v. Adams,* 134 F.Supp. 235 (N.D.Ala.), *aff'd* 228 F.2d 619 (5th Cir. 1955), KX 3152, 3151. Ms. Lucy registered on February 1, 1956, four years after her initial application. Thornton (11/7/90) 270–71. Within one week of her ordered admission Ms. Lucy would herself be suspended.

274. Following two days of general unrest and a third day of rioting on the Tuscaloosa campus, the Board of Trustees suspended Lucy on February 6, 1956, for her own safety and the safety of other faculty and students. Thornton (11/7/90) 272. When one of Lucy's lawyers, Constance Baker Motley, alleged during a press conference that UA had conspired with the rioters, the Board voted to expel her permanently on the ground she had libeled the University. *Id.* at 273–74.

275. The policy of using private, and sometimes public, investigative resources continued to be a favorite strategy for those hoping to forestall the integration of UA. Thornton (11/7/90) 275. For example, Ruby Steadman Peters, who had completed two years at ASU, was accepted to UA's Birmingham campus. After her admission a detective agency launched an investigation. When sufficient information about Ms. Peters had been gathered, Hill Ferguson of the Board of Trustees got Clarence Allgood, a former U.S. District Judge in Birmingham, and James A. Green of the Avondale Federal Savings and Loan Association, which held the mortgage on Peters' home, to talk her into withdrawing her application. Ms. Peters complied with

the wishes of Mr. Ferguson. Thornton (11/7/90) 276–77.

276. Meanwhile, unbeknownst to the Board, President Carmichael had accepted the advice and assistance of Alan Knight Chalmers, a Boston University Theology professor and fund raiser for the NAACP Legal Defense Fund, to identify the "right" black student finally to be admitted at UA. Chalmers proposed Billy Joe Nabors, an honors student at Talladega College, for admission to the UA Law School, and Carmichael instructed the Admissions Office to give special treatment to his application. Brewer Dixon, the UA trustee from Talladega, found out about Nabors' pending application through the newspaper, and inquired if Nabors had presented the necessary endorsements from practicing attorneys in Talladega County.[26] Thornton (11/7/90) 276–78.

277. When other Board members learned of Carmichael's plans for admitting Nabors, they brought pressure on the president by attacking a new policy on academic freedom Carmichael had submitted for approval at about the same time. They tied the academic freedom policy to what they called "a spirit of rebellion" on the faculty touched off by the "recent Lucy trouble." Thornton (11/7/90) 279–89. Emphasizing the mind set of the Board, Brewer Dixon stated:

> [N]o one would wish to unduly limit the rights of an individual as to his private ideas and beliefs, but in view of the fact that the state of Alabama has a direct interest in the University and its teachers, I feel that those members of the faculty who have been guilty of teaching and acts which are opposed to the policies of the University Board on this negro question should go. And there is pretty definite feeling throughout the state that we have several such members of our faculty.

*Id.* at 280–81, *quoting* KX 3126, exhibit. 1. President Carmichael denied that his facul-

---

26. At the time Mr. Nabors was seeking admission to the Law School, the University of Alabama required that at least two attorneys from

the applicants home county submit recommendation on his or her behalf before he or she could matriculate at the University.

ty had a rebellious spirit, but the Board members were not impressed.

278. Brewer Dixon's investigators reported that Nabors had a quick temper and got into arguments in school. Taking all this into consideration, Carmichael backed down, and Nabors was not admitted to the law school. Thornton (11/7/90) 279.

279. Following the Nabors affair it became increasingly clear to President Carmichael that he could not continue at UA. After securing other employment, Dr. Carmichael resigned January 1, 1957. Thornton (11/7/90) 280. Dr. Carmichael was replaced as president by Frank Rose. *Id.* 281.

280. Rose's appointment as UA President brought that office more in line with the segregationist policy of the Board of Trustees.

> Frank Rose was also a racial moderate and like Carmichael hoped that he would be able to ease the university into a quiet acceptance of integration, but unlike Carmichael, he took no active steps to achieve that. In fact, he accepted the fact that the Board of Trustees had adopted the policy of resisting segregation to the extent legally permissible and Rose's idea was to try to get integration accomplished peacefully once it was ordered by a Court. But he took no steps such as Carmichael had to try outside of the judicial arena to arrange the integration of the university.

Thornton (11/7/90) 281.

281. Even if the UA Board of Trustees had been willing to admit a black student, it is likely Governor John Patterson would have used his executive and political power to prevent it.

> [Patterson] was strongly opposed to the integration of the University of Alabama and stated that he would close the University of Alabama if an attempt were made to integrate it.

> In January of 1961, immediately after the integration of the University of Georgia by the admission of Charlene Hunter [and Hamilton Holmes], he was asked at a regularly scheduled press conference what his position would be if a similar

effort were made to integrate the University of Alabama, which, of course, at that time was under an injunction to permit blacks to enroll. His reply was that if any such effort were made that he would order the University of Alabama closed. And he was asked if the University of Alabama Board of Trustees were not a self-governing unit. And his reply was that it was true that the university was under a board of trustees and that he was only one vote on the board of trustees, but he said, the governor has inherent police powers to preserve order in the state and using those police powers, whatever might be the opinion or desires of the Board of Trustees of the University of Alabama, that he would himself by executive order close the University of Alabama were it integrated.

Thornton (11/7/90) 307–08.

282. Meanwhile, the state's campaign of harassment against the NAACP forced the Legal Defense Fund out of Alabama for several years. Thornton (11/26/90) 53–54. Without institutional support of some kind, and with blacks still denied participation in the political process, black applicants to UA were easily isolated and discouraged.

283. Even after Hill Ferguson and other staunch segregationists left the UA Board and were replaced by more moderate trustees, like Winton "Red" Blount, the campaign of massive resistance orchestrated by Alabama's central government, under Governors Patterson and Wallace, prevented any progress toward desegregation at UA. In fact, UA officials were inventive in searching out new legal devices to resist desegregation. In the fall of 1962 and spring of 1963 UA closed its processing of applications early to avoid having to consider applications from black students. President Rose wrote the head of the Department of Public Safety:

> The closing of the enrollment, as you know, has always been our practice and is one of our legal steps. You know us well enough to know that we don't need any encouragement or advice on closing our registration.

Thornton (11/7/90) 285–86, *quoting*, KX 3126, exhibit. 1.

284. Finally, pressure from the national government, now headed by the Kennedy administration, and from Alabama business interests that were being hurt in the national marketplace by strict segregation, produced the admission of black students at UA. In 1963 the Legal Defense Fund came back to Alabama to represent Vivian Malone and James Hood in their efforts to enroll in the University of Alabama. At the same time, two black employees of the Redstone Arsenal, Dave McGlathery and Marvin Carroll, retained Charles Morgan to pursue their admission to the UAH campus. UA was concerned that the federal government would stop financial support of UAH unless it admitted black students, but before Judge Grooms it resisted extension of the *Lucy v. Adams* injunction to the current university officials.

285. Winton Blount worked with the Kennedy Administration and business leaders to urge Wallace not to stand in the "schoolhouse door" for fear that trouble in Tuscaloosa would hurt business in the state. On May 16, 1963, Judge Grooms ordered UA to admit the black plaintiffs. In June 1963, Wallace carried out his campaign promise to stand in the door of Foster Auditorium. Thornton (11/7/90) 286–91; Thornton (11/26/90) 104–07.

286. The message Governor Wallace intended to send to the federal government and to the rest of the nation by his stand was this: In Alabama, segregation may have been defeated, but massive resistance was not defeated.

> Wallace wanted, throughout his administration, whenever faced with integration, Wallace wanted to be forced. He never wanted it to seem that the government of Alabama was voluntarily integrating.... He is saying that though I have been compelled to yield here, I'm not conceding the point of my opposition to

segregation and I'll continue to resist on other fronts in other ways at other institutions.

Thornton (11/7/90) 291–92.

287. Governor Wallace's stand in the door was done with the express consent of the UA Board of Trustees and pursuant to a Board resolution declaring that his presence on campus or in the City of Tuscaloosa was necessary to preserve peace and order.[27] USX 9d.

### iii. *Auburn University 1950–1965*

288. In answers to interrogatories, AU admits that its Board of Trustees maintained a policy of racial segregation until 1963. AU's 1982–83 self-study for the Southern Association of Colleges and Schools gives this brief account:

> As a result of litigation, the first black student ever admitted to Auburn University was enrolled in the Graduate School in January, 1964, and in August, 1966 the first black student to graduate from Auburn was awarded the Master of Education degree. In August, 1970 the University awarded the first Ph.D. degree to a black student. By the fall of 1980 black students made up slightly more than two percent of the main campus enrollment—482 of 18,603 students.

KX 733, p. H12.

289. In February 1949, the AU Board of Trustees formally adopted a resolution following the recommendations of the Southeastern Governors' Conference, which had met in Savannah on December 12–15, 1948. The Board's resolution provided:

> 1. That the School of Veterinary Medicine of the Alabama Polytechnic Institute accepts the designation: REGIONAL SCHOOL OF VETERINARY MEDICINE FOR WHITE STUDENTS under the terms and provisions of the Conference recommendations referred to above....

---

27. Many popular accounts of Governor Wallace's "stand in the schoolhouse door" indicate that the Governor and Attorney General Kennedy had an understanding that Mr. Wallace would "step aside" once ordered to do so by the federal authorities. According to the statement of Governor Wallace to the UA Board of Trustees there was no such agreement at any time with Mr. Kennedy or for that matter any other federal official. *See,* USX 9d (minutes of the UA Board of Trustees dated Nov. 12, 1966.)

2. Be it further resolved, that, in accordance with the recommendations referred to, a definite quota of qualified white residents for each of the cooperating states to be admitted to the School of Veterinary Medicine is hereby established and shall be as follows:

| | |
|---|---|
| Alabama | 35 |
| Tennessee | 10 |
| Mississippi | 8 |
| Florida | 8 |
| South Carolina | 9 |
| Louisiana | 5 |

USX 7b.

290. On June 7, 1954, President Draughon of AU reported on the Supreme Court's May 17 decision in *Brown v. Board of Education* to the Board of Trustees. He noted that the Supreme Court would take up remedy questions the following fall and made this recommendation: "In my opinion, the Alabama Polytechnic Institute should await the outcome of these cases before any change is made in its present policy." USX 7d. The Board's minutes then recite: "The Board commended him on the statement as being very good. He also stated he had read the statement over the telephone to Governor Persons...." *Ibid.*

291. The February 15, 1956, minutes of the AU Board reports:

President Draughon outlined to the Board his recommended policies toward applications for admission from Negro students. He stated there are at present no applications for admission from Negroes. In the case of such applications, the President stated he would request the Governor to call a meeting of the Board of Trustees and ask the Board to take such action as it may deem advisable.

In the course of discussion of this matter, the Board expressed deep concern over the situation that has arisen at the University.... The Administration and the Board of Trustees would like to see segregation maintained at the Alabama Polytechnic Institute and will exert every legal method to that end.

USX 7e.

292. President Draughon was considered a racial moderate, but, like other racially moderate administrators in Alabama public higher education, he felt he had to enforce the state's "racial orthodoxy" to stay in the good graces of state government. Thornton (11/26/90) 12.

293. Draughon demonstrated his willingness to uphold segregation by firing a dissident white faculty member in 1957. Bud Hutchinson, an economics professor on AU's faculty, wrote a letter to the campus newspaper criticizing an editorial that had attacked voluntary desegregation in New York City. The AU Board of Trustees immediately convened in emergency session and ordered Hutchinson fired. Draughon complied and told the press:

such racially moderate or integrationist views were contrary to the policy of Auburn University, and that no faculty member could express any such views and that any faculty member who attempted to do so was violating the policies of Auburn University, and Professor Hutchinson therefore would need to seek employment elsewhere.

Thornton (11/26/90) 11–12.

294. AU would not desegregate voluntarily; it took federal court action to do so. Thornton (11/26/90) 12.

295. On July 17, 1963, after Harold Franklin had applied for admission to AU's graduate school, President Draughon explained to Governor Wallace and other members of the Board of Trustees

that, with Board approval, we have pursued a policy of avoiding and discouraging such [Negro] applicants wherever possible. It has been a cardinal point in my policy that we do everything possible to prevent the focusing of public attention upon Auburn University. To say it another way: Our policy has been to keep our heads down and our mouths shut; to present no target, or as small a target as possible, to the advocates of integration....

. . . . .

Now, with reference to applications of Negroes, I think that it is rather remarkable that since the 1954 Decision of the

Supreme Court, we have had but 13 applications that were serious enough to cause us concern. Not one of these applicants has ever completed an application. We have pursued a rigid policy of requiring that all letters intimating that an application may be involved be sent immediately to the President's Office without any publicity whatever. In all such cases we have immediately had an investigation made of the individual....

. . . . .

I believe that, barring any unforeseen action, we may be safe until January 1, 1964, but there is no guarantee. I believe it is the considered judgment of the Board that we shall continue to try to avoid a showdown, and we shall pursue each case until it shall have been adjudicated in the Federal Courts. This is the pattern we have followed up to this meeting.

. . . . .

I have said from the beginning that Auburn stands to lose more in this question than any other Alabama institution. We are constantly faced with the cutting off of Federal Funds for Agricultural Extension and Research, and the cutting of all Federal Funds in contractual research. A very rough estimate is that we would lose between three and four million dollars per year if the drive to withhold Federal funds from segregated institutions should be successful. Board members may recall that I sent to them two or three years ago the Annual Report of the Civil Rights Commission which strongly recommended this action.

USX 7f, pp. 1–3.

296. The Auburn Board of Trustees and Governor Wallace ratified President Draughon's statements and went further:

Mr. Samford [a Board member] called attention to and read a statement carried in the catalog and stated the board has always taken the position they would never permit any Negro to register until we have court orders to admit him.

The Governor stated that was good and, in his judgment, they should continue to resist and set new regulations to make it hard, then turn them down completely and let the matter go into court.... He expressed appreciation to the Board for giving him information about the college professors in the AAUP. Such action always makes it more difficult. The Professors of Auburn are there to teach and should keep quiet. They are not there to set policies and social theories. He cited a case in question of a Professor criticizing him as Governor and Chairman of the Board. He can keep the peace if the professors will keep quiet. He commended Auburn for doing a good job in meeting problems and keeping things quiet.... He said he did not know of any plan except to wait for the final court order. We will continue to stand and resist.

USX 7f, p. 4.

297. At a special meeting of the AU Board with Governor Wallace in Montgomery on August 30, 1963, Attorney Thomas D. Samford, III, made a presentation about the pending federal lawsuit by Harold Franklin.

After full discussion, Mr. R.C. Bamberg moved, seconded by Mr. Frank P. Samford, that the Board of Trustees of Auburn University goes [sic] on record as being committed to the policy of using all its legal means to prevent this applicant from entering and carrying the case to the higher courts, if necessary, at whatever expense might be involved. The motion was unanimously adopted.

USX 7g, p. 2.

298. In *Franklin v. Parker*, heard by Judge Frank Johnson, AU contended it should not admit Harold Franklin to its graduate school because ASU had lost its accreditation in 1962, just before Franklin earned his bachelor's degree. Franklin (12/3/90) 14–17.

299. Franklin had wanted to become a lawyer and had applied first to the University of Alabama School of Law. Franklin (12/3/90) 14, 17. UA refused to admit him for the same reason given by AU, namely, ASU's loss of accreditation. Franklin (12/3/90) 14.

300. Through correspondence with Dean Parker of the Graduate School, AU first had tried to discourage Franklin from pursuing his application on the ground that AU did not offer the program in Government he was primarily interested in. But Franklin persisted, identifying history as a field of study close enough to his interests to satisfy him. Franklin (12/3/90) 20–22; KX 3139–41, 3143.

301. By court order, Harold Franklin became the first black student at AU. He was admitted to the graduate program in history. After the federal court overruled AU's refusal to provide Franklin with on-campus housing, he was housed in the wing of a dormitory that was cleared of all other students. Franklin (12/3/90) 22, 32–33. Later, when Willie Wyatt and Anthony Lee became the first black undergraduate students at AU, they and Franklin were housed in the guest house by themselves. Franklin (12/3/90) 51–52.

### 6. Four–Year Teachers' Colleges

302. The path towards integration of Alabama's remaining four-year colleges is largely unremarkable and occurred with relative ease after the integration of AU and UA by court order.

### i. The Use of the ACT and Heightened Admissions Requirements [28]

303. As discussed above, the State of Alabama's grand strategy for resisting desegregation recommended the use of restrictive admissions requirements to keep black students out of historically white schools. These recommendations were not solely the result of academic deliberations but were also political decisions by those in control of the governmental and educational apparatus of the state.

304. In assessing the motivation behind the decision to adopted heightened admission requirements, and in particular to use of the American College Test ("ACT") [29], the Court cannot escape considering the milieu in which these changes were developed and at whose insistence they were instituted. Having carefully reviewed the evidence, the Court is left with the firm conviction that the primary—though not exclusive—motivations of a substantial number of those who sought to change the admission standards at UAS and AU during the late 1950's and early 1960's were discriminatory.

---

**28.** The issues surrounding the implementation and current usage of the American College Test ("ACT") at AU and UAS is a matter over which the parties have considerable disagreement. The Court finds itself essentially confronted with two distinct questions. The first question concerns the initial motivation behind establishing the heightened standards for admission in the 1950's and 1960's. This is, in essence, an historical inquiry. The second question concerns the application of those heightened standards to African–American students seeking admittance to the universities in Alabama. At this juncture, the Court's findings address *only* the motivation behind the initial adoption of the ACT admission requirement. The Court will later discuss whether its current usage impermissibly impacts black students.

It will be the finding of the Court that as used by the University of Alabama System, the ACT test does not constitute a violation of the Fourteenth Amendment or Title VI, even though some of those who initially supported its use had hoped that, in some measure, it would aid in resisting integration. In short, the Court will find that as applied through out its history by UAS, the ACT is a legitimate educational device, designed and validated to provide the "System," in conjunction with other data, an assessment of a freshman's potential to perform adequately in college.

On the other hand, Auburn will be found to have such an inflexible and Draconian minimum cutoff score for regular freshman acceptance, and a virtually nonexistent special admissions category that it impermissible impacts the enrollment of black students; and moreover, is not related to sound educational policy. *See* ¶¶ 727–40.

**29.** The ACT consists of a battery of four examinations—in English, mathematics, social studies reading and natural science reading—that measure the test taker's general educational development on a nationally standardized basis. The ACT also produces a composite score, which is the average of the four test scores. In addition to the test itself, the American College Testing Program—the designers and administers of the ACT offers as one of its services what is known as the ACT Assessment, which is designed to present a comprehensive picture of the test takers. The ACT Assessment includes not only the test taker's ACT test results, but also the student's report of his high school grades and a "profile" section that provides information on the applicant's background, interests, activities, and needs.

305. The Court's conclusion does not impact the current legitimate use which admission criteria, including the ACT, have on the operation of a sound collegiate program—irrespective of the motive behind those who sought or supported its adoption. Any taint which the heightened requirements had when first adopted is washed away by the removal of the racial motivation behind its initial consideration *and* upon a showing that it is not currently used too improperly to disqualify black students because of their race. What is left is simply the exercise of sound educational policy making. What the Court cannot avoid, however, is the historical realization that many of the initial advocates of heightened admission standards envisioned that they could be used as a weapon in the campaign of massive resistance to federally ordered integration.

*a. University of Alabama*

306. UA trustee Brewer Dixon, a leading segregationist on the Board, discussed "the advisability of the adoption of additional admission requirements" at the Homecoming meeting of the Board on November 15, 1956.

> After discussion, in which each member of the Board took part, President Carmichael was asked to have members of the University administration edit and study a draft resolution patterned after a resolution adopted recently by the University System of Georgia and present recommendations for consideration of the Board at its next meeting.

KX 3680, p. 1.

307. The most recent resolution of the Board of Regents of the University System of Georgia had been adopted May 9, 1956. It amended an earlier resolution adopted April 8, 1953, which established as an admission requirement that each applicant submit certificates of recommendation from two alumni of the institution he or she was seeking to enter and a certificate of residency from the clerk of the superior court of the applicant's home county.

308. The May 1956 resolution authorized a third alumni certificate in lieu of the clerk's certificate for counties with a population exceeding 100,000. Later, in 1959, a federal court invalidated the alumni certificate requirement on the ground that it perpetuated Georgia's unconstitutional policy of segregation in higher education by "operat[ing] to make it difficult, if not impossible, for Negroes to comply with the requirement, whereas white applicants do not face similar difficulties." *Hunt v. Arnold,* 172 F.Supp. 847, 857 (N.D.Ga.1959); KX 3701.

309. The UA minutes do not reflect what final action was taken with respect to the proposed changes in admission requirements in 1956. At this time, the President apparently still retained his traditional authority to set the admission requirements and report them to the Board. The environment in which the UA Board considered these changes in admissions requirements was highly charged with widespread state and local government involvement in the campaign of massive resistance to federally mandated desegregation. The Montgomery Bus Boycott was the subject of federal litigation. Autherine Lucy had just been expelled from UA in February 1956, and blacks all over the South were beginning to force their constitutional claims in federal courts.

310. As for UA itself, it must be remembered that in June 1953 the Board established a policy to stop or delay desegregation by all legal means. Thornton (11/7/90) 269.

311. The next reference in the UA Board minutes to definite changes in admission requirements is on May 30, 1959:

> President Rose reported to the Board the recent adoption of a policy whereby high-school students with questionable academic records, or students from schools with which the University had had no previous experience, were being given entrance examinations to determine their qualifications for admission. He stated that under this program, 106 students had been refused admission this year and that this policy, which followed the policy of many larger institutions in the East, would help in raising the standards of

scholarship at the University and would save a great deal of time, money, energy and disappointment to these without the natural aptitude or educational background for college training. KX 3683.

312. UA's entrance examination requirement in 1959 was limited to students "with questionable academic records, or students from schools with which the University had had no previous experience," so it was tailor-made to apply to black students without disturbing the usual admissions practices for most white students.

313. President Rose's report to the Board on November 3, 1961, identifies the written examination initiated in 1959 as the American College Test. KX 3684. It appears that UA began administering the ACT to all applicants for undergraduate admission in 1962, as part of a new admissions program. KX 3685.

314. UA's decision to require all freshman applicants to obtain satisfactory scores on the ACT came in the wake of the Fifth Circuit's January 12, 1962, decision in the James Meredith case declaring the alumni certificate requirement to be unconstitutional, a ruling reiterated on June 25, 1962. *Meredith v. Fair*, 305 F.2d 343, 351 (5th Cir.), *cert. denied*, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962).

315. The Fifth Circuit called the alumni certificate requirement "[o]ne of the most obvious dodges for evading the admission of Negroes to "white" colleges...." *Meredith*, 305 F.2d at 352. It said southern universities had been on notice that the alumni recommendation procedure was unconstitutional

> [s]ince at least 1958, when *Ludley v. Board of Supervisors, Louisiana State University*, [150 F.Supp. 900 (E.D.La. 1957), aff'd, 252 F.2d 372 (5th Cir.), cert. denied, 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61 (1958),] was decided.... If the Board had any doubt about it, that doubt should have been resolved in 1959 when a similar requisite of the University of Georgia was held to be unconstitutional. *Hunt v. Arnold*, [172 F.Supp. 847 (N.D.Ga.1959).] We regard the con-

tinued insistence on the requirement as demonstrable evidence of a State and University policy of segregation that was applied to Meredith.

*Ibid.*

316. Still firmly committed to segregation and with the alumni recommendation device struck down, southern white universities had to find other devices to keep out black students. There is strong circumstantial evidence that heightened admission standards were one of the device turned to for this purpose.

317. The UA Board minutes of May 19, 1963, refers to Judge Grooms' order of May 16, 1963, with respect to the petitions for admission of Vivian Malone, Jimmy Hood and Dave McGlathery. The minutes emphasizes that the court

> reiterated the force of its order [of 1955 against Dean Adams] and, in effect, directed the University to process these applications toward admission if these applicants were found qualified under University admission requirements.

KX 3687. Thus, by now, admission requirements were the only viable device left to Alabama's HWUs to resist desegregation.

318. With Governor Wallace in attendance, the UA Board conducted a review of their admissions policies, following Judge Grooms' order requiring the admission of Vivian Malone and Jimmy Hood. Providing further evidence that the ACT requirements were part and parcel of the campaign of massive resistance, the September 9, 1963, UA Board minutes state:

> Trustee McCorvey was recognized at this point and reported to the full Board concerning policies and practices of student admissions to the University for the Board's information and approval.

> He stated that he had attended a meeting of the Executive Committee at which this matter was discussed and that the Executive Committee had expressed approval of the manner in which the University Administration was handling its admission procedures. There was further discussion by Dr. Rose, Mr. Bennett,

Dr. Pow, Governor Wallace and other Trustees, in which there was expression of a unanimous feeling of approval concerning the action and proposed action of the University Administration in this regard. KX 3689, p. 2.

319. While many of those behind the heightened admission standards desired to use them to maintain as all white the University of Alabama, it is clear that at least with regard to the ACT requirement it was never used in such a manner. Between 1959 when the ACT was first adopted and 1963 when the University of Alabama was for the second time ordered to admit black students, 200 blacks applied for admission to the university. All black applicants during this time withdrew their application prior to having to satisfy the examination requirement. UASX 1205 11, p. 175.

### b. Auburn University

320. As of 1955, every Alabama graduate of an approved high school was eligible for admission to AU. KX 1753, pp. 1–2. This open admissions policy soon changed.

321. In 1956, the year Autherine Lucy was ordered admitted to UA and the Alabama Constitution was amended to implement the state's strategy of massive resistance, the following proviso was added to AU's admissions policy, which echoes the language of the 1954 Interim Legislative Committee Report:

> Applicants for admission were considered in terms of their academic preparation, mental capacity, and aptitude for the course of study desired; morality; health; and psychological fitness for the environment, traditions and customs of this institution.

KX 1753, p. 2. Moreover, nonresidents were declared ineligible, except for children of AU alumni. *Ibid.*

322. In March 1962, the Board of Trustees for the first time formally adopted an admissions policy. It required graduates of Alabama high schools to achieve a score of 16 on the ACT. Nonresident applicants were required to score an 18 to be eligible for admission. Applicants who did not meet these test requirements

> were considered on an individual basis, and any one or any combination of the following types of evidence was used in appraising the eligibility of the applicant for admission: a personal interview, high school grades, rank in class, recommendation of the high school principal, and/or review of the results of tests already given or which were required.

KX 1753, p. 4.

323. In the Fall of 1967, only months after the March 1967 statewide desegregation order of the three-judge court in *Lee v. Macon,* the cutoff ACT score for Alabama applicants was increased to 18.

324. Failure to satisfy admissions requirements were the legal excuse AU selected in its first federal court defense of segregation. *Franklin v. Parker,* 223 F.Supp. 724 (M.D.Ala.1963), *modified on appeal,* 331 F.2d 841 (5th Cir.1964).[30] In accord with the 1954 Interim Legislative Committee Report, AU relied on the alleged inferior qualifications of blacks to resist desegregation. This pretextual strategy appears in the November 26, 1963, AU Board minutes, commenting on Judge Johnson's November 5, 1963, order to admit Harold Franklin.

> Auburn University has certain admission requirements which have been uniformly applied to every applicant for admission. The Federal District Court has chosen to admit an individual who is not qualified under the requirements of the University. If the order is allowed to stand, the Court has effectively destroyed the conditions for admission established by the University in operating in accordance with the standards of other similar institutions.

---

**30.** Mr. Franklin was applying for admission to the graduate school and was not subject to the newly instituted ACT requirement of Auburn University. In its defense of the suit brought by Mr. Franklin, Auburn maintained that since Mr. Franklin graduated from ASU at a time when it had lost its accreditation, that Auburn could not admit Mr. Franklin to its program. *See, Franklin v. Parker,* 223 F.Supp. 724, 726 (M.D.Ala. 1963).

**1116**

It is the firm opinion of the Board of Trustees of Auburn University that the order in question is contrary to the facts presented to the Federal Court and to applicable federal law. The Board will continue to utilize all available legal means to prevent the admission of any student who is not qualified to attend the University.

USX 7h.

ii. *Decentralizing Governance of the Traditionally White Teacher Colleges*

325. The 1967 laws taking the white teacher colleges (but not ASU and AAMU) out from under the control of the SBE and putting them under the governance of separate, gubernatorially appointed boards of trustees was part of a strategy of avoiding federally mandated segregation by decentralization. Separate boards would hopefully prevent the four schools from being subject to a single court order. Thornton (11/7/90) 313–15.

326. Governor Patterson explicitly recommended this racially discriminatory scheme in his May 2, 1961, state-of-the-state address to the Legislature, indicating that this was not the first time he had made such a recommendation:

I wish to again recommend the enactment of a law placing our State colleges—with the exception of the Negro colleges—under the control of separate boards of trustees if they are not already under such boards. I make this recommendation because I see the need for further decentralizing control of our colleges due to continued attacks by race agitators to integrate our schools. This decentralization would make it more difficult for these agitators to attack more than one college at a time. I believe the Negro colleges should remain under the control of the State Board of Education.

USX 10, pp. 15–16.

327. Governor Patterson made it clear that his recommendation to deny the HBUs autonomous boards of trustees was a continuation of Alabama's historical policy of maintaining white control over the higher education of blacks. His speech was delivered only a year after he had ordered the expulsion of ASU students and the firing of at least one ASU faculty member for participating in the Montgomery courthouse sit-in. The speech repeats the same connection between white supremacy and control of black education voiced by Governors Thomas G. Jones in 1887 and by Governor Jelks:

We have experienced only isolated episodes of racial strife, and the responsibility for these outbursts I place at the doorsteps of a handful of Negro preachers and school teachers who are influenced by outside troublemakers. While we cannot interfere with the right of free speech in the church, we can see to it that State money is not used to pay teachers to turn out race agitators and law violators. The role of the school is to educate and not to destroy.

USX 10, pp. 16–17.

328. Patterson's 1961 speech also repeated the threat to turn public education over to private schools and referred to his efforts to upgrade facilities at Negro schools, thus demonstrating the state's continued pursuit of the massive resistance scheme recommended by the 1954 Interim Legislative Committee Report. USX 10, p. 16.

329. Governor Patterson urged the state to renew its resolve to maintain segregation in his farewell address to the Legislature on January 8, 1963.

I recommend that we continue to maintain segregation of the races in our public schools. I recommend that we resist to the fullest all attempts to integrate our schools. We should make it clear at all times that we are not going to weaken or surrender but are going to hold steadfastly in our principles and beliefs. We should not back up one inch nor give in to the racial agitators or would-be integrators. We should make it known at all times that when they take us on that they are in for the fight of their lives. We can win if we stand firm, if we remain resolute and steadfast. I urge the incoming administration and the At-

torney General to continue the fight that we have waged so successfully thus far against all attempts to integrate our public schools and against the N.A.A.C.P. and all other race-baiting organizations which attempt to bring destruction upon us.

USX 11, pp. 14–15.

330. No action was taken to give the white teacher colleges separate boards until 1967. On March 22, 1967, the three-judge court in *Lee v. Macon* relied on interference by Governor Wallace and the SBE in court-ordered desegregation of the Macon County public schools to find there was a sufficiently unified statewide system of elementary-secondary education to issue a statewide desegregation order, which included provisions aimed at the post-secondary institutions governed by the SBE. This statewide injunction "brought home to officials in Alabama the virtues of decentralization." Thornton (11/7/90) 314; Thornton (11/26/90) 27–35.

331. So, in the summer of 1967, the Legislature finally passed laws transferring authority over the four white teacher colleges (UNA, JSU, LU and TSU) from the SBE to independent boards of trustees. Dr. Thornton gave his opinion that these laws were motivated in part by the desire to avoid federal desegregation efforts, and that ASU and AAMU were left under the SBE to ensure continued white control over them. Thornton (11/26/90) 37–40.

7. Importance of Alabama's HBU's To The Civil Rights Movement

332. ASU and AAMU are critically important institutions for the life of the black community in Alabama. In many ways they were the birth place of the 1950's and 1960's civil rights movement. In fact, historically black colleges throughout the South provided a tremendous amount of the impetus and leadership for the social and political reforms of the 1960's. In Dr. Thornton's words:

many of the ... events of the Civil Rights Movement are shaped by and have their locus in particular communi-

ties because there are black colleges in those communities. There is a bus boycott in Tallahassee and that clearly grows out of the presence of Florida A & M in Tallahassee. There are the sit-in's in Greensboro and that clearly grows out of the fact that North Carolina A & T is in Greensboro. The presence of Tuskegee Institute in Tuskegee is crucial to the Tuskegee boycott of 1957. And et cetera. Those are just some examples of how crucial these black colleges are to the Civil Rights Movement of the late 1950's and early 1960's.

Thornton (11/7/90) 294, 354–56.

333. The event that began the Civil Rights Movement on December 5, 1955, was the Montgomery bus boycott, and ASU played a crucial role in its birth and progression. In the mid 1950's E.D. Nixon initiated demands on the Montgomery City Commission to modify its segregationist policies with regard to public transportation. He was joined in his efforts by two other black leaders, Rufus A. Lewis, a former football coach at ASU, and Mrs. Jo Ann Robinson, and English teacher and leader of the Black Women's Political Council.[31]

334. Professor Jo Ann Robinson was "[t]he most prominent single figure of the black community in Montgomery in dealing with the city commission and the political structure in Montgomery...." Thornton (11/7/90) 295.

335. Professor Robinson's participation in the boycott tested the limits of black autonomy in an educational institution that ultimately was subject to white control—in this case, the SBE and the governor. President Trenholm was acutely aware that state appropriations for ASU and Professor Robinson's own job would be jeopardized should her involvement become known publicly. Dr. Trenholm summoned Professor Robinson to his office and would have fired her himself had she not promised to keep her role in the boycott secret. Thornton (11/7/90) 296–97.

---

**31.** The membership of the Black Women's Political Council was populated in large measure by professional women associated with ASU or on its faculty.

336. The boycott, begun when Mrs. Rosa Parks, a graduate of ASU's laboratory school, was arrested for refusing to give up her seat on a Montgomery bus, ended only after its leaders turned to the federal courts, *Browder v. Gayle*, 142 F.Supp. 707 (M.D.Ala.1955), thus setting the pattern for the civil rights revolution the Montgomery Bus Boycott touched off.

337. In addition to providing leadership during the bus boycott, ASU students were also very involved in the 1960 sit-ins in Montgomery. Thirty-five ASU students organized the sit-in at the Montgomery County Courthouse snack bar with the quiet support of the ASU community. They were backed by the ASU student body and some of the members of ASU's faculty. Franklin (12/3/90) 10–11. This was one of the first two sit-in demonstrations in the nation, along with the one carried out by students at historically black North Carolina A & T. Holmes (11/13/90) 6.

338. Governor Patterson and the SBE were thunderstruck by the sit-in, and they responded by marshaling the full force of Alabama's historical white control over black educational institutions. Governor Patterson called the SBE into emergency session. He demanded that all 35 students be expelled by ASU, but President Trenholm negotiated a resolution whereby only nine would be expelled and the rest placed on probation. The nine students expelled were selected because they had out-of-state addresses. Reed (2/12/91) 8. Trenholm was forced to face public humiliation, appearing before an SBE meeting chaired by Governor Patterson, who demanded that "racial agitation" on ASU's campus be silenced. Thornton (11/7/90) 303–05.

339. The March 2, 1960, minutes of the SBE describe the highly publicized appearance of President Trenholm before the SBE and Governor Patterson.

> Dr. H. Councill Trenholm, President, Alabama State College, complying with the formal request of Governor Patterson, appeared before the Board and gave his report of the investigation relating to the downtown demonstration of certain students from the college in the matter of

appearing at the Court House Restaurant and demanding service. It was determined by his investigations and that of Mr. Floyd Mann, Director of the State Department of Public Safety, that there were nine students who lead [sic] the demonstration. Dr. Trenholm agreed that the students should be punished and that their action might have been influenced by a student or students from out of the State. He earnestly requested that the students be allowed to take the final quarter examinations. The Board agreed that they be permitted to do so, but that the order of expulsion for the nine leaders of the demonstration be made effective Friday, March 4, and that the pupil record show such action, also that the probation of other students taking part in the demonstration be made effective the same date. Dr. Trenholm stated that the participating students were obsessed with obligation and conviction and felt that they had done no wrong. He expressed the feeling that he could control future behavior on the campus and that the students should be reprimanded and put on probation from now on. The Governor felt that the situation was much too tense and the danger of life and bloodshed too perilous to pass up lightly the matter of punishment of the participants.

USX 8h.

340. The SBE unanimously adopted Governor Patterson's motion that nine students be expelled and that twenty other students "be placed on probation and allowed to remain in school pending good behavior." USX 8h.

341. The SBE's expulsion of the ASU students was declared unconstitutional in the case of *St. John Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.1961). Before the *Dixon* suit was filed, however, six of the nine expelled ASU students attempted to enroll at the UA extension center in Montgomery. UA, of course, was under injunction in the *Lucy v. Adams* case to admit black students. But the UA extension center denied their applications, claiming that ASU had been

too slow in forwarding their transcripts. Thornton (11/26/90) 72–73.

342. President Trenholm was directed by the SBE on March 25, 1960, to dismiss all ASU faculty members "who are not loyal to the College in all matters of discipline and of rules and regulations pertaining to the proper functioning of the College at all times...." USX 8g.

343. At the SBE meeting on June 14, 1960,

there was the decision to dismiss that afternoon Dr. L.D. Reddick, Professor History, and there was also the mandate to the President [Trenholm] to appear before the State Board of Education and to have available the assembled personal-data on staff members as well as to submit report of his efforts and procedures in seeking to rectify the problems of the past five months.

USX 8g. Dr. Trenholm appeared and made his report to the SBE and Governor Patterson on July 20, 1960. *Ibid.*

344. One of the professors forced to resign as a result of SBE pressure was Jo Ann Robinson. Thornton (11/26/90) 71.

345. The following year, 1962, students at AAMU staged their own sit-in demonstration in Huntsville. This sit-in did not receive the same amount of publicity as the one in Montgomery; nevertheless, Governor Patterson demanded that the SBE fire Dr. Joseph Drake, President of AAMU, for not having prevented the demonstration. Dr. Drake was fired and replaced by Dr. Richard Morrison. Thornton (11/26/90) 109–10.

### 8. The History Of Branch Campus Development

i. *The University of Alabama at Huntsville*

*a. Origin and Development*

346. UAH began in the late 1940's as an extension of UA and in 1969 became a separate campus in the University of Alabama System. SOF ¶ 578.

347. The establishment and expansion of UAH is closely intertwined with national trends in higher education, the histories of Huntsville, Madison County, Redstone Ar-

senal, and the U.S. space program. Moquin, (3/20/91) 107.

*b. Extension Center Movement*

348. During the 1940's and early 1950's there was a national trend in higher education for large public institutions to establish extension centers in urban areas. 85 UASX 510. This trend was not limited to the South. 85 UASX 510; Fincher (3/26/91) 17.

349. The nation-wide extension movement was spurred by the demand for educational opportunities closer to home by World War II veterans wishing to take advantage of federal assistance, and by the growing interest in evening courses as a more convenient option for the adult, non-traditional student. 85 UASX 510; Fincher (3/26/91) 13.

350. In the late 1940's, The University of Alabama established extension centers in Gadsden, Montgomery, Birmingham, Mobile, Dothan and Selma. SOF ¶ 515.

351. During the late 1940's and early 1950's, the Huntsville community sought the benefits associated with the establishment of an extension center of the University of Alabama. 85 UASX 512; UASX 876.

352. A committee of interested local citizens was formed to encourage UA to establish an extension center in Huntsville. 85 UASX 512; UASX 876. All members of the committee were white.

353. The Madison County Chamber of Commerce and Industrial Development Agency assisted in assessing community need and support for a Huntsville Extension Center. 85 UASX 512.

354. Extension centers were heavily dependent on tuition and fees of students, and before a university would establish an extension center in an area certain assurances concerning the number of students who would take extension classes and the nature of support by their employers would generally be obtained. Each center had to stand on its own financial base with regard

to tuition and fee revenue. Fincher (3/26/91) 15.

355. Consequently, when considering the establishment of the extension center at Huntsville, the Dean of the Extension Division at UA inquires by letter dated February 26, 1949,

> [I]n regard to the establishment of a University of Alabama Center in Huntsville. I wonder what part of [the] population is white. If three-fourths of the citizens of [Huntsville] are white, that would give you some 27,000 to 28,000 people from whom a resident University Center would draw.

AAMUX 415, p. 5.

356. The activities of the Chamber of Commerce and other Huntsville citizens in seeking to persuade the University of Alabama to open an extension center in Huntsville fits the pattern for the origin of extension centers typically found elsewhere throughout the nation. Fincher (3/26/91) 18–20; UASX 876.

357. The undergraduate educational program of the Huntsville Center was designed to respond to local needs and was supported by the local white community. 85 UASX 551; 85 UASX 516(A); UASX 876.

358. The University of Alabama established its center in Huntsville based on the needs of the community. At the time the extension center was established, however, it was limited to only white students, while AAMU only a few miles away was limited to black students. AAMU was never considered for expansion by the state.

### c. Early Growth

359. The Huntsville Extension Center of UA offered its first classes in January 1950. SOF ¶ 413. Initially the Extension Center courses were taught at Butler High School. 85 UASX 1103. Butler High School was chosen as the location of the Extension Center in Huntsville because of its central location. One of the requirements of the UA Division in agreeing to locate a center in Huntsville was that centrally located facilities would be secured. 85 UASX 1103.

360. During the first full academic year (1950–51) of the Huntsville Center, instruction in the following courses was offered: accounting, biology, chemistry, child development, economics, engineering, English, German, history, marketing, mathematics, pesticides, physics, political science, psychology, and speech. SOF ¶ 414.

361. The academic programs and all other aspects of the Huntsville Center from 1950 to 1966 were governed and controlled by UA and its appropriate components. SOF ¶ 428.

362. Prior to 1966, the top administrative officer or executive officer of the Huntsville Center was the UA President. Dowdle (7/11/85) 2240.[32]

363. The top executive officer located in Huntsville was known as the Vice President for Huntsville Affairs. Dowdle (7/11/85) 2240.

364. By 1963, there were three full-time faculty members at the Huntsville Center. Dowdle (7/11/85) 2230–31. Until 1963, instructors would come from the Tuscaloosa campus to teach in Huntsville.

365. Beginning in June 1963, students could complete all required course work at the Huntsville campus for the following master's degrees:

M.A.: Mathematics

M.S.: Physics

M.S.E.: Engineering

These degrees were awarded by the University of Alabama. SOF ¶ 425.

---

**32.** Counsel for the Knight Plaintiffs raised a general objection to the admissability of the 1985 trial testimony of Mr. Dowdle and others to the extent that they testified about historical events concerning the development of the UAH campus. Counsel indicated that his cross examination of Mr. Dowdle and others regarding such events were limited given the manner in which the Knight Plaintiffs' claims were structured. After hearing argument the Court allowed UAH to introduce the prior testimony of Mr. Dowdle and others subject to counsel for the Knight Plaintiffs renewed motion to strike the testimony if it appeared that inadequate opportunity to examine the witnesses existed. It is the Court's recollection that the Knight Plaintiffs never again raised the issue. *See* Hinkle (3/12/91) 62–65.

366. Beginning in 1964, students could complete degree requirements at the Huntsville campus for the following bachelors degrees:

B.A.: History, English, Mathematics
B.S.: Physics
B.S.E.: Engineering

These degrees were awarded by the University of Alabama. SOF ¶ 426.

367. In 1964 the Southern Association of Colleges and Schools recommended to the University of Alabama that the Huntsville campus cease to be a campus and become a branch. SOF ¶ 429.

368. In 1966, UAH became an official branch of The University of Alabama. The Chief Executive Officer of UAH was the Vice President of Huntsville Affairs who reported to the President of the University of Alabama. SOF ¶ 430; 85 UASX 553.

369. Becoming an official campus carried accreditation implications in that it was expected that degrees would thereafter be offered in the name of UAH. Dowdle (7/11/85) 2235.

370. The announcement that degrees would be granted by UAH was made by President Rose in 1964. The first degrees were to be awarded in 1968. However, these degrees were not awarded in the name of UAH. Authority to award degrees in the name of UAH was not conferred upon the institution until 1969. Dowdle (7/11/85) 2236.

### d. Federal Government Support

371. In October 1948, the Chief of Ordnance of the U.S. Army designated Redstone Arsenal as the center for research and development in rocketry science. On June 1, 1949, certain facilities at Redstone Arsenal which had been closed after World War II were reactivated by the U.S. Army as the site of the Ordnance Rocket Center.

372. In October 1949, the Secretary of the Army designated a portion of what is now Redstone Arsenal, but which then was separately known as the Huntsville Arsenal, as the site of the Ordnance Guided Missile Center. On April 15, 1950, the "Von Braun team" from Fort Bliss, Texas, arrived and the Ordnance Guided Missile Center commenced operations. On February 1, 1956, what had been the Ordnance Guided Missile Center (but which subsequently had been renamed the Guided Missile Development Division), with some augmentation, became a command separate from the Redstone Arsenal Command, the Army Ballistic Missile Agency ("ABMA"). What was the Ordnance Rocket Center remained a part of the Redstone Arsenal Command at that time but experienced a number of name changes.

373. On March 31, 1958, the Army Ordinance Missile Command ("AOMC") was formed with headquarters at Redstone. The commander of the Army Ballistic Missile Agency became the commander of the Army Ordinance Missile Command at its establishment, and although the Army Ballistic Missile Agency remained at the Arsenal it became a subordinate command of AOMC. The Army Rocket and Guided Missile Agency ("ARGMA"), was added at Redstone as another subordinate command of AOMC on April 1, 1958. These two subordinate commands were abolished on December 11, 1961. On August 1, 1962, the Missile Command ("MICOM") (which had been officially established on May 23, 1962) became operational and replaced the Army Ordnance Missile Command. With the exception of the period January 31, 1977, through June 30, 1979, when it was split into the Army Missile Material Readiness Command ("MIRCOM") and the Army Missile Research and Development Command ("MIRADCOM"), the command has kept the name Missile Command through the present. MICOM should not be confused with elements of the Army Ballistic Missile Defense Systems Command ("BMDSCOM") (which is now the Strategic Defense Command ("SDC") which were also located in Huntsville, although at Research Park. SOF ¶ 416.

374. In the early 1950's, the Department of the Army, brought several hundred engineers and scientists, many of whom were or had been German citizens, with their families to Huntsville to work on

ballistic missile research and development. SOF ¶ 415.

375. The scientific arm of the Army Ballistic Missile Agency was the Development Operations Division, which was headed by Dr. Werhner Von Braun, a German scientist who had worked for the Nazi government in World War II. Zirdt (7/25/85) 5780.

376. The Soviet Union's successful launch of Sputnik in 1957 resulted in enhanced national priority being given both to the U.S. space program and to an effort to alleviate a national shortage of engineers and scientists. SOF ¶ 417.

377. In 1960, NASA [33] established the George C. Marshall Space Flight Center in Huntsville, Alabama and assigned to this Center substantial responsibility for implementing the nation's space exploration program. SOF ¶ 420.

378. When the Marshall Space Flight Center was created, the entire Von Braun technical team of the Army Ballistic Missile Agency was transferred to NASA. Zirdt (7/25/85) 5785.

379. During this period (1950–1966), Huntsville experienced dramatic population growth and UAH grew with the city. SOF ¶ 431.

380. After World War II, the United States Army perceived a need for graduate programs in scientific, engineering, and management areas to be offered in Huntsville to enhance educational opportunities for its civilian and military employees. SOF ¶ 422.

381. Due to the expansion of the missile program in Huntsville, the Army Ballistic Missile Agency found it necessary to hire and attract to Huntsville many new scientific personnel. The Army Ballistic Missile Agency found that it needed to have an academic atmosphere in Huntsville in order to recruit the scientific and engineering personnel needed. The required scientists and engineers would not be willing to take a job with the Army Ballistic Missile Agen-

cy if they were not able to continue their education in their specific field. Additionally, there was at that time a nationwide shortage of scientists and engineers which contributed to the recruitment problem. Zirdt (7/25/85) 5783; Hinkle (3/12/91) 14–17.

382. Private industry in the Huntsville also had a need to find, attract, and retain outstanding, creative and innovative research-oriented engineers and scientists. This need required that Huntsville have a readily accessible university with accredited programs to furnish well-trained graduates for employment in the area and to allow employees in private industry to stay current in their field as well as to pursue advanced degrees. Moquin (3/20/91) 22; UASX 840.

383. The initiative for the expansion of the Huntsville Center came from the Army. In order to create the atmosphere in Huntsville which it felt was needed, the Army wanted UA to establish a four-year undergraduate program at Huntsville. The Army hoped that this would lead to the establishment of a curriculum which would permit Redstone Arsenal employees to get advanced degrees as well as undergraduate degrees without leaving the Huntsville area. Zirdt (7/25/85) 5787; 85 UASX 539.

384. The Army considered institutions other than UA for the creation of the academic atmosphere that was needed in Huntsville; however, UA was the only one to which the Army had engineering ties. Zirdt (7/25/85) 5788–89. There is no indication that AAUM was ever considered by the Army or any other agency for expansion.

385. Beginning at least as early as 1956, the United States entered into a series of contracts with UA whereby graduate courses were to be offered at the Huntsville Center. Those contracts were continued until 1969. SOF ¶ 423; 85 UASX 533.

386. Initially, graduate courses were offered through the Extension Center in

---

**33.** The National Aeronautics and Space Administration (NASA) was formed in 1958. SOF ¶ 419.

Huntsville pursuant to a contract with the United States Army. The initial period of the contract was 1951 through 1953. The program ended in 1953 but was resumed in 1955. 85 UASX 1103.

387. The courses offered at the Redstone Graduate Program were taught by UA faculty members and limited to programs in the hard sciences. Dowdle (7/11/85) 2224; Hinkle (3/12/91) 12–13.

388. The all white Joint Graduate Study Steering Committee was an official committee formed and chartered by federal authorities at Redstone Arsenal. It was originally started by the Commanding General of the Redstone Arsenal. When NASA became a separate organization, the Joint Graduate Study Steering Committee became a joint committee staffed by NASA personnel as well as by military personnel. The Committee was alternately chaired on an annual basis by a military designatee or a NASA designatee. The purpose of the Joint Graduate Study Steering Committee was to further the opportunity to get engineering and other advanced degrees for employees of both NASA and the Army. Zirdt (7/25/85) 5789; 85 UASX 525; 85 UASX 542; 85 UASX 545.

389. The Joint Graduate Study Steering Committee played a critical role in the expansion of the UA Center in Huntsville. This Committee directed the federal effort to expand academic opportunities in Huntsville. Zirdt (7/25/85) 5789.

390. The Steering Committee exerted such influence as to amount to control over certain aspects of administration of the program at Huntsville Center. For example, the Joint Graduate Study Steering Committee had the right to approve the graduate courses offered by the Center pursuant to its contract with the Army, and it exercised control over the time of day in which graduate courses were offered at the Huntsville Center. Dowdy (7/30/85) 6910–12. The Committee also decided who was eligible to attend the courses, how many students would be allowed in each course and the tuition to be charged for the courses. Hinkle (3/12/91) 10–13.

391. The Joint Graduate Study Steering Committee wanted an administrator with an engineering or scientific background to be hired by UA to run the Huntsville Center's graduate program. After some discussion, UA eventually hired Dr. Joseph Dowdle. Dowdy (7/30/85) 6912–13.

392. The federal government supported the Army Ballistic Missile Agency's quest to provide additional educational opportunities in Huntsville. The Alabama state government was, however, reluctant at the time to expand the educational opportunities then available in Huntsville. Stuhlinger (7/29/85) 6412.

393. There were pressures from UA in Tuscaloosa to keep the program in Huntsville small. By 1953 the Huntsville Center was offering 83 courses. The UA graduate faculty in Tuscaloosa was jealous of the graduate program in Huntsville. Many of the graduate faculty in Tuscaloosa thought that they were losing students to Huntsville who otherwise would have gone to Tuscaloosa. 85 UASX 1103; UASX 839.

394. The Joint Graduate Study Steering Committee provided many initiatives for the expansion of the Huntsville Center. These initiatives were met by hesitancy and reluctance on the part of UA officials, who required persuading. Specifically, the Joint Graduate Study Steering Committee provided the initiative for the awarding of local degrees in Huntsville. As early as 1956 and 1957, Committee sought from UA officials the authority to award local degrees in Huntsville. Not until the mid 1960's did local degrees became available at UAH. Dowdy (7/30/85) 6900; 85 UASX 548.

395. Alabama A & M was unable to provide the courses which were needed at that time because it did not have an engineering school, nor did they have appropriate scientific courses. Dowdy (7/30/85) 6905.

396. AAMU was contacted and considered for involvement in the Redstone Graduate Program during the period when General Zirdt was in command of Redstone Arsenal, that is, from 1963 to 1967. Zirdt (7/25/85) 5816–17. By that time, however,

the UA extension center was already offering graduate programs in the hard sciences.

397. During the 1950's, AAMU had no programs in engineering science. Stuhlinger (7/29/85) 6415.

398. General Zirdt knew that Alabama A & M University did not have an engineering school. He knew from conversations that his staff had with Dr. Morrison, then President of AAMU, that the university did not have the engineering school and the engineering programs that the federal agencies in Huntsville required. Zirdt (7/25/85) 5800.

399. In August 1964 UA attempted to raise money for a particular expansion project. General Zirdt believed that UA was vitally in need of the money in order to expand its Huntsville facility. As Commanding General of Redstone Arsenal, he wrote a letter which he distributed to all personnel working on Redstone Arsenal requesting their support. This letter was official encouragement by the Army for the University's fund-raising effort. The official encouragement also took the form of some guidelines which were written under the direction of General Zirdt and published by the Redstone Rocket, a weekly newspaper published on Redstone Arsenal. This letter and the guidelines were distributed to the employees of Redstone Arsenal in their pay envelopes. In his letter, General Zirdt stated as follows: "the vital importance of The University of Alabama Huntsville campus is evident from any official, civic, family or personal viewpoint. It merits this official endorsement and our personal support. Speaking for the Army Missile Command, the Commandant of the Ordinance Guided Missile School and the Nike X Project Manager, I urge you to consider making an effective, personal contribution directly to The University of Alabama Huntsville campus. Certainly all will share in the benefits to be derived from living in a university community; all will have the opportunity to profit in a very real sense from the growth of this laudable enterprise". Zirdt (7/25/85) 5791; 85 UASX 549; 85 UASX 550.

400. Mr. John Hinkle came to Redstone Arsenal in 1960 as Chief of Civilian Training for the United States Army. He was responsible for all training activities and development of civilian personnel, which included on-the-job training, career development, off-post training, and graduate work. Hinkle (3/12/91) 3–4.

401. At the time of Hinkle's arrival, the emphasis for such training was in the engineering and scientific fields because of the high demand for such services at Redstone Arsenal. Hinkle, (3/12/91) 5.

402. These courses were offered at the UA Huntsville Extension Center and were monitored by several federal committees. These committees had been in existence prior to 1960, but in 1960 the Joint Graduate Studies Steering Committee was reorganized to reflect a reorganization of the various civilian personnel offices and the separation of NASA from the Army. The new Steering Committee represented both Army and NASA interests. Hinkle (3/12/91) 7–9.

403. This relationship between UA and the federal government was formalized in a series of contracts. All bills for the graduate program at the Huntsville Extension Center were paid by the Army. These bills included the cost of salaries of the professors from Tuscaloosa. Hinkle (3/12/91) 12–14; 85 UASX 533.

404. Hinkle worked frequently with Dr. Morrison and other AAMU personnel. Hinkle arranged for short courses in management to be offered at Alabama A & M University for the benefit of Army and NASA employees. Hinkle (3/12/91) 23–24.

405. Alabama A & M could not be used for the type of graduate courses offered at the Huntsville Extension Center because A & M did not have the engineering and scientific courses necessary. UA had an established engineering school already in being. Hinkle (3/12/91) 25, 43.

406. On February 16, 1965, there was a meeting attended by several NASA officials, including Dr. William R. Lucas, Chairman of the Joint Graduate Studies Steering Committee. At the meeting the

possibility of terminating the graduate contract with UA was discussed. The officials felt, however, that the current academic and political climate would make cancellation of the contract detrimental to the continuation of UA Huntsville Center and, thus, not in the federal government's best interest. These federal officials noted an apparent feeling against the expansion of the Huntsville Center. The officials noted that the percentage and number of graduate students at Huntsville had increased, while the percentage and number of graduate students at the Tuscaloosa campus had declined. Thus, the federal officials felt that UA people viewed the Huntsville program as contributing to the decline of the Tuscaloosa campus graduate program.

407. The federal officials also observed that the Alabama legislature was then dominated by rural interests. The federal officials hoped that the Alabama legislature would provide specific line-item funding for the graduate program in Huntsville. The federal officials felt that if the Huntsville graduate program became simply a part of the UA graduate program with the state funding to be distributed by UA officials, this could result in a dearth of funds for the Huntsville activity. The federal officials felt that the Tuscaloosa campus and the Alabama state legislature constituted interests which were against the Huntsville operation. Federal officials felt that withdrawal of federal support for the Huntsville program would provide these interests with strong ammunition for an argument that the Huntsville Center did not need definite, specified state support and that it did not need to be progressively enlarged, as the federal officials felt that it should be. Consequently, the federal government continued its contractual support of the graduate program at the Huntsville campus for an additional four years, until 1969. 85 UASX 540, 85 UASX 532 A.

408. In addition to graduate training for its employees, the Army also had need of a research facility in the Huntsville area. If Huntsville had a major research facility, Army and NASA research contracts could be placed in Huntsville, which would attract top level personnel to the area to work on the contracts. The top level researchers could also serve as faculty at the Extension Center to upgrade the quality of instruction. This, in turn, would help attract high quality employees to the Huntsville area and give added support to the Joint Graduate Study Steering Committee's efforts to persuade UA to allow Huntsville to award degrees in those areas. Hinkle (3/12/91) 17–19, 49–50.

409. The Steering Committee told UA that a research institute must be established in Huntsville and if UA would not do it, the federal government would find another university that would. UA then agreed to support the creation of a research institute in Huntsville. Hinkle (3/21/91) 19.

410. In a letter to UA President Frank A. Rose dated June 13, 1960, Mr. J.C. McCall, acting for the Joint Graduate Study Steering Committee, noted that Dr. Von Braun, General Schomburg and General Medaris all stated in no uncertain terms that it was "absolutely essential to the welfare of the organizations within Redstone Arsenal, and therefore to the United States, that the academic posture of the Huntsville community be greatly improved." They recognized the value of the existing University of Alabama activity in Huntsville, but observed that it was grossly inadequate and "the time ha[d] arrived when some definite action must be taken to rapidly accelerate the program." McCall stated that in order to accomplish this acceleration it was the recommendation of the Joint Graduate Study Steering Committee that UA establish a Research Institute in Huntsville. One of the purposes of the Institute would be "to enlarge and accelerate The University of Alabama educational program in Huntsville." 85 UASX 548.

411. Dr. Von Braun appealed to the Alabama Legislature to fund a research institute in Huntsville, and the Legislature responded favorably to that request. Hinkle (3/12/91) 20.

412. On June 20, 1961, one month after Governor Patterson imposed martial order on account of the bloody beating of free-

dom riders in Montgomery, Dr. Werhner Von Braun, Director of the George C. Marshall Space Flight Center, made an address to a joint session of the Alabama Legislature. In that address, he urged support for the Research Institute being proposed for establishment at the UA Extension Center in Huntsville. Dr. Von Braun noted that the federal effort in Huntsville needed high quality scientific and engineering personnel. In order to hire and retain those people he wanted an academic atmosphere established in Huntsville. Following Dr. Von Braun's appeal, the Alabama Legislature appropriated three million dollars for a bond issue to construct and equip the Research Institute in Huntsville. 85 UASX 547.

413. No one, not Von Braun, not the governor, no legislator and no educational official, suggested expanding AAMU instead. According to Dr. Thornton, use of a historically black college to serve the educational and economic interests of the Huntsville area was unthinkable to white decision makers. Thornton (11/26/90) 155–60.

414. In light of remarks by Dr. Von Braun, it was perceived by members of the Huntsville community that the expansion and growth of the Huntsville Center was essential to the continued prosperity of the community. 85 UASX 1103.

415. By 1969 UAH becomes a separately accredited campus within the University of Alabama system. SOF ¶ 758.

416. By 1969, UAH became a separate campus within the University of Alabama System. SOF ¶ 578.

ii. *University of Alabama at Birmingham*

417. The history behind the establishment of UAB is largely unremarkable from the prospective of this case. Yet, in order to properly orient the events of this time, the Court will provide a very brief historical sketch.

418. During the 1940's and 1950's, the trend for universities to offer services through extension centers had reached the point that practically all American colleges and universities had some form of extension activity. 85 UASX 510, p. VIII.

419. The University of Alabama at Birmingham opened in Birmingham as an extension center of The University of Alabama in 1936. At the time it opened, it did not enroll black students. In 1969, UAB became a separate campus of The University of Alabama System. Sometime in the 1960's and prior to becoming a separate campus, and at all times since becoming a separate campus, UAB has admitted black students. SOF ¶ 18.

420. In September, 1966, operations of the UAS at Birmingham were designated as the University of Alabama at Birmingham, transforming what had been called the University Extension Center into a four year, degree-granting institution. SOF ¶ 516.

421. The purpose of the Birmingham Extension Center from its beginning was to bring as many of the services of The University of Alabama to persons in the Birmingham community that the policies and resources of the institution permitted. 85 UASX 100, pp. 15–17, 20–22.

422. In June, 1969, UAB was given independence within the framework of the University of Alabama System, having its own administrative structure with a President as Chief Executive Officer. SOF ¶ 517.

423. The University of Alabama at Birmingham was authorized to award degrees in Birmingham apart from the Tuscaloosa campus in 1970. Glaze (7/23/85) p. 5140.

424. UAB was accredited as an independent educational institution in 1970 by the Southern Association of Colleges and Schools, and the accreditation was reaffirmed in 1974 and 1984. SOF ¶ 518.

iii. *Troy State University at Montgomery*

425. During the mid 1960's, the Armed Services determined that both officers and enlisted personnel could benefit, from additional educational services. Maxwell Air Force Base in Montgomery, Alabama, was,

and remains, a center for professional education for the Air Force. Stewart (3/18/91) 3.

426. The Department of Air Force determined, during the mid 1960's that a need for college-level instruction existed at Maxwell Air Force Base. Much like the Army in Huntsville, the Air Force sought a branch campus for its soldiers to attended. The Air Force contacted universities throughout the state to determine if any of the institutions were interested in providing academic programs during the evening hours so that military personnel could attend classes. Stewart (3/18/91) 3–4.

427. Following discussions between Air Force officials and TSU (then Troy State College), a Memorandum of Agreement was entered on January 7, 1965, providing that TSU would offer certain courses at Maxwell and Gunter Air Force Bases and that suitable facilities would be provided by the Air Force. Under the Memorandum of Agreement, "the ultimate goal for the future [would be] be a degree-granting branch." Stewart (3/18/91) 3–4; TSUX 9, pp. 1, 2; SOF ¶ 74.

428. The 1965 Memorandum of Agreement provided that "all academically qualified military personnel, civilians, and dependents will be eligible for admission to the courses offered by the College"; moreover, Department of Defense Directive 5500.11, issued December 28, 1964, regarding Non–Discrimination in Federally Assisted Programs, 29 F.R. 19291, was incorporated as "Attachment 1" to the 1965 Memorandum of Agreement. TSUX 9, p. 1; TSUX 10; Stewart (3/18/91) 5.

429. Department of Defense Directive 5500.11, prohibited racial discrimination generally, and with specific reference to institutions of higher education, provided that:

In the case of federal financial assistance to an institution of higher education, the assurance required by this Section shall extend to admission practices and to all other practices relating to the treatment of students.

TSUX 10, p. 14.

430. Pursuant to the Memorandum of Agreement, TSUM opened in 1965 as a racially integrated institution. TSUM has no history as either a *de jure* or *de facto* segregated institution. African–American students constituted approximately 25% of the enrollment in the spring quarter of 1965, the first session conducted by TSU in Montgomery. Hardwick, (3/18/91) 3–4; SOF ¶ 167; Stewart (3/18/91) 6–7.

iv. *Auburn University at Montgomery*

a. *Origin and Development* [34]

431. The Montgomery Chamber of Commerce, acting through its Education Committee first tried to get Auburn to relocate in Montgomery in 1922. The city government pledged $450,000 and 2000 acres of land if the AU Board would agree to move the university to Montgomery. AU's existing buildings badly needed replacing, and the state was about to invest large sums for capital improvements at all the state white universities. Relocation would have

---

**34.** Most of the history recited by the Court concerning the establishment and development of AUM comes from the extensive record developed in *Alabama State Teachers Association, et al. v. Alabama Public School and College Authority, et al.* ("ASTA"). The relevance and impact of the ASTA decision on this litigation is an issue over which the parties have a profound difference and one with which the Court will extensively deal. At any rate, a vast portion of the ASTA record was introduced into evidence in this trial by stipulation of the parties. *See* AUX 986.1–986.6. In its post-trial submission, Auburn University has thoroughly reviewed the ASTA record and proposed extensive findings regarding the establishment and development of AUM. AU's proposed findings concerning AUM

are distilled completely from the ASTA record. Auburn makes quite clear that many of its findings concerning the establishment of AUM are simply recitations of the evidence and pleadings which the plaintiffs presented to the ASTA court in 1968. It is clear that Auburn does not necessarily accept the veracity of the plaintiffs' evidence in ASTA, nor is Auburn conceding its accuracy by citing in their proposed findings the evidentiary allegations of the ASTA plaintiffs. Nevertheless, the Court has made extensive use of AU's proposed findings on this issue; however, before doing so the Court reviewed the ASTA record and as with all issues of fact satisfied itself that the record fully supports the factual findings herein.

been cost-efficient at this time in the school's history.

432. All the arguments about Montgomery's central location and the advantages of being near the seat of government were made. Auburn was promised that if it moved to Montgomery it "would always have backing it an active Chamber of Commerce." KX 3225, p. 3. Unpersuaded, the proposal was voted down by the Auburn Board of Trustees.

433. The Montgomery area Chamber of Commerce appealed to the Legislature, which was reminded that it represents all the people, not just Auburn alumni, and that it "is charged by the Constitution with the government, control, and support of Auburn." KX 3209, p. 1. There is no evidence the Legislature ever took any action, however, and AU obviously remained in Auburn. Anderson (11/28/90) 415–19; KX 3209, 3225, 3226.

434. By 1928, a presidential search committee of AU's Board was able to report:

The Legislature of 1927 has appropriated $1,250,000 for buildings and substantially increased its funds for operation and maintenance. With the sentiment of our people toward education, it appears that the financial troubles of the institution are largely in the past.

KX 3208. From this point forward, the idea of moving AU's main campus to Montgomery would become more and more remote. Anderson (11/28/90) 432–33.

b. *Early History*

435. In January, 1966, the Montgomery Chamber of Commerce reactivated its dormant Education Committee, under the chairmanship of Mr. Holman Head, primarily to work toward expansion of the then-existing University of Alabama Extension Center and to establish a state-supported, four-year university in Montgomery. Mr. Head had formerly been the Director of the UA Extension Center, which had operated in Montgomery since 1936. AUX 986.2, pp. 165–66; AUX 986.3, pp. 360–61, 369; AUX 986.1, p. 94.

436. The Extension Center was a non-degree granting institution offering courses primarily to freshman and sophomore level students, with programs in liberal arts, business, engineering, education and some nursing training. Course credit was eligible for transfer to other institutions. The Center was not racially segregated when the Chamber began its push for a four-year institution. AUX 986.3, pp. 361–62; AUX 986.2, pp. 168, 195.

437. It was the opinion of the Education Committee that there were many advantages in working with an existing university rather than establishing a new one, including utilization of existing facilities and the advantage of initial accreditation. The Montgomery Chamber of Commerce was the primary initiator and proponent of the establishment of the new four-year college in Montgomery.

438. The Chamber had no black members, directors, secretaries or clerical personnel, nor were any blacks in administrative positions or serving on the Education Committee. AUX 986.3, pp. 365–69, 379; AUX 986.4, p. 490; AUX 986.2, pp. 167–68.

439. The Chamber of Commerce first contacted the University of Alabama about the possibility of expanding its Extension Center into a four-year college in Montgomery. In July or August of 1966, Mr. Head met with Dr. Frank Rose, President of the University of Alabama, along with the Advisory Board of the Extension Center. AUX 986.3, pp. 422–34. Neither the Advisory Board nor the Alabama Board of Trustees had any black members. AUX 986.5, pp. 809–10, 983–84; AUX 986.1, p. 95.

440. The University of Alabama decided it would not operate the new institution and discussions thereafter turned to Auburn University. Dr. Philpott, President of Auburn, met with the Education Committee and the Advisory Board in February or March of 1967. AUX 986.2, p. 209; AUX 986.5, pp. 808–09; AUX 986.1, p. 95.

441. The Auburn Board of Trustees considered operating the new institution for the first time at its March, 1967 meeting. No formal action was taken at that time. The Board instructed Dr. Philpott to

inform the Education Committee that Auburn would do nothing to promote or secure a branch in Montgomery unless and until the Legislature appropriated and assigned the task to Auburn. AUX 986.2, p. 210; AUX 986.5, p. 809.

442. It was generally agreed that after passage of the enabling legislation, Auburn would take over the operation of the Extension Center in Montgomery and develop it into a four-year institution. AUX 986.2, p. 210; AUX 986.5, pp. 809–11; AUX 986.1, p. 95; AUX 986.4, p. 505.

443. Neither the State Superintendent of Education, the State Board of Education, nor Auburn made any study of the educational needs in Montgomery County prior to the enactment of the legislation which established AUM. AUX 986.5, pp. 813–14, 985–86; AUX 986.2, p. 153, 212.

444. Neither Alabama's nor Auburn's Board of Trustees considered or discussed the possibility of using Alabama State as a vehicle for expansion of the Extension Center. The Chamber of Commerce did not consider expansion of Alabama State. Drs. Rose and Philpott did not discuss the possibility of Alabama State taking over the Extension Center. AUX 986.3, p. 402; 90 AUX 986.5, p. 811; AUX 986.2, pp. 154–55, 174.

445. In about August of 1967, Mr. Head gave an address before the Education Committee, the University Center's Advisory Board, the local legislative delegation and representatives of city and county government outlining current plans for the new Montgomery institution. These groups included no blacks. AUX 986.3, pp. 374, 382–83; AUX 986.4, pp. 482–86; 90 AUX 986.1, pp. 94–95.

446. No public hearings were held with respect to the legislation establishing AUM. Senator Joe Goodwyn of Montgomery County played a major role in all negotiations and passage of the legislation establishing AUM. Mr. Head stated that he had "a tremendous amount of discussion with Senator Goodwyn during the two-year interval" but did not discuss with him the possibility of expanding Alabama State to meet the needs for higher education in Montgomery as perceived by the Education Committee. AUX 986.3, pp. 408, 411–13; 90 AUX 986.2, pp. 189–90.

447. Auburn University relied solely upon information developed by the Chamber of Commerce and the Extension Center, rather than on an independent study, to assess the needs of the Montgomery area for the development of the new institution. The written information available to Auburn was in the form of an "Outline Proposal," developed by Mr. Head, and a letter from Baptist Hospital concerning the need for nurses in the Montgomery-central Alabama area. AUX 986.3, pp. 395–98, 409–10; AUX 986.5, pp. 813–14; AUX 986.4, pp. 570–72, 675–677.

448. Dr. Philpott did not consider the feasibility of operating the Montgomery branch as a joint venture with Alabama State. AUX 986.2, p. 237.

449. In a speech to the Auburn faculty in October, 1966, Dr. Philpott had taken the position that certain studies should be conducted before any other new institutions of higher education were established in Alabama. Dr. Philpott was chairman of the Alabama Education Study Commission appointed by the Legislature in 1968 to study the needs of education in Alabama and devise a 10–year projected plan for the development of education. AUX 986.2, pp. 203–07.

450. Early in the planning stage of the new four-year institution, Alabama State was dismissed as a possibility for expansion because it was "inadequate" or because it had "limited offerings as total community needs are visualized." The Education Committee did not examine Alabama State's catalog or bulletin in concluding that its offerings were limited in terms of community needs. Alabama State had degree programs in education, liberal arts, and business, programs of the same nature that the new college would emphasize. AUX 986.2, pp. 175, 187; AUX 986.3, pp. 389–95; AUX 986.4, p. 487.

451. According to Dr. Thornton, ASU was never considered by the Legislature or the Chamber of Commerce to provide the

services needed for Montgomery's economic and cultural expansion,

because Alabama State was a black school, was thought of as a black school, was overwhelmingly black. And if the purpose here was to create a climate in the community that would lead to a vibrant cultural life and would lead business leaders to think this would be a pleasant place to locate factories and so on, to try to develop that kind of institution based upon a black college would not have seemed in the 1960's something that business leaders would have thought would have been an acceptable or effective thing.

Thornton (11/7/90) 312–13.

452. Dr. Joe L. Reed, Executive Secretary of the plaintiff Alabama State Teachers Association, testified during the ASTA trial that Senator Goodwyn introduced and promoted the AUM bill to fulfill political commitments and because there were "white students who are going to Alexander City [State Junior College in the Montgomery area] and white students who are going to Troy" to fulfill their educational needs rather than go to Alabama State. AUX 986.2, pp. 322–24.

453. The bill creating AUM, sponsored and handled by Senator Goodwyn, was passed by the Legislature very shortly after the date of introduction. AUX 986.2, p. 190.

454. After the bill creating AUM passed, the Chamber of Commerce created a site selection committee, the membership of which was all white. The planning committee established by Auburn to plan the academic program for the new school was also all white. AUX 986.5, pp. 815–16; AUX 986.2, p. 200; AUX 986.3, pp. 384–85.

455. Initial student recruitment efforts by Auburn for the new campus, including high school visitation, had focused on white high schools although there was evidence in the ASTA record that visitations to black high schools were planned. AUX 986.2, pp. 333–48.

456. During the ASTA proceedings Auburn presented substantial evidence regarding the legitimate educational reasons for establishing the new institution as an affiliate of one of the State's major doctoral-level institutions, and regarding the absence of any racial motivation or any intent or design to discriminate on the basis of race in any aspect of the new institution's operations. Auburn's evidence advised the court that it was not inconceivable that AUM would become a 15,000–student campus at some point in the future. E.g., AUX 986.1, pp. 46–70; AUX 986.4, pp. 451–60, 668–70; AUX 986.5, pp. 855–59, 872; AUX 986.2, pp. 224–25.

457. The defendants' evidence also showed that, in addition to the general needs identified by the Chamber of Commerce, Auburn was specifically aware of unmet needs of the United States Air Force for increased educational opportunities for business and political science at both the graduate and undergraduate levels; of insistent requests from the Montgomery medical community for nursing training programs; and of general needs by local and state government for increased educational opportunities, particularly in the areas of business, political science, and public administration. AUX 986.1, pp. 50–58; 90 AUX 986.3, pp. 397, 399–401, 409–10; 90 AUX 986.4, pp. 451–58, 580–83, 693–735, 786–88.

c. The ASTA Decision

458. In *Alabama State Teachers Ass'n, et al. v. Alabama Public School and College Authority, et al.*, 289 F.Supp. 784 (M.D.Ala.1968), *aff'd per curiam*, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) (hereinafter "*ASTA* "), a coalition of black plaintiffs, many of whom were affiliated with ASU, filed a class action seeking to enjoin the construction and operation of Auburn University at Montgomery or, in the alternative, to force AUM's merger into Alabama State or to restrict the academic program development of AUM. SOF ¶ 756.

459. The *ASTA* case, which was heard by a three-judge district court, is particularly important in this litigation because AUM strongly argues that many of the claims alleged by the Plaintiffs concerning the situation between ASU and AUM in the

Montgomery area were previously decided by the *ASTA* court and are therefore *res judicata* in this case and the parties are collaterally estopped from raising those issues again in this case.

460. The *ASTA* court was asked by the plaintiff class to declare unconstitutional Alabama Act No. 403 (1967) which authorized APSCA to issue and sell $5,000,000 in bonds for "the purpose of constructing, equipping, establishing, [and] creating ... a four-year college at Montgomery under the supervision and control of ... [the] Board of Trustees of Auburn University." *ASTA*, 289 F.Supp. at 786.

461. The plaintiffs challenged Act 403 on two grounds. The first ground concerned the propriety under state law of using the future proceeds from the sale of bonds to meet current operating expenses. This issue was not reached by the court since it determined that its resolution was uniquely a question of state law and therefore, the federal courts should decline jurisdiction on that question. Accordingly, the "[p]laintiffs' claim on this issue [was] dismissed without prejudice to their proceeding in an appropriate state court." *ASTA*, 289 F.Supp. at 787. The second ground, and by for the most important was discussed extensively by the court.

462. Stating the plaintiffs' argument in the form of a syllogism, the *ASTA* court put forth the primary attack on Act 403:

Alabama historically has had a dual system of higher education by law; although no longer supported by law, the dual system in fact remains largely intact; this Court and the Fifth Circuit recognize in the elementary and secondary education area an affirmative duty to dismantle the dual system; ... that duty is equally applicable to higher education; that duty requires officials to utilize new construction or expansion of facilities as an opportunity to dismantle the dual system; the history and operation of Act[ ] No[ ]. ... 403 indicate[s] that in planning the construction of [AUM] defendants did not maximize desegregation; therefore, their action is unconstitutional and should be enjoined.

*ASTA*, 289 F.Supp. at 787 (citations omitted).

463. The court then stated that the arguments before it were a matter of first impression and that no court in dealing with the desegregation of institutions of higher education had ever "gone any further than ordering nondiscriminatory admissions." The Court acknowledged that the United States through its agencies and Congress had largely limited its focus to admissions policies when confronting systems of higher education which discriminate. *ASTA*, 289 F.Supp. at 787. The Court went on to state:

We too are reluctant at this time to go much beyond preventing discriminatory admissions. Although much of plaintiffs' argument is valid, several faulty premises lead us to reject the conclusions they urge upon us. We would judicially notice that Alabama has traditionally had a dual system of higher education. Furthermore, we find as a fact that the dual system in higher education has not been fully dismantled. The law is clear also that the State is under an affirmative duty to dismantle the dual system. Indeed, in Lee v. Macon County Board of Education ..., we required the state colleges and junior colleges to refrain from discrimination in admissions and to begin faculty desegregation. We do not agree ... that the *scope* of the duty should be extended as far in higher education as it has been in the elementary and secondary public schools area.

*Ibid.* (emphasis in original).

464. The court then went on to discuss the important distinctions between elementary education and higher education. It was noted that the since higher education was neither free nor compulsory and students made choice on where to attend college on a variety of different grounds the jurisprudence developed in the desegregation of elementary and secondary schools had little relevance to college desegregation cases.

465. In discussing the role of the state in deciding where to open new institutions the court stated:

From where the legislators sit, ... the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution, and in deciding where to locate it, the legislature must consider a very complicated pattern of demand for [the educational institution] including, also, [its] impact on the dual system. We conclude that in reviewing such a decision to determine whether it maximized desegregation we would necessarily be involved, consciously or by default, in a wide range of educational policy decisions in which courts should not become involved.

*ASTA*, 289 F.Supp. at 788.

466. After a brief review of the history behind the proposed development of AUM, the court addressed some of the plaintiffs' more conspicuous arguments concerning the impact AUM would have on the dismantling of the state's dual system in the Montgomery area.

[Plaintiffs] maintain that the reason for having a new college in Montgomery was to provide for white students in the area. To the extent that this may mean "to provide for white students only," the record does not bear them out. ...

. . . . .

Plaintiffs further contend that inadequate consideration was given to how the proposed Auburn branch might be operated so as to eliminate the dual school system and that, because of this, the new college has become and will continue to be an identifiably "white" institution. In a sense that is so, but in that sense nearly every existing institution is "identifiable." ... Plaintiffs' contention that inadequate attention was given to desegregation is also based on defendants' failure to give serious consideration to expanding Alabama State ... as an alternative to establishing the Auburn branch. But this argument overlooks the fact that Alabama State is at least as identifiably "black" as Auburn is identifiably "white." In terms of eliminating the dual school system, one label is no more preferable than the other.

We thus reject plaintiffs' conclusion that, when the new college is put into operation, Montgomery will have two colleges—one [black], one white. ... It is certainly as reasonable to conclude that a new institution will not be a white school or a [black] school, but just a school as it is to believe that Alabama State would so evolve.

Much of the above discussion is based on speculation; this is necessarily true because much of plaintiffs' argument is based on speculation. However, the discussion does serve to show that in the discharge of the duty to maximize desegregation, the Auburn branch is at least arguably as acceptable as any alternative proffered by plaintiffs.

. . . . .

We conclude, therefore, that as long as the State and a particular institution are dealing with admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual school system on the college level, to the extent that the system may be based upon racial considerations, is satisfied.

*ASTA*, 289 F.Supp. at 788–790.

467. Based on this reasoning, the court concluded that Alabama Act No. 403 was constitutional on its face and as applied.

468. The *ASTA* plaintiffs appealed the decision to the United States Supreme Court which summarily affirmed the decision *per curiam*. Justice Douglas in dissenting from the decision observed:

Can we say in 1969 that a State has no duty to disestablish a dual system of higher education based upon race? The three-judge court in a careful opinion seems to draw a line between elementary and secondary schools on the one hand and colleges and universities on the other. The inference is that if this were an elementary school, the result would be different.

*Alabama State Teachers Ass'n, et al. v. Alabama Public School and College Authority, et al.*, 393 U.S. 400, 401, 89 S.Ct.

681, 682, 21 L.Ed.2d 631 (1969) (Douglas, J., dissenting) (footnote omitted).

### d. *AUM In The Present*

469. The old extension center on Bell Street was purchased by Auburn from UA and served as a temporary location for AUM from 1968 until 1971, while the current campus was being developed. AUM offered its first classes in September of 1968. SOF ¶¶ 768, 767, 774.

470. AUM's student body was never segregated by race, nor did AUM at any time have any racial restrictions. From the moment it began operations in the Bell Street facilities in 1969, black students attended the institution. Dunlavy (2/25/91) 5; AUX 986.2, pp. 168, 195, 224–25; AUX 986.4, p. 447.

471. In the fall quarter of 1971, AUM moved to its present campus. SOF ¶ 782.

472. The current campus of AUM is located approximately seven miles east of downtown Montgomery close to Interstate Highway 85. Classes commenced on the existing campus in the fall quarter of 1971. AUX 638, p. 18; Dunlavy (2/25/91) 5.

473. Prior to 1973, AUM operated as an accredited institution under the accreditation of Auburn University. SOF ¶ 770; Nance (2/26/91) 5–6.

474. At the time of AUM's beginning, its academic coordinating body was called the Administrative Council. This group had responsibility for curriculum development. SOF ¶ 773.

475. From its inception, AUM's academic plan was to develop undergraduate programs in the arts and sciences, with majors in the traditional areas. Also included in the original plan were teacher education programs at the undergraduate level and business programs at the undergraduate level. Further, there was also a very clear plan to develop graduate programs primarily oriented toward professionals or practitioners, including master's degree programs in teacher education and business. In the initial plan, a master's degree program in public administration was also envisioned. Williams (7/24/85) 5505–06.

476. In its first year as a degree-granting institution, AUM offered a full curriculum for a beginning freshman class and other courses and programs for students at all levels, including graduate students. SOF ¶ 775.

477. During the 1969–70 school year, AUM operated a large graduate program in connection with the Air University and Maxwell Air Force Base. Williams (7/24/85) 5505–06.

478. The first graduate work on the AUM campus was offered in 1969, immediately following the opening of AUM as a degree-granting institution. This graduate work was, in the beginning, done in connection with Auburn University on the main campus. SOF ¶ 776.

479. In 1969, AUM was organized into three academic divisions—Arts and Sciences, Business and Education—and two other divisions—Graduate and Continuing Education. SOF ¶ 777.

480. In the 1970–71 academic year, AUM continued to phase in courses required for the entering 1969 class to progress through a degree program, such that in that year the institution was essentially offering a full array of courses through the sophomore level, with a variety of other courses which were in demand for other reasons. SOF ¶ 778.

481. In the 1970–71 school year, courses were being offered in the arts and sciences, undergraduate education, and undergraduate business. SOF ¶ 779.

482. In the 1970–71 academic year, AUM continued to offer graduate study in education, business, political science, and public administration and continued to operate in conjunction with the Air University at Maxwell AFB. SOF ¶ 780.

483. The Air University program was designed so that Air Force officers on assignment at Maxwell could take course work to earn master's degrees in business, political science and public administration. SOF ¶ 781.

484. By the 1971–72 school year, the 1969 entering class was at the junior level.

In that school year, AUM was adding to its general curriculum courses needed to meet the demand of the degree requirements of that class. AUM continued to offer other courses, graduate and undergraduate, to meet the needs of students other than the students entering as freshman in 1969. SOF ¶ 783.

485. By the 1971–72 school year, graduate offerings at AUM had increased to meet the demand of students and had become somewhat broader in education, business and public administration. Williams (7/24/85) 5513.

486. For the academic year 1970–71, AUM conferred bachelor's degrees in business, education, social science and interdisciplinary studies. SOF ¶ 793.

487. For the academic year 1971–72, AUM conferred bachelor's degrees in business, education, letters, mathematics, psychology, and social services, and master's degrees in public administration, political science, business and education. SOF ¶ 794.

488. AUM's first self study was done in 1972, preparatory to becoming an operationally separate campus, for which independent Southern Association accreditation would be necessary. The self study began in 1971, but was dated 1972. SOF ¶ 784.

489. At least by the time of AUM's first self study in 1972, Arts and Sciences at AUM offered undergraduate majors in art, biology, English, history, government, mathematics, psychology, and sociology, in addition to courses in astronomy, chemistry, foreign languages, meteorology, physics, and speech communication. The master's degree in public administration was offered at least as early as 1972, consistent with initial plans. AUX 6773.

490. At least as early as the 1972 self study, AUM was offering an undergraduate business degree, with the opportunity for students to emphasize accounting, economics, general business, management, and marketing. AUX 6773.

491. As early as 1972, a master's degree in education, with areas of specialization in elementary education, secondary education, guidance and counseling, and school administration, was offered by AUM. AUX 6773.

492. In secondary education, majors in English, mathematics, social science, government, history, biology, business education and physical education were available at AUM at least by 1972. AUX 6773.

493. In 1973, AUM became accredited by the Southern Association of Colleges and Schools as an operationally separate institution. SOF ¶ 769; Nance (2/26/91) 5–6; AUX 746, p. 1.

494. At least by 1972, AUM offered master's in business administration, master's of political science and master's of education degrees. Also, a master's degree in public administration was offered at that time. AUX 6773.

495. After AUM received its independent accreditation, its academic programs—graduate as well as undergraduate—were operated independent of Auburn University. AUX 6773; Williams (7/24/85) 5515–16; Nance (2/26/91) 5–6; AUX Ex. 746, p. 1.

496. For the academic year 1972–73, AUM conferred bachelor's degrees in business, education, letters, mathematics, psychology, public affairs (law enforcement) and social sciences. It conferred master's degrees in business, education, public administration and political science. SOF ¶ 795.

497. For the academic year 1973–74, AUM conferred bachelor's degrees in biology, business, education, fine and applied arts, letters, mathematics, psychology, public affairs (law enforcement), and social science. At the master's level, AUM awarded that year degrees in business, education, public administration and political science. SOF ¶ 796.

498. Between the self study in 1972 and 1985, AUM developed several new degree programs. The first of those programs was a master's program in criminal justice. In addition, an undergraduate degree program in speech communication was developed; a master's degree program in psychology was developed; an undergraduate

degree program in nursing was implemented; and a master's degree program in information systems was begun. Williams (7/24/85) 5516–17.

499. The second AUM Southern Association self study was dated 1977. By the time of the 1977 self study, AUM had developed, and had in place academic programs consistent with those envisioned at the time of AUM's planning and founding. AUX 6760; Williams (7/24/85) 5505–06.

500. In 1978, AUM's independent accreditation was reaffirmed by the Southern Association of Colleges and Schools. SOF ¶ 771.

501. After the 1977 self study, AUM proposed and developed a master's degree program in information systems. This new program was developed to be responsive to business and industry, military and government, all of which were placing more and more emphasis on the handling of data with computing equipment. The program was designed to educate managers with indepth training in the management of information systems and the application of those systems to the management process. Williams (7/24/85) 5525–26.

502. The master's program in information systems was developed in response to a major need and demand for such a program in the Montgomery area. Williams (7/24/85) 5525–26.

503. As part of the discussion process leading to the development of the master's program in information systems, AUM, through its Business School Dean, contacted Alabama State University's Dean to explore the possibility of developing the program as a joint program. After an initial expression of interest, Dr. Vaughn, Alabama State's Dean, advised AUM officials that ASU did not want to participate in the program, but had no objection to AUM proposing and implementing it. AUX 5296; Williams (7/24/85) 5527–29.

504. As early as 1969, the Montgomery community had expressed to AUM a strong interest in AUM operating a nursing school, because area hospitals were having a great deal of difficulty in filling their nursing positions. Nursing had been one of the community needs which the Chamber of Commerce had emphasized in the original planning for a new four-year school in Montgomery. The inquiries were made to AUM's Administrative Council. AUM was in no position as of 1969 to offer such a program, however, due to the limited nature of its development, lack of resources, and lack of facilities. Williams (7/24/85) 5529–31; AUX 986.4, pp. 570–72, 577–83; 693–735.

505. Auburn University at Montgomery continued over the years to receive requests from the medical community on a continuous basis regarding the need for a nursing degree program in Montgomery. Williams (7/24/85) 5529–31.

506. Because of the continued strong interest in a nursing program, and because of developments making it likely that soon all nursing programs would be baccalaureate programs rather than two-year programs, which would further limit the supply of nurses, AUM made the decision to develop a nursing degree program. Williams (7/24/85) 5531–32.

507. By the time the undergraduate nursing program commenced in the 1979–80 academic year, AUM's facilities and other resources had developed sufficiently to support the program. Williams (7/24/85) 5533; AUX 983, pp. 99–100.

508. When the nursing proposal was submitted to ACHE, ACHE elected to postpone any decision until a statewide needs study was completed, but, in the meantime the Alabama Legislature passed legislation establishing several nursing schools, including one at AUM. Williams (7/24/85) 5533–35.

509. The AUM nursing program has been very successful, in that it has been heavily enrolled and its graduates have become successfully employed in Montgomery or the immediately surrounding areas. SOF ¶ 787.

510. Drawing on their collective resources, AUM and Auburn University have been jointly offering, since it was approved by ACHE in 1986, a doctoral program in public administration. The program uti-

lizes faculty resources from both campuses and requires that about one-half of the student's work be done on each campus. The degree, however, is awarded by Auburn University. Nance (2/26/91) 33–35; Dunlavy (2/25/91) 56–57; STX 151, p. 2.

511. The only other program added at AUM since 1985 was a master's degree program in liberal arts, which was built on strengths in the various liberal arts fields which had developed over the years. This program was approved by ACHE in 1987. AUX 640, p. 80; STX 151, p. 2.

512. In 1988 AUM's independent accreditation was once again reaffirmed by the Southern Association of Colleges and Schools. Nance (2/26/91) 5.

513. Every academic program at AUM for which there is available specialized accreditation holds that accreditation. AUM's School of Business is accredited by the American Assembly of Collegiate Schools of Business, at both the master's and bachelor's levels. The B.S. Nursing program is accredited by the National League of Nursing. The public administration program is accredited by the National Association of Public Schools of Affairs. The Medical Technology Program is accredited by the Committee on Allied Health of the American Medical Association. All the bachelor's, master's and education specialist programs in education are accredited by NCATE, the National Council for Accreditation of Teacher Education, and the Legal Assistant program is accredited by the American Bar Association. Nance (2/26/91) 6–7.

514. AUM's chief executive officer is the Chancellor. The Chancellor, along with the Assistant to the Chancellor, the Vice Chancellor for Student Affairs, the Vice Chancellor for Finance, the Vice Chancellor for Research and Development, and the Vice Chancellor for Academic Affairs, make up AUM's chief campus policy making body, the Executive Council. 85 Tr. 5502 (Williams); Boyer (2/25/91) 25; AUX 680. Williams (7/24/85) 5502.

## 9. The History And Development Of The Alabama Commission On Higher Education

### i. Origins

515. In 1968, Dr. Harry Philpott, President of AU and chairman of the Alabama Education Study Commission issued a report containing the following recommendation.

In a democracy, the concept of an elite class is repugnant. Therefore, the educational system must ensure that it does not provide for the development of an educational elite. The doors of educational opportunity must open freely to all. None should be denied the benefit of education nor should his needs and abilities be subject to a single appraisal.... The system of higher education requires an agency to coordinate the activities of its members....

If the programs outlined above are to be effective, they must be provided with the necessary resources and each program coordinated with each other program and institution. We cannot afford unnecessary duplications in programs or institutions.... Action is also needed to eliminate duplicate programs which currently exist in some areas. Many of these duplicate programs remain from the previous dual system. In localities where two institutions with essentially the same purpose exist, steps must be taken to bring all programs under a single institution and to eliminate that institution which shows least promise for future success. Initially, the duplicate institutions should be placed under a single administrative head with one institution becoming a branch campus of the other. As facilities are developed, the branch campus should be eliminated if the need no longer exists.

Report of the Alabama Education Study Commission 1968, pp. 77–78; SOF ¶ 66.

516. Based in part on the recommendations contained in Dr. Philpott's report, the Alabama Commission on Higher Education ("ACHE") was established by the Alabama General Assembly in 1969.

517. ACHE has twelve members; ten are appointed by the Governor, one is appointed by the Lieutenant Governor, and one is appointed by the Speaker of the Alabama House of Representatives, all with the advice and consent of the state Senate. Ala.Code § 16-5-2(a). Commission members are private citizens who serve nine-year terms without compensation. *Id.* 16-5-3. No person employed by an institution or serving as an institutional trustee is eligible to sit on the Commission, *id.* 16-5-2(b), and the Commission must meet at least four times a year. *Id.* 16-5-4(b).

518. The Commission is organized into committees—an Executive Committee, a Financial Affairs Committee, an Academic Affairs Committee, and a Student Assistance Committee. These committees consider specific matters before they are offered to the full Commission for action. STX 206, p. 1.

519. The Commission is supported by a staff of about 100. STX 206, p. 1. This staff is headed by an Executive Director, whose appointment must be confirmed by the State Senate every four years. Ala. Code § 16-5-4. ACHE also has two Deputy Executive Directors, one for planning and coordination and another for student assistance. STX 206, p. 23.

ii. *Statutory Responsibilities*

520. ACHE is not a central controlling board of trustees, it is rather a coordinating board with some regulatory powers. SOF ¶ 291.

521. ACHE's enabling statute articulates in some detail the Commission's responsibilities and the manner in which they are to be carried out. Among ACHE's more salient statutory duties are the following:

. . . . .

(c) The commission shall serve in an advisory capacity to the legislature and the governor ... in respect to all matters pertaining to state funds for the operation and the allocation of funds for capi-

tal improvements of state supported institutions of higher education....

Alabama Code § 16-5-2(c).

The commission, in consultation with the agencies and institutions concerned with higher education in this state, shall analyze and evaluate on a continuing basis the present and future needs for instruction, research and public service in postsecondary education in the state, including facilities, and assess the present and future capabilities....

*Id.* § 16-5-5.

The commission shall be responsible for statewide long-rang planning for postsecondary education in Alabama. Such planning shall be the result of continuous study, analysis and evaluation. Plans will include the establishment of statewide objectives and priorities with methods and guidelines for achieving them.

*Id.* § 16-5-6.

. . . . .

(b) The commission shall be the state coordinating agency for all data collection requirements of the federal government which require state level coordination and relate to postsecondary education.

. . . . .

*Id.* § 16-5-7(b).

(a) The commission ... is authorized to review periodically all new and existing programs and units of instruction, research and public service funded by state appropriations at state universities and colleges and to share with the appropriate governing board ... its recommendations.

(b) The commission shall ... study needless duplication of education, research or service programs ... and shall make recommendations to the institutions, the governor and the legislature that would strengthen the total program of higher education in the state.

(c) The governing boards of public institutions of higher education ... shall not hereafter undertake the establishment of any new unit or program of instruction for academic credit with state funds be-

fore submitting plans for the new unit or program to the commission for its review, evaluation and approval.[35] ...

. . . . .

(e) Nothing in this ... section ... shall be construed to prohibit any institution of higher education in this state from seeking and securing by separate bill the approval of the legislature for any new ... program of instruction, ... denied approval by the commission,....

*Id.* § 16–5–8(a), (b), (c), and (e).

(b) The commission shall receive, evaluate and coordinate budget requests for the public institutions of higher education ... and shall present to each institution and the governor and legislature, a single unified budget report containing budget recommendations for separate appropriations to each of the institutions. The recommendations of the commission shall be derived directly from its assessment of the actual funding need of each of the universities, as presented to it by the presidents,....

*Id.,* § 16–5–9(b)

The commission shall exercise the following powers and duties in addition to those otherwise specified in this chapter:

. . . . .

(2) To recommend to the legislature of Alabama the enactment of such legislation as it deems necessary or desirable to insure the highest quality of higher education in this state taking into consideration the orderly development and maintenance of the state system of public higher education to meet trends in population and the change in social and technical requirements of the economy.

(3) To advise and counsel the governor, at his request, regarding any area of, or matter pertaining to, postsecondary education.

. . . . .

(5) To develop and publish criteria which may be used by the legislature as a basis:

a. for changing the classification of any public institution of higher education; and

b. for determining the need for new public junior colleges, public senior colleges, universities or university systems....

. . . . .

(7) To hear applications from the institutions for the changes in classification or role and scope and to recommend to the legislature for clarification such classifications in role or scope which may not be agreed to by the governing board of any institution.

. . . . .

(12) To conduct a program of public information in order to inform citizens of the state of matters of importance to higher education in Alabama.

(13) To serve as the state agency for the administration of those titles of the Higher Education Act of 1965 ... as amended for those programs requiring a single state agency for which the commission qualifies, unless otherwise designated by executive order.

. . . . .

*Id.* § 16–5–10(2), (3), (5), (7), (12), (13).

522. In summary ACHE makes long-range plans for higher education in Alabama, reviews and approves academic programs, develops an annual unified budget recommendation for presentation to the Governor and Legislature, regulates most off-campus work conducted by Alabama's institutions of higher education, collects and disseminates data, and to some extent administers federally-funded programs. ACHE is also charged by statute to designate roles and classifications for each public institution of higher education in Ala-

---

**35.** The Alabama Supreme Court has concluded that this provision of ACHE's authority does not extend to the University of Alabama System or to Auburn University since both of these institutions have constitutionally designated boards of trustees. *Opinion of the Justices,* 417 So.2d 946

(Ala.1982); *see also,* SOF ¶ 206. In addition to AU's and UA's exemption from this provision, off-campus offerings by state educational institutions on military reservations are not required to secure ACHE approval. Ala.Code § 16–5–9(f).

bama, subject to final determination by the Legislature.

523. It was approximately five years after the establishment of ACHE that the commission's first black member, Mr. Clyde Foster, was appointed in 1974. Foster (1/7/91) (testimony not transcribed).

### 10. Creation Of The ASU And AAMU Boards Of Trustees

524. As a result of the Voting Rights Act of 1965, black people in Alabama began registering and voting in substantial numbers for the first time since Reconstruction. By 1974 there were thirteen black members of the state House of Representatives and two black state senators.[36] Pearson (11/13/90) 5; Holmes (11/13/90) 11.

525. Among the first objectives of the newly elected black members of the State House was an effort to secure self governance for the state's two principally black universities. The first attempt in 1973—when only two black representatives served in the legislature—failed. KX 3204.

526. In 1974, ACHE released Planning Document No. 1 in which, among other things, it recommended maintaining the existing structures of institutional governance with two exceptions:

Those two exceptions are the anomalous situations in Alabama A & M and Alabama State. When the former state teachers colleges became state universities in the late 1960's, they were removed from the jurisdiction of the State Board of Education and placed under their individual, institutional boards. That was not done for the two historically black institutions. There is no evidence to suggest that there were any improper motives for this decision. Nonetheless, the failure to provide these institutions with independent governing boards similar to those provided other institutions of comparable role and scope invites suspicion and the possibility of harmful, unwanted, and unwarranted legal difficulties. *The Commission strongly recommends that the next legislature give due considera-*

*tion to the creation of separate boards for Alabama A & M and Alabama State.*

USX 2, pp. 65–66 (emphasis in original).

527. In 1974, J. Richmond Pearson, who is now a state circuit judge in Birmingham, became one of the first two blacks elected to the State Senate since Reconstruction, along with U.W. Clemon, who is now a U.S. District Judge in the Northern District of Alabama and the original trial judge in this action. Judge Pearson testified he made creation of independent boards of trustees for ASU and AAMU the main promise of his senate campaign. He said it was a goal he had pursued since 1960, when he watched the television news and saw President Trenholm of ASU chastised by the SBE and Governor Patterson on account of the sit-in at the courthouse snack bar. Pearson (11/13/90) 7–8.

528. On the heels of ACHE's recommendation, Pearson managed the two HBU board bills in 1975, even though neither ASU nor AAMU was in his senatorial district and even though he had attended neither school. Judge Pearson explained that, as the only two black senators, he and Judge Clemon "considered the whole of Alabama" to be their constituency. Pearson (11/13/90) 8–9. Pearson knew the bills were important to most of his "constituents," and that they had the overwhelming support of the entire black community. Holmes (11/13/90) 14. The black legislators in the House of Representatives unanimously supported the bills. Holmes (11/13/90) 15.

529. Even though Pearson was the author of the original bills and managed them through the legislature, he got Montgomery and Madison County representatives to sponsor them "to remove the argument that the schools were not in my district." Pearson (11/13/90) 10.

530. There was considerable opposition to the HBU board bills. Alumni of the HWUs knew that it would give the HBUs

36. Today the number of black legislators has increased to 19 of 105 in the House and 5 of 35

in the Senate. Holmes (11/13/90) 2.

more clout in the competition for appropriations and opposed it on that account. Holmes (11/13/90) 13. Eventually both ASU and AAMU were given separate boards in 1975. *See* Ala.Code § 16–50–20(a) (creating ASU's Board of Trustees), and § 16–49–20 (creating AAUM's Board of Trustees).

531. The black legislators were confident that, once they were established, the ASU and AAMU boards would eventually get black majority memberships, even though the appointments would be made by Governor George Wallace. Representative Holmes explained why:

> I did think that ... the mere fact of having 13 black House members and two black senators, and that ... we could hold up Bills and the Governor needed our support on different issues that were coming before the legislature, you know, that was one of the main reasons that he needed the support of blacks. And then he, you know, was in office and wanted to run for reelection or something ... and he needed our support politically and legislatively.

Holmes (11/13/90) 16. Even though the initial appointments were majority white, within a few years black legislators and other black leaders were able to pressure the governor to appoint black majorities on both the ASU and AAMU boards. Holmes (11/13/90) 17.

532. Due to input from the administrations and alumni of ASU and AAMU, there were two significant differences between the two bills. As adopted, the ASU bill made gubernatorial appointees full members subject to affirmative action by the Senate to remove them. The AAMU bill required Senate confirmation of the governor's appointments. The Alabama State bill as amended in 1986 required that "at least one-half of the board shall be from the prevailing minority population of the state...." Ala.Code § 16–50–20(a).[37] No such provision was in the AAMU bill. Pearson (11/13/90) 18–21.

533. By 1978 the governor had appointed black majorities to the boards of both Alabama State and Alabama A & M.

## C. History Of The Early Land Grant System In Alabama

### 1. The 1862 Morrill Act

534. The historical development of Alabama's land grant system was discussed at trial by all three expert historians, Doctors Thornton, Anderson and Rogers, and by the Justice Department's expert on land grant programs, Dr. Rupert Seals. Most of the historical details were provided by Dr. Rogers and his two scholarly articles on the subject published in the *Alabama Review*, one in 1960 and the other in 1987. KX 601 and 606.[38]

535. In 1862, Congressman Justin Morrill of Vermont and Senator Benjamin Wade of Ohio pushed through Congress the "First Morrill Act"[39], 12 Stat. 503 *et*

---

**37.** As to the constitutionality of this provision see the Court's Conclusions of Law ¶¶ 106–126.

**38.** The 1960 article (KX 601) by Dr. Rogers makes no mention of the race issue, while the 1987 article (KX 606) describes how questions about sharing the Morrill Act money with blacks was a central issue in the legislative debates. Dr. Rogers explained that after testifying in the 1985 trial that race played no role in the establishment of Alabama's 1862 land grant college, he reexamined the primary materials and discovered that racial issues were indeed considered by the state in making its decision.

In his 1991 testimony, Dr. Rogers stands by the opinions expressed in the 1987 article, saying it "is by far the superior article." Rogers (3/13/91) 31–33. The professor candidly admits that, given the political milieu of the state

in 1960, the *Alabama Review* would not have published his 1987 version of the 1872 events. In Dr. Rogers' own words:

> There was not a great deal of interest in it. It was just starting, the historical research in black history and in the reconstruction period in education, and right, in 1960, it would have been—an editor would not necessarily have been impressed with an article that did that.

Rogers (3/13/91) 34.

Knight Plaintiff exhibits 601 and 606 were admitted without objection and the Court has utilized them in its review of the history of Alabama's land grant system. *See*, Rogers (03/13/91) 31–32 (admitting without objection KX 601 and 606).

**39.** Herein sometimes referred to as the "1862 Act."

*seq.*, 7 U.S.C. § 301 *et seq.*,[40] which was designed to foster the development, in each state, of

at least one college where the leading object shall be, without excluding other scientific and classical studies and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life.

7 U.S.C. § 304.

536. Towards that end, each state was entitled to 30,000 acres of land or land scrip for each of its senators and representatives in Congress in 1860. The land was to be sold and the income provided for the support of an agricultural college or colleges.[41] Alabama was to acquire the proceeds from the sale of 240,000 acres. Each state was required to provide the buildings for its land grant college(s). SOF ¶147.

537. Since the Confederacy was in a state of rebellion against the national government, the southern states obviously could not immediately take advantage of the 1862 Morrill Act. Following the end of the war, Congress passed legislation extending the benefits of the First Morrill Act to the states that had formally been in rebellion provided that the state legislatures take appropriate action by the end of 1872. Thornton (11/5/91) 110; Rogers (3/13/91) 10–11. Alabama, fearful of losing the opportunity for the federal land grant took the appropriate action.

538. Because of the leadership of Governor Patton in 1865, the 1868 Alabama Constitution directed the Legislature to establish an agricultural college to claim Alabama's share of the 1862 Morrill Act land. The Constitution provided that the legislature

may make the same a branch of the University of Alabama for instruction in agriculture, in the mechanic arts, and the natural sciences connected therewith, and place the same under the supervision of the regents of the university.

Thornton (11/5/90) 110; KX 655, 1868 Ala. Const., Art. XI, sec. 14.

539. A major political controversy developed over where to locate the land grant college. Rogers (3/13/91) 11.

540. The SBE enthusiastically sought to obtain the 1862 Morrill Act funds for UA.[42] The Legislature had lent UA money to replace buildings burned during the Civil War by the Union Army, and beginning in 1870 a portion of UA's appropriation based on the 1819 land grant from the state was to be withheld until the loan was repaid. Thornton (11/5/90) 111–12. Therefore, it was thought that the increased revenues generated by land grant act would strengthen the school financially.

541. Because of its legislative authority over education, the SBE in 1869 asked both Congress and the Alabama General Assembly to place the 240,000 acres of land grant at the Board's disposal. Noting that the Morrill Act prohibited the use of the land grant proceeds for the building of structures, the SBE argued that since it already

---

**40.** Congressman Morrill's first attempt at establishing a national land grant system occurred in 1859 when both houses of the Congress enacted the legislation. President Buchanan was, however, unimpressed and subsequently vetoed the land grant bill on the grounds that it violated the traditional policy of the federal government which had until that time, left the financing of education entirely to the states. In 1862, the Congress again enacted the land grant legislation and this time President Lincoln signed it into law.

**41.** The First Morrill Act did not preclude the establishment of more than one land grant institution in a state. SOF ¶ 181. Mississippi, for

example, accepted the First Morrill Act by joint resolution its General Assemble and then designated two land grant colleges: the University of Mississippi for whites and Alcorn University for blacks. The Morrill Act funds were divided on a 40:60 basis between these two schools. In Kentucky, South Carolina and Virginia, the First Morrill Act funds were also allocated between black and white land grant schools. SOF ¶ 148.

Mississippi State is now the 1862 land grant college for Mississippi.

**42.** Under the 1868 state constitution, the SBE was designated as the Board of Regents for the University of Alabama.

operated the UA campus which had adequate facilities for an agricultural college, it could make the most use of the Morrill Act funds. No decision was made on the SBE's request. KX 606, pp. 15–16.

542. With the deadline for meeting the conditions of the Morrill Act approaching, blacks thought they should get some of the federal land or monies. Thornton (11/5/90) 112–13.

543. In December 1871 Peyton Finley got the SBE to pass a resolution requesting the Legislature to set aside part of the Morrill Act funds for an agricultural college for the "colored race." The Legislature ignored Finley's resolution, but the SBE had gone on record as favoring one land grant college for blacks and another for whites. KX 606, pp. 18–19; Thornton (11/5/90) 112–13; Rogers (3/13/91) 36.

544. As a result of the 1870 general elections, control of the 1871–72 Legislature was divided between Republicans and Democrats. In the House, the Democrats outnumbered Republicans 64 to 36. Nineteen of the Republicans were black. Republicans had a majority in the Senate however. There was only one black senator, but many of the white Republicans were carpetbaggers "of a social reformist outlook" led by J.A. Farden of Autauga County. Thornton (11/5/90) 116; SOF ¶ 648.

545. By December 5th 1871, three cities or towns in Alabama—Tuscaloosa, Auburn and Florence—had formal bills entered in their behalf as sites for the future land grant college. SOF ¶ 649. Later that same year, special House and Senate select committees were formed to chose a site for the land grant college. SOF ¶ 650.

546. The black legislators and most white carpetbagger Republicans wanted the land grant college to be integrated or the Morrill Act funds divided between white and black land grant colleges. The leader of the integrationist faction was none other than Deforest Richards, a northern missionary professor who was serving as President of the University of Alabama in Tuscaloosa by appointment of the SBE. Thornton (11/5/90) 98, 117. Richards' integrationist views help explain the Legislature's hostility to designating UA the land grant college. Separate bills were introduced in the House and Senate establishing the land grant college at UA, and both eventually were defeated. Those legislators who supported location of the land grant school at UA appear also to have sympathized with the goal of dividing the Morrill Act funds between the races. Thornton (11/5/90) 121–23.

547. Auburn University's expert land grant historian Dr. Rogers, agreed that the white majority of the Legislature resisted designating UA the land grant college because they were opposed to the Republican-controlled SBE and did not want that body overseeing the 1862 Morrill Act funds. Rogers (3/13/91) 34–35.

548. None of the politicians, black or white, thought racial integration of the land grant college was a realistic option at the time. The black legislators took continued school segregation in Alabama as a political given. Rogers (3/13/91) 36–37.

549. The issue of race did not come out in the debates about how to use the 1862 Morrill Act funds until late in the 1871–72 legislative session. Rogers (3/13/91) 13–14. Dr. Rogers conceded that the most likely reason the race issue surfaced late was that all the legislators knew it was a contentious issue and hoped that it would not cause negotiations to break down and thus make the state miss the 1872 deadline for claiming the Morrill Act funds. Rogers (3/13/91) 39–40.

550. On February 12, 1872, Holland Thompson, a black member of the Alabama House of Representatives, moved an amendment to a land grant committee bill to provide for "equal facilities and advantages of instruction" for all students "whether white or colored." KX 606, pp. 25–26. Thompson's amendment would have had the effect of integrating the land grant school, and it was rejected by a vote of 43 to 21. Voting for an integrated land grant college were 20 Republicans and only one Democrat. Voting against were 35 Democrats, 5 Republicans, and 3 others not identified. Of the 20 Republicans voting for Thompson's amendment, 14 were black,

5 were carpetbaggers, and one was a scalawag. The other five black representatives did not participate in this roll call vote, so all black House members voting supported the integration amendment. Thornton (11/5/90) 117–18.

551. On February 23, Thompson moved another amendment to require "that no applicant for admission to said college shall be excluded on account of race, color or previous condition." Later that day, Thompson withdrew his amendment provided that the board of trustees of the future land grant college would see that the money was "divided between the white and colored race in the State equally." Thompson's proposal was defeated. KX 606, p. 26.

552. Undaunted, Thompson and Jeremiah Haralson, a black representative from Dallas County, tried, again unsuccessfully, to introduce another amendment. It proposed that the board of trustees "not draw from the [Morrill Act] funds more than their *pro rata* share ..., and the balance of said funds be retained by the treasurer subject to the order of a board of colored trustees to be appointed by the governor." KX 606, pp. 26–27. Twenty-two Republicans, including 14 blacks, voted against tabling this amendment. They were joined by ten Democrats, seven of whom were from the Tennessee Valley and may have been voting strategically to oppose location of the land grant college at Auburn. Only one black representative voted against Thompson's amendment,

so that these votes ended up being in large measure party divisions and the blacks in the legislature were very solidly in favor of use of the funds in one way or another to benefit blacks either through integrating the school or through dividing the funds.

Thornton (11/5/90) 118–19.

553. In the Senate meanwhile, the carpetbagger J.A. Farden introduced a bill that proposed that all federal funds be divided equally between whites and blacks and that separate schools be established. Conservative Republicans and a few Democrats opposed Farden's bill. When debate began in the Senate on February 12, 1872, Senator Pennington, leader of the forces in favor of an Auburn site, moved to table Farden's proposal and thereafter, the Farden proposal is not heard from again.

554. The House gave Auburn final approval on February 24, 1872, and when the bill came to the Senate for endorsement, Farden tried again to tack on an amendment that the funds be divided "between the white and colored people *pro rata,* according to population respectively." When this amendment was tabled, Farden responded with another amendment to practically the same effect, which also was tabled. The Senate then moved quickly to vote its approval of Auburn. KX 606, p. 33.

555. The legislation for the land grant college took the form of two acts, both signed by Governor Lindsay on February 26, 1872. The first designated Auburn as the site. KX 606, p. 34. The second act implemented the decision to establish a college. Instead of placing the school under the SBE, the act established an independent, gubernatorially appointed board of trustees for AU. KX 606, p. 34. Governor Lindsay, the Democrat elected in 1870, appointed all white Democrats to the first board of trustees.

[T]he hostility to giving administration of these [Morrill Act] funds to the State Board of Education, and the outcome allowing a separate board to be appointed by the governor who was a Democrat ... had both the goal of making the governing body of Auburn Democratic and making it all white.

Thornton (11/5/90) 123–24.

556. In the end, all efforts by black leaders and sympathetic white Republicans to provide for black citizens a share in the benefits of the 1862 Morrill Act funds and programs were defeated. The white majority of the Alabama Legislature decided that an all white land grant college would be established under all-white control at Auburn. Thornton (11/5/90) 123.

557. The land grant college at Auburn received no state support for approximately ten years, and was operated solely on

the income from the trust fund established with the proceeds of the 1862 land script sale. Alabama was the only state that did not supplement the Morrill Act funds. Rogers (3/13/19) 16; SOF ¶ 657; KX 606, p. 37.

558. Dr. Rogers, believes that Auburn would have been selected as the site of the land grant college even if race had not been an issue. Rogers (3/13/91) 15–16. Be that as it may, Dr. Rogers conceded that his opinion only concerns what geographical site might have been selected for the white land grant college; it does not address the issue of fairness to black citizens.[43] The following colloquy between Dr. Rogers and ASU's counsel is instructive:

Q. Let's go back for a minute to 1872, okay? You indicated, as I recall, ... something like race was not a factor in putting the land grant school at Auburn in 1872, ...?

A. Race was a factor in the selection and designation of Auburn, but it was not the major factor, and [whether] race, ... was a factor or not, in my opinion, it would still have been located at Auburn....

Q. Let's put aside the question of what town [the land grant college] was going to be in ...?

A. But that was the major topic, what town was it going to be in.

Q. Well, that may have been a major topic, ... but isn't it true that whether it had been at Auburn or [Birmingham] ... or anywhere else it was still going to be a white school run by whites for whites and only white students would have been there ...?

A. That's correct.

Rogers (3/13/91) 99–100.

559. Dr. Rogers testified that one reason whites did not share the First Morrill Act funds with blacks was that there was not enough federal money to support a white land grant college on par with UA and at the same time support a black land grant college. Rogers (3/13/91) 16–17. The $24,000 or so that would be realized from the 1862 Morrill Act land script was "like manna from heaven" for an impoverished white Alabama, and, Dr. Rogers admitted, whites simply considered their own desires to establish another school on a par with UA more important than blacks' interests in a fair share of these important federal funds. Rogers (3/13/91) 41–43.

---

**43.** According to Dr. Rogers, the primary conflict concerning the establishment of the land grant college at Auburn as opposed to elsewhere in the state is a geographic dispute between north and south Alabama. Rogers (3/13/91) 11–14. Dr. Rogers maintains that Auburn was ultimately chosen because it was more centrally located in the state, and because the existing facilities of the East Alabama Male College, located in Auburn, Alabama, were superior to existing facilities at other locations. *Id.* at 45.

The Court gives great credit and weight to the testimony of Dr. Rogers concerning the establishment of the land grant college at Auburn and the manner by which the state Legislature made its decision. Of course, by Dr. Rogers' own admission, in Alabama "race pervades everything, race is so significant you can't study Alabama history ... without race being some kind of factor." *Id.*, at 17. The crux of the good doctor's testimony is not that race was never considered, but rather, that other issues dominated the majority of the debate. It is almost as though the racial issue was never a serious matter for dispute. The funds available under the First Morrill Act were, in the opinion of the Legislature, insufficient to support more than one land grant college in the state, *id.* at

16–17, particularly in light of the state's desperate financial condition at that time. Thus, Alabama is left with three options: a white school; a black school; or an integrated school. The choice between these options is not a difficult decision for the state.

Firstly, the Court is left with the firm conviction that in 1872 racial integration of the schools in Alabama is a political and social impossibility. *Id.* at 131–32. Secondly, by the early 1870's Republican and black control of the state political apparatus is significantly curtailed by the ascendancy of the Democrats. Against this backdrop, the fact that race is not the single articulated factor in the decision to select Auburn is not significant. As Dr. Rogers testified, had the state legislature chosen a location other than Auburn as its 1862 land grant college, it still would have been a school specifically for white students. *Id.* at 99–103. This is the significant decision. The only issue for real debate was where to locate the land grant college, not whether it will be black, white or integrated. Thus, when Auburn argues that it was selected as the recipient of the 1862 Morrill Act funds for none racial reasons it is correct, but such an argument reveals only half the story.

560. On the same day the two land grant bills were enacted under the signature of Governor Lindsay, the state Legislature also passed a resolution urging the U.S. Congress to increase the amount of land available to Alabama under the 1862 Morrill Act, taking into account the fact that blacks in the state had been counted only as ⅗'s of persons in 1862, and the fourteenth amendment now required them to be counted as full persons. Dr. Rogers' 1987 article called this "gross hypocrisy." KX 606, p. 27. At trial he explained what he meant:

> Well, I would say a black person would very well be inclined to say that I'm not a part of the land grant school that's being established, but I'm being used to attain additional information [sic, funding] in line with the law that established that land grant school.

Rogers (3/13/91) 40–41.

## 2. The 1890 Morrill Act

561. Even as Alabama was busy enacting the appropriate legislation to take advantage of the 1862 land grant act, Justin Morrill was himself busy in the U.S. Congress attempting to see that blacks got a share of the funding. Thornton (11/5/91) 129.

562. In 1872 Morrill introduced the first of many legislative proposals designed to revamp the land grant system and provide for continuing appropriations for the existing 1862 land grant colleges. By the time of Morrill's renewed efforts he had been elected to the Senate where he became a very powerful member. Thornton (11/5/91) 129–30. Nevertheless it took Senator Morrill almost twenty years to secure Congress' approval for additional land grant legislation.

563. Finally, in 1890, Senator Morrill was successful in persuading Congress to pass the Second Morrill Act, 26 Stat. 417 *et seq.*, 7 U.S.C. § 321 *et seq.* This act provided for continuing federal appropriations; and more importantly it contained an anti-discrimination provision:

> No money shall be paid out under this act to any State or Territory for the support and maintenance of a college where a distinction of race or color is made in the admission of students, but the establishment and maintenance of such colleges separately for white and colored students shall be held to be a compliance with the provisions of this act if the funds received in such State or Territory be equitably divided....

7 U.S.C. § 323.

564. The 1890 Morrill Act contained a specific requirement that states practicing segregation "equitably" divide the new funds between white and black land grant colleges. 7 U.S.C. § 323. The determination of whether the division of funds was "equitable" was to be made by the Secretary of Agriculture. *Ibid.*

565. There is a popular misconception that the 1890 land grant colleges like AAMU got all the money authorized by that Act. AU actually gets more than half of the 1890 Morrill Act funds. Rogers (3/13/91) 105.

566. Since in 1872, Auburn did not accept Black students, it is clear then that after the Second Morrill Act the State of Alabama was faced with a choice of either designating a Black land grant institution or allowing Blacks to attend Auburn. The state chose the former course, and designated AAMU as its 1890 land grant institution[44] in 1891. USX 6, pp. 8–9 (1985).[45]

---

44. Under the rubric of "1890 institutions" fall those black colleges and universities who were designated to receive a portion of the land grant funding made available by the Second Morrill Act. Those states practicing enforced legal segregation designated a 1890 land grant institution since blacks were prohibited from attending the institutions established under the 1862 Morrill Act. Seals (10/30/90) 129.

45. On several occasions the Court allowed into the record without objection, the reports of various expert witnesses. The Court has extensively utilized many of these reports in making its findings of fact. By agreement of all counsel, the reports were admitted and no objection to the content of any of the reports were made during post trial filings. *See generally* Seals (10/30/90) 4–6; Bareither (2/19/91) 3–9.

During the process of interrogation, errors in calculations were disclosed in some of the reports and the Court has, of course, noted those corrections.

567. On February 13, 1891, the state Legislature enacted a bill to take advantage of the 1890 Morrill Act funds. The bill was entitled: "To receive and appropriate the moneys granted to the State of Alabama by Act of Congress, approved August 30, 1890, entitled an act to apply a portion of the proceeds of the Public Lands to the more complete endowment and support of the Colleges for the benefit of Agriculture and the Mechanic Arts,...." USX 6 (1985). In order to comply with the mandates of the federal legislation the Legislature divided the funds 56.6% for the white school at Auburn and 43.4% for AAMU's predecessor the State Colored Normal and Industrial School in Huntsville.

### 3. The Hatch Act

568. Agricultural experiment stations began to appear in the United States during the 1870's and 1880's, during a time when American farmers faced serious problems, including reduced production, soil erosion, and lack of scientific knowledge about fertilizers. In this period of the nation's history America was predominately a rural and agricultural society, and farmers' problems were felt immediately by nearly everyone. Anderson (11/27/90) 19–20.

569. In 1883, the state Legislature provided for Alabama's first experiment station to be located at Auburn. The Legislature in 1885, passed a law providing for a tag tax on fertilizer and appropriating one-third of its proceeds to the experiment station. Anderson (11/27/90) 21.

570. A second experiment station was approved by the Legislature in 1885 at Uniontown in Perry County, so that scientific experiments could be conducted on Black Belt types of soil. The Uniontown station operated as a branch of the Auburn station. Anderson (11/27/90) 20–21.

571. In 1887, recognizing the need to apply science to the problems of agricultural production, Congress enacted the Hatch Act, 24 Stat. 440 *et seq.*, codified with some differences in language at 7 U.S.C. § 361a *et seq.* This act made annual appropriations to the "college or colleges" established under the First Morrill Act, "or

any of the supplements to the Act, in each state for the purpose of setting up agricultural experiment stations." The Hatch Act recites that "in any State ... in which two such colleges have been or may be so established the appropriation ... made to such States ... shall be equally divided between such colleges *unless* the legislature of such State ... shall otherwise direct." When the Hatch Act was passed, the southern states (except for Mississippi, South Carolina and Virginia) had designated only white institutions as land grant colleges. SOF ¶ 150.

572. The state Legislature seized on the equivocal language contained within the Hatch Act to direct the federal funds and all state matching funds towards the white land grant institution. The Legislature divided the Hatch Act funds between the Auburn and Uniontown experiment stations, however. The legislature also passed a law requiring $2000 of the Hatch Act funds to be appropriated to experiment stations at Abeville and Athens, but the governor vetoed this bill. AU succeeded in monopolizing all the Hatch Act funds in 1891–92 by declaring itself independent of the other experiment stations. The Uniontown station continued to operate independently until 1927, when AU took it over again. Anderson (11/27/90) 21–23, 37–38.

573. The Alabama Legislature in 1897 did appropriate state funds from the tag tax for "colored agricultural experiment stations" at Tuskegee Institute and the Alabama State Normal School for Negroes in Montgomery; but neither of these was ever designated to receive Hatch Act funds. SOF ¶ 152; Anderson (11/27/90) 37.

574. The branch experiment station at Tuskegee would provide limited benefits to black farmers. It did not, however, conduct the kind of scientific work done by the experiment stations under the control of Auburn. Anderson (11/27/90) 42.

575. The Tuskegee and ASU experiment stations were given state appropriations of $1500. While the ASU experiment station never developed as such, the station at Tuskegee was placed under an all-white

board of control and was eventually made a branch station of AU. Anderson (11/27/90) 23–25, 39.

576. The Court finds compelling the testimony of Dr. Anderson that Congress, or at least an influential portion of its membership understood precisely that the "unless the [state] Legislature ... shall otherwise direct" clause would result in denial of Hatch Act Funds to blacks. No such clause appeared in the 1883 bill that failed, and the delay in passage of the Hatch Act is most likely attributable to objections of southern senators and representatives. Anderson (11/27/90) 40.

577. A full four years before Congress enacted the Hatch Act, AU has an experiment station of the type contemplated by the sponsor of the federal legislation. Consequently, Auburn argues that race was not considered by the state when deciding where to allocate its share of the Hatch Act funds. SOF ¶¶ 154, 649; Rogers (3/14/91) 18–20.

### 4. The Smith–Lever Act

578. In 1914, Congress, under the leadership of Hoke Smith of Georgia and Asbury Lever of South Carolina, enacted the Smith–Lever Act, 38 Stat. 372 *et seq.*, 7 U.S.C. § 341 *et seq.*, which made available federal funds for cooperative state extension services in the various states. The statute recites, in pertinent part:

In order to aid in diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics, and to encourage the application of the same, there may be inaugurated in connection with the college or colleges in each State now receiving, or which may hereafter receive, the benefits of [the First and Second Morrill Acts], agricultural extension work which shall be carried on in cooperation with the United States Department of Agriculture: *Provided,* that in any State in which two or more such colleges have been or hereafter may be established the appropriations hereinafter made to such State shall be admin-

istered by such college or colleges as the legislature of such State may direct.

7 U.S.C. § 341 (emphasis in original).

579. Congress passed the Smith–Lever Act as part of a general federal takeover of agricultural demonstration and extension services that, until then, had been funded primarily by private sources and state governments. The main purpose of the Smith–Lever Act was to bring the benefits of the Morrill Acts and the Hatch Act to the mass of people in rural and small town America who did not have ready access to the agricultural experiments occurring at the land grant colleges. Rogers (3/13/91) 20–21; Anderson (11/27/90) 47.

580. It is clear that racial issues played a dominate role in the congressional debates over the Smith–Lever Act. Rogers (3/13/91) 72; Anderson (11/27/90) 48–51. The racial issue that dominated the congressional discourse concerned how, and whether, black farmers would actually receive the benefits of the farm demonstration work that were the central concern of the legislation. Anderson (11/27/90) 48.

581. Hoke Smith of Georgia and James K. Vardaman of Mississippi led the congressional faction opposed to a division of the Smith–Lever funds. Hoke Smith was a leader of the Progressive forces in Georgia and the major figure in the movement to disfranchise blacks by amending the Georgia Constitution. Thornton (11/5/90) 211. Vardaman was "the leader of the most ... extreme racist elements within Mississippi" and often referred to "as the great White Chief." *Ibid.*

582. During the congressional debates on the Smith–Lever Act Smith and Vardaman made the following comments:

Smith: It would be a "very unfortunate condition of affairs if the Negroes were permitted to manage their own affairs." [I] would not "waste half of this fund ... upon the 900,000 negroes of the rural section of Georgia where there is nobody competent to do the demonstrating." "I never saw a negro who was a civil engineer ... or a mechanical engineer." "You are dealing with the masses of the Negroes who are not ready for

it." "[I]t is difficult to move them to work beyond what is absolutely necessary and what they are almost forced to do in order to live." Besides, white farmers who will benefit directly from extension work will have "every incentive" to use the information to benefit their black sharecroppers.

Vardaman: The education of the Negro "does not cost as much as it costs to educate the white man...." [I am] ... the Negro's friend, "understood him" and [know] what was best for him. KX 3247, 22–24, 30.

583. Of course, the Smith–Lever Act eventually passed with the "as the legislature of such State may direct" clause included. AAMUX 26. The purpose of the Act was "to aid in diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics...." *Id.*, sec. 1. Congress intended that these extension programs "be inaugurated in connection with the college or colleges in each State now receiving, or which may hereafter receive, the benefits of [the 1862 and 1890 Morrill Acts]." *Ibid.* Then comes the racially motivated proviso:

*Provided,* That in any State in which two or more such colleges have been or hereafter may be established the appropriations hereinafter made to such State shall be administered by such college or colleges as the legislature of such State may direct.

*Ibid.*

584. Dr. James Anderson expressed the opinion that Southern members of Congress had explicit racially discriminatory motives for insisting on inclusion of this proviso in the Smith–Lever Act. Anderson (11/27/90) 48–50, 57. Auburn's expert historian essentially agreed that the practical effect of the proviso, particularly in the south was to limit the federal funds to the 1862 land grant colleges. Rogers (3/13/91) 73–74.

585. Dr. Rogers also pointed out another provision of the Smith–Lever Act that he

characterized as "a victory for the south." It required funding to be apportioned among the states on the basis of rural people rather than on acres of farm land. The Southern states were helped by this provision because they could count the majority of their black populations, which lived on farms, at the same time that their legislatures were empowered to give all the money to the white land grant colleges. Dr. Rogers acknowledged how, in Alabama's case, this provision fulfilled the Legislature's 1872 memorial to Congress requesting more Morrill Act funds based on counting blacks as whole persons, even though blacks would be barred from participation in the land grant programs. Rogers (3/13/91) 76–77.

586. On May 12, 1914, four days after the Smith–Lever Act became law, the U.S. Secretary of Agriculture notified Governor Emmet O'Neal how to provide formal acceptance of Alabama's share of Smith–Lever Act funds. USX 6, p. 54. The Secretary informed the Governor that:

A formal assent to the provisions of the Act must be given either by the State Legislature or by the Governor in case the legislature is not in session. In connection with this there should be the designation of the agricultural college or colleges to which the funds provided in this Act are to go.

*Ibid.* The federal government would appropriate $10,000 to Alabama for the fiscal year beginning July 1, 1914.

In succeeding years, additional amounts will be available to each State provided an equal sum has been appropriated for that year by the legislature of said State or provided by State, county, college, local authority, or individual contributions from within the State.

*Ibid.*

587. Since the Alabama Legislature was not in session, Governor O'Neal on May 22, 1914, designated AU's predecessor to receive all the Smith–Lever funds.[46] USX 6, pp. 55–60; SOF ¶ 166.

---

**46.** Later, in January of 1915 AU was designated the sole recipient of the Smith–Lever Act by the Legislature.

588. Unaware that Governor O'Neal had already designated AU as the recipient of the Smith–Lever funds, Dr. Walter S. Buchanan, President of Alabama A & M University wrote the Governor on June 16, making "formal application to have a portion" of the Smith–Lever funds to be "administered through the State Agricultural and Mechanical College at Normal—the federal land grant school for Negroes in this state." USX 6, attachment 19, p. 1. Buchanan's formal application included a lengthy account of the current situation and the importance to the black community of AAMU's participation in Smith–Lever programs:

> No doubt you are aware of the fact that the land grant school for white people—the Alabama Polytechnic Institute—already participates in two or more federal funds which are not accessible to us here at Normal because of the more or less elementary character of the work which we are called upon to perform. We get none of the benefits of the Adams nor the Hatch funds, nor of the Original Morrill Act. We participate only in the Second Morrill Act—the act of 1890.

> Now the Lever Agricultural Extension Act aims to accomplish a class of instruction which is not only within the reach of our school, but which is just the kind of instruction which half a million Negroes cultivating one hundred twenty-five thousand farms in Alabama so sadly need. And no provision looking toward the permanent improvement of the productivity of our great state can afford to overlook this large and important element of our population. You will agree, I am sure, that more so than their white neighbors, these Negroes are suffering for the "useful and practical information on subjects relating to agriculture and home economics" which this measure aims to take to their very doors.

*Id.* at 1.

589. President Buchanan anticipated the argument of the time that whites must control all aspects of blacks' education and attempted to counter it—at least with respect to agricultural extension work in the homes of black farmers:

> But perhaps the question with you is how best to reach the Negroes. Now there is no question in my mind but that the Negro is best reached and helped through leaders of his own race. Work of this character is so largely social in its methods—if it is to be done most effectively—that it could hardly be done by white teachers without in a large measure trespassing upon our long established and carefully guarded social customs and traditions. Especially is this true when it comes to teaching home economics.

> . . . . .

> Perhaps it is argued that we are not prepared to do the work. But we have done various forms of extension work satisfactorily and effectively—the Jeanes work, the United Co-operative Demonstration work, etc.

*Id.* at 1–2.

590. The president of AAMU then explained the integral importance of extension work to the overall program of agricultural education for blacks.

> The white land grant school with its larger and more varied financial backing has naturally developed managerial and operative efficiency along lines which our more limited and less flexible means have not allowed us to operate. And just as these special funds have added considerably to the influence and usefulness of Auburn, an adequately supported department of agricultural extension will add to our effectiveness as disseminators of useful and practical information and as trainers of rural life leaders among our people. I feel satisfied that with the material already available we can develop extension leadership as fast as the funds to employ it become available. The supply of Negro agricultural graduates of college grade is far below the demand—but this supply will be materially increased immediately if this large avenue of employment is opened up to them through the use of colored men and women as demonstrators under the

terms of this bill. And this side of the question should make a strong appeal when it is considered that so many avenues of employment which are open to educated white men and women are stubbornly closed against Negroes.

*Id.* at 2.

591. President Buchanan's formal application went on to request a division of Smith–Lever funds between AU and AAMU according to white and black population percentages, which Buchanan estimated would provide Alabama A & M $4,500 of the $10,000 federal appropriation for 1914. He also requested that Alabama A & M University receive thirty percent of state appropriations for extension work. *Id.* at 3. With this support Buchanan promised statewide coverage for the black community:

For the year beginning July 1, 1915, we ought to be able to put on nine more men fully equipped as county agents—giving at least one in each congressional district to be located in the county where he would be most effective.

County demonstrators in home economics would be added as fast as the funds would permit, but from the very start we should do some work along this line wherever we are doing any work at all. This can often be done in a very limited way without additional cost.

*Id.* at 4.

592. Buchanan submitted to O'Neal a detailed budget and plan for expenditure of AAMU's share of Smith–Lever funds. *Id.* at 4 and 5–13.

593. On June 20, 1914, Governor O'Neal forwarded Buchanan's letter to President H.C. Thach of Auburn with this request:

Please read the letter carefully, and return same, after you have given it consideration.

I would be glad, also, if you would give me your opinion as to Buchanan's suggestions, and the suggest [sic] form of reply.

USX 6, attachment 20. Thach replied by letter dated June 26, 1914. USX 6, attachment 21.

594. By the time the Governor's correspondence reached President Thach, President Buchanan had already visited Thach twice concerning the matter. President Thach responded to the Governor:

According to the Act and your certification, the work has already been established and organized in connection with the land grant college for the whites, established in 1872 under the provision of the federal act of 1862. The funds available this year is (sic) only $10,000, and this has been appropriated by the Board of Trustees in an enlargement of the work already undertaken throughout the State. The plan includes assistance to the negro race, which will be administered by the staff of officers and specialists already employed. There is, on the part of the present organization, the keenest appreciation of the needs of the negro race, and as the funds develop every effort will be made to render all assistance possible.

SOF ¶ 167.

595. At the time President Thach wrote his letter to the Governor there was apparently considerable public debate in Alabama about whether blacks should share in the Smith–Lever funds, and if so which black institutions should get a portion of the proceeds. SOF ¶ 673.

596. On July 24, 1914, W.W. Lavender, a white attorney in Centerville, wrote Governor O'Neal referring to newspaper accounts "that a certain part of the appropriation made by Congress for Agriculture Schools in Alabama would go to negro schools and their part of same is left to you." USX 6, attachment 22. Lavender urged support for "a negro school known as the Centerville Industrial Institute." *Id.*

597. Prominent white citizens of Madison County were urging the governor to give AAMU the blacks' share of the Smith–Lever money. W.F. Garth, proprietor of Piedmont Stock Farm in Huntsville, agreed with President Buchanan that AAMU "is entitled to the entire part of the fund set aside for Negro Colleges." USX 6, attachment 23.

598. David A. Grayson, a Huntsville lawyer, gave O'Neal a lengthy brief for supporting AAMU, citing portions of the Smith–Lever Act that he construed to require division of the funds between the state's white and black land grant colleges. USX 6, attachment 24. Grayson then said:

> From what I can learn Mr. Thatch [sic] at Auburn has not planned to expend or have expended any of this money through the land grant negro school at Normal.

> I see in the papers that a very distinguished committee has recommended that a portion of this money be expended in behalf of the negro, and this seems to me to be quite just. I think, however, that all that is expended in behalf of the negro should be expended through the Agricultural & Mechanical College at Normal, since Normal is a state school, and has been badly in need of money for many years.

*Id.* at 2.

599. Booker T. Washington, president of Tuskegee Institute, also made a concerted effort to get his school a share of the Smith–Lever funds. On several occasions Dr. Washington corresponded directly with Gov. O'Neal in an effort to secure the funding. AAMUX 26. In opposing Tuskegee's request, Mr. Grayson used the argument about native white control of blacks' education to discredit the school's request.

> The State has control of the Agricultural & Mechanical College at Normal, and can direct the policy and doctrines taught at said institution. For that reason the money should be expended through the Agricultural & Mechanical College at Normal.

> The State has no control of the policies at Tuskegee and besides Tuskegee is not in need of state funds, and does not need prestige, it has been able to get all the funds it has ever needed for any purpose.

> While the money could not be used to any substantial extent for the payment of teachers engaged in teaching in the college, the expenditure of this money

would increase the prestige of this *state* institution very greatly.

*Id.* at 2 (emphasis in original).

600. After some discussion, the Governor indicated to Dr. Washington that at the time Auburn was designated, "[i]t was understood that a proper proportion of this fund should be used for the benefit of the colored farmers of the State." SOF ¶ 671; AAMUX 26 (letter of July 7, 1914).

601. The Governor stated his intention to "approve any plan to which [Dr. Thach and Dr. Washington] may agree in reference to a proper division of this fund." AAMUX 26 (letter of July 7, 1914).

602. In the end, however, Governor O'Neal deferred to Thach and allowed to stand his earlier designation of AU to administer the entire Smith–Lever federal appropriation. Thach gave his final "no" to funding for AAMU in a letter to Governor O'Neal dated July 28, 1914:

> Concerning the question under consideration, I beg to say that I have regarded the matter as "res adjudicata," and I beg to hand you statement of the facts, the summary of which I quoted you on June 26th, 1914, in connection with Prof. Buchanan's letter.

> . . . . .

> The question under consideration was first of all, as you remember, reviewed by yourself and me on May 22, 1914, at your office; and your certification of the Agricultural and Mechanical College at Auburn was issued as the proper administrator of this fund in accordance with the terms of the Act. This certificate was duly forwarded to the United States Secretary of Agriculture where it was regularly approved and placed on file, and I was officially summoned to Washington to perfect the plans.

> . . . . .

> And in keeping with your certification, every Southern State, without exception, has assigned the Smith–Lever Fund to its white agricultural and mechanical colleges for administration.

> It may be stated that an effort was made in the United States Senate to

amend the House Bill and introduce the question of race into the measure, and by the solid vote of Republican senators the bill was so amended; but, in conference, the whole question of division by race was omitted.

. . . . .

In further execution of the directions of the Board of Trustees, these projects were submitted by me in person to the United States Department of Agriculture, July 1, 1914, and after the fullest and most elaborate conference, covering several days, were approved.

In pursuance, further, of the action of the Board of Trustees, as ratified by the United States Department of Agriculture, contracts have been duly made for the execution of these projects and are now in operation.

. . . . .

The income this year is only $10,000, and is largely used in expansion of the work as already organized. Next year when this appropriation increases, as it likely will, further provision will be made for the negro race.

. . . . .

Having conducted this particular matter in strict accordance with the law in the premises, the plans being approved and ratified by yourself and the Board of Trustees, and in turn approved and ratified by the United States Department of Agriculture, and the contracts having been duly drawn and put into operation, you can readily understand that I thought my duty was entirely fulfilled in the matter and the transaction fully concluded. I am sure that the confusing press notices must be predicated upon some misunderstanding.

USX 6, attachment 29; AAMUX 26 (letter dated July 28, 1914).

603. Governor O'Neal agreed with President Thach and on July 31, 1914, wrote the lawyer for AAMU's board to say "I have no further authority in the matter." USX 6, AAMUX 26 (letter dated July 31, 1914).

I have every assurance that Dr. hach will see to it that in the administration of these funds the colored race will receive its due proportion of benefit and instruction.

It has been the policy of the Southern states, as I am advised, through the action of the Governors where the Legislature was not in session, to designate its technical institution receiving the benefits of the Act of Congress approved July 2nd, 1862, and the acts supplementary thereto, the proper institution to receive and administer the money appropriated by the Smith–Lever Act.

*Ibid.*

604. Dr. Anderson expressed the opinion that racial discrimination was a motive in the decision of Governor O'Neal and other state officials involved in the decision to give all the Smith–Lever funds to AU:

I think it was racial discrimination against not only the Alabama A & M as a black land grant institution, also against the black farmers in the state, because by so doing it really denied any significant benefits of those funds to black farmers despite the statement by the president of Auburn University.

Anderson (11/27/90) 57–58.

605. While agreeing that race played some role in the decision to allocate Smith–Lever funds to Auburn, AU's expert historian, Dr. Rogers, nevertheless opined that regardless of whether race played a part in the Governor's decision, AU would have been designated to receive the 1914 federal funds. According to Dr. Rogers, Auburn was better equipped to conduct statewide agricultural cooperative extension work and because the amount of money available was relatively small ($10,000). Rogers (3/13/91) 23–24; 135–36.

606. But Dr. Rogers admitted:

[T]here is no question though that race entered into that decision and he could very well have decided to have given a portion of the Smith–Lever funds to black schools. He did not.

Rogers (3/13/91) 23. Dr. Rogers nevertheless persisted in his belief that the Smith–Lever funds would have gone to Auburn had race not been an issue.

607. Whether the admittedly discriminatory motive behind the original decision concerning the distribution of Smith–Lever funds, the Hatch Act Funds and the Morrill Act funds results in any current liability for the State of Alabama and or Auburn University is will be resolved in the appropriate section.

## CURRENT ADMISSIONS STANDARDS

### A. The ACT Examination

608. Having concluded that in the late 1950's and early 1960's academic and state officials initially adopted the ACT test as a weapon in the campaign of resistance to federally ordered integration,[47] the Court now examines the extent to which the state universities that use the ACT do so, for what purpose they use it and its impact on the admission of black students.

609. The fact that the ACT was first adopted for an illegal purpose, shifts the burden of proof to the Defendants to establish by a preponderance of the evidence that the actual use of the ACT does not have an *impermissible* impact on black students. Based on the evidence before the Court, it is clear that all the Defendants other than AU have met their burden.

### 1. Background of The ACT College Admission Test

610. The American College Testing Program was founded in 1959 by Dr. E.F. Lindquist and Dr. Ted McCarrell as a non-profit organization to provide measurement, evaluation and research services to educational institutions and agencies throughout the United States.

611. ACT is governed by a 37 member board comprised of representatives from states that participate significantly in ACT's programs. AUX 634, p. 11.

612. ACT is a test of educational development and achievement and not of aptitude. AUX 634, 12, p. 16. It focuses on four major areas: English, mathematics, reading, and scientific reasoning. AUX

634, p. 17. It is a professionally developed standardized test used throughout the nation in college undergraduate admissions decisions. AUX 634, pp. 24–30; AUX 635, p. 8; SOF ¶ 222.

613. Currently ACT has approximately 583 full-time employees. The professional staff is trained in measurement, research and statistics, and there are individuals with advanced training in computers, guidance and counseling. AUX 634, pp. 12–13. ACT also uses individuals of all races as consultants and item writers. AUX 634, pp. 13–14, 27.

614. Item writers and consultants for the ACT typically are teachers on secondary school and college faculties who have a substantial knowledge base in their content areas. AUX 634, p. 14. Such consultants are used to develop questions and materials contained in the ACT assessment and to review materials. AUX 634, p. 14.

615. The ACT assessment program is designed to provide information to students, parents, and educational institutions to assist them during the transition from high school to college. It consists of three basic parts: a test component; a student profile section (which asks questions about a student's educational aspirations, experiences, extra curricular activities, and anticipated needs in college); and an interest inventory to ascertain a student's career interests. AUX 634, pp. 15–16.

616. The test is administered annually on five national test dates at hundreds of test sites and in all 50 states and the District of Columbia. AUX 634, p. 17; AUX 635, p. 9.

617. Between 2,800 and 2,900 colleges and universities in the United States use the ACT in some way, and in the most recent year, about 1.2 million students took the examination. AUX 635, p. 10.

### 2. The ACT Test Is Used To Examine Students' Academic Preparation

618. The development process for the ACT Assessment is intended to identify those aspects of the high school experience

---

47. *See* supra, ¶¶ 377–98.

that are important for success in college. AUX 634, p. 16.

619. The mean composite score on the ACT test for college bound high school students throughout the country is approximately 18. The standard error of measurement on each of the four ACT tests is approximately two standard score points; on the composite score it is approximately one standard score point. For example, if each of the student's four ACT test scores is 18, that student's true score would likely (about two times out of three) be in the range of 16 to 20 for each test. The student's true composite score would be in the range of 17 to 19 if his or her composite ACT is 18. AUX 5953P.

620. The kind of courses taken in high school are directly related to performance on the ACT test and to subsequent performance in college.[48] AUX 635, p. 34.

621. Students who have had at least four years of English, three years of math, three years of social studies and three years of science[49] earn higher scores on the ACT Assessment and higher college grades, regardless of ethnicity, family income level and academic range in high school. AUX 635, p. 35.

622. The average national composite score on the ACT for college bound high school students in 1990 is approximately 22.3 if the high school core curriculum is completed. KX 2062 [Summary Report National] p. 4. If the core curriculum is not completed, the average score is 19.1.[50] *Ibid.*

623. On a national scale the composite average score on the 1990 ACT examination for Caucasian non-Hispanics who complete a high school core curriculum is reported as 22.8. KX 2062. [Summary Report National] p. 4. For African–American students who complete the core curriculum the average score is 18.2. *Ibid.* For Caucasian non-Hispanic test takers who do not complete the core the average ACT composite score is 19.7, and for African–American students the average is 16.1. *Ibid.*

624. The average 1990 ACT composite score for black students in Alabama who complete a core curriculum in high school is 18.3. The comparable scores for black students in Alabama who did not complete the core curriculum is 15.7. KX 2062, [Summary Report Alabama] p. 5.

625. The average 1990 ACT composite score for white students in Alabama who complete a core curriculum in high school is 22.5. The comparable scores for white students in Alabama who did not complete the core curriculum is 18.8. KX 2062, [Summary Report Alabama] p. 5.

626. There is undisputed evidence that high school students who complete core course work tend to earn higher average ACT scores than do students who *do not* complete a core of studies in high school. This association holds true across racial and ethnic groups. Wharton (4/2/91) 126.

B. *The Development of the ACT Test*

627. Procedures are employed in the test development process of the ACT to guard against racial bias, gender bias or any other bias based on an immutable characteristic. Questions are written by item writers who reflect diverse geographical, ethnic and gender Backgrounds. Item writers are provided training materials that include guidelines for preventing bias and promoting fairness in the materials being developed. In the review stages, criteria for bias avoidance are utilized. Members of minority sub-groups act as reviewers to examine the test for minority bias. AUX 634, pp. 26–27.

---

**48.** While there is a clear correlation between high school curriculum and performance on the ACT, questions concerning the adequacy of high school education in Alabama are clearly beyond the purview of issues before this Court.

**49.** This distribution of high school classes is commonly known as the "core curriculum." KX 2062, p. 3.

**50.** As a point of comparison, a score of 18.0 and 19.0 would be at the 49th percentile and 55th percentile, respectively, nationally and at the 54th percentile and 60th percentile, respectively for Alabama. KX 1945, p. 2 (state report), p. 2 (national report).

628. Proposed ACT test items identified as potentially biased are excluded from the pool of potential questions. AUX 634, p. 27.

629. After each administration of the ACT there is a statistical examination of items to determine if an item had a disproportionate impact on one or more subgroups. AUX 634, p. 28.

630. Each item writer for the ACT Assessment is given an item writer's guide, that includes specifications for avoidance of subject matter that may be unfamiliar to members of a sub-group. AUX 628, pp. 25, 27.

631. As part of the development process for questions on the ACT test each form of the test is reviewed by minority consultants. AUX 617, pp. 25, 27.

*C. The ACT Is Not A Racially Discriminatory Examination*

■ 632. As found by the Court, the American College Testing Program employs a number of procedures to minimize any potentially discriminatory impact due to improper test development. There is uncontradicted evidence that the ACT is a valid predictor of freshman year college success. The finding that the test itself is not discriminatory is based on the extensive validation studies which have been done at the national level. Additionally, the fact that both of Alabama's HBUs utilize the examination in some fashion militates against an argument that the test is a priori discriminatory.

633. In statistical tests of the validity of a combination of the ACT Assessment and high school grades as a predictor of success in the first year of college, the median multiple correlation for predicting overall GPA during the freshman year is between .56 and .68 on a scale of 0 to 1. No other variable has been identified that provides a better measurement degree than that.

634. Statistical evaluation has shown that ACT test scores, used together with high school grades, tend to over-predict the average college freshmen GPA for all students by .01 of a GPA unit. AUX 635, pp. 31–32.

635. Another statistical study showed the same factors tended to over-predict the average college freshman GPA for blacks (as opposed to all minorities) by .05 of a GPA unit. Either of these translates into no more than one-half of a single grade-unit for the entire year. AUX 635, p. 33.

636. In a statistical study looking at predictive validity by gender, by racial background and by age, where cross-evaluation statistics were developed to deal with bias (defined as the difference between predictive and earned grade), the typical bias for minority students, based on ACT composite score and high school grades, was .01. When a separate sub-group consisting only of people in a particular ethnic group was tested, there was a similar kind of bias index of .01. AUX 635, p. 31.

637. Numerous research studies show that tests like the ACT are essentially as predictive of college grades for minority or socioeconomicly disadvantaged students as they are for middle class white students. AUX 5953P, p. 4.

638. According to a statistical study by Dr. James Maxey[51] and Richard Sawyer, based on data submitted between 1973 and 1978, predicted grade point averages of black students were, on the average, somewhat higher than their earned grade averages (by .05 grade units); the grade point averages of white students were also over-predicted, but to a smaller degree (by .01 grade units). The magnitude of this difference, however, is small relative to the value of the statistics. AUX 5953G, p. 2.

639. ACT has studied the validity of the ACT Assessments for predicting college grades and has found that the tests are essentially as predictive for educationally disadvantaged students as for all other students. AUX 5953K.

640. Because the ACT Assessment measures the current status of students' educational development and academic abili-

---

**51.** Dr. Maxey is an expert in testing, with specialization in evaluation of tests used in admis- sions decisions to colleges and universities. SOF ¶ 221.

ties, the test scores are necessarily lower for students for whom social factors have interfered with educational development. AUX 5953P, p. 4.

641. Research indicates that a combination of high school grades and admission test scores is a better predictor of college success than either alone. 85 UASX 328, p. 134.

642. Antoine Garibaldi testified that one would expect individuals who have higher ACT scores to have a much greater potential of completing an undergraduate degree. Garibaldi (1/15/91) 46.

643. Research has shown that students with low academic ability (as measured by standardized test scores) and low socioeconomic backgrounds graduate at a rate of between 13% and 20%, while 60% of students with high academic ability and high socioeconomic status eventually graduate. Garibaldi (1/15/91) 49.

### D. The Use of the ACT by Colleges and Universities in Alabama

#### 1. Admission Requirements for Regularly Admitted Freshmen

644. As of 1985, Troy State University in Montgomery, the University of North Alabama, Jacksonville State University, Livingston University, Alabama State University, and Alabama A & M University had essentially open admissions for freshmen, and required only a high school diploma or indication of an educational attainment equivalent to graduation from high school.[52] As of 1985, ACT scores might be used by such universities for counseling, placement, and diagnosis of educational deficiencies, but were not used as a criterion in admissions. As of 1985, Alabama's numerous junior colleges also admitted students without reference to ACT scores, with essentially open admissions to those who graduated from high school or indicated educational attainment equivalent to graduation from high school. SOF ¶ 219.

645. ACT test scores are used as part of the admissions decision process for freshmen at AU, AUM, University of Alabama, UAB, UAH, University of South Alabama, University of Montevallo, TSU (main campus), and TSU (Dothan/Fort Rucker). SOF ¶ 220.

646. The decisions about whether to admit educationally disadvantaged students to college who do not score well on the ACT test involve value judgments that pertain to the purpose and mission of the institution. If the primary concern of an institution is to enroll students who are likely to be successful academically without extensive remedial course work, then selection criteria are necessarily reflective of that. If, on the other hand, the institution is willing and able to assist educationally disadvantaged students, then its selection criteria must necessarily reflect its mission. ACT recommends that each college carefully examine its sense of purpose and mission relative to the type of students it seeks to enroll, and then implement practices and procedures consistent with same. AUX 5953K, p. 4.

647. A cutoff score, or a minimum required score on the ACT is used in many institutions in the country to identify people who are eligible to be enrolled in a particular program. The rationale for the use of the particular score differs from institution to institution. AUX 5953K, p. 26.

#### i. The University of Alabama System

648. The high school GPA and enhanced ACT scores required for regular admission to the freshman class at UAH are as follows: if the ACT score is 14 or below the GPA must be at least 3.25; if the ACT score is 15 the GPA must be at least 3.0; if the GPA is 16 to 17 the GPA must be at least 2.75; if the ACT is 18 to 19 the GPA must be at least 2.50; if the ACT is 20 to 21 the GPA must be at least 2.25; if the ACT is 22 the GPA must be at least 2.0; if the ACT is 23 and above the GPA must be at least 1.15. UASX 1100.

---

**52.** The University of North Alabama is now beginning to phase in admissions requirements which in some instances include the use of ACT examination scores. Potts (3/11/91) 24–26.

649. At UAB, if the composite ACT score is 20 or above on the enhanced examination and the GPA is 2.0 or better, the student is admitted unconditionally.[53] McCallum (4/1/91) 74; Cocoris (4/8/91) 4–5; UASX 72.

650. At the University of Alabama's main campus in Tuscaloosa, freshman regular admissions decisions are made on a sliding scale combining ACT scores with high school GPA in the following manner: A score of 15 or below on the ACT renders a freshman applicant unacceptable for regular admissions; if the ACT score is between 16 and 20, then the GPA must be between 2.7 to 2.1 respectively; if the applicant has a 21 or above on the ACT or a 21 on the old ACT examination, then the a minimum of a 2.0 GPA is sufficient for regular admission. UASX 1102.

651. The above formula for determining regular admission for high school students takes into account high school grades and test scores, with more weight being given to high school grades. The formula has been developed over a number of years through research, using a correlation regression analysis, in which a formula is built for predicting the success of students in their first year at UA. Smith (4/4/91) 17, 21.

652. Dr. Roy Smith has been director of Testing at the University of Alabama's main campus since 1973 and has been employed in the field of education since the early 1960's. Based on his work and study of college admissions, Dr. Smith is familiar with and has considerable experience with admission standards and testing, and he is familiar with both the admission practices at other colleges across the nation and the historical development of testing. Smith (4/4/91) 13, 20–21.

653. Dr. Roy Smith has conducted research on the predictive validity of the ACT and the admission process at UA since 1972, when he became the Director of Testing at the University of Alabama. Each year, Dr. Smith examines the first se-

mester grade point average of the entering freshmen and correlates it to the students' entering ACT scores and high school grades. From this yearly study, he has concluded that the freshmen scores on the standardized tests, in combination with high school grades, are highly related to success in the first semester at college. For at least the last 19 years, the correlation has ranged from a .52 to a .59, with some years as high as .62, but typically in the .55 range. Smith (4/4/91) 22–23.

654. Based on his studies performed yearly, Dr. Smith testified that the formula and admission requirements that UA uses are highly related to academic success of the student in the first semester. Smith (4/4/91) 21.

655. UA has recently modified its admission standards to require in 1995 that entering freshman complete a college preparatory curriculum in high school. According to the university, the effect of the new requirement will be a positive one in that students taking these courses will be better prepared to succeed in college. Sayers (4/3/91) 20–21.

ii. *Auburn University*

656. AU's current admissions requirements for undergraduates are based on a combination of a student's high school record and his performance on standardized tests. Admission requirements for Alabama residents require a high school grade point average of 2.0, completion of a prescribed core curriculum, and a minimum score on the ACT of 18. Reeder (2/27/91) 5–7; AUX 58 and 59. Auburn does not use a sliding scale of admissions and thus a high GPA will not compensate for a lower ACT score or vice versa.

657. For out-of-state residents, AU requires higher minimum standardized test scores—22 on the ACT—and higher high school grade point averages—2.5—except for black students and students with prior Auburn affiliation (e.g., parent or family

---

**53.** An ACT score is not required at UAB for applicants who have been out of high school for

three or more years. Cocoris (4/8/91) 5.

member attended the University). These applicants are judged by in-state admissions requirements. Reeder (2/27/91) 6–7, 31–32.

658. At the time of trial in 1985, athletic scholarship recipients seeking admission to AU were not subject to any minimum ACT requirement. SOF ¶ 141. Currently, athletes are subject to some degree of admission standards.

659. AUM bases regular freshman admissions decisions on a sliding scale "admission points" system which considers enhanced ACT score and high school grade point average on academic courses only. Applicants with a 19 on the enhanced ACT and a 2.0 GPA are regularly admitted. A higher than 19 ACT score can compensate for lower than 2.0 GPA and vice versa. Dunlavy (2/25/91) 20–24; AUX 929; SOF ¶ 142.

660. In 1977, AU's Director of Planning and Analysis completed a study entitled, "The Value of ACT and SAT Test Scores as Predictors of First Year Performance at Auburn University," and reported:

Both the ACT and the SAT exhibit an acceptable level of predictive validity. Used alone, either is an equally good predictor of college performance. Of equal or greater importance, though, is past performance, as measured by high school grades. Obviously, a wide variety of high school grading practices exist [sic], but the student who receives good grades in high school typically scores high in college. This predictive relationship is at least as strong as (and generally stronger than) those obtained when the ACT and SAT are used as predictors.

SOF ¶ 140.

661. The AUM freshman admissions formula give substantial weight to an applicant's high school grade point average. For example, an applicant who has a GPA of at least 2.6 on a 4.0 scale would be regularly admitted to AUM regardless of his or her ACT score. AUX. 929; Dunlavy (2/25/91) 90.

iii. *Troy State University*

662. For a freshman to be unconditionally admitted to Troy State University's main campus he or she must have a minimum of 18 on the enhanced ACT with an overall 2.0 high school GPA. Hutto (3/18/91) 22–23.

663. Troy State University in Montgomery has what it terms a "modified open admissions policy." For undergraduates over the age of 21, unconditional admission requires graduation from high school with a "C" average or successful completion of the high school equivalency test. Johnson (3/18/91) 4; TSUX 51 pp. 2–3.

664. The ACT test is not required for undergraduates over 21 years of age because the ACT has not been shown to be a sufficiently accurate predictor of success for those students who have been out of secondary school for a number of years. Johnson (3/18/91) 22; TSUX 51 pp. 2–3.

665. For undergraduates 21 years of age or younger, unconditional admission is based on a sliding scale of grade point average and ACT test scores, with, for example, a "C" average and a 13 ACT authorizing unconditional admission. Johnson (3/18/91) 22; TSUX 51 pp. 1–2.

2. Alabama's HBU's Use of the ACT

666. As stated, ASU has essentially open admissions.[54] That means that a student with a high school diploma or its equivalent is admitted to the university without regard to standardized test scores or high school GPA. SOF ¶ 143. Steptoe (1/28/91) 5. If, however, it appears from the applicant's prior academic record that his preparation for college work is marginal, then the university requires that letters of recommendation be submitted and if sat-

---

**54.** ASU did not always have a purely "open" admission policy. For example, at least as late as the 1973–74 school year, ASU required, for unconditional first-time freshman admission, that the applicant have graduated with a "C" average from an accredited high school, have completed 16 high school units, or their equivalent, including at least three units in English and eight units in mathematics, natural sciences, social sciences and foreign languages, and have submitted a satisfactory ACT score. 85 AUX 6467(d), p. 19; *see also* Howard (1/23/91) 4B–5B.

isfactory the student is admitted upon those letters. *Ibid.*

667. While Alabama State University does not use the ACT for admission decisions, it does make extensive use of the examination for purposes of placement within the university's curriculum and no student may stay at the university who has not, at sometime during freshman orientation, taken the examination.[55] Freeman (1/30/91) 44–45.

668. ASU has found the ACT score to be positively correlated with academic success at the institution. Bryant (2/6/91) 52–53.

669. Alabama A & M University has what its Executive Vice President calls a modified open enrollment since there is an evaluation element to the process and not every one is accepted. Frazier (1/9/91) 17.

670. AAMU analyzes the high school GPA and the ACT score to determine whether the student can benefit from the regular collegiate program or whether the student needs additional developmental work, once admitted.[56] Frazier (1/9/91) 16–17.

671. Much like ASU, Alabama A & M University uses the ACT test primarily as a means for evaluating entering students to determine their placement in the college's curriculum.

672. Dr. Jay Chunn, AAMU's Academic Vice President, and a few of the university's faculty members have been reviewing the possibility of initiating at the university a minimum cutoff score of 16 for admission to Alabama A & M University. Dr. Chunn indicated at trial that should the idea survive committee review that the consequences of instituting an ACT cutoff score "are fairly positive for Alabama A & M."

Chunn (1/10/91) 135–36. Dr. Chunn also testified that should the school adopt an ACT cutoff that the institution would ensure through some mechanism that those students who could not be admitted under the regular admission standards would still gain access to the school.

673. Dr. Chunn testified that the ACT test is one of the two best measures of performance of blacks during their first year of college. The other being high school grades. Chunn (1/10/91) 59.

E. *Non-traditional College Admissions*
 1. Conditional Admissions at the University of Alabama System
 i. *University of Alabama at Huntsville*

674. As indicated, UAH bases admission to the freshman class on two elements: scores on the ACT test and the high school grade point average on academic subjects. The two are considered together, and the higher an applicant's ACT score is the lower will be the required GPA, and vice versa. An applicant who does not meet the admissions standards for admission as a regular student is *automatically* admitted as a conditional admit. The admissions policies are stated in the UAH Catalog. Koger (3/26/91) 4–6; UASX 879, pp. 30–31, 34–35; UASX 519, pp. 14–15, 19; UASX 517, pp. 18–19, 24; Hall (7/25/85) 6086–87.

675. A conditionally admitted student at UAH is required to take a light course load until 15 hours of credit are completed. Credits earned in such status will count toward a degree when the student qualifies for regular admission. After completing 15 hours, a conditional or probationary admit who has an overall average of C or better will be admitted as a regular stu-

---

**55.** For admittance to its teacher education program, ASU required that students score a minimum of 16 on the ACT. This requirement was mandated by the State Board of Education. A recent opinion from the United States District Court for the Middle District of Alabama, Northern Division held that the SBE's minimum ACT requirement for teacher education programs was in violation of Title VI and enjoined its further use. *Groves, et al. v. Alabama State Board of Education,* 776 F.Supp. 1518 (M.D.Ala.

1991). The court found that the ACT test was not designed to be used as an absolute criterion to predict those students who possess the skills necessary to become competent teachers. *Id.* at 1520.

**56.** Before an applicant can be accepted to AAMU he or she must take the ACT and have the test results sent to the university. AAMUX 636, p. 37.

dent. If a conditional or probationary student fails to achieve an overall C average, he or she will be placed on academic probation and will be subject to the policies governing students in such a status. Koger (3/26/91) 6–7; UASX 879, pp. 34–35, 62.

676. The conditional or probationary admission criteria are designed to allow access on a trial basis to UAH for students with lower levels of academic preparation, giving them the opportunity to achieve academic success notwithstanding the negative predictive indicators. Koger (3/26/91) 13–14.

677. UAH provides access for undergraduate higher education, through its various admissions categories, to all persons who apply. Koger (3/26/91) 46–47; Hall (7/25/85) 6085; UAS 879X, pp. 29–35; UASX 514, pp. 9–12.

678. For Fall 1990, the total number of new undergraduate students (first-time freshmen and transfer students) enrolled at UAH was 929. Of that number, about 12% or 111 were admitted on either a conditional or probationary basis. Black students represented 22% or approximately 24 of all such conditional admits. Koger (3/26/91) 15–17.

679. Approximately 26% of all new undergraduate black students admitted in the Fall of 1990 were in the conditional or probationary admissions categories. Koger (3/26/91) 16–17.

ii. *University of Alabama at Birmingham*

680. At UAB, any applicant who does not meet the requirements for regular unconditional admission is considered under the standards for conditional admission. Cocoris (4/8/91) 5. In reviewing applicants for conditional admission, UAB applies a sliding scale of admission which allows a student with a low ACT score to compensate by submitting a higher GPA and vice versa. *Ibid;* UASX 266.

681. The purpose of the sliding scale is to project the potential success rate of applicants who do not meet the unconditional admissions requirements at UAB. Thus, this sliding scale expands the admissions options at UAB.[57] Cocoris (4/8/91) 5.

682. Students who are admitted to UAB conditionally are required to see an advisor, to take a lighter load, and to attend orientation. These conditions only apply during the first term of the student's attendance at UAB. Conditionally admitted students are eligible for financial aid. Cocoris (4/8/91) 6–7.

683. In the fall of 1990, approximately 60% of blacks enrolled at UAB were enrolled under the conditional admittance standard. Cocoris (4/8/91) 25–26.

684. All students who meet the requirements for conditional admission to UAB are offered enrollment. Cocoris (4/8/91).

iii. *University of Alabama at Tuscaloosa*

685. If a high school student does not fall within the formula developed for regular admission status at UA's main campus, he or she may be admitted as a summer trial admittee. A summer trial admittee must take three courses in the summer with special support, and if they are passed, then the student is allowed to return in the Fall with no restrictions. In the Fall of 1990, UA had 55 conditional admittees of which five were black. Smith (4/4/91) 15, 18; UASX 1206.

686. In 1990 as a percentage of total first time entering freshman, conditional admittees constituted less than two percent of the class and black conditional admittees constituted less than .018% UASX 1206.

687. If an incoming student shows evidence of inadequate preparation, the student may be admitted, but restricted to a 12 semester hour load. This is done to give the student an opportunity to succeed, and applies particularly to those who might

---

57. The correlations within the sliding scale are developed by American College Testing Program based on first term GPA's of the freshman classes provided by UAB. It predicts students

who have a 50% chance of successfully obtaining at least a 2.0 GPA average the first term of enrollment at UAB. Cocoris (4/8/91) 5, 26.

have been out of high school for a long time. Smith (4/4/91) 15–16.

688. Another special type of admission status is the Dean's admission. A student with unusual skills or talents in the academic area, for example, an outstanding speech major or art student or outstanding musician who typically may not be as well prepared in the math and science area, may be admitted pursuant to the Dean of the school's permission. This is an exceptional admission; only 7 students were granted admission under this status in the Fall of 1990, and of this seven, two were black. Smith, (4/4/91) 16; UASX 1206.

### 2. Conditional Admissions at Auburn University

#### i. *Main Campus*

689. Auburn University does not have a *per se* category of conditional admissions. Rather, occasional exceptions are made to AU's regular admissions standards on a case-by-case basis for applicants who appear to have a "reasonable" chance of success at the university. Reeder (2/27/91) 7–9. A vast preponderance of the exceptions for individuals with ACT scores significantly below 18 are made for the benefit of athletes. *Id.* 51; AUX 947.

690. Assistant Director of Admissions Cynthia King, is one of the professionals who determines exceptions to the regular admissions requirements of AU. Ms. King testified that she reviews all admission decisions that adversely impact black applicants. By Ms. King's own admission, the exceptions to the admission requirements for black non-athletes are insubstantial in number. King (2/28/91) 53. Ms. King could not recall exactly but testified that last year she made between ten and twenty five exceptions to the regular admission process. *Ibid.*

#### ii. *Auburn University at Montgomery*

691. For any given year, approximately 10% of AUM's undergraduate students would be conditionally admitted. SOF ¶ 591.

692. High school graduates who do not meet, or choose not to try to meet, the regular AUM admissions criteria can be enrolled as "special students" under AUM's special admissions option. The availability of the special admissions option which has no minimum high school GPA or ACT requirement provides virtual assurance that AUM will admit all students who are desirous of attending the university.

693. If a person admitted under the special admissions program achieves a 2.0 GPA on his or her first 20 hours of academic work, he or she is no longer classified as a "special student," but rather is considered regularly admitted. This special admissions policy has always existed at AUM, and its existence is prominently noted in the AUM undergraduate catalog. SOF ¶¶ 142, 589, 590; AUX. 638, p. 33.

694. Students who enter AUM under the special admissions option but fail to maintain a 2.0 GPA on their first 20 hours of academic work are not permitted to continue their enrollment at AUM. Dunlavy (2/25/91) 25; SOF ¶ 145.

695. Individuals interested in attending AUM who do not meet the regular admissions standards are counseled and advised about the special admissions option. All applicants not eligible for regular admission are contacted by mail and asked to attend a counseling session with admissions personnel, where the special admissions option is explained. Students who elect to pursue this option execute an agreement indicating that they understand their status as a specially admitted student and the requirements for becoming a regularly admitted student. Dunlavy (2/25/91) 25–26, 28; AUX 644; AUX 752.

696. Specially admitted students are advised about the availability at AUM of support services such as the Learning Center, which offers instructional support in reading and writing, math and a variety of tutoring services. These counseling and academic services are designed to increase the likelihood of the student achieving regular student status and proceeding successfully toward a degree. AUX 644; Dunlavy (2/25/91) 91–91.

697. Of the AUM students enrolled under a special admissions status, approxi-

mately 16 to 18 percent are black. SOF ¶ 602.

698. Approximately 60% of the students admitted by AUM under the special admissions option achieve regular student status by making the required grade point average. Blacks and whites admitted conditionally are about equally likely to achieve regular student status. Dunlavy (2/25/91) 57–58.

### 3. Conditional Admissions at the Troy State University System

#### i. *Main Campus*

699. If a student scores less than 18 on the enhanced ACT the student may be conditionally admitted at TSU with an overall 2.3 GPA from high school; if a student attains less than an overall 2.0 GPA, or C average, from high school, the student may be conditionally admitted with an enhanced ACT score above 18. Hutto (3/18/91) 22–23, 34–35.

700. Conditionally admitted students are assigned to the Counseling Center, which determines their course work until their basic skills have been improved to the level for admission to the regular academic program. Hutto (7/31/85) 7000–01.

701. For the academic year beginning in the Fall of 1990, approximately 275 of the 1,100 entering freshmen were admitted conditionally. Hutto (3/18/91) 29.

702. Beginning with academic year 1991–92, a student may be specially admitted to Troy State University, Main Campus, regardless of ACT or SAT score, if the student attains a minimum 2.0 GPA, or C average, in high school. Hutto (3/18/91) 23, 29, 35.

703. If a student fails to satisfy the minimum standards for unconditional, conditional or special admission to TSU, Main Campus, and if the student has made application sufficiently early in his senior year, the Office of Enrollment Services will work with that student to encourage refresher courses to attain the minimum ACT score

at a subsequent testing session, to permit the student to take a residual ACT for use of TSU only, or to work with high school counselors in an effort to raise the GPA to the 2.0 minimum. Hutto (7/31/85) 7001–05; Hutto (3/18/91) 24–25.

#### ii. *Troy State University At Montgomery*

704. For undergraduates over 21 years of age, but with less than a "C" average, or for undergraduates under 21 years of age, but with grade point averages and test scores less than the minimum, conditional admission will be granted, and the student is required to receive no less than a "C" average on the first 20 hours of college work. Johnson (3/18/91) 5; TSUX 51 pp. 2–3.

### 4. Admission By Transfer [58]

#### i. *University of Alabama System*

705. The three UAS campuses have very similar transfer requirements. At UA's main campus and at UAB undergraduate students may be admitted as transfer students, without reliance upon high school grades or ACT test scores, if the student has taken 24 or more semester—or 36 or more quarter hours—at an accredited institution, and has a "C" average from the school from which they are transferring. Smith (4/4/91) 17; Cocoris (4/8/91) 7.

706. Admission of transfer students to the undergraduate degree programs at UAH are based on the student's college GPA if more than 18 hours of college work have been attempted. If the transfer applicant has an average of "C" or better on 18 hours he or she qualifies for regular admission. If less than 18 hours have been attempted, then the applicant will generally be evaluated on the basis of high school grades and ACT score. A transfer student who does not meet the criteria for regular admission will be admitted in a probationary status. Kroger (3/26/91) 7–8; UASX 879, p. 32; UASX 517 pp. 19–20.

---

**58.** This section of the Court's Order deals only with the mechanics of transferring from one institution to another. For a discussion of the transfer of academic credits, particularly be-
tween community or junior colleges and public senior institutions once a transfer student has been accepted *see* infra. ¶¶ 1785–92.

ii. *Auburn University Main and Montgomery Campuses*

707. For an Alabama resident to be admitted as a transfer student to AU or AUM, one must have a satisfactory citizenship record, an overall average of "C" or better on all college work attempted, and eligibility to re-enter the last institution attended. No minimum ACT is required for admission as a transfer student to AU or AUM after completion of one year of college. King (2/28/91) 62–63; Reeder (2/27/91) 9–12; AUX 638 p. 34.

iii. *Troy State University Main and Montgomery Campuses*

708. A student may transfer to TSU if he or she has achieved a "C" average on all college work attempted. TSUX 31, p. 16. A transfer student with a GPA of 1.70 to 1.99 may be admitted as a conditional student. Thereafter, they must earn a 2.0 GPA on the first thirty quarter hours attempted at TSU. *Ibid.*

709. Like TSU, TSUM requires transfer students seeking unconditional admission to have earned at least a "C" average on all college work attempted. TSUX, 32 p. 27. A transfer student with less than a 2.00 GPA will be allowed to enroll as a conditional student, but must earn at least a 2.0 GPA on the first twenty hours attempted at TSUM. *Ibid.*

iv. *Alabama A & M University*

710. Students electing to transfer to AAUM from other colleges must have maintained a "C" average and have been in good standing at the previous college. AAMUX 636 p. 39. Grades below a "C" are not transferrable.

v. *Alabama State University*

711. At ASU, an applicant seeking transfer to the University must have at least at least a "C" average on all work attempted at another college in order to be admitted as a regular degree-seeking student. ASUX 3, p. 24. Transfer students who do not fulfill the regular admissions requirements for transfer standing may nonetheless be admitted as degree-seeking students with the status of "conditional admission." Students so enrolled, are restricted in the number of credit hours they may initially take and must maintain a "C" average for the first seventeen hours attempted at ASU. *Ibid.*

F. *Impact of Regular Admission Criteria on Blacks Applying to HWUs*

712. The Knight Plaintiffs maintain that the admission requirements in place at the HWUs which utilize ACT cutoff criteria disqualify a disproportionate number of black students in a sufficiently large enough percentage so as to render the admission requirements discriminatory. There is no doubt that black students in Alabama score significantly lower on the ACT than do white students. The following table which is 1987 data from the American College Testing Program indicates the impact that certain scores on the unenhanced ACT test would have on white and black students if particular cutoff limits were established for regular freshman college admission. Though the table is compiled from 1987 data and utilizes scores on the unenhanced ACT test, the percentage of scores within the ranges indicated generally hold true to this day.

| WHITES | | | BLACK | |
| --- | --- | --- | --- | --- |
| ACT SCORE | % DISQUAL. | | ACT SCORE | % DISQUAL. |
| 18 | 41 | | 18 | 81 |
| 17 | 35 | | 17 | 76 |
| 16 | 29 | | 16 | 70 |
| 15 | 23 | | 15 | 64 |
| 14 | 18 | | 14 | 58 |

Table compiled from KX 2056.

713. It is clear that even the most modest ACT requirement would have a substantially deleterious impact on black applicants. Accordingly, the issue is whether, the use of ACT test scores and other admission criteria that works a disproportionate impact on blacks violates the United States Constitution or Title VI.

■ 714. With the exception of Auburn University, it is evident to the Court that when the appropriate legal standards are applied to this issue there is but one conclusion—the Defendant universities' admission standards, both regular and conditional, do not transgress the laws or Constitution of the United States.

715. In selecting which areas of study and at what level it will offer courses, an institution is not only making a statement about its own role but also its need for a particular kind of student assessment. In all cases, from highly selective academic institutions to those practicing open admissions, student assessment plays a valuable role for the college in insuring that a student is initially situated in a curriculum in which he or she has a legitimate expectation of success.

716. Were the Court to lower the ACT cutoff for regular admission to the universities and colleges in Alabama to a point where it did not have a disproportionate impact on black applicants there would be essentially open admissions at all of the state's public senior institutions. Even if the Court were inclined to so do, the result would not necessarily be an appreciable increase in the number of black students attending Alabama's predominantly white universities since there would be a substantial increase in the number of white students who would be eligible for admission as well.[59]

717. There are several nondiscriminatory rationales for using legitimate cutoff scores in determining who shall be regularly admitted to a particular academic institution. The admissions process must, for example, identify the characteristics of people who have a real chance for academic success. Admission policies must also be used to limit the number of individuals eligible for admission. This is particularly important when the institution is popular and the capacity for meeting student needs limited. Of course, the need to control enrollment may not be used as pretext for illegal conduct. Finally, admission standards necessarily reflect the mission differentiation and academic function among various institutions. Without this differentiation, higher education would become an amorphus assemblage of institutions producing students at the lowest common denominator.

■ 718. It is not the function of the courts to establish the academic mission for any particular institution. In the absence of an impermissible impact on students, this Court will not usurp the traditional role of the university to establish the standards under which those who wish to enroll are admitted.

719. Dr. George Borjas, the statistical analysis expert for UAS, testified in 1985 that an admissions standard that included both average ACT scores or composite scores and average GPA would tend to help those students who actually do worse on the ACT since blacks tend to do almost as well as whites in the high school GPA. Borjas (7/24/85) 5355–56.

720. The Knight Plaintiffs argue that "UA and AU and their branch campuses must adopt new admissions requirements that do not have a racially discriminatory impact on black students." (Knight Plaintiffs' Proposed Conclusions of Law, ¶ 147). Yet at the same time, the private Plaintiffs maintain that the Defendants "are not required to lower their academic standards and expectations of students.... [But] ... must modify their academic programs and support services fully and fairly to

---

59. Of course, the Court might order that only black students be admitted under a lowered ACT score. Pretermitting the legal issues involved in such an order, the Plaintiffs did not directly advance the argument and had they done so, the Court would most likely not have favored the approach.

respond to the needs of unprepared students and to provide them a full and equal opportunity successfully to complete the required academic work." *Id.* ¶ 148.

721. The position of the Knight Plaintiffs is not at all clear to the Court.[60] If they are asserting that the current admission requirements at some of the Defendant institutions are discriminatory, they cannot then also argue that the Defendants need not modify their expectation of students or lower their academic standards. If the Defendant institutions' current policy of regular freshman admission is discriminatory it must be lowered to the point where its impact is not impermissible, *or* the institution must have in place procedures that militate against the harsh result—such as a carefully conceived and executed conditional admission category.

722. It cannot be forgotten that the ACT, unlike the SAT, is a measure of academic preparation and not of scholastic aptitude.

723. The primary difficulty with the ACT does not lie in its use by colleges evaluating freshman applicants, but rather with a secondary education system that so poorly equips its students to adequately perform on the test. To adopt the Plaintiffs' position would forcibly place upon the state's universities and colleges the obligation of remediating the failures of Alabama's secondary and elementary school system. Many of the colleges and universities in Alabama have chosen as part of their mission this goal and the Court emphasis again that such a mission is one for which those schools can be proud. Nevertheless, it is inappropriate for this Court to make that choice for all institutions in Alabama—that is a decision for the institution and the state.

■ 724. In all countries that have adopted the European model of university education, institutions are differentiated to some extent by their mission and the level of academic preparation which students bring to the university. Universities must use entrance requirements that reflect their mission, otherwise, they potentially face a situation where the students are not compatible with the mission and will not benefit from the academic requirements of the institution. As long as the admission standards do not run afoul of the country's laws, the fact that one institution is considerably more selective than another is not a matter for the federal courts.

725. With the exception of Auburn University, the Court specifically finds that as used in Alabama the ACT test is, and has always been a legitimate and validated device for measuring academic preparation, and moreover is necessary in the exercise of sound educational policy. Any racial animus in the ACT's adoption has not been transferred into its actual use and consequently, the ACT does not have an impermissible discriminatory effect on Alabama's black students.

■ 726. Functionally the ACT stands as a neutral barometer of pre-collegiate education in Alabama. There is no doubt that the ACT has a negative impact on the opportunity of black students to attend some of Alabama's HWUs. This negative impact alone does not render constitutionally infirm the use of a test whose function is to provide an adequate nondiscriminatory measure of academic preparation. The inferences upon which the Plaintiffs would have the Court find continuing liability for the use of the ACT are far to tenuous.

*G. Auburn University's Admissions Requirements Have A Disproportionate Impact On Black Applicants*

727. The admissions requirements at Auburn University are more Draconian

---

**60.** Apparently, the United States agrees with the Knight Plaintiffs that the Defendants are not obligated to modify or lower "valid admission or other educational standards simply because they have a disparate impact on other-race students." According to the Government, this principle holds true to the extent that the existing policies do not represent intentionally discriminatory conduct. (United States' Proposed Conclusions of Law ¶ 362). The Government, however, concludes that the ACT as used in Alabama is intentionally discriminatory and resolves that the "evidence [indicates] that there are readily available, professionally *more* valid, and *less* racially segregative alternatives known to the State and its subsidiary entities." *Id.* at ¶ 367 (emphasis in original).

than at any other university in Alabama. Auburn's failure to use either a sliding scale for regular freshman admission or to have in place a well conceived conditional admissions policy disproportionately impacts black applicants to the University.

728. Auburn University's Director of Admission, Dr. Charles Reeder, conceded that AU's ACT cutoff score may be the cause of the low number of black students attending Auburn. Dr. Reeder testified as follows:

Q. If I told you that documents already in evidence indicate that the 18 for unenhanced ACT disqualified between 75 and 80 percent of all black test takers, would that cause you any concern?
A. I would say I would be concerned, yes.
Q. [I]f you're disqualifying for regular admissions consideration three quarters of the black students in Alabama who may be in the pool, aren't you severely restricting those that you can recruit to begin with?
A. I suppose you are.

. . . . .

Q. [D]o you think that having the ACT cut score where it is now has anything to do with the relatively low number of black students who attend Auburn?
A. It may have something to do with it, yes.

Reeder (2/27/91) 48–49.

729. The black undergraduate enrollment at AU is the lowest of any major campus in Alabama. At only four percent, Auburn's black enrollment clearly evinces that its admissions policies have a disproportionate impact on black students. This conclusion is substantiated when the percentage of black enrollment at Auburn is compared to that at the University of Alabama—the only other predominantly white institution with a statewide mission.[61]

730. Auburn University's strict admissions standards do not translate into heightened retention rates for black students. Auburn's retention rate is significantly less than that at UA.

731. While UAB uses a higher ACT cutoff for regular freshman admissions than does AU, it nonetheless has a well conceived and validated conditional admissions policy which utilizes a sliding scale. This conditional admissions policy insures that the student body is diversified and that its regular admission practices do not fall too harshly on one group of applicants. AU's conditional admissions practice on the other hand is little more than ad hoc decisions made only rarely on a case by case basis.

732. To be sure, the University of Alabama's main campus has only the most marginal conditional admissions policy, yet it has a well developed sliding scale for regular freshman admissions that enables the university to guarantee a diverse student body.

733. Until AU develops an overall admissions policy that does not impermissibly impact black students, its admissions practices are in violation of Title VI and the Fourteenth Amendment. In its remedial decree the Court will direct Auburn University to review its current admissions policy and modify it so as to comply with the law. The Court notes approvingly the admissions practices utilized by UA's main campus and UA's campus at Birmingham.

734. Of course, admissions practices must be specifically tailored to the particular institution and the Court does not presume to possess the expertise necessary to develop an appropriate admissions policy for Auburn. Admissions policies must also be validated. The Court will therefore require that by the 1993–94 school year Auburn have in place a reformed admissions policy which it in good faith believes will not have a disproportionate impact on black applicants. This lag time is necessary so that AU can conduct the appropriate internal studies.

735. In requiring AU to modify its admissions requirements, the Court is not indicating that there is a legal obligation that a previously segregated institution achieve a stated level or percentage of black students in it student body in order

61. At UA, black undergraduate enrollment is approaching ten percent. See ¶ 1426.

to defeat a Title VI or Fourteenth Amendment claim based on alleged vestiges of discrimination. In this instance, AU's admissions policy erects a barrier to black enrollment which has no legitimization in sound educational policy making and perpetuates the prior dual system of education by securing the racial identity of the institution.

736. If AU had shown that its black students are retained at significantly higher rates than black students at similarly situated campuses in Alabama, then a strong argument could have been made that the university's admissions standards are a legitimate exercise of university autonomy and educational policy making. As it is, however, no such showing can be made. In fact, the University of Alabama's main campus with a significantly less Draconian policy has a considerably better retention rate than does Auburn.

737. When coupled with a change of admissions policy, Auburn's strong recruiting system should aid the university in substantially increasing its black enrollment.

738. Auburn will likely argue that its admissions standards are valid and that their validity stands as a defense to the Court's action. A validated admissions policy tells only part of the story however.

739. A "valid" policy which disproportionately excludes blacks at an institution which specifically used such policies in an effort to keep African–American students out, is not valid simply because those few students who manage to negotiate the obstacle to enrollment graduate at a rate above the national average. There is simply no sound educational reason for Auburn not to have in place an admissions policy that either applies a sliding scale for regular admittees or formalized conditional admission standards for those applicants who have demonstrated ability but have the misfortune of not scoring well on the ACT.

740. The Court is not telling Auburn that it is to lower its standards to accommodate high school students who may be ill-prepared to do the college level work. But as shown by other schools in Alabama, there are students who are fully able to complete the college curriculum of an institution such as Auburn without having scored an 18 on the ACT or having a GPA of 2.00. This Court is hard pressed to discern why a student who might score a 16 on the ACT but present a GPA of 3.20 is not qualified to do the academic work at AU. The institution may very well admit such a student, but the decision to do so is essentially an *ad hoc* with no consistent foundation.

## LAND GRANT ISSUES

741. This Court has discussed in some detail the historical development of Alabama's land grant system. *See* supra, ¶¶ 534–607. By way of brief recapitulation there are three primary federal statutes which provide for a land grant system. The most important of these statutes is the First Morrill Act of 1862, and the Second Morrill Act of 1890. The Second Morrill Act amends the 1862 act by extending its benefits to colleges enrolling black students in states where collegiate education was legally segregated. In broad terms the Morrill Acts authorized and assisted the states in establishing land grant universities. In addition to the Morrill Acts, Congress also enacted the Smith–Lever Act and the Hatch Act. The Smith–Lever Act, passed in 1914 established and funded the cooperative extension services. The cooperative services are attached to the states' 1862 land grant colleges and universities. The 1887 Hatch Act provided funds for the establishment of agricultural experiment stations by the country's land grant institutions. These experiment stations are the first line of applied agricultural research.

### A. The National Land Grant Model

742. With the exception of Connecticut which has two experiment stations, every other state in the United States, including Alabama, has a single agricultural experiment station of statewide jurisdiction under the exclusive administrative supervision and control of its "1862" land grant institu-

tion. SOF ¶ 730; Kottman (3/4/91) 11, 13, 25, 57.

743. Every state in the United States, including Alabama, has a single cooperative extension service of statewide jurisdiction under the exclusive administrative supervision and control of its 1862 land grant institution. Kottman (3/4/91) 11, 57; Call (3/6/91) 25–26, 48–49.

744. There are sixteen states which have designated "1890" institutions. Those sixteen states are: Alabama, Georgia, Florida, North Carolina, South Carolina, Virginia, Kentucky, Tennessee, Mississippi, Louisiana, Arkansas, Oklahoma, Texas, Missouri, Maryland and Delaware. SOF ¶ 731.

745. In each of the 16 states with 1890 institutions, the statewide agricultural experiment station, and the statewide cooperative extension service, are under the exclusive administrative supervision and control of each state's 1862 land grant institution. Seals (3/6/91) 104–13; Call (3/6/91) 25–26.

746. With the exception of Arkansas, all states headquarter the statewide extension service and the statewide experiment station at the same location under the centralized control of their 1862 land grant institution. This administrative structure facilitates the circular flow of information between the cooperative extension service and the experiment station. This enables these groups to respond quickly to agricultural emergencies, and also to engage in long range agricultural planning. This centralization is critical since agricultural research is complex, capital intensive, extremely expensive and greatly influenced by the principles of "critical mass" and synergism. Call (3/6/91)) 20; SOF ¶ 733.

747. In those states which have at one time maintained more than one experiment station, subsequent action has resulted in their consolidation into a single administrative structure. Those states which consolidated their disparate experiment stations are Georgia, New York, and to some extent

Ohio. (Kottman) (3/4/91) 22–24; Call (3/6/91) 18–22, 49.

748. The evolution of the national land grant model, under which every state has a single statewide experiment station—with the exception of Connecticut—and a single statewide cooperative extension service headquartered at the same location under the exclusive administrative control and supervision of its "1862" land grant university, has been shaped by many forces. The capital intensive and interdisciplinary nature of agricultural research and experimentation demands substantial resources, as do the cooperative service activities. The principals of economy of scale during an era of growing competition for a shrinking supply of public dollars militates in favor of a single system which can avoid unnecessary duplication, in both administrative overhead and research. Kottman (3/4/91) 11–15, 19–27, 37–38, 70–71, 94–95, 97–99, 102–03, 130, 145–46, 158–64; Buchanan (3/7/91) 15–21.

749. The forces that have shaped the current land grant model nationally are in no way the product of an era of *de jure* segregation, but rather the result of economic and scientific practicality.

## B. Alabama's Land Grant System

750. In Alabama, agriculture is the single most important industry. Buchanan (3/7/91) 8–9. It employs over 250,000 people and in most years produces commodities valued at the "gate" at two and one-half billion dollars which is roughly equivalent to ten billion dollars at the "marketplace." *Id.* 11.

### 1. Alabama's Agricultural Experiment Station

751. Auburn has had exclusive administrative supervision and control of the Alabama Agricultural Experiment Station ("AAES") since it was assigned that responsibility, first, by the Alabama legislature in 1883 [62] and, again, in 1889 when the state designated it to receive the proceeds of the recently enacted Hatch Act. SOF ¶¶ 151, 660, 661, 724.

---

**62.** The first Alabama Agriculture Experiment Station was established by the state in 1883 in conjunction with the creation of the State Department of Agriculture. SOF ¶ 659.

752. Alabama law provides: "There shall be an Alabama agricultural experiment station system under the charge of and operated in connection with Auburn University...." Ala.Code §§ 2–30–40 to –44. To this end, the AAES has been headquartered at AU since its creation. Its main research station and laboratories are also located on the AU campus, where all of its administrators and scientists are stationed. AAES has 21 sub-stations located in strategic locations throughout the state. These sub-stations range from a large farm in Limestone County to a forestry unit in Coosa County to a horticulture station in Mobile. The 1989–90 budget for Alabama's experiment station system was $30,553,750. AUX. 90; Buchanan (3/7/91) 13, 26–31, 38; SOF ¶ 715.

753. Every AAES sub-station is authorized by an act of the Alabama Legislature and each act mandates an annual operating appropriation for each particular unit. SOF ¶ 717.

754. The Alabama Agricultural Experiment Station has a statewide mission. Its primary function is to do agricultural and forestry research. It does research and experimentation on all crops in all soil types. At any given time, AAES has 200 to 220 ongoing research projects. The AAES has acquired a national reputation for research in, among other things, soil erosion control, crop variety, breeding programs, and horticulture. SOF ¶¶ 714–718; Buchanan (3/7/91) 26, 39–42.

755. Auburn receives several million dollars a year from the federal government under the Hatch Act for its experiment stations. USX 6; USX 2–10.

### 2. Alabama's Cooperative Extension Service

756. Since 1915 when the state accepted the benefits of the Smith–Lever Act, AU has had exclusive administrative supervision and control of the Alabama Cooperative Extension Service ("ACES"). SOF ¶¶ 173–74, 674–75.

757. Alabama law provides "[t]here shall be an Alabama extension service under the charge of and operated in connection with [AU]...." Ala.Code §§ 2–30–1 to –4. To this end, the ACES has been headquartered at AU since its creation 76 years ago. It is composed of nine districts, each with a district agent whose primary responsibility is the management and supervision for all programs and field personnel within his or her district. The nine district agents are housed in three regional offices located in Selma, Decatur and Auburn. There is a county office in each of 67 counties in the state. In 1990 ACES's budget was $19,345,812. AUX 42, 955, 967, 968.

758. Since at least 1970 to the present, AU has collected one-million dollars a year in federal funds under the Smith–Lever Act. USX 6.

759. The Alabama Code sets forth ACES's statewide mission as follows:

The objects, purposes and duties of the extension service shall be to aid in diffusing among the people of Alabama in the several counties useful and practical information on subjects relating to agriculture and home economics; to provide for the continuance and improvement of farm and home demonstration work; to provide for the training of men and women leaders; to provide for organizing clubs of farm people, including men, women, boys and girls for the improvement of agriculture and farm home life; to promote the welfare of the rural districts by other forms of extension work in agriculture and home economics....

Ala.Code § 2–30–2.

760. Since 1971, ACES has operated under the supervision of the United States District Court for the Middle District of Alabama pursuant to the continuing injunction issued in *Strain v. Philpott*, 331 F.Supp. 836. *Strain*, which will be discussed in more detail below, is jurisdictionally predicated on Title VI and the fourteenth amendment and covers a range of concerns paralleling to some extent the issues in this case.

761. Federal law requires that a single, comprehensive program of extension be developed for each state. P.L. 95–113 (1977). AAMU, Tuskegee Institute and Auburn

University have since entered into such a plan. The plan requires the institutions, among other things:

D. To take the necessary steps to effect a joint Extension program at the county, district, and state levels.

G. To develop organizational structures at the county, district and state levels that promote unified programs and discourage fragmentary or duplicative programs.

SOF ¶ 175.

### C. AAMU's Land Grant Expansion and Changing Appropriations

762. The is no dispute that Auburn University receives a vastly larger percentage of both state and federal funds for agricultural research and extension work than does Alabama A & M University. *See* USX 6, Tables 1, 3; and USX 2–10, Tables 1, 2.

763. Until the mid 1960's, none of the county's 1890 land grant universities received any funding for research or extension. During that decade, the United States Secretary of Agriculture began providing the 1890 institutions a small appropriation for agricultural research work. By 1971, the amount of federal money given to the sixteen 1890 universities approached eight million dollars. AAMU was the direct recipient of $560,000 dollars from the federal government in 1971. The amount of federal money grew to over 1.34 million dollars by 1985, and in 1990, the federal government provided AAMU 1.41 million dollars for agricultural research. USX 6, Table 1; USX 2–10, Table 1.

764. No state monies were appropriated to AAMU for agricultural research until 1982 when $90,000 was given to the university. USX 6, Table 1. By 1990, the amount of state allocated funds was slightly over $177,000 USX 2–10, Table 1.

765. The 1890 institutions first obtained federal appropriations for agricultural extension service work in 1972. Since that date, the appropriations have increased steadily over the succeeding years. In 1972 the federal government appropriated $228,000 to AAMU for extension work and by 1990, the amount was 1.11 million dollars. USX 6, Table 3. State funds for extension work were not forthcoming until 1982 when $90,000 was appropriated. *Ibid.* By 1990, AAMU was receiving over $200,000 from the state for extension work. USX 2–10, Table 2.

766. The state has never designated Alabama A & M University to received any funds under either the Hatch Act or the Smith–Lever Act. Seals (10/30/90) 73. It must again be reiterated however, that no 1890 land grant college in the United States is the beneficiary of these funds. *Id.* 99–100.

767. Virtually all of AAMU's physical plant and land, dedicated to agriculture, was constructed or acquired after 1967. In 1968, the Carver Complex was built with state funds and between 1982 and 1987 AAMU received from the USDA approximately $4,000,000 with which it built the Carver Annex, poultry science buildings, greenhouses, and other improvements. In 1988, AAMU used $500,000 in federal funds and $1.5 million of the proceeds from a state bond issue to purchase a 900 acre research farm on which it subsequently spent $488,000 for buildings (an extension center, a central office building, and a field laboratory), $100,000 for fences, and $90,000 for roadways. Shuford (1/22/91) 9–11, 53–56; Kottman (3/4/91) 46.

768. Dr. Cooper, one of AAMU's "land grant" experts, and a former Vice President of the university testified Alabama A & M has fared better in state funding for agricultural research and extension than all the other 1890 institutions. Cooper (1/17/91) 61–62. For example, AAMU is second only to Tuskegee in land holdings of all "1890" institutions:[63] Tuskegee has 4,271 acres and AAMU has 2,090. AAMUX 500, p. 25, 39. By way of comparison, Dr. Buchanan testified that Georgia had never allocated any money for research to its "1890" institution, Fort Valley State College. Buchanan (3/7/91) 43.

---

**63.** While Tuskegee is not a state land grant college its programs and facilities nonetheless have considerable similarity with land grant institutions generally.

*D. Alabama's Land Grant System Is Not Currently A Vestige of Discrimination*

769. As this Court has noted, the state's decisions concerning the allocation of federal land grant funds to Auburn in the late nineteenth and early twenty century resulted in part from racial discrimination. On this question of fact the Plaintiffs have met their burden.

770. The Defendants however, seriously challenge whether any discrimination actionable in this law suit continues in the administration of the states land grant activities. Moreover, it is maintained that even if discrimination had not played a role in the development of Alabama's land grant system, that the same decision leading to the current structure of the land grant system would have been made.

771. Since the Plaintiffs have met their burden of showing discrimination, the Court therefore shifts the burden to the Defendants—primarily Auburn and the State—to establish by a preponderance of the evidence that the same decision would have been made regarding the structure of the state's land grant system. On the evidence before the Court the Defendants have met their obligation.

772. The land grant model adopted in Alabama is not a vestige of *de jure* segregation but is the same model which prevails throughout the United States. Even though race was an early factor in the decision to place AAES and ACES under the exclusive control and supervision of Auburn University, an identical result would have occurred for the same compelling and valid non-racial reasons which dictated a similar administrative structure in the other 49 states, 34 of which never has *de jure* segregation.

773. The fact that AU was already existent as a thriving land grant college when the Hatch Act funds and Smith–Lever funds became available, accounts in large measure for that institution securing the benefits and obligations of those federal funds. Rogers (3/14/91) 18–19; AUX, pp. 27–32, 92–93.

774. There is no evidence that Auburn's administrative control of AAES and ACES have a present day disparate impact on the black farming community in Alabama. The Knight Plaintiffs attempted to draw a connection between the dwindling number of black farmers in the State of Alabama and the "white" control of the Alabama's land grant system by Auburn University. *See* Kottman (3/4/91) 130–142 (questions by counsel for Knight Plaintiffs.) There is no creditable evidentiary support for the Plaintiffs' position.

775. The record does not support a finding that the decline in the black farm population in Alabama is the result of any thing other than complicated sociological forces and the generally arduous nature of farm work. No evidence was introduced tending to show that black farmers in the state receive any less attention from the AAES and the ACES than their white counterparts. To lay at the feet of Alabama's land grant system the blame for a declining black farm population is unpersuasive.

776. There is no creditable evidence that the operation of Alabama's land grant system under the direction and primary control of Auburn University is a vestige of segregation. While it is true that AU secured the vast share of land grant resources for itself during an era when racial discrimination was the rule, there is no indication that AAES or ACES is today under the supervision of Auburn for any illegitimate purposes, or that its control by Auburn adversely effect the African American citizens of the state.

777. The disparity between Alabama A & M University and Auburn University in terms of land grant funding and program management is not an altogether anomalous situation. As previously discussed, the differences in mission between an 1862 and an 1890 land grant institution are fairly uniform across the country. Alabama's land grant system is the paradigm of the national land grant model, and the most economically efficient means of delivering the services needed in aid of the state's agricultural interest. Kottman (3/4/91) 15–17, 25–27, 37–38, 130.

778. So that it is clearly understood, the Court is not basing its decision on an economic efficiency analysis, but rather on the evidence that Alabama's land grant system, as currently constituted, is not a vestige of segregation. The Defendants have established that the taint of segregation which permeated the founding and early operation of the land grant system has been eliminated and, moreover, that the adoption in the state of the current land grant system would have been the same absent the racial animus behind its early development.

779. Finally, any discriminatory practices which might remain in the operation of Alabama's extension service are currently under the supervision of the United States District Court for the Middle District of Alabama in *Strain, et al. v. Philpott, et al.,* 331 F.Supp. 836.[64]

780. No Title VI higher education enforcement action or approved statewide higher education desegregation plan in any state has resulted in a change of administrative responsibility for the state's cooperative extension service or the state's agricultural experiment station. SOF ¶ 642. Moreover, no Title VI enforcement action has resulted in the reallocation of Hatch Act or Smith–Lever Act funds. SOF ¶ 643.

781. The United States Department of Agriculture ("USDA") is responsible for Title VI compliance for Alabama's experiment station and its cooperative extension service. SOF ¶ 729. AAMU has never filed a complaint with the USDA alleging racial discrimination against it by ACES or AAES. *Id.* ¶ 727. And there are no outstanding complaints of racial discrimination against AAES pending in the USDA office of Equal Opportunity. *Id.* ¶ 721.

## RACIAL COMPOSITION OF FACULTY AND ADMINISTRATIVE POSITIONS

### A. Contentions and Defenses

782. The Knight Plaintiffs and allied Defendants maintain:

The exclusion of African Americans from or their underrepresentation on the governing boards, administrations and faculties of the HWUs is a manifestation of Alabama's historical policy of preventing black persons from exercising authority or even significant influence over the education of white persons. Black underrepresentation in positions of authority at HWUs is the [chief] current mechanism of massive resistance at these schools. It ensures that the educational values, content and styles of the African–American community will not share genuine influence on HWU campuses

---

[64]. The issues in *Strain v. Philpott* were joined in 1971 and continue to this day. The *Strain* case is predicated on the fifth and fourteenth amendments to the Constitution and Title VI of the Civil Rights Act of 1964. AUX 949.

Much like the case at bar, the court in *Strain* certified a plaintiff class consisting of:

[A]ll Negro citizens of the State of Alabama and include a Negro employee of the Alabama Cooperative Extension Service (ACES), and Negro farm operators and other rural residents who are beneficiaries or potential beneficiaries of extension services in the State of Alabama; they represent classes of Negro employees of ACES, Negro members or potential members of 4–H and Home Demonstration Clubs, and all Negroes who are allegedly denied equal services or excluded from positions in the operation of ACES.

The complaint seeks relief against Harry M. Philpott, as President of Auburn University; Dr. Fred R. Robertson, as Vice President for Extension of Auburn University and as director of the ACES; the Board of Trustees of Auburn University; and the Board of Revenue (or Board of Commissioners) of each Alabama county.

AUX 949, pp. 1–2; SOF ¶¶ 709, 708.

In addition to the class of private citizens, the United States intervened as a party plaintiff in this action under the authority contained within 42 U.S.C. § 2000h–2. *Id.* at p. 2; SOF ¶ 710.

The thrust of the plaintiffs' complaint in *Strain* is "that ACES has provided and continues to provide its services on a racially segregated and discriminatory basis; [and that,] ... ACES has discriminated against [blacks] in hiring and promotion and in the terms and conditions of employment...." AUX 949, p. 2.

The court agreed with the plaintiffs and entered a decree in 1971 designed to prevent discrimination and to "prescribe procedures designed to prevent discrimination in the future and to correct the effects of past discrimination." AUX 949, p. 13. The decree remains in force today and the plaintiffs have recently returned to the court with what they allege are breaches of the 1971 decree. AUX 44.

with the educational values, content and styles of the white community.

Knight Plaintiffs' and Allied Defendant's Joint Proposed Findings of Fact, ¶ 213, pp. 281–82.

783. The Knight Plaintiffs and Allied Defendants argue that the limited number of faculty and administrative positions held by blacks at the HWUs is a vestige of *de jure* segregation which encourages and perpetuates a dual system of higher education.

784. Though not fully developed, it is apparently the position of the United States that the State of Alabama by perpetuating racially identifiable faculties and administrations at the HBUs and the HWUs has allowed the state to announce that some of its colleges and universities are intended for attendance by white students and others are intended for attendance by black students. The Government believes that this approach has the effect of maintaining the racial identification of the universities and colleges in Alabama. *See* United States' Proposed Findings of Fact ¶ 138 pp. 40–41; *see also,* Amended Complaint of the United States ¶ 27(B).

785. Obviously, the non-allied Defendants challenge the Plaintiffs' views. It is their position that they have employed blacks in administrative and faculty slots in sufficient number given the small pool of "qualified" blacks holding appropriate academic degrees.[65]

*B. Auburn University*

1. Black Faculty Recruitment

786. Like all the public universities in the state, Auburn employs a number of strategies which it purports to use in an effort to increase the number of black faculty on its campus. For example, when a faculty or administrative position becomes available, AU advertises for the position nationally, and in an effort to reach potential black applicants the university advertis-

es in the Affirmative Action Register and in Black Issues in Higher Education. Emert (2/27/91) 11–12. AU also utilizes professional associations to which its current faculty belong, including organization primarily populated by African–American academics. *Id.* at 15. Additionally, Auburn's current black faculty are encouraged by the university's administration to assist in the recruitment of other black faculty. *Ibid.*

787. In 1984, AU initiated a program to recruit minority faculty, especially in the hard sciences "whereby if [a academic department] fill[s] a vacant position with a qualified minority, [then] that particular department would be awarded an extra position." Emert (2/27/91) 12. From the record the Court cannot judge the success of this program.

788. Finally, Auburn has a program which attempts to encourage some of its black undergraduates to seek Ph.D.s. Through this "grow your own" program promising juniors and seniors are contacted and offered stipends at AU if they will continue in their respective programs through the master's level at the university. Subsequent to receiving the master's, the university attempts to place these students at other institutions where they can pursue doctorates. Emert (2/27/91) 17. The hope is that once the doctorate is completed, AU will have an advantage in recruiting the student back to Auburn. *Ibid.*

789. Unfortunately, all of Auburn's efforts have borne little fruit as the number of black faculty at the university remains low.

2. Black Faculty Employment

790. For the academic year 1989–90 AU had 1039 full-time faculty as reported on the EEOC Survey/Higher Education Staff Information. USX 2–8.[66] Of this number 11 were black, 975 were white and the remaining 53 would apparently be "oth-

---

65. Each public college or university in Alabama is responsible for its own faculty and staff recruitment, hiring, promotion and tenure decisions. The state does not control faculty and staff employment practices. SOF ¶ 191.

66. United States Exhibit 2–8 is attached as appendix "B".

er."[67] For the academic year 1989–90 AU had 1.1% black faculty to white faculty. Of these eleven black faculty members only one has tenure. *Ibid.*

791. For the ten year period covering the academic years 1975–76 through 1985–86, Auburn University had no less than 3 nor more than 13 black full-time faculty as reported on the EEOC Survey/Higher Education Staff Information. SOF ¶ 186.[68] During this period, Auburn's full-time faculty fluctuated between 903 and 1024. *Ibid.*

792. As counted by Auburn, the overall representation of blacks in full-time faculty positions during the 1989–90 school year—including instructors, visiting and adjunct professors, and extension personnel with faculty rank—was 22 out of 1217, or approximately 1.8 percent. Haworth (2/21/91) 15–16; AUX 213, Table F–2.

793. If one were to include all black persons holding faculty rank at AU as of February 1991, including instructors, extension personnel, part-time faculty and librarians[69], the total number of black faculty would be 29 out of approximately 1200 faculty members[70] or 2.4 percent. AUX 54a; Emert (2/27/91) 120–123.

794. Of the 29 black faculty, only 20 have departmental appointment, and of this twenty only 17 have full-time faculty appointments. AUX 54a. Were one to exclude from the seventeen full-time black faculty those holding only instructor rank, the total number of full-time black faculty at the assistant level or above is fourteen or 1.3 percent. *Ibid.* At present, AU has no black full professors on its campus, and at the departmental level, only four associate professors. Emert (2/27/91) 129; AUX 54a.

795. As of February 1991, AU had 100 instructors, four of whom were black. AUX 54a.

3. Black Administrative Employment

796. During the cross examination of Dr. George H. Emert, Executive Vice President of Auburn University, it was disclosed that at AU's high level academic administrative positions there are no blacks in position of authority. Dr. Emert's testimony is as follows:[71]

Q. How many of your trustees are black?

A. One.

Q. Out of how many?

A. Twelve.

Q. The top echelon, no blacks up there, president executive vice president,....

. . . . .

A. No, sir.

---

**67.** The Court determines the number of individuals which it classifies as "other" by adding together the white and black faculty and then subtracting this number from the total number of faculty positions reported on USX 2–8.

Desegregation is more than simply a comparison of black and white. The presence of racial and ethnic minorities other than African Americans on a faculty goes a long way towards truly desegregating an institution. Those individuals which this Court has classified as other, contribute significantly to the multicultural environment of Alabama's colleges and universities. Be that as it may, this case concerns the existence of vestiges of the official policy of discrimination against blacks and therefore the focus remains properly on that issue.

**68.** Stipulation of Fact 186 is attached as appendix "C".

**69.** While the Court certainly understands why extension faculty and librarians are given academic rank, there is undisputed evidence that these individuals' responsibilities do not include

to any significant degree the teaching of students. Emert (2/27/91) 122–23.

**70.** The exact number of individuals holding faculty rank at Auburn University, or any other institution in the state, changed from day to day and witness to witness. A considerable cause of the confusion resulted from the manner in which faculty are counted. Unfortunately for the Court, the parties never agreed on a benchmark measurement. Be that as it may, the significance of the testimony does not lie in the actual number of faculty at the institution, but rather, in a comparison of the percentages of black to white faculty. The failure to determine exactly the number of total faculty is not significant when one realizes that the percentages of black to white faculty do not deviate to any considerable degree, and certainly not enough to impact the Court's analysis.

**71.** Dr. Emert was cross examined using AUX 60 which is the organizational chart of Auburn University. AUX 60 is attached as appendix "D".

Q. Your next tier, government relation and all of those people across there, none are black, is that right?

A. That's correct.

Q. Then your next tier, telecommunication and educational telecommunication and university counsel, and as far as heading any of those departments, none of those are black?

A. That's correct.

Q. Then in the next item you have vice presidents. And none of them are black. Isn't that right?

A. Yes, sir.

Q. Then if you go down to the next tier, your various colleges and the deans of those colleges, none of them are black?

A. That's correct.

Emert (2/27/91) 129–30.

797. In 1989–90 AU reported to the federal government that it has 281 administrative positions of which four are held by blacks. USX 2–8.

## C. Auburn University at Montgomery

### 1. Black Faculty Recruitment

798. AUM's faculty recruitment efforts are national in scope. For the academic year 1990–91 approximately 150 out of AUM's 210 total faculty personnel had their highest degree earned in states other than Alabama. Nance (2/26/91) 10–11; AUX 938, pp. 26, 32.

799. Similar to Auburn, AUM has in place special efforts which it utilizes in the recruitment black faculty. In addition to advertising nationally to the broad pool of potential applicants, AUM has advertised in publications specifically directed at the black academic community. Nance (2/26/91) 11. From time to time, AUM also has had a policy of conferring by letter with HBUs and HWUs which are known to produce black Ph.D.s in an effort to identify promising candidates. *Id.* at 11–12. The exact extent of this contact remains unclear. Finally, AUM has a policy of using its own black faculty to assist the university in recruiting other black faculty. *Id.* 97.

800. AUM has also, on occasion, recruited faculty without terminal degrees. Some of these recruited faculty have been black. Nance (2/27/91) 15–17, 20. Such recruitment is, however, done cautiously and a strong effort is made to identify individuals with master's who are already in the pipeline for the Ph.D., or who, once hired, will pursue the terminal degree and do the necessary research and other work required to earn academic advancement. *Ibid;* Nance (7/18/85) 3929–30.

801. In some instances, positions at AUM have been designated for special and intensive recruitment of black faculty when the national data indicated that market conditions are favorable for finding qualified black faculty in a given discipline. On some occasions where qualified black faculty have been located for an understaffed area, positions have been created to accommodate the hiring of the individual. SOF ¶ 751.

### 2. Black Faculty Employment

802. For the ten year period covering the academic years 1975–76 through 1985–86, AUM never had more than 12 nor less than 2 black full-time members of the faculty. SOF ¶ 186. As reported to the federal government, the total AUM full-time faculty during this period fluctuated between 97 and 179. *Ibid.*

803. For the academic year 1989–90, AUM had 191 faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 9 were black, 172 were white and the remaining 10 would apparently be "other." *Ibid.* For the 1989–90 academic year AUM had slightly more than 5.2% black faculty to white faculty as reported to the federal government.

804. For the academic year 1990–91, AUM had an increase of three black faculty members. This brought the total full-time nine-month black faculty at AUM to twelve. Nance (2/26/91) 13; AUX 213 Table F–3.

805. Of the twelve black faculty, three hold the rank of instructor and are without

their terminal degree. Nance (2/27/91) 44–47.

806. Except for a single academic year—1989–90—which saw AUM lose two black faculty members, AUM's full-time faculty has been between five and seven percent throughout the 1980's. SOF ¶ 186; Nance (2/27/91) 13–14; Haworth (2/21/91) 19.

807. AUM has one of the highest percentages of full-time black faculty members of any of the public universities in the State of Alabama, and, at least as of 1985, had the highest percentages of such faculty among the institutions which have predominantly white student bodies. SOF ¶ 753.

808. Six of the twelve full-time nine-month black faculty at AUM are tenured. Among the overall AUM faculty, approximately 57% are tenured. Nance (2/27/91) 22, 42.

809. No nine-month black faculty member has a rank higher than associate professor. Nance (2/27/91) 48.

810. AUM has a substantial investment in adjunct or part-time faculty. For the most recently completed academic year, AUM employed a total of 118 part-time faculty of whom 11 or 9.3% were black. AUX 213, Table F–4.

3. Black Administrative Employment

811. AUM has only one black individual in a high level administrative position. Boyer (2/25/91) 42. Since 1989 Dr. Joe L. Boyer has been an assistant to the AUM Chancellor. He also has an academic appointment in the department of education as full professor.[72] Id. at 2–3.

812. Dr. Boyer had been on the AUM faculty from 1971 to 1981, after at which time he left to become President of Mississippi Valley State University, a predominantly black public institution. Boyer (2/25/91) 20–21. Dr. Boyer served for six years in that position before accepting the presidency of Knoxville College in Knox-

ville, Tennessee. Id. at 22. Knoxville College is a small Presbyterian college. Dr. Boyer remained in Tennessee for approximately one year before returning to AUM. Ibid.

813. As reported to the federal government, AUM has four black administrators out of 62 administrative positions. USX 2–8.

D. The University of Alabama System

1. University of Alabama Main Campus

i. Black Faculty Recruitment

814. UA recruits nationally, advertises nationally, and hires from a national pool. Davis (4/15/91) 4; Sayers (4/3/91) 6, 16–17.

815. The university has in place a written affirmative action plan that sets out policies and forms that it has adopted to standardize minority recruitment and selection procedures. SOF ¶ 383.

816. UA actively solicits applications from black individuals seeking positions on its faculty. The university publishes notice of its faculty and administrative positions in academic publications of general circulation and in publications specifically targeting the minority academic community. SOF ¶ 381.

817. In the last few years, UA has spent from $6,000 to $8,000 per year for subscriptions and ads in *Black Issues in Higher Education*—a periodical aimed at black academics. UA has also subscribed to a number of minority registries that assist in locating black faculty. Crump (4/4/91) 11.

818. Representatives from UA, including department chairs and faculty members, have visited the campuses of predominantly black institutions were it solicits applications from, black individuals for faculty vacancies. SOF ¶ 390. UA also recruits at professional meetings to solicit applications from black individuals. Id. at ¶ 382.

---

**72.** Since Dr. Boyer is not on a nine-month academic contract with AUM, but rather has a twelve month contract based on his status as assistant to the Chancellor, he is not counted as one of the 12 full-time black faculty persons for purposes of computing the relevant percentages of black to white faculty at AUM.

819. Many of the constituent colleges of UA maintain separate lists of organizations and institutions that are known to have contact with black academics or black graduate students. These lists are used to assist in the attempted recruitment of black faculty. Huttenstine (3/12/91) 45–47; UAS 315.

820. On occasion UA also appoints black adjunct faculty members and black graduate students to search committees for faculty, staff and department chair positions. Huttenstine (3/12/91) 78; Black (3/12/91) 38; Tripp (3/13/91) 52–53.

821. In the college of Arts and Sciences, additional faculty vacancies have been provided to departments in order to aid in the recruitment of black faculty. SOF ¶ 389. Moreover, the Dean of the College of Arts and Sciences has supplemented salaries in the department to assist in the recruitment of black faculty members. Davis (4/15/91) 6.

822. UA faculty have been told that if they find qualified black candidate for faculty positions they should be pursued actively, even if no position is open. Black (3/12/91) 29–30, 37.

823. Recruitment efforts at the University of Alabama Law School to some degree follow the same path as that followed by the university's other schools and colleges.

824. The primary recruitment vehicle for law school faculty around the country is through the Annual Conference of the American Association of Law Schools. The conference collects applications from interested persons and forwards those applications on to each participating law school. The law school then selects approximately 20–25 candidates to interview at the conference. There are approximately 175 law schools which belong to the conference. Randall (4/15/91) 31–33.

825. Last year, of the 1100 forms filled out by persons interested in law school professorships, only 6% were completed by African Americans. Randall (4/15/91) 31–34.

826. This past year, of the 26 interviews conducted by University of Alabama recruiters, 13–14 were interviews of black candidates. Of the six candidates who visited UA in a second interview, 3 were black, two were females and none were white males. From those interviews, the law school hired one African American male and one Asian American male. Randall (4/15/91) 33–35.

827. To help attract black faculty to the law school, UA has, on occasion made significantly higher salary offers to African Americans than similarly situated Caucasian faculty. Randall (4/15/91) 35–38.

828. In addition to the above described activities the law school is also an active participant in programs designed to increase the pool of minority law professors. Randall (4/15/91) 39–40.

ii. *Black Faculty Employment*

829. For the ten year period covering the academic years 1975–76 through 1985–86, UA never had more than 20 nor less than 10 black full-time members of the faculty. SOF ¶ 186. During this period the total UA full-time faculty fluctuated between 702 and 833. *Ibid.*

830. For the academic year 1989–90, UA had 887 faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 21 were black, 826 were white and the remaining 40 would apparently be "other." *Ibid.* For the 1989–90 academic year UA had slightly more than 2.5% black faculty to white faculty as reported to the federal government. Of the 21 black faculty members 8 were tenured. *Ibid.*

831. UAS's labor expert, Dr. Bernard Siskin working with slightly different numbers than those reported to the federal government[73] reached conclusions as to percentages somewhat different than those

---

**73.** The variations in the raw numbers and percentages between USX 2–8 and UASX 1106—Dr. Siskin's employment data—are due primarily to the manner in which faculty are counted.

one would reach using only the EEOC survey data contained in USX 2–8.

832. According to Dr. Siskin's study, during the 1989–90 school there were 901 full-time faculty[74] members employed at the University of Alabama. UASX 1106, Table 1. Twenty three or 2.6% of the full-time faculty at UA were black. *Ibid.*

833. Of the 901 UA full-time faculty, 833 or 92.5% hold the rank of assistant, associate or full professor. UASX 1106, Table 2. The remaining 68 or 7.5% of the faculty hold the rank of instructor or less. Twenty one of the 23 black faculty members at the university hold the faculty rank assistant or above. *Ibid.*

834. Of the 901 full-time faculty only 736 or 81.7% are reported as doctorate level faculty. UASX 1106, Table 3. Twenty one or 91.3% of the 23 black faculty at UA have doctorates as reported by the university. *Ibid.* Thus, 18.3% or 165 of the faculty at UA do not have doctorates. *Ibid;* Siskin (4/8/91) 132–33.

835. Taking the 736 full-time members of the faculty who have doctorates and subtracting the 21 black doctoral faculty from that number, one arrives at 715 non-black doctoral faculty at the University of Alabama. Thus the percentage of black doctoral faculty to non-black doctoral faculty is 2.9 percent.

iii. *Black Administrative Employment*

836. Black faculty, staff and students sometimes serve on search committees for various administrative positions. Randall (4/8/91) 3.

837. Generally, the qualifications for academic administrative positions at UA closely parallel faculty qualifications. Sayers (7/24/85) 5719.

838. As of April 1991, the highest placed black administrator at the University of Alabama is the associate vice president in the office of student affairs. Sayers (4/3/91) 33. There have never been any blacks who held full vice president positions at the university. *Ibid.*

839. At the departmental level, a few blacks have served as chairs, others as assistant deans and still other at various low level administrative positions. Crump (4/4/91) 18, 52–53; Rogers (4/4/91) 40; Sayers (4/4/91) 33. Presently there is a black Assistant Dean of the Graduate School, a black chair in the Department of Women's Studies and a black chair in the Department of Educational Administration and Leadership.

840. The federal government reports that UA has a 119 administrative positions three of which are held by blacks. USX 2–8.

2. University of Alabama at Birmingham

i. *Black Faculty Recruitment*

841. Similar to UA, the University of Alabama at Birmingham has had for several years an affirmative action plan in place. SOF ¶ 343. At UAB the plan was first instituted in 1969 and approved by the federal government in 1970. Glaze (7/23/85) 5176; SOF ¶ 548. In 1974 UAB's affirmative action plan was revised and included a comprehensive faculty recruitment program that requires demonstration that the recruitment program is providing opportunities for women and minority group members to apply for university positions. SOF ¶ 556. UAB's affirmative action plan was approved by the United States Department of Labor in 1982 and since that date each pre-award compliance review by the federal government has resulted in a finding that UAB is in compliance with its plan. SOF ¶ 553. The office of the academic affirmative action officer at the university is charged with providing information and assistance to insure that the university complies with and follows its affirmative action policies. Glaze (7/23/85) 5148.

842. Every vice president for University College at UAB has instituted special incentive programs for recruitment and appointment of black faculty members. SOF ¶ 559.

843. Recruitment of faculty at UAB is primarily conducted by the dean and de-

---

**74.** Dr. Siskin excluded from his definition of full-time faculty those holding visiting, tempo-

rary or part-time faculty status. Siskin (4/8/91) 10.

partment chair who are immediately responsible for hiring with the assistance of a search committee. Recruitment activities include seeking out candidates in those institutions where there are graduate programs in the relevant discipline, personal solicitation at professional meetings, and advertising in major national academic journals targeting both the general academic community and some journals specifically intended for black academics. Glaze (7/23/85) 5155–57, 5170; McWilliams (4/3/91) 3–4; 85 UASX 120, pp. 38–39.

844. For each vacancy that is filled in Academic Affairs at UAB, a packet of documents must be completed which includes a list of recruitment efforts, to whom offers were made, efforts made to attract minority and female applicants, and an explanation for why female or minority individuals were not hired. McWilliams (4/3/91) 4–5; 85 UASX 129.

845. In October, 1975, the vice president of what was then known as University College, met with deans, affirmative action officers, department heads, and others to announce new affirmative action efforts. These efforts included the requirement that each school draft a plan for recruiting women and members of minority groups, announcement that the vice president's office would cover increased recruitment expenses necessitated by the plans, and that some new positions would be "free" (not assigned to a school budget) to be awarded to the school or schools successful in recruiting women and/or minority group members. SOF ¶ 557. Moreover, special consideration would be given to increasing starting salary offers when necessary to attract women or minority candidates. SOF ¶ 558.

846. The Committee for the Recruitment and Retention of Black Faculty at UAB was appointed in 1985. This committee remains active today along with the Comprehensive Minority Faculty Development Program Committee appointed in 1989. Both of these committees deal with the recruitment and retention of black faculty. Dale (3/26/91) 9–12; UASX 10.

847. The Committee for the Recruitment and Retention of Black Faculty receives an annual budget of $25,000. These funds are used to increase salaries for black faculty and are one time funds only. The increase in salary must then be maintained by the individual departments. Dale (3/26/91) 18–19; UASX 18; UASX 258.

848. The Comprehensive Minority Faculty Development Program at UAB is designed to increase the number of black faculty in academic programs at UAB. McCallum (4/1/91) 27–29; Hickey (4/4/91) 5, 14–15; UASX 2–2a.

849. The primary components of the Comprehensive Minority Faculty Development Program at the university are as follows: (1) Pre-college student summer internships (approximately 30 minority high school students per year; $1,000 stipends per student); (2) Undergraduate scholarships (15 per year, 10 freshman level, 5 junior level, $2500 scholarship for 3 terms for 4 years plus a $1,000 stipend bearing summer internship); (3) Graduate fellowships (8 per year, $17,500 stipend for 4 years); (4) Post doctoral and visiting faculty fellowships ($25,000 per year per student; in year 1, the faculty member devotes full time to research, supported completely by the Comprehensive Minority Faculty Development Program, year 2, two-thirds of time devoted to research sponsored by Comprehensive Minority Faculty Development Program, one-third devoted to teaching, supported by department, year 3, one-third of time devoted to research sponsored by Comprehensive Minority Faculty Development Program, two-thirds time devoted to teaching sponsored by department); (5) Faculty recruitment (4 awards per year of $30,000 to departments who recruit minority faculty into tenure earning position with a preference to areas of most significant underrepresentation); (6) Summer graduate internships for students from predominantly black institutions (10 summer internships per year of $1,000 per student); (7) Faculty retention (support for existing faculty to engage in enrichment experiences). McCallum (4/1/91) pp. 30–33; UASX 2a.

850. Approximately $600,000 was set aside for the Comprehensive Minority Faculty Development Program during the first year of operation, and approximately $1.4 million dollars was spent last year on the program. McCallum (4/1/91) 30, 35. Since the initiation of the program in 1988, there has been an increase of twelve full-time black faculty members at UAB. McCallum (4/1/91) 22–35; 99–100; UASX 4–4a; UASX 271.

851. The Comprehensive Minority Faculty Development Program at UAB serves as a model for other programs around the country. Hickey (4/4/91) 31.

852. Approximately two years ago, a committee was put together at UAB from within the Medical Center which included representatives from all of the schools in the medical center, the hospital and previous graduates of the various professional schools. This committee made recommendations regarding recruiting and retaining minority students and expanding the number of minority faculty and administrators. Priest (4/1/91) 4.

ii. *Black Faculty Employment*

853. For the ten year period covering the academic years 1975–76 through 1985–86, UAB never had more than 40 nor less than 28 black members of the full-time faculty. SOF ¶ 186. During this same time frame, as reported to the federal government, the total UAB full-time faculty fluctuated between 1033 and 1355. *Ibid.*

854. For the academic year 1989–90, UAB had 1497 faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 44 were black, 1,349 were white and the remaining 104 would apparently be "other." *Ibid.* For the 1989–90 academic year UAB had slightly more than 3.3% black faculty to white faculty as reported to the federal government. Of the 44 black full-time faculty members 20 or approximately 45% were tenured. *Ibid.*

855. UAS's labor expert, Dr. Bernard Siskin working with slightly different numbers than those reported to the federal government reached conclusions as to percentages somewhat different than those one would reach using only the EEOC survey data contained in USX 2–8.

856. According to Dr. Siskin's study, during the 1989–90 school there were 1,455 full-time faculty members employed by the University of Alabama at Birmingham. UASX 1106, Table 1. Forty four or 3.0% of the full-time faculty at UAB were black. *Ibid.*

857. Of the 1455 UAB full-time faculty, 1274 or 87.6% hold the rank of assistant, associate or full professor. UASX 1106, Table 2. The remaining 181 faculty hold the rank of instructor or less. Thirty five of the 44 black faculty members at the university hold the faculty rank of assistant professor or above. *Ibid.* Thus, of the 181 faculty who hold the rank of instructor or less 5.4% are black.

858. Of the 1455 full-time faculty only 1195 or 82.1% are reported as doctorate level faculty. UASX 1106, Table 3. Twenty four of the 44 black faculty at UAB have doctorates as reported by the university. *Ibid.* Thus, 260 full-time faculty members at UAB do not have doctorates. Of this number 20 or 7.7% are black. *Ibid.*

859. Taking the 1195 full-time members of the faculty who have doctorates and subtracting the 24 black doctoral faculty from that number one arrives at 1,171 non-black doctoral faculty at the University of Alabama at Birmingham. Thus the percentage of black full-time doctoral faculty to non-black full-time doctoral faculty is 2.0%.

860. Were one to include both full and part-time UAB faculty for the two year period between 1988 and 1990, one would have a total faculty of 1,833. KX 3656, Table 4. Of this number 1,649 are non-Hispanic Caucasians, 60 are non-Hispanic African American,[75] and the remaining 124 are either Hispanic, Asian, or American Indian. *Ibid.* Thus, as reported by the

**75.** Though KX 3656, Table 4 does not indicate whether the 60 blacks listed as UAB faculty are all American, for purposes of this calculation the Court assumes that they are.

Knight Plaintiffs, the overall percentage of blacks on the UAB faculty for the period indicated by Table 4 of Knight Exhibit 3656 is 3.3 percent. The black to white percentage of faculty—excluding Hispanics, Asians and American Indians—is 3.4 percent. *Ibid.*

iii. *Black Administrative Employment*

861. Excluding the medical school, the highest black administrative official at UAB is the associate vice president of student affairs. Lamar (4/1/91) 4. UAB has at least one black in an associate deanship. Dale (3/26/91) 2. At the university's medical school the positions of assistant vice president for health affairs and assistant dean for minority enhancement is held by one black individual. Priest (4/1/91) 2–3.

862. For the academic year 1989–90, UAB had 14 black administrators out of a total of 243 as reported to the federal government. USX 2–8.

3. University of Alabama at Huntsville

i. *Black Faculty Recruitment*

863. In addition to its general efforts at publishing faculty vacancies in national journals, UAH like its sister institutions UA and UAB has an affirmative action program that has been in place for more than twenty years. Cook (3/25/91) 6.

864. At UAH overall responsibility for assuring that the institution's affirmative action program is effectively implemented rests with the President. The President is assisted in this duty by certain designated officials. On the faculty side, the Provost and Vice President for Academic Affairs is the appointed Faculty Equal Employment Opportunity/Affirmative Action (EEO/AA) Officer, and the Associate Vice President for Academic Affairs functions as the Faculty EEO/AA Coordinator. On the staff side, the Vice President for Finance and Administration is the appointed Staff EEO/AA Officer, and the Director of Personnel Services functions as the Staff EEO/AA Coordinator. There are also parallel officials in the UAH School of Primary Care. The EEO/AA officers and coordinators have joint responsibility with the President in their respective areas for insuring

that the university's obligations are being faithfully carried out. UASX 560, p. II/1–II/2.

865. Each year, a working group of EEO/AA personnel at UAH develops a proposed Affirmative Action Plan for the upcoming year. The plan is then submitted to the University's Affirmative Action Committee for review and approval. The proposed plan is next submitted by the EEO/AA coordinators to their respective EEO/AA officers, who review, approve, and present it to the president. The president promulgates and issues the plan to the university community, reaffirming the institution's commitment to the EEO/AA principles and goals expressed therein. Quick (3/20/91) 32–33, 35; UASX 560, pp. II/2, II–4, V/3; UAS 969.

866. Under the UAH affirmative action plan, when candidates for a position are adjudged to be substantially equal in job qualifications, a particular candidate's status as a black is to be viewed as an extra consideration in the candidate's favor in the making of the final selection. UASX 560, pp. IV/3, IV/8.

867. The UAH affirmative action plan contains detailed procedures which must be followed for every hiring or appointment of new faculty. The Faculty EEO/AA Coordinator monitors each step of the recruitment and selection process to insure compliance with these procedures and requirements. UASX 560, pp. IV/5–IV/9 and Ex. 2; UASX 1519; Cook (3/25/91) 6–12.

868. The faculty EEO/AA procedures include the following steps. After the academic unit receives permission to fill a faculty position, an Academic Recruitment Plan must be completed by the department or program chair and approved by the faculty EEO/AA coordinator and dean. This form requires identification of specific recruitment measures to be used in an effort to bring the opening to the attention of potential non-majority and female candidates. The advertisement must be attached to the academic recruitment plan and must include the institution's affirmative action statement. No advertisement

may be placed without prior approval of the faculty EEO/AA coordinator. After applications have been received, an applicant work sheet must be prepared by the academic unit, listing each applicant. This work sheet is sent to the faculty EEO/AA coordinator, who, independent of the academic unit, is responsible for collecting from the applicants, via separate correspondence, data concerning race, gender or ethnicity, that data is then added to the work sheet. The work sheet must be completed before any interviews take place.

869. After the interviews are held and a decision made for a recommended candidate, the department or program chair must summarize in a selection and justification for academic appointment form the affirmative action efforts used, the number of applicants in the various protected class categories, the reasons for selection of the recommended candidate, and the specific reasons for nonselection of all candidates interviewed. The dean must approve this form and submit the recommended appointment to the provost. After final review by the EEO/AA coordinator to insure that all affirmative action requirements have been met, the provost may approve the selection, and the position is then offered to the recommended candidate. UASX 1516; UASX 1527; UAS 1528; UASX 1529; UASX 560, pp. IV/5–IV/8 and Ex. 2; Cook, (3/25/91) 6–12.

870. The faculty procedures at UAH for advertising position openings require contact with minority caucuses and agencies, use of minority directorates, contact with institutions known to have access to minority group members, and other efforts designed to bring the opening to the attention of interested black candidates. UASX 560, pp. IV/6–IV/7 and Ex. 2, pp. 2–3—2–5; UASX 1527; Wilson (7/30/85) 6714–16, 6730–31; Billings (7/30/85) 6818–19.

871. UAH deans, as well as the faculty EEO/AA coordinator monitor the process for advertising faculty position openings and assure that proper affirmative action procedures are carried out. UASX 560, p. IV/6 and Ex. 2, Forms A–F; Cook (3/25/91) 7–13; Wilson (7/30/85) pp. 6714–16, 6730–31; Billings (7/30/85) pp. 6818–19.

872. The faculty EEO/AA coordinator reviews major personnel actions involving faculty and prepares quarterly summaries of all faculty hires, transfers, promotions, and terminations as a means of monitoring compliance with the institution's EEO/AA commitments. These summaries, along with a report on faculty EEO/AA progress and problem areas are provided annually by the faculty EEO/AA coordinator to the vice president for academic affairs and provost. UASX 560, pp. V/1, V/3.

873. The UAH affirmative action plan establishes hiring goals for black faculty when the institution's utilization rate falls below the availability rate in the relevant national pool of potential qualified candidates. Because of the low availability of black faculty with the minimum academic qualifications, no goals have been required in recent years. UASX 560 pp. VII/1–VII/8 and Ex. 6–4; Cook (3/25/91) 13; Russell (3/21/91) 42.

874. Usually, faculty appointments are recommended by the academic peers of a candidate. SOF ¶ 468.

ii. *Black Faculty Employment*

875. For the ten year period covering the academic years 1975–76 through 1985–86, UAH never had more than 3 nor less than 2 black members of the full-time faculty. SOF ¶ 186. During this same time frame the total UAH full-time faculty fluctuated between 153 and 223. *Ibid.*

876. For the academic year 1989–90, UAH had 245 full-time faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 6 were black, 212 were white and the remaining 27 would apparently be "other." *Ibid.* For the 1989–90 academic year UAH had slightly more than 2.8% black faculty to white faculty as reported to the federal government. Of the 6 black full-time faculty members 1 had tenured. *Ibid.*

877. UAS's labor expert, Dr. Bernard Siskin working with slightly different numbers than those reported to the federal

government reached conclusions as to percentages somewhat different than those one would reach using the EEOC survey data contained in USX 2–8.

878. According to Dr. Siskin's study, during the 1989–90 school there were 278 full-time faculty members employed by the University of Alabama at Huntsville. UASX 1106, Table 1. Eight or 2.9% of the full-time faculty at UAH were black. *Ibid.*

879. Of the 278 UAH full-time faculty, 221 or 79.5% hold the rank of assistant, associate or full professor. UASX 1106, Table 2. The remaining 57 or 20.5% of the faculty hold the rank of instructor or less. Five of the eight black faculty members at the university hold the faculty rank assistant professor or above. *Ibid.* Of those holding instructor rank or less, 5.3% are black.

880. Of the 278 full-time faculty 225 are reported as doctorate level faculty. UASX 1106, Table 3. Five of the eight black faculty at UAH are reported as doctoral level faculty. *Ibid.* Thus, 19.1% or 53 full-time faculty members at UAH do not have doctorates. Of this number three or 5.7% are black. *Ibid.*

881. Taking the 225 full-time members of the faculty who have doctorates and subtracting the five black doctoral faculty from that number one arrives at 220 non-black doctoral faculty at the University of Alabama at Huntsville. Thus the percentage of black full-time doctoral faculty to non-black full-time doctoral faculty is 2.3 percent.

882. Of the eight full-time black faculty at UAH, three hold the rank of instructor, three hold the rank of assistant professor, one is an associate professor and one is a full professor. KX 3660.

iii. *Black Administrative Employment*

883. For the academic year 1989–90, UAH had two black administrators out of a total of 66 as reported to the United States Government. USX 2–8. In January of this year, one of the two died.

E. *Troy State University System*

1. Troy State University Main Campus

884. Very little evidence was introduced by Troy State regarding its efforts at black faculty recruitment. Other than the customary and usual national advertisement of available faculty positions, no particular evidence was forthcoming by this Defendant.

885. For the ten year period covering the academic years 1975–76 through 1985–86, TSU never had more than 8 nor less than 4 black members of the full-time faculty. SOF ¶ 186. As reported to the federal government, during this same time frame the total TSU full-time faculty fluctuated between 238 and 303. *Ibid.*

886. For the academic year 1989–90, TSU had 246 full-time faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 9 were black, 210 were white and the remaining 27 would apparently be "other." *Ibid.* For the 1989–90 academic year TSU had slightly more than 4.3% black faculty to white faculty as reported to the federal government. Of the 9 black full-time faculty members 1 had tenure. *Ibid.* In total for the 1989–90 academic school year, TSU's black faculty comprised 3.65% of the entire full-time federally reported faculty. *Ibid.*

887. Out of it 21 administrative positions reported to the federal government in 1990, TSU reports that none are held by blacks. USX 2–8.

2. Troy State University at Montgomery

888. TSUM has no black administrators. M. Johnson (3/18/91) 81.

889. Of the 34 full-time faculty report by TSUM, only one is black. M. Johnson (3/18/91) 83; TSUX, pp. 119–21. Though TSUM advertises nationally for its vacant positions, the evidence indicates that approximately one-half of TSUM's full-time faculty have—or will receive—their terminal degrees from institutions in Alabama. *Id.* at 85.

890. Twelve or 8.8% of TSUM's 136 adjunct professors are black. TSUM indicates that it is much easier to employ ad-

juncts than full-time professors because adjunct faculty are typically paid less since their primary source of income is a job other than university teaching. M. Johnson (3/19/91) 46. Moreover, adjunct faculty need not possess the doctorate in order to be offered a position at TSU. *Id.* at 87. The salaries at TSUM for each full-time faculty rank are below state averages.

### F. University of North Alabama

891. For the ten year period covering the academic years 1975–76 through 1985–86, UNA never had more than 7 nor less than 3 black members of the full-time faculty. SOF ¶ 186. As reported to the federal government, during this same time frame the total UNA full-time faculty fluctuated between 176 and 207. *Ibid.*

892. For the academic year 1989–90, UNA had 190 full-time faculty members as reported on the EEOC Survey/Higher Education Staff Information Report. USX 2–8; *see also* Woods (3/11/91) 21 (the number of blacks on the UNA faculty as reported by the federal government in USX 2–8 has remained constant through at least March of 1991). Of this number 5 were black, 183 were white and the remaining two would apparently be "other." USX 2–8. For the 1989–90 academic year UNA had slightly more than 2.7% black faculty to white faculty as reported to the federal government. *Ibid., see also* UNAX 4. Of the five full-time black faculty members three had tenured. USX 2–8. In total, for 1989–90 academic school year, UNA's black faculty comprised 2.6% of the entire full-time faculty. *Ibid.*

893. Out of its 12 administrative positions reported to the federal government, UNA reports that none are held by blacks. USX 2–8; UNAX 4.

894. Two of UNA's 38 part-time faculty members are black. UNAX 5.

### G. Alabama State University

895. For the ten year period covering the academic years 1975–76 through 1985–86, ASU never had more than 42 nor less than 29 white full-time faculty members. SOF ¶ 186. During this same period, the size of ASU's faculty fluctuated between 184 and 159. *Ibid.*

896. For the academic year 1989–90, ASU had 181 full-time faculty as reported to the federal government on EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 118 were black and 50 white and the remaining 13 would apparently be "other." *Ibid.* For the 1989–90 academic year ASU had 65.2% black full-time faculty and 27.6% white faculty. Forty seven percent of the black faculty were tenured while 56 percent of the white faculty had tenure.

897. ASU reported that of its 26 administrators for the 1989–90 school year four were white. USX 2–8.

898. ASU is very well integrated on the faculty level.

### H. Alabama A & M University

899. For the ten year period covering the academic years 1975–76 through 1985–86, AAMU never had more than 110 nor less than 45 white full-time faculty members. SOF ¶ 186. During this same period, the size of ASU's faculty fluctuated between 335 and 226. *Ibid.*

900. For the academic year 1989–90, AAMU had 245 full-time faculty as reported to the federal government on EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 138 were black and 57 white and the remaining 50 would apparently be "other." *Ibid.* For the 1989–90 academic year AAMU had 56.3% black full-time faculty and 23.3% white faculty. Sixty nine percent of the black faculty were tenured while 70% of the white faculty had tenure.

901. AAMU reported to the federal government that of its 50 administrators for the 1989–90 school year two were white. USX 2–8.

902. At the faculty level AAMU is very well integrated.

### I. Calhoun State Community College

903. Calhoun State, like Athens State, is an institution under the desegregation

mandate of *Lee v. Macon.* Under the 1975 consent decree entered into between the parties in *Lee v. Macon,* the State Board of Education adopted uniform criteria for the employment, promotion, transfer, and assignment of faculty without regard to race. This criteria specifies that all colleges under the control of the SBE, including CSCC, shall make hiring decisions based on several objective criteria as specified within the consent decree.

904. For the ten year period covering the academic years 1975–76 through 1985–86, CSCC never had more than 21 nor less than 13 black members of the full-time faculty. SOF ¶ 186. As reported to the federal government, during this same time frame the total CSCC full-time faculty fluctuated between 149 and 117. *Ibid.*

905. For the academic year 1989–90, CSCC had 141 full-time faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 18 were black, 122 were white and the remaining one would apparently be "other." *Ibid.* For the 1989–90 academic year CSCC had slightly more than 14.8% black faculty to white faculty as reported to the federal government. Of the 18 full-time black faculty members 16 had tenured. USX 2–8. In total, for 1989–90 academic school year, CSCC's black faculty comprised 12.8% of the entire full-time faculty. *Ibid.*

906. For the 1989–90 academic year CSCC reports no black administrators on its EEOC Survey Form. USX 2–8.

907. As counted by Calhoun, there are 33 administrators.[76] Six of these administrators are black. Bynum (1/18/91) 28–35.

908. CSCC is well integrated at the faculty level.

### J. Athens State College

909. For the ten year period covering the academic years 1975–76 through 1985–86, ASC never had more than 3 nor less than 1 black members of the full-time faculty. SOF ¶ 186. During this same time the total ASC full-time faculty fluctuated between 38 and 44. *Ibid.*

910. For the academic year 1989–90, ASC had 56 full-time faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 4 were black and 52 were white. *Ibid.* For the 1989–90 academic year ASC had 7.7% black faculty to white faculty as reported to the federal government. Of the four full-time black faculty members 2 had tenured. *Ibid.*

911. For the 1989–90 academic year ASC reports that of its four administrators one is black. USX 2–8.

912. As calculated by the Knight Plaintiffs' expert, ASC as of 1983 had a black faculty population of 7.5%. By 1988 that percentage increased to 7.7%, but by 1990 the percentage had fallen off to 6.1%. KX 3661.

### K. Jacksonville State University

913. For the academic year 1989–90 JSU had one black administrator out of a total of 44. USX 2–8. During this same year, the university had a total faculty of 283. *Ibid.* Eleven faculty members were black, 266 were white and the remaining six would be "other." *Ibid.* Of the 11 black faculty only one had tenure. *Ibid.*

914. As reported to the federal government, for the ten year period covering the academic years between 1975–76 and 1985–86, JSU's never had more than 10 nor less than three black faculty. SOF ¶ 186. During this same period, JSU's faculty fluctuated between 256 and 341. *Ibid.*

### L. Livingston University

915. For the academic year 1989–90 LU had no black administrator. USX 2–8. During this same year, the university had a total faculty of 98. *Ibid.* One faculty member was black, 91 were white and the remaining six would be "other." *Ibid.*

---

76. The number 33 is arrived at by counting those individuals whose compensation is derived from salary schedules B, C–1, 2 or 3. *See* Bynum (1/8/91) 28.

The lone black faculty member did not have tenure. *Ibid.*

916. As reported to the federal government, for the ten year period covering the academic years between 1975–76 and 1985–86, LU never had more than 1 black faculty member and during many of years had none. SOF ¶ 186. During this same period, Livingston University's full-time faculty fluctuated between 62 and 77. *Ibid.* From the record it appears that no black has ever had tenure at LU.

*M. The University of Montevallo*

917. For the ten year period covering the academic years 1975–76 through 1985–86, MU never had more than 7 black faculty and for several years had no black faculty. SOF ¶ 186. During this time UM's full-time faculty fluctuated between 124 and 149. *Ibid.* On the record before the Court, UM has had but one black faculty member with tenure and that individual is no longer with the university.

918. For the 1989–90 school year, UM had 143 full-time faculty of whom only two were black, 132 white and the remaining 9 would apparently be "other." USX 2–8. For this year, UM had 2 black administrators out of a total of 24. *Ibid.*

*N. University of South Alabama*

919. For the ten year period covering the academic years 1975–76 through 1985–86, USoA never had more than 19 nor less than 7 black members of the full-time faculty. SOF ¶ 186. As reported to the feder-

al government, during this same time period the total USoA full-time faculty fluctuated between 344 and 600. *Ibid.*

920. For the academic year 1989–90, USoA had 631 full-time faculty members as reported to the federal government on the EEOC Survey/Higher Education Staff Information Report. USX 2–8. Of this number 19 were black, 572 were white and the remaining 40 would apparently be "other." *Ibid.* For the 1989–90 academic year USoA had slightly more than 3.3% black faculty to white faculty as reported to the federal government. *Ibid.* Of the 19 full-time black faculty members 7 had tenure. In total, for the 1989–90 academic school year, USoA's black faculty comprised 3.0% of the entire full-time faculty. *Ibid.*

921. Out of its 152 administrative positions reported to the federal government, USoA reports that 5 are held by blacks. USX 2–8.

*O. Comparative Chart*

922. The following chart summarizes the 1989–90 academic year's full-time faculty and administrative data information contained in the previous paragraphs. It presents the information as a percentage of black faculty and administrators to white faculty and administrators—except in the case of ASU and AAMU where the converse is presented. It excludes from the percentages those individuals who are classified as "other." The data is complied exclusively from USX 2–8.

| 1989–90 | Faculty | Administrators |
|---------|---------|----------------|
| *AU* | 1.1 | 1.5 |
| *AUM* | 5.2 | 6.9 |
| *UA* | 2.5 | 2.6 |
| *UAB* | 3.3 | 6.1 |
| *UAH* | 2.8 | 3.2 |
| *TSU* | 4.3 | –0– |
| *TSUM* | 2.9 | –0– |
| *UNA* | 2.7 | –0– |
| *ASU* | 42.4 | 18.2 |
| *AAMU* | 41.3 | 4.2 |
| *ASC* | 7.7 | 33.3 |
| *CSCC* | 14.8 | –0– |
| *JSU* | 4.1 | 2.4 |
| *LU* | 1.1 | –0– |
| *UM* | 1.5 | 8.3 |
| *USoA* | 3.3 | 3.4 |

## FACULTY AND ADMINISTRATIVE EMPLOYMENT

923. Neither the United States nor the Knight Plaintiffs introduced any evidence that any individual was denied a faculty or administrative position at any state institution of higher education on the basis of race.

924. If the Knight Plaintiffs' position is tenable, the small number of black faculty and administrators at most of the HWUs is an effort on the part of the state and its predominately white universities and colleges to perpetuate vestiges Alabama's prior *de jure* policy of segregation. The Knight Plaintiffs have argued that the low black faculty numbers have negative implications for the increased recruitment of additional black faculty and the retention of black students. In this respect it is contended that the low numbers are more critical than the low percentages. *See* Knight Plaintiffs' and Allied Defendants' Proposed Findings of Fact, ¶ 414.

925. To the non-allied Defendants the story of the small number of blacks on their faculty is not a vestige of *de jure* segregation, but rather, a national phenomena resulting from the paucity of qualified black faculty and administrative candidates in the job market.

926. Unavoidably, both sides are correct to some extent. The Court is thus faced with the unenviable situation of distilling from the mass of evidence the degree to which some of the Defendants' actions are culpable and correspondingly, the nature of their obligation to remedy the situation.

927. Some of the theories of liability advanced by the Knight Plaintiffs regarding faculty employment are unavailing. Throughout their findings concerning the sufficiency of black faculty representation on the HWUs, the Knight Plaintiffs make repeated appeals to the fact that black students often do not have the opportunity to take classes from black professors and thus lack the powerful impact that black professors can have as role models. As a consequence the Knight Plaintiffs argue that the HBUs must change their employment criteria.

928. Undoubtedly, black as well as white students are strongly influenced and encouraged by college professors. The Knight Plaintiffs' evidence has thoroughly convinced the Court that black students at majority white colleges and universities benefit on many levels from the presence of black faculty and administrators. Be that as it may, the Knight Plaintiffs never established by a preponderance of the evidence that black students themselves were being deprived of a full and fair education simply because they did not have the opportunity to form a mentor/mentee relationship with a black professor.

929. The lack of black faculty role models is not, standing alone, a basis for Title VI or Fourteenth Amendment liability. It is certainly not inconceivable that a black student on a majority white campus could find the same mentoring and guidance from a white professor that he or she believes might be available from a black professor. This observation does not, however, indicate that the Defendants have satisfied their obligation to comport employment practices in a manner that assures compliance with the requirements of Title VI.

930. Some of the Defendant universities and colleges have employment practices which impermissibly impact blacks by perpetuating and encouraging a dual system of higher education at the administrative and faculty level of the institution. It is not that illegitimate barriers to black employment survive, but rather, that the minority employment procedures already in place are not implemented and followed with sufficiently sustained vigor so that they can assist in increasing the number of African American faculty and administrators and thereby wash the taint of the prior

dual system away. The evidence indicates that a general attitude of indifference permeates a few of the institutions as they confront their obligation to eliminate the vestiges of segregation which cling to their faculty and administrative structures.

931. In order to understand the nature of the obligation to desegregate faculties and administrative positions an appreciation of available labor pool is required.

## A. The Appropriate Labor Pool For Faculty Positions

932. There is considerable disagreement among the parties as to the appropriate labor pool from which the Defendant universities should draw their full-time faculty. The Knight Plaintiffs assert that the universities are not required to limit [their] search for black faculty members to black individuals with terminal degrees. *See e.g.,* Knight Plaintiffs' Proposed Findings of Fact ¶¶ 233, p. 286 (AU); 284, p. 299 (AUM); 335, p. 313 (UNA); 361, p. 361 (TSUM).

933. The Defendants take the opposite view. It is their contention that the only appropriate labor pool consists of individuals with terminal degrees. *See e.g.,* AU's Proposed Findings of Fact, ¶ 316; UAS's Proposed Findings of Fact ¶¶ 397–405; TSU's Proposed Findings of Fact ¶¶ 185–86.

934. The rationale behind a terminal degree requirement is the belief that the inclusion of substantial numbers of master's level faculty at an institution of higher education would both adversely affect the reputation of the institution, and therefore, its attractiveness to students, and would also raise serious questions about whether the institution would become obsolescent in its offerings. D. Smith (7/22/85) 4747.

935. The desire for faculty with terminal degrees is not unique to Alabama or its HWUs. On a national basis, institutions of higher education rarely recruit or employ in tenure earning positions faculty who do not have the terminal degree. Jones (3/25/91) 11–12. Indeed, at Alabama A & M University for example, the student recruitment literature published by the ad-

missions office describes an outstanding faculty as one in which a high percentage of its members hold the highest degree in their fields. AAMUX 630.

936. Alabama State University also recognizes the need that its faculty have terminal degrees. One may not, for example, be advanced to the level of associate or full professor unless he or she has first earned a doctorate in the field in which he or she teaches. ASUX 248, pp. 5–6. An individual may, however, be appointed as an assistant professor without the doctorate, but only if he or she has had at least a master's degree, plus three academic years of successful teaching experience at an accredited college and has completed at least forty eight semester hours in a doctoral program. *Id* at 5.

937. The Knight Plaintiffs do not offer any convincing evidence—other than a general need to redress the low number of black faculty on the HWUs—in support of their position that the Defendant universities should employee non-terminal degree faculty on a full-time basis at the assistant, associate or full professor ranks. In an era when knowledge is highly specialized and in constant flux, it is essential that a university's faculty be equipped with the necessary resources and experience to impart to students the expansiveness and changing character of knowledge. This is particularly so for research universities where faculty are called upon not only to stay abreast of the current trends but also to aid in the solution of a myriad of technical and social problems.

938. Were this Court to order as part of a remedial plan the employment of non-doctoral full-time tenure track faculty at any or all of the Defendant universities, it would be imposing on the Defendants a requirement at odds with virtually every other university and college with which the Court is familiar; and moreover, a requirement contrary to the privilege accorded the Academy through the principles of academic freedom.

939. The search for full-time tenure earning faculty is, for the most part, na-

tional in scope. On the whole, institutions throughout the United States compete for faculty from the same limited pool of doctoral graduates. There are, to be sure, some institutions in Alabama such as TSUM that, while contending that faculty searches are national in scope, inevitably hire a large percentage of their faculty from graduates of in state schools.

940. The Knight Plaintiffs argue that Alabama's HWUs are able to hire their own black doctoral students as faculty members. *See e.g.*, Knight Plaintiffs' Proposed Findings of Facts ¶ 235, p. 287.

941. It is virtually universal that institutions of higher education generally, and doctoral granting universities in particular, prefer not to employ their own doctoral graduates in any substantial number for a variety of reasons. Among them is the negative impact that such employment practices might have on the accreditation of the institution. The policy against hiring one's own doctoral recipients is academically sound in that it insures faculties are educationally diverse and that students will benefit from a broad range of academic experiences and perspectives. Siskin (4/8/91) 119; Black (3/12/91) 22–24; Haworth (2/21/91) 73.

942. The Plaintiffs are absolutely correct in indicating that some of the institutions in Alabama have made exceptions to this "rule." Such exceptions are certainly appropriate when initiated by the institution acting within what it considers to be its best interest. The Court is certainly mindful that hiring one's own black doctoral students is one of several possible solutions to increasing black faculty. To some extent, the universities in Alabama have employed their own black graduates, though by no means would the Court characterize the effort as substantial.[77] *See* Emert (2/27/91) 33–34; Sayers (4/3/91) 17–18.

943. No one disputes that the number of black doctoral graduates in the United States is abysmally low, particularly in the sciences, math and engineering. The Defendants point to the national data concerning the availability of black faculty as a defense to the allegations that black faculty are under represented on Alabama's majority white campuses. Even a brief review of the data bears out the veracity of the Defendants' assertions.

944. The availability of black faculty varies from discipline to discipline. KX 1710 p. 11. Between July 1988 and June 1989, 34,470 doctorates were awarded by institutions in the United States. UASX 1226. Of this total, 964 or 2.8% were awarded to black graduate students. *Ibid.* In at least ten of the reported 36 fields of study blacks received from zero to one percent of total degrees. *Ibid.* In seven of the reported fields blacks received between one and two percent. In only two cases—vocational home economics and protective services—did blacks receive over ten percent of the awarded doctorates. *Ibid.* In terms of real numbers, African Americans received the most degrees in the field of education where they accounted for 414 or 6.4% of the awarded degrees. *Ibid.*

945. In the hard sciences the number of blacks receiving terminal degrees is minuscule. For example, out of the 900 doctoral degrees awarded in the United States in mathematics for the year 1988–89 only four went to blacks. During that same period of the 625 doctoral degrees granted in computer science, none went to blacks. Cook (3/25/91) 25.

946. At the present time, there are no significant regional differences in the number of blacks receiving doctorates. Siskin (4/8/91) 113. Historically, however, the South, as a region, has produced fewer terminal degrees than other parts of the country. AUX 984. Compared to most other states, Alabama was relatively late in offering doctoral programs, and still produces a relatively small number of doctorates. AUX 984; UASX 1227. In 1949–50,

**77.** Overall, eight percent of the faculty at UA received their doctoral degrees from the University of Alabama. In applying the general policy against hiring one's own, more frequent exceptions are apparently made for minority candidates than non-minority candidates. Sayers (4/3/91) 29; Crump (4/4/91) 13.

no doctorates were awarded in Alabama, while 6,633 were awarded elsewhere in the nation; in 1959–60, only 33 doctorates were awarded in Alabama, compared to a national total of 9,829; in 1969–70, only 221 doctorates were awarded in Alabama, compared to a national total of 29,866. By 1985–86, the number of doctorates produced in Alabama was only 270, compared to a national total of 33,653. 90 AUX 984, p. 1. For 1989, Alabama awarded 325 or less than 1% of the total doctorates for that year. UASX 1227, p. 38.

947. In 1988–89, UA awarded 107 doctorates of which 10 or 9.4% went to blacks while UAB awarded 5.3% of its 75 doctorates to blacks. UASX 1228 p. 113. Of the 113 doctorates granted by Auburn University during the same period none were received by blacks. *Ibid.* Similarly blacks received none of the 19 doctorates awarded by UAH or the seven doctorates given by the University of South Alabama. *Ibid.*

948. From 1982–83 through the summer of 1990, AU conferred 825 doctorates, of which 32 or 3.9% were received by blacks. Haworth (2/21/91) 52.

949. Five percent or 149 of the approximately 2,980 doctoral degrees awarded at UA from 1968 to the present have been awarded to blacks. Crump (4/4/91) 16.

950. Of the 321 doctorates awarded by state institutions in 1989–90 fourteen or 4.4% were granted to blacks.[78] This is almost twice the national average of 2.8 percent.

951. Having decided that the Defendants may legitimately require their tenured and tenure track faculty to have terminal degrees, and that the appropriate market from which to draw faculty is national, there yet remains an issue to resolve. Are the Defendants utilizing the procedures they themselves have put into place to increase the recruitment of black faculty? These procedures when properly designed and implemented work to negate the impermissible situation which arose during the era of *de jure* segregation.

### B. Utilization of Faculty Recruitment Procedures

952. The procedures developed and implemented for the recruitment and retention of black faculty at UAB are the sort of procedures, which if consistently and conscientiously applied, should yield good results. With sustained energy and resources, UAB's program should greatly assist the university in increasing its black faculty. Also, the number of black faculty at AUM, ASC and CSCC show a concerted and committed effort to assure black representation on the faculty.

953. On the other end of the spectrum are the efforts of Auburn University, Livingston University and the University of Montevallo.

#### 1. Auburn University

954. Though in some respects AU has a well conceived plan in place, its utilization is essentially non-existent as indicated by the continued small percentage of black faculty on its campus. The failure of Auburn's plan to increase to any appreciable degree black faculty most likely results from insufficient institutional support or commitment. At any rate, the number of black full-time departmental faculty at AU must be increased if the university is to remove the taint of its segregated past.[79]

955. In its remedial plan the Court will direct that AU verify its efforts to increase the number of black faculty on its campus. The Court will not set a quota of black professors for AU nor will it design an

---

**78.** In total, 325 terminal degrees were offered by institutions in the State of Alabama. Four of those degrees were, issued by Southeastern Institute of Technology ("SIT"), a private college located in Huntsville, Alabama. UASX 1228, p. 113. None of the degrees awarded by SIT went to blacks.

**79.** In *Strain, et al. v. Philpott, et al.,* 331 F.Supp. 836, The United States District Court for the Middle District of Alabama entered a decree directing the Alabama Cooperative Extension Service to, *inter alia,* formulate objective salary schedules and promotion criteria, set hiring quotas, and submit compliance progress reports to the court. AUX 950, Decree 9/1/71. The *Strain* decree continues in effect to this day and regulates the employment practices of the extension service.

affirmative action plan for the university. Rather, the Court expects the university to review the policies it already has in place and augment those policies where needed to bring the university's efforts up to date. Thereafter, the Court expects the university to apply itself with due diligence and financial resources in implementing its program. The Court expects material improvement in the employment of black faculty at Auburn University within three years.

956. The Court realizes that competition for black faculty is best described as keen. Undoubtedly institutions such as Auburn face at best an up-hill battle in attracting qualified black faculty. Without a sincere and genuine effort to do so, Auburn will never be able to eliminate the vestiges of segregation which cling to the racial composition of its faculty to this day.

### 2. Montevallo and Livingston Universities

957. The record for black faculty employment at UM and LU is no better than at Auburn University. These institutions have, however, entered into consent decrees with the United States which specifically address the issue of faculty employment. The decrees contain requirements which should assist these universities in increasing their black faculty. The Court will closely monitor Montevallo and Livingston Universities to insure compliance with the decrees. Should the Court determine that these institutions are not fulfilling their obligations under the decrees, it will not hesitate to intervene. The Court expects material improvement in the employment of black faculty at these institutions within three years.

### C. Administrative Employment

958. The record for black administrative employment at some institutions is worse than that for faculty employment. At several of the institutions—TSU, TSUM, UNA, LU and CSCC—there are no black administrators as reported to the federal government for the academic year 1989-90. USX 2-8. All of these institutions other than UNA have entered into consent decrees with the United States which specifically direct that the institutions put in place policies and procedures to increase the number of black professional staff and administrators. The Court will closely monitor the Troy State University System, Livingston University, and Calhoun State Community College to insure compliance with the decrees. Should the Court determine that these institutions are not fulfilling their obligation under the decrees it will not hesitate to intervene. The current state of affairs at these institutions with regard to black administrative employment is unacceptable. The Court expects to see material improvement within three years.

959. The Court heard testimony from Robert Potts, the newly appointed president of the University of North Alabama, concerning the black administrative employment situation at UNA. Mr. Potts, who was lead counsel for the University of Alabama System in the first trial of this case, testified eloquently about his desire to increase the number of black administrators on his campus. He correctly observed that a predominantly white institution such as UNA must do more than merely publishing notices of vacancies in national periodicals if qualified black candidates are to be located and eventually employed in responsible administrative positions. Potts (3/11/91) 9–10.

960. In its remedial decree, the Court will direct that UNA develop and implement the sort of recruitment policies which President Potts himself said are necessary if qualified blacks are to be eventually employed in responsible administrative positions. Until UNA employs blacks in administrative positions, it cannot claim that it has eliminated the vestiges of segregation that arose during the period of forced racial separation. With the good office of President Potts behind it, the University of North Alabama should quickly meet the challenge of increasing its black administrative personnel.

961. The continued and uninterrupted dominance of white control of a university's administrative structure is as clear a manifestation of vestiges of the prior dual

system of segregation as survives in Alabama. At many of the state's institutions which have employed black administrative personnel, the numbers remain abysmally low. With rare exception, the jobs in which these individuals serve are not important policy making positions.

962. In its remedial decree, the Court will direct that AU, UA, UAH, and JSU devise and implement a program designed to increase the number of African American individuals serving in positions of important administrative responsibility. Within three years, the Court expects to see material improvement in the employment of black administrators at these universities.

### BLACK FACULTY PROMOTION AND RETENTION

963. Considerable anecdotal evidence was introduced by all sides concerning the individualized treatment of certain black faculty on majority white campuses. While this evidence is helpful to the Court as it struggles to understand the environment within which black and white faculty work, the Court sees no need to comment on the individualized employment issues raised by many of the witnesses. Suffice it to say that this lawsuit is not about employment discrimination but about desegregation. To the extent that certain witnesses have individualized employment grievances against some of the Defendants, those issues are beyond the purview of this case. *See Knight, et al. v. State of Alabama, et al.,* No 83-M-1676-S (N.D.Ala. March 12, 1990) (Memorandum and Order, pp. 75–77).

964. The Court has thoroughly reviewed the relevant evidence concerning the promotion and retention of black faculty at the HWUs and white faculty at the state's HBUs. On the whole, as a matter of percentages, blacks are significantly under represented at the higher levels of academic rank. Whether this constitutes a vestige of discrimination is the central issue. It is incumbent on the Plaintiffs in this action to establish that the promotional policies of the Defendant universities are a direct effort to perpetuate the prior dual system of higher education in Alabama. The Plaintiffs have failed in this regard.

965. The United States Government introduced no evidence on this issue while the Knight Plaintiffs' evidence was mostly restricted to anecdotal accounts of disenchanted faculty. The Knight Plaintiffs did proffer some statistical evidence tending to show that as a percentage of all promoted faculty black faculty did not receive academic advancement at the same rate as white faculty. *See e.g.,* KX 3655 and 3660.

966. While interesting, the Knight Plaintiffs' statistical evidence is not probative of the academic promotion issue before the Court. The only legitimate inference that can be drawn from the evidence is that overall, the number of black faculty on predominately white university campuses is disproportionately low. Any attempted comparison between the white faculty promoted as a percentage of all those advanced and the black faculty promoted against the same statistical pool will inevitably lead to widely divergent results, the significance of which only reinforces the reality of white and black representation on university faculties.

### THE ALABAMA COMMISSION ON HIGHER EDUCATION'S FUNDING FORMULAE

*A. The Components of ACHE's Funding Formula*

967. The Alabama Commission on Higher Education ("ACHE") was created by the Legislature in 1969 to coordinate public higher education in Alabama. The Commission is composed of twelve lay citizens who serve staggered nine-year terms. Ten members are appointed by the Governor, one by the Lieutenant Governor and one by the Speaker of the House. The appointments are made with the advice and consent of the Senate. Ala.Code § 16-5-2; SOF ¶¶ 7, 205, 571; STX 112.

968. "The commission serves in an advisory capacity to the legislature and the governor ... in respect to all matters pertaining to state funds for the operation and the allocation of funds for capital improve-

ments of state supported institutions of higher education." Ala.Code § 16–5–2(c). ACHE is not a central controlling board of trustees or regents. SOF ¶ 291.

969. The commission, which meets at least four times annually, is responsible for the overall statewide planning and coordination of higher education in Alabama, while also administering a variety of student aid programs. STX 112.

970. The planning and coordination staff aids the commission in reviewing and approving programs; formulating annual budget recommendation; establishing long-range goals and formulating statewide policies, among other things. STX 112.

971. ACHE promulgates procedures for all institutions to follow in developing their budget requests. Any institution of higher education in the state may submit any matter pertaining to the financial operation and needs of an institution to the Legislature or to the Governor at any time without going through ACHE. Ala.Code § 16–5–9(b).

972. Alabama was the penultimate state in the nation to have any kind of higher education coordinating board, and until 1979, the function of ACHE was totally advisory. Sutton (7/3/85) 764.

973. Each year, every Alabama public institution of higher education submits a proposed budget to ACHE, utilizing a standard format. With respect to most appropriations related to instruction of students, ACHE's recommendations to the Governor are determined by a funding formula. Some activities of institutions, largely nondepartmental research and public service, are included in special line item requests that become a part of the appropriations request. Other special line items may be added by the Legislature on a periodic basis. SOF ¶ 241.

974. The funding formula was first used by ACHE in 1973, after several years of investigating funding practices in other states. The formula was originally derived from a Texas model, but has been modified from time to time. SOF ¶ 242 Over one-

half of the states in the U.S. use a funding formula. All funding formulae share common characteristics. McKeown (2/13/91) 23, 26.

975. In the literature of Higher Education Finance, there are concepts of horizontal equity which is the equal treatment of equals, and vertical equity which is the unequal treatment of unequals. McKeown (2/13/91) 21. Funding formulae address the issue of how to fund equitably institutions that differ in mission. *Id.* at 22–23. The purpose of the funding formula is to provide appropriate amounts to differing institutions. *Id.* 50–51. Thus the formula attempts to address the issue of vertical equity. *Id.* at 51; 90 AU Ex. 281, pp. 53–55.

976. AU's expert financial witness, Dr. Mary McKeown, compared Alabama's funding formula to formulae of a number of other states including states with desegregation plans approved by the United States Department of Education. Dr. McKeown testified that Alabama's formula is typical of formulae used throughout the nation which have been developed based on studies of actual program costs. McKeown (2/13/91) 32–38; AUX 281, pp. 59–285.

977. The Alabama funding formula recognizes differences in instructional costs by assigning "weights" to credit hours in various academic programs so as to allocate to each institution the amount ACHE believes is necessary to pay the costs associated with instruction in each of its programs. SOF ¶ 257; Sutton (7/16/85) 3133–37; AUX. 281, pp. 37–38; McKeown (2/13/91) 50.

978. ASU's finance witness, Dr. Daniel Sullivan, testified that Alabama's range of formula weights was unusually high. Sullivan (2/11/91) 132–33, 137. Dr. McKeown differed with Dr. Sullivan and after reviewing other states' formula components in detail, testified that the formula weights in Alabama were comparable to the other states which she considered.[80] McKeown (2/13/91) 46–49.

---

**80.** In making her comparative study, Dr. McKeown examined the funding formulae uti-

lized in the following states: Texas, Kentucky,

979. Valid financial comparisons among institutions must take into account expected variations in costs. AUX 281, pp. 33–34. Comparisons among dissimilar institutions can be made on a per weighted credit hour basis. McKeown (2/13/91) 62–63.

980. Alabama's funding formula allocates different amounts on the basis of academic discipline and level of instruction. Irrespective of the institution, similar amounts are allocated for each weighted student credit hour by academic discipline and level of instruction. AUX 281, p. 53.

981. A goal of Alabama's current funding formula is vertical equity. Differences among the institutions relating to institutional mission, to academic fields of study, and to levels of instruction are recognized and different amounts are accordingly allocated by the formula. For example, in the instructional program, a system of complexity indices was developed to allocate different amounts in recognition of the differential costs of providing equivalent educational services to students at different levels in varying academic disciplines. AUX 281, p. 54.

982. Economies and diseconomies of scale are recognized in the general administration and student services formula. This recognition conforms to the empirical evidence presented by Drs. Leslie and Brinkman that economies of scale exist and should be considered in cost studies of institutions of higher education. AUX 281, p. 54.

983. ACHE also has introduced the use of "peer" data into the calculation of formula amounts for the public four-year colleges and universities. The formula in use in 1990 adjusts funding per full time equivalent student ("FTES") by regional averages for the four-year institutions in the Southern Regional Educational Board states. This calculated amount provides a target for funding general operations of

Tennessee, Kansas and Maryland. McKeown

the institutions. Other states are using peers in the formula process. For example, Kentucky and West Virginia use peer data to set faculty salary levels in their formula computations. AUX 281, p. 54.

984. ACHE recommends funding levels for each public senior educational institution in Alabama based on its formula.

985. All public institutions in Alabama, including AAMU and ASU, were invited to participate in the study that preceded the adoption of the first funding formula. SOF ¶ 243. The funding formula was not utilized at any time during which segregation in higher education was practiced.

986. Before making its recommendation, ACHE projects how much money will be available to fund higher education based upon projections of the size of the ASETF and bearing in mind the traditional percentage of the trust fund that is allocated to higher education. Rutledge (2/20/91) 149; Sullivan (2/11/91) 50, 57–59. ACHE uses its funding formula to determine how the money available for higher education will be allocated among the various sectors of the public higher education community. Rutledge (2/20/91) 44.

987. The Alabama funding formula generates an estimate of funds needed for operations at each institution based upon its programs, enrollment, physical plant and its mission in research and service. Sutton (7/14/85) 3126–30; McKeown (7/18/85) 3582.

988. The funding formula is actually a series of formulas. The most important component is the regular academic program formula, or "RAP formula." Rutledge (2/20/91) 44–43. The RAP formula is used to recommend a funding level for the regular academic programs at all institutions. *Id.* at 43–45; STX 202.15.

989. The RAP formula is the sum of the following calculations:

(3/13/91) 39–42; AUX 942.

990. Instructional costs vary from one academic discipline to the next and from one level of instruction to the next. The differences in cost are based, in part, on differences in faculty salaries, faculty work loads, and class sizes. STX 57, p. 10. Costs also vary because of differences in support needs, such as laboratories and specialized equipment for some types of research and course work. McKeown (2/13/91) 24–28, 31–32.

991. The Alabama funding formula recognizes differences in program costs by assigning "weights" to credit hours in the various academic programs in an attempt to allocate to each institution the amount necessary to pay the costs associated with each of its programs. SOF ¶ 257.

992. The academic complexity weights used by ACHE purport to represent the relative cost of providing programs in different academic disciplines and different levels of instruction. Rutledge (2/20/91) 26–27; STX 202.16. They were derived from the funding formula used in Texas and modified by ACHE for use in Alabama. Rutledge (2/20/91) 26; STX 57. p. 14.

993. For example, the weight for freshmen and sophomore-level foreign language classes is 0.95; the weight for freshmen

and sophomore-level pharmacy classes is 2.87, and the weight for doctoral-level agriculture classes is 16.03. STX 202.16, 202.-17.

994. ACHE uses a three-year average of credit hour production to compute formula components in a given year; for example, the 1991–92 unified budget process uses credit hours reported for academic years 87–88, 88–89, and 89–90. Rutledge (2/20/91) 29–30; STX 202.19.

995. The "SREB–Based Multiplier," is the estimated cost of delivering one credit hour having a complexity weight of 1. Rutledge (2/20/91) 32. The SREB–Based Multiplier is based upon appropriations data gathered for the 15 states participating in the Southern Regional Educational Board. *Ibid.*

996. Costs vary among institutions. Differences in costs are related to differences in costs are related to differences in programs, academic discipline levels, types of instruction, distribution of students among disciplines and economies of scale, among other reasons. McKeown (2/13/91) 24–29; SOF ¶ 255. One expects to see higher costs per student at research and doctoral level institutions than at comprehensive universities. Sullivan (2/11/91) 212–13.

997. Beginning with the 1991–92 budget recommendation, ACHE used two SREB–Based Multipliers: one for doctoral institutions and one for regional institutions. The multiplier for doctoral institutions for 1991–92 is $76.25; the multiplier for regional institutions in 1991–92 is $73.14. Rutledge (2/20/91) 32; STX 202.18.

998. The difference in SREB-based multipliers for doctoral and regional institutions is intended to reflect the fact that doctoral institutions pay higher faculty salaries than regional institutions. Rutledge (2/20/91) 33–34. For the purpose of applying the doctoral/regional differential in the SREB-based multiplier, doctoral institutions include AAMU, UAH, UAB, UA, AU, and USoAla. This classification applies to institutions that have doctoral programs, whether or not doctoral degrees were awarded in a given year. *Id.* at 86–87.

999. To arrive at a figure for instruction and direct expenses, complexity weights are applied to credit hours reported by institutions to yield weighted credit hours. Credit hours reported by institutions as remedial are then given additional weight since ACHE adds a 21% increment to those hours. Rutledge (2/20/91) 34. These adjusted weighted credit hours are then multiplied by the appropriate SREB–Based Multiplier.

1000. Academic Support represents an amount of financial support for the deans, department heads, and secretarial services within the colleges and divisions. Rutledge (2/20/91) 38. The dollar amount for academic support for a given institution is 5% of the institution's figure for instruction and direct expenses. *Id.* at 40; STX 202.-18.

1001. Research and public service in the regular academic program formula represents funds to allow faculty members to stay up to date in their disciplinary fields and to allow institutions to provide general public service to their communities, such as making auditoriums available for public events. The dollar figure for research in this formula element is derived by calculating 2% of the sum of instruction and direct expenses and academic support, plus 5% of an institution's sponsored research total. Public service is 2% of the sum of Instruction and direct expenses and academic support. STX 202.18; STX 112, p. C–2.

1002. The library support element recommends funding based on credit hours, weighted for degree level but not for academic discipline. Rutledge (2/20/91) 39. The recommended amount for a given year is derived by multiplying unweighted undergraduate credit hours by a predetermined dollar amount, multiplying unweighted master's-level credit hours by a higher amount, multiplying unweighted doctoral-level credit hours by a still higher amount, and finding the sum of those figures. The base dollar figure for 1991–92 is $7.03. *Id.* at 40–41; STX 202.18.

1003. ACHE calculates a figure for student services by multiplying a dollar amount times student head-count enroll-

ment reported by the institution. The recommended dollar amount per student varies with enrollment level, with the highest value, $626 per student for 1991–92, applying to the first 1,000 students. STX 202.-18.

1004. The plant maintenance element relates to daily upkeep of the physical plant, including housekeeping and grounds maintenance. Rutledge (2/20/91) 39. The amount for plant maintenance is a dollar amount applied to gross square feet as reported by the institution.

1005. Institutional support is a general category that recommends funding for vice presidents, the accounting structures, the president's office, and all of the large departments necessary to run a college or university. Funding for institutional support is 14% of all figures previously described. Rutledge (2/20/91) 42; STX 202.-18; STX 112 p. C–6.

1006. The utilities element recommends funding for utilities at 100% of estimated actual costs based on data reported by the institutions. Rutledge (2/20/91) 39, 42.

1007. The figure for tuition is a dollar amount derived from 90% of estimated average tuition per credit hour charged by all institutions, multiplied by an institution's unweighted credit hours (excluding military science hours). Rutledge (2/20/91) 42.

1008. To arrive at other costs, ACHE adds the figures for academic support, research and public service, libraries, student services, plant maintenance, institutional support, and utilities and subtracts the tuition figure. ACHE subtracts the tuition figure because a portion of the cost of running academic programs is borne by tuition rather than state appropriations. Rutledge (2/20/91) 39.

1009. To arrive at the SREB level of funding, ACHE adds the figure for instruction and direct expenses to the figure for other costs. Rutledge (2/20/91) 39. This number is supposed to represent the cost of running the regular academic program at a given institution.

1010. ACHE uses additional formulae to recommend funding for the optometry and dental schools at UAB, the medical programs at UAB and USoAla, the veterinary program at Auburn, and medical clinical experience at UA, UAB, UAH, USoAla. Rutledge (2/20/91) 143–45; STX 202.15. A special formula is also used to allocate funds to the Agricultural Experiment Station and Cooperative Extension Service run by AU and various research and service programs at a variety of institutions. *Ibid.*

1011. The remaining formula, for facilities renewal, applies to all institutions. It addresses the cost of building rehabilitation based on the amount, age, and utilization of space as reported by the institutions, combined with national data concerning costs. Rutledge (2/20/91) 139–43. It is clear the Legislature has not responded to ACHE recommendations concerning facilities renewal because legislative appropriations have not contained such a designation. Rutledge (2/20/91) 52.

1012. The total funding formula is composed of the regular academic program formula, combined with the special formulas described above. The total formula, as applied to each institution, generates a figure referred to as the regional standard or, in earlier years, "need." Rutledge (2/20/91) 46.

1013. No aspect of the funding formula takes into account the race of any student, faculty member, staff person, or administrator.

1014. Generally, the money available to fund higher education in Alabama is less than the amount recommended by the formula. Rutledge (2/20/91) 47–48. Since about 1984 or 1985, ACHE has tried to make a recommendation to the Governor and the Legislature that is more akin to what the state might actually provide. *Ibid.*

1015. ACHE publishes its funding recommendations in a document entitled Unified Budget Recommendations, or "UBR." UBRs have been published more or less annually since 1973.

1016. The ordinary graduate and undergraduate programs are referred to as the Regular Academic Program in the ACHE

formula, and the appropriation for these programs depends heavily on the "RAP funding formula." The RAP funding formula does not cover line items (the largest of which are for research and public service), nor does it cover funding for health programs, such as the medical school, nursing school, veterinary school, etc. For the HBUs and all smaller state schools the RAP funding formula covers most of their activities, whereas for schools like AU and UA, a large part of their funding comes outside the RAP funding formula.

1017. The formula generates only about 65% of the state appropriations for the four-year institutions, with the other 35% coming from various line items, which favor the large HWUs. Leslie (10/30/90) 42.

1018. Both the financial expert for the United States, Dr. Leslie, and the expert for ASU and AAMU, Dr. Sullivan, agreed that the RAP funding formula does not treat the HBU's fairly in its recommendations for allocating state funds. Sullivan (2/5/91) 55.

1019. A funding formula is essentially a device for preserving and continuing the status quo, and perpetuating the past allocation of resources. Leslie (10/30/90) 39–41, 43.

1020. The Third Quadrennial Evaluation Committee, a group appointed by the State of Alabama, criticized the Alabama funding formula specifically "for not taking into account the accumulated results of past under-funding of the predominantly black colleges." USX 5, p. 37.

1021. In Alabama, the formula is used for recommendations, because the Legislature is not bound to make its appropriations in line with the formula. Sullivan (2/5/91) 65–67.

1022. There is no standard manner of devising a formula, no right or wrong way. Rather, a formula is a political document, in the sense that it represents value choices, indicating what the authors of the formula believe should be the state's priorities, and how to measure them. While a formula can be quite complex, it typically boils down to a political battle or tug of war. Sullivan (2/5/91) 67–70. ASUX 373, 374.

1023. As indicated by the chart at ¶ 989 supra, the Alabama funding formula includes the following ten elements:

1. instruction
2. academic support
3. research
4. public service
5. library support
6. general administration and student services
7. maintenance of plant
8. general institutional support
9. utilities
10. tuition adjustment

ASUX 324.

1024. The first nine elements are added together to reach a recommended budget need, and then an amount representing tuition is deducted to reflect the fact that tuition will contribute part of the need, and that part therefore need not be appropriated. ASUX 342; Sullivan (2/11/91) 108–12, 118–27.

1025. Of the formula elements, the instructional component, accounts for approximately 50% of the total. Sullivan (2/11/91) 112; ASUX 342. In addition, however, some of the other elements are calculated as a percentage of instruction. Specifically, academic support and public service are tied to instruction, while research and general institutional support are partly tied to instruction. When the factors tied to instruction are added, the combination of the instruction element and the instruction-related elements accounts for nearly two-thirds of the total formula amount. Sullivan (2/11/91) 112; ASUX 342.

1026. This means that the method of calculating the instruction element is at the heart of the formula. And at the heart of the instruction element, in turn, is the "weighted credit hour." This assumes that the cost of instruction varies with different types of courses, or at different levels. For example, a credit hour in an undergraduate course is given a weight ranging

from 1.0 for general courses, to as much as 2.74 for nursing and 3.02 for pharmacy. The differences between undergraduate and graduate level courses are more striking. Master's level courses in engineering and nursing for example, are weighted at 5.46 and 5.82, respectively, while doctoral level courses in engineering and nursing are both given weights of 17.60. ASUX 324.

1027. When the money projected to be available for the RAP formula is divided up, an average for a weighted credit hour is arrived at, called the "instructional multiplier." For 1990–91, the instructional multiplier was $59.56. This means, in effect, that a student in a three-hour undergraduate course with a weight of 1.00, "produces" 3 × $59.56, or $178.68, in instruction costs for the school, whereas a student in a three-hour graduate course with a weight of 17.60, produces 3 × $59.56 × 17.60, or $3144.77. These differences are enhanced by the other elements in the funding formula that are tied to instruction. Sullivan (2/5/91) 77–82; Leslie (10/31/90) 120–22.

1028. Assigning high weights to doctoral courses necessarily favors schools with large doctoral programs, since they are the ones with doctoral courses. Correspondingly, this disfavors schools with no doctoral programs or limited ones. Sullivan (2/5/91) 82.

1029. The range of weights favoring the doctoral institutions is extremely high compared to other states. Sullivan (2/5/91) 82; Leslie (10/30/90) 40; ASUX 343, p. 4.

1030. The Alabama funding formula favors schools with heavy research orientation. It also favors schools with high tuition. Leslie (10/30/90) 42–43.

1031. One of the elements in the Alabama funding formula that is not directly tied to the instruction element or to the weighted credit hour gives a large advantage to schools with doctoral programs. This is the library element, which is theoretically tied to *unweighted* credit hours, but then differentiates sharply between levels, so that for example a credit hour in a doctoral course receives 8.6 times the weight as does a credit hour in an undergraduate course. Sullivan (2/5/91) 82–83; ASUX 324.

1032. Overall, considering all the formula elements, the great bulk of the recommendation is tied to the first element, which in turn is tied directly to the weightings. Sullivan (2/5/91) 86.

1033. Finally, when the first nine elements are totaled, an amount is deducted to represent money that is raised by tuition and therefore does not need to be raised through the appropriation. Rather than deducting the actual amount raised in tuition by each school, however, the formula deducts a standard amount based on the average tuition in the state. This means that a school with lower than average tuition will be harmed by this method because its recommended appropriation will be reduced by an amount greater than it actually collects for tuition. Both the HBUs are disfavored in this way because both have lower than average tuition. Sullivan (2/5/91) 86–90.

1034. If the HBUs raised their tuition, they could overcome the tuition deduction penalty. The large percentage of poor students these schools have make it difficult to do so, however. Sullivan (2/11/91) 121–22.

1035. The HBUs suffer, as do some of the smaller predominately white institutions when compared to the larger schools with substantial graduate programs, in another way. An equal amount is deducted for tuition from every *unweighted* credit hour, even though there is a vast difference in how much the formula recommends for different credit hours. For example, the tuition deduction for 1990–91 was $40.47 per unweighted credit hour. This means that for a student taking a three-hour undergraduate general course, with a weight of 1.0, the tuition deduction is $121.41 (compared to the value of the instruction element of $178.68), whereas for the graduate student taking a three-hour graduate engineering class, the tuition deduction is still $121.41 (although now this has to be compared to the value of the

instruction element of $3,144.77). In other words, the formula recommends a huge state allocation of funds for the graduate course, while recommending that almost all of it be supported by state appropriations, while only a tiny amount has to be made by tuition. Sullivan (2/5/91) 89.

1036. In contrast to the favorable treatment in the formula for graduate programs, the formula virtually ignores the problem of teaching the less prepared students. The formula includes only one feature on this topic, and that is to add an increment of 21% to the weight for remedial courses. The major component of cost is class size, and since remedial classes at ASU for example, are generally about half the size of other classes, the weight that would reflect this difference would be 100% greater, or 2.0, whereas the actual weight for remedial courses in the formula is only 21% greater, or 1.21. Sullivan (2/5/91) 90–92.

1037. There is nothing in the formula that addresses desegregation. Sullivan (2/5/91) 93.

1038. Other states' formulas, however, typically have elements that cover both of these topics, i.e., desegregation and teaching less-prepared students. Sullivan (2/5/91) 93.

1039. Dr. Sullivan did a number of computations to show how seriously the formula affects schools, and how seemingly small changes in the formula could make large differences in the ultimate recommendations. ASUX 371.

1040. For example, if the added costs of educating less-prepared students were recognized by establishing a weight of 2.0 for all students with ACT scores under 15, this would mean a $3,000,000 increase for ASU. Sullivan (2/11/91) 116; ASUX 371.

1041. Likewise, if the wide range of weights between graduate and undergraduate courses were compressed, this would produce an additional $1,000,000 for ASU. Sullivan (2/11/91) 117–18; ASUX 371.

1042. The tuition deduction was formerly done in a different way in the Alabama formula; instead of deducting a standard amount for each school, a specific percentage was set and that percentage of each school's budget was deducted. If that method were still in use, ASU would have gained $650,000 in the most recent year. Sullivan (2/11/91) 120.

1043. If instruction were based upon unweighted credit hours rather than weighted credit hours the figure for instruction for ASU would be nearly $2,000,000 more for 1990–91. Since the instruction-related elements add about 25% of the instruction figure, those elements would increase by about $500,000, for a total effect of $2,500,000 if unweighted credit hours were the basis for instruction and instruction-related costs. Sullivan (2/11/91) 124–26. A similar effect would result at all the smaller colleges and universities in Alabama.

### B. Comparison of Alabama's Funding Formula With Other States' Formulae

1044. Other states have formulas which recognize costs of desegregation and recognize costs of educating less-prepared students. For example:

1045. *Florida.* In order to assist in desegregation, and especially to bolster the HBU, Florida has added 72 extra faculty positions and 32 support positions to Florida A & M University, to strengthen its offerings. ASUX 54; Sullivan (2/11/91) 128–29.

1046. As to less-prepared students, Florida adds 10% to Florida A & M University's counseling allocation, to reflect the fact that less-prepared students need additional counseling. ASUX 54; Sullivan (2/11/91) 133.

1047. *Kentucky.* In order to assist in desegregation, Kentucky has changed the mission of its HBU, Kentucky State University, by making it the statewide liberal arts school. In addition, there is a commitment to giving Kentucky State the lowest faculty-student ratio. This is reflected in the fact that whereas for other schools in the Kentucky system higher weights are given to upper-division undergraduates (juniors and seniors) than to lower-division undergraduates, the Kentucky State University lower-divi-

sion undergraduates are given the higher weights. This means that the need for smaller classes for lower-level undergraduates at Kentucky State University is recognized in the weights. ASUX 55; Sullivan (2/11/91) 135–36.

1048. As to under-prepared students, Kentucky adds $200 into the formula for each freshman and sophomore who scored less than 12 on the ACT. ASUX 55. Sullivan (2/11/91) 137–38. If the same thing were done in Alabama, it would mean an additional $2,000,000 per year for ASU. *Id.* at 138.

1049. *Oklahoma.* Oklahoma has also changed the mission of its HBU, Langston University, and has provided extra funding to accomplish that mission. ASUX 57; Sullivan (2/11/91) 138.

1050. Oklahoma also recognizes that schools vary in the amount of tuition they can realistically charge or collect. First, Oklahoma takes into account all sources of funds available to a school besides the state appropriation, so that a school which has a large endowment, or strong fund-raising ability, has that taken into account in deciding how much of the load should be borne by the state. In addition, the amount expected to be raised by the school varies with the type of school, so that a comprehensive school is not expected to be able to raise as great a percentage of non-state funds as a doctoral research institution. ASUX 57; Sullivan (2/11/91) 139–40.

1051. *South Carolina.* South Carolina sets a specific percentage of the budget that each school is expected to raise by tuition, i.e., it has a percentage tuition deduction (like Alabama's former system). South Carolina, however, goes one step further, and sets the tuition deduct percentage for its HBU, South Carolina State College, at three-quarters of the percentage for other four-year schools in the system. This recognizes the fact that the HBU in South Carolina, because of its many low-income students, simply does not have the ability to charge as much tuition as other schools. ASUX 58; Sullivan (2/11/91) 139–40.

1052. In Alabama, because the tuition deduction is a flat amount based on statewide average tuition, the tuition deduction for the HBU's winds up being higher than for other schools, rather than lower, as in South Carolina. Looking at ASUX 342, the average tuition deduction for all the Alabama schools is 23.8% of the total budget amount (first nine elements), but ASU's tuition deduction is 28.2%. If the South Carolina formula approach were used, ASU's tuition deduction would be three-quarters of the state average, which would bring it down to about 18%. Deducting 18% instead of 28.2% would save ASU $1,500,000 in the formula generated recommendation. ASUX 342; Sullivan (2/11/91) 141–42.

1053. *Virginia.* Virginia has a remedial increment of 1.5. Virginia treats the remedial cost as being comparable to an entire level's difference, *i.e.*, the remedial increment is comparable to the increment for upper-division undergraduates, and are not far below the master's level weights. ASUX 60; Sullivan (2/11/91) 142–43.

1054. *Texas.* Texas was the source of the formula adopted by Alabama. It had one of the largest ranges of differences between undergraduate and graduate programs, and has since narrowed the range. Texas has now added an "equal opportunity" element under which extra money is paid for minority (black) students enrolling in each school. ASUX 59; Sullivan (2/11/91) 147–48.

1055. Alabama considered adopting an "equal opportunity" element like Texas, but declined to do so last year at the time it was adopting a number of changes that would further favor the major doctoral institutions at the expense of the HBU's. Sullivan (2/11/91) 148.

1056. The states that have incorporated formula elements to advance desegregation or to recognize problems in educating less well-prepared students have recognized that these goals require a continuing commitment because the process takes time and the costs don't go away. Sullivan (2/11/91) 150.

1057. The Legislature has frequently deviated from the formula, in order to give

more money to the HBUs than the formula recommended. This began happening in the 1980's, following the redistricting that resulted in the election of larger numbers of black legislators, and particularly about 1985–86, near the time of the first trial in this case. Sullivan (2/11/91) 156–57.

1058. In the 1983–84 preface to the UBR, ACHE noted that the HBUs below-average tuition would cost them about $2,000,000. It recommended an amount for the state's predominately black universities that was approximately $2,000,000 greater than the pure formula numbers and then suggested that the HBUs raise their tuition. ASUX 341 (1983–84 Preface, p. 7).

1059. In 1984–85, ACHE recommended smaller increases to the HBUs than to most of the other schools, on the ground that they had received more than the formula amounts the previous year. ACHE also had an extra $9,000,000 in the budget that year, which it allocated for what it called "critical needs," of which the AU and UA systems received more than half the entire amount, or over $5,000,000, while the HBU's received about 5% each. ASUX 341 (1984–85 Preface, pp. 4, 5); Sullivan (2/11/91) 161–62.

1060. In 1986–87, ACHE reported that it was recommending elimination of many of the line items, but it nonetheless maintained most of the line items for the HWUs especially for the AU and UA system. It recommended maintaining two small line items for the HBUs, and indicated that it intended to do away with these lines once this case is over:

> Maintaining these lines is considered prudent until the current litigation is resolved.

ASUX 341 (1986–87 Preface, p. 3); Sullivan (2/11/91) 162–63.

1061. In 1987–88 every school except the HBUs was recommended for an increase that year by ACHE. The decrease in the HBUs recommended amounts was explained as follows:

The fact that application of the formula provides less funds this year than last year for some institutions represents a healthy correction of prior inequities.

ASUX 341 (1987–88 Preface, p. 1).

1062. In both 1987–88 and 1988–89, ACHE recognized that the Legislature had given the HBUs more than the formula recommendation during the previous year, but characterized that situation as temporary and indicated a desire to study further the circumstances at each university "to determine what, if any, programs or needs generate on-going special appropriations." ASUX 341 (1987–88 Preface, p. A–3, and 1988–89 Preface, p. A–5). Sullivan (2/11/91).

1063. ACHE had traditionally referred to its formula recommendation as the "needs budget," but in 1988–89, it changed the name to "regional standard," thus implying that the formula or formula recommended amounts were based on some regional standard. In 1990–91, ACHE introduced another term, "the index of equity," which was simply a comparison of each HBUs amount to what the ACHE formula would recommend. ASUX 341 (1988–89 Preface, pp. A–5, A–7, and 1989–90 Preface, pp. A–7—A–8); Sullivan (2/11/91) 165–71.

1064. The ACHE staff member responsible for introducing these terms acknowledged that there was no basis for them, that there was nothing regional about the regional standard, and that the index of equity was not related to equity in the sense of fairness, but was rather related only to the ACHE formula. Rutledge (2/20/91) 136–37, 149–55, 156–67.

## C. Description Of How ACHE's 1990– 1991 RAP Formula Works [81]

1065. The formulae for the regular academic programs, which typically account for 65 to 70 percent of the higher education funding, are derived and applied as follows:

1066. The average funding rate per full time equivalent FTE student for regular academic programs of the senior institu-

---

**81.** The following description of ACHE's 1990–91 RAP formula is taken entirely from the report prepared by AU's expert witness Dr. Mary McKeown. Dr. McKeown's report contains a detailed description of the RAP formula and the manner in which it is applied by ACHE to arrive at its unified budget recommendations.

tions of the other southern states, for the last fiscal year, is calculated, using data furnished through the Southern Regional Education Board ("SREB"). This rate is multiplied by the total FTE enrollment for the proceeding year of the Alabama universities, to produce an equivalent total funding amount for the Alabama institutions. These amounts are modified to reflect:

(a) extraordinary items resulting from traditional legislative overrides,

(b) Alabama's system of funding for teacher's retirement and social security, and

(c) inflation anticipated from the last year to the budget year.

1067. The amounts calculated above are directed to institutions according to a formula consisting of the sum of the following elements: (1) weighting factors; (2) general operating revenues per FTE and Alabama's regular academic programs, and (3) other cost factors. The following tables set out the weights assigned to the various academic subdivision groupings, the calculations for general operating appropriations, and the other cost factors which are used in the RAP formula.

### (a) WEIGHTING FACTORS

| Academic Subdivision Groupings | Complexity Indices | | |
|---|---|---|---|
| | Under–Graduate | Graduate Level 1 | Graduate Level 2 |
| 1. Business | 1.12 | 3.27 | 13.45 |
| 2. General | 1.00 | 2.73 | 10.33 |
| 3. Education | 1.04 | 2.30 | 8.79 |
| 4. Nursing, Health | 2.74 | 5.82 | 17.60 |
| 5. Engineering/Architecture | 2.07 | 5.46 | 17.60 |
| 6. Fine Arts | 2.09 | 4.95 | 17.71 |
| 7. Home Economics | 1.39 | 3.34 | 9.31 |
| 8. Science | 1.29 | 5.36 | 17.60 |
| 9. Military Science | 0.12 | xx | xx |
| 10. Law | xx * | 2.31 | xx |
| 11. Agriculture | 1.51 | 4.57 | 16.03 |
| 12. Veterinary Medicine | xx | xx | 20.53 |
| 13. Pharmacy | 3.02 | 5.06 | 19.01 |
| 14. Interdisciplinary | 1.26 | 3.23 | 10.33 |

* Undergraduate Law is treated as Undergraduate Business.

---

### (b) GENERAL OPERATING APPROPRIATIONS
PER FULL TIME EQUIVALENT STUDENT IN PUBLIC HIGHER EDUCATION
SOUTHERN REGION EDUCATION BOARD STATES
1988–89 and

CALCULATION OF ALABAMA REGULAR ACADEMIC PROGRAM
FUNDING TARGET FOR 1990–91

| | Doctoral | | | | Master's | | | Bacca- | All |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | Total | I | II | Total | laureate | Senior |
| SREB States | 5,044 | 4,865 | 4,162 | 4,804 | 3,898 | 3,659 | 3,756 | 3,361 | 4,390 |
| Alabama | 4,674 | 3,950 | 4,386 | 4,496 | 3,395 | 3,894 | 3,786 | 2,424 | 4,227 |
| Arkansas | 4,669 | | | 4,669 | 3,780 | 3,656 | 3,745 | 3,825 | 4,006 |
| Florida | 6,914 | 6,773 | 8,803 | 7,297 | 7,019 | 7,347 | 7,147 | | 7,263 |

| | Doctoral | | | | Master's | | | Bacca- | All |
|---|---|---|---|---|---|---|---|---|---|
| | I | II | III | Total | I | II | Total | laureate | Senior |
| Georgia | 5,788 | 5,549 | | 5,665 | | 3,419 | 3,419 | | 4,551 |
| Kentucky | 4,199 | 4,420 | | 4,294 | 3,842 | 4,122 | 3,934 | | 4,080 |
| Louisiana | 3,551 | | 2,655 | 2,935 | | 2,503 | 2,503 | | 2,796 |
| Maryland | 6,642 | | 5,962 | 6,453 | | 5,244 | 4,508 | 5,686 | 5,648 |
| Mississippi | | 4,137 | 3,447 | 3,982 | | 4,076 | 4,076 | | 3,994 |
| North Carolina | 6,726 | 5,442 | 4,688 | 6,071 | 5,190 | 5,317 | 5,219 | 6,512 | 5,751 |
| Oklahoma | 4,005 | | | 4,005 | | 2,467 | 2,467 | 2,872 | 3,252 |
| South Carolina | 5,370 | 4,847 | 4,711 | 5,102 | | 3,813 | 3,813 | 2,980 | 4,478 |
| Tennessee | 6,086 | 4,914 | 3,987 | 4,810 | | 4,400 | 4,400 | | 4,741 |
| Texas | 4,101 | 4,174 | 3,450 | 3,997 | 2,934 | 3,137 | 2,998 | 3,214 | 3,672 |
| Virginia | 4,979 | 4,719 | 3,861 | 4,716 | | 3,469 | 3,334 | 3,122 | 4,281 |
| West Virginia | 4,448 | | | 4,448 | | | 3,094 | 2,618 | 3,358 |

| | |
|---|---|
| Fall 1988 Alabama FTE Students at all levels | 90,018 |
| 1988–89 SREB Funding Level for Alabama | $418,045,919 |
| Adjusted for Retirement | 352,716,776 |
| Less Line Items (R & PS) | 32,323,049 |
| 1988–89 Level Of Funding | 320,393,727 |
| 1988–89 Inflation (5%) | 336,413,413 |
| 1989–90 Inflation (5.5%) | 354,916,151 |
| SREB Target 1990–91 | $354,916,151 |

### (c) OTHER COST FACTORS

Senior Institutions·

1. Instruction: The three year average of actual on-campus weighted semester credit hours for 1986–87, 1987–88 and 1988–89 is applied to the instructional multiplier. The instructional multiplier for the mean is 59.559158.

2. Academic Support: 5% of the amount generated for instruction.

3. Research: 2% of combined amounts for instruction and academic support plus 5% of 1987–88 sponsored research.

4. Public Service: 2% of combined amounts for instruction and academic support.

5. Library Support: Actual on-campus unweighted semester credit hours (except military science) corresponding to the weighted credit hour value multiplied by the following cost factors:

 | | |
 |---|---|
 | Undergraduate | $ 6.74 |
 | Graduate I (Masters) | 13.54 |
 | Graduate II (Doctoral) | 57.97 |
 | Law | 35.76 |

6. General Administration and Student Services (GA/SS): For institutions with total approved campus headcount enrollment of less than 4,000:

 | | |
 |---|---|
 | 1,000 or fewer | $600.72 |
 | 1,001 to 2,500 | 303.41 |
 | 2,501 to 3,999 | 206.50 |

 For institutions with total approved campus headcount enrollment of 4,000 or greater:

 | | |
 |---|---|
 | First 4,000 | $341.52 |
 | 4,001 to 8,000 | 255.77 |
 | Over 8,000 | 230.05 |

The GA/SS amount is computed based on total approved campus headcount, then distributed proportionately among the GA/SS components of the formula funded lines of the institution.

Example: Total Approved Campus Headcount 4,000
Main–Campus Headcount 3,800
Approved Branch Campus Headcount 200

Total GA/SS = 4,000 × 341.52 = $1,366,080.

Main–Campus: $\underline{3,800}$ × 1,366,080 = $1,297,776

Approved Branch Campus: $\dfrac{200}{4,000}$ × 1,366,080 = $68,304

7. Maintenance of Physical Plant and Custodial Services: Projected gross square feet for September 30, 1990, multiplied by $3.45.

8. General Institutional support: 14% of total amount generated in items 1–7.

9. Utilities: The highest annual consumption rate per gross square foot of E & G floor area for the last three years (July–June, 1986–87, 1987–88, 1988–89) for heat energy and electrical energy were multiplied by projected rates per energy units for 1990–91. The "other" utilities input (water, sewage, and solid waste disposal) was calculated by multiplying the actual rate of consumption per gross square foot of E & G floor area for 1988–89 by a projected rate per energy unit for 1990–91. The projected escalation factors for electricity and other utilities were the same as the inflation factors that were used throughout the calculation of the RAP (1.050 and 1.055). The sum of the projected amounts per gross square foot was then multiplied by the projected gross E & G floor area for September 30, 1990.

10. Tuition Adjustment: The average tuition and fees charged by each institution for an on-campus semester hour of instruction for fall term 1989 were calculated.

The average rate charged each full-time student was $44.97 per semester credit hour.

Ninety percent (90%) of this rate was applied to each institution's actual three year average of unweighted on-campus semester credit hours (except military science) to obtain the amount of tuition and fee revenue to be deducted.

44.97 — Tuition rate per average semester credit hour for Fall 1989
× .90
40.47 — 1990–91 Tuition Adjustment

---

*D. Comments on Alabama's Funding Formula*

1068. The Alabama formula is used to acquire financial resources. It is not a spending plan. Financial accountability practices in Alabama are not such that institutions are expected to expend resources in accordance with the calculations by which they were acquired. For example, while the formula generates a dollar amount for operation and maintenance of the physical plant, there is no commensurate requirement that this money be spent for that purpose. As a consequence, it is the overall amount of money provided to institutions through the formula rather than the amounts generated by sub-compo-nents that is the primary concern. ASUX 343, p. 2.

1069. The RAP formula is surrounded by a series of other elements of the resource allocation process. Primary among them are the formulas that estimate funding needs for the medical and veterinary schools, for university hospitals, and for agricultural experiment/cooperative extension services. ASUX 343, p. 2.

1070. The formula includes significant incentives for growth, particularly at the graduate level. ASUX 343, p. 4.

1071. Because major elements of the formula—instruction, academic support, research, public service, library, general ad-

ministration and student services, and general institutional support—are tied to either student credit hours produced or to the number of head-count students, institutions are rewarded for growth. ASUX 343, p. 4.

1072. In addition, since many of the elements of the formula are directly or indirectly tied to weighted student credit hour ("SCH") and since the weights for doctoral-level education are extremely high relative to weights for undergraduate education, institutions have a strong incentive to offer increasing amounts of doctoral-level education. These rates are generally in line with those in the Texas formulas from which they were derived. Those rates, however, are well above the averages for other states across the country. The rewards for providing doctoral-level education are sufficiently high as to, almost inevitably, create pressures to expand the mission of all four-year institutions to encompass education programs at the doctoral level. ASUX 343, pp. 4–5.

1073. The formula includes a mechanism for providing a 5% state match for external funds received to support research. This creates incentives for all institutions to pursue external research funding regardless of whether or not research activity is within the intended mission, role, and scope of the institution. Further, this five percent is another of those elements that comes off the top in the resource allocation scheme. Therefore, its impact is magnified. ASUX 343, p. 6.

1074. The formula includes factors for both utilities and operation and maintenance of plant based on the gross square footage of campus facilities. The rates associated with these factors are normally adjusted annually to reflect inflation. Also, funds for these functions are set aside early in the calculation process, before the remaining funds are distributed among other institutional functions. As a result, there are incentives in the formula for institutions, individually and collectively, to build additional facilities, particularly if they can be built with state rather than institutional resources. ASUX 343, pp. 6–7.

1075. Formulas are by nature conservative funding mechanisms. This is because they are, by design, promoters of the status quo. The reason is that they are driven by, i.e., based upon, historical funding patterns. In other words, they distribute resources on the basis of how those resources were distributed in the past. USX 5, p. 31.

1076. In deciding how much money to allocate to institutions for the activities they conduct, the designers of formulae must somehow place a dollar value on each unit of activity. Invariably, this requires deciding how much to pay for the education of each student. Generally a value is set for each student credit hour of instruction or for the education of each full-time-equivalent ("FTE") student. An institution's "base" allocation from the state, then, consists of the number of these SCH or FTE units times the dollar value for each unit. Frequently, there are supplemental amounts added on for such functions as research and public service, special adjustments such as for the diseconomies of small size, and special dispensations for miscellaneous factors idiosyncratic to the state and its peculiar institutions. USX 5, pp. 31–32.

1077. To evaluate the impact of formulas to resource allocation one must understand how the unit dollar values are obtained. Without exception, these values derive from how much has been spent in the past to educate a particular kind of student. The amounts spent at some time in the past are divided by the number of students (or SCH's) (or FTE's) present at that time to arrive at a unit value for future allocations. Often, but not always, differentiations are made by such variables as field of study and student or course level (e.g., lower division, upper division, graduate). USX 5, p. 32.

1078. A common approach is to take the budget of a given department, such as physics, for a given year and divide that budget by the number of SCH's or FTE's produced during that year. This average per SCH or FTE figure for all physics departments in the state (or region) or

within a classification of institutions within a state (or region) becomes the amount to be received for each physics student credit hour generated. (This can be also done at each level of instruction.) When these values are multiplied by the number of SCH's or FTE's in the year immediately past or projected for the coming year and the resulting figures are summed for all departments, an institution's base allocation is known. Although there are many variations of this standard model, all state allocation formulas, including Alabama's, work in this general way. USX 5, p. 32.

1079. Although there are many formula variations, all formulas are ultimately driven from some historic distribution of past resources. Thus, formulas merely perpetuate the past. If the past has been noted for inequitable allocations to institutions, so will the future—unless the formula is changed to ignore the inequities of the past. USX 5, pp. 32–33.

1080. The Alabama formula is no exception. The unit values that drive the formula emanate from the allocations and expenditures of the past. USX 5, p. 33.

1081. One reason state appropriations per student are higher at the University of Alabama and Auburn University, is because they have higher enrollments in higher expenditure academic fields and academic levels. USX 5, p. 33.

1082. The traditionally white universities possess far more of the high expenditure curricula and graduate programs. An institution with programs that have spent more money in the past will receive more money in the future. USX 5, p. 33.

1083. Existing curricular distribution among institutions, plus enrollments, is what drives the formula. Typically larger institutions will enjoy economics of scale. Usually this will mean lower costs for educating a given student enrolled in a curriculum common to both the HBUs and HWUs. Smaller institutions typically will have less capability to educate students under a standard formula amount. USX 5, p. 34.

1084. The Alabama formula favors large, complex HWUs. The formula yields

first an amount for instruction based upon institutional enrollments in accordance with weights. This amount, which favors institutions with historically higher expenditure curricula, serves as the base for subsequent formula categories. Under the formulas, the more an institution receives in the instruction category, the more it will receive in most other categories. USX 5, p. 34.

1085. The advantage of the formula to those Alabama institutions having the more complex curricula is extraordinary. The formula illustrates all the advantages of dollar compounding. Almost all formula category yields are compound values of instruction. The institutional support category yields 14 percent of amounts already compounded. In other words, institutional support is calculated as a compound amount of compounded amounts. USX 5, p. 35.

1086. The institutions favored under the formula in Alabama receive another financial advantage in tuition. The institutions with the more complex curricula charge higher tuition; hence, they gain under a tuition adjustment factor in the formula. That factor reduces the overall formula dollar amount by 90 percent of the average state tuition. An institution charging high tuition is permitted to keep the tuition revenue above 90 percent average tuition and have its formula appropriation reduced by a lower average amount, while an institution charging low tuition will have its formula amount reduced as though it were receiving a higher tuition. These latter institutions, which include the HBUs, not only realize less tuition income, their formula based appropriation is also smaller. USX 5, p. 35.

1087. Those HWUs that already gain through the formula core because they possess the curricula which generate extra dollars, also receive other formula amounts for special line items far beyond such amounts for the HBUs. USX 5, p. 36.

1088. The Alabama formula produces more income for institutions with specialized curricula and graduate programs.

With relatively minor exceptions, the formula fails to take into account the diseconomies of small size. The formula compounds the gains from specialized and graduate curricula by utilizing values thus obtained as the basis for determining dollar amounts from other (O & M) formula categories. USX 5, pp. 36–37.

## STATE FUNDING FOR HIGHER EDUCATION

### A. Background

1089. The state annually appropriates funds for the operation of institutions of higher education. For a number of years, funding per student in higher education in Alabama has been below the regional average for the Southeast. Rutledge (2/20/91) 47–48.

1090. Alabama State University's finance expert, Dr. Daniel Sullivan, testified that Alabama devotes a higher percentage of its total state budget to education than does any other state in the country. Sullivan (2/11/91) 220. Auburn University's finance expert, Dr. Mary McKeown, also examined this issue. AUX 281, pp. 6–12, (Tables 1.1 through 1.7). Her data indicate that Alabama's expenditures for higher education are higher per capita than neighboring states and the nation as a whole; and that, in terms of financial capacity as measured by per capita income, Alabama's effort to fund higher education is the second highest in the nation. *Id.* p. 12; McKeown (2/13/91) 18.

1091. Almost half of the total state revenue dollars in Alabama are earmarked for the Alabama Special Educational Trust Fund (hereinafter "the ASETF"). Rowe (2/26/91) 103.

1092. The only fund derived from state taxes in Alabama containing revenues that have not been earmarked for specific purposes is the General Fund. The General Fund makes up only about 10% of the state budget in a typical year. Rowe (2/26/91) 103.

1093. Transfers between the ASETF and the General Fund are virtually nonexistent.

1094. Traditionally, the ASETF is split among three groups of recipients: kindergarten through 12th grade, higher education, and "other."[82] Rowe (2/26/91) 85. Higher education traditionally receives one-third of the amount allocated to education, and senior institutions usually receive 80% of the amount allocated to higher education. *Id.* 42, 104.

1095. Total annual state revenues are currently a little less than six billion dollars. Kindergarten through higher education receive approximately 2.7 billion dollars of that amount. Rowe (2/26/91) 103. For fiscal year 1989–90, noncapital appropriations to Alabama's public senior institutions totaled about $479 million. STX 202.-24, p. 7.

1096. The Alabama Constitution prohibits deficit spending, and payment out of specified funds must be prorated if the appropriations exceeds the amount of projected revenues. Ala.Const. amend. 26. A deficit in one fund triggers proration of that fund, and not any other. In years in which no proration in the ASETF occurs there is usually a balance in the fund at the end of the year. Rowe (2/26/91) 101.

1097. At the time of trial, money payable from the ASETF was being prorated at 3.72 percent.[83] Rowe (2/26/91) 86. When funds from the ASETF are prorated, proration applies across the board. Rowe (2/17/91) 86.

1098. The amount available for appropriation to public senior institutions of higher education in Alabama in a given year depends on the projected size of the ASETF. Sullivan (2/5/91) 50, 57–59. En-

---

**82.** Apparently the state spends considerable sums of money out of the ASETF on entities which cannot properly be classified educational. *See* Rowe (2/26/91) 80.

**83.** State Defendants have moved the Court to take judicial notice that, as of June 1, 1991, proration of the ASETF has increased to 6.5% and the General Fund has been prorated by 1.6 percent. The Court notes the request but denies the motion since the record in this case is closed.

hanced funding for any one or more college or university would reduce available funds for the remaining institutions.

1099. The way in which the State of Alabama appropriates money to its public institutions of higher education was a matter of stipulation among the parties. Appropriations are determined annually by the State Legislature. They are influenced, though not determined, by recommendations of the Governor as a part of overall state budget recommendations. The Governor's recommendations are influenced though not determined by recommendations of ACHE. SOF ¶ 240.

1100. The budgetary cycle for higher education begins when the Governor's budget office sends out forms for institutions of public higher education to use in making their budgetary requests for state appropriations. Rowe (2/26/91) 3–4. The institutions send the completed forms to the executive budget office, with copies to ACHE and the legislative fiscal office. *Id.* 4. ACHE holds hearings and then makes a unified budget recommendation for higher education to the Governor and Legislature. *Ibid.* The Governor's office and the Legislature also hold hearings jointly, usually after they receive ACHE's recommendation. *Id.* 4–5.

1101. Early in the legislative session, the Governor presents the overall budget recommendation to the Legislature. Hunt (2/7/91) 103. The Governor's recommendation consists of three parts: his oral message to the Legislature; an Executive Budget document containing a year of budget history, projections for the current year; and, recommended appropriations. Rowe (2/26/91) 5. Recommendations for higher education are included in this package.

1102. The Legislature then acts on the recommendations. The Governor does not exercise any line-item veto power. Rowe (2/26/91) 5.

1103. In recent years, the bulk of the money for higher education has been appropriated under what the Legislature refers to as operations and maintenance, some money is appropriated by specific line item. Rutledge (2/20/91) 72, 73, 75–76.

1104. Except as to special line items, public colleges in Alabama are not required to spend state funds appropriated to them in any particular manner. Once such funds are appropriated, it is the prerogative of each institution to determine how the funds are spent. SOF ¶ 246.

### B. Importance Of Funding To A University Or College

1105. The funds available to an institution and its students have critical effects both on the ability of the institution to educate its students and on its ability to desegregate by attracting other-race students.

1106. Over a period of time the funds available to an institution impact the nature and reputation of the institution, and the mission it can carry out for the state and its citizens. To change these long-term characteristics takes a long-term effort. Specifically, the effects of long-term discrimination in funding cannot be overcome simply by additional funding for a short period.

### C. Historical Funding Patterns

1107. During the time of *de jure* segregation, the HWU's were better funded than the HBU's as a whole, and each HWU was better funded than either HBU. This was true not only for UA and AU, but for the white normal schools as well.

1108. The historically deficient funding of the HBU's was recognized in several major studies of the Alabama education system, including the 1919 study, the 1945 study and the 1958 study. *See* USX 12, pp. 379, 427–29; USX 13, pp. 333–34; USX 14, p. 162.

1109. From 1891 through 1950, UA received a total of $19,731,891.21 in state funds, whereas ASU received a total of $2,805,445.12, for a ratio of 7.0 to 1. STX 150.

1110. From 1891 through 1950, AU received a total of $30,633,807.05 in state funds, whereas AAMU received a total of $1,699,601.81, for a ratio of 18.0 to 1. STX 150.

1111. From 1891 through 1950, JSU received $2,215,281.27, LU received $2,261,-360.91, and UNA collected $2,353,172.64. STX 150.

1112. State exhibit 150 shows the basic state funding for the various higher education units in Alabama from 1981 through 1982 as follows:

| | | 1982 | 1981 | 1980 | 1979 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 9,703,094.30 | 9,146,893.24 | 8,129,975.15 | 7,445,416.66 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 8,352,663.65 | 7,882,873.33 | 7,198,326.03 | 6,533,115.83 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 60,441,721.59 | 58,379,458.61 | 52,583,120.06 | 48,126,773.96 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | 6,702,137.30 | 6,320,040.62 | 5,653,328.63 | 5,178,676.30 |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 12,503,987.49 | 11,802,945.23 | 10,796,487.50 | 9,874,208.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 3,901,244.10 | 3,671,254.40 | 3,142,481.16 | 2,879,889.41 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 8,395,679.58 | 7,932,687.42 | 7,258,353.77 | 6,591,291.58 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | 507,159.50 | 473,605.69 | 494,275.82 | 453,679.99 |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 6,502,073.50 | 6,118,037.60 | 5,251,166.23 | 4,762,084.78 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 44,914,323.09 | 42,367,824.24 | 38,099,680.85 | 34,733,152.42 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 68,371,802.66 | 64,519,164.78 | 58,485,027.26 | 53,473,706.56 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | 12,003,828.00 | 11,326,831.90 | 10,242,209.79 | 9,275,092.64 |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 7,952,536.05 | 7,505,390.03 | 6,838,062.40 | 6,257,716.66 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | 25,546,146.62 | 24,107,434.55 | 21,917,436.25 | 19,840,540.17 |
| | 2. Capital | | | | |

| | | 1978 | 1977 | 1976 | 1975 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 6,951,132.00 | 6,194,000.00 | 6,194,000.00 | 3,919,021.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 5,936,199.00 | 5,414,000.00 | 5,414,000.00 | 3,975,744.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 44,939,592.00 | 39,255,800.00 | 40,320,000.00 | 30,508,124.00 |
| | 2. Capital | | | | |

| | | 1978 | 1977 | 1976 | 1975 |
|---|---|---|---|---|---|
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | 4,753,001.00 | 4,343,600.00 | 4,520,000.00 | 2,391,133.00 |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 9,120,000.00 | 7,277,720.00 | 7,570,000.00 | 6,096,612.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 2,681,554.00 | 2,394,000.00 | 2,493,000.00 | 1,927,425.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 6,023,364.00 | 5,360,840.00 | 5,770,000.00 | 4,713,931.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | 223,000.00 | 201,000.00 | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 4,705,276.00 | 4,309,280.00 | 4,478,000.00 | 3,476,928.00 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 33,377,257.00 | 29,917,000.00 | 31,071,000.00 | 24,177,555.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 47,907,789.00 | 37,057,200.00 | 38,343,400.00 | 33,015,433.00 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | 8,733,764.00 | 7,299,760.00 | 7,524,000.00 | 5,616,090.00 |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 5,728,623.00 | 4,818,000.00 | 5,018,000.00 | 3,778,902.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | 18,904,515.00 | 15,104,320.00 | 15,402,000.00 | 11,034,204.00 |
| | 2. Capital | | | | |

| | | 1974 | 1973 | 1972 | 1971 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 2,825,731.00 | 2,832,416.00 | 2,832,416.00 | 2,513,474.90 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 3,804,796.00 | 2,833,732.00 | 2,736,574.00 | 2,539,848.60 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 29,390,665.00 | 21,813,840.00 | 21,333,640.00 | 19,237,079.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | 2,109,766.00 | 1,575,000.00 | 1,555,200.00 | 1,155,280.00 |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 5,878,226.00 | 4,245,133.00 | 4,245,133.00 | 3,477,733.92 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 1,864,269.00 | 1,291,906.00 | 1,291,906.00 | 1,111,474.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 4,571,004.00 | 3,399,053.00 | 3,176,082.00 | 2,472,432.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1974 | 1973 | 1972 | 1971 |
|---|---|---|---|---|---|
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 3,414,159.00 | 2,420,689.00 | 2,420,689.00 | 1,886,329.00 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 22,975,891.00 | 16,502,271.00 | 16,277,270.00 | 13,289,041.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 22,174,238.00 | 14,593,989.00 | 14,580,589.00 | 10,143,639.00 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | 5,171,078.00 | 3,697,338.00 | 3,472,338.00 | 2,242,202.00 |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 3,613,820.00 | 2,655,961.00 | 2,655,961.00 | 2,039,071.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | 9,366,884.00 | 6,559,732.00 | 5,591,732.00 | 4,791,625.00 |
| | 2. Capital | | | | |

| | | 1970 | 1969 | 1968 | 1967 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 2,089,452.00 | 2,548,113.00 | 2,008,113.00 | 1,988,231.00 |
| | 2. Capital | | | | 800,000.00 |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 2,364,000.00 | 2,029,185.00 | 2,779,185.00 | 2,009,094.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 18,661,077.00 | 15,600,750.00 | 15,600,750.00 | 15,139,357.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | 1,000,000.00 | 200,000.00 | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 3,565,669.00 | 345,500.00 | 345,500.00 | 95,500.00 |
| | 2. Capital | | 200,000.00 | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 1,387,834.00 | 88,500.00 | 88,500.00 | 88,500.00 |
| | 2. Capital | | 250,000.00 | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 2,296,851.00 | 103,500.00 | 88,500.00 | 88,500.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 2,025,562.00 | 1,567,006.00 | 1,567,006.00 | 1,551,550.00 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 13,247,607.00 | 7,192,342.00 | 10,686,026.67 | 10,496,090.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 10,342,217.00 | 10,786,831.00 | 7,023,842.00 | 5,771,130.00 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | 2,191,033.00 | 2,666,123.00 | 1,666,123.00 | 1,649,627.00 |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 2,092,166.00 | 95,500.00 | 95,500.00 | 95,500.00 |
| | 2. Capital | | | | |

| | | 1970 | 1969 | 1968 | 1967 |
|---|---|---|---|---|---|
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | 4,335,125.00 | 3,133,155.00 | 3,133,155.00 | 3,102,134.00 |
| | 2. Capital | | | | |

| | | 1966 | 1965 | 1964 | 1963 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 1,555,315.00 | 1,316,197.00 | 1,265,291.00 | 1,039,902.00 |
| | 2. Capital | 100,000.00 | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 1,576,178.00 | 1,369,876.00 | 1,316,895.00 | 1,082,313.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 11,999,762.00 | 10,142,032.00 | 9,754,602.00 | 7,893,722.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 95,500.00 | 95,500.00 | 95,500.00 | 95,500.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 88,500.00 | 88,500.00 | 88,500.00 | 88,500.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 88,500.00 | 88,500.00 | 88,500.00 | 88,500.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 1,180,030.00 | 998,095.00 | 962,221.00 | 732,826.00 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 8,364,210.00 | 7,067,389.00 | 6,794,412.00 | 5,576,425.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 4,576,335.00 | 3,805,156.00 | 3,658,506.00 | 3,008,942.00 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | 800,000.00 | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 95,500.00 | 95,500.00 | 95,500.00 | 95,500.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | 2,462,500.00 | 709,000.00 | 509,000.00 | |
| | 2. Capital | | | | |

| | | 1962 | 1961 | 1960 | 1959 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 912,870.28 | 763,755.83 | 812,658.43 | 651,105.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 1,019,023.44 | 928,987.26 | 988,367.79 | 892,255.00 |
| | 2. Capital | | | | |

| | | 1962 | 1961 | 1960 | 1959 |
|---|---|---|---|---|---|
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 7,432,179.68 | 6,919,730.94 | 7,208,549.05 | 5,617,830.40 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 89,427.00 | 81,999.64 | 87,526.11 | 92,119.30 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 82,872.00 | 75,989.20 | 81,110.59 | 85,367.10 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 82,872.00 | 75,989.20 | 81,110.59 | 85,367.10 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 714,977.88 | 628,898.62 | 669,216.42 | 607,698.00 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 5,249,873.44 | 4,880,280.42 | 5,038,481.53 | 3,969,329.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 2,833,511.40 | 2,633,314.19 | 2,801,676.08 | 2,230,637.50 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 89,427.00 | 81,999.64 | 87,526.11 | 92,119.30 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1958 | 1957 | 1956 | 1955 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 622,231.00 | 588,264.19 | 624,818.90 | 500,000.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 852,686.92 | 753,561.56 | 808,577.50 | 750,000.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 5,161,936.19 | 4,889,739.49 | 5,200,303.32 | 3,727,100.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 8,803,416.00 | 92,858.23 | 111,157.44 | 95,500.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 81,581.40 | 86,051.87 | 96,681.45 | 88,500.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 81,581.40 | 86,051.87 | 103,042.35 | 88,500.00 |
| | 2. Capital | | | | |

| | | 1958 | 1957 | 1956 | 1955 |
|---|---|---|---|---|---|
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 562,312.46 | 554,232.37 | 588,672.36 | 515,000.00 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 3,559,161.30 | 3,412.904.63 | 3,629,404.92 | 2,577,500.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 2,036,769.46 | 1,994,166.98 | 2,120,541.38 | 1,525,010.00 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 88,034.16 | 92,858.23 | 110,613.52 | 95,500.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1954 | 1953 | 1952 | 1951 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 517,649.76 | 500,000.00 | 500,000.00 | 390,060.20 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 776,474.86 | 750,000.00 | 750,000.00 | 396,000.00 |
| | 2. Capital | | | | 200,000.00 |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 3,857,664.87 | 3,518,100.00 | 3,518,100.00 | 3,064,669.06 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 108,423.02 | 95,500.00 | 95,500.00 | 94,545.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 96,852.57 | 88,500.00 | 88,500.00 | 87,615.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 100,760.58 | 88,500.00 | 88,500.00 | 87,615.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 533,179.26 | 515,000.00 | 515,000.00 | 480,960.29 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 2,668,484.51 | 2,577,500.00 | 2,577,500.00 | 2,332,156.40 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | 1,578,842.10 | 1,460,010.00 | 1,460,010.00 | 1,074,144.64 |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | 1954 | 1953 | 1952 | 1951 |
|---|---|---|---|---|
| M. Univ. of N. Ala.—Florence | | | | |
| 1. Non-capital | 108,136.84 | 95,500.00 | 95,500.00 | 94,545.00 |
| 2. Capital | | | | |
| N. Univ. of South Alabama | | | | |
| 1. Non-capital | | | | |
| 2. Capital | | | | |

| | 1950 | 1949 | 1948 | 1947 |
|---|---|---|---|---|
| A. Alabama A & M University | | | | |
| 1. Non-capital | 310,200.00 | 225,000.00 | 225,000.00 | 130,000.00 |
| 2. Capital | | | | |
| B. Alabama State University | | | | |
| 1. Non-capital | 371,584.00 | 271,000.00 | 271,000.00 | 171,000.00 |
| 2. Capital | | | | |
| C. Auburn University—Auburn | | | | |
| 1. Non-capital | 3,302,784.00 | 2,851,584.00 | 2,291,100.00 | 1,140,398.86 |
| 2. Capital | | | | |
| D. Auburn Univ.—Montgomery | | | | |
| 1. Non-capital | | | | |
| 2. Capital | | | | |
| E. Jacksonville State University | | | | |
| 1. Non-capital | 90,916.00 | 95,500.00 | 95,500.00 | 67,500.00 |
| 2. Capital | | | | |
| F. Livingston University | | | | |
| 1. Non-capital | 84,252.00 | 88,500.00 | 88,500.00 | 67,500.00 |
| 2. Capital | | | | |
| G. Troy State Univ.—Troy | | | | |
| 1. Non-capital | 84,252.00 | 88,500.00 | 88,500.00 | 67,500.00 |
| 2. Capital | | | | |
| H. Troy State Univ.—Montg'y | | | | |
| 1. Non-capital | | | | |
| 2. Capital | | | | |
| I. University of Montevallo | | | | |
| 1. Non-capital | 451,200.00 | 451,200.00 | 450,000.00 | 310,519.98 |
| 2. Capital | | | | |
| J. Univ. of Alabama—Tuscaloosa | | | | |
| 1. Non-capital | 2,187,850.00 | 2,187,850.00 | 1,860,000.00 | 785,438.86 |
| 2. Capital | | | | |
| K. Univ. of Alabama—B'ham | | | | |
| 1. Non-capital | 1,007,680.00 | 1,007,680.00 | 725,000.00 | |
| 2. Capital | | | | |
| L. Univ. of Alabama—Huntsville | | | | |
| 1. Non-capital | | | | |
| 2. Capital | | | | |
| M. Univ. of N. Ala.—Florence | | | | |
| 1. Non-capital | 90,916.00 | 95,500.00 | 95,500.00 | 67,500.00 |
| 2. Capital | | | | |
| N. Univ. of South Alabama | | | | |
| 1. Non-capital | | | | |
| 2. Capital | | | | |

| | 1946 | 1945 | 1944 | 1943 |
|---|---|---|---|---|
| A. Alabama A & M University | | | | |
| 1. Non-capital | 130,000.00 | 81,000.00 | 81,000.00 | 30,000.00 |
| 2. Capital | | | | |

| | | 1946 | 1945 | 1944 | 1943 |
| --- | ---------------------------- | ---- | ---- | ---- | ---- |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 171,000.00 | 131,000.00 | 131,000.00 | 67,500.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 1,140,393.86 | 1,040,398.86 | 1,040,398.86 | 866,999.05 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 310,519.98 | 294,623.98 | 294,623.98 | 245,519.98 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 785,438.86 | 685,438.86 | 685,438.86 | 571,199.05 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1942 | 1941 | 1940 | 1939 |
| --- | ---------------------------- | ---- | ---- | ---- | ---- |
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 30,000.00 | 30,000.00 | 25,000.00 | 17,500.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 866,999.05 | 866,999.05 | 866,999.05 | 714,699.05 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |

| | | 1942 | 1941 | 1940 | 1939 |
|---|---|---|---|---|---|
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 245,519.98 | 245,519.98 | 245,519.98 | 205,119.98 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 571,199.05 | 571,199.05 | 571,199.05 | 393,899.05 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 67,500.00 | 67,500.00 | 67,500.00 | 67,500.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1938 | 1937 | 1936 | 1935 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 17,500.00 | 4,375.00 | 5,276.41 | 10,593.90 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 67,500.00 | 16,875.00 | 20,351.86 | 31,193.18 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 714,699.05 | 178,674.76 | 204,282.43 | 328,411.17 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 67,500.00 | 16,875.00 | 20,351.85 | 31,193.18 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 67,500.00 | 16,875.00 | 20,351.86 | 31,193.18 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 67,500.00 | 16,875.00 | 20,351.86 | 31,193.18 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 205,119.98 | 51,280.00 | 58,629.44 | 110,353.21 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 393,899.05 | 98,474.76 | 112,588.17 | 212,466.72 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1938 | 1937 | 1936 | 1935 |
|---|---|---|---|---|---|
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 67,500.00 | 16,875.00 | 20,351.85 | 31,193.18 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1934 | 1933 | 1932 | 1931 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 10,595.63 | 8,560.87 | 10,000.00 | 10,000.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 38,542.35 | 28,398.75 | 75,000.00 | 75,000.00 |
| | 2. Capital | | | | 37,500.00 |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 341,267.46 | 277,983.24 | 808,635.78 | 871,135.78 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 41,847.41 | 30,985.92 | 35,000.00 | 35,000.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 38,559.90 | 30,628.98 | 35,000.00 | 75,000.00 |
| | 2. Capital | | | | 100,000.00 |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 38,915.15 | 38,675.71 | 35,000.00 | 75,000.00 |
| | 2. Capital | | | | 75,000.00 |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 113,049.44 | 92,094.90 | 299,420.43 | 399,420.43 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 243,817.14 | 198,465.78 | 570,855.78 | 695,855.78 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 41,391.85 | 33,444.77 | 35,000.00 | 75,000.00 |
| | 2. Capital | | | | 25,000.00 |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1930 | 1929 | 1928 | 1927 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 25,000.00 | 25,000.00 | 25,000.00 | 15,000.00 |
| | 2. Capital | 50,000.00 | 50,000.00 | | |

| | | 1930 | 1929 | 1928 | 1927 |
|---|---|---|---|---|---|
| B. | Alabama State University | | | | |
| | 1. Non-capital | 75,000.00 | 60,000.00 | 40,000.00 | 20,000.00 |
| | 2. Capital | 87,500.00 | 37,500.00 | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 908,135.78 | 944,082.13 | 701,785.78 | 319,780.00 |
| | 2. Capital | 187,500.00 | 250,000.00 | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 75,000.00 | 75,000.00 | 75,000.00 | 40,000.00 |
| | 2. Capital | 125,000.00 | 75,000.00 | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 75,000.00 | 75,000.00 | 75,000.00 | 40,000.00 |
| | 2. Capital | 75,000.00 | 75,000.00 | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 75,000.00 | 75,000.00 | 75,000.00 | 40,000.00 |
| | 2. Capital | 150,000.00 | 100,000.00 | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 297,587.09 | 295,753.76 | 286,587.09 | 98,963.32 |
| | 2. Capital | 100,000.00 | 200,000.00 | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 567,605.78 | 564,355.78 | 548,105.78 | 215,500.00 |
| | 2. Capital | 125,000.00 | 187,500.00 | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 75,000.00 | 75,000.00 | 75,000.00 | 40,000.00 |
| | 2. Capital | 75,000.00 | 100,000.00 | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1926 | 1925 | 1924 | 1923 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 20,000.00 | 20,000.00 | 20,000.00 | 21,999.98 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 319,780.00 | 319,780.00 | 301,780.00 | 283,780.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 40,000.00 | 40,000.00 | 40,000.00 | 42,999.99 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 40,000.00 | 40,000.00 | 40,000.00 | 42,499.99 |
| | 2. Capital | | | | |

| | | 1926 | 1925 | 1924 | 1923 |
|---|---|---|---|---|---|
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 40,000.00 | 40,000.00 | 40,000.00 | 72,499.99 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 96,155.74 | 85,473.46 | 85,391.96 | 85,306.96 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 215,500.00 | 215,500.00 | 215,500.00 | 215,500.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 40,000.00 | 40,000.00 | 40,000.00 | 49,499.99 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1922 | 1921 | 1920 | 1919 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 4,000.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 20,000.00 | 20,000.00 | 18,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 352,780.00 | 352,780.00 | 185,280.00 | 174,280.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 44,305.96 | 44,305.96 | 28,000.00 | 20,000.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 37,500.00 | 37,500.00 | 27,500.00 | 20,000.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 32,500.00 | 32,500.00 | 27,500.00 | 20,000.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 75,056.52 | 75,056.52 | 65,824.61 | 56,673.23 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 278,000.00 | 278,000.00 | 121,000.00 | 121,000.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1922 | 1921 | 1920 | 1919 |
|---|---|---|---|---|---|
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 44,500.00 | 44,500.00 | 34,500.00 | 20,000.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1918 | 1917 | 1916 | 1915 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 1,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 7,500.00 | 15,000.00 | 15,000.00 | 10,000.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 49,890.00 | 87,280.00 | 87,280.00 | 88,440.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 15,000.00 | 20,000.00 | 20,000.00 | 20,000.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 15,000.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 15,000.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 40,866.16 | 54,427.68 | 54,427.68 | 29,120.63 |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 49,500.00 | 71,000.00 | 71,000.00 | 42,000.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 15,000.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1914 | 1913 | 1912 | 1911 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| | 2. Capital | | | | |

| | | 1914 | 1913 | 1912 | 1911 |
|---|---|---|---|---|---|
| B. | Alabama State University | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 5,000.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 98,480.00 | 75,460.00 | 87,280.00 | 80,530.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 20,000.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 20,000.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 20,000.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | 162,544.24 | 40,111.35 | 62,555.63 | |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 158,500.00 | 65,750.00 | 93,500.00 | 87,000.00 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 57,500.00 | 20,000.00 | 20,000.00 | 15,000.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | | 1910 | 1909 | 1908 | 1907 |
|---|---|---|---|---|---|
| A. | Alabama A & M University | | | | |
| | 1. Non-capital | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| | 2. Capital | | | | |
| B. | Alabama State University | | | | |
| | 1. Non-capital | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| | 2. Capital | | | | |
| C. | Auburn University—Auburn | | | | |
| | 1. Non-capital | 114,780.00 | 120,083.57 | 146,876.43 | 31,380.00 |
| | 2. Capital | | | | |
| D. | Auburn Univ.—Montgomery | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| E. | Jacksonville State University | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 10,000.00 |
| | 2. Capital | | | | |
| F. | Livingston University | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 10,000.00 |
| | 2. Capital | | | | |

| | | 1910 | 1909 | 1908 | 1907 |
|---|---|---|---|---|---|
| G. | Troy State Univ.—Troy | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 10,000.00 |
| | 2. Capital | | | | |
| H. | Troy State Univ.—Montg'y | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| I. | University of Montevallo | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| J. | Univ. of Alabama—Tuscaloosa | | | | |
| | 1. Non-capital | 180,000.00 | 236,000.00 | 199,746.05 | 77,253.95 |
| | 2. Capital | | | | |
| K. | Univ. of Alabama—B'ham | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| L. | Univ. of Alabama—Huntsville | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |
| M. | Univ. of N. Ala.—Florence | | | | |
| | 1. Non-capital | 15,000.00 | 15,000.00 | 15,000.00 | 10,000.00 |
| | 2. Capital | | | | |
| N. | Univ. of South Alabama | | | | |
| | 1. Non-capital | | | | |
| | 2. Capital | | | | |

| | 1906 | 1905 | 1904 | 1903 |
|---|---|---|---|---|
| Normal Schools: | | | | |
| Florence | 10,000.00 | 10,000.00 | 10,000.00 | 7,500.00 |
| Jacksonville | 10,000.00 | 10,000.00 | 10,000.00 | 7,500.00 |
| Livingston | 10,000.00 | 10,000.00 | 10,000.00 | 7,500.00 |
| Troy | 10,000.00 | 10,000.00 | 10,000.00 | 7,500.00 |
| Montgomery | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Building | | | | |
| Huntsville | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| Tuskegee | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Colleges of Agriculture and Mechanical Arts* | 10,293.75 | 28,781.25 | 24,775.00 | 25,000.00 |
| University of Alabama Land Fund | 27,000.00 | 36,000.00 | 36,000.00 | 35,500.00 |
| Renewal of Special App.** | | | | 2,500.00 |
| Agricultural and Mechanical College | 20,280.00 | 20,280.00 | 20,280.00 | 20,280.00 |
| Alabama Poly. Institute State Bd. of Horticulture*** | | 1,500.00 | 1,500.00 | 1,500.00 |
| Medical College of Alabama | | | | |
| Florence State Normal Repair Buildings and Grounds | | | | |

*A & M (Auburn)—Federal
Huntsville Normal—Federal
(Morrill Fund)

**December 5, 1990

***March 5, 1903

| | 1902 | 1901 | 1900 | 1899 |
|---|---|---|---|---|
| Normal Schools: | | | | |
| Florence | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Jacksonville | 7,500.00 | 7,500.00 | 2,500.00 | 2,500.00 |
| Livingston | 7,500.00 | 7,500.00 | 2,500.00 | 2,500.00 |
| Troy | 7,500.00 | 7,500.00 | 5,000.00 | 5,000.00 |
| Montgomery | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Building | | | | |
| Huntsville | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| Tuskegee | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Colleges of Agriculture and Mechanical Arts* | 25,000.00 | 30,575.00 | 24,962.50 | 24,224.50 |
| University of Alabama | 24,000.00 | 34,000.00 | 34,000.00 | 34,000.00 |
| Land Fund | | 66,740.98 | 1,000.00 | 3,241.86 |
| Renewal of Special App.** | 10,000.00 | | | |
| Agricultural and Mechanical College | 20,280.00 | 20,280.00 | 20,280.00 | 20,280.00 |
| Alabama Poly. Institute | | | | |
| State Bd. of Horticulture*** | | | | |
| Medical College of Alabama | | | | |
| Florence State Normal | | | | |
| Repair Buildings and | | | | |
| Grounds | 5,000.00 | | | |

*A & M (Auburn)—Federal
Huntsville Normal—Federal
(Morrill Fund)

**December 5, 1900

***March 5, 1903

| | 1898 | 1897 | 1896 | 1895 |
|---|---|---|---|---|
| Normal Schools: | | | | |
| Florence | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Jacksonville | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Livingston | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Troy | 5,000.00 | 5,000.00 | 5,000.00 | 4,000.00 |
| Montgomery | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Building | | | | |
| Huntsville | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| Tuskegee | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Colleges of Agriculture and Mechanical Arts* | 23,149.75 | 23,238.25 | 22,000.00 | 18,547.50 |
| University of Alabama | 37,000.00 | 21,000.00 | 24,000.00 | 24,000.00 |
| Land Fund | 2,052.32 | | 3,515.82 | 4,607.88 |
| Renewal of Special App.** | | | | |
| Agricultural and Mechanical College | 20,280.00 | 20,280.00 | 20,280.00 | 20,280.00 |
| Alabama Poly. Institute | | | | |
| State Bd. of Horticulture*** | | | | |
| Medical College of Alabama | | | | |
| Florence State Normal | | | | |
| Repair Buildings and | | | | |
| Grounds | | | | |

*A & M (Auburn)—Federal
Huntsville Normal—Federal
(Morrill Fund)

**December 5, 1900

***March 5, 1903

| | 1894 | 1893 | 1892 | 1891 |
|---|---|---|---|---|
| Normal Schools: | | | | |
| Florence | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Jacksonville | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Livingston | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Troy | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Montgomery | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 |
| Building | | | | 3,000.00 |
| Huntsville | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 |
| Tuskegee | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| Colleges of Agriculture and Mechanical Arts* | 23,452.50 | 18,000.00 | 17,000.00 | 31,000.00 |
| University of Alabama | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 ** |
| Land Fund | 5,632.33 | 9,096.86 | 29,193.40 | 4,767.45 |
| Renewal of Special App.*** | | | | |
| Agricultural and Mechanical College | 20,280.00 | 20,280.00 | 20,280.00 | 20,280.00 ** |
| Alabama Poly. Institute | | | | |
| State Bd. of Horticulture**** | | | | |
| Medical College of Alabama | | | 5,000.00 | |
| Florence State Normal Repair Buildings and Grounds | | | | |

*A & M (Auburn)—Federal
Huntsville Normal—Federal
 (Morrill Fund)

**Interest on University Fund

***December 5, 1900

****March 5, 1903

1113. Comparing the state funds appropriated to the HWU's and to the HBU's, respectively, the following chart shows selected years with the disparity during the time of *de jure* segregation.

NON–CAPITAL STATE APPROPRIATIONS

| YEAR | TBI | TWI | TWI/TBI |
|---|---|---|---|
| 1910 | 11,500 | 354,780 | 30.9:1 |
| 1915 | 14,000 | 224,560 | 16.0:1 |
| 1920 | 33,000 | 489,604 | 14.8:1 |
| 1925 | 35,000 | 780,763 | 22.3:1 |
| 1930 | 100,000 | 2,073,328 | 20.7:1 |
| 1935 | 41,000 | 776,003 | 18.6:1 |
| 1940 | 121,500 | 2,069,718 | 17.0:1 |
| 1945 | 241,000 | 2,435,461 | 10.1:1 |
| 1950 | 681,784 | 8,139,884 | 11.9:1 |
| 1955 | 1,250,000 | 9,652,644 | 7.7:1 |
| 1960 | 1,801,026 | 18,395.109 | 10.2:1 |
| 1965 | 2,686,073 | 26,389,090 | 9.8:1 |
| 1970 | 5,453,452 | 61,145,141 | 11.2:1 |
| 1975 | 7,894,765 | 126,736,337 | 10.1:1 |
| 1980 | 15,328,301 | 220,761,629 | 14.4:1 |
| 1985 | 22,052,000 | 339,237,000 | 15.4:1 |

## NON-CAPITAL STATE APPROPRIATIONS

| YEAR | TBI | TWI | TWI/TBI |
|------|-----|-----|---------|
| 1990 | 34,174,000 | 475,430,900 | 13.9:1 |
| 1992 | 37,718,600 | 533,992,600 | 14.2:1 |

Source: Figures for 1910 through 1980 are from STAX 150 except that appropriations from the Teacher Training Equalization Fund have been added from 1940 (when they can first be traced) through 1965 (the last year shown before the Fund was eliminated in 1968). Figures for 1985 and 1990 are from ASUX 338. Figures for 1992 are the ACHE recommendations for 1991–92, and are from ASUX 346, Table 2.

1114. During the years of *de jure* segregation, the HWU's were treated better with regard to special appropriations, dedicated funds such as fertilizer taxes, capital appropriations and capital bond issues, and other funds over which the state had control or influence, such as federal funds and charitable contributions.

1115. A major example of disparity in specialized appropriations was the Teacher Training Equalization Fund, which was created in 1927. In the early years, most of that fund was distributed to UA, AU, and UM. In the 1930's small portions of the fund went to ASU. Very soon, however, the pattern was established by which the entire fund was given to the SBE to divide up among the white normal schools, specifically TSU, JSU, LU, and UNA. By the 1960's, the fund amounted to several million dollars, and in its last year, 1967, it amounted over $6,000,000. ASUX 412–437.

1116. For more than 100 years, the State of Alabama has made an annual appropriation to UA (now over $60,000) representing imputed interest on state funds which were lost when the Bank of Alabama failed in 1837. Similar annual appropriations are made to AU and UM. No funds of this sort have ever been appropriated to the HBU's. *See e.g.*, ASUX 437, p. 2846; ASUX 318, p. 74; Thornton (11/5/90) 34–37 and 106.

### D. *Historical Differences Cannot Be Made Up Overnight*

1117. Inequality in funding over a number of years cannot be made up overnight. The funding level over a period of years affects a school's mission, program, facilities, and reputation, all of which can then change only very slowly. Leslie (10/30/90) 30.

1118. Of the major considerations that can affect raw financial comparisons—such as economy of scale, enrollment trends, and historical patterns—the historical patterns are the most important. This is because historical deficits tend to continue over a period of time, and become cumulative, which, of course, means they cannot be erased overnight. Leslie (10/30/90) 30; Leslie (10/31/90) 99.

1119. Even if the reality could be changed quickly, the perceptions may take much, much longer:

it takes a long, long time to turn an institution around, not only in reality, but even in the perceptions that people have of the place, how attractive it will be to students who have known historically that an institution has been under funded, has been in comparative terms low quality.

Leslie (10/31/90) 100.

1120. The historical pattern would affect programs, curricula and reputation. Leslie (10/31/90) 102.

1121. The costs of education are not the same for all students. The better-prepared students are less expensive to teach, because they need fewer special services and fewer small classes. The HBU's have a disproportionate number of the less well-prepared students, and thus they have additional costs per student that must be absorbed by their budgets. The HBU's also have a disproportionate share of poorer students, who also impose additional

costs on the institution. Sullivan (2/5/91) 90–92; Sullivan (2/11/91) 121–23, 186.

1122. Among the added costs are the expenses of hiring additional faculty in order to teach smaller classes, and additional administrative and professional staff needed to accommodate the demands for expanded academic and financial aid counseling. Sullivan (2/11/91) 179–82.

1123. Other considerations influence the financial picture. First, the economy of scale means that in general a large school can educate students more economically than can be done at a small school. Second, enrollment trends affect financing. A school with a declining enrollment does not decrease its costs proportionally, and thus a school with a declining enrollment will seem to be better financed than it really is. The opposite is true for a school with a growing enrollment, that is, it will seem to be underfinanced. Both these considerations apply to the HBU's in Alabama, which are relatively small schools and which have been undergoing enrollment declines in recent years. This means, of course, that the HBU's will appear to be in a better financial position than they are in actuality. Leslie (10/30/90) 28–30.

1124. Discrepancies in funding grow and become embedded over the years. "A discrepancy of a few hundred dollars in spending per student may have little impact in a single year, but if this discrepancy continues year after year, sometimes less and sometimes more, the basic fabric of the institutions being disparately treated begins to vary more and more." USX 5, p. 39.

1125. Change takes a long time, and does not occur by itself, but rather requires a major effort. "It is extremely rare for an institution to undergo major change in as little as a decade. Where this does happen, there is usually a massive influx of funds." USX 5, p. 39.

1126. Sometime after desegregation was ordered in Alabama, the State began to move toward more equal funding, "but by then the present system was in place, and resources had been spread over too many campuses." USX 5, p. 40.

1127. A factor which should be considered in analyzing funding patterns is the number of students in a school. Comparisons are most appropriate, generally, when measuring similar sized student bodies, or when measuring funds on a per student measure.

1128. Even here, there are some disputes over how to measure the number of students. Alabama uses a measure which essentially measures credit hours, and then divides by 15 per semester for undergraduates and by smaller numbers for graduate level students. Another method measures numbers of full-time and part-time students, as defined by the institution, and takes the total of all full-time students plus one-third of the part-time students. It is impossible to say in the abstract that either system is "right" or "wrong." The one plus one-third method is commonly in use throughout most of the nation. The Alabama method introduces the mission difference into the calculation by differentiating between students at different levels.[84]

1129. If the measurement or comparison is between total dollars, and total dollars per student, then on the average, the HWU's are better funded than the HBU's. This pattern holds true whether we look only at state appropriations or at all funds, whether we look at revenues or expenditures, and whether we look at amounts tied to instruction, all student-related items, or all items.

1130. State funds directly affect an institution's ability to raise other funds. An institution that is better funded can pay higher faculty salaries, which attract professors and researchers who can get research grants from the federal and state governments as well as from private sources. These grants provide supplementary compensation for faculty, which puts the institution in a better market position

---

**84.** The funding formula currently used in Alabama relies heavily on a weighted credit hour calculation. The weighted credit hour calcula-tion is in turn influenced by an institution's mission.

for hiring strong faculty. These grants also allow an institution to bring in graduate research assistants, who further cut the school's costs by taking on some of the teaching load. Leslie (10/31/90) 125–26. Also related to the funding of an institution is its public service activities.

1131. Broad based public service is important, because it gives an institution a higher profile and an advantage in attracting special state funding. This visibility is also critical in securing private and corporate contributions. Leslie (10/31/90) 126–27.

1132. The financial slack that occurs when an institution has money not directly needed for the day-to-day operations of its basic programs can be put to use developing new programs, especially graduate-level programs, which in Alabama then in turn generate large amounts of money because of the high weights in the funding formula. Leslie (10/31/90) 127.

1133. Major income categories for higher education include public appropriations, state, federal and private grants and tuition and fees. Major expenditure categories include instruction, instructional support, academic support, student services, research and public service, plant operation and maintenance, institutional support, and scholarships. Both on the revenue side and the expenditure side, these major categories are usually termed "E & G," *i.e.*, Educational and General, to distinguish them from revenues or expenditures less related to the principal educational function of a school.

1134. Comparisons are made among schools, not because schools have rights or are entitled to funds as such, but because schools are the instruments through which students are reached, which means that the overall resources of a school, whether in funds, facilities, or programs, determine what is received by the school's students.

1135. This Court heard many expert and lay witnesses on the question of funding. Each witness had a particular method of analysis or perspective from which to view funding comparisons, and each of the various analyses was festooned with myriad exhibits, tables, and charts.

1136. Dr. Larry Leslie, expert witness for the United States, compared data between the HBU's and most of the HWU's. The HWU's that were not used in his comparison included both a large, high cost institution (USoA) and several smaller, low cost institutions such as (JSU and UM).

1137. Looking at total E & G revenue per student, in 1983 this was $7,780 at the HWU's and $5,514 at the HBU's, for a difference of 41%. USX 5, p. 15.

1138. By 1989 total E & G revenue per student was $13,021 at the HWU's and $8,729 at the HBU's, a difference of 49%. USX 2–11, p. 3, and Table 1–3.

1139. Looking solely at state appropriations, in 1983 per student this was $4,073 at the HWU's and $2,730 at the HBU's, a difference of 49%. USX 5, p. 16.

1140. By 1989 state appropriations was $6,383 at the HWU's and $5,275 at the HBU's, a difference of 21% per student. USX 2–11, p. 4, and Table 1–3.

1141. Although it appears that the HBU's have gained in state appropriations, these state appropriations do not include all forms of state assistance received by the HWU's (such as grants and contracts or special bond issues through surrogate public bodies). The pendency of this suit has been acknowledged as a specific influence favoring temporarily higher appropriations to the HBU's.

1142. Looking solely at gifts, grants and contracts (all sources combined), in 1983 this was $1,509 per student at the HWU's and $1,932 at the HBU's, a difference of 22% in the HBU's favor. USX 5, p. 16.

1143. By 1989, gifts, grants and contracts (all sources combined) was $3,311 at the HWU's, and $1,610 at the HBU's, a difference of 106%. USX 2–11, p. 4 and Table 1–3.

1144. The unusual figure for gifts, grants and contracts for 1983 was explained by the fact that during that year, the accounting standard included Pell Grants (federal student aid money) under

grants and contracts. Such inclusion distorted the financial picture, because Pell Grants are a restricted pass-through, payable only to students who then turn around and pay some or all of it to the school as tuition and fees. USX 5, p. 16.

1145. To evaluate the 1983 figures for gifts, grants and contracts, a look at the comparable figures for 1981, 1985, and 1987 shows (a) that the HBU's dollar per student figure has never before or since even approached the $1,932 figure recorded for 1983, and (b) that the differences between the HWU's and the HBU's were 62%, 28% and 52%, in the years surrounding the -22% figure recorded for the 1982 Pell Grant year. USX 5, Tables 2I, and USX 2-11, Tables 1-1 and 1-2.

1146. The financial picture may also be viewed by looking at expenditures. That is, the funds the schools have available to spend in carrying out their educational functions.

1147. Looking at total education and general expenditures per student using Dr. Leslie's selected institutions, one sees that in 1983 at the HWU's the E & G was $7,474 at the HWU's and $5,427 at the HBU's, for a difference of 38%. USX 5, Table 2J.

1148. By 1989 total E & G expenditures per student was $12,161 at the HWU's and $8,667 at the HBU's, a difference of 40%. USX 2-11, p. 4 and Table 1-3.

1149. Looking at expenditures in the category of instruction, in 1983 this was $3;142 at the HWU's and $1,682 at the HBU's, for a difference of 87%. USX 5, p. 18 and Table 2J.

1150. By 1989 total instruction expenditure was $4,348 at the HWU's and $2,872 at the HBU's, a difference of 51%. USX 2-11, pp. 4-5 and Table 1-3.

1151. Looking at the total of the expenditure categories most closely related to students (instruction, student services, academic support, and scholarships), in 1983 this figure was $4,503 at the HWU's and $3,346 at the HBU's, a difference of 35%. USX 5, p. 18, and Table 2J.

1152. By 1989, the figure for instruction-related categories was $6,281 at the HWU's and $4,672 at the HBU's, a difference of 34%. USX 2-11, p. 5 and Table 1-3.

1153. Looking at all the other expenditure categories, the figure for 1983 is $2,970 for the HWU's, and $2,081 for the HBU's, a difference of 43%. USX 5, p. 19 and Table 2J.

1154. By 1989, the figure for the other expenditure categories was $5,880 at the HWU's and $3,995 at the HBU's a difference of 47%. USX 2-11, p. 5 and Table 1-3.

1155. The overall comparisons favoring HWU's over HBU's also hold true when comparing the HBU's with the UA system (UA, UAB, and UAH), as well as comparing them with AU. This is true both as to 1983 and 1989. USX 5, pp. 19-25; USX 2-11, pp. 6-8. Leslie (10/31/90) 106-08.

1156. Paragraphs 1136 through 1154 of the Court's findings in this section of its order are taken from the testimony of Dr. Leslie and from Tables prepared by him and admitted into evidence during the trial. While of some help to the Court and indicative of some trends in E & G revenue per student and E & G expenditures per student, this evidence is of limited use for the following reasons:

A. Comparisons between HWUs and HBUs did not include all such institutions.

B. Comparisons were not made between institutions of similar mission.

C. Legitimate differences in costs were not recognized.

D. Funds not applicable to student costs were not eliminated in comparisons.

E. The obtaining and use of student data in a manner not supported by the literature or common practice. AUX 8359; AUX 341.

1157. The pattern shown by Dr. Leslie does not apply to AUM. The figures appear to show that AUM is less well-financed that its HWU counterparts, and is instead financed at about or below the level of ASU. The Plaintiffs, ASU and AAMU contend that AUM's financing is augmented by various ways in which the State

government and local governments funnel money to AUM which improves its financial position beyond the picture conveyed by the raw data.

1158. Dr. Sullivan, the financial expert witness for the Knight Plaintiffs and Allied Defendants made a comparison of student appropriations and expenditures.

1159. As will be discussed in the following few paragraphs, Dr. Sullivan found that the HBU's are today receiving no more in funding than they were in 1970. At that point, following a long history of segregation and discrimination, ASU, for example, had about 3.7% of the students in the higher education system, and was receiving about 3.5% of the dollars. Sullivan (2/5/91) at 24.

1160. This does not mean the HBU's are as well off as they were in 1970, because the cost of what the HBU's have to do today has risen faster than the cost of the HBU's functions. For example, an increasing proportion of the HBU's money today has to go to student scholarships, which is consequently not really available to produce educational resources. Sullivan (2/5/91) at 29.

1161. Moreover, the percentage of state money paid to the HBU's has not been steady and is not stable today. Thus, the 3.5% received by ASU in 1970 slipped to about 3.1% by 1975 and stayed there for about ten years. In 1986, it went up again to about 3.6%, but has been creeping back down in the late 1980's. Sullivan (2/5/91) at 29.

1162. In 1970 ASU spent 2.6% of the money spent by the four-year higher education institutions. That percentage dipped during the remainder of the decade and has now only climbed back up only to where it was at the beginning of the 1970's. By 1988, ASU was spending 3.1% of the money spent by the four-year institutions, but a large percentage of that was for scholarships, which means that the net total it had available to spend providing educational services was 2.6%, just a shade higher than the net total of 2.4% in 1970. ASUX 359; Sullivan (2/11/91) 179–80.

1163. Looking at particular categories, ASU spent 2.5% of the four-year institutions' expenditures on instruction in 1970, and after dropping down to 2.1% in the late 1970's, has now climbed back to 2.5% again. As for the instructional total (i.e., the elements that accompany instruction, such as research, academic support, library, etc.), the ASU percentage has dropped sharply, from 2.6% in 1970 to 1.9% today. ASUX 359; Sullivan (2/11/91) 177–81.

1164. The reason for this is basically the support services necessary because ASU has a larger percentage of less well-prepared students than any other institution. Most notably, in 1970, ASU spent 3.3% of the four-year institutions' expenditures on student support; in the 1980's, that figure rose to 5.1% and has stayed there. ASUX 359; Sullivan (2/11/91) 180–81.

1165. Overall, ASU's 2.6% share of expenditures must be compared to its 3.7% share of the students, which means it has far less than a proportional share of money to spend on educating its students, even though its students are among the most expensive in the state to teach. Sullivan (2/11/91) 182.

1166. These numbers show directly why ASU has difficulty competing with AUM, a competition which makes it difficult for ASU to attract white students and desegregate. As well as making it difficult for ASU to provide the highest quality education to its currently enrolled students. Sullivan (2/11/91) 182–87.

1167. The same process and trend apply in Huntsville, and explain why AAMU has difficulty competing with UAH. Sullivan (2/11/91) 183.

1168. One measure of these trends is the percentage of each school's budget that it is able to devote to instruction and instruction-related activities. Here again, it is AUM and UAH that are able to devote large percentages of their money to instruction and academic activities, while ASU and AAMU are forced to spend large amounts of their money on student sup-

port, administering financial aid, and other activities which draw resources away from instruction and academics. ASUX 360; Sullivan (2/11/91) 182–84.

1169. Comparisons in funding for students and institutions may also be made on a head count basis. In fact, for earlier years this is one of the few measurements available.

### E. Headcount Funding 1941–1969

1170. Counsel for ASU introduced evidence of state funding of institutions of higher education for most of the years during the period 1941–42 through 1969–70. ASUX 412, 422. Funding per headcount student for AAMU, ASU, UNA, JSU, LU, and TSU for this period appears in the following table:

STATE FUNDING PER STUDENT [85]

| 1941–1969[86] | AAMU | ASU | UNA | JSU | LU | TSU |
|---|---|---|---|---|---|---|
| **1941** | | | | | | |
| Approp. | 39,000 | 97,250 | 100,585 | 106,945 | 83,100 | 96,340 |
| Students | 644 | 1,046 | 468 | 357 | 188 | 287 |
| $ Per Student | 61 | 92 | 215 | 299 | 442 | 336 |
| **1942–43** | | | | | | |
| Approp. | 32,694 | 96,923 | 110,043 | 105,975 | 83,475 | 96,340 |
| Students | 562 | 793 | 416 | 364 | 125 | 197 |
| $ Per Student | 58 | 122 | 265 | 291 | 668 | 489 |
| **1943–44** | | | | | | |
| Approp. | 114,637 | 160,556 | 125,192 | 113,656 | 85,662 | 100,468 |
| Students | 347 | 670 | 385 | 329 | 62 | 139 |
| $ Per Student | 330 | 240 | 325 | 345 | 1,382 | 723 |
| **1944–45** | | | | | | |
| Approp. | 124,197 | 161,041 | 115,214 | 113,656 | 85,662 | 100,468 |
| Students | 381 | 685 | 440 | 357 | 78 | 150 |
| $ Per Student | 325 | 235 | 261 | 318 | 1,098 | 671 |
| **1947–48** | | | | | | |
| Approp. | 238,294 | 302,976 | 287,056 | 240,936 | 173,425 | 216,535 |
| Students | 914 | 1,688 | 1,506 | 1,295 | 477 | 923 |
| $ Per Student | 261 | 179 | 190 | 186 | 364 | 235 |
| **1948–49** | | | | | | |
| Approp. | 239,904 | 301,795 | 288,566 | 244,388 | 162,939 | 220,862 |
| Students | 1,018 | 2,193 | 1,433 | 1,452 | 477 | 1,068 |
| $ Per Student | 236 | 138 | 201 | 168 | 342 | 207 |
| **1949–50** | | | | | | |
| Approp. | 324,880 | 383,253 | 347,494 | 334,579 | 197,047 | 286,773 |
| Students | 1,181 | 2,751 | 1,643 | 1,805 | 555 | 1,140 |
| $ Per Student | 275 | 139 | 211 | 185 | 355 | 252 |
| **1950–51** | | | | | | |
| Approp. | 407,339 | 397,578 | 364,458 | 357,354 | 205,401 | 284,275 |
| Students | 1,127 | 3,135 | 1,329 | 1,495 | 550 | 1,182 |
| $ Per Student | 361 | 127 | 274 | 239 | 373 | 279 |
| **1951–52** | | | | | | |
| Approp. | 513,235 | 751,829 | 399,275 | 263,984 | 245,640 | 316,846 |
| Students | 1,068 | 3,330 | 1,205 | 1,003 | 348 | 746 |
| $ Per Student | 480 | 226 | 331 | 263 | 706 | 425 |

**85.** Financial data is from ASUX 412 and 422. Student enrollment data is from AUX 281, pp. 310–311.

**86.** Annual reports of the State Department of Education of College and University receipts are not included in ASUX 412 for the years 1945–46, 1946–47 and 1952–53. Therefore, complete data for those years are not available.

| 1941–1969[86] | AAMU | ASU | UNA | JSU | LU | TSU |
|---|---|---|---|---|---|---|
| **1953–54** | | | | | | |
| Approp. | 719,518 | 778,831 | 445,625 | 469,019 | 280,711 | 359,591 |
| Students | 1,071 | 2,881 | 1,034 | 1,169 | 419 | 1,106 |
| $ Per Student | 671 | 270 | 431 | 401 | 670 | 354 |
| **1954–55** | | | | | | |
| Approp. | 786,500 | 1,131,212 | 360,346 | 399,110 | 232,440 | 365,653 |
| Students | NA | NA | NA | NA | NA | NA |
| $ Per Student | | | | | | |
| **1955–56** | | | | | | |
| Approp. | 656,563 | 812,207 | 462,064 | 478,505 | 251,891 | 444,419 |
| Students | 1,033 | 2,461 | 1,423 | 1,508 | 465 | 1,242 |
| $ Per Student | 636 | 330 | 325 | 317 | 542 | 358 |
| **1956–57** | | | | | | |
| Approp. | 622,158 | 756,797 | 434,437 | 450,043 | 236,910 | 417,986 |
| Students | 1,045 | 2,298 | 1,608 | 2,625 | 615 | 1,380 |
| $ Per Student | 595 | 329 | 270 | 171 | 385 | 303 |
| **1957–58** | | | | | | |
| Approp. | 647,904 | 885,857 | 467,384 | 495,793 | 244,584 | 443,249 |
| Students | 1,059 | 2,129 | 1,715 | 2,677 | 646 | 1,515 |
| $ Per Student | 612 | 402 | 273 | 185 | 379 | 293 |
| **1958–59** | | | | | | |
| Approp. | 674,781 | 895,459 | 512,173 | 545,021 | 270,678 | 496,186 |
| Students | 1,245 | 2,412 | 1,761 | 2,625 | 783 | 1,685 |
| $ Per Student | 542 | 371 | 290 | 208 | 346 | 294 |
| **1959–60** | | | | | | |
| Approp. | 852,148 | 991,881 | 683,130 | 771,158 | 356,675 | 673,831 |
| Students | 1,265 | 2,660 | 1,883 | 2,643 | 791 | 1,643 |
| $ Per Student | 674 | 373 | 362 | 292 | 450 | 294 |
| **1960–61** [87] | | | | | | |
| Approp. | 804,577 | 932,555 | 714,301 | 780,466 | 374,087 | 628,868 |
| Students | 1,329 | 2,396 | 1,869 | 2,282 | 691 | 1,609 |
| $ Per Student | 605 | 389 | 382 | 342 | 541 | 391 |
| **1961–62** | | | | | | |
| Approp. | 945,082 | 1,023,132 | 733,860 | 798,763 | 384,131 | 661,444 |
| Students | 1,307 | 2,468 | 2,081 | 2,578 | 740 | 1,848 |
| $ Per Student | 723 | 386 | 353 | 310 | 519 | 374 |
| **1962–63** | | | | | | |
| Approp. | 1,078,881 | 1,086,815 | 739,576 | 902,875 | 372,254 | 706,613 |
| Students | 1,104 | 1,948 | 1,894 | 2,432 | 739 | 2,023 |
| $ Per Student | 977 | 558 | 390 | 371 | 504 | 349 |
| **1963–64** | | | | | | |
| Approp. | 1,306,770 | 1,321,513 | 936,317 | 1,173,552 | 446,875 | 988,716 |
| Students | 1,222 | 2,062 | 2,154 | 2,603 | 854 | 2,315 |
| $ Per Student | 1,069 | 641 | 435 | 451 | 523 | 427 |
| **1964–65** | | | | | | |
| Approp. | 1,361,609 | 1,375,036 | 947,354 | 1,205,305 | 489,029 | 1,023,729 |
| Students | 1,465 | 2,058 | 2,245 | 3,337 | 1,050 | 2,402 |
| $ Per Student | 929 | 668 | 423 | 361 | 466 | 426 |
| **1965–66** | | | | | | |
| Approp. | 1,607,820 | 1,576,678 | 1,055,757 | 1,500,514 | 602,105 | 1,173,236 |
| Students | 1,645 | 1,640 | 2,491 | 4,055 | 1,173 | 2,691 |
| $ Per Student | 977 | 961 | 424 | 370 | 513 | 436 |
| **1966–67** | | | | | | |
| Approp. | 2,055,898 | 2,020,345 | 1,442,378 | 2,302,132 | 924,228 | 1,724,858 |
| Students | 1,774 | 1,671 | 2,733 | 4,255 | 1,182 | 2,720 |
| $ Per Student | 1,016 | 1,606 | 564 | 541 | 782 | 634 |

**87.** Enrollment data for this row only from McKeown's Report, AUX 281, p. 373.

| 1941–1969[86] | AAMU | ASU | UNA | JSU | LU | TSU |
|---|---|---|---|---|---|---|
| 1967–68 | | | | | | |
| Approp. | 2,061,342 | 2,785,401 | 1,587,775 | 2,571,129 | 868,531 | 1,582,204 |
| Students | 2,028 | 1,734 | 3,007 | 4,842 | 1,327 | 2,828 |
| $ Per Student | 1,106 | 1,606 | 528 | 531 | 655 | 559 |
| 1968–69 | | | | | | |
| Approp. | 2,062,341 | 2,035,628 | 1,587,775 | 2,766,292 | 868,524 | 1,597,204 |
| Students | 2,224 | 2,169 | 3,054 | 5,440 | 1,628 | 3,207 |
| $ Per Student | 927 | 939 | 520 | 509 | 533 | 498 |
| 1969–70 | | | | | | |
| Approp. | 2,405,306 | 2,365,500 | 2,092,166 | 3,565,699 | 868,524 | 2,296,851 |
| Students | 2,350 | 2,340 | 3,114 | 5,651 | 1,175 | 3,159 |
| $ Per Student | 1,024 | 1,011 | 672 | 631 | 739 | 727 |

1171. As the table above indicates, per-student appropriations for AAMU exceeded the average for UNA, JSU, LU, and TSU for the period 1947–48 through 1969–70. Per-student appropriations for ASU have exceeded the average for UNA, JSU, LU, and TSU for most years between 1955–56 and 1969–70.

### F. Funding Of Institutions Per FTE

1172. A generally accepted method of comparing state resource allocation is on a per student basis.

1173. Comparisons of state resources allocation on a per student basis are most appropriately done by computing numbers of full-time equivalent students ("FTE") at each institution. SOF ¶ 252.

1174. All of the Alabama public institutions regularly report credit hour production to ACHE, from which ACHE computes FTE by dividing the number of semester equivalent undergraduate credit hours by 15, graduate credit hours by 12, and professional hours by 9. Computing full-time equivalent students on the basis of credit hour production is a generally accepted methodology. SOF ¶ 253.

1175. Since fiscal year 1986–87, ASU has received the highest level of regular academic program funding per FTE student of all the public senior institutions of higher education. STX 202.25 For fiscal years 1986–87 through 1989–90, AAMU has received the second-highest level of regular academic program funding per FTE student among Alabama's senior public institutions of higher education. *Ibid.* For fiscal year 1990–91, AAMU has the third-highest level of RAP funding per FTE student; UAB was second highest that year. *Ibid.*

1176. Since fiscal year 1977–78 (the earliest year for which RAP funding per FTE student is available) AAMU's RAP funding per FTE student has been above the state average. STX 202.25, pp. 17, 20. Since fiscal year 1979–80, ASU's RAP funding per FTE student has been above the state average. *Ibid.*

1177. That portion of an annual appropriation designated as the Regular Academic Program portion on STX 202.24 relates most directly to the basic programs common to all colleges and universities. The other line-item appropriations shown on the exhibit relate to programs, such as medical and first professional programs, found only at a few institutions. State Exhibit 202.24 is as follows:

University and College Appropriations
1977-78 through 1990-91
($000's)

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.140% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama A&M University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 6,951 | 8,102 | 7,892 | 9,354 | 9,079 | 9,702 | 9,777 | 10,776 | 11,845 | 13,999 | 14,776 | 16,791 | 16,634 | 17,039 |
| Research and Public Service | | | | | | | | | | | 75 | 119 | 108 | 133 |
| Ag. Research & Extension | | | | | | 300 | 300 | 371 | 403 | 399 | 399 | 421 | 382 | 1,471 |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | 1,628 | 750 | | | | |
| Total: A & M | 6,951 | 8,102 | 7,892 | 9,354 | 9,079 | 10,002 | 10,077 | 11,147 | 13,876 | 15,148 | 15,250 | 17,330 | 17,124 | 18,642 |
| **Alabama State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 5,936 | 7,149 | 6,951 | 8,052 | 7,816 | 8,524 | 8,703 | 10,505 | 12,061 | 13,955 | 15,082 | 17,147 | 16,977 | 18,485 |
| Research and Public Service | | | | | | | | 100 | 96 | 95 | 95 | 108 | 73 | 123 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | 1,628 | 908 | | | | |
| Total: ASU | 5,936 | 7,149 | 6,951 | 8,052 | 7,816 | 8,524 | 8,703 | 10,605 | 13,785 | 14,958 | 15,177 | 17,255 | 17,050 | 18,607 |
| **Athens State College** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 1,146 | 1,455 | 1,418 | 1,562 | 1,508 | 1,981 | 2,025 | 2,499 | 2,670 | 2,715 | 2,761 | 3,308 | 3,266 | 4,435 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 513 | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: ASC | 1,146 | 1,455 | 1,418 | 1,562 | 1,508 | 1,981 | 2,025 | 2,499 | 3,183 | 2,715 | 2,761 | 3,308 | 3,266 | 4,435 |

University and College Appropriations
1977-78 through 1990-91
($1000's)

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.140% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Auburn University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 30,570 | 35,339 | 34,440 | 39,882 | 38,716 | 42,963 | 43,252 | 53,478 | 55,612 | 51,781 | 52,630 | 63,438 | 62,958 | 71,559 |
| Research and Public Service | 607 | 1,368 | 1,323 | 1,695 | 1,640 | 1,898 | 2,198 | 3,431 | 5,353 | 6,393 | 6,543 | 8,382 | 7,117 | 6,703 |
| Ag. Res. and Public Service | | | | | | | | | | | | | 1,061 | 1,104 |
| First Prof. Health | | | | | | | | 300 | | | | | | |
| Hospitals and Clinics | | | | | | | | | 7,318 | 6,876 | 6,876 | 9,650 | 9,496 | 11,465 |
| Health Related Res.& Pub. Serv. | | | | | | | | | 287 | 270 | 270 | | 294 | 318 |
| Defed Maint. R&PS | | | | | | | | | 958 | | | | | |
| Other | | | | | | | | 18 | 113 | 50 | | | | |
| **Total: Auburn University** | 31,177 | 36,707 | 35,763 | 41,577 | 40,356 | 44,861 | 45,450 | 57,227 | 69,641 | 65,370 | 66,319 | 81,469 | 80,926 | 91,148 |
| **Auburn University at Montgomery** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 4,582 | 5,367 | 5,226 | 6,253 | 6,067 | 7,076 | 7,178 | 8,977 | 10,095 | 10,188 | 10,366 | 11,597 | 11,325 | 12,473 |
| Research and Public Service | 50 | 146 | 141 | 157 | 155 | 168 | 168 | 478 | 749 | 604 | 604 | 673 | 657 | 727 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | 121 | 124 | 120 | 50 | 49 | 51 | 51 | 54 | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 1,437 | | | | | |
| Other | | | | | | 18 | 18 | 18 | 17 | | | | | |
| **Total: AUM** | 4,753 | 5,637 | 5,487 | 6,460 | 6,271 | 7,313 | 7,415 | 9,527 | 12,298 | 10,792 | 10,970 | 12,270 | 11,981 | 13,199 |
| **AES/CES** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | | | | | | | | | | | | | | |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | 13,762 | 15,690 | 15,310 | 17,947 | 17,521 | 19,137 | 19,542 | 24,560 | 29,032 | 28,155 | 28,562 | 33,591 | 32,820 | 37,421 |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 671 | | | | | |
| Other | | | | | | | | | | | | | | |
| **Total: AES/CES** | 13,762 | 15,690 | 15,310 | 17,947 | 17,521 | 19,137 | 19,542 | 24,560 | 29,703 | 28,155 | 28,562 | 33,591 | 32,820 | 37,421 |

University and College Appropriations
1977-78 through 1990-91
($1000's)

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Auburn University System** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 35,152 | 40,706 | 39,666 | 46,135 | 44,783 | 50,039 | 50,430 | 62,455 | 65,707 | 61,969 | 62,996 | 75,035 | 74,282 | 84,031 |
| Research and Public Service | 657 | 1,514 | 1,464 | 1,852 | 1,795 | 2,066 | 2,366 | 3,909 | 6,102 | 6,997 | 7,147 | 9,055 | 7,774 | 7,429 |
| Ag. Research & Extension | 13,762 | 15,690 | 15,310 | 17,947 | 17,521 | 19,137 | 19,542 | 24,560 | 29,032 | 28,155 | 28,562 | 33,321 | 33,881 | 38,525 |
| First Prof. Health | | | | | | | | 300 | 7,318 | 6,876 | 6,876 | 9,650 | 9,496 | 11,465 |
| Hospitals and Clinics | 121 | 124 | 120 | 50 | 49 | 51 | 51 | 54 | 287 | 270 | 270 | 270 | 294 | 318 |
| Health Related Res.& Pub. Serv. | | | | | | 18 | 18 | 36 | 130 | 50 | | | | |
| Defd Maint. R&PS | | | | | | | | | 3,066 | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: Auburn University System | 49,692 | 58,034 | 56,560 | 65,984 | 64,148 | 71,311 | 72,407 | 91,314 | 111,642 | 104,317 | 105,851 | 127,331 | 125,727 | 141,768 |
| **Jacksonville State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 9,102 | 10,630 | 10,368 | 11,940 | 11,587 | 12,258 | 12,508 | 13,629 | 15,728 | 15,090 | 15,377 | 17,386 | 17,167 | 18,692 |
| Research and Public Service | | 97 | 94 | 96 | 95 | 100 | 100 | 557 | 816 | 749 | 642 | 725 | 716 | 982 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 1,250 | | | | | |
| Defd Maint. R&PS | | | | | | | | | | | | | | |
| Other | 18 | 17 | 17 | 17 | 18 | 18 | 18 | 18 | 17 | | | | | |
| Total: JSU | 9,120 | 10,744 | 10,479 | 12,053 | 11,700 | 12,376 | 12,626 | 14,204 | 17,811 | 15,839 | 16,019 | 18,111 | 17,883 | 19,674 |
| **Livingston University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 2,664 | 3,116 | 3,033 | 3,743 | 3,632 | 4,127 | 4,201 | 4,771 | 5,438 | 5,298 | 5,367 | 5,939 | 5,864 | 6,181 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 929 | | | | | |
| Defd Maint. R&PS | | | | | | | | | | | | | | |
| Other | 18 | 17 | 17 | 17 | 18 | 18 | 18 | 18 | 17 | 18 | 18 | 20 | 20 | 23 |
| Total: LU | 2,682 | 3,133 | 3,050 | 3,760 | 3,650 | 4,145 | 4,219 | 4,789 | 6,384 | 5,316 | 5,385 | 5,959 | 5,884 | 6,204 |

University and College Appropriations
1977-78 through 1990-91
($000's)

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Troy State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 5,693 | 6,606 | 6,433 | 7,366 | 7,131 | 8,035 | 8,243 | 9,512 | 11,872 | 11,020 | 11,226 | 12,612 | 12,453 | 13,433 |
| Research and Public Service | | | | | | | | 752 | 902 | 646 | 646 | 728 | 719 | 1,261 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | 36 | 35 | 34 | 35 | 36 | 36 | 36 | 36 | 34 | | | | | |
| Total: TSU | 5,729 | 6,641 | 6,467 | 7,401 | 7,167 | 8,071 | 8,279 | 10,300 | 12,808 | 11,666 | 11,872 | 13,340 | 13,172 | 14,694 |
| | | | | | | | | | | | | | | |
| **Troy St.Univ-Dothan/Ft. Rucker** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 330 | 844 | 817 | 940 | 926 | 1,157 | 1,158 | 1,329 | 1,626 | 1,638 | 1,675 | 2,155 | 2,128 | 2,654 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 120 | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: TSUD | 330 | 844 | 817 | 940 | 926 | 1,157 | 1,158 | 1,329 | 1,746 | 1,638 | 1,675 | 2,155 | 2,128 | 2,654 |
| | | | | | | | | | | | | | | |
| **Troy St. Univ. in Montgomery** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 187 | 216 | 209 | 241 | 238 | 411 | 538 | 695 | 1,492 | 1,505 | 1,537 | 2,218 | 2,190 | 2,849 |
| Research and Public Service | | | | | | | | | | | 100 | 113 | 111 | 108 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maintenance | | | | | | | | | 96 | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: TSUM | 187 | 216 | 209 | 241 | 238 | 411 | 538 | 695 | 1,588 | 1,505 | 1,637 | 2,331 | 2,302 | 2,957 |

University and College Appropriations
1977-78 through 1990-91
($000's)

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Troy State University System** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 6,210 | 7,666 | 7,459 | 8,547 | 8,295 | 9,601 | 9,939 | 11,536 | 14,990 | 14,163 | 14,438 | 16,985 | 16,771 | 18,935 |
| Research and Public Service | | | | | | | | 752 | 902 | 646 | 746 | 841 | 830 | 1,369 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defd Maintenance | | | | | | | | | 216 | | | | | |
| Other | 36 | 35 | 34 | 35 | 36 | 36 | 36 | 36 | 34 | | | | | |
| Total: Troy State System | 6,246 | 7,701 | 7,493 | 8,582 | 8,331 | 9,639 | 9,975 | 12,324 | 16,142 | 14,809 | 15,184 | 17,826 | 17,601 | 20,305 |
| **University of Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 28,773 | 31,665 | 30,827 | 36,190 | 35,024 | 38,488 | 38,049 | 43,190 | 49,897 | 47,475 | 48,231 | 55,147 | 54,453 | 61,454 |
| Research and Public Service | 2,238 | 3,298 | 3,341 | 3,817 | 3,761 | 4,062 | 4,572 | 9,971 | 11,992 | 12,596 | 12,791 | 14,279 | 14,100 | 14,789 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | 1,125 | 1,369 | 1,384 | 1,648 | 1,652 | 1,783 | 2,620 | 2,825 | 2,984 | 2,655 | 2,655 | 3,081 | 3,042 | 3,359 |
| Hospitals and Clinics | 612 | 720 | 696 | 810 | 798 | 862 | 862 | 914 | 1,234 | 1,154 | | | | |
| Health Related R&PS | 491 | 722 | 733 | 814 | 774 | 837 | 862 | 1,090 | 753 | 842 | 2,026 | 2,366 | 2,336 | 2,430 |
| Defd Maint. R&PS | | | | | | | | | 958 | | | | | |
| Other | 18 | 17 | 17 | 18 | 17 | 18 | 18 | 18 | 17 | 16 | 16 | | | |
| Total: UA | 33,277 | 37,791 | 36,998 | 41,297 | 42,026 | 46,050 | 46,983 | 58,008 | 69,835 | 64,738 | 65,719 | 74,873 | 73,930 | 82,032 |
| **University of AL at Birmingham** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 17,908 | 21,434 | 21,041 | 25,960 | 25,205 | 28,524 | 28,567 | 36,684 | 42,840 | 40,887 | 41,642 | 47,020 | 46,429 | 52,412 |
| Research and Public Service | 263 | 426 | 413 | 592 | 575 | 732 | 1,057 | 1,338 | 3,273 | 2,871 | 2,871 | 4,181 | 4,128 | 4,231 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | 22,229 | 26,605 | 25,740 | 28,962 | 28,082 | 29,821 | 29,821 | 36,627 | 41,531 | 36,531 | 37,226 | 42,398 | 41,865 | 46,056 |
| Hospitals and Clinics | 5,500 | 6,040 | 5,842 | 6,367 | 6,180 | 6,269 | 6,551 | 8,237 | 7,657 | 7,077 | 7,077 | 8,343 | 8,238 | 10,117 |
| Health Related R&PS | 1,709 | 3,580 | 3,650 | 4,271 | 3,838 | 4,235 | 4,605 | 4,946 | 6,510 | 9,696 | 9,719 | 11,027 | 10,888 | 11,161 |
| Defd Maint. R&PS | | | | | | | | | 958 | | | | | |
| Other | 100 | 98 | 94 | 97 | 94 | 96 | 100 | 100 | 95 | 100 | 100 | | | |
| Total: UAB | 47,709 | 58,183 | 56,780 | 66,249 | 63,974 | 69,677 | 70,701 | 83,132 | 102,864 | 97,162 | 98,635 | 112,968 | 111,547 | 123,977 |

University and College Appropriations
1977-78 through 1990-91
(1000's)

| | 77-78 | 78-79 (after 2.901% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **University of AL in Huntsville** | | | | | | | | | | | | | | |
| Regular Acad. Programs (UAH) | 5,626 | 6,508 | 6,344 | 7,471 | 7,251 | 8,741 | 9,060 | 11,846 | 14,174 | 13,698 | 14,010 | 16,303 | 16,097 | 19,222 |
| Research and Public Service | 263 | 375 | 503 | 601 | 584 | 915 | 915 | 1,845 | 2,797 | 2,814 | 2,814 | 3,362 | 3,320 | 3,396 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | 2,268 | 2,564 | 2,480 | 2,824 | 2,741 | 2,846 | 2,846 | 3,045 | 3,291 | 3,016 | 3,016 | 3,293 | 3,252 | 2,877 |
| Hospitals and Clinics | 558 | 627 | 606 | 657 | 638 | 848 | 848 | -924 | 933 | 905 | 1,082 | 1,216 | 1,201 | 1,229 |
| Hlth. Related R&PS | | | | | | | | | | 177 | | | | |
| Defd Maint. R&PS | | | | | | | | | 958 | | | | | |
| Other | 18 | 17 | 17 | 17 | 17 | 18 | 18 | 18 | 17 | 18 | 18 | | | |
| Total: UAH | 8,733 | 10,091 | 9,950 | 11,570 | 11,231 | 13,368 | 13,687 | 17,678 | 22,170 | 20,628 | 20,940 | 24,174 | 23,869 | 26,724 |
| **University of Alabama System** | | | | | | | | | | | | | | |
| Regular Acad. Programs (UA) | 52,307 | 59,607 | 58,212 | 69,621 | 67,480 | 75,753 | 75,676 | 91,920 | 106,911 | 102,060 | 103,883 | 118,470 | 116,979 | 133,089 |
| Research and Public Service | 2,784 | 4,099 | 4,257 | 5,010 | 4,920 | 5,709 | 6,544 | 13,154 | 20,062 | 18,281 | 18,476 | 21,822 | 21,547 | 22,417 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Prof. Health | 25,622 | 30,538 | 29,604 | 33,434 | 32,475 | 34,450 | 35,287 | 42,497 | 47,806 | 42,202 | 42,897 | 48,772 | 48,158 | 52,291 |
| Hospitals and Clinics | 6,670 | 7,387 | 7,144 | 7,834 | 7,616 | 7,979 | 8,261 | 10,075 | 9,824 | 9,136 | 7,077 | 8,343 | 8,238 | 10,117 |
| Health Related R&PS | 2,200 | 4,302 | 4,383 | 5,085 | 4,612 | 5,072 | 5,467 | 6,036 | 7,263 | 10,715 | 12,827 | 14,609 | 14,425 | 14,819 |
| Defd Maint. R&PS | | | | | | | | | 2,874 | | | | | |
| Other | 136 | 132 | 128 | 132 | 128 | 132 | 136 | 136 | 129 | 134 | 134 | | | |
| Total: U A System | 89,719 | 106,065 | 103,728 | 121,116 | 117,231 | 129,095 | 131,371 | 163,818 | 194,869 | 182,528 | 185,294 | 212,015 | 209,347 | 232,733 |
| **University of Montevallo** | | | | | | | | | | | | | | |
| Regular Acad. Programs (UM) | 4,705 | 5,210 | 5,073 | 6,268 | 6,084 | 6,475 | 6,617 | 7,953 | 8,700 | 8,752 | 8,878 | 9,901 | 9,777 | 9,915 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | 328 |
| First Prof. Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 1,245 | | | | | |
| Defd Maintenance R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: UM | 4,705 | 5,210 | 5,073 | 6,268 | 6,084 | -6,475 | 6,617 | 7,953 | 9,945 | 8,752 | 8,878 | 9,901 | 9,777 | 10,243 |

University and College Appropriations
1977-78 through 1990-91
($1000's)

| | 77-78 | 78-79 (after 2.9811% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **University of North Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 5,711 | 6,791 | 6,620 | 7,649 | 7,423 | 8,201 | 8,528 | 10,033 | 11,454 | 11,677 | 11,882 | 13,223 | 12,669 | 13,837 |
| Research and Public Service | | | | | | | 250 | 665 | 479 | 353 | 353 | 406 | 788 | 865 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Prof. Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 1,437 | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | 18 | 17 | 17 | 17 | 18 | 18 | 18 | 18 | 17 | | | | | |
| Total: UNA | 5,729 | 6,808 | 6,637 | 7,666 | 7,441 | 8,219 | 8,796 | 10,716 | 13,387 | 12,030 | 12,235 | 13,629 | 13,457 | 14,702 |
| **University of South Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 9,103 | 10,898 | 10,675 | 13,031 | 13,201 | 14,299 | 14,438 | 18,214 | 21,658 | 21,940 | 22,523 | 25,343 | 25,024 | 26,820 |
| Research and Public Service | | 89 | 86 | 88 | 85 | 93 | 91 | 298 | 285 | 283 | 283 | 316 | 312 | 473 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Prof. Health | 8,001 | 9,001 | 8,896 | 9,873 | 9,551 | 10,418 | 10,418 | 11,877 | 12,048 | 11,972 | 11,954 | 12,836 | 12,674 | 13,404 |
| Hospital and Clinics | 1,582 | 1,627 | 1,574 | 1,618 | 1,049 | 1,145 | 1,145 | 1,213 | 3,132 | 1,206 | 1,206 | 2,473 | 2,442 | 4,287 |
| Health Related R&PS | | | | | | | | | 491 | 487 | 487 | 1,295 | 1,279 | 1,124 |
| Defed Maint. R&PS | | | | | | | | | 958 | | | | | |
| Other | 18 | 17 | 17 | 17 | 17 | 18 | 18 | 18 | 17 | | | | | |
| Total: USA | 18,704 | 21,632 | 21,248 | 24,627 | 23,903 | 25,973 | 26,112 | 31,620 | 38,589 | 35,888 | 36,471 | 42,264 | 41,732 | 46,309 |
| **All Senior Institutions** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 138,987 | 161,330 | 157,367 | 185,902 | 180,888 | 200,962 | 202,842 | 244,591 | 277,162 | 271,618 | 277,963 | 319,528 | 315,411 | 351,459 |
| Research and Public Service | 3,441 | 5,799 | 5,901 | 7,046 | 6,895 | 7,968 | 9,353 | 19,435 | 28,742 | 27,404 | 27,817 | 33,390 | 32,148 | 33,791 |
| Ag. Research & Extension | 13,762 | 15,690 | 15,310 | 17,947 | 17,521 | 19,437 | 19,842 | 24,931 | 29,435 | 28,554 | 28,961 | 34,012 | 34,263 | 40,123 |
| First Prof. Health | 31,623 | 39,539 | 38,500 | 43,307 | 42,026 | 44,868 | 45,705 | 54,374 | 67,172 | 61,050 | 61,727 | 71,258 | 70,329 | 77,161 |
| Hospital and Clinics | 8,252 | 9,014 | 8,718 | 9,452 | 8,665 | 9,124 | 9,406 | 11,588 | 13,243 | 10,612 | 8,553 | 10,816 | 10,973 | 14,722 |
| Health Related R&PS | -2,321 | 4,426 | 4,503 | 5,135 | 4,661 | 5,123 | 5,518 | 6,090 | 7,254 | 11,202 | 13,314 | 15,904 | 15,704 | 16,143 |
| Defed Maint. R&PS | | | | | | | | | 15,744 | | | | | |
| Other | 244 | 235 | 230 | 235 | 235 | 258 | 262 | 280 | 361 | 1,860 | 170 | 20 | 20 | 23 |
| Total: All Senior Institutions | 200,630 | 236,033 | 230,529 | 269,024 | 260,891 | 287,740 | 292,928 | 361,289 | 439,613 | 412,300 | 418,505 | 464,928 | 478,848 | 533,621 |

University and College Appropriations
1977-78 through 1990-91
($000's)

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Junior & Technical Colleges | 59,247 | 72,977 | 72,745 | 78,854 | 76,725 | 82,845 | 83,208 | 96,897 | 116,988 | 106,829 | 107,286 | 123,728 | 121,601 | 135,221 |
| Al. Ind. Devel. Training Pgm. | | | | | | | 1,450 | 1,624 | 2,076 | 1,712 | 3,712 | 6,812 | 6,252 | 12,166 |
| Facility Renewal | | | | | | | | | 936 | | | | | |
| Chancellor & Statewide Pgms. | | | | | | | | 950 | 1,190 | 1,188 | 1,363 | 1,978 | 1,146 | 4,475 |
| Total: Two-Year Institutions | 59,247 | 72,977 | 72,745 | 78,854 | 76,725 | 82,845 | 84,658 | 99,471 | 121,190 | 109,729 | 112,961 | 132,518 | 128,999 | 151,862 |
| | | | | | | | | | | | | | | |
| All Public Institutions | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 198,234 | 234,307 | 230,112 | 264,756 | 257,613 | 283,807 | 286,050 | 341,488 | 394,150 | 378,447 | 385,849 | 443,256 | 437,012 | 486,680 |
| Research and Public Service | 3,441 | 5,799 | 5,901 | 7,046 | 6,895 | 7,968 | 10,803 | 21,059 | 30,818 | 29,116 | 31,529 | 40,202 | 38,400 | 45,957 |
| Ag. Research & Extension | 13,762 | 15,690 | 15,310 | 12,947 | 17,521 | 19,437 | 19,842 | 24,931 | 29,435 | 28,554 | 28,961 | 34,012 | 34,263 | 40,323 |
| First Prof. Health | 33,623 | 39,539 | 38,500 | 43,307 | 42,026 | 44,868 | 45,705 | 54,374 | 67,172 | 61,050 | 61,727 | 71,258 | 70,329 | 77,161 |
| Hospital and Clinics | 8,252 | 9,014 | 8,718 | 9,452 | 8,665 | 9,124 | 9,406 | 11,588 | 13,243 | 10,612 | 8,553 | 10,816 | 10,973 | 14,722 |
| Health Related RIPS | 2,321 | 4,426 | 4,503 | 5,135 | 4,661 | 5,123 | 5,518 | 6,090 | 7,754 | 11,202 | 13,314 | 15,904 | 15,704 | 16,143 |
| Defd Maint. RIPS | | | | | | | | | 16,680 | | | | | |
| Other | 244 | 235 | 230 | 235 | 235 | 258 | 262 | 1,230 | 1,551 | 3,048 | 1,533 | 1,998 | 1,165 | 4,498 |
| Total: All Public Institutions | 259,877 | 309,010 | 303,274 | 347,878 | 337,616 | 370,585 | 377,586 | 460,760 | 560,803 | 522,029 | 531,466 | 617,446 | 607,847 | 635,483 |

Distribution By Major Categories
University and College Appropriations 1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.9811% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama A&M University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 97.00 | 97.02 | 96.67 | 85.36 | 92.41 | 96.89 | 96.89 | 97.14 | 91.40 |
| Research and Public Service | | | | | | | | | | | 0.49 | 0.68 | 0.63 | 0.71 |
| Ag. Research & Extension | | | | | | 3.00 | 2.98 | 3.33 | 2.90 | 2.63 | 2.62 | 2.43 | 2.23 | 7.89 |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 11.73 | 4.95 | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: A & M | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Alabama State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 99.08 | 87.49 | 93.29 | 99.37 | 99.37 | 99.57 | 99.34 |
| Research and Public Service | | | | | | | | 0.92 | 0.70 | 0.64 | 0.63 | 0.63 | 0.43 | 0.66 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 11.81 | 6.07 | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: ASU | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Athens State College** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 83.88 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 16.12 | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: ASC | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories
University and College Appropriations 1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.9811% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 1.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Auburn University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 98.05 | 96.27 | 96.30 | 95.92 | 95.94 | 95.77 | 95.16 | 93.45 | 79.86 | 79.21 | 79.36 | 77.87 | 77.80 | 78.51 |
| Research and Public Service | 1.95 | 3.73 | 3.70 | 4.08 | 4.06 | 4.23 | 4.84 | 6.00 | 7.69 | 9.78 | 9.87 | 10.29 | 8.79 | 7.35 |
| Ag. Res. and Public Service | | | | | | | | | | | | | 1.31 | 1.21 |
| First Prof. Health | | | | | | | | | | | | 11.84 | 11.73 | 12.58 |
| Hospitals and Clinics | | | | | | | | 0.52 | 10.51 | 10.52 | 10.37 | | 0.36 | 0.35 |
| Health Related Res.& Pub. Serv. | | | | | | | | | 0.41 | 0.41 | 0.41 | | | |
| Defed Maint. R&PS | | | | | | | | | 1.38 | | | | | |
| Other | | | | | | | | 0.03 | 0.16 | 0.08 | | | | |
| Total: Auburn University | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Auburn University at Montgomery** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 96.40 | 95.21 | 95.24 | 96.80 | 96.75 | 96.16 | 96.80 | 94.23 | 82.09 | 94.40 | 94.49 | 94.52 | 94.52 | 94.50 |
| Research and Public Service | 1.05 | 2.59 | 2.57 | 2.43 | 2.47 | 2.30 | 2.27 | 5.02 | 6.09 | 5.60 | 5.51 | 5.48 | 5.48 | 5.50 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | 2.55 | 2.20 | 2.19 | 0.77 | 0.78 | 0.70 | 0.69 | 0.53 | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 11.68 | | | | | |
| Other | | | | | | 0.25 | 0.24 | 0.19 | 0.14 | | | | | |
| Total: AUM | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **AES/CES** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | | | | | | | | | | | | | | |
| Research and Public Service | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 97.74 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 2.26 | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: AES/CES | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories

University and College Appropriations 1977-78 through 1990-91

| Category | 77-78 | 78-79 (after 2.9011% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.550% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Auburn University System** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 70.74 | 70.14 | 70.13 | 69.92 | 69.81 | 70.17 | 69.65 | 68.40 | 58.86 | 59.40 | 59.51 | 58.93 | 59.08 | 59.27 |
| Research and Public Service | 1.32 | 2.61 | 2.59 | 2.81 | 2.80 | 2.90 | 3.27 | 4.28 | 5.47 | 6.71 | 6.75 | 7.11 | 6.18 | 5.24 |
| Ag. Research & Extension | 27.69 | 27.04 | 27.07 | 27.20 | 27.31 | 26.84 | 26.99 | 26.90 | 26.00 | 26.99 | 26.98 | 26.38 | 26.95 | 27.17 |
| First Prof. Health | | | | | | | | | 6.55 | 6.59 | 6.50 | 7.58 | 7.55 | 8.09 |
| Hospitals and Clinics | | | | | | | | 0.06 | 0.26 | 0.26 | 0.26 | | 0.23 | 0.22 |
| Health Related Res.& Pub. Serv. | 0.24 | 0.21 | 0.21 | 0.08 | 0.08 | 0.07 | 0.07 | 0.33 | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 2.75 | | | | | |
| Other | | | | | | 0.03 | 0.02 | 0.04 | 0.12 | 0.05 | | | | |
| Total: Auburn University System | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Jacksonville State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 99.80 | 98.94 | 98.94 | 99.06 | 99.03 | 99.05 | 99.07 | 95.95 | 88.30 | 95.27 | 95.99 | 96.00 | 96.00 | 95.01 |
| Research and Public Service | | 0.90 | 0.90 | 0.80 | 0.81 | 0.81 | 0.79 | 3.92 | 4.58 | 4.73 | 4.01 | 4.00 | 4.00 | 4.99 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 7.02 | | | | | |
| Other | 0.20 | 0.16 | 0.16 | 0.14 | 0.15 | 0.15 | 0.14 | 0.13 | 0.10 | | | | | |
| Total: JSU | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Livingston University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 99.33 | 99.46 | 99.44 | 99.55 | 99.51 | 99.57 | 99.57 | 99.62 | 85.18 | 99.66 | 99.67 | 99.67 | 99.67 | 99.63 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | 14.55 | | | | | |
| Other | 0.67 | 0.54 | 0.56 | 0.45 | 0.49 | 0.43 | 0.43 | 0.38 | 0.27 | 0.34 | 0.33 | 0.33 | 0.33 | 0.37 |
| Total: LU | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories
University and College Appropriations 1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Troy State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 99.37 | 99.47 | 99.47 | 99.53 | 99.50 | 99.55 | 99.57 | 92.35 | 92.69 | 94.46 | 94.56 | 94.54 | 94.54 | 91.42 |
| Research and Public Service | | | | | | | | 7.30 | 7.04 | 5.54 | 5.44 | 5.46 | 5.46 | 8.58 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | 0.63 | 0.53 | 0.53 | 0.47 | 0.50 | 0.45 | 0.43 | 0.35 | 0.27 | | | | | |
| Total: TSU | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Troy St.Univ-Dothan/Ft. Rucker** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 93.13 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 6.87 | | | | | |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: TSUD | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Troy St. Univ. in Montgomery** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 93.95 | 100.00 | 93.89 | 95.17 | 95.17 | 96.35 |
| Research and Public Service | | | | | | | | | | | 6.11 | 4.83 | 4.83 | 3.65 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maintenance | | | | | | | | | 6.05 | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: TSUM | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories

University and College Appropriations 1977-78 through 1990-91

| Category | 77-78 | 78-79 (after 2.9811% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Troy State University System** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 99.42 | 99.55 | 99.55 | 99.59 | 99.57 | 99.63 | 99.64 | 93.61 | 92.86 | 95.64 | 95.09 | 95.28 | 95.28 | 93.26 |
| Research and Public Service | | | | | | | | 6.10 | 5.59 | 4.36 | 4.91 | 4.72 | 4.72 | 6.74 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | | | | | | |
| Defed Maintenance | | | | | | | | | 1.34 | | | | | |
| Other | 0.58 | 0.45 | 0.45 | 0.41 | 0.41 | 0.37 | 0.36 | 0.29 | 0.21 | | | | | |
| Total: Troy State System | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **University of Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 86.47 | 83.79 | 83.32 | 83.59 | 83.34 | 83.58 | 80.98 | 74.46 | 71.45 | 73.33 | 73.39 | 73.65 | 73.65 | 74.92 |
| Research and Public Service | 6.79 | 8.73 | 9.03 | 8.82 | 8.95 | 8.82 | 9.73 | 17.19 | 20.04 | 19.46 | 19.46 | 19.07 | 19.07 | 18.03 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | 3.38 | 3.62 | 3.74 | 3.81 | 3.93 | 3.87 | 5.58 | 4.87 | 4.27 | 4.10 | 4.04 | 4.11 | 4.11 | 4.09 |
| Hospitals and Clinics | 1.84 | 1.91 | 1.88 | 1.87 | 1.90 | 1.87 | 1.83 | 1.58 | 1.77 | 1.78 | | | | |
| Health Related R&PS | 1.48 | 1.91 | 1.98 | 1.88 | 1.84 | 1.82 | 1.83 | 1.88 | 1.08 | 1.30 | 3.08 | 3.16 | 3.16 | 2.96 |
| Defed Maint. R&PS | | | | | | | | | 1.37 | | | | | |
| Other | 0.05 | 0.04 | 0.05 | 0.04 | 0.04 | 0.04 | 0.04 | 0.03 | 0.02 | 0.02 | 0.02 | | | |
| Total: UA | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **University of AL at Birmingham** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 37.54 | 36.84 | 37.06 | 39.19 | 39.40 | 40.94 | 40.41 | 41.85 | 41.56 | 40.37 | 42.08 | 42.22 | 41.62 | 42.28 |
| Research and Public Service | 0.55 | 0.73 | 0.73 | 0.89 | 0.90 | 1.05 | 1.50 | 1.52 | 3.18 | 2.95 | 2.91 | 3.70 | 3.70 | 3.41 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | 46.59 | 45.33 | 45.33 | 43.72 | 43.90 | 42.80 | 42.18 | 41.56 | 37.44 | 37.60 | 37.74 | 37.53 | 37.53 | 37.15 |
| Hospitals and Clinics | 11.53 | 10.38 | 10.29 | 9.61 | 9.66 | 9.00 | 9.27 | 9.35 | 7.44 | 7.28 | 7.17 | 7.39 | 7.39 | 8.16 |
| Health Related R&PS | 3.58 | 6.15 | 6.43 | 6.45 | 6.00 | 6.08 | 6.51 | 5.61 | 6.33 | 9.98 | 9.85 | 9.76 | 9.76 | 9.00 |
| Defed Maint. R&PS | | | | | | | | | 0.93 | | | | | |
| Other | 0.21 | 0.17 | 0.17 | 0.15 | 0.15 | 0.14 | 0.14 | 0.11 | 0.09 | 0.10 | 0.10 | | | |
| Total: UAB | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories
University and College Appropriations 1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.9811% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 1.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **University of AL in Huntsville** | | | | | | | | | | | | | | |
| Regular Acad. Programs (UAH) | 64.42 | 64.49 | 63.76 | 64.57 | 64.56 | 65.39 | 66.19 | 67.01 | 63.93 | 66.40 | 66.91 | 67.44 | 67.44 | 71.93 |
| Research and Public Service | 3.01 | 3.72 | 5.06 | 5.19 | 5.20 | 6.84 | 6.69 | 10.44 | 12.62 | 13.64 | 13.44 | 13.91 | 13.91 | 12.71 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Professional Health | 25.97 | 25.41 | 24.92 | 24.41 | 24.41 | 21.29 | 20.79 | 17.22 | 14.84 | 14.62 | 14.40 | 13.62 | 13.62 | 10.76 |
| Hospitals and Clinics | 6.39 | 6.21 | 6.09 | 5.68 | 5.68 | 6.34 | 6.20 | 5.23 | 4.21 | 4.39 | | | | |
| Hlth. Related R&PS | | | | | | | | | 4.32 | 0.86 | 5.17 | 5.03 | 5.03 | 4.60 |
| Defed Maint. R&PS | | | | | | | | | | | | | | |
| Other | 0.21 | 0.17 | 0.17 | 0.15 | 0.15 | 0.13 | 0.13 | 0.10 | 0.08 | 0.09 | 0.09 | | | |
| Total: UAH | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **University of Alabama System** | | | | | | | | | | | | | | |
| Regular Acad. Programs (UAH) | 58.30 | 56.20 | 56.12 | 57.48 | 57.56 | 58.68 | 57.60 | 56.11 | 54.86 | 55.91 | 56.06 | 55.88 | 55.88 | 57.19 |
| Research and Public Service | 3.10 | 3.86 | 4.10 | 4.14 | 4.20 | 4.42 | 4.98 | 8.03 | 10.30 | 10.02 | 9.97 | 10.29 | 10.29 | 9.63 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Prof. Health | 28.56 | 28.79 | 28.54 | 27.60 | 27.70 | 26.69 | 26.86 | 25.94 | 24.53 | 23.12 | 23.15 | 23.00 | 23.00 | 22.47 |
| Hospitals and Clinics | 7.43 | 6.96 | 6.89 | 6.47 | 6.50 | 6.18 | 6.29 | 6.15 | 5.04 | 5.01 | 3.82 | 3.94 | 3.94 | 4.35 |
| Health Related R&PS | 2.45 | 4.06 | 4.23 | 4.20 | 3.93 | 3.93 | 4.16 | 3.68 | 3.73 | 5.87 | 6.92 | 6.89 | 6.89 | 6.37 |
| Defed Maint. R&PS | | | | | | | | | 1.47 | | | | | |
| Other | 0.15 | 0.12 | 0.12 | 0.11 | 0.11 | 0.10 | 0.10 | 0.08 | 0.07 | 0.07 | 0.07 | 0.07 | | |
| Total: U A System | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **University of Montevallo** | | | | | | | | | | | | | | |
| Regular Acad. Programs (UAH) | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 87.46 | 100.00 | 100.00 | 100.00 | 100.00 | 96.80 |
| Research and Public Service | | | | | | | | | | | | | | |
| Ag. Research & Extension | | | | | | | | | | | | | | 3.20 |
| First Prof. Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 12.52 | | | | | |
| Defed Maintenance R&PS | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Total: UM | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories
University and College Appropriations 1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.9811% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **University of North Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 99.69 | 99.75 | 99.74 | 99.78 | 99.76 | 99.78 | 96.95 | 93.63 | 85.56 | 97.07 | 97.11 | 97.02 | 94.15 | 94.12 |
| Research and Public Service | | | | | | | 2.84 | 6.21 | 3.58 | 2.93 | 2.89 | 2.98 | 5.85 | 5.88 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Prof. Health | | | | | | | | | | | | | | |
| Hospitals and Clinics | | | | | | | | | | | | | | |
| Health Related Res.& Pub. Serv. | | | | | | | | | 10.71 | | | | | |
| Defd Maint. R&PS | | | | | | | | | | | | | | |
| Other | 0.31 | 0.25 | 0.26 | 0.22 | 0.24 | 0.22 | 0.20 | 0.17 | 0.11 | | | | | |
| Total: UNA | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **University of South Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 48.67 | 50.38 | 50.24 | 52.91 | 55.23 | 55.05 | 55.29 | 57.60 | 56.12 | 61.13 | 61.76 | 59.96 | 59.96 | 57.92 |
| Research and Public Service | | 0.41 | 0.40 | 0.36 | 0.36 | 0.36 | 0.36 | 0.94 | 0.74 | 0.79 | 0.78 | 0.75 | 0.75 | 1.02 |
| Ag. Research & Extension | | | | | | | | | | | | | | |
| First Prof. Health | 42.78 | 41.61 | 41.87 | 40.09 | 39.96 | 40.11 | 39.90 | 37.56 | 31.22 | 33.36 | 32.78 | 30.37 | 30.37 | 28.95 |
| Hospital and Clinics | 8.46 | 7.52 | 7.41 | 6.57 | 4.39 | 4.41 | 4.38 | 3.84 | 8.12 | 3.36 | 3.31 | 5.85 | 5.85 | 9.26 |
| Health Related R&PS | | | | | | | | | 1.27 | 1.36 | 1.34 | 3.07 | 3.07 | 2.86 |
| Defd Maint. R&PS | | | | | | | | | 2.48 | | | | | |
| Other | 0.10 | 0.08 | 0.08 | 0.07 | 0.07 | 0.07 | 0.07 | 0.06 | 0.04 | | 0.05 | | | |
| Total: USA | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **All Senior Institutions** | | | | | | | | | | | | | | |
| Regular Acad. Programs (O&M) | 69.28 | 68.35 | 68.26 | 69.10 | 69.31 | 69.84 | 69.25 | 67.70 | 63.05 | 65.88 | 66.42 | 65.89 | 65.87 | 65.86 |
| Research and Public Service | 1.72 | 2.46 | 2.56 | 2.62 | 2.64 | 2.77 | 3.19 | 5.38 | 6.54 | 6.65 | 6.65 | 6.89 | 6.71 | 6.33 |
| Ag. Research & Extension | 6.86 | 6.65 | 6.64 | 6.67 | 6.72 | 6.76 | 6.77 | 6.90 | 6.70 | 6.93 | 6.92 | 7.01 | 7.16 | 7.56 |
| First Prof. Health | 16.76 | 16.75 | 16.70 | 16.10 | 16.11 | 15.59 | 15.60 | 15.05 | 15.28 | 14.81 | 14.75 | 14.69 | 14.69 | 14.46 |
| Hospital and Clinics | 4.11 | 3.82 | 3.78 | 3.51 | 3.32 | 3.17 | 3.21 | 3.21 | 3.01 | 2.57 | 2.04 | 2.23 | 2.29 | 2.76 |
| Health Related R&PS | 1.16 | 1.84 | 1.95 | 1.91 | 1.79 | 1.78 | 1.88 | 1.69 | 1.76 | 2.72 | 3.18 | 3.28 | 3.28 | 3.03 |
| Defd Maint. R&PS | | | | | | | | | 3.58 | | | | | |
| Other | 0.12 | 0.10 | 0.10 | 0.09 | 0.09 | 0.09 | 0.09 | 0.08 | 0.08 | 0.45 | 0.04 | | | |
| Total: All Senior Institutions | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

Distribution By Major Categories
University and College Appropriations 1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.140% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Junior & Technical Colleges | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 98.29 | 97.41 | 96.53 | 97.36 | 95.51 | 93.37 | 94.26 | 89.04 |
| Al. Ind. Devel. Training Pgm. | | | | | | | 1.71 | 1.63 | 1.71 | 1.56 | 3.29 | 5.14 | 4.85 | 8.01 |
| Facility Renewal | | | | | | | | | 0.77 | | | | | |
| Chancellor & Statewide Pgms. | | | | | | | | 0.96 | 0.98 | 1.08 | 1.21 | 1.49 | 0.89 | 2.95 |
| Total: Two-Year Institutions | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **All Public Institutions** | | | | | | | | | | | | | | |
| Regular Acad. Programs (U&H) | 76.28 | 75.83 | 75.88 | 76.11 | 76.30 | 76.58 | 75.76 | 74.11 | 70.28 | 72.50 | 72.60 | 71.79 | 71.90 | 71.00 |
| Research and Public Service | 1.32 | 1.88 | 1.95 | 2.03 | 2.04 | 2.15 | 2.86 | 4.57 | 5.50 | 5.58 | 5.93 | 6.51 | 6.32 | 6.70 |
| Ag. Research & Extension | 5.30 | 5.08 | 5.05 | 5.16 | 5.19 | 5.24 | 5.25 | 5.41 | 5.25 | 5.47 | 5.45 | 5.51 | 5.64 | 5.84 |
| First Prof. Health | 12.94 | 12.80 | 12.69 | 12.45 | 12.45 | 12.11 | 12.10 | 11.80 | 11.98 | 11.69 | 11.61 | 11.54 | 11.57 | 11.26 |
| Hospital and Clinics | 3.18 | 2.92 | 2.87 | 2.72 | 2.57 | 2.46 | 2.49 | 2.51 | 2.36 | 2.03 | 1.61 | 1.75 | 1.81 | 2.15 |
| Health Related R&PS | 0.89 | 1.43 | 1.48 | 1.48 | 1.38 | 1.38 | 1.46 | 1.32 | 1.38 | 2.15 | 2.51 | 2.58 | 2.58 | 2.35 |
| Defed Maint. R&PS | | | | | | | | | 2.97 | | | | | |
| Other | 0.09 | 0.08 | 0.08 | 0.07 | 0.07 | 0.07 | 0.07 | 0.27 | 0.28 | 0.58 | 0.29 | 0.32 | 0.19 | 0.66 |
| Total: All Public Institutions | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

University and College RAP Appropriations,
Full Time Equivalent Students, and
RAP $ Per FTE
1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Alabama A&M University** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 6,951 | 8,102 | 7,892 | 9,354 | 9,079 | 9,702 | 9,777 | 10,776 | 11,845 | 13,999 | 14,776 | 16,791 | 16,634 | 17,039 |
| Reg Prog FTE | 4,015 | 3,888 | 3,933 | 4,166 | 4,013 | 3,792 | 3,907 | 3,514 | 3,651 | 3,294 | 3,112 | 3,627 | 3,901 | |
| RAP $ Per FTE | 1,731 | 2,084 | 2,007 | 2,245 | 2,262 | 2,559 | 2,502 | 3,067 | 3,244 | 4,250 | 4,748 | 4,629 | 4,264 | |
| **Alabama State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 5,936 | 7,149 | 6,951 | 8,052 | 7,816 | 8,524 | 8,703 | 10,805 | 12,061 | 13,955 | 15,082 | 17,147 | 16,977 | 18,485 |
| Reg Prog FTE | 4,357 | 4,483 | 3,705 | 3,864 | 3,703 | 3,683 | 3,756 | 3,448 | 3,243 | 3,150 | 2,883 | 3,426 | 3,791 | |
| RAP $ Per FTE | 1,362 | 1,595 | 1,876 | 2,084 | 2,111 | 2,314 | 2,317 | 3,134 | 3,719 | 4,430 | 5,231 | 5,005 | 4,478 | |
| **Athens State College** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 1,146 | 1,455 | 1,418 | 1,562 | 1,508 | 1,981 | 2,025 | 2,499 | 2,670 | 2,715 | 2,761 | 3,308 | 3,266 | 4,435 |
| Reg Prog FTE | 967 | 1,010 | 931 | 883 | 758 | 773 | 809 | 887 | 1,001 | 1,246 | 1,427 | 1,637 | 1,903 | |
| RAP $ Per FTE | 1,185 | 1,441 | 1,523 | 1,769 | 1,989 | 2,563 | 2,503 | 2,817 | 2,667 | 2,179 | 1,935 | 2,021 | 1,716 | |
| **Auburn University** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 30,570 | 35,339 | 34,440 | 39,882 | 38,716 | 42,963 | 43,252 | 53,478 | 55,612 | 51,781 | 52,630 | 63,438 | 62,958 | 71,559 |
| Reg Prog FTE | 18,285 | 19,953 | 19,172 | 18,667 | 16,641 | 18,446 | 18,421 | 18,709 | 18,380 | 18,472 | 19,249 | 19,615 | 20,612 | |
| RAP $ Per FTE | 1,672 | 1,771 | 1,796 | 2,136 | 2,077 | 2,329 | 2,348 | 2,858 | 3,026 | 2,803 | 2,734 | 3,234 | 3,054 | |
| **Auburn University at Montgomery** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 4,582 | 5,367 | 5,226 | 6,253 | 6,067 | 7,076 | 7,178 | 8,977 | 10,095 | 10,188 | 10,366 | 11,597 | 11,325 | 12,473 |
| Reg Prog FTE | 3,081 | 3,205 | 3,623 | 4,001 | 3,974 | 4,136 | 4,297 | 3,978 | 4,106 | 4,180 | 4,205 | 4,338 | 4,726 | |
| RAP $ Per FTE | 1,487 | 1,675 | 1,442 | 1,561 | 1,527 | 1,711 | 1,670 | 2,257 | 2,459 | 2,437 | 2,465 | 2,673 | 2,396 | |
| **AES/CES** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | | | | | | | | | | | | | | |
| Reg Prog FTE | | | | | | | | | | | | | | |
| RAP $ Per FTE | | | | | | | | | | | | | | |

University and College RAP Appropriations,
Full Time Equivalent Students, and
RAP $ Per FTE
1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Auburn University System** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 35,152 | 40,706 | 39,666 | 46,135 | 44,783 | 50,039 | 50,430 | 62,455 | 65,707 | 61,969 | 62,996 | 75,035 | 74,282 | 84,031 |
| Reg Prog FTE | 21,366 | 23,158 | 22,795 | 22,668 | 22,615 | 22,582 | 22,718 | 22,687 | 22,486 | 22,652 | 23,454 | 23,953 | 25,338 | |
| RAP $ Per FTE | 1,645 | 1,758 | 1,740 | 2,035 | 1,980 | 2,216 | 2,220 | 2,753 | 2,922 | 2,736 | 2,686 | 3,133 | 2,932 | |
| **Jacksonville State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 9,102 | 10,630 | 10,368 | 11,940 | 11,587 | 12,258 | 12,508 | 13,629 | 15,728 | 15,090 | 15,377 | 17,386 | 17,167 | 18,692 |
| Reg Prog FTE | 5,915 | 6,070 | 6,200 | 6,291 | 5,907 | 5,646 | 5,650 | 5,969 | 6,095 | 6,025 | 6,154 | 6,258 | 7,118 | |
| RAP $ Per FTE | 1,539 | 1,751 | 1,672 | 1,898 | 1,962 | 2,171 | 2,214 | 2,283 | 2,580 | 2,505 | 2,499 | 2,778 | 2,412 | |
| **Livingston University** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 2,664 | 3,116 | 3,033 | 3,743 | 3,632 | 4,127 | 4,201 | 4,771 | 5,438 | 5,298 | 5,367 | 5,939 | 5,864 | 6,181 |
| Reg Prog FTE | 1,336 | 1,169 | 1,157 | 1,028 | 1,205 | 1,419 | 1,422 | 1,401 | 1,395 | 1,377 | 1,456 | 1,552 | 1,679 | |
| RAP $ Per FTE | 1,994 | 2,666 | 2,621 | 3,641 | 3,014 | 2,908 | 2,954 | 3,405 | 3,898 | 3,847 | 3,686 | 3,827 | 3,493 | |
| **Troy State University** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 5,693 | 6,606 | 6,433 | 7,366 | 7,131 | 8,035 | 8,243 | 9,512 | 11,872 | 11,020 | 11,226 | 12,612 | 12,453 | 13,433 |
| Reg Prog FTE | 4,436 | 4,622 | 4,637 | 4,567 | 4,379 | 4,180 | 4,226 | 4,043 | 4,088 | 4,176 | 4,196 | 4,346 | 4,448 | |
| RAP $ Per FTE | 1,283 | 1,429 | 1,387 | 1,613 | 1,628 | 1,922 | 1,951 | 2,353 | 2,904 | 2,639 | 2,675 | 2,902 | 2,800 | |
| **Troy St.Univ-Dothan/Ft. Rucker** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 330 | 844 | 817 | 940 | 926 | 1,157 | 1,158 | 1,329 | 1,626 | 1,638 | 1,675 | 2,155 | 2,128 | 2,654 |
| Reg Prog FTE | 1,146 | 1,006 | 1,766 | 1,019 | 909 | 946 | 1,079 | 983 | 1,099 | 1,032 | 1,034 | 1,146 | 1,214 | |
| RAP $ Per FTE | 288 | 839 | 463 | 922 | 1,019 | 1,223 | 1,073 | 1,352 | 1,480 | 1,587 | 1,620 | 1,880 | 1,752 | |
| **Troy St. Univ. in Montgomery** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 187 | 216 | 209 | 241 | 238 | 411 | 538 | 695 | 1,492 | 1,505 | 1,537 | 2,218 | 2,190 | 2,849 |
| Reg Prog FTE | 1,228 | 866 | 1,258 | 1,250 | 1,291 | 1,370 | 1,276 | 1,290 | 1,254 | 1,349 | 1,397 | 1,464 | 1,634 | |
| RAP $ Per FTE | 152 | 249 | 166 | 193 | 184 | 300 | 422 | 539 | 1,190 | 1,116 | 1,100 | 1,515 | 1,341 | |

University and College RAP Appropriations,
Full Time Equivalent Students, and
RAP $ Per FTE
1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Troy State University System** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 6,210 | 7,666 | 7,459 | 8,547 | 8,295 | 9,603 | 9,939 | 11,536 | 14,990 | 14,163 | 14,438 | 16,985 | 16,771 | 18,935 |
| Reg Prog FTE | 6,810 | 6,494 | 7,661 | 6,836 | 6,579 | 6,496 | 6,581 | 6,316 | 6,441 | 6,557 | 6,627 | 6,956 | 7,296 | |
| RAP $ Per FTE | 912 | 1,180 | 974 | 1,250 | 1,261 | 1,478 | 1,510 | 1,826 | 2,327 | 2,160 | 2,179 | 2,442 | 2,299 | |
| **University of Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 28,773 | 31,665 | 30,827 | 36,190 | 35,024 | 38,488 | 38,049 | 43,190 | 49,897 | 47,475 | 48,231 | 55,147 | 54,453 | 61,454 |
| Reg Prog FTE | 14,965 | 15,084 | 16,059 | 16,291 | 15,580 | 14,519 | 13,971 | 13,610 | 13,429 | 14,235 | 15,707 | 16,861 | 17,025 | |
| RAP $ Per FTE | 1,923 | 2,099 | 1,920 | 2,221 | 2,248 | 2,651 | 2,723 | 3,173 | 3,716 | 3,335 | 3,071 | 3,271 | 3,198 | |
| **University of AL at Birmingham** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 17,908 | 21,434 | 21,041 | 25,960 | 25,205 | 28,524 | 28,567 | 36,884 | 42,840 | 40,887 | 41,642 | 47,020 | 46,429 | 52,412 |
| Reg Prog FTE | 9,612 | 10,047 | 10,380 | 10,296 | 10,454 | 10,483 | 10,531 | 9,958 | 9,857 | 9,991 | 10,110 | 11,370 | 11,563 | |
| RAP $ Per FTE | 1,863 | 2,133 | 2,027 | 2,521 | 2,411 | 2,721 | 2,711 | 3,704 | 4,346 | 4,092 | 4,119 | 4,135 | 4,015 | |
| **University of AL in Huntsville** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 5,626 | 6,508 | 6,314 | 7,471 | 7,251 | 8,741 | 9,060 | 11,846 | 14,174 | 13,698 | 14,010 | 16,303 | 16,097 | 19,222 |
| Reg Prog FTE | 3,023 | 3,173 | 3,504 | 3,738 | 4,108 | 4,375 | 4,337 | 4,258 | 4,241 | 4,452 | 4,511 | 4,840 | 5,038 | |
| RAP $ Per FTE | 1,861 | 2,051 | 1,811 | 1,999 | 1,765 | 1,998 | 2,089 | 2,782 | 3,342 | 3,077 | 3,106 | 3,368 | 3,195 | |
| **University of Alabama System** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 52,307 | 59,607 | 58,212 | 69,621 | 67,480 | 75,753 | 75,676 | 91,920 | 106,911 | 102,060 | 103,883 | 118,470 | 116,979 | 133,089 |
| Reg Prog FTE | 27,600 | 28,304 | 29,943 | 30,325 | 30,142 | 29,377 | 28,839 | 27,826 | 27,527 | 28,678 | 30,328 | 33,071 | 33,626 | |
| RAP $ Per FTE | 1,895 | 2,106 | 1,944 | 2,296 | 2,239 | 2,579 | 2,624 | 3,303 | 3,884 | 3,559 | 3,425 | 3,582 | 3,479 | |
| **University of Montevallo** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 4,705 | 5,210 | 5,073 | 6,268 | 6,084 | 6,475 | 6,617 | 7,953 | 8,700 | 8,752 | 8,878 | 9,901 | 9,777 | 9,915 |
| Reg Prog FTE | 2,536 | 2,484 | 2,525 | 2,325 | 2,310 | 2,390 | 2,309 | 2,360 | 2,277 | 2,221 | 2,553 | 2,348 | 2,659 | |
| RAP $ Per FTE | 1,855 | 2,097 | 2,009 | 2,696 | 2,634 | 2,709 | 2,866 | 3,370 | 3,821 | 3,941 | 3,477 | 4,217 | 3,677 | |

1254

University and College RAP Appropriations,
Full Time Equivalent Students, and
RAP $ Per FTE
1977-78 through 1990-91

| | 77-78 | 78-79 (after 2.981% proration) | 79-80 (after 6.1406% proration) | 80-81 (after 3.568% proration) | 81-82 | 82-83 | 83-84 | 84-85 | 85-86 (after proration) | 86-87 | 87-88 | 88-89 | 89-90 | 90-91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **University of North Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 5,711 | 6,791 | 6,620 | 7,649 | 7,423 | 8,201 | 8,528 | 10,033 | 11,454 | 11,677 | 11,882 | 13,223 | 12,669 | 13,837 |
| Reg Prog FTE | 4,289 | 4,334 | 4,485 | 4,601 | 4,563 | 4,499 | 4,513 | 4,411 | 4,330 | 4,178 | 4,253 | 4,383 | 4,567 | |
| RAP $ Per FTE | 1,332 | 1,567 | 1,476 | 1,662 | 1,627 | 1,823 | 1,890 | 2,274 | 2,645 | 2,795 | 2,794 | 3,017 | 2,774 | |
| **University of South Alabama** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 9,101 | 10,898 | 10,675 | 13,031 | 13,201 | 14,299 | 14,438 | 18,214 | 21,658 | 21,940 | 22,523 | 25,343 | 25,024 | 26,820 |
| Reg Prog FTE | 5,526 | 5,561 | 5,976 | 6,317 | 6,841 | 7,409 | 7,308 | 7,205 | 7,114 | 7,461 | 7,722 | 8,319 | 9,046 | |
| RAP $ Per FTE | 1,647 | 1,960 | 1,786 | 2,063 | 1,930 | 1,930 | 1,976 | 2,528 | 3,044 | 2,941 | 2,917 | 3,046 | 2,766 | |
| **All Senior Institutions** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 138,987 | 161,330 | 157,367 | 185,902 | 180,838 | 200,962 | 202,842 | 244,591 | 277,162 | 271,618 | 277,963 | 319,528 | 315,411 | 351,459 |
| Reg Prog FTE | 84,717 | 86,955 | 89,311 | 89,304 | 88,636 | 88,066 | 87,812 | 86,026 | 85,560 | 86,839 | 89,969 | 95,530 | 100,924 | |
| RAP $ Per FTE | 1,641 | 1,855 | 1,762 | 2,082 | 2,041 | 2,282 | 2,310 | 2,843 | 3,239 | 3,128 | 3,090 | 3,345 | 3,125 | |
| **Junior & Technical Colleges** | 59,247 | 72,977 | 72,745 | 78,854 | 76,725 | 82,845 | 83,208 | 96,897 | 116,988 | 106,829 | 107,886 | 123,728 | 121,601 | 135,221 |
| Reg Prog FTE | 47,104 | 46,348 | 44,102 | 46,431 | 47,229 | 48,733 | 49,266 | 45,235 | 46,164 | 47,442 | 47,318 | 50,254 | 53,715 | |
| RAP $ Per FTE | 1,258 | 1,575 | 1,649 | 1,698 | 1,625 | 1,700 | 1,689 | 2,142 | 2,534 | 2,252 | 2,280 | 2,462 | 2,264 | |
| **All Public Institutions** | | | | | | | | | | | | | | |
| Regular Acad. Programs ($000) | 198,234 | 234,307 | 230,112 | 264,756 | 257,613 | 283,807 | 286,050 | 341,488 | 394,150 | 378,447 | 385,849 | 443,256 | 437,012 | 486,680 |
| Reg Prog FTE | 131,821 | 133,303 | 133,413 | 135,735 | 135,865 | 136,799 | 137,078 | 131,261 | 131,724 | 134,281 | 137,287 | 145,784 | 154,639 | |
| RAP $ Per FTE | 1,504 | 1,758 | 1,725 | 1,951 | 1,896 | 2,075 | 2,087 | 2,602 | 2,992 | 2,818 | 2,811 | 3,040 | 2,826 | |

1178. The continued presence or absence of the programs represented by the line-item appropriations on STX 202.24 has not been shown to be a result of race discrimination. Students of all races are free to participate in each program. An appropriation to such a program relates to the actual costs and utility of such a program. To the extent that such an appropriation benefits students, it benefits all students, regardless of race.

1179. During the last decade, ASU's percentage of the RAP appropriation has each year exceeded its percentage of the total headcount or full-time-equivalent enrollment in public senior colleges in Alabama. This is shown in the following table.

RAP Appropriation
ASU

| | % H'count [88] | % FTE [89] | % $ [90] |
| --- | --- | --- | --- |
| 1980 | 3.98 | 4.26 | 4.33 |
| 1981 | 3.96 | 4.11 | 4.32 |
| 1982 | 3.97 | 4.12 | 4.24 |
| 1983 | 3.95 | 4.22 | 4.29 |
| 1984 | 3.73 | 3.95 | 4.42 |
| 1985 | 3.54 | 3.72 | 4.35 |
| 1986 | 3.42 | 3.56 | 5.14 |
| 1987 | 3.39 | 3.15 | 5.43 |
| 1988 | 3.58 | 3.57 | 5.37 |
| 1989 | 3.69 | 3.74 | 5.38 |
| 1990 | 3.70 | 3.64 | 5.26 |

1180. During the last decade, AAMU's percentage of the RAP appropriation has in every year exceeded its percentage of the total headcount or full-time-equivalent enrollment in public senior colleges in Alabama. This is shown in the following table.

88. ASU Headcount enrollment (STX 202.1) divided by "All Senior" headcount enrollment (STX 202.1), multiplied by 100. This represents the percentage of students, by headcount, in public senior colleges in Alabama who attend ASU.

89. ASU FTE enrollment (STX 202.2) divided by "All Senior" FTE enrollment (STX 202.2), multiplied by 100. This represents the percentage of FTE students in public senior colleges in Alabama who attend ASU.

90. ASU RAP appropriation (STX 202.24) divided by "All Senior" RAP appropriation (STX 202.24), multiplied by 100. This represents the percentage of the total RAP appropriation which goes to ASU.

RAP Appropriation
AAMU

| | % H'count | % FTE | % $ |
|------|-----------|-------|------|
| 1980 | 4.29 | 4.59 | 5.03 |
| 1981 | 4.23 | 4.46 | 5.02 |
| 1982 | 4.05 | 4.24 | 4.83 |
| 1983 | 4.04 | 4.39 | 4.82 |
| 1984 | 4.05 | 4.03 | 4.41 |
| 1985 | 4.14 | 4.19 | 4.27 |
| 1986 | 3.79 | 3.73 | 5.15 |
| 1987 | 3.51 | 3.40 | 5.32 |
| 1988 | 3.76 | 3.78 | 5.25 |
| 1989 | 3.73 | 3.85 | 5.27 |
| 1990 | 3.95 | 4.01 | 4.85 |

1181. If one adjusts the total appropriations shown on STX 202.24 to remove those line items which most clearly are specific to high cost programs unique to one or two institutions (to wit, Agricultural Research and Extension, First Professional Health, Hospitals and Clinics, and Health Related RAP's) the trends of both ASU and AAMU receiving a larger percentage of the State's higher education dollars than the percentage of students attending those schools continues. It is shown for AAMU and ASU on the following table.

Adj Appropriation ASU Adj Appropriation AAMU

| | ASU % H'count | ASU % FTE | ASU % $ | AAMU % H'count | AAMU % FTE | AAMU % $ |
|------|---------------|-----------|---------|----------------|------------|----------|
| 1980 | 3.98 | 4.26 | 4.17 | 4.29 | 4.59 | 4.84 |
| 1981 | 3.96 | 4.11 | 4.06 | 4.23 | 4.46 | 4.71 |
| 1982 | 3.97 | 4.12 | 3.98 | 4.05 | 4.24 | 4.53 |
| 1983 | 3.95 | 4.22 | 3.99 | 4.04 | 4.39 | 4.49 |
| 1984 | 3.73 | 3.95 | 4.03 | 4.05 | 4.03 | 3.99 |
| 1985 | 3.54 | 3.72 | 4.18 | 4.14 | 4.19 | 4.09 |
| 1986 | 3.42 | 3.56 | 4.79 | 3.79 | 3.73 | 4.73 |
| 1987 | 3.39 | 3.15 | 4.75 | 3.51 | 3.40 | 4.65 |
| 1988 | 3.58 | 3.57 | 4.68 | 3.76 | 3.78 | 4.58 |
| 1989 | 3.69 | 3.74 | 4.69 | 3.73 | 3.85 | 4.61 |
| 1990 | 3.70 | 3.64 | 4.64 | 3.95 | 4.01 | 4.28 |

1182. Dr. Paul Brinkman, an expert witness for the state used another method to compare funding for students attending institutions of higher education in Alabama.

1183. Persons familiar with higher education finance and economics sometimes analyze funding equity by comparing funding levels for individual institutions within a state to funding levels for similar institutions outside the state. Brinkman (3/5/91) 10.

1184. Dr. Brinkman, formerly a consultant with the National Center for Higher Education Management Systems (NCHEMS) [91], did such a comparative study for Alabama's public senior institutions in 1989–90. Brinkman (3/5/91) 11. There was testimony that the comparative study

91. NCHEMS is a private non-profit agency founded about 25 years ago. The first work of the organization focused on the standardization of data throughout the country, and the federal government used the results of the work of NCHEMS and others to create standards for reports it requires of institutions in the United States. Since the middle 1980's, NCHEMS has ceased being heavily funded by the federal government and has become more of a consulting group. Brinkman (3/5/91) 7–8

was not prepared for this lawsuit. Rather, it was part of NCHEMS' ongoing analysis of Alabama's funding formula prepared for ACHE and the Council of College and University Presidents. *Id.* 7; Rutledge (2/20/91) 192.

1185. Dr. Brinkman has a Ph.D. in higher education administration, with a concentration in finance and a minor in economics. Brinkman (3/5/91) 3. He specializes in cost analysis and the use of comparative data. *Id.* 2.

1186. NCHEMS maintains large data bases consisting of information gathered primarily by the federal government. Dr. Brinkman's comparative studies use data from "HEGIS" and "IPEDS" reports submitted by institutions to the federal government—"HEGIS" stands for Higher Education General Information Surveys, and "IPEDS" stands for Integrated Post-Secondary Education Data System. IPEDS reports replaced HEGIS reports in 1986.

1187. In the Alabama study, Dr. Brinkman first used HEGIS data to construct peer groups for each public senior institution in Alabama. Brinkman (3/5/91) 11. The peer groups consisted of institutions with roles similar to those of the Alabama institutions. *Id.* 33–35.

1188. Dr. Brinkman then used IPEDS data to compare funding levels; he expressed the funding level at each Alabama institution as a percentage of the mean and median funding levels for the peer group institutions. Brinkman (3/5/91) 35–43.

1189. Dr. Brinkman defined funding on a per-student basis so he could compare institutions of dissimilar size. Brinkman (3/5/91) 34, 36. Because he scaled the analysis to students, he considered only that portion of each institution's funding that related to students. *Id.* 36. Dr. Brinkman analyzed expenditures rather than revenues because only expenditures are categorized in the HEGIS and IPEDS reports in a way that allows the identification of student-related funds. *Id.* 36–37.

1190. Dr. Brinkman examined only "educational and general expenditures," and made further adjustments to that figure, to peel away expenditures that did not relate to students (such as research and public service) or the funding formula (such as gifts and grants) and to adjust for peculiarities in expenditure practices at Alabama's public institutions of higher education (such as using operations money to fund capital projects). Brinkman (3/5/91) 36–39.

1191. The results of Dr. Brinkman's Alabama study are shown in Tables 1 through 3 below:[92]

Table 1. Comparison of Adjusted Educational and General Expenditures * per Full–Time Equivalent Student, Alabama Public Four–Year Colleges and Universities with Their Respective Reference Groups, 1987–88.

| | % of Mean | % of Median |
|---|---|---|
| AAMU | 131.8 | 137.4 |
| UAH | 106.9 | 118.9 |
| ASU | 113.4 | 118.1 |
| UM | 102.9 | 100.0 |
| LU | 89.5 | 97.0 |
| ASC | 79.5 | 93.5 |
| UA | 83.0 | 91.9 |
| JSU | 90.1 | 91.7 |
| TSU | 87.9 | 88.8 |
| UAB *** | 80.9 | 80.9 |
| UNA | 82.1 | 79.1 |

Table 2. Comparison of Tuition Revenues per FTE Student, Alabama Public Four–Year Colleges and Universities with Their Respective Reference Groups, 1987–88.

| | % of Mean | % of Median |
|---|---|---|
| UA | 118.7 | 127.9 |
| UAH | 118.5 | 126.3 |
| ASC | 125.5 | 122.5 |
| UM | 105.8 | 116.4 |
| TSUM | 101.2 | 107.8 |
| TSU | 101.2 | 107.8 |
| ASU | 103.1 | 107.3 |
| TSU–Dothan | 109.9 | 105.7 |
| AUM | 101.3 | 102.2 |
| UAB | 96.4 | 99.8 |
| JSU | 91.0 | 97.5 |
| AU | 95.0 | 96.6 |

Table 3: Comparison of Adjusted Educational and General Expenditures ** Minus Tuition and Fee Revenue, per FTE Student, Alabama Public Four–Year Colleges and Universities with Their Respective Reference Groups, 1987–88.

| | % of Mean | % of Median |
|---|---|---|
| AAMU | 144.1 | 169.9 |
| ASU | 121.0 | 127.3 |
| UAH | 102.0 | 113.7 |
| LU | 96.6 | 102.2 |
| UM | 101.9 | 98.1 |
| JSU | 89.8 | 94.4 |
| TSU | 82.3 | 85.6 |
| UNA | 81.3 | 82.2 |
| AU | 63.4 | 79.8 |
| UAB *** | 76.9 | 76.9 |

**92.** STX 156, pp. 7, 9, and 10.

| | % of Mean | % of Median | | % of Mean | % of Median | | % of Mean | % of Median |
|---|---|---|---|---|---|---|---|---|
| TSU–Dothan | 69.8 | 76.3 | AAMU | 92.9 | 92.1 | ASC | 64.5 | 76.2 |
| USoALA | 71.7 | 75.3 | | | | AUM | 78.6 | 77.1 |
| AU | 72.9 | 73.2 | USoALA | 88.9 | 88.3 | UA | 67.3 | 73.4 |
| AUM | 75.3 | 72.2 | UNA | 84.4 | 80.9 | | | |
| | | | | | | USoALA | 64.1 | 67.1 |
| TSUM | 49.0 | 50.0 | LU | 69.3 | 71.8 | TSU–Dothan | 53.8 | 58.8 |

Source of raw data: IPEDS

TSUM 32.0 29.7

---

\* Basic adjustment to educational and general (E & G) expenditures was as follows: From E & G expenditures, subtract E & G mandatory transfers, E & G nonmandatory transfers, expenditures for research, public service, and restricted scholarships and fellowships, a prorated share of expenditures for institutional support and plant operation and maintenance based on the proportion of E & G expenditures (less transfers) spent on research and public service, restricted expenditures for instruction, and revenue from "other sources," unrestricted private gifts, grants, and contracts, and unrestricted endowment.

\*\* See footnote in Table 1.

\*\*\* Estimated by regression model; see text for details.

---

1192. Dr. Brinkman's "Table 1" compares adjusted educational and general expenditures per FTE student at Alabama public senior institutions with adjusted educational and general expenditures per FTE student at institutions in their peer groups. STX 156, p. 7.

1193. AAMU, UAH, and ASU are the only Alabama institutions in Dr. Brinkman's Table 1 with values above 100% in both the "percentage of mean" and "percentage of median" columns. A value above 100 means the Alabama institution spends more money per student than the mean or median for its peer group. Brinkman (3/5/91) 43; STX 156, p. 7.

1194. Dr. Brinkman's "Table 2" compares tuition revenues per student between Alabama public senior institutions and the institutions in their peer groups. Brinkman (3/5/91) 118; STX 156, p. 9. Tuition revenues for ASU and AAMU are not far from the means and medians for their peer groups.

1195. Dr. Brinkman's "Table 3" compares adjusted educational and general expenditures per FTE student at each Alabama public senior institution with adjusted educational and general expenditures for institutions in their peer groups, taking out tuition and fee revenues for all institutions. Brinkman (3/5/91) 117; STX 156, p. 10. Most of the funds shown in Table 3, if not all, come from appropriations.

1196. AAMU, ASU, and UAH are the only Alabama institutions in Table 3 with values above 100 in both the "percentage of mean" and "percentage of median" columns.

1197. Because the size of the peer groups is relatively small, the "percentage of median" values are slightly more meaningful than the "percentage of mean" values. Brinkman (3/5/91) 42–43.

1198. As Dr. Brinkman pointed out, possible reporting errors, variations in accounting schemes used by institutions, and inability to find peers that perfectly match the subject institutions affect the validity of the comparative study results. Brinkman (3/5/91) 45.

1199. Moreover, the study was designed to reveal statewide patterns rather than precisely measure the funding level of a particular institution. Brinkman (3/5/91) 45.

1200. Nevertheless, the comparative study revealed in the opinion of Dr. Brinkman that, for fiscal year 1987–88, Alabama's predominately black colleges were better funded, relative to their peers in other states, than were all but one of the predominately white colleges relative to their peers in other states.

1201. Witnesses for ASU have complained that ASU has been excluded from many of the processes that affect public institutions of higher education in Alabama. The comparative study provided an opportunity for institutional participation in picking both peer institutions and financial measures. Brinkman (3/5/91) 39–40. Alabama State and Alabama A & M however, did not participate as fully in the comparative study as did some of the other institutions. *Id.* 25–26.

1202. The first step in the analysis, picking a group of peer institutions for each Alabama institution being studied, relied heavily on institutional input. Although the final choice of peer groups for each institution was largely a group decision, ACHE had final responsibility for choosing the peer institutions. Brinkman (3/5/91) 33.

1203. AAMU participated early in the process and attended meetings with Dr. Brinkman, ACHE, and other institutional representatives. Brinkman (3/5/91) 26. Alabama A & M University did, however, miss later meetings in which final peer groups were selected. *Ibid.*

1204. Dr. Brinkman had no response from ASU to his initial list of potential peers until all other peer groups had been finalized and the financial indicators portion of this study was about to begin. Brinkman (3/5/91) 26–28. No representatives of ASU attended meetings attended by Dr. Brinkman. *Id.* 27.

1205. Each institution succeeded in having some of its peer candidates included in the final list of peer groups. STX 159, 216.6. The percentage of peer candidates included in the final list for each institution varied widely, as follows: UAH, 46%; ASU, 47%; JSU, 57%; ASC, 60%; TSU–Dothan, 62%; UNA, 67%; UM, 67%; UA, 69%; AAMU, 71%; UAB, 75; AUM, 75%; LU, 77%; USoALA, 79%; TSU, 81%; AU, 85%; and TSUM, 87%. Although only UAH's percentage of choices included in the final list was lower than that of ASU, AAMU appears in about the middle of the list.

### G. Costs Of Instructional Programs

1206. Costs of instructional programs vary among institutions. Differences in costs are related to differences in academic discipline levels, types of instruction, distribution of students among disciplines and levels, and economies of scale, among other reasons. SOF ¶ 255.

1207. Throughout the United States, per student expenditures for some academic programs, e.g., the liberal arts, education and business, are less than for other programs, *e.g.*, biology, chemistry, physics, pharmacy, medicine, law and engineering. Leslie (7/9/85) 1592–93. Other examples can be given, but the fact that higher costs are associated with certain types of academic programs than with others is true throughout the United States.

1208. Black students in the United States as a whole are under-represented in many academic disciplines that are associated with higher than average instructional expenditures, such as the hard sciences, engineering, medicine, pharmacy and architecture. SOF ¶ 256.

1209. For purposes of making comparisons among institutions in higher education, generally accepted methodology requires comparisons to be made within institutional categories. Leslie (7/9/85) 1582–86; AUX 281, p. 29.

1210. Public institutions in Alabama that are most appropriate for comparison to AAMU and ASU under generally accepted methodology include JSU, UNA, LU, TSU and AUM. McKeown (7/9/85) 3558–59; USX 5; AUX 5045.

1211. There is no generally recognized method of categorizing institutions of higher education that supports comparing AAMU or ASU to AU, UA or UAB.

1212. The United States' witness, Dr. Leslie, took the position that institutional role and mission should not be considered in making financial comparisons even though he has written otherwise. Leslie (7/9/85) 1588–91.

1213. Dr. Leslie's methodology of consolidating AAMU and ASU as predominantly black institutions and comparing them to aggregated numbers for a partial list of the other universities including AU, UA and UAB, which have extensive graduate and professional program offerings, is not consistent with generally accepted methodology in the literature of higher education. AUX 281. p. 302.

1214. Comparisons of State resource allocation on a per student basis are most appropriately done by computing numbers of full-time equivalent students at each institution. SOF ¶ 252.

1215. Dr. Leslie's method of computing FTE as full-time headcount students plus one-third part-time headcount students makes no distinction between medical, dental or Ph.D. candidates on the one hand and undergraduate students on the other. McKeown (2/13/91) 76.

1216. Dr. Leslie's 1985 report summarizes individual institutional comparisons as follows:

When Alabama institutions and campuses were examined separately, in most categories the [HBUs] received less and expended less per student than did the Auburn and University of Alabama systems and campuses, with the exception of Auburn, Montgomery, which is more similar in its financial patterns to the [HBUs]. The [HBUs] tended to receive and spend about as much or somewhat more per student than did the remaining Alabama [HWUs].

1217. Dr. Leslie's 1985 College and University Business Administration ("CUBA") reports of dollars per student reflect the following total income and total expenditures for AAMU, ASU, JSU, AUM, TSU, TSUM and UNA:

OCTOBER 1, 1955

| | AAMU | ASU | JSU | AUM | TSU | TSUM | UNA |
|---|---|---|---|---|---|---|---|
| Income: | | | | | | | |
| Total E & G | 624 | 613 | 431 | 0 | 652 | 0 | 424 |
| Expenditure: | | | | | | | |
| Total E & G | 579 | 639 | 425 | 0 | 647 | 0 | 394 |

OCTOBER 1, 1960

| | AAMU | ASU | JSU | AUM | TSU | TSUM | UNA |
|---|---|---|---|---|---|---|---|
| Income: | | | | | | | |
| Total E & G | 623 | 0 | 580 | 0 | 662 | 0 | 1,013 |
| Expenditure: | | | | | | | |
| Total E & G | 707 | 0 | 528 | 0 | 643 | 0 | 959 |

OCTOBER 1, 1965

| | AAMU | ASU | JSU | AUM | TSU | TSUM | UNA |
|---|---|---|---|---|---|---|---|
| Income: | | | | | | | |
| Total E & G | 1,499 | 1,585 | 840 | 0 | 0 | 0 | 775 |
| Expenditure: | | | | | | | |
| Total E & G | 1,462 | 1,374 | 597 | 0 | 0 | 0 | 722 |

| | AAMU | ASU | JSU | AUM | TSU | TSUM | UNA |
|---|---|---|---|---|---|---|---|
| **OCTOBER 1, 1970** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 2,206 | 2,049 | 1,075 | 2,566 | 1,240 | 1,169 | 1,154 |
| Expenditure: | | | | | | | |
| Total E & G | 2,228 | 1,786 | 901 | 1,557 | 1,218 | 1,004 | 1,191 |
| | | | | | | | |
| **OCTOBER 1, 1972** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 2,647 | 1,839 | 1,508 | 2,113 | 1,805 | 1,738 | 1,284 |
| Expenditure: | | | | | | | |
| Total E & G | 2,571 | 1,734 | 1,336 | 2,207 | 1,535 | 1,797 | 1,355 |
| | | | | | | | |
| **OCTOBER 1, 1974** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 2,692 | 2,062 | 1,927 | 2,135 | 2,393 | 1,574 | 1,685 |
| Expenditure: | | | | | | | |
| Total E & G | 2,890 | 1,868 | 1,821 | 1,728 | 1,892 | 1,718 | 1,551 |
| | | | | | | | |
| **OCTOBER 1, 1976** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 3,294 | 1,957 | 1,956 | 2,746 | 2,160 | 794 | 1,791 |
| Expenditure: | | | | | | | |
| Total E & G | 3,202 | 1,886 | 1,958 | 2,405 | 1,802 | 1,060 | 1,808 |
| | | | | | | | |
| **OCTOBER 1, 1978** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 4,628 | 2,734 | 2,391 | 3,121 | 2,075 | 1,226 | 2,293 |
| Expenditure: | | | | | | | |
| Total E & G | 4,529 | 2,545 | 2,425 | 2,603 | 1,831 | 1,787 | 2,106 |
| | | | | | | | |
| **OCTOBER 1, 1980** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 4,574 | 2,840 | 3,268 | 3,254 | 2,488 | 1,322 | 2,820 |
| Expenditure: | | | | | | | |
| Total E & G | 5,047 | 2,814 | 3,148 | 2,971 | 2,037 | 1,896 | 2,563 |
| | | | | | | | |
| **OCTOBER 1, 1982** | | | | | | | |
| Income: | | | | | | | |
| Total E & G | 5,929 | 5,112 | 4,011 | 3,685 | 3,202 | 1,888 | 3,474 |
| Expenditure: | | | | | | | |
| Total E & G | 5,983 | 4,889 | 4,019 | 3,292 | 2,737 | 2,739 | 3,277 |

90 US Ex. 2–14.

1218. Dr. Leslie's institutional comparisons were made in two forms, "Auburn 1" which included AAES and ACES in AU's per student dollar figures and "Auburn 2" without ACES and AAES dollars being attributed to AU students.

1219. Dr. Leslie's 1985 CUBA report with Auburn 2 reflects the following total income and expenditures for AAMU, ASU and AU. USX 2–14.

OCTOBER 1, 1955

| | AAMU | ASU | AU2 |
|---|---|---|---|
| Income: | | | |
| Total E & G | 624 | 613 | 774 |
| Expenditure: | | | |
| Total E & G | 579 | 639 | 716 |

OCTOBER 1, 1960

| | | | |
|---|---|---|---|
| Income: | | | |
| Total E & G | 623 | 0 | 1,135 |
| Expenditure: | | | |
| Total E & G | 707 | 0 | 1,139 |

OCTOBER 1, 1965

| | | | |
|---|---|---|---|
| Income: | | | |
| Total E & G | 1,499 | 1,585 | 1,275 |
| Expenditure: | | | |
| Total E & G | 1,462 | 1,374 | 1,094 |

OCTOBER 1, 1970

| | | | |
|---|---|---|---|
| Income: | | | |
| Total E & G | 2,206 | 2,049 | 2,199 |
| Expenditure: | | | |
| Total E & G | 2,228 | 1,786 | 2,271 |

OCTOBER 1, 1972

| | | | |
|---|---|---|---|
| Income: | | | |
| Total E & G | 2,647 | 1,839 | 2,634 |
| Expenditure: | | | |
| Total E & G | 2,571 | 1,734 | 2,568 |

OCTOBER 1, 1974

| | | | |
|---|---|---|---|
| Income: | | | |
| Total E & G | 2,692 | 2,062 | 3,420 |
| Expenditure: | | | |
| Total E & G | 2,890 | 1,868 | 3,355 |

| | AAMU | ASU | AU2 |
|---|---|---|---|
| **OCTOBER 1, 1976** | | | |
| Income: | | | |
| Total E & G | 3,294 | 1,957 | 3,189 |
| Expenditure: | | | |
| Total E & G | 3,202 | 1,886 | 3,289 |
| | | | |
| **OCTOBER 1, 1978** | | | |
| Income: | | | |
| Total E & G | 4,628 | 2,734 | 4,458 |
| Expenditure: | | | |
| Total E & G | 4,529 | 2,545 | 4,334 |
| | | | |
| **OCTOBER 1, 1980** | | | |
| Income: | | | |
| Total E & G | 4,574 | 2,840 | 5,101 |
| Expenditure: | | | |
| Total E & G | 5,047 | 2,814 | 4,605 |
| | | | |
| **OCTOBER 1, 1982** | | | |
| Income: | | | |
| Total E & G | 5,929 | 5,112 | 5,875 |
| Expenditure: | | | |
| Total E & G | 5,983 | 4,889 | 5,544 |

---

1220. If AU is compared directly to AAMU for the years in Dr. Leslie's 1985 report, 1955, 1960, 1965, 1970, 1972, 1974, 1976, 1978, 1980 and 1982, excluding the agricultural experiment station and cooperative extension service appropriations, AAMU received and spent more total educational and general money per student than Auburn in four of the ten years, and AAMU received more E & G money per student than AU in seven of the ten years. Leslie (11/1/90) 367; USX 2–14.

1221. Dr. Leslie's 1985 "black student" versus "white student" comparisons were done only with "Auburn 1," that is by including the AAES and ACES dollars as if they were spent on students at AU. USX 5, Table 3.

1222. Dr. Leslie's 1985 Table 3 was recalculated by Dr. McKeown to remove consideration of AAES and ACES dollars, using a "method 1" which accepted Dr. Leslie's FTE methodology and a "method 2" which used ACHE's FTE methodology. The result is that using Dr. Leslie's FTE calculation which ignores the difference between undergraduate, graduate and first professional students; black students were shown to receive $51.00 per student more than white students, and white students were shown to spend $21.00 more than black students. Using ACHE FTE methodology of undergraduate credit hours divided by 15, graduate credit hours divided by 12 and first professional credit hours divided by 9; black students were shown to receive and spend more money than white students: AUX 8359, Table 6.6.

Table 6.6
Recalculation of Dr. Leslie's Table 3

| | Method 1 Academic Year 1982–83 | | Method 2 Academic Year 1982–83 | |
| | Black | White | Black | White |
|---|---|---|---|---|
| **INCOME** | | | | |
| State and Local Apprp. | 3567 | 3695 | 3510 | 3542 |
| Tuition and Fees | 1164 | 1393 | 1146 | 1335 |
| Gifts, Grants, Contracts | 2001 | 1423 | 1969 | 1364 |
| Other | 356 | 525 | 350 | 503 |
| Total | 7087 | 7036 | 6975 | 6744 |
| **EXPENDITURES** | | | | |
| Instruction | 2772 | 3157 | 2728 | 3026 |
| Student Services | 333 | 306 | 328 | 293 |
| Operation and Main. | 661˙ | 630 | 650 | 604 |
| Academic Support | 566 | 700 | 557 | 671 |
| Institutional Support | 694 | 564 | 683 | 541 |
| Scholarships | 641 | 332 | 631 | 318 |
| Total | 5667 | 5689 | 5577 | 5453 |

1223. In 1990, Dr. Leslie updated his 1985 report but excluded JSU and excluded Pell Grants, both of which his 1985 report included for its last year, 1982–83. Leslie (10/31/90) 253–37.

1224. The statement in Dr. Leslie's 1990 report that a trend of more revenue and expenditures for the traditionally white than the traditionally black institutions has widened from 1982–83 to the time of his 1990 report is inconsistent with the data and is based on comparing 1982–83 figures including JSU as a HWU and Pell Grant income for all institutions in his sample, but excluding JSU as a HWU.and excluding Pell Grant income after 1982–83. There is no such trend when 1982–83 is compared with identical data for subsequent years. AUX 341, 4–7.

1225. Dr. Leslie's 1990 report states that UAB's revenues and expenditures do not explain the differences he sees in HBU and HWU resources:

The per student revenues and expenditures for UAB are much higher than for other Alabama institutions, almost certainly because the medical school and perhaps other structures are included in the UAB data. This is, once again, the issue of mission. In any case the medical school data do cause the [HWU] values to increase substantially; however, even if UAB data are excluded from the analysis, the inequities are not resolved.

USX 2–11, p. 6.

1226. Dr. McKeown recalculated Dr. Leslie's 1990 comparisons of "traditionally white institutions" versus "traditionally black institutions" to include the same income and expenditure categories Dr. Leslie had used in 1985, to both exclude and include JSU and to demonstrate the effect of removing UAB. Dr. McKeown did this using Dr. Leslie's FTE calculation, with ("Auburn 1") and without ("Auburn 2") AAES and ACES as follows: AUX 341, Tables S3 and S4.

TABLE S–3
TABLE 1–3 RECALCULATED
FINANCIAL COMPARISONS
HWUs VS HBUs
LESLIE FTE CALCULATION
FOR THE YEAR BEGINNING OCTOBER 1, 1988
AUBURN 1

| | AAMU and ASU | HWUs Omits JSU | HWUs, Inc. JSU | HWUs, Omits UAB |
|---|---|---|---|---|
| TOTAL FTE ENROLLMENT: | 7,108 | 64,311 | 70,335 | 60,296 |
| REVENUES: | | | | |
| State/Local Approp. | $ 5,275 | $ 6,510 | $ 6,252 | $ 5,187 |
| Tuition/Fees | 1,665 | 2,189 | 2,136 | 2,052 |
| Gifts, Grants, Contracts | 2,596 | 3,517 | 3,281 | 1,787 |
| Other | 598 | 1,195 | 1,107 | 908 |
| Total E & G Revenues | $10,136 | $13,411 | $12,776 | $ 9,933 |
| EXPENDITURES:[93] | | | | |
| Total 1, 4, 6, 8 | 5,658 | 6,506 | 6,308 | 5,211 |
| Total 2, 3, 5, 7 | 3,995 | 5,981 | 5,600 | 4,106 |
| Total E & G Expenditures | $ 9,655 | $12,487 | $11,908 | $ 9,317 |

TABLE S–4
TABLE 1–6 RECALCULATED
FINANCIAL COMPARISONS
HWUs VS HBUs
LESLIE FTE CALCULATION
FOR THE YEAR BEGINNING OCTOBER 1, 1988
AUBURN 2

| | AAMU and ASU | HWUs Omits JSU | HWUs, Inc. JSU | HWUs, Omits UAB |
|---|---|---|---|---|
| TOTAL FTE ENROLLMENT: | 7,108 | 64,311 | 70,335 | 60,296 |
| REVENUES: | | | | |
| State/Local Approp. | $ 5,275 | $ 5,905 | $ 5,699 | $ 4,541 |
| Tuition/Fees | 1,665 | 2,189 | 2,136 | 2,052 |
| Gifts, Grants, Contracts | 2,596 | 3,418 | 3,190 | 1,680 |
| Other | 598 | 950 | 884 | 649 |
| Total E & G Revenues | $10,136 | $12,462 | $11,909 | $ 8,921 |
| EXPENDITURES: | | | | |
| Total 1, 4, 6, 8 | 5,658 | 6,483 | 6,287 | 5,186 |
| Total 2, 3, 5, 7 | 3,995 | 5,065 | 4,762 | 3,130 |
| Total E & G Expenditures | $ 9,652 | $11,548 | $11,049 | $ 8,316 |

1227. Dr. Leslie's 1990 report concludes that AUM receives and spends less per FTE than ASU. USX 2–11, p. 8.

1228. Dr. Leslie's 1990 report concludes that AAMU and ASU tend to receive and expend "about as much or somewhat more per FTE than do the other [HWUs]" excluding UAS, AU and AUM. "When proximate campuses are compared, the [UAH]

93. The expenditure categories indicated by the numbers are as follows:
 1. Instruction
 2. Organized Res.
 3. Extension & Public Services
 4. Student Services
 5. Operation & Maintenances
 6. Academic Support
 7. Institutional Support
 8. Scholarships
 USX 5.

receives and expends more per student in essentially every category than does Alabama A & M. On the other hand, [ASU] receives and expends more per FTE than does Auburn, Montgomery. USX 2–11, p. 8.

1229. In all three years analyzed by Dr. Leslie in his 1990 report, 1984, 1986 and 1988, educational and general expenditures at AAMU were greater than at AU, omitting AAES and ACES expenditures in two of the three years using Leslie's FTE, and in all three years using ACHE FTE. USX 2–11, pp. 13–18.

1230. For purposes of this action, comparisons of resource allocation should generally focus on resources supporting instruction of students rather than research and public service functions, the intended beneficiaries of which are by definition the general public, external to the institution. McKeown (7/18/85) 3567, 3586, 3594.

1231. According to CUBA 3rd Edition, Education and General revenues are received from the following revenue sources: tuition and fees; federal appropriations; state appropriations; local appropriations; federal grants and contracts; state grants and contracts; local grants; private gifts, grants and contracts; endowment income; sales and services of educational activities; and other. SOF ¶ 247.

1232. By CUBA 3rd Edition, Educational and General expenditures include expenditures for Public Service and Research. SOF ¶ 248.

1233. By NACUBO (National Association of College and University Business Officers) definition, expenditures classified as "Research" are those expenditures related to non-instructional research activities. SOF ¶ 251.

1234. By CUBA 3rd Edition definition, expenditures classified as "Public Service" are those expenditures related primarily to activities that are "Established primarily to provide non-instructional services beneficial to individuals and groups external to the institution." SOF ¶ 249.

1235. By NACUBO definition, expenditures classified as "Public Service" are those expenditures related to activities that are performed for individuals and groups outside of the institution. SOF ¶ 250.

1236. Dr. McKeown recalculated Dr. Leslie's black versus white students comparison for the most recent year 1990 by removing research and public service expenditures by all institutions, with JSU and with and without UAB, as follows:

TABLE S–7
TABLE 2–6 RECALCULATED
FINANCIAL COMPARISON
BLACK VS. WHITE STUDENTS
LESLIE FTE CALCULATION
FOR THE YEAR BEGINNING OCTOBER 1, 1988
AUBURN 2
REMOVING RESEARCH AND PUBLIC SERVICE EXPENDITURES

| | Including JSU | | With JSU, Omit UAB | |
| | Black | White | Black | White |
| --- | --- | --- | --- | --- |
| TOTAL FTE ENROLLMENT: | 13,041 | 61,111 | 11,455 | 53,120 |
| EXPENDITURES: | | | | |
| Instruction | $3,723 | $4,183 | $2,898 | $3,356 |
| Total 1, 4, 6, 8 | 6,131 | 6,171 | 5,194 | 5,160 |
| Total 2, 3, 5, 7 | 2,265 | 1,764 | 2,058 | 1,463 |
| Total E & G Expend | $8,396 | $7,935 | $7,251 | $6,623 |

AUX 341, Table S–7.

1237. Dr. Sullivan testified that AAMU also had approximately the same percentages of students and dollars in 1990 as in 1970. Sullivan (2/5/91) 28.

1238. In 1970–71, the State of Alabama appropriated $74 million for its senior institutions, and in 1990–91, the appropriation was $534 million. Sullivan (2/5/91) 60. This is an increase of 721 percent.

1239. Alabama State exhibit 356, prepared by Dr. Sullivan, reflects a consumer price index of 38.8 in 1970 and 124 in 1989, which is an increase of 320 percent.

1240. Although ASU received 3.5% of the money in 1970 and 3.5% of the money in 1990, Dr. Sullivan acknowledged that in 1990 ASU received 3.5% of a much larger amount of money in real dollars, adjusted for inflation, than in 1970. Sullivan (2/5/91) 250.

1241. According to Dr. Sullivan, ASU's percentage of total expenditures by all senior institutions increased from 2.7% in 1970–72 to 3.1% in 1987–89; and over the same time AAMU's percentage of total expenditures increased from 4% to 6.4% while AU's percent decreased from 22.7% to 16.-9%. ASUX 359, Table 7.

1242. Dr. Sullivan's tables also reflect that as of 1987–89, AUM accounted for 2.8% of the expenditures of all senior institutions, but that it had 5% of the students. ASUX 353, 359.

1243. Dr. Sullivan's tables reflect that in 1987–89 AU's main campus had 18.3% of the state's students but only spent 16.9% of the money, which he confirmed is not what one would expect to see at a doctoral level institution. Sullivan (2/11/91) 228.

1244. In 1987–88, ASU had 3.5% of the state's headcount enrollment, and 3.1% of the expenditures of senior public institutions. The other Montgomery institutions, AUM and TSUM, had 5% and 2.3% of the state's students, respectively, but accounted for only 2.9% and .5% of the expenditures in 1987–89. AUX 926, p. 6.

1245. In the Montgomery area, ASU had 32.1% of the students but expended 48.2% of the funds in 1987–89. AUX 926, p. 6.

1246. AAMU had 3.6% of the students in the state and 36.3% of the Huntsville students but accounted for 4.1% of the expenditures in the state and 39.6% of Huntsville expenditures. ASUX 359; AUX 926, pp. 5–6.

1247. Dr. Sullivan found that, from 1972 to 1988, the number of black students enrolled at Montgomery area institutions grew from 2,546 to 5,371 and that by 1985, a majority of black first-time freshmen from the Montgomery area were enrolling in the majority white Montgomery area institutions, AUM and TSUM. One-third of the black first-time freshmen from the Montgomery area attended AUM in 1985. ASUX 355.

1248. In most years since the ACHE formula was adopted, AAMU and ASU have received a larger percentage of the formula recommended state appropriations than the other institutions. AUX 348, 348.1; McKeown (2/13/91) 54–57; AUX 281, p. 288. Also in most years since the formula has been used, ASU and AAMU have received in state appropriations for regular academic programs more dollars per weighted student credit hour than most of the other institutions. AUX 281, p. 294; AUX 349 and 349.1; McKeown (2/13/91) 63–65.

1249. On a per full-time equivalent student basis, AAMU and ASU have been funded as well as or better than the majority white institutions of similar size and mission, including the other former teachers colleges (UNA, JSU, LU and TSU), since 1973 when ACHE first compiled credit hour data from which FTE can be calculated. AUX 349, 349.1, 349.2, 925.

1250. Pre–1973 funding comparisons were made for the years 1955, 1960, 1965 and 1970 by Dr. McKeown using headcount data and by Dr. Leslie, who converted headcount data to FTE by an assumed ratio of full-time to part-time students at each school. Both calculations showed that AAMU and ASU received more state funding per student than the four former white teachers colleges during all four comparison years during the period 1955–70. USX 5; 90 AUX 927.

1251. State resources under the ACHE formula are not allocated or used to support black students differently than white

students at any of the predominantly white institutions. Leslie (7/9/85) 1116–17.

*H. The "$4 Million" And Its Impact On The Funding Comparisons*

1252. Beginning with the fiscal year 1986–87 recommendation, ACHE has usually recommended reduced funding levels for ASU and AAMU. STX 203. Beginning with the fiscal year 1987–88 recommendation, the Governor's office has similarly recommended reduced funding levels for ASU and AAMU. *Ibid.*

1253. The State Defendants claim these changes in the recommendations pattern resulted from events related to a 1985 education bond issue and the 1986–87 appropriations process.

1254. In 1985, not long before Governor George Wallace was to go out of office, a bill authorizing a $300 million education bond issue partially for capital expenditures at Alabama's colleges and universities was introduced and passed in the Alabama House of Representatives. The Alabama Senate added $10 million to the issue and the bill was to be sent to the House for concurrence. Reed (2/12/91) 109–110.

1255. ASU was dissatisfied with the amount it was to receive under the bill; it had hoped to receive $15 million to build a physical education complex. Reed (2/12/91) 110.

1256. Representatives of ASU expressed their concerns to Governor Wallace's office rather forcibly, after which time an agreement was reached between various state officials. Governor Wallace's administration, the Speaker of the House of Representatives, the Speaker Pro Tem of the House of Representatives, the Lieutenant Governor and President of the Senate agreed that part of the money appropriated to APSCA during fiscal year 1986–87 would be allocated to ASU and AAMU so that those amounts, when combined with the amounts made available to the two institutions from the 1985 bond issue, would total $15,000,000 for each institution. Reed (2/12/91) 116; STX 202.7.

1257. In return, ASU agreed to defend the allocations to the HBUs under the $310,000,000 bond issue if the allocations were questioned in connection with the earlier trial of this matter. Reed (2/12/91) 115–16.

1258. ASU and AAMU each received approximately $11 million from the 1985 bond issue. Reed (2/12/91) 116; STX 202.7. Under the agreement described above, ASU and AAMU each were to receive approximately $4 million in capital funds for 1986–87.

1259. Governor Wallace's appropriations bill for 1986–87 did, in fact, recommend "capital outlay" line items for AAMU and ASU in the amount of $4 million per institution, although the money was to be appropriated directly to the institutions rather than to APSCA. Reed (2/12/91) 118; Rowe (2/26/91) 16; STX 208.

1260. In addition, the Governor's bill provided that each institution was to receive approximately $11 million for noncapital purposes—$10,908,253 for ASU and $10,998,533 for AAMU.[94]

1261. The amounts appropriated from the ASETF for 1986–87 by the enacted budget, however, differed from Governor Wallace's recommendations as follows:[95]

| ASU | Bill | Act | Change |
| --- | --- | --- | --- |
| Capital Outlay line | $ 4,000,000 | $ 908,253 | −3,091,747 |
| Total, other lines | 10,908,253 | 14,050,000 | +3,141,747 |
| Grand total | 14,908,253 | 14,958,253 | + 50,000 |

**94.** STX 209 (calculated by subtracting the capital outlay amount from the total for each institution).

**95.** STX 208, 209; Act No. 86–622, 1986 Ala.Acts (Regular Session) 1210, 1259–1260.

| AAMU | Bill | Act | Change |
|---|---|---|---|
| Capital Outlay line | $ 4,000,000 | $ 750,000 | —3,250,000 |
| Total, other lines | 10,998,533 | 14,398,533 | +3,400,000 |
| Grand total | 14,998,533 | 15,148,533 | + 150,000 |

1262. ASU and the state agree that the reduction in the capital outlay line and corresponding increase in the noncapital lines for ASU occurred at the behest of representatives of ASU. Reed (2/12/91) 118, 163; Rowe (2/26/91) 99–100, 113–17.

1263. During legislative committee meetings, representatives of AAMU had stated that the university's need for operating funds was a higher priority than its need for capital funds. Rowe (2/26/91) 115–16.

1264. ASU and the state, however, disagree about whether Governor Wallace's recommendation would have unfairly reduced ASU's non-capital appropriations from the funding level of the previous year.

1265. The noncapital portion of Governor Wallace's recommendation did represent a decrease of about $3.4 million from ASU's appropriation for the previous year. STX 77, p. 8; ASUX 313, p. 22.

1266. Dr. Joe L. Reed, chairman of ASU's Board of Trustees, testified that the Governor's noncapital recommendation was lower than the noncapital appropriation for the previous year because the $4 million for capital outlay had been deducted from the noncapital recommendation. Reed (2/12/91) 117–18. However, Governor Wallace's 1986–87 recommendation for every predominately white institution was lower than the amount appropriated to the institution for the previous year. ASUX 313, p. 22. Appropriations for all senior institutions except AAMU and ASU dropped between 1985–86 and 1986–87. STX 202.23.

1267. ACHE's recommended appropriations for ASU and AAMU for 1986–87 were lower than the appropriations for the two institutions for 1985–86. STX 77, pp. 7–8. The UBR for 1986–87 designates approximately $2.9 million of the 1985–86 appropri-

ations for each institution, however, as coming from "special/non-recurring funds." *Ibid.* In each case, that amount represented about 20% of the total appropriations to the institutions for that year. *Id.* 7–29.

1268. ACHE also recommended lower funding for six of the fourteen HWUs. STX 77, pp. 7–29. The predominately white institutions for which increased funding was recommended had the following in common: the funds designated by ACHE as special/non-recurring for 85–86 represented 12% or less of the total 1985–86 appropriation. *Ibid.* For all but one institution, such funds represented less than 7% of the 1985–86 appropriation. *Ibid.*

1269. AAMU contends Governor Hunt's first budget recommendation, for fiscal year 1987–88, discriminated against ASU and AAMU. Governor Hunt did recommend less for ASU and AAMU for 1987–88 than had been appropriated for those institutions for 1986–87. At the same time, the Governor recommended increased funding for every other senior institution. STX 210, p. 3; Hunt (2/7/91) 106–07.

1270. The 1986–87 appropriations figures for ASU and AAMU each include $4 million which, by agreement, was originally intended as a one-time appropriation for capital outlay. STX 208, 209; ASUX 290.

1271. When $4 million is subtracted from the 1986–87 appropriations for ASU and AAMU, it appears that Governor Hunt recommended a 1.01% increase for AAMU and a 0.87% increase for ASU. These percentages approximate those of the HWUs; the mean increase for the HWUs (without weighing the figures for size of appropriation) is 1.07, and the median increases for the HBUs are 0.82 and 1.01.

1272. The Legislature, however, responded differently. Whereas all of the HWU except TSUM were appropriated less money for 1987–88 than they had received for 1985–86, ASU and AAMU were appropriated more money than they had received for 1985–86. STX 210, p. 3.

1273. Alabama State University and Alabama A & M University were among four institutions for which ACHE recommended a reduced funding level for 1987–88. STX 87, pp. B–1 through B–24.

1274. The Legislature continues to provide more funding to ASU and AAMU than is recommended by ACHE. This action by the Legislature is the primary reason state funding has appeared favorable to ASU and AAMU when FTE and other criteria are utilized in making comparisons of funding since 1985.

*I. Current Method Of Funding*

■ 1275. The State of Alabama has made no effort to overcome the effects of years of discriminatory funding as to the HBU's.

1276. In the interrogatories which are ASUX 305, Questions 1(e) and 2 of Part I ask what actions the State of Alabama has taken in each year since 1954 to aid desegregation in public higher education. In answer to this question, the State defendants say only that since 1970 they have carried out their responsibilities in a non-discriminatory manner. Questions 2(b) and 2(c) of Part IV ask what the state's obligation to desegregate consists of, and what steps the state takes to meet that obligation. In answer to these questions, the State defendants say:

the State's obligation is fulfilled when those matters within its power, funding,

and, more recently, program approval, are done without racial consideration.

And:

Funding and program approval have been administered without regard to race.

1277. Some other Defendants say their only obligation to desegregate is to act in "good faith" and to make admissions and hiring decisions "without regard to race." *See* ASUX 305–B (AU), 305–C (UA), 305–D (TSU), and 305–E.

1278. The state introduced into evidence several dozen publications of ACHE, dating from 1972 through the present. Those publications show virtually no mention of the problems caused by the history of segregation. For example, there is no discussion of the need to desegregate, or of the status of desegregation, nor of specific problems caused by the small numbers of other-race students enrolled in the state's various higher education institutions, nor of the small number of black faculty and administrators in the HWU's.

1279. As a direct result of the political leverage exerted by and through the black legislative caucus, state appropriations to ASU and AAMU have substantially increased. Holmes (11/13/90) 43.

1280. This strong support for ASU and AAMU by black legislators and politicians in Alabama is a primary reason these schools have been well treated in the appropriations fights in recent years.

1281. Real growth in funding at ASU and AAMU between 1970 and 1989 is shown by UAS exhibit 1070. The calculations in UASX 1070 factor in inflation and are as follows:

Measure of "Real Growth" in ASU and A & M Appropriations

(From ASU Ex. Nos. 337, 338 and 356)

| | 1970–71 | % of total | 1990/91 | % of total | 1990/91 1970–71 |
|---|---|---|---|---|---|
| A & M | $ 2,554,682 | 3.435 | 18,642,000 | 3.493 | 7.297 times |
| ASU | 3,331,488 − 750,000 | (not used) | | | |
| | 2,581,488 | 3.471 | 18,607,000 | 3.487 | 7.208 times |
| Total | 74,373,409 | 100.0 | 533,622,000 | 100.0 | 7.175 times |

From ASU Ex. 356:

CPI for 1970: 38.8
CPI for 1989: 124.0

$$1989 \text{ Dollars are } \frac{124}{38.8} = 3.1959 \text{ times 1970 Dollars}$$

| | 1970–71 appropriation | × | CPI | = | 1970–71 appropriation in 1989 dollars | Actual 1989 | Difference |
|---|---|---|---|---|---|---|---|
| A & M | 2,554,682 | × | 3.1959 | = | 8,164,508 | 17,124,000 | 8,959,492 |
| ASU | 2,581,488 | × | 3.1959 | = | 8,250,177 | 17,050,000 | 8,799,823 |
| Total | 74,373,409 | × | 3.1959 | = | 237,689,977 | 478,848,000 | 241,158,023 |

1282. Since at least the end of *de jure* segregation, E & G funding for students at ASU and AAMU has been equal to that at comparable HWUs in Alabama. This conclusion is supported by the testimony of expert financial witnesses and by the documentary evidence introduced.

1283. At no time in the past or up to the present, however, have any funds been made available to assist ASU and AAMU in overcoming the effects of discriminatorily low funding so that they may adequately provide services to their students.

1284. During the period of *de jure* segregation of the public colleges and universities in Alabama the HBU's were discriminatorily underfunded when compared with HWU's.

1285. Since at least the mid–1950's funding by the State of Alabama for HBU's has improved and for a number of years State funding for ASU and AAMU has been at least on a par with the public universities in Alabama that are comparable.

1286. When comparing funding of higher education in Alabama on a per student basis or FTE basis students at ASU and AAMU are not funded as well as the average for students attending Alabama's HWU's. This difference is, in part, the result of high cost programs at some of the HWU's which are not offered at the HBU's.

1287. In the most recent years, contrary to the wishes of the Governor of Alabama and ACHE, ASU and AAMU have been better financed on the FTE basis or per student basis than comparable universities in Alabama. Noticeably, this condition has existed during the more active life of this litigation.

1288. Funding provided by the State for the education of students at ASU and AAMU has not allowed either of these institutions to provide an education to its students in a manner which has overcome the effect of past discriminatory under funding for the operation of HBUs and to provide an education today free from the stigma of past discrimination such as poor physical facilities and the tarnish of a reputation of lack of quality education.

## THE ADEQUACY OF CAMPUS FACILITIES ON THE HBU'S

### A. Facilities and Higher Education

1289. Facilities play a rather diverse role in higher education. They enable an institution to carry out its mission, maintain its academic programs and define its character. Kaiser (10/29/90) 16.

1290. Facilities also have a definite influence in terms of student enrollments.[96] In 1984, the Carnegie Foundation for the Advancement of Teaching conducted a survey that sought to determine those factors

96. The quality and quantity of the facilities of an institution of higher education have an effect on the institution's ability to attract and retain students, faculty and staff. SOF ¶ 116.

which most influenced high school students and their parents when deciding which university or college a first-time freshman would attend. In all 1000 college bound high school students and their parents were surveyed. Kaiser (10/29/90) 16.

1291. Regarding those students and parents who made personal visits to a particular institution, the article is quoted as saying: "When we asked high school students and their parents to name the source of information they found most useful in making a decision about college, the campus visit was rated number one. On such trips, prospective students were able to talk with current students, if not with faculty, see the buildings, and as one student put it, 'get a feel for the institution' and when asked students what influenced them the most during the campus visit, 62% said the appearance of the buildings and grounds." The results of the survey were reported in *Change Magazine*.[97] Kaiser (10/29/90) 17.

### B. The Plaintiffs' Allegations

1292. In its proposed findings the United States Government contends that "[t]he choices [which] the State of Alabama made in its resource allocation for facilities in the past thirty years has deterred the historically black institutions from attracting [white] students. [And thus has] failed to alter the essentially all black enrollments of A & M and ASU." United States' Proposed Findings ¶ 253.

1293. The Knight Plaintiffs and Allied Defendants essentially agree with the United States' position and assert that as a result the HBUs continue to suffer from a "stigma of inferiority" within the wider academic and social community. Moreover, the private plaintiffs and Allied Defendants maintain that the close proximity of predominately white institutions in the Huntsville and Montgomery area compete with a disproportionate advantage for limited capital funding. *See* Knight Plaintiffs' and Allied Defendants' Proposed Findings of Fact ¶ 456.

1294. Before considering the specifics of the Plaintiffs' claims, it is necessary to

review Alabama's capital appropriations process and the role individual institutions play within that procedure.

### C. Capital Funding Process

#### 1. State Funding Process

1295. The capital outlay procedure as it applies to higher education in Alabama consists of three components: the budget request process, the allocation methodology, and the projected development process.

1296. The capital outlay requests as well as the operating budget requests are submitted by each institution as a single budget to the Legislature, the Executive Budget Office, and ACHE as part of the annual budget process. After a bureaucratic review, institutional, executive and ACHE representatives appear before the appropriate legislative committees in the state House and Senate to argue in favor of their particular budget recommendation. AUX 283, p. 9; 85 UASX 1034 p. 10.

1297. ACHE's legislative budget recommendation often differs substantially from the budget recommendation submitted by the institution or the governor. Ultimately, the final legislative appropriation is significantly different from any of the budget recommendations which were initially submitted to the General Assembly. *See*, STX 202.20; 202.21; 202.22; and 202.23 (setting forth the budget recommendations of the various entities involved in the process and the final legislative appropriation. These exhibits cover the time period from 1977–1991).

1298. In order to understand the manner in which Alabama allocates its educational dollars one must be acquainted with the Alabama Special Educational Trust Fund ("ASETF"). All state operations in Alabama are funded from one of several funds, each of which is backed by specific set of taxes. In some cases, taxes are divided between two or more funds. AUX 283, p. 9. The largest of these funds is the ASETF which is supported by the income tax, sales tax, and certain utility and excise taxes. The ASETF constitutes

---

**97.** The Court notes that language quoted from the article in *Change Magazine* while ordinarily hearsay was expressly adopted by the Government's expert witness as the basis for an opinion which he formed. *See* Kaiser (10/29/90) 19.

the principal source of state funding for capital outlay appropriations and operating funds for all public education in Alabama. AUX 283, p. 9.

1299. Money from the trust fund can be provided to an institution for capital projects in two ways. The first method is a direct appropriation to the institution. The second method is through the authorization of a bond issue to which the state pledges the revenues in the trust fund. The bond issue approach represents the more common method of financing capital improvements. Bond issue funds can be used for land acquisition, major equipment, large and small renovations and new construction. AUX 283, p. 10.

1300. While there is not a specific formula for the allocation of bond proceeds, it is generally dependent upon student enrollments and the play of politics at the state and local level. When a bond issue is authorized, it may be sold in its entirety or may be packaged in several series. As the series are sold, the institution accounts are given their pro rata share. AUX 283, p. 10.

1301. In addition to funding from AS-ETF, the universities and colleges in Alabama can secure monies for capital improvements through the bonding power of the Public Educational Building Authorities. These Public Educational Building Authorities or PEBAs are statutorily created bonding entities whose function is to assist in the capital financing of educational institutions in Alabama. Ala.Code § 16–18–1 *et seq.*

1302. The enabling language within the PEBA statute provides that these authorities, when created by the private action of individuals, may assist in the improvement of educational facilities by issuing interest-bearing revenue bonds, the proceeds of which are devoted to the enhancement of educational facilities. *Id.* § 16–18–2. The bonds so issued are free from state taxation, but the state has no obligation to the holders of the bonds to guarantee the bonds against default.

1303. In addition to PEBAs and regular state appropriations or bond issues, public universities and colleges can generate additional revenues pursuant to the authority granted the individual boards of trustees to issue bonds under the Alabama Code. Ala. Code § 16–3–28(a)(2). Under this statutory authority, a board may issue institutional bonds and pledge for their payment certain specific fees and monies not appropriated by the state to the institution. *Id.* § 16–3–28(a)(3). The authority to issue institutional bonds reposes in the board while the pledged revenues are campus specific in the case of multi-campus systems and always fee specific.

1304. Finally, many of Alabama's universities and colleges have access to millions of dollars in direct gifts, grants and loans from public and private sources.

### 2. Non–State Funding Process

1305. By Order dated September 12, 1991, the Court asked the parties to file supplemental briefs concerning the amount of non-state revenues each institution received for capital expenditures over the last few years. The Court received hundreds or pages in briefs and supporting documentation. As with most of the issues in this case, there is tremendous disagreement among the parties as to what the evidence indicates and its significance.

1306. One matter is certain, however, and that is that UAS and AU receive substantial portions of their capital funding from sources other than the state. Alabama A & M University, Alabama State University and all of the smaller predominately white institutions rely much more upon the state to meet their capital funding needs than do either UAS or AU.

### D. ACHE's Capital Needs Recommendations

1307. Since 1985, ACHE has included capital needs in its unified budget recommendations. For the following three years ACHE reported only the amount of money the institutions needed to renew existing facilities. As of 1989, the cumulative renewal backlog for senior institutions totalled about 355 million dollars. STX 112, p. G–6. For the fiscal year 1990–91 ACHE received total capital requests from the state's senior institutions of more than $788 million.[98] *Id.* G–3.

98. This amount includes a request for the marine environmental science consortium.

1308. Since publication of the 1988–89 unified budget recommendation, ACHE has prioritized the capital needs identified by institutions and has recommended that the Legislature fund those critical needs as well as a portion of the cumulative renewal backlog. In prioritizing institutional capital requests, ACHE evaluates the institutional requests in light of facility inventories reported by the institutions. Rutledge (2/20/91) 230–32.

1309. Critical capital needs as reported in the 1990–91 unified budget recommendation for all senior institutions of higher education are as follows:

| | | |
|---|---|---:|
| TSU–Phenix City | $ | 4,992.00 |
| TSU–Dothan | $ | 951,832.00 |
| AUM | $ | 1,059,645.00 |
| ASC | $ | 1,343,310.00 |
| TSUM | $ | 1,459,381.00 |
| LU | $ | 2,401,012.00 |
| TSU | $ | 3,297,039.00 |
| UAH | $ | 3,653,181.00 |
| UM | $ | 3,688,179.00 |
| ASU | $ | 4,511,476.00 |
| UNA | $ | 4,226,295.00 |
| AAMU | $ | 5,234,837.00 |
| JSU | $ | 5,338,747.00 |
| USoALA | $ | 14,398,607.00 |
| UA | $ | 28,400,873.00 |
| UAB | $ | 34,668,629.00 |
| AU | $ | 40,879,262.00 |
| TOTAL OF ABOVE | | $155,517,295.00 |

1310. For fiscal year 1990–91, the Legislature did not authorize capital appropriations for any senior institution of higher education either in terms of new funds or funds dedicated to ameliorating what ACHE has identified as critical capital needs.

### E. Legislative Capital Outlay

1311. Capital outlay funds are not appropriated by the Legislature on any regular or predictable basis. "Lacking cyclical procedures for evaluating or funding capital needs, the state has initiated capital appropriations, normally from new bond revenues, only when external events made such a move politically desirable." STX 112 p. G–1; Rutledge (2/20/91) 17; STX 202.7.

1312. The following table, taken from State Exhibit 202.8 tallies the distribution of total capital funds from state appropriations and bond issues during the period between 1953 through 1989 for the public senior institutions in Alabama.

| | Appropriation | Bond Issues | All Funds |
|---|---|---|---|
| AAMU | $4,990,000 | 22,539,686 | 27,529,686 |
| ASU | 4,458,253 | 21,442,597 | 25,900,850 |
| ASC | 536,043 | 1,757,359 | 2,293,402 |
| AU | 2,715,500 | 66,286,284 | 69,001,784 |
| AUM | 3,500,000 | 14,016,005 | 17,516,005 |
| JSU | 1,755,000 | 18,630,177 | 20,385,177 |
| TSU | 1,200,000 | 18,277,098 | 19,477,098 |
| TSUD | 125,000 | –0– | 125,000 |
| TSUM | –0– | –0– | –0– |
| TSU–PC | 100,000 | –0– | 100,000 |
| UA | 1,026,878 | 60,216,745 | 61,243,623 |
| UAB | 10,960,213 | 67,204,149 | 78,164,362 |
| UAH | 1,350,000 | 23,452,962 | 24,802,962 |
| UM | 1,600,000 | 11,219,891 | 12,819,891 |
| UNA | 1,500,000 | 15,355,362 | 16,855,362 |
| USA | 1,000,000 | 29,038,827 | 30,038,827 |
| Total | $36,816,887 | $369,437,143 | $406,254,030 |

1313. More than half of the total revenues from bond appropriations for both AAMU and ASU resulted from the 1985 bond issue. STX 202.7. Additionally, $1.7 million of AAMU's and ASU's total direct appropriations from the state came in 1985 the year this case was first tried. STX 202.6.

### F. Institutional Autonomy Regarding Capital Development

1314. When public funds are appropriated to a university or college, the state does not micro-manage the institution's use of those funds. The state leaves it to the board of trustees to determine how and when appropriated monies are to be used. The institution is free, within relatively broad limits to do as it pleases with the funds allocated to it; if bond funds are involved however, approval of the Alabama Public School and College Authority ("APSCA")[99] is usually required before expenditures can be made. APSCA does give an institution considerable discretion relating to capital outlay, depending on how the institution itself perceives its needs. Bareither (2/19/91) 43, 114–119.

1315. The system in Alabama is a non-reward, non-punishment system. That is, if an institution does not expend funds allocated to it, that does not prevent the institution from having additional funds appropriated. There are no rewards to institutions for securing outside funds in addition to the dollars allocated to it by the state. Finally, the State of Alabama's system is entrepreneurial in the sense that it puts a maximum amount of autonomy and responsibility on the individual institution for managing its own affairs. Bareither (2/19/91) 34, 43, 256.

1316. Typically, bond issue revenues can be used for land acquisition, major equipment purchases, renovations and new construction. Alabama's institutions of higher education exercise almost complete autonomy over the purposes to which they apply resources for capital outlay. 85 UASX 1034 p. 13.

1317. Facilities such as dormitories and student centers are traditionally financed as auxiliary enterprises, with the individual campus issuing institutional bonds and retiring the debt with student fees. Kaiser (11/6/90) 167.

1318. Institutions such as AAMU and ASU which were formerly governed by the State Board of Education exercised considerable autonomy over the purposes to which they applied capital resources allocated to them during the period of SBE control. Wood (7/31/85) 7254–56. The decision over whether to spend capital resources on new construction or renovation has always been made by the administration of the individual institution, even while institutions were under the governance of the State Board of Education. Stephense (3/11/91) 11–14; Gibson (1/9/91) 44–48, 50.

1319. Funds from bond issues flow through an institution in different amounts and at different times and the institution must carefully manage its development process to recognize and account for this.

1320. When money becomes available through the sale of a bond issue, a school is notified that its percentage of the funds is available. Once an institution decides upon a project it wishes to spend its bond proceeds on, an institutional request is accepted by the Alabama Public School and College Authority. 85 UASX 1034 p. 16. There need be no relationship between projects previously requested in the budget process and projects which are submitted for approval to APSCA. *Ibid.*

**99.** APSCA is a public corporation of the state whose members consist of the Governor, the State Superintendent of Education, and the Director of Finance for Alabama. Ala.Code § 16–16–6. APSCA has the statutory authority to provide for the construction, reconstruction, altera- tion, and improvement of public buildings and other facilities for public educational purposes including the procurement of sites and equipment therefor and to anticipate by the issuance of its bonds the receipt of revenues appropriated and pledged by the Legislature. SOF ¶ 10.

1321. After APSCA approves the project designated by the institution, the Alabama Building Commission is notified and the institution is told that it can undertake the next step, which is the selection of an architect. 85 UASX 1034, p. 16.

1322. The university or college itself selects the architect with the approval of the Building Commission. The Building Commission's approval of the architect is limited to ensuring that the institution has conducted an appropriate review, and that the state's fee schedule has not been exceeded. 85 UASX 1034, pp. 16–17. The Building Commission is also charged with ensuring that the design is technically feasible and that state building regulations have been followed. AUX 283, p. 11. When this is done the bids are let.

1323. Once the bids are accepted, and the work begun, the institution's accounts are never credited with any funds held by APSCA, as all payments are through the Building Commission at every stage of the project.

### G. The Plaintiffs' Evidence

1324. In support of its claim that Alabama's decision on resource allocation for facilities during the period from 1954 to the present were and are insufficient to enable ASU and AAMU to attract white students and thereby desegregate, the United States proffered the testimony of Dr. Harvey Kaiser, an expert in the area of higher education facilities. The Knight Plaintiffs did not put up any independent evidence concerning facilities but adopted the testimony

of the Government's expert and participated in the cross examination of Auburn's facilities expert. Of course, the Knight Plaintiffs introduced extensive documentary evidence on the issue of facilities funding.

### H. Comparison of Capital Funding At Selected Institutions

1325. As a preliminary matter the Government's facilities witness, concedes that at least since 1983 the capital appropriations have been equitably distributed between the state's predominately black and predominately white universities and colleges when considering program offerings and enrollments. Kaiser (11/6/90) 305–307.

1326. According to Dr. Kaiser, even though appropriations since 1983 have been equitable, their recent equitability does not ameliorate the sub-average condition under which capital appropriations for the HBUs labored for most of their modern history, and particularly during the period of rapid enrollment and program growth during the 1950's, 1960's and 1970's.[100] Kaiser (11/6/90) 306–07.

1327. Dr. Kaiser's testimony echoes the sentiments of the Alabama Educational Survey Commission in its 1945 report *Public Education In Alabama*. In that report, the Commission recognized that:

> [O]ne of the greatest needs of Alabama in the field of higher education is the improvement of facilities for [black] students.... [Despite recent efforts] the facilities for [black] students are still below the quality that should be maintained.... The physical facilities of

---

**100.** Dr. Kaiser's testimony is instructive:

Q. And, in fact, on capital funding in recent years, predominately black institutions have received more than would have been equitable looking at [enrollment and program growth]?
A. Yes.
Q. And, in fact, if you evaluate recent practices on the basis of the traditionally used factors, you would say that the recent statewide [funding] policies are equitable, is that correct?

A. Yes.

. . . . .

Q. [A]s far as the recent history, your study has shown no evidence ... of discriminatory action on the part of the state as to any of the institutions white or black, is that correct?
A. Yeah, recent discriminatory [sic], I just can't set aside where the institutions started from.
Kaiser (11/7/90) 305–06.

these institutions need immediate improvement and extension. Equally important as the physical plant requirements is the need for strengthening the instructional facilities particularly the libraries.

USX 13, p. 333.

1328. By 1958 the facilities condition at the state's predominately black colleges had apparently not improved greatly. In a report released by the Alabama Education Commission in that year it was observed that the physical plant and facilities at the state's historically black institutions were not sufficient to admit all those who presently were applying for admission and that as such the facilities had to be increased. USX 14, p. 162.

1329. In order to understand the state's response in terms of capital allocations for facilities development and improvement during the period of rapid program and enrollment growth, the Court must pick an appropriate set of comparisons and a logical starting date from which to begin those comparisons.

1330. The Court will pick 1955 as a starting date for its analysis since it is in that year that the federal courts begin in earnest to undo the evils of *de jure* school segregation. By 1956, the mandate of

*Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was specifically extended to higher education in *Hawkins v. Board of Control of Florida,* 350 U.S. 413, 414, 76 S.Ct. 464, 464, 100 L.Ed. 486 (1956).

1331. As for the termination date, the Court will select 1983. By Dr. Kaiser own admission, capital funding has been equitable since that date. The issue to determine is whether within this time period, the state's capital funding deterred the desegregation of Alabama State and Alabama A & M. The analysis should not occur in the vacuum of a 29 years between 1954 and 1983. The Court is therefore mindful of the conditions as they existed before and after this time period.

1332. In selecting institutional comparisons, the Court must look to quantitative factors. Some of the factors that are most important to determining whether academic facilities are adequate [101] are student enrollment and program offerings. Bareither (2/19/91) 22. According to the Defendants, the appropriate set of comparisons based on these factors are between the following institutions: AAMU, ASU, AUM, TSU, UAH, UNA. For purposes of facilities comparisons the Court accepts the Defendants' set of universities.[102]

**101.** The term "adequate" has a different meaning depending on whether the Plaintiffs or the Defendants are advancing its use. To the Plaintiffs, the word means facilities of sufficient quality and quantity to attract white students, in numbers large enough to disestablish—through desegregation—the vestiges of a prior dual system of higher education. To the Defendants, the term means comparing capital appropriations between institutions of similar size and mission and determining whether those appropriations are equitable. The Court considers the term imbued with both meanings, as neither the Defendants' nor the Plaintiffs' position is wholly tenable standing alone.

Obviously, for all parties "adequate facilities" also connotes buildings of a size and character necessary to carry out institutional mission.

**102.** The Defendants arrive at their proposed comparisons by reviewing the classification schemes advanced by the Carnegie Foundation, the Southern Regional Educational Board and the National Center for Educational Statistics.

(*See* supra, ¶¶ 1583–87 for a full discussion of the various classification schemes and methodologies used to group colleges according to mission and program size). The Defendants properly concluded that AAMU, ASU, AUM, TSU, UAH and UNA currently share the most common characteristics relating to facilities requirements. Whether comparisons based on this current commonality alone are sufficient to determine if the prior dual system of higher education is eliminated is not itself addressed by the Defendants nor by the classification schemes upon which they rely.

Since the Court has found that there exists within the State of Alabama a "system of higher education," it must not only consider the comparisons proposed by the Defendants, but must also review the system in its totality ever mindful however, that the state's institutions serve very different functions and have very different missions. Nevertheless, any comparison for purposes of determining the adequacy of facilities which seeks to compare Alabama State Uni-

1333. After briefly discussing the physical layout of five of the six comparison campuses [103], the Court will examine the interplay between increasing student enrollments and academic program offerings and the state's response to changes in these variables between 1954 and 1983.

### 1. Facility Appearance At The Six Comparison Campuses

#### i.

1334. The University of North Alabama is an attractive campus. It is not large, but a great deal of attention and care has been given to the university. The older buildings on the campus have been well cared for. Kaiser (10/29/90) 27.

1335. The new facilities at UNA are tastefully designed and well coordinated with the older buildings. The recent library addition has been opened and the Geogh University Center was done with a good sense of architectural coordination with the buildings around it. Kaiser (10/29/90) 27.

1336. The buildings appeared to be well managed with a good sense of stewardship and appreciation for the historic nature of the building. Kaiser (10/29/90) 27.

#### ii.

1337. Auburn University at Montgomery was done from a master plan. There are individual free standing buildings, well-placed in relationship to each other in material, height and form. The recent medical technology building fits well even though it was done 20 years after the original buildings were erected. There are ample grounds for recreation. Kaiser (10/29/90) 28.

#### iii.

1338. The University of Alabama at Huntsville was planned from scratch and the concept was to place individual buildings in a research park-like environment. The buildings fit very well with the mission of the university and with the adjacent buildings. The facilities are well integrated into the program offerings of the university. A few of the early core buildings look alike but they are a great distance apart and do not architecturally intrude one on the other. Kaiser (10/29/90) 28.

1339. The newer buildings at UAH are very exciting in architecture, but depart strongly from the earlier buildings. The Administrative Science Building and the Bevill Center are two examples of this departure. The campus is quite attractive and its land area substantial. Kaiser (10/29/90) 28–29.

#### iv.

1340. Alabama State University in Montgomery is in a congested residential site, though it recently made some land acquisitions off the edges of the campus. Kaiser (10/29/90) 29.

1341. The architecture at Alabama State University is dramatically different around the edges than when looking at the older core buildings. One finds older buildings which are not in the best of conditions. Kaiser (10/29/90) 30.

1342. One would have to have a strong desire to attend ASU when considering the buildings. The campus is not as attractive or appealing as some of the other campuses in the state because of the physical conditions of buildings and the grounds. Kaiser (10/29/90) 30.

#### v.

1343. Alabama A & M is a very striking campus from a distance. However, on closer examination there is found the same type of deterioration as at ASU to the exteriors and interiors of building. There is a considerable amount of congestion and no breathing room to identify or feel comfortable around buildings. Kaiser (10/29/90) 30.

1344. The roads and grounds are tattered and worn. One gets a sense of pride where there have been recent renovations,

versity or Alabama A & M University to the University of Alabama or Auburn University is not appropriate given the stark divergence in mission and enrollment size between these institutions.

**103.** No testimony was introduced regarding the physical appearance of the TSU campus.

but attention still needs to be given to the older facilities. Kaiser (10/29/90) 30.

1345. In terms of facilities, a comparison of the white and black proximate universities reveals a different level of refinement and attention.

1346. When comparing AAMU and UAH, one is left with the impression that UAH's facilities are vastly better, not only for science and technology, but for regular undergraduate purposes as well. Kaiser (10/29/90) 30.

1347. The testimony is uncontradicted that the quality of facilities at the University of North Alabama are much more attractive in appearance and ambience than those at AAMU. Kaiser (10/29/90) 40.

1348. ASU and AUM are strikingly different campuses. AUM is comprised almost entirely of new buildings superior in appearance and appeal than those at ASU. Kaiser (10/29/90) 42.

## 2. The Era of Expanding Enrollments and State Support

1349. By the 1950's public higher education throughout the United States and Alabama was on the threshold of explosive enrollment and program expansion. In the 1958 Report of the Alabama Education Commission it was predicted that by 1970 approximately 60,000 additional students would be enrolled in Alabama's public colleges and universities. USX 14, pp. 13–41. By 1965, however, head count enrollments at public institutions were approaching 50,-000 and increasing rapidly, by the fall 1979 enrollments exceeded 100,000 and have continually remained above that level. STX 202.1. The vast preponderance of the increase in student enrollments is attributable to substantial numbers of white students coming into the system.

1350. In order to accommodate this massive increase in enrollments, the state's system of higher education grew not only at existing institutions but also at newly expanded branch campuses. For example, the Huntsville center of the University of Alabama founded in 1950 became a branch campus in 1969 as did the University of

Alabama's complex in Birmingham. During the 1960's, Troy State University opened its branch campuses at Dothan (1965) and at Montgomery (1966). The state established AUM in 1967, and the University of South Alabama was opened in 1963.

1351. It is clear that during this period of rapid growth the state was essentially confronted with three choices: 1) it could increase funding to existing universities and colleges and thereby develop the facilities and programs necessary to cope with the growth; 2) the state could establish entirely new facilities for previously nonexistent schools; or 3) the state could engage in a combination of increased funding for existing institutions while also establishing entirely new schools or expanding essentially dormant branch campuses. The state elected the final option but placed the bulk of its efforts and capital funding towards establishing new schools or expanding dormant branch campuses.

1352. The following table is compiled from State Exhibit 161 and sets out the state capital bond funds at the six selected institutions from 1955 through 1983.[104]

| | |
|---|---|
| AAUM | $11,238,465 |
| ASU | $10,243,198 |
| AUM | $10,451,801 |
| TSU | $11,738,422 |
| UAH | $19,995,410 |
| UNA | $11,114,172 |
| | $74,781,468 |

STX 161.

1353. Capital appropriations from the state were considerably more erratic than state bond issues. During the thirty year period examined by the Court, the institutions now under consideration received direct state capital appropriations during only a four year time frame between 1966 and 1969. STX 169. During this period UNA did not get any capital appropriations. AUM, UAH and TSU received appropriations only once while ASU benefited from capital appropriations on two different occasions and AAMU received state monies three separate times. The follow-

---

**104.** Funding for AUM does not begin until 1967.

ing table indicates the total direct capital appropriations received from the state by the six comparative institutions between 1954 and 1983.

| | |
|------|------------|
| AAUM | $2,190,000 |
| ASU | $1,500,000 |
| AUM | $2,000,000 |
| TSU | $ 200,000 |
| UAH | $ 350,000 |
| UNA | $ -0- |
| | $6,240,000 |

STX 169.

1354. Focusing for the moment on the institutions located in Montgomery and Huntsville, it becomes apparent that much of the states' early efforts in these two cities were directed towards establishing a new institution (AUM) or a improving branch campus (UAH) rather than increasing the resources of AAMU or ASU so that they could participate in the increased student enrollments and program demands. This conclusion is substantiated by a comparison of enrollment and physical plant growth between the four proximate institutions and UNA.

1355. AUM opened in 1967 with less than 400 students holding classes in temporary facilities. By 1970 Auburn University at Montgomery had over 1,000 students and by 1981 enrollment exceeded 5,000—almost a thousand students more than attended ASU at the same time. Kaiser (11/06/90) 88; USX 4, Table 1; STX 109 p. 7. A similar story can be told at UAH.

1356. UAH which became a separate campus in 1969 saw its enrollment grow from approximately 2300 in 1965 to almost 6000 by 1982. USX 4, Table 1. During this same period of time AAMU's enrollment went from slightly over 2000 to approximately 4100. *Ibid.*

1357. For the 1954–55 school year enrollment at UNA was slightly more than 1000 students. By the 1983 school year enrollments increased to over 5000. USX 4, Table 1.

1358. By 1983, only eighteen years after its establishment, AUM accumulated a plant investment value[105] of over 32.6 million dollars. USX 4, Table 4. Using 1983 as the bench mark, ASU's plant investment value barely surpassed $29 million. UAH had a plant investment worth $48 million while AAMU had a physical plant and related items valued at slightly more than 42.2 million dollars. *Ibid.* The University of North Alabama's plant value as reported in 1983 was just over $30.2 million.[106] *Ibid.*

1359. In a relatively short time, AUM and UAH grew from rather modest beginnings to surpass ASU and AAUM in both enrollment and plant value due in large measure to the direct efforts of the state and its capital funding policies.

1360. Much of the capital investment in AUM and UAH between 1955 and 1983 went directly to core academic or E & G[107] space rather than campus residential facilities. No more than seven or eight per cent of UAH's undergraduate students live in

---

**105.** In this context, "plant investment value" is computed by taking the "book value" of a university's lands improvements, buildings, equipment, books, and other similar items and adding them together. The data is compiled by reference to the universities' financial statements for 1983.

**106.** The increase in plant investment from 1983–1989 for five of the six comparative institutions is as follows:

| | |
|------|-------------|
| AAUM | $18,646,416 |
| ASU | $ 8,593,760 |
| AUM | $19,714,538 |
| UAH | $15,670,212 |
| UNA | $22,119,715 |

USX 2–12, Table 2.

The amounts listed above are book value of the actual cost of an improvement and were

generated by the Government's facilities expert from annual financial statements for each campus. Included are values of land, buildings, equipment and in some cases, a category titled "other improvements." Sources of funds are not identified and it is assumed that they represent a combination of state, federal, and other sources.

**107.** Educational and general space ("E & G") is that space in a college or university that is assigned to the various organizational units within the university for instruction, research, public service, academic and student support services, and operation and maintenance of plant. It includes classrooms, laboratories, library facilities and faculty and administrative office space. It does not include residential facilities.

university owned housing today and the Court has no reason to believe that the university's housing requirements were anything other than modest throughout its entire existence. UASX 813 p. 4; Fisher (3/25/91) 61. Similarly, AUM has always been primarily a non-residential commuter institution and today has on-campus housing for only about 330 of its students. SOF ¶ 608.

1361. The University of North Alabama also has a very small number of students who reside in campus housing. Of UNA's 5600 students no more than 850 live in dormitories. Wood (3/11/91) 6. On the other hand, Alabama State University and Alabama A & M University had and continue to have substantial student housing requirements—the cost of which are not insubstantial.

1362. Between 1965 and 1983, Alabama A & M University added 647,099 square feet of new construction to its campus. Alabama A & M's new construction between 1965 and 1983 constituted 51% of its total campus space. SOF ¶¶ 266–67.

1363. Between 1965 and 1982, Alabama State University added 557,517 square feet of new construction to its campus space. ASU's new construction between 1965 and 1982 constituted approximately 56% of its total campus space. SOF ¶¶ 267–69.

1364. Between 1965 and 1982, Auburn University at Montgomery constructed 454,968 square feet of new space. AUM's new construction between 1965 and 1982 constituted 100% of its total space. SOF ¶¶ 70–71.

1365. Between 1965 and 1982, Troy State University added 483,555 square feet of new construction to its campus space. Troy State University's new construction between 1965 and 1982 constituted 41% of its total campus space. SOF ¶¶ 72–73.

1366. Between 1965 and 1982, the University of North Alabama added 496,676 square feet of new construction to its campus space. The University of North Alabama's new construction between 1965 and 1982 constituted 49% of its total space. SOF ¶¶ 73–74.

1367. Between 1965 and 1982, the University of Alabama at Huntsville added 705,985 square feet of new construction, excluding off-campus medical school facilities, to its campus space. The University of Alabama at Huntsville's new construction between 1965 and 1982, excluding off-campus medical school facilities, constituted approximately 70% of its total campus space. SOF ¶¶ 75–76.

## I. The State Has Inadequately Funded The Capital Development of Its HBU's

1368. It cannot be forgotten that coinciding with the increases in college enrollment, federal courts began ordering the desegregation of higher education in Alabama. Responding to enrollment pressures and federal court oversight, the State of Alabama made a series of decisions—predominately in the mid 1960's—concerning facilities development which has to this day detrimentally impacted on the ability of Alabama's predominately black universities to desegregate, and frustrated the state's effort to meet its obligation to eliminate discrimination root and branch.

1369. Through a history of inadequate funding, Alabama's historically black universities have not been in the position to improve their facilities to the level necessary to attract other race students particularly in the face of strong competition for capital funding from the predominately white universities located in close geographic proximity. The evidence is clear that UAH, AUM, and UNA have a detrimental impact on the ability of Alabama A & M and Alabama State to attract and retain white students when considering the role university facilities play in attracting other race students.

1370. For example, in 1958 it was recommended that over 19.6% of AAMU's campus be replaced while at UNA only 6.2% of the campus was listed as needing replacement. 85 UASX 1034, Table 12. By 1983, AAMU was reporting that 6.9% of its total space should be demolished and that 34.1% of its facilities were in need of major remodeling with an estimated cost of greater than fifty per cent of the replace-

ment value of the building. In 1983 Alabama A & M University reported that only 31.9% of its space was in satisfactory condition. STX 177, Table III.

1371. Since 1983 the state has substantially improved the situation by increasing capital funding through direct appropriations and capital bond issue. The HBUs have received substantial benefits from the recent increases in capital funding.[108] Much of the increased funding is the direct result of pressure by black state legislators and the effects which this case has indirectly had on the state's capital funding process. Yet, on the whole, the state has not done all it must do to insure that vestiges of discrimination are eliminated root and branch so that its HBUs can legitimately begin the process of desegregating.

1372. According to their own self-reported data Alabama's HBUs are improving their facilities at a considerable rate. Nevertheless, responding to financial deprivation occurring over a number of years is a matter that will take more funding, particularly in light of the increased age of the facilities at the state's historically black universities when compared with the proximate HWUs.[109]

1373. The critical capital needs of AAMU and ASU have been identified by ACHE in its 1990–91 Unified Budget Recommendations. STX 112, pp. G–1—G–8. Under ACHE's calculation, AAMU is in need of $15,863,143 in order to meet its immediate capital requirements. Alabama State requires $14,735,938 of capital funding to meet its similar obligations and needs. *Id.*, at p. G–6.

1374. ACHE determines its recommended capital appropriation by including the facilities renewal formula at 100% of the calculated backlog,2[110] fully funding all modifications and alterations of existing structures, as well as funding all utilities and campus-wide projects and requests for land acquisition. STX 112, p. G–1. ACHE's recommended capital appropriation for ASU and AAMU far exceed those for AUM ($3,211,044) and UAH ($11,070,-244 excluding $5,926,000 for land acquisi-

---

**108.** The 1985 state bond issue stands out as an example of the state's increased funding efforts towards its historically black universities. Out of the 1985 bond issue ASU and AAMU received over 11 million dollars each. This is substantially more than was given to any of the other universities in Alabama other than AU, UA or UAB. Additionally, in 1985 and 1986 AAMU and ASU were given direct capital appropriations totalling $2.45 million and $2.6 million respectively.

The impact of the state bond issues and direct capital appropriations has had an immediate influence on the condition of facilities at the HBUs. For example, by 1988 AAMU reported that 51.3% of its buildings were in a satisfactory condition, an increase of 19.4% over the reported 1983 data. USX 2–12, Table 12.

**109.** For days this Court heard testimony from officials and students of both ASU and AAMU concerning the sorry plight of existing campus facilities and the need for new buildings in order to ensure academic program accreditation and meet student needs. The Court realizes that each of the institutions in Alabama has considerable autonomy over the expenditure of capital funds appropriated to it by the Legislature, and will supposedly allocate those funds in a manner that best serve the interest of the university's students and programs.

While the Court has no reason to believe that any university administration in Alabama is conducting itself in a manner inconsistent with the best interest of its institution, the Court is nonetheless perplexed by certain of the choices which ASU and AAMU have made respecting recent capital expenditure decisions. Building nineteen million dollar athletic complexes, university radio stations, and fine arts centers, is not be the best use of funds when faced with accreditation requirements which go unmet because of inadequate building space and library collections that are plainly insufficient.

Undoubtedly these kind of facilities are important to a university, they are not however, the sort of critical needs which this Court believes must be met if either ASU or AAMU are to desegregate and encourage the attendance of white students on their campuses. Sound academic programs and the facilities to support them rather than a state of the art athletic complex is what is necessary to attract high caliber students—either black or white.

**110.** The renewal backlog formula is used to determine the amount of funds necessary to restore a building to essentially a new condition. The variables affecting the formula are primarily driven by the age and construction quality of the building. STX 112, pp. F–1—F6. "The renewal backlog (deferred maintenance) is defined as the summation of all the years allowances to date for a building." STX 114, p. 7.

tion).[111] *Id.* at p. G–6.

1375. The Court finds that the amounts calculated by ACHE in its 1990–91 Unified Budget Recommendation under the heading Capital Funding Recommendation (*see* STX 112, p. G–6.) decreased by one-third, constitute the best and primary evidence available regarding the capital funds necessary to alleviate the vestiges of discrimination which to this day hamper the ability of ASU and AAMU to desegregate. The Court finds that a capital allocation by either direct legislative appropriation or by state bond issue is the best method to eliminate the vestiges.[112]

1376. The capital funds necessary to eliminate the vestiges of discrimination which adhere to Alabama A & M's physical plant as a result of prior discriminatory funding practices is $10,628,306. This funding can be appropriated either directly or through a bond issue, all at once or over a three year period. If the appropriation is made over the three year period, the effects of inflation must be taken into consideration.

1377. Before it may spend any of this money Alabama A & M University is required to secure the approval of the Court for the proposed expenditures to ensure that expenditures are directed towards capital projects related to the final dismantling of existing vestiges of discrimination. The Court will give the university great latitude in managing its affairs, but will see that the money is appropriately utilized.

1378. Alabama State University should receive at least $9,873,078 for capital expenditures. This appropriation is to be made under exactly the same conditions as the appropriation for Alabama A & M University and governed by the same restrictions.

1379. The Court's findings are *not* based on an institutional enhancement theory, but rather on the realization that the adequacy of facilities has a direct and immediate impact on individual students as they consider which institution to attend. SOF ¶ 116. Finally, the underfunding of capital development at ASU and AAMU resulted from actions of the state and not because of activities carried on by the state's individual institutions of higher education.

1380. If in the future—unconnected with the above discussed funding—the state enacts a general capital appropriation for institutions of higher education, or approves a bond issue dedicated to college and university capital improvements, then the HBUs shall receive at least the difference between amount calculated by the Court this day and that reported on STX 112, p. G–6.

### *STUDENT CHOICE: MAKING ENROLLMENT DECISIONS*

### A. *Student Choice In General*

1381. In large measure, student choice is affected by the overall academic preparation of an institution's student body. Students tend to make choices about which college to attend based on their own level of academic preparation. Wise (3/14/91) 8–9. Everything being equal, a student is less likely to pick as his or her first choice a school where the average academic preparation of the student body is much higher or lower than his or her own preparation. *Id.* at 18.

1382. There is a significant relationship between ACT examination scores and the institutions of higher education to which people apply and in which they enroll. SOF ¶ 297.

1383. Students also tend to pick schools where they feel, by and large, they will be competitive. Students learn of the academic fit between themselves and a college by reading a prospective college's publica-

---

**111.** The amounts calculated for Alabama A & M ($15,836,143) do not include any monies for land acquisition, while those for Alabama State ($14,735,938) include $1,064,000 in appropriations for land. STX 112, p. G–6.

**112.** Due to serious Eleventh Amendment problems the Court cannot compel the state to appropriate these funds. *See* Conclusions of Law ¶¶ 87–105. The Court can and will, however, obligate the state to eliminate the vestiges which cling to its institutions to this day.

tions and by discussing the institution with their parents and other students. SOF ¶ 296.

*B. ACT Scores and Student Choice*

1384. Professor David Wise, an economist on the faculty of Harvard University, was called by the non-allied Defendants as an expert in the area of student choice. Wise (3/14/91) 2–4. Dr. Wise offered a number of opinions concerning the matriculation decisions of Alabama high school seniors who had taken the ACT. Dr. Wise's opinions are based on his expertise in the field of student choice and on information provided by the American College Testing Program. Additional data concerning actual enrollment decisions was also considered by the witness.

1385. Much of Dr. Wise's testimony is based upon information supplied by the test takers when registering for the ACT examination.[113] The test takers are asked to list in order of preference those schools to which they want their test scores sent. This choice is made before the student has begun the formal application process and before he or she knows his or her test score. In all, the students are able to select six schools, the first three of which are free. That is they add no cost to the test taker. Wise (3/14/91) 43.

1386. The data from the students' self-selected choices is compiled by the American College Testing Program. This information was utilized by Dr. Wise in formulating his opinions. The witness limited his review of the self-selected choice data to the first three responses indicated by the student on the registration form.[114]

1387. In comparing the distribution of ACT scores among students enrolled in Alabama's public colleges and universities, the following comparisons involving the proximate institutions are evident:

(a) About 81 or 82 per cent of AAMU students have ACT scores below 16, while about 81% of UAH students have ACT scores above 16. Wise (3/14/91) 22; AUX 215, Figure 7(a).

(b) Approximately 98 per cent of the students at AAMU have lower ACT test scores than their counter-parts at UAH. *Id.* at 32.

(c) Roughly 79 per cent of ASU students score a fourteen or below on the ACT, while the same percentage of AUM students score above a 14. AUX 215, Figure 7(b).

1388. The level of academic preparation of Alabama's college students as measured by the ACT varies widely from institution to institution. The following table prepared by Dr. Wise sets out the mean ACT test score by race for the 1989–90 academic year for students whom Dr. Wise was able to find an enrollment match. The Table was admitted as part of Auburn's Exhibit 215.

Table 6a. Mean ACT Score,
by College Enrolled and by Race,
1989–1990.

| Institution | Black | White | Race Other | Missing | All |
|---|---|---|---|---|---|
| Alabama A & M | 12.15 | 17.15 | 12.12 | 14.29 | 12.44 |
| U of Montevallo | 17.86 | 21.15 | 20.50 | 20.40 | 20.87 |
| Ala State—Montgomery | 12.15 | 15.75 | 12.25 | 10.15 | 11.83 |
| Auburn U—Auburn | 19.90 | 23.10 | 22.71 | 22.06 | 22.86 |

**113.** In the 1989–90 school year 24,692 Alabama students took the ACT examination.

**114.** In their brief the Knight Plaintiffs and the Allied Defendants do not directly address the testimony of Dr. Wise. They did, however, on cross examination challenge some of the assumptions upon which Dr. Wise based his testimony. Suffice it to say that the Court is mindful of the limitations of Dr. Wise's testimony and methodology. Nevertheless, his testimony is creditable and of assistance even within the limitations exposed by the Knight Plaintiffs and allied Defendants.

| Institution | Black | White | Race Other | Missing | All |
|---|---|---|---|---|---|
| U of No Alabama | 13.24 | 18.33 | 16.43 | 15.35 | 17.55 |
| Jacksonville St U | 11.37 | 17.75 | 17.14 | 13.45 | 15.73 |
| Livingston U | 13.58 | 17.86 | 19.83 | 14.65 | 16.36 |
| Troy St U—Troy | 14.83 | 19.75 | 16.75 | 16.78 | 18.88 |
| U of Ala—University | 19.05 | 22.30 | 20.45 | 20.95 | 21.86 |
| U of Ala—Huntsville | 15.85 | 22.08 | 20.87 | 18.31 | 21.15 |
| U of Ala—Birmingham | 17.26 | 20.53 | 19.50 | 20.94 | 19.73 |
| Auburn U—Montgomery | 15.04 | 19.20 | 18.00 | 19.79 | 18.72 |
| U of S Alabama | 17.40 | 20.80 | 19.33 | 19.64 | 20.40 |
| All | 14.14 | 21.22 | 19.49 | 16.76 | 19.37 |

Note: Note: Based on all 1988–1989 Alabama test takers for whom an enrollment match was found.

1389. Among *all* students in Alabama who took the ACT in 1988–89 those who listed AAMU as their first choice institution had a mean ACT score of 11.87; those who listed ASU as their first choice had a mean ACT of 12.34. The mean ACT score of students listing UA, UAH and UAB as their first choice institutions were 18.94, 19.65 and 17.0 respectively. AUX 215, Table 5. For Auburn University at Montgomery the mean ACT score for those students listing AUM as their first choice was 16.57. At AU the mean score for the same subset of students was 19.5. *Ibid.*

1390. Among black students in Alabama taking the ACT in 1988–89, and who listed AAMU as their first choice institution on the ACT registration form, the mean test score was 11.64. For whites listing AAMU as their first choice the mean was 16.33. Those black students listing ASU as first choice had a mean score of 11.59, while white students listing ASU as first choice had a mean score of 17.84. AUX 215, Table 5. The mean ACT score of black students listing UA, UAH and UAB as their first choice institution were 14.88, 14.79 and 13.79, respectively. *Ibid.* Black students listing AU as first choice had a mean score of 15.64 and those listing AU

as first choice had a mean score of 13.89. *Ibid.*

1391. Among black Alabama students who took the ACT in 1988–89 and who listed as their first choice an Alabama public four-year institution, approximately 46% of those who had ACT scores in the 0–12 range selected majority black schools,[115] and approximately 54% listed majority white schools. Among those with ACT scores of 24 and above, the proportion choosing majority black colleges was 9.4%, while the proportion choosing majority white schools was 90.6%. Wise (3/14/91) 12; AUX 215, Table 1.

1392. Among black students taking the ACT in Alabama in 1988–89 who listed their first choice institution to be one of Alabama's public four-year institutions, for those who scored between 17 and 19 on the ACT, 13.5% listed UA as their first choice school, 8.8% listed UAB as their first choice school, 7.4% listed AAMU as their first choice school, and 4.1% listed ASU as their first choice school. AUX 215, Fig. 2c.

1393. Among black students taking the ACT in Alabama in 1988–89 who listed their first choice institution to be one of the Alabama public four-year institutions, for those who scored between 20 and 23 on the ACT, 15.6% listed UA as their first choice

115. For the 1983–84 school year, an ACT composite score of ten would be at the eleventh percentile for all Alabama Students taking the test, and at the eleventh percentile for the southeastern region of the United States. SOF ¶ 614.

A score of twelve on the ACT for the 1988–89 school year would be at the 18th percentile nationally and at the 21st percentile for Alabama. KX 1945, p. 2 (state report), p. 2 (national report).

school, 7.7% listed UAH, 3.9% listed ASU, and 3.6% listed AAMU as their first choice school. AUX 215, Fig. 2d.

1394. Among black students taking the ACT in Alabama in 1988–89 who listed their first choice institution to be one of the Alabama public four-year institutions, for those who scored 24 and above on the ACT, 9.6% listed UA as their first choice school, 5.6% listed UAB as their first choice school, 3.0% listed UAH as their first choice school, 2% listed AAMU as their first choice school, and 1.7% listed ASU as their first choice school. Wise (3/14/91) 4.

1395. Auburn University is the most popular first choice, at 11.6%, among public institutions in Alabama for black students who score in the highest ACT quintile. Wise (3/14/91) 21.

1396. In 1988–89, only 5.5% of ACT test takers who indicated AUM as their first choice indicated ASU as the second choice; among white students, only 1.2% who indicated AUM as a first choice indicated ASU as a second choice. AUX 215, Table 7a. Only seven white students who indicated AUM as a first choice indicated ASU as a second choice; 38 black students who indicated AUM as a first choice indicated ASU as a second choice. *Id.*, Table 7b.

1397. Among black students who take the ACT and who list as their first choice of college an Alabama public four-year institution, the percentage which chooses majority white schools is substantial and increases with ACT scores. Wise (3/14/91) 12.

### C. Factors Other Than Academic Preparation Have An Influence On Student Choice

1398. According to Dr. Walter Allen, the Knight Plaintiffs and allied Defendants' expert on student choice, factors which affect a student's choice of colleges include: proximity, financial considerations, academic programs, general reputation, facilities, the prospects of gaining admission, and how receptive the environ-

ment will be. Allen (1/16/91) 45–46. The Court finds that each of these elements in addition to the general academic preparation of the students already attending the institution, has a substantial impact on the enrollment of students.

1399. Cutbacks in federal student assistance have had a detrimental impact on black students attending colleges. There are fewer sources of financial aid available from the federal government in 1990 than there were in 1979–80. Garibaldi (1/15/91) 34.

1400. The effort an institution expends to make other-race students feel comfortable on its campus is a factor in those students selecting a particular institution. Wright (7/10/85) 1747–48. A student will not attend a school where the environment is perceived by him or her as hostile.

1401. A substantial number of high school graduates in Alabama, both black and white, choose to attend public two-year institutions in the state.[116] SOF ¶ 316.

### STUDENT ENROLLMENT: THE RACIAL COMPOSITION OF ALABAMA'S COLLEGES AND UNIVERSITIES

#### A. Contentions Of The Parties

1402. The United States and the Knight Plaintiffs claim that the lack of substantial numbers of black student at the state's HWUs are vestiges of the *de jure* period of segregation. In support of their claim, the Knight Plaintiffs offered the testimony of several black students attending many of the state's predominately white universities and colleges. These students testified that the small number of other African American students at the state's HWUs had a detrimental impact on black students already attending the institution and also on the efforts of an institution hoping to increase its black enrollment. *See* Screen (11/13/90) 24–30, 58; O. Gordon (12/06/90); Ward (3/11/91) 13, 30.

---

**116.** In 1990, 72,817 students were enrolled in Alabama's two-year colleges, of whom 14,600 were black. STX 202.1; 202.3.

1403. The evidence offered by the Government in support of its claim that the student bodies in Alabama's colleges and universities are racially identifiable consists of the self-reported data from the institutions concerning the racial composition of their student bodies. *See* USX 2–1—2–6.

1404. The Defendants deny the Plaintiffs' claims, and assert that the composition of the student bodies at the various institutions is not a vestige of segregation. They argue that increasing black student enrollments at the state's HWU dispels any contention to the contrary.

1405. According to the Defendant universities, the increase in black enrollment results not only from the elimination of prior discriminatory policies, but also from the many affirmative efforts of the HWUs to increase black enrollment.

*B. Knight Plaintiffs' Evidence*

1406. The Knight Plaintiffs rely primarily upon the testimony of students attending the HWUs to make their point about the impact of small black student enrollments. According to the Knight Plaintiffs the low enrollment of black students means that African–American students on HWUs often have only one or two other black students in their classes. Screen (11/13/90) 24, 42; Dickerson (12/3/90) 16. Teague (12/6/90); Gallagher (12/11/90); Bynum (1/8/91); Watson (11/14/90); Prince (12/3/90); De Jenerette (12/3/90).

1407. Kelvin Prince, currently a student at UNA, testified about his shock when he first arrived on campus and discovered that he was only one of four blacks in the college band, which was composed of 120 students. Prince (12/3/90) (testimony not transcribed).

1408. Even AU's own witness, Harold Melton, testified that when he enrolled at AU in 1984, there were approximately 500 black students out of a total of 18,000 students. There were only three black students enrolled in Mr. Melton's major, international business, out of forty or fifty students. Melton (3/6/91) 20–21.

1409. Current AU student Tami Screen testified that when she came to AU, she "didn't like it because I didn't see any other blacks on campus. I believe I had one other black in my biology class and we kind of hooked together and we were basically friends from that point on. And other than that, I didn't know anyone." Screen (11/13/90) 9. Screen also testified that if she saw a black student on the first day of class that she didn't know, the two of them would sit down together without question. Screen (11/13/90) 29.

1410. Screen described the circumstance of seeing another black person on campus:

> It's rare that you do see another black on campus. So it's almost everything except a hug, and if that person doesn't acknowledge you or doesn't speak to you or maybe turns their head, you can assume that that person is either a freshman or a transfer student that just got there and does not realize yet they're not going to see blacks all the time.

Screen (11/13/90) 58.

1411. The Knight Plaintiffs offered testimony that the small number of black students at Auburn University has an impact on black students in the classroom. Tami Screen described it this way: "[I]f there is a subject that comes up concerning blacks or quote-unquote black issue[s], everyone turns around and they kind of, they have looks on their faces, and I interpret them as saying, well is she going to say something this time? It's like you have to stand up and defend something." Screen (11/13/90) 24. "You have to be a role model, because you're the only black they're seeing in that class." *Id.* 25.

1412. Other manifestations of a small minority student population were explained. According to UAH engineering student Orlando Gordon, the presence of only one or two other black students in a class creates pressure on the black students. Blacks in engineering try to work among themselves in study groups because their opportunities are limited in joining other study groups. O. Gordon (12/6/90). Kelvin Prince at UNA stated if black stu-

dents are not outgoing, they rarely participate in class. Prince (12/3/90).

## C. *The Defendants' Enrollment Evidence*

1413. It is uncontradicted that nearly sixty per cent of the black students attending public senior institutions in Alabama are enrolled in the state's predominately white schools. Wise (7/23/85) 5000; AUX 8079.

### 1. Auburn University

1414. As demonstrated by the following table, Auburn University's total black undergraduate head count enrollment between 1978 and 1990 has remained small.[117]

| Year | Blacks | | Whites | | Other | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | # | % | # | % | # | % | |
| 1978 | 410 | 2 | 17,349 | 96 | 346 | 2 | 18,105 |
| 1980 | 484 | 3 | 17,726 | 95 | 393 | 2 | 18,603 |
| 1982 | 441 | 2 | 17,566 | 96 | 394 | 2 | 18,401 |
| 1984 | 586 | 3 | 17,810 | 94 | 492 | 3 | 18,888 |
| 1986 | 683 | 4 | 18,036 | 95 | 170 | 1 | 18,889 |
| 1988 | 729 | 4 | 19,002 | 95 | 209 | 1 | 19,940 |
| 1989 | 843 | 4 | 19,890 | 92 | 968 | 4 | 21,701 |
| 1990 | 847 | 4 | 19,654 | 91 | 1,036 | 5 | 21,537 |

STX 202.3; USX 2-1 to 2-7; AUX 56.

1415. Approximately 7% of the Fall 1990 entering freshman class at AU was black. AUX 56, p. 2.

1416. Black enrollment at AU is rising albeit slowly. The number of black freshmen has increased consistently from 68 entering freshmen in 1983 to 191 black freshmen in 1990. Reeder (2/27/91) 16. In mid-February 1991, 94 more black applicants had been accepted than at that same time in February 1990. Reeder (2/27/91) 16, 49; King (2/28/91) 68.

### 2. Auburn University at Montgomery

1417. The number of black students attending AUM has increased steadily over the years since AUM's creation. SOF ¶ 599. The total black head count enrollment at AUM has increased from 54 (3.5%) in fall quarter 1971 to a high of 1062 (16.9%) in fall quarter 1990. AUX 647, 671 and 918.

1418. Of the first time entering undergraduates at AUM for the 1984–85 school year, 19.4% were black. SOF ¶ 623. In 1990 the percentage jumped to 20.45 percent. Dunlavy (2/25/91) 18–19; AUX 920.

### 3. The University of Alabama System

#### i. *General Enrollment Data*

1419. As of the Fall of 1990, UAH had approximately 6,000 undergraduate students enrolled. Of that total 5.8% were black. Koger (3/26/91) 27–26.

1420. Over the past several years, the number of black students enrolled has increased. The total enrollment at UAH, however, has also increased rapidly, so the percentage of black students has remained generally level. Koger (3/26/91) 28.

1421. Black enrollment at the University of Alabama at Birmingham is at present approximately 15% of the total student population. The present black enrollment in the undergraduate programs is approximately 19%, in the graduate programs approximately 8%, and in the first professional programs approximately 4 percent. Lyons (4/1/91) 6–7; UASX 70.

---

117. Auburn University has moved the Court to take judicial notice of the fact that black enrollment during the fall quarter of 1991 at Auburn University is 1,009 as compared to 848 during the same quarter of 1990. While the increase in enrollment is laudable, the Court will not grant the motion of Auburn since the record in this matter is closed.

1422. In 1983, blacks constituted 24% of the full-time undergraduate enrollment at UAB; they accounted for 18% of the total enrollment. SOF ¶ 547.

1423. Black undergraduate enrollment at UA increased from approximately 1% in 1967 to approximately 11% in 1983. SOF ¶ 306. As of the Fall of 1990, UA had 19,550 students. Sayers (4/3/91) 5. Blacks comprised approximately ten percent of the overall enrollment. *Id.* 23–24.

1424. As of the Fall of 1989, the academic divisions with the largest percentage of black students at UA were the College of Engineering (14.3%), the School of Social Work (15.3%), and the Capstone College of Nursing (22%). Crump (4/4/91) 39–24; UASX 303, p. 1.

1425. Headcount enrollment data from the United States Government reported in the Fall of 1988 indicates that of the 109 public four-year doctoral institutions in the United States, excluding doctoral institutions in Alabama except for the three UAS institutions, UAB ranks third in terms of percentage black student enrollment, UA ranks 16th in terms of percentage black student enrollment, and UAH ranks 42nd in terms of percentage black student enrollment. Considering the black student enrollment at UA, UAB, and UAH collectively, UAS ranks eleventh in terms of percentage of black student enrollment. *See* UASX 1108; UASX 1112, attached as appendix "E".

ii. *Dr. George Borjas' Testimony*

1426. The University of Alabama System offered the testimony of Dr. George Borjas to establish that the enrollment of undergraduate black students at its constituent campuses is what one would expect given the admission standards, program offerings and geographical service area of the particular institutions. Borjas (3/21/91) 59. It was Dr. Borjas' testimony that UA, UAB and UAH each are enrolling more black freshmen from Alabama than one would expect considering the academic preparation of black high school students in Alabama and the admissions require-

ments in place at the University of Alabama System campuses.

a. *Borjas' Conclusions Regarding Black Student Enrollment At UA.*

1427. *1990–91:* Applying the admission standards of UA to the data on race, residence, GPA, and ACT scores from the 1989–90 Alabama ACT test taker tape, one would expect the entering freshman class at UA in 1990–91 to be 11.4% black. Adjusting for the academic fields offered by UA and the rate or percentage in which black students receive degrees in those fields outside of the South, the predicted percent black increases to 11.6%. The 1990–91 entering freshman class at UA from the state of Alabama was 15.2% black, well above the predicted percentage. The entire entering freshman class in 1990–91 (including out of state) was 10.2% black. Borjas explained that the difference in 11.6% and 10.2% was statistically only marginally significant, but that the proper comparison was with the in-state enrollment because he used (and had available) only the ACT computer tapes for Alabama resident test takers. Borjas (3/21/91) pp. 36–49; UASX 1095, 1096, 1097, and 1099.

1428. *1984–85:* In the 1985 trial, Borjas established that the predicted percent of black students at UA, adjusted by admission standards, geography, and academic fields was 13.3%; the actual percent of the enrolled freshmen for the relevant year (1984–85) was 11.1%. 85 UASX 1053. Borjas testified that the difference was statistically significant, but that it was not numerically important because his conservative assumptions would over-predict the black percentage (make it larger) and the academic field distribution information from IPEDS did not break down into subfields, in which there could be major racial differences. Borjas (7/25/85) pp. 5290–92. More significantly, Borjas testified that UA had reported that only one or two percent of its students were conditionally admitted but his review of the ACT tapes indicated that 17% of the entering class was not qualified for regular admission. He used 17% in his computations. He testified that if he had used 10%, the predicted percent

black at UA would have been 11.3% (instead of 13.3%), almost precisely the actual percent of 11.1, and if he had used the 2% reported by UA, it would have been 9.1%, well below the actual (11.1%). *Id.* 5284–86.

### b. Borjas' Conclusions Regarding Black Student Enrollment At UAB.

1429. *1990–91:* Applying the admission standards of UAB to the data on race, residence, GPA and ACT scores from the 1989–90 Alabama ACT test taker tape, and adjusting for the fact that UAB draws 80.8% of its students from Jefferson County (UAB's location) and four adjoining counties, one would expect the entering freshman class at UAB in 1990–91 to be 21.2% black. Adjusting further for the academic fields offered by UAB and the rate or percentage in which black students receive degrees in those fields outside of the South, the predicted percent black decreases only slightly to 22.1%. The 1990–91 entering freshman class at UAB from the state of Alabama was 27.1% black and the entire entering freshman class (including out of state) was 27.5% black, both well above the predicted percentage. Borjas (3/21/91) pp. 50–54; UASX 1095, 1096, 1097, and 1099. The Alabama (or in-state) enrollment is the proper percentage to compare to the predicted percentage because the pool considered was the Alabama test taker pool which excluded out-of-state test takers.

1430. In response to the Knight Plaintiffs' counsel's challenge that Jefferson County alone drives the UAB enrollment results and that Jefferson County's over 18 years of age population is 32% black, Borjas redid his analysis. First, using only the five counties (ignoring the rest of the state), the percent predicted black increased only to 21.8% (instead of 21.2%) and after the academic field adjustment, it increased to 22.8% (instead of 22.1%), hardly any change. Borjas (3/21/91) pp. 92–93. Second, using the statewide pool (*i.e.*, eliminating the geographic adjustment for the five county area and treating UAB as a statewide institution, as UA was), the percent predicted black actually was lower,

19.6% instead of 21.2%. Borjas (3/21/91) pp. 122–23.

1431. *1984–85:* In the 1985 trial, Borjas did not apply or use an admission standard or policy for UAB in predicting its black enrollment because a large percentage of students who had not taken the ACT (for example, because they had been out of high school for more than three years) were being admitted. Thus, using 1980 census data (and no GPA, ACT or other admission based standards) and adjusting for geography (same five county area) and academic field, Dr. Borjas found that the predicted black percentage of the 1984–85 freshman class should be 26.2%; the actual percent was 26.9%. Using just the ACT test takers, the predicted percent black was 22.5%. Borjas (7/25/85) pp. 5287–89 and 5292; 85 UASX 1053.

### c. Borjas' Conclusions Regarding Black Student Enrollment At UAH.

1432. *1990–91:* Applying the admission standards of UAH to the data on race, residence, GPA, and ACT scores from the 1989–90 Alabama ACT test taker tape, and adjusting for the fact that UAH draws 87.4% of its students from Madison (UAH's location) and four adjoining counties, one would expect the entering freshman class at UAH in 1990–91 to be 9.3% black. Adjusting further for the academic fields offered by UAH and the rate or percentage in which black students receive degrees in those fields outside of the South, the predicted percent black decreases to 8.1%. The 1990–91 entering freshman class at UAH from the state of Alabama was 12.2% black and the entire entering freshman class (including out of state) was 11.5%, both well above the predicted percentage. Borjas (3/21/91) pp. 54–57; UASX 1095, 1096, 1097, and 1099. The Alabama (or in-state) enrollment is the proper percentage to compare to the predicted percentage because the pool considered was the Alabama test taker pool which excluded out-of-state test takers.

1433. *1984–85:* In the 1985 trial, the predicted percent black of the entering freshmen at UAH in 1984–85, adjusted by

admission standards, geography (the primary five county service area of UAH), and the academic fields at UAH, was 6.8% and the actual percent black among the entering freshmen in 1984–85 was 7.2 percent.

1434. For the Fall 1990 term, black undergraduate students represented just under 6 per cent of all undergraduate students enrolled at UAH. As indicated, the actual Fall freshman enrollment for the same year was 11.5%. Koger (3/12/91) 28.

### 4. Enrollment In The State's HBU's

1435. In 1978 AAMU had a total head count enrollment of 4,425. Of this number 64% were black, 19% were white and 16% were classified as other. USX 2-1. By 1988 AAMU's total enrollment was 4,244. Seventy-six percent of this enrollment was black, 13% white, one percent other, and at least ten percent are reported foreign nationals. *Id.* at 2–6.

1436. In 1978 the total student enrollment at Alabama State University was 4,794. Black enrollment accounted for approximately 99 percent. USX 2-1. By 1988, ASU's enrollment had fallen to 4,045 but black enrollment as a percentage of total enrollment declined only two percentage points to 97 percent. *Id.* at 2–6.

1437. ASU is the most racially identifiable university in the State of Alabama. Much of ASU's racial identifiability stems from the existence of vestiges of segregation which survive in the state. The Court's Remedial Decree should eliminate the remaining vestiges which impede the desegregation of ASU. Accordingly, within three years, the Court expects to see a material improvement in ASU's white student enrollment. During the intervening period, the university should design and implement a recruitment policy directed at white students.

### 5. Troy State University and Troy State at Montgomery

1438. The percentage of black students enrolled at TSU increased from 2% in the fall quarter of 1972 to 19% for the fall quarter of 1985. Hutto (7/31/85) 6990, 6991. From the fall quarter of 1986 through the same period in 1990, black student enrollment at TSU has averaged approximately 16 per cent. Hutto (3/18/91) 15.

1439. The racial composition of the TSUM student body, by headcount, from fall, 1977 through fall, 1990, was as follows:

| | BLACK | WHITE | OTHER |
| --- | --- | --- | --- |
| FALL, 1977 | 18% | 81% | 1% |
| FALL, 1978 | 22% | 77% | 1% |
| FALL, 1979 | 25% | 73% | 2% |
| FALL, 1980 | 29% | 68% | 3% |
| FALL, 1981 | 27% | 70% | 3% |
| FALL, 1982 | 29% | 68% | 3% |
| FALL, 1983 | 27% | 69% | 4% |
| FALL, 1984 | 24% | 72% | 4% |
| FALL, 1985 | 23% | 74% | 3% |
| FALL, 1986 | 20% | 77% | 3% |
| FALL, 1987 | 21% | 75% | 4% |
| FALL, 1988 | 22% | 75% | 3% |
| FALL, 1989 | 24% | 73% | 3% |
| FALL, 1990 | 24% | 73% | 3% |

TSUX 7; Johnson (3/18/91) 5–6.

### 6. The University of North Alabama

1440. Since at least 1978 to the present, black student enrollment has averaged 8% at the University of North Alabama. Wood (3/11/91) 6–8; USX 2–1—2–6.

### D. Student Enrollment and the Plaintiffs' Claim of Vestiges of Segregation

1441. All of the state's predominately white universities with the exception of Auburn have shown a marked improvement in black enrollment over the last twenty years. Auburn lags behind the rest of the state primarily because of the unyielding admission policies which it now has in place. Except with regard to Auburn University, the Plaintiffs have failed to support their claim that black enrollments at the state's HWUs is a vestige of segregation.

### UNDERGRADUATE STUDENT RECRUITMENT

1442. In addition to admission standards, the Knight Plaintiffs contend that one of the reasons why black students are not admitted to the state's predominately white universities in larger number is because of alleged ineffective recruiting efforts directed at prospective black stu-

dents. The evidence does not bear out the Plaintiffs' contentions.

1443. Suffice it to say that on the whole, the recruiting efforts of the state's large predominately white universities is exemplary. The recruiting practices extend to the smaller institutions as well. For example, while AUM does not have a very well developed recruiting program directed at potential black students, the large black enrollment at that institution negates the need for such an effort. Black students seem to seek out AUM. The same is true of TSUM.

1444. So that these findings of fact are as complete as possible, the Court will review the recruitment efforts of the following schools: Auburn University; and the University of Alabama System. The efforts of these institutions typify those of other public HWUs in Alabama.

*A. Auburn University Recruitment*

1445. AU actively engages in numerous recruitment activities directed specifically at encouraging black students to attend AU. Reeder (2/27/91) 17–31, 70–71; 13–29, 44, 48; King (2/28/91) 13–29; AUX 899. Special recruitment activities aimed at blacks include, but are not limited to, the following: (1) purchasing lists of potential black students and corresponding with these students about AU; AUX 770, 771, 773–776, 790; Reeder (2/27/91) 17–20, (2) distributing brochures designed to address issues of concern to African–American students; King (2/28/91) 14; Reeder (2/27/91) 22–25; AUX 769, 882, (3) awarding renewable Presidential Opportunity Scholarships in the amount of resident tuition, AUX 899, (4) participating in the Minority Introduction to Engineering ("MITE") Program; W. Walker (3/7/91) 19–23, (5) corresponding with high school counselors to obtain names of prospective black students; King (2/28/91) 19–20; AUX 781, (6) conducting recruiting visits and participating in college day programs; King (2/28/92) 13–14, 34, 44–45, 65–66, (7) conducting phone-a-thons, where current black students contact prospective black students to answer questions about AU; Reeder (2/27/91) 17–18,

and (8) inviting black students to a special day at AU called "Tiger Day." King (2/28/91) 21–24; Emert (2/27/91) 25–26.

1446. Auburn University participates in student search activities through the College Board and ACT to identify prospective students. Reeder (2/27/91) 17. In order to make early contact with prospective black students, AU utilizes a minority student search service offered by the preliminary ACT (PACT), the ACT and the SAT or PSAT equivalent of the PACT. Ms. King corresponds with students identified through these searches, encouraging them to consider AU. *Id.* at 28; AUX 771, 772, 773, 778; 90 AU Ex. 899.

1447. In addition to correspondence, prospective black students receive a number of different brochures produced by the university and directed towards black students. AUX 762, 766, 768, 769, 882.

1448. AU's admission office sends congratulatory letters to students named National Achievement Scholarship semifinalists in Alabama, Georgia, Florida and Tennessee who have been awarded College Board Scholarships for engineering or business administration and to outstanding minority community college graduates in Alabama, Georgia, Florida and Tennessee. AUX 899, p. 2.

1449. AU holds recruiting days on the campuses for high school students and their parents. The recruiting days are commonly referred to as "War Eagle Day" and "Tiger Day." Minority as well as non-minority high school students are invited to War Eagle Day. King (2/28/91) 20–21. Tiger Day, on the other hand is specifically designed to attract minority students and their parents to AU, and to introduce them to the opportunities available at the university. AUX 789, p. 3. Tiger Day is held during football season and complimentary tickets are given to all guests. AUX 899. The effectiveness of Tiger Day as a recruiting activity is discussed annually. There is some dissention within the office of student recruitment as to the continuing validity of "Tiger Day" since to some it singles black prospective students out and may give them a less than realistic picture of black enrollment at the university. V. Larkin

(12/13/90) 62; King (2/28/91) 21–22; Barns (2/28/91) 32. The current decision to retain Tiger Day is based on the participation in the program and responses to a survey of high school counselors conducted by AU's assistant director of admissions. King (2/28/91) 21–24.

1450. AU sends recruiters to high schools and junior colleges. Reeder (2/27/91) 11–13; King (2/28/91) 44–45, 65–66.

1451. AU admission office representatives attend high school career day programs throughout the State of Alabama, and some programs in Florida, Georgia, and Mississippi. AUX 899.

1452. The MITE program was implemented in 1978. Through this program, minority students are brought into the university and are introduced to AU's engineering program. The program lasts for one week and students are required to take 18 hours of mathematics and computer science, 16 hours of laboratory work and attend various seminars. Students are introduced to industry representatives and given information about life as a student at Auburn. Walker (3/7/91) 19–21.

1453. For the past three years, three one-week programs have been conducted. Enrollment is limited to 25 students per program, with an annual participation of approximately 75 students. *Id.* at 19–20, 66–67. The goals of the MITE program are to convince young people to go to college, to convince them to go to AU and encourage them to major in engineering. *Id.* at 21. The MITE program has been a tremendous success. Students who participated in the MITE program before enrolling as a student at AU have helped conduct the program after enrolling in AU's engineering program. *Id.* at 19, 21. Follow-up surveys to the MITE program participants indicate that 50% of the participants go to college and that 25% of the participants major in engineering. *Id.* at 22.

B. *The University of Alabama System Recruitment*

1. University of Alabama at Huntsville

1454. Although UAH does some recruiting throughout Alabama, it focuses its major attention on its five county service area. The percentage of the enrolled UAH student body from this five county service area has consistently been 85% or higher. Koger (3/26/91) 20–21; UASX 562, p. 40; UASX 563, p. 41; 85 UASX 509(B), p. 35.

1455. UAH's general recruitment activities include contacts with all of the high schools and many community colleges in its primary service area.

1456. UAH offers a full four-year scholarship to any black student graduating in Madison County or the surrounding counties who becomes a National Achievement Test Semifinalist. UAH has sponsored this scholarship program since 1976–77. SOF ¶ 460.

1457. For the 1985–86 academic year, fifteen black National Achievement Test semifinalists accepted scholarship offers from UAH. Gibson (7/25/85) 5872, 5874. For the 1990–91 academic year, nine scholarship offers were made to black National Achievement Test semifinalists and 4 accepted. For the Fall 1991–92 academic year, thirteen scholarship offers have been made. These students are very highly recruited and generally receive many scholarship offers. Koger (3/26/91) 25.

1458. UAH recruits students from a number of high schools which have substantial black enrollments, both in the Huntsville area and beyond. UASX 818; UASX 766.

1459. UAH has used a black owned radio station and a black owned newspaper, both of which target primarily, a black audience, to promote UAH for recruiting purposes. Koger (3/26/91) 24–25; UASX 994.

1460. UAH recruiting personnel participate in College Fairs sponsored by the National Scholarship Service and Fund for Negro Students in various cities in Alabama as a means of recruiting black students. Koger, (3/26/91) 23–24.

2. University of Alabama at Birmingham

1461. By stipulation of the parties it is conceded that UAB actively recruits black

students to both its graduate and undergraduate programs. SOF ¶ 541. What follows is a brief outline of the efforts expended by UAB in recruiting black students to its various programs.

1462. UAB makes special efforts to recruit black students by, among other things: (a) participating in college day programs in the predominantly black high schools; (b) presenting special programs at predominantly black schools; (c) participating in the National Scholarship Service and Fund for Negro Students, Inc.; (d) participating in College for Minority Engineering Program; (e) participating in ACT Educational Opportunity Service; (f) sending the calendar of events in Black History Month at UAB to predominantly black schools; (g) participating in the National Conference on the Minorities Right to Post–Secondary Education; and (h) conducting a Minority Junior College Articulation Program. SOF ¶ 542.

1463. The Office of Minority Recruitment and Retention at UAB began operating in March of 1989 and was formed as a result of the Comprehensive Minority Faculty Development Program to increase the number of minority, particularly black, students at UAB and to retain these students to the masters or doctoral programs. Scott (3/19/91) 3–4; UASX 94; UASX 243.

1464. The Minority Presidential Scholarship Program at UAB allocates 15 full 4–year scholarships annually to black students, ten awards to freshman level students and five to junior level students. Scott (3/19/91) 4–6; UASX 5; UASX 94; UASX 243.

1465. The Laboratory/Summer Internship Program at UAB (part of the Comprehensive Minority Faculty Development Program) is an outreach program which provides laboratory research opportunities for black high school sophomores and juniors. Twenty summer internship students are chosen per year to spend ten weeks on the UAB campus to gain firsthand experience working in lab and with a UAB faculty mentor, afternoon seminars and visits to academic units. The purpose of this program is to give students experiences in

their academic field. The students are placed with a mentor for ten weeks and they receive a $1,000 stipend payment. Scott (3/19/91) 6–8; UASX 94; UASX 243.

1466. Since 1980, UAB has conducted a Minority High School Student Research Apprentice Program designed to provide experience in health related research. The aim of the program is to stimulate interest in minority high school students in careers in science. UAB's program is one of the largest in the country and has been expanded this year to include six minority teachers or teachers who teach a high proportion of minority students. SOF ¶ 546; Hickey (4/4/91) 8–9; UASX 86.

1467. In October, 1989, UAB hosted a southeastern conference on recruitment and retention of black students. This conference was sponsored jointly with the National Association of State Universities and Land Grant Colleges and was one of five held throughout the United States. McWilliams (4/3/91) 20–22.

3. University of Alabama at Tuscaloosa

i. *Minority Recruitment Efforts In The UA Admissions Office*

1468. In its effort to recruit black students, UA has for many years sent institutional representatives to predominantly black high schools. SOF ¶ 347. Written reports indicate this practice has existed for at least 24 years. UASX 336. Currently, UA attempts to visit every secondary school in the state at least one time per year in an effort to recruit qualified students. Smith (4/4/91) 34.

1469. In addition to trips to predominantly black high schools, UA conducts approximately 6 or 7 special recruitment excursions each year to recruit minority students. 85 UASX 317; 85 UASX 316; UASX 337. For example, UA staff have attended the Atlanta Inter-city Program regularly since 1979, SOF ¶ 348; UASX 337. Since 1979, they have also regularly attended programs sponsored by the National Scholarship Service and Fund for Negro Students (college fairs designed to bring minority students together with educational institutions for review and inter-

view of students) in Atlanta, Montgomery, and New Orleans. SOF ¶ 350. UA recruiters have attended every year since it started in the early 1970's, the Memphis Volunteer Placement Program, a program for seniors in the Memphis City schools, which are predominantly black, SOF ¶ 349; UASX 336; UASX 337. They have also participated in the Equal Educational Opportunity Center program in Huntsville, which is a program designed to assist minority students explore their educational and career goals. 85 UASX 317.

1470. UA's Admissions Office has participated in the United Negro College Fund recruitment functions in Birmingham, and UA representatives have visited Upward Bound Programs and have hosted several of their student groups at the campus. UASX 336; UASX 337.

1471. UA makes an effort to ensure that black students are represented in recruitment brochures, and their positive role in campus life is displayed. Smith (4/4/91) 36; UASX 1034.

1472. Alumni groups, several of which are located in cities with significant minority populations, assist in the recruitment of students. For example, the Jefferson County Program recognizes outstanding juniors and has a significant black contingent. UASX 336; UASX 337.

1473. UA utilizes the services of Bama Network, a black alumni organization, to assist in the recruitment of black students and in dealing with racial issues on campus. Minor (12/4/90) (testimony not transcribed).

1474. The Admissions Office and high level administrators at UA have assisted Bama Network members in organizing career days for students at predominantly black high schools. The activities of Bama Network have helped the University in increasing its black student enrollment. Knopke (4/16/91) 37–38; UASX 341.

1475. Bama Network has sponsored a scholarship drive to raise money for black students. Minor (12/4/90) (testimony not transcribed).

1476. Each year UA's National Alumni Association sponsors a student leadership conference for secondary students. A significant number of students who are invited and attend are black. Through the Office of Campus Programs, thousands of students each year participate in activities such as cheerleaders clinics, band camps, French, Spanish and physics clubs. These activities have significant minority participants. UASX 337, p. 3.

1477. National Achievement Scholars are those black students who score in the top one percentile on a standardized exam. The University of Alabama expends much energy recruiting National Merit/National Achievement Program scholars. UA's Admission Office first writes the students to recognize their accomplishment and then invites them to come to the campus to talk with faculty and staff about the opportunities available for them. Hicks (7/24/85) 5197. Any student who achieves National Merit/Achievement Finalist designation is offered a Presidential Scholarship, which covers tuition and fees. Of those National Achievement scholars in the state who pursue enrollment in Alabama, 61% enroll at UA. Twenty-six National Achievement scholars enrolled at UA in 1989–90. UA was ranked 11th in the nation, behind schools such as Yale, Harvard, Stanford, MIT, Duke, and Georgia Tech, in the number of National Achievement scholars enrolled. Crump (4/4/91) 53–54; UASX 303, p. 2; UASX 336; UASX 337, p. 2.

ii. *Recruitment By UA Students*

1478. The student freshman orientation staff, "Avanti," is comprised each year of 38–40 members, 6–8 of whom are black. These students serve as hostesses and recruiters for the University at various functions. Lucas (3/19/91) 10–13.

1479. The University successfully recruited and in many instances graduated, several of the Knight Plaintiffs' fact witnesses. For example, Dr. Roberta Watts received her doctorate from UA; Watts (11/15/90); Vivian Larkin received her master's degree from UA; Larkin, V., (12/13/90); Dr. Yvonne Kennedy received

her Ph.D. from UA in 1979; Kennedy (1/7/91); Alvin Holmes attended UA for graduate work; Holmes (11/13/90) 3; George Pugh, Head Coach at A & M graduated from UA and his son is currently attending UA; Pugh (1/14/91) 13; Arthur Barnett worked on a Ph.D. in marketing at UA; Barnett (1/28/91), Dr. Vivian DeShields, Director of Professional Laboratory Experiences at ASU, received a Ph.D. from UA; DeShields (1/31/91); Dr. Bernadette Lester, Dean of Social Work at ASU, received her Ph.D. from UA; Lester (1/31/91); Jacqueline Williams, Vice President for Student Affairs at ASU, is currently enrolled in a doctoral program at UA; Williams (1/29/91) 3; Gary Mitchell's child is enrolled in a doctoral program at UA; Mitchell (5/31/90) 100; and Clyde Foster had one child who attended UA and UAB medical school and another child currently attending UA. Foster (12/13/90).

### iii. *Minority Recruitment Efforts In The College Of Engineering*

1480. One of the Knight Plaintiffs' experts on school desegregation, Dr. Blackwell, admitted that "[t]he University of Alabama has taken some very, very commendable steps toward the increase of minority students in engineering, through a variety of programs." Blackwell (2/5/91) 291. What follows is a brief description of some of those programs.

#### a. *SECME and High School Outreach Efforts*

1481. Beginning in the 1970's, UA's College of Engineering undertook a role in coordinating the recruitment and retention efforts for blacks in colleges of engineering throughout the country. SOF ¶ 403. The basis of that effort was a nationwide concern with the very small percentage of blacks who were professional engineers. Rey (7/24/85) 5754. In the early 1970's, between 1 and 1.5% of all the engineers in the United States were black. SOF ¶ 402. Today, only 2 or 3% of the engineers are blacks. Singleton (4/15/91) 4–6.

1482. In 1977, UA helped found the Southeastern Consortium for Minorities in Engineering ("SECME"). The group's objective is to substantially increase the number of minority students interested in and qualified for the study of engineering. In Alabama, efforts are directed almost exclusively toward black students. Toward that goal, the Consortium has received several grants, as did the University, to bring students and counselors to the campus for engineering career seminars, teacher training, and funding of the Southeastern Curriculum Center. The SECME program has had a substantial impact on the enrollment of blacks in engineering schools throughout the Southeast since its inception in 1977. SOF ¶¶ 380, 405; Rey (7/24/85) 5758.

1483. The pre-college component of SECME helps provide role models for minority students. UA personnel and students travel to Alabama high schools with corporate personnel to increase minority student's exposure to engineering. Singleton (4/15/91) pp. 5, 9–10.

1484. Since 1977, the number of participating high schools in SECME has grown from 62 to 240, the number of universities from 6 to 28, and the number of states from five to eight. Student participation has risen to 18,029. SECME has gained acclaim as a national model of innovation through intervention. UASX 476, pp. 2, 4.

#### b. *NAMEPA*

1485. UA's commitment to the goal of increasing minorities in engineering is also demonstrated by its participation in NAMEPA, the National Association of Minority Engineering Program Administrators, which is a national network of pre-college and university administrators, as well as major corporations working in partnership to increase the number of minorities in engineering disciplines. The Director of the Minority Engineering Program at UA sits as the Chair of the Southern Region on the Board of Directors of NAMEPA. Singleton (4/15/91) 18–19, 24; UASX 480.

### c. Minority Engineering Program

1486. In 1986, UA wrote a proposal to the National Action Council for Minorities in Engineering ("NACME"), for grant money to establish a Minority Engineering Program with a full time director. UASX 475. When the proposal was granted, an Office for Minority Engineering Programs ("MEP") was established and a full time director was hired in 1987. Although the proposal originally provided funds to pay the director for 3 years, NACME advised UA that the funding would not be available for the 1988–89 academic year. Because of UA's commitment, the university President, and the Dean of the School of Engineering came up with the money to maintain the position. Singleton (4/15/91) 12.

1487. The Director of the Minority Engineering Program at UA, Mr. Greg Singleton, is black. The director reviews entering minority freshmen course schedules and, when appropriate, advises them to take lighter loads to ensure higher grade point averages their first semester. Singleton (4/15/91) 19–20.

1488. The objectives of MEP and its Director are to increase the number of minority high school graduates in Alabama who are academically qualified to pursue undergraduate engineering studies; coordinate recruitment efforts with UA Admissions and Financial Aid offices to enroll academically qualified minority students in engineering; supervise and coordinate a retention program for minority engineering students; develop corporate support to fund MEP; encourage students to participate in NSBE and the appropriate technical and professional organizations on campus; coordinate cooperative education and maximize co-op and full-time employment opportunities for minority engineering students; and inform minority students about financial assistance that is available and procedures for optimizing the prospects for receiving assistance. UASX 433.

1489. A recently established early intervention program in place at UA is the ROLL TIDE (Retention Orientation Learning Laboratory Tide Introduction for Developing Engineers) program. UA was one of 24 universities across the country selected to receive funding from ARCO to establish this summer bridge program. Black students who have been accepted to the Engineering program at UA are invited to attend a five week program to be offered the summer before their freshmen year. The students will attend preparatory (not remedial) classes in math, engineering graphics, computer programming and English. For their participation they receive up to seven semester credit hours. The classes will be kept to a maximum of 15 students and the information will be presented in a noncompetitive format. Minority engineers and computer scientists are brought in as guest speakers. It is anticipated that this program will further improve UA's retention of minority students in the engineering fields. Singleton (4/15/91) 22–23; UASX 481.

### d. Scholarships To Support Minorities In Engineering

1490. Another part of UA's recruitment efforts has involved scholarship programs. UA has been successful in obtaining different industries to provide scholarships to engineering students. For example, UA has participated in the National Action Council for Minorities in Engineering ("NACME") from its beginning in the mid 1970's. The purpose of this program is to provide scholarship funds and other assistance to black students in Engineering. SOF ¶ 409.

### e. Engineering Student Enrollment Facts

1491. In 1973 there were 39 black students enrolled in the college of Engineering at UA. In 1975, there were 77 black students in the program. By 1977, there were 147 black engineering students. Since the early 1980's UA has had over 300 undergraduate black students in its College of Engineering. SOF ¶ 406.

1492. The percentage of black freshman enrollment in the College of Engineering has grown from 14.26% in 1980 to 21.35% by 1989. Singleton (4/15/91) 29–31.

1493. In terms of minority enrollment (African–American, Native American and Hispanic), UA's engineering program ranks 19th in the nation. If traditionally black institutions are excluded, UA ranks 5th in the country in terms of number of blacks enrolled. Singleton (4/15/91) 32–34; UASX 484. Aside from traditionally black universities, UA has the highest percentage of black engineering students of any institution in the Southeastern United States. SOF ¶ 408.

iv. UA's BioPrep Program

1494. Another very successful program of minority student recruitment is the Biomedical Sciences Preparation Program, or BioPrep established at UA in 1981. (Knopke, 4/16/91, p. 10). This program is considered a model program of its kind for other areas of the country. UASX 487; UASX 311.

1495. The UA College of Community Health Sciences developed, designed, and secured funding for the BioPrep program, which is specifically designed to increase the flow of black students into medical schools and other health related professions. SOF ¶ 393.

1496. One of the goals of the BioPrep program is to find and encourage high school students in rural areas to pursue medical related professions and return to the county in which they were reared. Knopke (4/16/91) 14; UASX 487.

1497. Students selected for BioPrep undertake, in the ninth grade, an accelerated program of study that includes a four-year sequence of courses designed by UA Arts and Sciences faculty. The courses emphasize the sciences: biology, chemistry, physics, and anatomy, in addition to other basic courses such as English, social studies and mathematics. UASX 487.

1498. As part of the coordination of the BioPrep program, black high school students from nearby rural counties are brought to UA on weekends and during the summer and are acquainted with members of the faculty, practicing physicians, medical and nursing students and others who can assist them in developing an interest and aptitude for later study in health related areas. SOF ¶ 394.

1499. Studies comparing ACT scores of students participating in the BioPrep program with ACT scores of students in control groups have indicated that BioPrep students perform better on all components of the ACT exam than comparable students in the control group who did not have access to BioPrep courses. For example, a study comparing ACT scores of 1990 Bio-Prep high school graduates with those of 1986 graduates who would have been selected for BioPrep had it been available in their school, showed that the BioPrep students had significantly higher scores.[118] Knopke (4/16/91) 16; UASX 310; UASX 1060.

1500. The BioPrep program has received national press coverage, including an article in the prestigious *Journal of the American Medical Association,* in *College Board News* and in *Physician's Financial News.* Knopke (4/16/91) 16–17.

1501. Another program that UA has sponsored to encourage black high school students to pursue college degrees in health-related fields is the Minority Research Apprenticeship Program in Microbiology. Black students in Tuscaloosa have been recruited by UA's Department of Microbiology for participation in a research program during their junior year in high school. The students work three afternoons per week during their junior year as well as the following summer in the labs at UA learning to take blood counts. They receive instruction from college professors, and receive pay for their apprenticeship. Townsend (4/16/91) 5–6.

---

**118.** A sample of black students in the 1990 Bio-Prep class had a mean ACT English score that was almost five points higher than that of black students in the 1986 control group.

These same students had a mean ACT math score that was a little over seven points higher than that of black students in the 1986 control group. Overall, the mean ACT score of black students in the class of 1990 was over five points higher than that of black students in the 1986 control group. UASX 1060.

1502. In addition to those recruiting activities already discussed, UA has in place extensive and well developed recruiting efforts directed primarily at black students in the college of communications, arts and sciences and nursing.[119] Huttenstine (3/12/91) *et seq.*, (college of communications); Davis (4/15/91) *et seq.*, (college of arts and science); Crump (4/4/91) *et seq.,.* (college of nursing).

## BLACK UNDERGRADUATE RETENTION RATES

### A. The University Of Alabama System

### 1. UA's Various Retention Programs

1503. Over all, the retention rate at the University of Alabama for freshman black students is over eighty per cent, well above the Southern University Group ("SUG") average. UASXs, 1179A; 1179; 1180; and 1181. After four years, the University of Alabama graduates or retains from 62% to 64% of its black students. The SUG average for the same period is 46.5% of black students retained after four years. Thus, UA's retention rate for black students after four years is approximately 16 to 17 percentage points higher than SUG's retention rate. Crump. (4/4/91) 21–22, 36. Much of the success of UA is directly attributable to the programs it has in place to assist in student retention.

1504. The retention efforts on the campuses of the University of Alabama System for black students covers an array of programs and services. For example, UA operates a learning skills center and personal counseling programs which are available to all students experiencing difficulty or adjustment problems in the university environment. SOF ¶ 357. The availability of these programs has been a factor in the recruitment and retention of black and white students. SOF ¶ 358.

1505. Dr. Joan Comas testified extensively about the opportunities for academic support offered through UA's Learning Skills Center (now called the Center for Teaching and Learning). This Center is open for all students, and an effort is made to ensure that a diverse group of tutors are available for individual tutoring. Of the 31 tutors employed by the Center for Teaching and Learning, 23% are black, 6% Hispanic and 71% white. Comas (4/15/91) 10–11, 1–32.

1506. The Center For Teaching and Learning was developed in 1985 and its purpose is to assist students in improving study and reading skills. The Center also assists students in the problem solving courses such as math and science. The Center does not concentrate on remedial education. Comas (4/15/91) 5–6.

1507. The Center for Teaching and Learning provides tutorial assistance in three different types of methods. First, it has an independent study lab where students can learn through a multi-media lab containing videotaped lectures of UA courses, audio cassette tape players and computer programs. The resources have been selected by faculty members to ensure that they correspond with UA courses. Materials are available to assists students in a number of courses ranging from math and science to engineering and English. A second method of tutorial assistance is through group programs, which include reviews for math exams, math skills for chemistry and biology, seminars and workshops on time management, college reading skills, test anxiety, listening, note taking, concentration, exam preparation, and review courses for LSAT, MCAT, GRE, GMAT and MAT. Finally, free on site tutors are available for certain courses. Comas (4/15/91) 5–11; UASX 347; UASX 351, pp. 1–3, 12–18, 21–25, 37–41.

1508. The Center's review courses for the professional level entrance exams are open to Stillman students, who frequently participate. Comas (4/15/91) 21.

1509. A great deal of time and effort is expended on promotional activities to inform students of the various programs offered free of charge through the Center for

---

**119.** Of all the academic divisions within UA, the Capstone College of Nursing has the highest percentage of black students in its programs, with black enrollment at 22 percent. UASX 303, p. 1.

Teaching and Learning. Comas (4/15/91) 8–9; UASX 347; UASX 353; UASX 351, pp. 9, 21, 36.

1510. Other special programs offered through the Center include a joint program with housing entitled the Summer Academic Experience, in which study skills programs and satellite resource centers are set up in the dorm, and in which supplemental instruction ("SI") programs are made available, particularly to entering freshmen attending summer school as conditional admittees. The SI programs are conducted by a staff member who has actually attended the classes and who individualizes the study skills techniques to the particular course the students are taking. Studies have shown that students in the SI courses have much better grades than those who do not participate in the SI group, and this is true for conditionally admitted students as well. Comas (4/15/91) 13–15; UASX 443.

1511. Since its inception, the various programs offered through the Center for Teaching and Learning have served thousands of students. Usages in the Center have increased from 5,297 in 1985–86 to over 40,000 in 1989–90. Comas (4/15/91) 28–32; UASX 352.

1512. Some of the student tutors who have worked at the Center for Teaching and Learning have established similar programs or gone to work at other institutions. These graduates frequently seek assistance from Dr. Joan Comas, the Director of the Center, in improving the programs they work with at other institutions. Comas, (4/15/91) 31.

1513. One of the Knight Plaintiff's student witnesses, Monique Camp offered testimony concerning the academic evaluation of her work. Ms. Camp implied that her work in the School of Communications at UA was less well received and evaluated by the professors in the Department of Journalism because she was black. Ms. Camp

stated she had never attended the learning skills center for special assistance on any of her classes even though she was aware of the tutoring programs and had done poorly early on in her academic career at UA.[120] Camp (11/8/90) 77–78, 111.

1514. In addition to the Center for Learning and Teaching, UA offers the Student Support Services Program. Approximately two-thirds of the participants in the Special Services program are black. UASX 346.

1515. A student participant in Special Services Programs receives assistance in reading improvement and math, extensive advising for class scheduling, tutorial assistance, structured academic and personal counseling, and financial aid assistance. 85 UASX 309; UASX 346. A student enrolled in Special Services who is placed on academic probation is permitted to remain at UA for three additional semesters, even though the regular practice of the university is to place the student on suspension after one semester of academic probation. Holley (12/3/90).

2. Financial Aid at UA

1516. The University actively supports the development of student financial assistance for all of its students. An effort is made to insure that qualified black students receive financial assistance to begin and complete their education. SOF ¶ 368.

1517. The University has made efforts to employ black individuals in the professional staff of the Office of Financial Affairs. SOF ¶ 369. Most recently, the Director of the Office of Financial Affairs was Curtis Johnson, a black male. Lucas (3/19/91) 13–14. Previous directors have also been black. Jones, T. (7/23/85) 5226.

1518. Because of its own institutional policy, UA is able to inform prospective students of their financial aid package earlier than most institutions. A consequence of this policy has been to allow the Univer-

---

**120.** Ms. Camp testified extensively about alleged incidents of racism and discrimination directed towards her by faculty and administrators in the University of Alabama's School of Communications. The claims of Ms. Camp were thoroughly refuted by the university and shown to be more or less the result of dissatisfaction with her academic performance at the university. The Court finds the testimony of Ms. Camp concerning the alleged incidents of racial animus directed towards her completely lacking in creditability.

sity to be more successful in their recruitment of poorer students who depend more heavily on the availability of student assistance. SOF ¶ 391.

1519. Black students at UA receive a significant proportion of the financial aid awards in the form of Perkins Loan/NDSL; Stafford Loan/GSL; Pell Grants; State Grants, and university Grants, Scholarships, and College Work Study. UASX 354, p. 1.

1520. For the year 1984–85, white students at UA received $4,778,137 in loans compared to $980,684 in loans for blacks. During that same time period, white students at UA received $4,100,867 in grants compared to $2,001,186 in grants to blacks. This is significant considering that whites constituted at least 80% of the student enrollment. Jones T., (7/23/85) 5222–5223; 85 UASX 322.

1521. Since 1987, a sizeable amount of aid in the form of loans, grants, scholarships and work study was awarded to black students. UASX 354.

1522. A total of $22 million dollars was awarded for the 1987–88 school year. Black students received $5.2 million or 24%, white students received $15.9 million or 72.5%, while "other" students received $766,196 or 3.5% of the total aid awarded. Black students received $2.5 million in scholarships and grants, which accounted for 47% of the total dollars awarded black students; white students received $6.9 million in scholarships and grants, which accounted for 47% of the total dollars awarded white students; while "other" students received $465,898 in scholarships and grants, which accounted for 60% of the total dollars awarded this group. UASX 354, p. 1.

1523. A total of $27.2 million was awarded for the 1988–89 school year. Black students received $6.5 million or 24%, white students received $19.9 million or 73%, while "other" students received $858,000 or 3% of the total aid awarded. Blacks received $3.0 million in scholarships and grants, which accounted for 47% of the total dollars awarded black students; whites received $8.1 million in scholarships

and grants, which accounted for 41% of the total dollars awarded white students; while "other" students received $489,568 in scholarships and grants, which accounted for 57% of the total dollars awarded this group. UASX 354, p. 2.

1524. A total of $27.6 million was awarded for the 1989–90 school year. Black students received $6.1 million or 22%, whites received $20.6 million or 75%, while "other" students received $928,000 or 3% of the total aid awarded. Black students received $2.9 million in scholarships and grants, which accounted for 47.6% of the total dollars awarded black students; white students received $8.3 million in scholarships and grants, which accounted for 40% of the total dollars awarded white students,; while "other" students received $525,189 in scholarships and grants, which accounted for 57% of the total dollars awarded this group. UASX 354, p. 3.

1525. Though not as well developed, a similar story of retention efforts can be told on the UAB and UAH campuses.

1526. Race or ethnicity is not a statistically significant factor in the determination of retention rates for UAH students. That is retention rates for black students do not differ significantly from that for white students. Graduation rates for black students, arrayed by ACT score, are generally the same as the corresponding graduation rates for white students in the same ACT grouping. UASX 768, pp. 7, 12, 14–15; UASX 830.

### B. Auburn University

1527. Auburn University does not have nearly the retention program that the University of Alabama System does and consequently, its black graduation and retention rates suffer in comparison to those of UAS.

1528. AU's black graduation rate for classes entering the university from 1980–1984 is slightly higher than 44 per cent. AUX 947. This average is consistent with the SUG average but significantly lower than the average at UA. It is nevertheless well above the 25–30 percent graduation

rate for blacks nationally.[121] Garibaldi (1/15/91) 36.

## C. Other Predominately White Colleges and Universities

1529. The Court has fully reviewed the evidence introduced at trial and finds that the remaining predominately white defendant universities and colleges—given their primary mission and service area—have in place the retention programs necessary to accomplish the goal of retaining and graduating black students.[122]

## D. Retention And Graduation Rates At The HBUs

1530. In light of the fact that students generally come to the state's HBU with lower ACT scores and grade point averages, one would expect these schools to have lower retention rates than schools with selective admission requirements. Allen (1/16/91) 56.

1531. Generally accepted national studies show that students who come from the lowest quartile in socio-economic groupings and from the lowest quartile in terms of ACT scores have a college graduation rate of between 13 and 20 percent. On the other hand, students who come from the highest quartile in each grouping have a graduation rate of approximately 60 percent. Garibaldi (1/15/91) 48.

### 1. Alabama A & M University

1532. The retention rates for students at AAMU have been comparable to those for students at all colleges and universities. Garibaldi (1/15/91) 35. Within six years, 44 percent of the freshman class entering AAMU in the fall of 1981 had graduated; 50% of the freshman class entering AAMU in the fall of 1982 graduated within six years; and 40% of the freshman class entering AAMU in the fall of 1983 graduated in six years. AAMUX 648. Since 95 per-

cent of the undergraduates at AAMU are black, these graduation rates compare very favorably with the graduation rates for black students on a national level. Garibaldi (1/15/91) 44.

1533. The retention and graduation rates at AAMU compare favorably with those at other public universities in Alabama for black students and for students in similar ACT groupings.

### 2. Alabama State University

1534. The graduation rates at ASU rarely exceed 25 percent. ASUX 197. Like AAMU, however, Alabama State takes students who, on the whole, are ill prepared for college academic work. In order to address the low retention rates, ASU has instituted an extensive developmental education program designed to improve its retention rates.

1535. As part of its academic affairs policy, ASU, through its Board of Trustees, provides extensive developmental or remedial education offerings, as shown by the following facts, (a)–(e):

(a) The University College, one of the academic colleges at Alabama State University, is the entry level for all beginning and transfer students who come to Alabama State University.

(b) Students entering the University College are evaluated using the ACT test score, the high school grade point average and certain University-administered evaluation instruments, with the evaluation being for the purpose of determining whether the student is placed in developmental course work or into the regular college core curriculum.

(c) If a student's ACT composite score is 8 or below[123], that student automatically goes into the Four Year Plus curriculum program.

---

**121.** The comparable percentage for white students is 46 percent. Garibaldi (1/15/91) 36.

**122.** In 1985, AUM was notified that its developmental program had been selected for citation in the National Directory of Exemplary Developmental Programs. SOF ¶ 632.

**123.** Based on 1989–90 ACT norms, a composite score of 8 was at the fourth percentile nationally and at the sixth percentile for Alabama. KX 1945, p. 2 (state report), p. 2 (national report). According to ACT records, in the fall of 1989 ASU had 243 of its enrolled freshmen out of a total of 1011 with a composite score of eight or less on the ACT.

(d) The Four Year Plus curriculum program contains a complete curriculum in itself, including developmental English, developmental math, developmental reading, study skills, orientation, and speech.

(e) If a student scores from 9 to 12, inclusive, on the ACT composite, the student may be eligible for admission to the Special Services Program, which is another area of developmental education within the Department of Advancement Studies.

SOF ¶ 629.

1536. About 75% of ASU's undergraduate students at any given time are in University College. There is no maximum length of time a student can remain in University College; in general however, ASU's policies relating to probation, suspension and dismissal will take effect at some time. Freeman (1/30/91) 173.

## GRADUATE AND PROFESSIONAL SCHOOL ADMISSION AND RECRUITMENT

A. *Knight Plaintiffs' and Allied Defendants' Allegations*

1537. The Knight Plaintiffs and the Allied Defendants make the following allegations concerning what they term the "graduate and professional roadblock" facing blacks aspiring to graduate work at the University of Alabama and at Auburn University. In the Plaintiffs' own words:

One of the most devastating facts, from the standpoint of opening the middle class to the black community, is the minuscule number of blacks awarded Ph.D. degrees by Alabama's historically white institutions: since 1983, only 13 (2.3%) of Auburn's 567 Ph.D. graduates have been black; 25 (5%) of 492 at the University of Alabama. At the same time, the historically white universities defend the underrepresentation of blacks on their faculties and administrations by pointing to the relatively small pool of black Ph.D.'s. Meanwhile, Auburn and the University of Alabama continue vigorously to oppose expansion of the historically black universities' missions to include Ph.D.

and professional programming. By guarding their monopoly on Ph.D. and professional education, the white schools continue to perform their historical gatekeeping role for Alabama's system of white supremacy.

The small pool of African Americans who already have the doctoral and professional degrees demanded for university faculty positions today is a proximate result of at least two current racially motivated policies: (1) the restriction of the historically black universities' missions with respect to graduate and professional programs and (2) blacks' continued inability to overcome institutionalized massive resistance at historically white graduate and first professional schools. Unless *both* racially discriminatory policies are corrected, the black community will continue to be denied equal access to the leadership and resources needed for its political, social and economic development.

Knight Plaintiffs' and Allied Defendants' Joint Submission of Proposed Facts at pp. 333–34.

1538. The Defendants vigorously challenge the basic assumptions on which the Knight Plaintiffs rest their claim. They point to the extensive recruiting efforts undertaken in an effort to increase black graduate and professional enrollment and the small numbers of blacks applying for such programs.

1539. There is no doubt that the small number of black Ph.D. candidates is a problem, not only in Alabama but nationally as well. Data published by the National Center for Educational Statistics show this is a national problem. In the Fall of 1987, blacks constituted only 3% of the full-time regular faculty at four-year institutions in the United States and only 4% of the part-time regular faculty. KX 1710, 1710A. Similarly, the number and percentage of blacks among recent Ph.D. recipients is extremely low. Haworth (2/21/91) 42–84; AUX 213. In fact, the number of black bachelor and doctoral degrees awarded nationally declined from 1976 to 1987. *Id.* 79–80.

B. *The University of Alabama System*

1. Graduate and Professional
School Enrollment

1540. Graduate and advanced professional school enrollment of blacks at UA increased from approximately two percent in 1967 to 6.5% in 1983 in the Graduate School, and from approximately 2.2% in 1969 in the advanced professional schools to approximately 4.3% in 1983. SOF ¶ 361.

1541. On campus black fall enrollment in the Graduate School increased from 108 students in the Fall of 1984 to 132 students in the Fall of 1990. UASX 1185. Spring enrollment for 1991 increased to 162 black students. Approximately 80% of the black graduate students are Alabama residents. Rogers (4/4/91) 17, 23, 45.

1542. Black enrollment in the University of Alabama School of Law increased from approximately 2% in 1969 to approximately 5% in 1983. SOF ¶ 362. Currently, of the 520 law students 6.2% are black. In the Fall of 1990, the entering class at the law school had twelve black students for a total of 6.6%. Randall (4/15/91) 27, 67–68.

1543. UAB's black doctoral enrollment, which totaled 18 (3.4% of all doctoral students) in Fall 1987, climbed to 24 (4.1%) in Fall 1988 then to 31 (5.2%) in Fall 1989. UASX 212.

1544. Prior to the Fall of 1988, only 1 to 4 new black doctoral students enrolled at UAB each year (representing no more than 5% of all incoming doctoral students). In the Fall of 1988, this total rose to 8 (8.7%). In the Fall of 1989, the total climbed to 15 (14.2%). Hickey (4/4/91) 24; UASX 212.

1545. There has been a marked decline in the number of applicants to medicine and dentistry schools. McCallum (4/1/91) 102–103; Priest (4/1/91) 27–28, 52–54. In the last two years, however, the number of black students applying and the number of black students accepted at the University of Alabama School of Medicine have gone up. *Id.* at 41.

1546. This year's medical school black applicant pool is at its all time high. There were 101 black applicants to the University of Alabama School of Medicine this year. Priest (4/1/91) 30.

1547. Approximately 50% of the black students who are accepted to the University of Alabama School of Medicine choose to matriculate elsewhere outside of the state. Of the 14 black students accepted to the University of Alabama School of Medicine in last year's class only eight matriculated. Priest (4/1/91) 32–34.

1548. As of the time of trial there were 14 black students holding acceptances to the University of Alabama School of Medicine and another 6 on the alternate list. Priest (4/1/91) 37.

1549. Approximately 25% of the enrollment at UAH is at the graduate level. UASX 949, 57. Blacks constitute approximately 2.83% of all degree seeking graduate students. UASX 949, p. 41.

2. Graduate and Professional
School Recruitment

1550. The graduate school at UAB utilizes the Minority Graduate Student Locator Service to assist in the recruitment of minority students. Additional recruitment activities of the UAB Graduate School include: distribution of brochures and posters announcing minority fellowships with tear-off interest cards; participation in the Minority Access to Research Careers meeting each year; attendance at recruiting fairs at historically black institutions; attendance at special minority recruiting events throughout the country; and developing a relationship with the National Consortium for Educational Access. Barnard, (7/24/85) 5404–05.

1551. The graduate school at UAB also offers numerous minority fellowships. Hickey (4/4/91) 10–15.

1552. The schools of medicine, dentistry, optometry, and public health at UAB cooperate in the President's Program to identify, recruit, and select black students for training and education to facilitate their entry into health professional programs. An Assistant Vice President in the Office of Senior Vice President for Health Affairs is specifically charged with supervision of this program. SOF ¶ 545.

1553. The University of Alabama School of Medicine actively recruits black students. Such recruitment efforts include: (a) utilization of the National Medical Minority Applicant Registry; (b) regular visits to colleges of the State of Alabama, both black and white; (c) visitation to summer enrichment programs, such as the Harvard College Summer Program; and (d) participation in the health careers opportunities; (e) hosting high school and undergraduate advisors to make them aware of opportunities in medicine and university admission requirements; (f) summer research apprenticeship programs at both high school and college level; and (g) informal network of advisors, physicians, and church leaders. Hoffman (7/23/85) 5084–92; Priest (4/1/91) 4, 9–10, 12–14, 38–39.

1554. In addition to black colleges within the State of Alabama, the University of Alabama School of Medicine actively recruits at the Atlanta Consortium, which consists of Morris Brown, Morehouse, Atlanta and Clark. Hoffman (7/23/85) 5125.

1555. At the main campus of the University of Alabama System there are in place a number of programs to attract black applicants to the Graduate School. Since the 1984–85 academic year, the Graduate School at UA has maintained an administrative unit known as the Minority Student Assistance Office. Its functions are both to recruit black graduate students to UA and to provide whatever assistance they may need once they have enrolled. Beidler (7/24/85) 5647, 5657.

1556. Through the Minority Student Assistance Office, UA administers G*POP which stands for Graduate and Professional Opportunities Program. SOF ¶ 395. The G*POP program at UA is specifically designed to recruit and enroll black students into specific disciplines in which African Americans have traditionally been underrepresented. These include business programs, engineering programs, psychology and biology. *Id.* at ¶ 396.

1557. Through officials of the UA Graduate School, contacts are made with many predominately black universities and colleges in the south in an effort to locate qualified black undergraduate students interested in graduate studies. Rogers (4/4/91) 14–16, 19.

1558. In 1988 UA also funded and hired a full time graduate school student recruiter. Much of the recruiter's energy has been focused on increasing the number of black graduate students. UASX 1187; UASX 1188; Rogers (4/4/91) 14–17, 19.

1559. In addition to the efforts described above, UA subscribes to the Minority Student Locator Service which is operated by the Graduate Record Examination Board, to identify black students who are interested in attending graduate school. When students are identified, the university then makes direct contact with the students through representatives of specific departments and colleges of the university. SOF ¶ 398.

1560. Another program administered by the Graduate School is the Minority Faculty Development Program, which was developed as a way to help faculty members at the predominantly black schools receive their terminal degrees. Faculty members participating in this program receive from UA a $9,000 work-free fellowship and a tuition scholarship of approximately $2,000. Sayers (4/3/91) 14; Rogers (4/4/91) 28–29; UASX 1193.

1561. While the program was set up initially to fund one year of support, UA's Graduate School has renewed fellowships for faculty members who continue to pursue their terminal degree at UA. UASX 1196. The program initially was designed to assist Stillman College faculty members, but in 1988, the program was extended to faculty members at A & M, ASU, and Oakwood College. UASX 368; Rogers (4/4/91) 29.

1562. Another example of UA's effort to increase the pool of black doctorates for teaching positions is the Graduate School's recent establishment of a Future Faculty Fellows Program for African–American students who plan to become college or university professors. The fellowships in this program provide a stipend of $8,000 per annum plus a tuition scholarship worth up to $4,400. The Graduate School pro-

vides the support for two years, after which the departments will assume support for the fellows through research and teaching assistantships or other forms of aid. Four new fellows will be appointed biennially. Rogers (4/4/91) 35–36; UASX 1197.

1563. In addition to the efforts outlined above, the University of Alabama has made the commitment to provide the financial resources necessary to enable black graduate students to complete their education.

1564. Various faculty and administrators of the UA School of Law visit approximately twenty different historically black colleges each year, including A & M and ASU, in an effort to attract minority applicants. Black students who have graduated from law school are often asked to accompany a law school recruiter on these trips, and the law school pays that former student's expenses. In addition, when available, black full-time professors have visited many of these schools to recruit. Randall (4/15/91) 11–12.

1565. The School of Law has participated in the Council on Legal Education Opportunity ("CLEO") since its inception. This program operates with the cooperation of accredited law schools. Seven six-week summer institutes provide minority, educationally and economically disadvantaged students an opportunity to demonstrate their capacity for legal study and to become acclimated to it. The program assists in placing the students in an accredited law school and pays all costs for the students. The University of Alabama sends a financial contribution annually and often sends a successful minority student as a teaching assistant in the program. SOF ¶ 353.

1566. The UA School of Law has for some time accepted black students who have obtained a CLEO certificate, but who would not normally have gained admission based on their LSAT scores and college grade point averages. Randall (4/15/91) 16.

1567. To assist in the recruitment and retention of black and other minority stu-

dents, the UA School of Law offers a minimum of $1,500 in an annual scholarship to every black admittee, regardless of his/her entering credentials. Since in-state tuition is $2,400 a year, this scholarship covers almost two-thirds of an in-state student's tuition. Minority students learn of this assistance from UA in personal phone calls made to recruit minority students, in personal conversations with minority students during recruitment visits and admittance discussions, and often in letters from the Dean. Financial assistance of this sort has been made available since at least 1985, and the amount of assistance has steadily increased over the years in response to tuition increases. Non-minority students would need exceptionally high qualifications to be considered for the money black students receive. Randall (4/15/91) 11–12, 72–73.

### 3. Admissions Requirements

1568. The Graduate School at UA admits students based on college grades, scores on various examinations including the GRE, MAT, GMAT and National Teachers Exam, and upon recommendation of the faculty. Similar to the undergraduate admission categories, graduate students may be admitted as either regular admits, conditional admits or as non-degree seeking students. Rogers (4/4/91) 6–7. A higher percentage of black applicants to the Graduate School are admitted through the conditional admissions status as opposed to the regular admissions status. UASX 1210; Rogers (4/14/91) 7–8.

1569. The overall criteria for admission to the Graduate School at UAB are the possession of a bachelor's degree from an accredited university or college, a "B" average, and an appropriate score on one of the nationally recognized tests, such as the Graduate Record Examination.[124] Barnard (7/24/85) 5400.

1570. The criteria for admission to The University of Alabama School of Medicine are 90 hours of college work (a degree is not required) broken down into set num-

---

**124.** The Plaintiffs do not claim that the GRE or any other advance aptitude test necessary for graduate or professional school enrollment has an impermissible racial impact.

bers of hours in biology, chemistry, physics, mathematics and English, Medical College Admissions Test scores, an interview and letters of recommendation. Hoffman (7/23/85) 5077–78; Priest (4/1/91) 7.

1571. The decision of the Admissions Committee for the University of Alabama School of Medicine centers around four main areas: 1) the academic record; 2) the basic ability to perform at a reasonable level on a standardized test; 3) the evaluation which is provided by the college faculty from which the student comes and; 4) the interview process which gives the Admissions Committee an opportunity to assess the ability of the student to communicate and to discuss such things as motivation and personal interests, hobbies, etc. Hoffman (7/23/85) 5078.

1572. Blacks have been on the Admissions Committee for the University of Alabama School of Medicine for at least the last twenty years. The Admissions Committee has had more than one black on it for at least the last thirteen years. Hoffman (7/23/85) 5125; Priest (4/1/91) 7–8.

1573. The University of Alabama School of Medicine gives a preference to Alabama residents because it is a state-supported institution. The catalog makes the statement that students who are legal residents of the State of Alabama must be given preference in the selection process. Hoffman (7/23/85) 5085.

1574. There is no quota system for the admission of black students to the University of Alabama School of Medicine. Priest (4/1/91) 8. While there are no quotas per se, non-majority race or ethnicity is certainly a factor which is favorably considered when reviewing applications for enrollment. Hoffman (7/23/85) 5080–82.

### C. Auburn University

#### 1. Graduate School Enrollment

1575. In order to be admitted to the Graduate School at Auburn University, an applicant must possess at least a bachelor's degree or its equivalent from an accredited institution and in most instances an appropriate score on the GRE or other examination. AAMUX 504–A, p. 29.

1576. In 1990 Auburn University had 2,544 total graduate students of whom 65 or 2.6% were black. AUX 56. For the five year period between 1985 and 1989 black graduate enrollment at AU fluctuated between 3.8 and 2.7 percent. See, AUX, 727, 729, and AAMUX 975.

1577. While Auburn's percentage of black graduate students is not great, the fact is that many of the degree programs in which AU offers advance studies are not heavily enrolled in by blacks nationally. Haworth (2/21/91) 53–56. Once you control for fields of study, the number of African Americans receiving Ph.D.'s from Auburn is not inconsistent with national averages. Id. 26–27.

#### 2. Graduate School Recruitment

1578. Auburn proffered extensive evidence concerning the recruitment of black graduate students to its various programs. After careful review, the Court concludes that AU's recruiting efforts as well as its financial aid programs are well conceived, developed and designed to maximize to the extent possible black graduate enrollment. See generally the testimony of the following witnesses: Emert (2/27/91) 16–17, 39; W. Walker (3/7/91) 9–10, 36–37; Higgins (7/22/85) 4185–86; AAMUX 504–A, p. 28.

### D. Auburn University At Montgomery

1579. Auburn University at Montgomery has a record of black graduate student enrollment for which it can be proud. In 1990, 10.3% of AUM's graduate students were black. AUX 646. In 1988 the black graduate enrollment was 14.4 percent, and in 1986 it was 12.1 percent. AAMUX 1008, 1011.

1580. While AUM does not have any recruitment activities directed exclusively towards blacks, it is quite apparent to the Court that qualified African American students who are interested in the graduate programs of AUM have no difficulty in securing enrollment and financing their education. Dunlavy (2/25/91) 15.

1581. The evidence does not support the Plaintiffs' contention with respect

to current graduate and professional education policies at the state's predominately white flagship institutions that blacks are denied equal access to the programs. No doubt there is a paucity of black graduate professional students in Alabama. This reality however, is not unique to Alabama as it is in fact a national phenomenon. The evidence does not warrant a finding that the admission and recruitment policy for graduate or professional students at AU or UAS has an adverse impact on black students with the necessary academic training and skills.

## INSTITUTIONAL CLASSIFICATION AND PROGRAM APPROVAL

### A. Introduction

1582. Much of the testimony at trial related to the classification of institutions according to their mission. As ACHE uses the term, an institution's "mission" is its overall purpose, how it sees itself philosophically, and its aspirations and hopes for what it may become. Blow (2/14/91) 13. Under ACHE's definition, an institution's "role" describes the programs it offers, its student clientele, and the relative emphasis it gives to instruction, research, and service. *Ibid.*

1583. In Alabama, as in the rest of the nation, higher education programs vary from institution to institution and are not uniform. SOF ¶ 302. Indeed, it is educationally sound for a state to support institutions with differing missions, roles, and programs. *Id.* at ¶ 303.

1584. Role differentiation is necessary because states cannot afford to fund every higher education institution at a level that would allow it to offer high-quality programs in all disciplines and at all degree levels. Godwin (2/12/91) 21. This is especially true in Alabama, which has relatively few educational dollars to spread among sixteen separately accredited public senior institutions and 39 two-year institutions.

### B. Classifying Institutions According to Role

1585. Classifying institutions according to institutional role is a common practice in higher education; for example, the Carnegie Foundation for the Advancement of Teaching, the United States Department of Education, the American Association of University Professors ("AAUP"), and the Southern Regional Education Board ("SREB") have all developed systems that classify institutions of higher education.

1586. Classification methods differ, but they all distinguish among (1) research and doctoral degree granting universities, (2) baccalaureate and comprehensive universities with limited graduate missions and (3) junior and community colleges.

1587. The Carnegie Foundation publishes a report periodically that describes its classification system and then classifies public and private institutions in the United States according to the system. STX 145, p. 7. The Carnegie classification system is based on the amount of federally funded research at a particular institution, the comprehensiveness of the institution's role, and the number of degrees awarded at different levels. *Ibid.*

1588. The following categories used by the Carnegie classification system apply to senior institutions in Alabama:[125]

**Research I & II:** Offer a full range of baccalaureate programs, are committed to graduate education through the doctorate degree, and give a high priority to graduate research. Research I universities receive annually at least $33.5 million in federal support and award at least 50 Ph.D.s each year. Research II universities receive annually between $12.5 million and $33.5 million in federal support for research and development and award at least 50 Ph.D.s each year.

**Doctorate I & II:** In addition to offering a full range of graduate programs, the mission of these institutions includes a commitment to graduate education through the doctorate degree. Doctorate I universities award at least 40 Ph.D.s annually in five or more academic disciplines. Doctorate II

---

**125.** STX 145, p. 7.

universities award annually 20 or more Ph. D.s in at least one discipline or 10 or more Ph.D.s in three or more disciplines.

**Comprehensive I:** Offer baccalaureate programs and, with few exceptions, graduate education through the masters degree. More than half of their baccalaureate degrees are awarded in two or more occupational or professional disciplines such as engineering or business administration. All institutions in this group enroll at least 2,500 students.

**Comprehensive II:** Award more than half of their baccalaureate degrees in two or more occupational or professional disciplines, such as engineering or business administration, and many also offer graduate education through the masters degree. All of the colleges and universities in this group enroll between 1,500 and 2,500 students.

**Liberal Arts I:** These highly selective institutions are primarily undergraduate colleges that award more than half of their baccalaureate degrees in arts and science fields.

**Liberal Arts II:** These institutions are primarily undergraduate colleges that are less selective and award more than half of their degrees in liberal arts fields. This category also includes a group of colleges that award less than half of their degrees in liberal arts fields but, with fewer than 1,500 students, are too small to be considered comprehensive.

1589. The SREB classifies institutions primarily to help report on institutional data such as full-time enrollment, full-time equivalent enrollment, financial support per full-time equivalent student, faculty salaries, and student aid. Godwin (2/12/91) 15. The definitions of institutional categories used by the SREB follow: [126]

Doctoral I Institutions awarding at least 100 doctoral degrees distributed among at least 10 Classification of Instructional Programs (CIP) categories (2-digit classification), with no more than 50 percent of the degrees in any one category.

Doctoral II Institutions awarding at least 30 doctoral degrees distributed among at least five CIP categories (2-digit classification).

Doctoral III Institutions awarding at least one doctoral degree.

Master's I Institutions awarding at least 100 masters, education specialist, or post-masters certificates and degrees distributed among at least 10 CIP categories (2-digit classification), excluding post-baccalaureate certificates.

Master's II Institutions awarding at least one masters, education specialist, or post-masters certificate or degree, excluding post-baccalaureate certificates.

Baccalaureate Institutions that award the baccalaureate degree as the highest degree.

1590. The AAUP system classifies institutions according to the number of degrees awarded and the number of fields in which those degrees are awarded. Godwin (2/12/91) 14-15.

1591. In addition to the above described classification schemes, ACHE developed its own method of classifying Alabama's educational institutions. ACHE's first attempt at classification is found in Planning Document Number One issued in 1975 shortly after ACHE's formation. USX 2.

1592. Planning Document Number One recommended that institutions of higher education be classified according to the following system:

 I. Doctoral Universities (Public)
 A. Comprehensive Universities
 B. Urban Universities with a Comprehensive Role in Selected Graduate and Professional Fields
 C. Urban Universities with Specialized Graduate and Professional Roles
 II. Master's–Level State Universities (Public)
 III. Two-Year Institutions (Public)
 IV. Private Institutions
 V. Propriety Institutions
USX 2, p. 39.

126. STX 201, p. 119.

1593. The public four-year institutions in Alabama were classified by ACHE as follows:

Category I–A: UA, AU

Category I–B: UAB

Category I–C: UAH, USoALA

Category II: ASU, JSU, LU, TSU, UNA, AAMU, AUM, UM

USX 2, pp. 42–51.

1594. The classification system contained within Planning Document Number One was intended by ACHE to account for institutional differences between the colleges and universities in Alabama. USX 2, pp. 38–39. Planning Document One was originally intended to remain in effect from 1975 through 1980. *Id.* at 40. In fact, it remained in place until 1985 when ACHE adopted the Instructional Role Matrices document. Blow (2/14/91) 40.

1595. One of the uses of ACHE's classification scheme was to aid in determining which academic programs a particular institution could offer. The Plaintiffs and the HBUs contend that ACHE's classification scheme perpetuates vestiges of a dual system of higher education by denying to the state's predominately black schools the ability to offer degree programs beyond the master's level. According to the Knight Plaintiffs and the HBUs, ACHE's Planning Document Number One "was yet another white governmental betrayal of the historical mission of ASU and AAMU." Knight Plaintiffs' and Allied Defendants' Proposed Findings of Fact, p. 255.

1596. The Court is not persuaded by the Plaintiffs' evidence that ACHE's Planning Document Number One sought to hinder or retard the development of ASU or AAMU based on the institutions racial characteristics. The state's historically black universities were not the only institutions whose pre–1975 status was perpetuated by the classification system in Planning Document Number One.

1597. The classification system used in Planning Document Number One prevented institutions from having programs approved at a higher level than their classification would allow, but that prohibition applied equally to all institutions within a classification. Blow (2/14/91) 15–16. For example, ACHE would not have approved the establishment of doctoral degree programs at JSU, LU, TSU, UNA, AUM, or UM while Planning Document Number One was in effect. USX 2, 50–52.

1598. Moreover, ACHE's grouping of Alabama's institutions was similar to that of other classification systems. The following table shows how Alabama's institutions have been classified under the Carnegie, SREB, AAUP, and 1975 ACHE systems:[127]

| | Carnegie 1987 | SREB 1988–89 | AAUP | ACHE 1975 |
|---|---|---|---|---|
| AU | Research II | Doctoral I | I | I–A |
| UA | Doctorate I | Doctoral II | I | I–A |
| UAB | Doctorate II | Doctoral II | I | I–B |
| UAH | Comprehensive I | Doctoral III | IIA | I–C |
| USoALA | Comprehensive I | Doctoral III | IIA | I–C |
| AAMU | Comprehensive I | Masters I | IIA | II |
| JSU | Comprehensive I | Masters I | IIA | II |
| UNA | Comprehensive I | Masters II | IIA | II |
| AUM | Comprehensive I | Masters II | IIA | II |
| TSU | Comprehensive I | Masters II | IIA | II |
| ASU | Comprehensive I | Masters II | IIA | II |
| TSUM | Comprehensive II | Masters II | — | — |
| TSUD | Comprehensive II | Masters II | IIA | — |
| UM | Comprehensive II | Masters II | IIA | II |
| LU | Liberal Arts II | Masters II | IIB | II |
| ASC | Liberal Arts II | Baccalaureate | IIB | — |

127. STX 199, p. 1; USX 2, pp. 42–51; STX 145; STX 201, p. 119.

1599. The Court finds that the classification system in Planning Document Number One was not designed or applied for the purpose of discriminating on the basis of race. Rather, in classifying Alabama's public senior institutions according to role, ACHE acted in accordance with sound educational practices used throughout the nation.[128]

1600. ACHE no longer uses the classifications described in Planning Document Number One, and since the mid–1980's, ACHE has approved three doctoral programs at AAMU under the new classification scheme. STX 151; Blow (2/12/91) 9.

### C. Instructional Role Matrices

1601. Currently, ACHE's planning and role designation efforts have three components: (1) a statement of statewide goals set out in a document entitled "A Strategic Agenda for Alabama Higher Education for 1990–95," (2) a document known as the "Instructional Role Matrices Recognized by the Alabama Commission on Higher Education for Alabama Public Institutions of Higher Education," and (3) five-year planning documents submitted to ACHE by the institutions and updated annually. Blow (2/14/91) 9–12; STX 115 and 144.

1602. The Instructional Role Matrix document contains grids, with rows showing academic subdivision groupings and columns showing degree levels. A separate grid applies to each public four-year institution. If an institution has an existing degree program in a particular academic field at a particular degree level, an "X" appears in the appropriate spot. If an institution has no existing program in a particular field and at a particular degree level, but both the institution and ACHE agree it should be able to expand in that area, a "O" appears in the appropriate spot. STX 144.

1603. An institution cannot have a new degree program approved in an area in which it does not have a role designated at a certain degree level unless it first petitions ACHE for a role change. Blow (2/14/91) 16–17. If ACHE and an institution cannot agree on a role designation, the institution has the right to go to the Legislature and petition the Legislature for a role definition in the requested areas. *Id.* at 18.

1604. ASU contends that ACHE has treated other institutions, such as AU and UA, more favorably than ASU with regard to approval of institutional roles. Steptoe (1/28/91) 37. It contends ACHE unfairly denied ASU a role in engineering but would have approved a proposal for a computer engineering masters program by AU but for a deferral of consideration on account of this lawsuit.

---

**128.** Much of the Plaintiffs' objection to Planning Document Number One stems from the failure of ACHE to recognize the racially motivated historical restrictions on the role and mission of the state's HBUs. According to the Plaintiffs and the HBUs, ACHE's adoption of Planning Document Number One illegally restricted the mission of AMU and ASU during the time the document was in force. As an example, the Plaintiffs point to language contained in the document that describes "Alabama State and Alabama A & M [as] meet[ing] the needs of the state's Negro citizens" while the University of Alabama and Auburn University serve as the state's major institutions. STX 2, pp. 13–14. The Plaintiffs believe that this language typifies ACHE's mind set and works to the disadvantage of ASU and AAMU by institutionalizing the perceived inferior nature of these two schools and limiting their curricular offerings. The Plain-

tiffs' have failed however, to establish through competent evidence that ACHE acted with improper motive when classifying institutions in the mid–1970's, or that the classification scheme had the result of discriminating against the state's HBUs.

ACHE is a state agency whose purpose, among other things is to add a semblance of order to Alabama's disparate system of higher education. ACHE approached the situation as it appeared in 1975. Its ultimate classification of the state's institutions is essentially identical to the classifications of the Carnegie Foundation, the SREB and the AAUP. Fixing liability on ACHE because of its failure to enhance its 1975 classification of the state's HBUs to compensate for the state's history of segregation is, in this instance, so thin a sheet of ice for the Court to skate upon that it dare not venture forth.

1605. ACHE denied ASU a role in engineering because recent studies of engineering programs in Alabama had found that engineering resources in the state were spread too thinly and no new engineering schools should be established. STX 144, p. 8. Alabama has six public engineering schools plus an engineering school at the private Tuskegee University. Dr. William Blow, Deputy Executive Director of ACHE for Planning and Coordination, testified that he believes Alabama has more engineering schools by population than any other state in the region. Blow (2/14/91) 17–18.

### D. Program Approval

1606. ACHE has no power to terminate on-campus degree programs,[129] but it does have authority to approve new programs. Blow (2/14/91) 19.

1607. Before 1979, the Commission could only recommend to an institution whether a new program should be implemented; the institution was free to implement the program against ACHE's recommendation. Blow (2/14/91) 19.

1608. ACHE's authority to approve or disapprove new programs is subject to several restrictions. First, without ACHE's approval, an institution can implement a new program that will not use state funds. Ala.Code § 16–5–8. Second, an institution may secure legislative approval of the expenditure of state funds for new degree programs, even over ACHE's objection. *Id.* § 16–5–8(e). Public universities have sometimes secured state funding for programs they have not sent to ACHE for approval. Sutton (7/3/85) 762. Third, the constitutional status of the boards of trustees raises questions about ACHE's ability to prevent AU or UAS from instituting a new program with state funds without ACHE's approval.[130] UAS, for example, participates in ACHE's review processes of new programs and units only voluntarily and only to the extent that ACHE's action is treated in an advisory position or as a recommendation to the UAS board of trustees. SOF ¶ 573. Since 1979, however, UAS has always acquiesced in ACHE's determinations. Moreover, the addition of a course, a series of courses, or a concentration of courses within a degree program that has been duly authorized by ACHE is within the proper authority of the institutions.[131]

1609. ACHE has established procedures and criteria for the review of new programs and units of instruction, at both the undergraduate and graduate levels. SOF ¶ 9.

1610. The development of a new academic program is a complex and extended process requiring a careful assessment of a host of interrelated factors, including, but not limited to: the relationship of the program to the institution's mission; the priorities of the institution; the demand for the program in the area served by the institution; the availability of the program at other institutions; anticipated student enrollments; the presence of an appropriate, existing faculty base; adequacy of faculty and programs in supporting disciplines; adequacy of existing resources (facilities, equipment, library, etc.) and cost of new resources necessary for the program. SOF ¶ 508.

1611. Typically, an institution may devote several years to plan, propose, develop, and activate a new academic program, the actual period of time being, in large part, a function of the degree to which the new program builds on existing institutional strengths and infrastructure. SOF ¶ 509.

1612. If an institution wishes to add a degree program to its offerings, it first

---

**129.** Subject to grandfathering provisions and the right of institutions to secure legislative approval over ACHE's objection, ACHE does have authority to authorize and regulate off-campus offerings, new or existing. This authority does not extend to AU and UA, however, nor does it extend to off-campus offerings on military reservations. SF p. 58, ¶ 206.

**130.** *See Opinion of the Justices,* 417 So.2d 946 (Ala.1982).

**131.** Wilson (7/30/85) 6771–38.

lists the program in its planning document. It then develops a proposal according to published ACHE guidelines and submits the proposal to ACHE for review. Blow (2/14/91) 20–21.

1613. ACHE conducts peer review of proposed new undergraduate programs or units by soliciting the reactions of other institutions to those new programs. At the graduate level, proposed new programs are referred to an Advisory Council consisting of the graduate deans of each of the institutions. ACHE also uses outside consultants to help review graduate programs. SOF ¶ 9.

1614. The ACHE staff reviews the proposal and presents a written recommendation to the Commission Committee on Academic Affairs with the staff's rationale for approval or disapproval. Blow (2/14/91) 22–23. The Committee decides whether to accept the staff's recommendation, modify it, or reject it. The Committee recommendation then goes to the full Commission for a vote. *Id.* at 23–24.

1615. The criteria used by ACHE for approval of new programs include relevance to institutional role, relevance to institutional planning, societal need for the program in the state (including whether the program unnecessarily duplicates an existing program), academic soundness of program objectives and content, documentation of student availability and demand, appropriateness of program completion requirements, the institution's record of success in related program areas, appropriateness of administrative arrangements for the program, the institution's plan to pursue special accreditation, availability of faculty, library resources, equipment, and general facilities to support the program. Blow (2/14/91) 25–29. ACHE also considers the availability of financial resources to support a proposed program because the state does not ordinarily provide start-up funds for new programs. *Id.* at 29.

1616. ACHE's decisions to approve programs have sometimes been favorably influenced by claims that a proposed program will attract other-race students or increase minority representation in a given discipline. Blow (2/14/91) 29.

1617. During the approximately 20-year period from August 1971 through the time of trial, the Commission considered only two program proposals from ASU and approved both of them. STX 194, Table 3; STX 151.

1618. ASU had submitted two additional programs to the staff and voluntarily withdrew those programs before the staff made its recommendation. Blow (2/14/91) 33–34. All programs at ASU which were in place as of the time of trial were in place prior to that initiation of ACHE involvement in review of the new program proposals. SOF ¶ 791.

1619. The Commission has considered 31 programs proposed by AAMU. STX 194, Table 3; STX 151. Only four of those programs were ultimately disapproved by the Commission. *Id.* at Table 2; STX 151.

1620. ACHE has never disapproved a new program proposal from ASU. SOF ¶ 792.

## ACADEMIC PROGRAM DUPLICATION

### A. Dr. Conrad's Analysis

1621. The Plaintiffs and Allied Defendants maintain that the creation, expansion and maintenance of historically white university branch campuses in Montgomery and Huntsville were and are manifestations of Alabama's intentionally discriminatory policies of (1) restricting the HBUs' missions and (2) perpetuating the stigma of black inferiority by ensuring that white persons would be discouraged from attending college at historically black institutions under the educational authority of black persons. The Plaintiffs and Allied Defendants believe that AUM and UAH are important institutional mechanisms in the current strategy of massive resistance, and their continued duplication of programs that already are or ought to be offered at Alabama State and Alabama AAMU perpetuates white supremacy, segregation and their official stigma on the black community. *See* Blackwell (2/4/91) 149.

1622. Dr. James Blackwell expressed the opinion that the academic programs at AUM and UAH, CSCC, ASC and UNA duplicated similar programs at ASU and AAMU. According to the Plaintiffs, unacceptable duplication exists with respect to a number of undergraduate and graduate programs, particularly in education and business.[132] Blackwell (2/4/91) 151–56.

1623. Dr. Clifton Conrad, an expert on academic program duplication for the United States testified on the results of an analysis he conducted attempting to quantify the amount of alleged program duplication between the historically black and historically white institutions.

1624. Dr. Conrad employed the following definitions in his analysis:

*Program.* A program is a series of related courses that lead to a particular degree. Conrad (12/17/90) II–179.

*Core Program.* Core programs are defined as undergraduate level programs that are necessary for the provision of general and specialized education in the liberal arts and sciences, and in land grant institutions for the provision of opportunities considered essential to the fulfillment of the land grant function. Conrad (12/17/90) II 68–69.

Core programs exist only at the baccalaureate degree or undergraduate level. There are no graduate programs that are core programs and since graduate programs are all non-essential, if they are offered at two or more comparative institutions the graduate courses are unnecessarily duplicated. Conrad (11/7/90) 74.

*CIP.* CIP is an acronym which stands for Classification of Instructional Programs. CIP is a topology of academic programs which breaks academic offerings down into a variety of categories and subcategories by general subject matter or fields of study. Conrad (11/7/90) 43–46; USX 2–9, app. C.

*Duplication.* Duplication is defined as the offering of the same CIP program between compared institutions. Conrad (12/17/90) II–184, 185.

*Unnecessary Duplication.* When non-core programs are duplicated at institutions being compared, these non-core or non-essential programs are duplicated unnecessarily. Conrad (11/7/90) 81.

*Unitary Curriculum Structure.* A unitary curriculum structure is one where there is not an extensive amount of program duplication and a relatively substantial amount of meaningful program uniqueness exist so as to distinguish one institution from another. Conrad (11/7/90) 72–73; USX 2–9B.

*Dual Curriculum Structure.* A dual curriculum structure is one in which there is a substantial amount of overall program duplication in the sets of institutions being compared, and a fair amount of that is unnecessary duplication. Additionally, a dual curricula structure is evident when there is not a significant number of unique

---

**132.** Dr. Blackwell also expressed the opinion that the presence of predominately white universities in close proximity to AAMU and ASU prevent the HBUs from having access to the many private and public contracts and grants the HWUs receive to assist the economic development of their regions. Blackwell (2/4/91) 157–58. The Knight Plaintiffs and Allied Defendants believe that the alleged denial of equal access to state and private contracts puts the HBUs at a disadvantage "not only with respect to the educative function, because there is a relationship between research capability and education, but also with respect to the broader function of the institution within the state...." Walters (12/10/90) 90.

Whether the limited state contract work provided the HBUs impermissible impact ASU and AAMU was never established. While the evi-

dence is uncontradicted that AUM and UAH receive substantially larger state and federal contracts—both in number and dollar value—than either ASU or AAMU, there is no support in the record to substantiate the claim that such contractual activities contribute to a dual system of higher education in the state or are the result of a vestige of segregation.

The majority of contracts secured by AUM for example result chiefly from the entrepreneurial efforts of Dr. Raymond Wells, the Director of the Center for Government and Public Affairs. As a result of his individual effort, AUM has garnered a reputation for excellence in providing technical assistance to state government. There is no showing that the state's choice of AUM as one of its sources of technical assistance is in any way related to a campaign to stigmatize or limit ASU.

programs in both sets of institutions. Conrad (12/17/90) II–74.

*High Demand Programs.* A high demand program is a program where a disproportionately high number of students can reasonably be expected to chose a degree program as indicated by current national data on student completion. Stated simply, high demand programs are programs in which students decide to major. Conrad (12/17/90) II–117, 118. Appendix E, USX, 2–9. High demand programs are not necessarily core programs.

*Meaningful Program Uniqueness.* The conspicuous presences of a significant number of non-duplicated (unique), non-core high demand programs. USX 2–9B; Conrad (12/17/90) II–71.

*Range.* Range refers to the breadth of program offerings; the number of major fields by CIP classification. Conrad (12/17/90) II–11.

1625. When asked by the Government whether there was a unitary system in Alabama, Dr. Conrad responded in the affirmative and then offered the following testimony:

[W]hat I found was that there was a great deal of program duplication including unnecessary ... duplication ... between the predominately white and the predominantly black institutions in the state of Alabama.

And further, I found in the context of looking at program duplication, that there was very little significant, or what I call meaningful program distinctions between the two predominately black institutions in the state and the predominantly white institutions.

Dr. Conrad then goes on to conclude that the HBUs are not distinguished programmatically in meaningful ways, such that the racial identifiability of the predominantly black institutions becomes a very significant feature. Conrad (12/17/90) II–60.

1626. As a precursor to his examination of academic program duplication, Dr. Con-

rad made two sets of grouped comparisons. In the first set, the comparison involved statewide groupings, to wit: UAH, AUM, UA, AU, UAB, UNA, and TSU, were compared to Alabama State and Alabama AAMU universities. The second grouping involved pairs of comparative institutions, to wit:

1. UAH and AAMU
2. UNA and AAMU
3. UA and AAMU
4. AU and AAMU
5. AUM and ASU
6. TSU and ASU
7. AU and ASU
8. UA and ASU

Based on his analysis of these grouped comparisons, Dr. Conrad draws his conclusions about the nature of program duplication in Alabama.

1627. Dr. Conrad's study of academic program duplication in Alabama is based on an analysis of the CIP code designation for the courses offered by the various institutions studied. After counting the number of programs identified by CIP code that are duplicated within the two sets of grouped comparisons, Dr. Conrad applies his definitional construct to locate those programs he considers to be unnecessarily duplicated. He then applies the same methodology to identify the "unique" or unduplicated programs. Finally, conclusions are drawn from the data by comparing the duplicated and unduplicated offerings relative to the various statewide and individualized grouped comparisons. Based on this analysis, it is concluded that Alabama has a dual curricular system of higher education.[133]

1628. In addition to his determination that a dual curriculum system of education exists in Alabama, Dr. Conrad also offered extensive testimony concerning the quality of the educational offerings in Alabama's public institutions. In examining the academic quality, Dr. Conrad utilized a number of indicators among them, the edu-

**133.** Dr. Conrad's conclusions are succinctly set out in pages 1–4 of USX 2–9B which is attached as appendix "F".

cational background of faculty, their scholarly productivity, the curriculum offerings of the university, and quality of the library holdings. Conrad (12/17/90) II–62, 149–151.

1629. Dr. Conrad testified that when he look[s] at [these] indicators, they all point in the same direction, sometimes the trend is far more pronounced than others, but the conclusion is really inescapable and that is that based on these ... indicators of program quality ... [they] clearly [show] that the predominantly white institutions on the average are of higher quality than the predominantly black institutions in the [S]tate of Alabama.

Conrad (12/17/90) II–169–70.

1630. According to the Knight Plaintiffs the inferiority of the state's HBUs as measured by the indicators utilized by Dr. Conrad, is the result of a state policy of white supremacy with respect to black higher education. Conrad (12/17/90) II–285.

1631. Finally, Dr. Conrad testified that the failure of ASU and AAMU to have any unique high demand programs adversely impacted their ability to attract and enroll white students. Conrad (12/17/90) II–146.

### B. Defendants' Critique of Dr. Conrad's Testimony

1632. The non-allied Defendants strongly disagree with Dr. Conrad's methodology and conclusions. In their opinion the doctor's aggregation of data from predominately white institutions, with predominately black institutions is educationally unsound and predetermines the outcome of the inquiry.

1633. According to the Defendants, the analysis performed by Dr. Conrad of program duplication among Alabama institutions of higher education is based on two principal mistakes in attempts to use statistical analysis. First, Dr. Conrad's definition of terms such as "substantial" duplication is not based on any articulated standard of comparison or quantification. Dr. Conrad's second, and far more serious error of statistical technique, occurred when

he jumped from a "grouping to a conclusion." That is, Dr. Conrad grouped institutions solely on the basis of their racial histories and concluded that similarities or differences in their present curricular offerings must have been based upon their racial histories. By failing to account for any other factors, such as history of an institution as primarily a teacher's college, size of an institution, graduate programs offered at an institution, Dr. Conrad's conclusions have no statistical or analytical validity. Siskin (7/25/85) pp. 5906–5908.

1634. The Defendants go on to argue that Dr. Conrad's analysis of duplication is flawed because he grouped institutions and made his comparisons without regard to mission differentiation. The consideration of mission is a critical function in understanding a university and its programs. Jones (3/25/91) pp. 31–32.

1635. Similarly, Dr. Conrad's quality analysis of institutions is allegedly flawed because he failed to take into consideration the missions of the institutions he was evaluating. Comparing regional universities with doctoral research universities constitutes an improper comparison and will achieve a prescribed result. Jones (3/25/91) p. 66.

1636. Yet another criticism of Dr. Conrad's method was his reliance on CIP codes as a means of making program comparisons.

1637. Institutions of higher education in Alabama and elsewhere use the CIP classification scheme to designate their academic programs in what, according to the institution's judgment, is the appropriate classification. STX 100, p. i; Conrad (11/1/90) 45; Conrad (12/19/90) II–543.

1638. In Alabama, each institution provides its CIP classifications to ACHE, which periodically compiles the submissions into a statewide Inventory of Academic Programs. STX 100; Conrad (11/1/90) 46.

1639. Although ACHE attempts to verify the accuracy of the institution's CIP designations, it is largely an institutional decision where in the taxonomy a particular program is placed, and there are often mul-

tiple options. Conrad (11/1/90) 45; STX 100, p. i.

1640. The CIP system must be used with great caution if employed to compare or contrast academic program offerings at different institutions. Jones (3/25/91) 50–53. Even the Knight Plaintiffs own expert on duplication cautioned against using CIP code designation as a basis for making comparisons between courses at different institutions. Blackwell (2/5/91) 154.

1641. CIP classifications by institutions are often inaccurate and unreliable and should be used as gross indicators only. CIP classifications should be used only as a starting point in analyzing whether duplication exists between or among academic programs. Jones (3/25/91) 50–52.

1642. The CIP classification system has other significant limitations as well. While it may allow one, for example, to ascertain whether programs offered by two respective institutions are broadly similar to one another, it would provide no information regarding the actual content and emphasis of the respective programs, the degree of rigor of the programs, or any of a number of other characteristics of the programs or the students enrolled in them. Jones (3/25/91) 106–07.

### C. Dr. Conrad's Program Duplication Testimony is Unpersuasive

1643. The Court has considered in some detail the report and conclusions of Dr. Conrad concerning program duplication. As a preliminary matter, the Court notes that a considerable portion of the methodology utilized by Dr. Conrad to determine which courses are core and noncore, duplicated and unduplicated is so disassociated from the realities of higher education in Alabama as to be of minimal assistance.[134]

1644. Undoubtedly there is a considerable amount of duplication between all institutions of higher learning in Alabama. A myriad of factors, most of which were not considered by Dr. Conrad, are directly responsible for much of what he determined was unnecessary duplication among curricula offerings.

1645. For instance, the mission designation, student clientele, service area and size of many of the institutions in Alabama directly impacts the nature of the offerings available at any particular college or university.[135] Dr. Conrad seems to concede this point when he utilizes mission designation when examining the state's two land grant colleges; but then, he completely ignores mission differentiation when considering the remaining institutions. Moreover, the definitions and classifications which Dr. Conrad uses in determining what constituted "core" studies in the undergraduate curriculum lead to extreme results when considered in terms of actual student demand for particular programs. As the doctor indicated, the determination that a particular program should be classified as core is not affected by levels of student demand for the particular course.[136] Conrad (12/18/91) II–390, 529.

1646. Under the doctor's definition Portuguese and electron particle physics are core programs while elementary education and business are not. Id. II–390, II–532–33. This in the face of the fact that every four year public college or university in Alabama has a program in business, management, or administrative science. SOF ¶ 471. Moreover, all four year schools in the state have a teacher education program. SOF ¶ 483. A substantial number

---

134. The arguments of the Defendants regarding Dr. Conrad's program duplication analysis are compelling and the Court adopts them as persuasive.

135. See generally, the Testimony of Dr. Linda Bunnell Jones (3/25/91) 52–56, 60–64, 106–108.

136. In other words, a program which might be in high demand is not necessarily core. For

instance under Dr. Conrad's analysis education and business courses are not "core" even though almost 75% of all college students are enrolled in such programs. Had business and education been included in the calculations for core courses, there would have been "a whole lot less unnecessary duplication" in Alabama. Conrad (12/18/91) II–533.

of Alabama's undergraduate students are enrolled in one of these programs.[137]

1647. Dr. Conrad's definition of "core programs" is based upon educational antecedents that have their origins in the classical educational model. In defense of his definition of "core," Dr. Conrad testified eloquently about the individual and role of a liberal arts education in refining and developing the individual's mind and character. Dr. Conrad's words are worth repeating since they resonate with some truth.

1648. Prompted by a question that implied that his definition of "core" curriculum is rooted in social elitism since it failed to reflect current enrollment patterns Dr. Conrad responded:

There are those who will argue that the liberal arts and sciences are fundamentally elitist. I have never been among them. I have found the liberal arts to be the most freeing of subjects, which is certainly consistent with the very conception of [a] liberal education....

. . . . . .

[A liberal arts education] ... is freeing for people and to deny people the opportunity to study with ... the ancient poets, or the great writers whether it's Octavio Paz or the poetry of Jose Martie ... [is wrong].... [Such studies are] not mere idle pursuits as they were to some extent in ancient Greece, but to the contrary. It is through the study of literature and history that ... individuals ... define and refine those qualities of mind and character that will serve them well in any occupation.

Q. [W]hat would be the harm, Doctor, in recognizing after these two and half millennia that many people in modern day society find it essential to work for a living in the fields of business or education and hence those fields particularly ought to be included in the core, the heart of any academic institution....

A. I think that ... the professional fields ought to be offered and I think

that ten or fifteen years from now, we'll know [sic] longer pit the liberal arts versus the vocational/professional arts....

. . . . .

But in the interim, I think above all our colleges and universities ought to be informed by some larger vision, certainly it includes professional training but above all, [they should] emphasizes education as the very term itself suggests.

Conrad (12/19/90) II–631–34.

1649. The Court appreciates and accepts Dr. Conrad's observations. Nevertheless, it must examine the educational system in Alabama in its current form and not based on the postulation of an idealized curricula structure. In Dr. Conrad's definition of "core" there is no appreciation for the educational rational for a particular program's existence. Dr. Conrad's definition of a "core academic program" is, for purposes of this litigation, overly restricted when considered in relation to actual student program enrollments and the functioning of curricular development at the state's institutions. This judgment is warranted given the conclusions which Dr. Conrad reaches concerning an alleged dual curricular system of education predicated on race.

1650. Dr. Conrad concedes that there is considerably less unnecessary duplication if education and business courses are considered core. Discarding a major category of programs because they do not satisfy a traditional notion of liberal arts education is problematic, irrespective of Dr. Conrad's notions concerning meaningful program uniqueness. Conrad (12/19/91) II–532–33.

1651. The evidence proffered by the Government through the testimony of Dr. Conrad does not mandate a finding that Alabama is currently operating a dual curricula system of education. This does not mean of course that vestiges of the former dual curricular system do not continue to exist. Yet, with the end of *de jure* segregation, Alabama's officially sanctioned dual

---

**137.** For example, nationally, approximately 23% of all undergraduate degrees awarded by institutions of higher education in this country have been in the business or management disciplines. In 1988–89, 24% of all bachelor's degrees were awarded in this discipline. Owens (3/26/91) 48. At the master's level 24% of the degrees awarded are awarded in the area of business or management. *Ibid.*

system of education was eradicated within a short time by the opening of all public colleges and universities to students regardless of race. Therefore, the issue for determination is whether there are vestiges of the dual curricular system which impede the desegregation of ASU and AAMU.

1652. Analyzing two programs to determine whether duplication exists and whether that duplication impermissibly perpetuates a dual system requires consideration of the total learning package, which includes the mission, the curriculum structure and design, the student clientele, and instructional methods. Simply looking at program labels is not adequate.

## D. The Court's Analysis Of The Program Duplication Claims

1653. Sound educational policy, unrelated to discriminatory animus or the *de jure* period of segregation, dictates some "non-core" program duplication among all institutions—particularly in the area of high demand programs.[138] Otherwise, those institutions that are selected as the exclusive recipients of high demand programs such as business and education, will arrogate for themselves all the benefits associated with large programs and student enrollments. When a significantly disproportionate percentage of undergraduate college students elect to enroll in one or two programmatic areas the state must take note lest its educational system fail to meet the needs of its students.

1654. A state that limits its high demand program offerings to only one institution or to a very few institutions may well find itself facing acute shortages of trained personnel in certain areas or the mass exodus from the state of college age individuals dissatisfied with the limited educational options available within the state. The resulting loss of young people could, over time, have a negative impact on the life of the state. Indeed, the parties have stipulated that the need for well-qualified teachers in Alabama will increase in the future, with acute shortages expected in certain fields. SOF ¶ 482.

1655. Throughout the country and in Alabama, high demand non-core programs are duplicated by state institutions whether geographically proximate or not.[139] What makes the situation in Alabama problematic is the fact that the proximate institutions [140] are racially identifiable *and* the allegation that this racial identifiability, rather than sound educational policy, is the impetus for non-core high demand program duplication between the proximate HBUs and HWUs.

1656. In deciding whether there are illegal vestiges of segregation between the proximate schools as a result of unnecessary program duplication, the Court will be guided by the following three pronged inquiry:

1) Are the duplicated curricular offerings at the proximate institutions part of

---

**138.** While rejecting Dr. Conrad's methodology, the Court nonetheless finds his definitions useful in describing the programmatic relationship between institutions.

The Court will limit its duplication inquiry to high demand programs since it is the location of these programs which essentially impacts on the ability of an institution to attract other race students. For example, it is stipulated that while there are a number of programs offered by ASU which are not offered at AUM, Alabama State has been unable to attract any significant number of white students to the programs which, under any definition, are not duplicated by AUM. SOF ¶ 624. Of course, none of the unduplicated programs at ASU are considered high demand programs.

**139.** Every four year public college or university in Alabama has a program in business, manage-

ment, or administrative science as well as teacher education. SOF ¶¶ 471, 483.

**140.** The Court will limit its discussion to an examination of the proximate institutions and their curricular offerings. It is primarily the proximate institutions which the Plaintiffs maintain unnecessarily duplicate program offerings at the HBUs and consequently contribute to stigmatization of the predominately black universities and impede their ability to desegregate. The proximate institutions are TSUM, AUM, and ASU and AAMU, UAH, CSCC and ASC.

It is stipulated that the program and course offerings of UA and UAB do not unnecessarily duplicate the programs and courses at the state's predominately black universities. SOF ¶¶ 388, 538.

Alabama's prior dual system of education; if yes;

2) then the Court must inquire whether the duplication nevertheless serves a legitimate educational objective of the state; assuming that it does,

3) the final issue for determination is whether in the exercising of that objective the state is encouraging the racial identity of a particular institution in hopes of perpetuating its prior history of educational segregation?[141]

1657. The Court will limit its analysis to a discussion of the two high demand programs most often considered as being unnecessarily duplicative—education and business. There was scant if any evidence introduced concerning program duplication in other areas.

1658. For purposes of this discussion the Court will assume, without deciding, that the education and business programs at the proximate predominately white institutions were established in furtherance of the dual system of education.[142]

1659. Based on the reasons articulated at the start of this sub-section the Court specifically finds that the existence of education and business programs at the proximate institutions currently serves a legitimate educational objective of the state. Accordingly, the final issue for determination is whether in the exercising of that objective, the state is continuing to encourage the racial identity of a particular institution in hopes of perpetuating its prior history of educational segregation.

**141.** Some may argue that since the Court accepts the proposition that the state must eliminate vestiges of segregation "root and branch" that the inquiry should stop once it is decided that a duplicative program exists and that its duplication results from the *de jure* period of segregation. Such an argument is not be compelling, however.

All vestiges of the *de jure* period of segregation are not and should not be actionable. For example the existence of AAMU and ASU as predominately black schools and conversely the existence of UAS and AU as predominately white schools is, standing alone a vestige of segregation. These institutions arose during the period of *de jure* segregation when white Alabamians did not want black students attending the same schools as white students. Obviously, if the Court's mandate were to see that *all* vestiges of segregation are eliminated, than the Court would have to preside over the dismantling and reorganization of the state's system of higher education. Unless directed otherwise by a higher tribunal, this Court has no intention of so doing. What then is the distinction between a vestiges of segregation requiring elimination and a vestige which should remain?

The difference primarily lies in the current nature or character of the vestige under consideration. If the vestige has the result of continuing to encourage or foster the existence of the prior dual system of education then it must be eliminated root and branch. (*See* Conclusions of Law ¶¶ 1–2). If, however, the essential character of the vestige has been transformed since the end of the *de jure* period so that it no longer contributes to the prior dual system but rather serves a legitimate and needed function within the state, then there is no need for its elimination. Alabama's HBUs are an excellent example.

The continued existence of these two institutions is no longer an actionable vestiges of the prior dual system since their essential character and function within the state have changed. They are no longer specifically designated as universities intended for blacks only. The fact that they currently have predominately black student bodies, and are under the control of predominantly black boards of trustees, is the result of historical and political forces that, while having antecedents in the segregative past, do not automatically render them continuing illegal vestiges. These institutions serve a legitimate and vital role within the system of higher education in Alabama. They need not and should not be eliminated. The same rational holds true for the state's predominately white schools.

As with the institutions themselves, many of duplicated academic programs serve legitimate *functions that do not foster or contribute to the* continuation of Alabama's prior dual system or the racial identifiability of any particular institution. Programs such as business and education must remain in place as currently constituted if the state is to adequately meet the demands of the future.

**142.** The Court is aware, of course, that in the case of AUM, TSUM and ASC that the institutions were either not in existence or not under the state's control during the era of *de jure* segregation. The Plaintiffs' contented however, that their current program offerings in many instances duplicate those in place at the proximate predominately black institution and thus continue to perpetuate the prior dual system of education.

Since the Government has entered into a consent decree with TSUM and ASC, it has abandoned its claim of improper program duplication against these institutions.

1. The University of Alabama
 at Huntsville

i. *Institutional Comparison between UAH and AAMU*

1660. A review of UAH and AAMU revealed substantial distinctiveness in the missions and operations of AAMU and UAH as educational institutions, as indicated by the following differences: AAMU serves a student clientele that is drawn largely from outside of Madison County (75% of its student body comes from outside Madison County) whereas 75% of UAH's students come from within Madison County and 85% from within a four to five county area. Alabama A & M students are, by and large residential, full-time students, while those served by UAH are largely nonresidential, commuter students. UAH's students are also, on the whole, older than those attending AAMU.

1661. The provision of higher education to students who have had limited access to educational opportunity and who are from economically disadvantaged families is a dominant element in the mission of AAMU. AAMUX 604.1, pp. 3, 5; 636, p. 10.

1662. There is a substantial difference in the level of academic preparedness of entering freshmen at AAMU and UAH. The degree to which the new freshmen attending AAMU have been involved in college preparatory programs is much less than is true for incoming freshmen at UAH. Only 25% of AAMU's incoming freshmen have followed college preparatory curricula in high school, a fact consistent with the institution's mission to serve educationally disadvantaged young people. In contrast, 65% of UAH's incoming freshmen have pursued college preparatory curricula. UAH's incoming freshmen also have a higher high school grade point average than is the case at AAMU. The average high school grade point average for incoming freshmen at UAH is 3.3, while at AAMU it is 2.5. Wharton (4/2/91) 47–48; UASX 680; 681; 682; 683; 684; 685; 686; 687; 688; 689; 690; 691.

1663. There is a substantial difference in the scores recorded on the ACT examination by AAMU and UAH students, reflecting the differences in high school preparation that characterize the two groups. The average ACT composite score for students at AAMU is currently about 12, compared with UAH where the average is currently in the range of 22–23. Wharton (4/2/91) 49; Frazier (1/9/91) 138; UASX 680; 681; 682; 683; 684; 685; 686; 687; 688; 689; 690; 691.

1664. In 1989, only 1.9% of AAMU students had ACT scores that matched the average at UAH. UASX 691; 684.

1665. At AAMU there are extensive counseling and tutorial programs, developmental courses, special assistance activities like Upward Bound, and special programs to enhance academic skills. The emphasis on developmental and remedial education at UAH is much less than that at AAMU. Wharton (4/2/91) 69–70; Bogue (7/29/85) 6444–6445; UASX 519; 522.

1666. Since its inception UAH has expressed a strong interest in serving the older, nontraditional student. Wharton (4/2/91) 46; 85 UASX 512; 509(B); 509(C); UASX 949.

1667. Entering freshmen are not the main enrollment source of UAH. Of the 3,200 new enrollments at UAH for the 1987–88 school year, there were 600 new freshmen, 750 transfer undergraduate students, a substantial number, 1216, of non-degree seeking students, and 480 new graduate students. As a result of this kind of student mix, the average age of UAH undergraduates is 26 years. Wharton (4/2/91) 65–66; UASX 949; 564; 565; 880; 949, p. 42.

1668. Alabama A & M's enrollment profile indicates a heavy concentration of freshmen (1298), a considerably smaller number of sophomores (545), a smaller yet number of juniors (360), and a somewhat larger number of seniors (460). This is "very heavily front end loaded with freshmen," bringing the average age to an estimated 20, with a majority of students being 18 or 19. Wharton (4/2/91) 64; UASX 568; 565.

1669. UAH is a commuter campus, with the great majority of its students living in

the community and commuting to classes each day. Only about 5% of UAH students currently reside on campus. Wharton (4/2/91) 67–68.

1670. AAMU undergraduate students expect to live on campus (60% do), participate in on-campus activities, attend full-time (approximately 90% do), and develop cohesive relationships with other students. Wharton (4/2/91) 59–60, 66–67; Frazier (1/9/91) 45.

1671. Alabama A & M is a traditional residential campus, whose student body is made up of recent high school graduates who are pursuing undergraduate degrees full-time and who generally remain on-campus for four years. Wharton (4/2/91) 66, 68, 186; 85 UASX 669, p. VII–57.

1672. UAH and AAMU draw students from very different geographical areas. Madison County and the contiguous counties are very important sources for UAH's enrollment and not very important for AAMU. UAH draws approximately 85% of its enrollment from Madison County and the contiguous counties. AAMU draws only 30% of its enrollment from this area. Wharton (4/2/91) 54–55; Hall (7/25/85) 6093; UASX 949; 85 UASX 650.

1673. AAMU has a state-wide service area and UAH does not. UAH draws only 7% of its in-state students from outside its five county service area. Jefferson, Mobile, Montgomery and Macon counties yielded 627 students for AAMU for the 1988–87 school year, which is about one-sixth of the AAMU enrollment, but only 63 students for UAH, which is less than 1% of its enrollment. (Wharton, 4/2/91, pp. 54–56; UASX 650; UAS 651; 85 UASX 520(A). Frazier (1/9/91) 46.

1674. AAMU has an out-of-state enrollment of approximately 15% and draws students especially from Michigan, Illinois, and Ohio. In contrast, UAH has an out-of-state enrollment of approximately 6 percent. Wharton (4/2/91) 55–56; AAMUX 604.1, p. 6; Frazier (1/9/91) 46; 85 UASX 520(A).

ii. *Program Comparison* [143]

a. *Education*

1675. Teacher education courses were offered at the Huntsville Center—the precursor to UAH—from its very inception in the early 1950's. SOF ¶ 477–78.

1676. In comparison with the AAMU teacher education program, the UAH program is quite limited in terms of the range of degrees available, the scope of certification options available, and the size of the academic unit in which the program is housed. Of all the teacher education programs in the state's four-year institutions, UAH's program is the smallest. SOF ¶¶ 484, 487.

1677. UAH and AAMU have adopted different curricular models for their teacher education programs. The UAH education program emphasizes the cognate field or specific subject area (i.e., history, biology, etc.), while the program at AAMU is slanted towards education courses dealing with teaching methods, educational psychology, etc. SOF ¶¶ 485–86.

1678. UAH has two undergraduate degree programs in teacher education. One in elementary education and the other in music education. There are no graduate degree teacher education programs at UAH. Egbert (3/27/91) 15–16.

1679. Currently, AAMU has approximately 18 undergraduate teacher education

---

**143.** While the Court has rejected the methodology of Dr. Conrad it is nonetheless interesting to note his concession that as between Alabama A & M and the Huntsville campus of UA there is meaningful program distinctiveness. In fact, Dr. Conrad concedes that if all his institutional comparisons were like his duplication analysis of Alabama A & M University and the University of Alabama at Huntsville, the state would have a "far more unitary system than a dual one." Conrad (12/1/90) 58, 68, 96.

According to Dr. Conrad, one of the possible explanations for the small amount of program duplication between AAMU and UAH is that there is clearly "some mission differentiation between those two institutions." *Id.* 84. Dr. Conrad's conclusions in this regard lend further credence to the Court's position that one must consider a myriad of factors, including mission when determining whether impermissible program duplication exists.

degree programs and 33 graduate degree programs. Egbert (3/27/91) 16.

1680. There are significant differences in the structure and scope of certification activity at UAH and AAMU. Alabama A & M currently offers a total of 157 certificate options at all levels, *e.g.*, Class B, Class A, Class AA, etc.), while UAH currently offers only a total of 62. As an example of the differences in scope, AAMU offers certificate opportunities in 46 areas at the Class A (master's degree) level and in 37 areas at the Class AA (post-master's) level; in contrast, UAH offers Class A certificate options in only 10 areas and has no Class AA certificate options. At AAMU the certificate options are offered in 40 programs (e.g., history, physics, etc.), while at UAH the certificate options are available in only 21 programs. Egbert (3/27/91) 12–14; UASX 712; 763, pp. 3–4, 54–55.

1681. The inventory of certificate programs at AAMU and UAH reveals differing institutional areas of emphasis. AAMU has a broad array of certificate options at the specialist (Class AA) level, while UAH has no such options at all. AAMU has strength, with no corresponding programs at UAH, in vocational education certificate areas (such as business education, home economics education, agri-business education, etc.), in physical education, and in non-teaching certificate areas, such as those for special education and school support personnel (school administrators, counselors, etc.). On the other hand, UAH has certificate options in modern foreign languages and strengthened subject matter options in the sciences, as to which there are no corresponding programs at AAMU. Egbert (3/27/91) 11–12.

1682. In comparison with UAH, AAMU has a much more comprehensive teacher education program, in terms both of breadth, since it encompasses most of the potentially available option areas, and in terms of depth, since it encompasses all of the potentially available option levels. At UAH, teacher education is more focused and narrowly defined.

1683. The School of Education is one of six schools at AAMU (the others being Agriculture and Home Economics, Business, Engineering and Technology, Arts and Sciences, and Graduate Studies). There are seven departments within the School of Education (Art and Art Education; Elementary, Early Childhood, and Middle School Education; Health, Physical Education, and Recreation; Music Education; Psychology and Counseling; Secondary Education; and Special Education). Use of this organizational unit for the teacher education program, with its size and complexity, is testimony to the comprehensiveness and importance of that academic program area at AAMU. Teacher education is one of five major programs there.[144] UASX 568, p. 9; 522, pp. 270, 283, 295, 303, 320, 327, 346; Egbert (3/27/91) 27–29.

1684. At UAH, the teacher education program is administered through a department, which is but one of ten departments in the College of Liberal Arts, which, in turn, is but one of seven colleges or schools at the institution. Egbert (3/27/91) 27; UASX 949, pp. 16–17.

1685. The number of full-time faculty members in the AAMU School of Education has ranged in recent years from 50 to 55, not counting as many as a dozen additional faculty who hold joint appointment in the School of Education and another school. Egbert (3/27/91) 27; Hicks (1/16/91) 25–26.

1686. The number of full-time faculty members, including the Department Chair, in the UAH Department of Education has been as many as six in recent years and is currently five. Egbert (3/27/91) 27.

1687. At AAMU, the School of Education generates about 20% of total undergraduate and graduate credit hours at the

---

**144.** Alabama A & M University also operates a graduate level teacher education program in Birmingham at the AAMU Birmingham Center. Responsibility for this graduate program in education falls to the Dean of the School of Education at AAMU. AAMU also offers graduate teacher education courses at many other places throughout the state. Hicks (1/16/91) 31–32, 41–43.

institution. At UAH, the teacher education credit hours represents less than 5% of the total credit hours generated. Egbert (3/27/91) 28, 38–39.

1688. The curriculum differences in the UAH and AAMU elementary education programs are pronounced. UAH requires students seeking a degree and certificate in elementary education to have competence in an arts and sciences academic field. Students are required to take between 18 to 24 semester hours in a selected field, about 60% of which must be in upper division (junior and senior) courses. This cognate area requirement amounts to a minor. There is no comparable requirement in the elementary education degree program at Alabama A & M. Egbert (3/27/91) 18; Egbert (7/30/85) 6784, 90–91; 85 UASX 1104, p. 40.

1689. AAMU has a much higher professional education course requirement for the elementary education program, amounting to approximately 72 hours, than UAH. At UAH the professional education course requirement is 54 hours. This is a difference of 18 hours, or a third more courses in this area at AAMU as compared with UAH. Egbert (3/27/91) 17–18.

1690. The curriculum differences in the UAH and AAMU elementary education programs mean that students at UAH will spend much of their time learning about one field of study while students at AAMU will spend substantially more time learning about the processes of teaching. Egbert (3/27/91) 18.

1691. With respect to the curriculum for the Class B secondary education certificate, the programs at AAMU and UAH are very different. AAMU generally requires about 15% more course work than UAH in the professional education area (39 hours at AAMU versus 33 hours at UAH), while UAH requires from 15–20% more courses in the teaching field than AAMU (32–39 hours at UAH versus 27 hours typically at AAMU). At UAH the student will take sufficient hours in the teaching field to qualify for a major, and in fact will receive a degree in the teaching field area (e.g., B.A. in History, B.S. in Chemistry or Phys-ics, etc.) with a recommendation for the Class B certificate in that area. At AAMU by contrast, the degree is a secondary education degree with an emphasis in the teaching field. Egbert (3/27/91) 22–25; UASX 1530; 1531.

1692. Because of the different teacher education curricula at UAH and AAMU at the undergraduate level, the two institutions are turning out a "different product."

1693. In the Class A or master's level certificate programs for secondary education, there are substantive differences between the program requirements at UAH and those at Alabama AAMU. At UAH there is no master's degree in education. In order to qualify for the Class A certificate at UAH a teacher must obtain a master's degree in history, or in physics, or in biology, and if the student takes the requisite professional education courses he/she will be recommended for the Class B certificate in the teaching field. UAH requires approximately 24 semester hours of course work in the academic area and approximately 12 semester hours in professional education courses. At AAMU the requirement is essentially reversed: approximately 12 semester hours in an academic education area and approximately 24 semester hours of professional education courses. Egbert (3/27/91) 25–26, 68.

b. Business

1694. Graduate courses in business were offered in cooperation with the Redstone Arsenal at UAH beginning in 1955. Owens (3/26/91) 47; UASX 812, p. 47; 85 UASX 516(B), p. 2; 516(F); 548, Oct. 14, 1959 Minutes; UASX 551.

1695. UAH established a Master of Administrative Science degree in 1970. A Bachelors of Arts in Economics was authorized in 1969 and a Bachelors of Science in Business Administration degree in 1971. These degrees in Business were among the first degrees offered by UAH. 85 UASX 673, p. 4; 519(A), p. 1.

1696. In 1961–62, the Huntsville Center offered undergraduate courses in accounting, business law, business statistics, eco-

nomics, finance, management, and marketing. 85 UASX 516(I).

1697. In 1961–62, AAMU did not have a business administration curriculum, and its offerings in business were limited to courses which were a part of curricula in business education leading to a teaching certificate and in secretarial science. 85 AAMUX 83.

1698. During the late 1950's and early 1960's, NASA and Army officials at Redstone Arsenal requested that the Huntsville Center develop expanded offerings in administration and management on the graduate level and, eventually, a master's degree program, in order to meet the needs of their scientific and technical personnel functioning in management roles. (85 UASX 536; 539; 543, 548: Sep. 30, 1959 Minutes, Oct. 14, 1959.

1699. On June 11, 1962, William R. Lucas, Chairman of the Joint Graduate Study Steering Committee, stated what were then the goals of the federal government with regard to the expansion of the UA program in Huntsville. Among other things, he mentioned that the federal government would like for UA to place more full-time, resident UA professors at Huntsville, expand the library in Huntsville, and expand the management programs offered in Huntsville. Dr. Lucas stated that a goal of the federal government was to, "[e]ncourage the Department of Public Administration to continue its favorable effort to provide graduate training in management oriented courses to engineers and others who have no, or few, undergraduate courses in the department. Press this effort until a full graduate program is established. Consider the vast potential for management training in the Huntsville area." 85 UASX 536.

1700. On October 1, 1962, Dean J.R. Morton at UA had a discussion with the Joint Graduate Study Steering Committee. At that time the importance of developing appropriate services in public administration and management in Huntsville was recognized. 85 UASX 539.

1701. In the management area, federal officials were looking to turn their engineers and scientists into managers. The federal agencies were primarily concerned with upgrading the management skills of the managers that they already had, many of whom were engineers and scientists by academic preparation. The federal agencies were not concerned about developing an MBA or related type of academic program. Dowdy (7/30/85) 6919–20.

1702. Steps leading to the establishment of a graduate program in administrative science were initiated at UAH in 1966. 85 UASX 511(B) I–4.

1703. Dr. Donald Smithburg was hired by UAH in 1968 to develop a graduate program in administration and management. Smithburg (7/25/85) 6056.

1704. After further discussions with federal agency representatives, Dr. Smithburg developed a master of science program in administrative science (MAS), which was proposed and approved by the UAH administration in 1970. UAH awarded its first masters degrees in administrative science in 1971. Smithburg (7/25/85) 6057–59, 6065–66, 6069; Dowdle (8/1/85) 7345–46; 85 UASX 583; 673.

1705. AAMU established a master's level business administration program (M.B.A.) in 1970 and awarded its first degrees under that program between July 1, 1972 and June 30, 1973. 85 AAMUX 126, p. 76; 684, p. 1; 685, p. 4.

1706. The Florida Institute of Technology (FIT), a non-state institution, opened a Graduate Center on Redstone Arsenal, Huntsville, Alabama, in 1976. SOF ¶ 472.

1707. Since it first began operation, FIT has functioned under agreements with the U.S. Army Missile Command. By the terms of these agreements FIT has been given rent-free use of Army facilities on the Arsenal for use as a Graduate Center, it has provided graduate programs in business and management, and the Army has paid the tuition costs of military personnel who enroll at the Center. 85 UASX 1110, 4–7, 11, 14–19.

1708. Enrollment at the FIT Redstone Arsenal Graduate Center began with about 30 students in the summer of 1976, exceed-

ed 200 students in 1982, and by the Fall quarter of 1990 increased to over 300 students. 85 UASX 1110, p. 49; 85 UASX 674; UASX 761, p. 20 and Ex. 8; Owens (3/26/91) 54.

1709. Southeastern Institute of Technology (SIT) began operations in Huntsville in 1976 as a private institute offering professional master's and doctoral programs. 85 UASX 1109, pp. 13–14.

1710. SIT offers, and has offered since the time it opened, a variety of master's degree programs in business and management. 85 UASX 1109, pp. 15, 17, 21, 68, 73–74.

1711. SIT enrolled 40 students in its business and management programs in 1976–77, the first year of operation. Business and management enrollment since then has shown a general overall increase, with nearly 70 students enrolled in such programs for Fall 1990. 85 UASX 672; 85 UASX 1109, p. 36.

1712. During the period from 1974 to 1976, AAMU reported a substantial white enrollment in its MBA program. During the period 1976 to 1978, AAMU reported the beginning of a decline in the enrollment of white students in its MBA program, a decline which is reported to have continued into the 1980's with a dramatic drop from 1980 to 1982. Ayteh (7/10/85) 1887; Rice (7/15/85) 2651–53; 85 UAS 667(A)–(D); SOF ¶ 473.

1713. UAH experienced a growth in enrollment in its master's program in administrative science from 1971, when degrees were first awarded until 1978. Beginning in 1978, enrollment in the UAH master's administrative science program experienced a decline which continued into the mid 1980's. Since that time enrollment in the graduate administrative science master's program has shown some increase, though Fall term enrollment for 1989 was still less than it was in 1978. Billings (7/30/85) 6822; AAMUX 204; 85 UASX 689; 509(B), p. 75; UASX 563, pp. 71, 73; 949, pp. 61, 63.

1714. The decline in white or predominantly white student enrollment in the graduate business or management programs at AAMU and UAH beginning in the late 1970's was paralleled by a increase in white enrollment in the graduate business programs at the FIT Redstone Arsenal Graduate Center and at SIT. 85 UASX 580(A); 689.

1715. The loss of white enrollment by AAMU in its graduate business program may be attributable to the growth of the graduate business programs at the FIT Redstone Arsenal Graduate Center and, to a lesser extent, that of SIT. (85 UASX 692; 1109, pp. 42–43; 1113, pp. 126–128, 130–131.

1716. In 1981 or 1982, officials at AAMU communicated to the Army a concern that the FIT program at the Redstone Arsenal was drawing potential students away from the AAMU graduate business program. 85 UASX 1110, pp. 63–67.

1717. The former Dean of the School of Business at AAMU identified FIT, Calhoun Community College, and Athens State College as the chief competitors to his business program. He specifically attributed to FIT much of the decline in the white enrollment in his MBA program. 85 UASX 1113, pp. 126–131.

1718. When viewed from the standpoint of curriculum, the UAH and AAMU graduate business/management programs are very different.[145] Owens (7/30/85) 6637–6641.

1719. AAMU is endeavoring to conform the curriculum of its business programs and school to the standards of the American Assembly of Collegiate Schools of Business. Owens (3/26/91) 13; Watkins (7/1/85) 264.

1720. UAH is endeavoring to conform the curriculum of its business/management programs and college to the standards of the American Assembly of Collegiate Schools of Business. Owens (3/26/91) 13.

---

**145.** In 1989, UAH changed the name of its graduate management decree [from a Master's in Administrative Science degree] to a Master's of Science in Management. However, no curricular changes were made in this degree program at that time. SOF ¶ 475.

1721. The American Assembly of Collegiate Schools of Business (AACSB), the national accrediting body for business and management programs, classifies an MBA program such as the one at AAMU as substantially different from a master's degree in management such as the one at UAH. Owens (3/26/91) 25–26.

1722. The AACSB requires that an MBA program be "broad in nature and aimed at general competence for overall management" and that any specialization be limited in credit hours. UASX 770 33.

1723. Alabama A & M's MBA program is one of breadth, consistent with the AACSB standards. The basic, core curriculum includes one course in 9 different topical areas plus the capstone course. A specialization is not required and is not taken by most students. A student who opts for a specialization must take 12 hours of course work beyond that otherwise required for the degree. All specialties are in traditional business areas and are taught within the business school. Owens (3/26/91) 26–27, 124; UASX 524, pp. 89–92 AAMU 127, pp. 76–82.

1724. The AAMU degree is a "generalists" program and is not intended to give a concentration or specialty in any one area. 85 UASX 1113, pp. 62–63.

1725. The specialized structure and technical nature of the UAH MAS program is consistent with AACSB standards for non-MBA programs. UASX 770, p. 33.

1726. "The Master of Science in Management (MSM) degree is a unique specialized management program, especially designed for the management of technology, including the special needs of the Huntsville community." UASX 879, p. 96.

1727. The UAH MAS program has a basic curriculum which focuses on the quantitative and human aspects of organizational problem solving. A specialization is mandatory and may be taken in accounting, management, management information systems, or project management. Owens (3/26/91) 28; UASX 879, pp. 96–97.

1728. The UAH MSM program could under no circumstances qualify for AACSB accreditation as an MBA program. Owens (7/30/85) 6673.

1729. The curricula of the MBA program at AAMU and the MSM program at UAH are significantly different in structure and in content and reflect significantly different educational objectives.

1730. Even when the optional areas of concentration in the AAMU MBA are considered, the UAH and AAMU graduate business/management programs are different. For example, the UAH MSM degree with an option in accounting is designed to train managerial accountants, that is, managers who can use accounting as a tool in decision-making. At AAMU, the MBA with an accounting concentration is designed to train a professional accountant, that is, one who would aspire to function as a CPA in the corporate world or in public accounting. Similarly, the UAH MSM with a management option is oriented toward technology management, whereas the AAMU MBA with a management concentration has a behavioral science orientation and emphasizes human resource management. Owens (3/26/91) 30–31, 113, 115.

1731. The MBA and the MSM degrees are sufficiently different that some institutions offer both of them as part of their graduate program in business/management. Owens (3/26/91) 31–32.

1732. There are major differences in the business offerings at the undergraduate level as well.

1733. Several undergraduate business programs are available exclusively at one of these two institutions, such as, for example, general business, office systems management, and logistics at AAMU, management of information systems and procurement management at UAH. UASX 879, pp. 89–94; 522, p. 227; 85 UASX 1102, 44–45.

1734. In most instances in which a business major is available at both institutions, significant differences in curricular design serve to distinguish the program. For example, in the marketing areas, the emphasis at UAH is on marketing research and at AAMU it is on marketing management. In

accounting, UAH emphasizes managerial accounting while AAMU emphasizes public accounting. 85 UASX 1102, p. 45; 1113, pp. 123–124.

1735. UAH has an upper division entry requirement for students in the undergraduate business administration program which includes a bibliographic component, a communications component (Basic Speech Communication), and a mathematics component including calculus, in addition to a requirement of completion of certain pre-business administration courses. AAMU does not have corresponding requirements. UASX 879, pp. 86–87; 522, pp. 235–57; 515, pp. 89–91.

1736. The business/management programs at UAH are designed primarily to serve industrial organizations and high technology firms, whereas the AAMU program is more oriented toward financial, retail merchandising, and service organizations. 85 UASX 1102, pp. 42–43, 54–56.

### 2. Athens State College, Calhoun State Community College and Alabama A & M University

#### i. *Institutional Profile*

##### a. *Calhoun State Community College*

1737. Calhoun State Community College ("CSCC") is a two year institution located in Decatur, Alabama, approximately 28 miles from AAMU SOF ¶ 46. It is operated by the State Board of Education and offers those courses typically associated with the first and second year college. Id ¶ 42. CSCC also offers a diverse range of college courses in the Huntsville area at a "campus" situated in a commercial shopping mall in the relative vicinity of Alabama A & M. Id ¶ 46.

1738. As of 1985, the following was true: the typical student at Calhoun is 30 years of age or older. He or she is frequently a person who is married with a family, employed, and in need of educational services to obtain a better job or position. The student is frequently employed full or part-time, and therefore in order to be able to obtain an education the person must be able to attend during non-working hours. In many cases, unless the em-ployed individual can attend at night, an education is simply inaccessible. SOF ¶ 893.

1739. CSCC has an open admissions policy and offers the Associate's of Science Degree.

#### b. *Athens State College*

1740. ASC provides college instruction at the junior and senior levels only. It has no first professional schools or master's level programs. The admission standards at ASC are such that a person in good standing with at least 96 quarter hours of college work with a "C" average is admitted. Bartlett (7/18/85) 3513. ASC recruits its students almost exclusively from the state's junior and technical colleges, it does not recruit from high schools.

1741. ASC is located in Athens, Alabama approximately thirty miles from AAMU. SOF ¶ 46. The college also offers courses at the military bases at Redstone Arsenal in Huntsville. Id. ¶ 42. In 1981, the Legislature placed ASC and CSCC under a single administration with the President of CSCC being also the President of ASC. Id. ¶ 45. There are approximately 2500 students who attend ASC. SBEX 7.

1742. For the Fall Quarter 1989, 13.6% of the students enrolled at ASC were 21 years of age or younger. Seventy percent of the students at the college were age 25 or older. SBEX 7; 8. For the school year 1989–90, 59% of the students attended the institution on a part time basis. SBEX 14.

#### ii. *Program Comparison*

##### a. *Calhoun State Community College*

1743. At the outset, the Court finds it rather odd that a state community college would find a need to establish a branch campus in the same town with two state supported public senior institutions.

1744. The offerings of CSCC in Huntsville include a considerable number of business courses. In the Summer Quarter of 1990, 22 business courses were offered at the "Mall." For the Fall Quarter 1989, there were 549 students in business courses at that location. UASX 792, 793.

1745. These courses attract large numbers of white students. While the course are offered at non-traditional times usually after 5:30 pm., and attract non-traditional students, the Court cannot conclude that such course offerings do not hinder the desegregation of AAMU's undergraduate student body by unnecessarily duplicating high demand business programs.

1746. The consent decree recently entered into between the Government and CSCC does not address this duplication. While the decree provides that AAMU shall have made available to it at Calhoun's "Mall" campus four classrooms wherein it may offer instruction, and office space so that it can conduct recruitment activities, no effort is directed at addressing the issue of program duplication in the area of business.

1747. The Court is sensitive to the need for adequate business offerings in Huntsville. Many of the business courses must be available at non-traditional times so that working students can attend. Neither AAMU nor UAH offer business courses at the same time as Calhoun State and consequently the Court will not order Calhoun's business programs transferred or closed. Rather, the Court will, within the framework of the consent decree already agreed to, order Calhoun, the SBE—the governing board of CSCC—and Alabama A & M University to convene the Consent Decree Monitoring Committee and discuss the problem of business program duplication and thereafter make a recommendation to the Court concerning the situation.[146]

1748. The Court would suggest that the discussions and recommendations center on establishing additional cooperative programs between AAMU and CSCC in the area of business education so that both institutions might benefit from their close proximity. The suggestions offered to the Court must be substantive and not merely cosmetic.

### b. Athens State College

1749. The Court has carefully considered the issue of program duplication between ASC and AAMU. The Court finds that the distance between these institutions and the difference in the students who attend the two institutions does not merit a finding that the undergraduate business and education programs at ASC unnecessarily duplicate those at AAMU. The mission of the two institutions is just too dissimilar.

1750. Under the terms of the consent decree between ASC and the Government, AAMU has received classroom space at Athens State to conduct graduate teacher education programs leading to a Masters in Education Degree. These programs are eventually be offered jointly. Such joint program offerings go long a way towards accommodating the need of the state for adequately educated individuals and also assist in meeting the duty to desegregate.

### 3. Alabama State University and Auburn University at Montgomery

#### i. *Institutional Comparison Between ASU and AUM*

1751. AUM is primarily a non-residential, commuter institutions. SOF ¶ 608. Approximately 80 to 85 percent of AUM's students work either full time or part time. *Id.* ¶ 600. Classes are scheduled at AUM so as to accommodate the institution's commuter students, who make up about 90 percent of the university's enrollment. Classes run from 8:00 a.m. to 10:00 p.m. Monday through Thursday. The class schedules are arranged so that commuter students can take a full load while making

---

**146.** As a defense to the claim of program duplication, CSCC re-offered the 1985 testimony of Ms. Jean Jacobs. Ms. Jacobs, an employee of CSCC and apparently a recent recipient of a Ph.D., performed a purported analysis of program duplication between Alabama A & M and CSCC's Huntsville branch campus for the 1985 trial. Calhoun's attempt to use Dr. Jacobs' testimony as a defense to claims of program duplication is without merit.

The cross examination of Dr. Jacobs revealed that she had never before done a program duplication analysis. Moreover, it was shown that her methodology consisted of reviewing the course descriptions contained in AAMU's and CSCC's academic catalogs, and based on these description drawing conclusions concerning alleged program duplication. Jacobs (7/17/85) 3463–3466.

only two trips a week to the campus. Dunlavy (2/25/91) 32–33.

1752. Approximately 30% of AUM's students attend class in the evening only. Dunlavy (2/25/91) 48. For Fall Quarter 1990, 1,535 out of 4,761 AUM students (24%) were classified as night students. Except for education and nursing, all degrees available at AUM can be achieved by attending only evening classes. Most of the university's graduate degree programs offer coursework at night only. *Id.* at 61.

1753. The academic preparation level of AUM students, on the average, is substantially higher than that of ASU students, on the average. For the fall 1989 entering freshmen class at AUM, the mean composite ACT score was 18.7; at ASU it was 11.8. KX 1902; 1936. A large majority of AUM students score above 14 on the ACT, while the same proportion of ASU students score below 14. AUX 215, figure 7b.

1754. Unlike AUM, ASU has an extensive remedial program in place designed to assist student who have educationally disadvantaged backgrounds and need special assistance to improve their academic skills.

1755. In contrast to AUM, ASU is primarily a residential institution. Steptoe (1/29/91) 23. "Residential life" is viewed as one of the university's major commitments. SOF ¶ 610. Alabama State has between 1,800 and 1,900 students living in on-campus dormitories and demand for campus housing is substantial.

1756. ASU's students are primarily traditional college age students. While ASU offers courses from 8:00 a.m. until 10:00 p.m., students can earn degrees in only six areas by attending evening or weekend classes. SOF ¶ 835.

1757. ASU draws its students from throughout the state and does not rely primarily on Montgomery and surrounding counties. The opposite holds true for AUM whose enrollment is almost exclusively draw from Montgomery and surrounding counties.

ii. *Program Comparison*

1758. Both AUM and ASU have extensive programs in business and education.

Generally, these programs duplicate each other. Insufficient evidence was introduced to allow the Court to make the detailed program comparisons which were possible between AAMU and UAH. The evidence is sufficient however, for the Court to find that the programs in education and business are sufficiently similar so that it has a negative impact on the ability of ASU to desegregate. Conversely, however, the duplication also enables AUM to maintain the high enrollment of black students at its institution. The Court would work a great disservice on the State of Alabama were it to prohibit AUM or ASU from offering either or both of the programs under consideration. The burden to desegregate cannot fall unfairly on one particular race. To eliminate a high demand program at AUM in the expectation that ASU's white student enrollment would increase might very well have a segregative effect on AUM without the corresponding benefit to ASU. Particularly so, given the significant differences in the level of academic preparation between the student bodies of AAMU and ASU.

1759. The Court has already noted that Alabama has legitimate non-racial motives for maintaining multiple offerings of educational and business courses throughout the state. This would be particularly true in Montgomery where there is burgeoning high-tech industry and, of course, state government. This does not completely counterbalance the negative impact which unrestrained program duplication produces in the Montgomery area.

1760. As part of its remedial decree, the Court will direct that a Committee on Cooperation be formed in the Montgomery area consisting of representatives of ASU's Board of Trustees, the Governor's Office, ACHE and AU/AUM's Board of Trustees. This committee will be charged with examining the issue of program duplication between ASU and AUM in the area of business and education. The committee will be charged with making a recommendation to the Court concerning the aforementioned issue. The committee should focus on es-

tablishing cooperative programs in these two areas so that each institution might benefit from the proximity of the other. The Court expects the recommendations of the committee to be substantive and not merely cosmetic. Anything less, will require the Court to assume the lead and devise a plan which may not suit either party.

4. Troy State University at Montgomery and Alabama State University

1761. The issue of duplication between TSUM and ASU has largely been rendered moot by the consent decree executed by TSU and the United States. In the decree, TSUM agrees to discontinue, among other programs, its undergraduate courses in education by September 1, 1994. At the graduate education level, TSUM will no longer offer Early Childhood Education; High School Education; or School Administration. Additionally, undergraduate business administration courses will be limited by TSUM to offering the required management courses listed for this concentration only at Maxwell/Gunter Air Force Base and TSUM will not allow more than a 20% civilian enrollment in its business administration courses with a management concentration.

1762. Moreover, those courses which TSUM now offers only on the Air Force Base shall not be offered at any location in Montgomery other than the base. Finally, under the terms of the consent decree between TSUM and the federal government, TSUM is to develop joint graduate programs with ASU.

*E. ACHE And New Program Approval*

1763. Clearly, the location of unduplicated high demand programs has a definite impact on the enrollment of other race individuals at an otherwise racially identifiable institution. The location of such programs at the state's HBUs should materially assist their desegregation. Likewise, the continued placement of high demand programs at the predominately white institutions in close proximity to the predominately black institutions has a restricting influence on the latter's ability to attract white students and to meet their constitutional duty to desegregate.

1764. In its remedial decree, the Court will direct that ACHE give the HBUs preference in the establishment of high demand programs in either Montgomery or Huntsville. Of course, ASU or AAMU must be able to meet the demands of the programs. ACHE need not modify its program approval procedures, but the Court is firm in its requirement that ACHE provide the necessary leadership in this regard. To this end, the Court will require that all new academic programs in the Huntsville or Montgomery area, approved for implementation by ACHE receive Court approval. The Court believes that this oversight is important to ensure the desegregation of the state's predominately black institutions. The Court does not plan to micro-manage ACHE's program approval procedures, only to ensure that program allocation does not impermissibly encourage or continue an institution's racial identity.

### THE RACIAL CLIMATE ON THE HWU'S

1765. The Court heard considerable testimony from African–American students who attend many of the state's predominately white institutions concerning the racial climate on the campuses. Substantially all of the evidence introduced was anecdotal in nature and a large measure of it dealt with problems involving the racial composition of fraternities and sororities.

1766. Virtually all fraternities and sororities on state campuses in Alabama are racially segregated. Seldom do students attempt to join "Greek" organizations predominated by individuals of a different racial background than their own. This self selection occurs despite the universal requirement that all organizations on state campuses, including "Greek" organization, be operated in a non-discriminatory manner. There is insufficient evidence to compel a finding that the universities and colleges in Alabama are allowing their fraternities or sororities to be operated discriminatorily.

1767. Undoubtedly there are many incidents which occur on university and college campuses in Alabama that do not portray a picture of racial harmony and tolerance. The racial insensitivity of the Kappa Alpha fraternity as exhibited by its odious display of a large Confederate battle flag and black statuette in servile pose does not project the sort of image which a university is desirous of cultivating. Neither does the booing of a newly chosen black homecoming queen by a large football crowd bode well for a university's prestige.

1768. These events, and events like them, are the legacy of bigotry. They surely dismay and supremely embarrass most of a university's faculty, staff, students and administrators. The record is replete with examples of state institutions confronting head on this unfortunate legacy through symposia, student activities and services and university sponsored commemorations of the Civil Rights Movement and its leaders. There is no credible evidence that any institution in Alabama is fostering through official or unofficial policy a racially inhospitable climate on its campus or denying black students full participation in all campus activities.

## MULTICULTURALISM AND THE UNIVERSITY

1769. Multiculturalism is the latest shibboleth in Academy. Throughout the country, proponents and opponents alike are engaged in a sustained debate about the benefits and disadvantages of introducing multiculturalism into the curriculum and environment of the university. Dr. James Blackwell a sociologist and expert witness for the Knight Plaintiffs testified extensively about the current debate and the meaning of that debate in the context of Southern history and the educational enterprise. His remarks are worth quoting at some length since they so directly set forth the views of those in favor of multiculturalism.

Q. Now, if I understand multi culturalism ... it is a movement to move away from Eurocentrism in the entire environment on the campus, is that correct?

A. That is one part. That's a major part, a move away from a Eurocentric interpretation or environment and move into an environment that reflects diversity. When I say that is part of it, the argument that people make with multi culturalism also includes a desire to be included, to recognize a change in demographics within the United States, so their colleges and universities reflect contemporary reality, that is saying the reality of the fact that this country, this state[,] ... have increasingly larger numbers of other groups of people in them. [T]he [S]tate of Alabama has more blacks than it does any other [minority] group. But to recognize that change and to let [the] manifestation of that demographic reality be present on the campuses of the traditional white institutions and let [it] be reflected in the programmatic development of those institutions, let it be reflected in the programmatic development of the historically black institutions so that all these institutions have a truly multi cultural environment reflecting the change in demographic patterns and the contributions of all these diverse groups of people to the United States. Alabama was not built solely on the shoulders of white people, there were many black people who helped build Alabama and one has to recognize that fact and let those people be proud of the contributions that they have made....

Q. [W]hat is the relationship between the Eurocentrism that is challenged in the multi culturalism movement today and ... the southern system of white supremacy that reigned for so many decades?

A. Well, the challenge is fundamentally the same, we're projecting the status quo, protecting life as it really is in terms of the pattern of black white relationships. The reason why ... may people are challenging the Eurocentric model is to eliminate these notions of supremacy, ... or eliminate what I, in sociology, refer to as ... the domination of one culture over another to the expectation

that all groups must conform to [the dominate culture].

. . . .

Blackwell (2/5/91) 331–32.

1770. According to the Knight Plaintiffs:

> One of the central objectives of the national movement towards multiculturalism on college campuses [is] the inclusion of African–American studies in the core curriculum. Until this is done, the curriculum will continue to send the message that African–American history, culture and experience are not central to the mission of the university.

Knight Plaintiffs' Proposed Findings of Fact ¶ 507, pp. 359–60.

1771. The Court heard extensive testimony concerning the structure and content of the core curriculum. Without doubt, the African American experience is not widely disseminated to students through the core curriculum at the predominately white institutions. This lack of centrality does not mean, of course, that the HWUs are devoid of black studies or that the black experience is completely neglected. It is not.

1772. The Knight Plaintiffs have invited this Court to join the foray of the national debate on multiculturalism and use the arguments of the debate to find that the predominately white schools of the state are illegal bastions of Eurocentrism perpetuating vestiges of segregation. The Court will decline the invitation.

1773. According to the private Plaintiffs, Eurocentrism is manifested in Alabama by the existence of "white educational institutions" under the predominate control of Caucasians whose unyielding western propensity towards curriculum and ideology inculcates notions of racial superiority among whites. More to the point, the Knight Plaintiffs propose that the Court compel the state's majority white institutions to develop "genuinely multicultural environments on ... their campuses" wherein the institutions reflect the cultural diversity of the state in their employment of black professionals and in their curricula offerings.

1774. The Court has gone to great length to examine the complex issues before it with the dispassionate objectivity which the law requires, unswayed by the popularity or disrepute of any particular epistemology. The debate on the value and worthiness of multiculturalism is raging. Valid points are raised on all sides. This country's legal, governmental and political traditions are unmistakably European. Its people though are an admixture of all cultures and all races. Diversity is the life blood that courses through the American vein and our educational institutions must appreciate and account for this. Whether the state's predominately white institutions will adopt the views of Dr. Blackwell and those of his ilk should ultimately be decided on the forge of academic debate, not in the adversarial setting of the courtroom. The doctrines of multiculturalism while worthy of serious discussion, are not, though, appropriate theories of liability nor do they provide a *judicial* blueprint for eliminating surviving vestiges of discrimination.

1775. Curricula design has historically been left to the university. One of the central tenets of academic freedom is the right to decide matters of course content. Such freedom is essential to guarantee the unimpeded exchange of ideas. It is not the duty of a federal court to dictate to a university the content of its curriculum; such decisions belong to the institution's faculty in the absence of a constitutional violation.

### THE BOARDS OF TRUSTEES

#### A. Powers Given the Boards of Trustees

1776. The following powers, among others, are within the province of the individual boards of the institutions in the state:

A. To hire and fire faculty and staff;

B. To establish, raise and reduce salaries for faculty and staff;

C. To institute, regulate, alter, or modify the government of the university;

D. To prescribe courses of instruction;

E. To establish tuition and fees rates; and,

**1334**

F. To confer degrees.

SOF ¶ 191.

*B. Plaintiffs' Allegations*

1777. The United States and Knight Plaintiffs challenge the racial composition of the boards of trustees for the various public four year colleges and the racial makeup of the State Board of Education in its function as the board of trustees for Athens State College and Calhoun State Community College.

1778. In the Government's complaint, it states that the "Defendants have discriminatorily denied black persons positions on governing boards of traditionally white institutions.... These practices have the effect of impeding the desegregation of the institutions." Complaint, p. 12.

1779. All the Government cites in support of its claim are the following stipulations of fact agreed to by all the parties before the start of trial: [147]

a. Auburn University's Board of Trustees consists of ten members appointed by the Governor with the advice and consent of the State Senate, plus the State Superintendent of Education and the Governor as *ex officio* members as well as non-voting student members from AU and AUM. Currently, one AU Board member is black. SOF ¶ 13. The first and only black person to serve on the AU board was appointed by the Governor in 1985. SOF ¶ 84.

b. The Board of Trustees of TSU consists of nine members appointed by the Governor with the advice and consent of the State Senate, plus the State Superintendent of Education and the Governor, who are *ex officio* members as well as one nonvoting student member. Ala.Code § 16-56-1 *et seq.* (1975). The TSU board has no black members, nor has a black ever

been asked to serve on the TSU board. SOF ¶ 14, 86.

c. The Board of Trustees of the University of Alabama is composed of 15 members. The Governor and State Superintendent of Education are *ex officio* members. Three non-voting students are permitted to attend the Board meetings and are considered student representatives, not Board members. Currently, 12 members of the Board are white and 3 members are black. The UA board has never had more than three black members. SOF ¶ 15, 91.

d. No black person served on the State Board of Education from Reconstruction until a federal court in 1986 ordered its members to be elected from new single-member districts. Two of the eight current SBE members are black. SOF ¶ 5.

1780. The Knight Plaintiffs contend that the exclusion of African Americans from, or their underrepresentation on, the governing boards of predominately white universities is a manifestation of Alabama's historical policy of preventing black persons from exercising authority or influence over the education of white persons.

1781. No evidence was proffered that any individual was denied membership on one of the state's boards of trustees on account of race.

1782. The boards are either constitutionally created as in the case of UA and AU [148] or statutorily mandated as with the remaining institutions.[149] In general the governor appoints members to the various boards—the exception being the University of Alabama—with the advice and consent of the senate. The governor is also an *ex officio* member of all boards of trustees.

1783. The following table shows the total number of board members at each of

---

**147.** More than 90 percent of the Government's proposed findings of fact in this case consist of nothing more than a recasting and reorganization of the agreed upon stipulations of fact. The efforts of the Government in this regard are disappointing and its work product virtually useless to the Court.

**148.** *See* supra ¶¶ 76–87 for a discussion of the facts leading up to the decision to give AU and UA constitutional boards of trustees.

**149.** The following section of the Alabama Code provides for the creation of boards of trustees at the states public four year institutions: USoA (16-55-2); JSU (16-52-3); UNA (16-51-3); UM (16-54-2); TSU (16-56-3); LU (16-53-3); ASU (16-50-1); AAMU (16-49-20).

the public universities and the number of black board members at each particular institution. *Ex officio* board members are excluded

| INSTITUTION | MEMBERS | BLACKS |
|-------------|---------|--------|
| USoA | 15 | 2 |
| JSU | 9 | 2 |
| UNA | 9 | 1 |
| AU | 10 | 1 |
| UM | 11 | 2 |
| TSU | 9 | 0 [150] |
| LU | 13 | 3 |
| ASU | 12 | 9 |
| AAMU | 11 | 7 |
| UA | 15 | 3 |

KX 3648.

■ 1784. The evidence does not warrant a finding that the current composition of the various boards of trustees is a vestige of discrimination or that appointments in the recent past were designed to ensure the racial identifiability of any particular institution or intended to impede the desegregation of any institution.

1785. The Knight Plaintiffs make a compelling argument in favor of their assertion that the small number of black board members at the state's predominately white institutions are a manifestation of a conscious or unconscious attitude among whites Alabamians not to "submit themselves to the authority of African Americans." In some measure, the history which this Court has reviewed substantiates the Plaintiffs position. Yet, on this claim, the Knight Plaintiffs have not established a nexus between that history and the actions of the state with sufficient evidence to warrant a finding of liability.

1786. The Court has already found that the Boards of Trustees for AU and UA were established for nondiscriminatory reasons. The Knight Plaintiffs argue that the formerly all white teachers colleges were given separate boards based on the recommendation of Governor John Patterson in 1961.[151] The facts show that these colleges (UNA, TSU, JSU and LU) were not given their separate boards until six years later, after they were involved in the *Lee v. Macon* litigation. The Plaintiffs take the position that the request of the governor and the finding of segregation by the three-judge panel in *Lee* are the reasons for the creation of the separate boards. This overlooks that fact that the *Lee* court had already established jurisdiction over those institutions when they were given separate boards. The schools separation from the SBE did not impair the jurisdiction and efforts of the court to enter orders and require actions by those institutions. There are legitimate academic reasons for the state to give its institutions their own boards that have nothing to do with impeding desegregation.

1787. The appointment of board members is essentially a political decision influenced by the expediency of a number of factors unrelated to race. The Court's duty in this case is not to replace political expediency with judicial decision making—except where political forces are operating in contravention of the Constitution or laws of the United States Government.

### TRANSFERS OF ACADEMIC CREDIT BETWEEN JUNIOR AND SENIOR COLLEGES

■ 1788. The Knight Plaintiffs contend that the transfer of academic credits from the public junior, community and technical colleges to the state's senior level institutions is impeded. Consequently, the Knight Plaintiffs dispute the assertion made by some Defendants that the two-year college system provides an alternative means for students to enter the state's senior institutions when they do not meet, or choose not to meet, the ordinary admissions requirements. *See* McClammy (12/12/90) 42–43 (position of the Knight Plaintiffs articulated). On the weight of the evidence, the Court finds the Knight Plaintiffs' position unsubstantiated.

**150.** The consent decree between the Government and TSU requires the university to increase its efforts to see that blacks are appoint to the Board in the future. The Court expects TSU to apply itself with diligence in this matter.

**151.** *See* supra ¶¶ 399–405.

1789. Transfers of academic credits between junior colleges and senior level institutions are partly guided by a document commonly referred to as the Alabama College System Course Directory ("course directory").[152] KX 3564. This document is an inventory of the courses offered at the junior and community colleges throughout the state. The course directory also purports to indicate the extent to which a university within the state will accept for credit a course completed at a two-year institution. McClammy (12/12/90) 25–27. Of course, the determination of how credits are awarded by a particular senior institution is entirely discretionary with the university. *Id.* at 47.

1790. The purpose of the course directory is to assist counselors at the two-year colleges to aid students who ultimately plan to enroll in a four-year state institution to plan their education in a manner which will result in the smallest loss of credit upon transfer. McClammy (12/12/90) 46.

1791. The common course directory is the result of an "articulation agreement" between the senior level institutions and the community and junior college system. This articulation agreement identifies various courses offered by community and junior colleges which transfer automatically to the four-year institutions. McClammy (12/12/90) 19. In order to be included within the articulation agreement, a junior or community college must be accredited through the Commission on Colleges by the Southern Association of Colleges and Schools ("SACS"). *Id.* at 18–19. This accreditation is limited for those institutions whose primary purpose is to prepare students to receive an associate's degree and then transfer to a four-year institution.[153] *Ibid.*

1792. Technical colleges on the other hand, receive a different form of SACS accreditation and no statewide articulation agreement for the transfer of credit exists with them since their primary mission is the training of individuals for skilled labor positions as opposed to academic work tending ultimately to lead to a baccalaureate decree.

1793. According to the Knight Plaintiffs since by far the largest percentage of African–American students in the two-year system are enrolled in the state's technical colleges, the failure of the senior institutions to have articulation agreements with technical colleges negates any claim that the two-year system operates as a conduit for black high school graduates to enroll in the largest HWUs due to the loss of credit upon transfer. McClammy (12/12/90) 43.

1794. In a literal sense the Knight Plaintiffs are absolutely correct. Those students who choose to attend technical schools face the greatest loss of credits if they later seek to enroll in a four-year institution. The loss of credit, however, has nothing to do with the fact that black students populate the technical colleges in substantially larger numbers than the junior colleges. The loss is due wholly to the difference in academic mission between the technical and junior college curriculum.

1795. The extent to which the two-year college system provides a route of entry into the senior institutions was never established. It is safe to assume, however, that transfer of enrollment to the University of Alabama system or Auburn University is not substantial in comparison to regular admissions, and it is certainly not a major vehicle for black enrollment at these institutions.

### *TECHNACENTER*

1796. The Alabama TechnaCenter is a commercial high-technology research park in Montgomery. AUM officials originated

**152.** Community colleges include academic courses usually associated with junior colleges, and technical courses commonly offered at technical colleges. To the extent a community college embraces a junior college curriculum it is included in the course directory.

**153.** The two-year colleges have proposed to the four-year universities that they generally accept a two-year college student as a junior when the student transfers after having received an Associate's Decree. This proposal was presented to the Council of Presidents and is still under study. Kennedy (1/7/91) 91–93.

the concept of a research park in Montgomery many years ago, but the idea never came to fruition until the United States Air Force decided to privatize work on development of software and information systems as part of its "Modernization Plan for Standard Air Force Information Systems on Phase IV Base–Level Computers" (Phase IV) at Gunter Air Force Base. Gunter Air Force Base, near Montgomery, is now the center for the Air Force's computer operations. AUX 654, p. 1.

1797. Privatization meant that substantial federal contracts would be let at Gunter and private companies would position themselves to acquire this work. AUX 654, p. 3. If the work required by these contracts could be done by firms in the Montgomery area, the result would be a major boom to the local economy. Steptoe (1/29/91) 62–63. It has been projected that the value of the computer related work to be done at Gunter is in the three to five billion dollar range over the next five years. The impact could create as many as twenty thousand technical jobs. *Ibid.*

1798. During 1983, officials at AUM were able to interest Mr. Bowen Ballard, a private real estate developer and member of AUM's Advisory Board, in the concept of a high-technology research park. Ballard (2/6/91) 8–11; AUX 654, p. 1. AUM maintains a close connection with the Montgomery community through its Advisory Board. Mr. Ballard is heavily involved in land development in east Montgomery where AUM is located. Ballard (2/6/91) 5–6.

1799. Mr. Ballard and the AUM officials were interested in developing something like the Golden Triangle Research Park in Montgomery. During 1983, Ballard visited the Golden Triangle Research Park in North Carolina with officials from AUM. Ballard (2/6/91) 11.

1800. For the next five years, very little happened regarding the research park. No one could determine what would entice a major company to locate a large operation in Montgomery.

1801. The next big development regarding the research park occurred during 1987 and 1988 when the expansion of the Air Force's operations at Gunter Air Force Base received media attention. Gunter's mission was to be in computers and information systems for the Air Force. Ballard (2/6/91) 23–24, 33; AUX 654, pp. 2–3. Moreover, as a cost saving measure, the Air Force decided to privatize information systems and software development on Phase IV. Since this work would not be done "in house," Gunter would be the point where substantial federal contracts would be entered for computer programming, research, development and modernization.

1802. Having been an Air Force Reservist for some 20 years, Ballard was in a position to better understand what the contracts at Gunter were really about and how the various Air Force installations work with one another. Ballard (2/6/91) 71. Ballard realized that the high-tech activities at Gunter would provide the catalyst for a research park in Montgomery. When private firms were awarded contracts to do Phase IV work, something needed to be done to entice those firms to do this work in Montgomery instead of elsewhere. Ballard and AUM officials concluded that Montgomery needed a pool of potential employees who were trained in high-tech skills. With a trained employee base, companies doing high-tech work would be more likely to locate operations in Montgomery.

1803. The Chancellor of AUM assigned Dr. Jim Kenny to work with Ballard and to organize a group to further explore this potential catalyst, including learning more about Gunter's mission and computer related contracts with the Air Force. Ballard (2/6/91) 27. Dr. Kenny, Vice Chancellor for Research and Development at AUM, has served as university liaison to the group developing the Alabama TechnaCenter research park. The group includes representatives from Ballard Realty, the park developer, and Newell Corporation, the land owner. Kenny (2/6/91) 11.

1804. The group involved in the research park concept invited representatives from the City of Montgomery, the Montgomery Area Chamber of Commerce, the State of Alabama and Alabama State Uni-

versity to discuss the concept and to discuss the need for a trained and educated employee base which would be essential to attracting high technology industry to the Montgomery area and to the research park. Coordinating this training and education with the State of Alabama's Industrial Development Training ("AIDT") program became part of the concept.[154]

1805. In addition to a trained employee base, several other ingredients were necessary to entice high-tech industries to Montgomery. Degree programs for their existing employees and college graduates as potential employees are also major motivating factors in a corporation's decision of where to locate operations.

1806. Another necessary ingredient for a successful research park was a large tract of land dedicated as a research park, with the necessary utilities, transportation, zoning and continuity. Ballard (2/6/91) 31. Hence, the next event regarding the Alabama TechnaCenter was the securing of land to create a research park and building the first facility.

1807. On February 2, 1989, application was made to the Montgomery City Council to create a Public Education Building Authority to issue tax-free bonds which could be utilized to finance the first facility in the Alabama TechnaCenter research park. Ballard (2/6/91) 52–53; ASUX 279. On February 7, 1989, the Council unanimously approved a resolution authorizing the formation of the Montgomery Public Educational Building Authority, a political subdivision of the City. ASUX 279. The Authority was authorized to issue tax free municipal bonds in the amount of approximately $2,700,000 to finance construction of the first building in the research park.

1808. The financing arrangement calls for the Authority to issue the bonds, then lease the building to AUM. AUM, in turn, may sublease portions of the building. Two state agencies have already subleased 85% of the building. Ballard (2/6/91) 56–

57, 59; AUX 654, p. 5. The sublessees have the ability to cancel their subleases each year.

1809. Auburn is primarily responsible for lease payments to the Montgomery Public Educational Building Authority for 25 years. The Authority, in turn, will make principal and interest payments on the bonds, so that by the end of twenty-five years, the indebtedness will be retired. Title to this facility will then be vested in Auburn. Ballard (2/6/91) 59–60.

1810. Newell Corporation donated five acres to the Montgomery Public Education Building Authority for the first research park facility. Ballard (2/6/91) 54; see ASUX 116, ¶ 44. Other than this donated parcel, only one lot in this research park has been disposed of by Newell. It was sold to a utility which provides electrical service to the park. Ballard (2/6/91) 63–64.

1811. Auburn has an option to purchase an additional five acres in the research park at $50,000.00 per acre. ASU or any other person or entity who agrees to abide by the covenants and restrictions can purchase land in this research park at that same price.

1812. During 1987, before any actual steps were taken regarding the development of the TechnaCenter, Ballard and AUM officials had discussions with Dr. Leon Howard, President of ASU, and other ASU officials in an attempt to generate interest in the concept. Ballard (2/6/91) 42–43. Discussions with officials from Alabama State University in 1987 also encompassed the notion of keeping graduates of local institutions at home by providing them with excellent job opportunities in the area. Again, in September of 1988, Dr. Kenny and Mr. Ballard went to ASU and met with officials there for the purpose of seeking ASU's participation in the research park project. Kenny (2/6/91) 6–7.

1813. Development of the research park and building the first facility have been no

---

**154.** The State of Alabama through AIDT trains and educates citizens for employment with industries which require employees with particularized skills and which are planning to locate

in Alabama. The goal was to get AIDT to train and educate prospective employees for high-technology jobs created as a result of Phase IV.

secret. It was necessary to obtain approval from the Montgomery City Council and that Council's subordinate agencies through various stages of the research park process and the building of the first facility. Joe Reed, who is the Chairman of the ASU Board of Trustees, is also a member of the Montgomery City Council. The Council unanimously approved formation of the Authority which is involved in financing the first facility. AUX 654, p. 5; Reed (2/12/91) 130.

1814. During 1988, Dr. Kenny proposed to ASU officials that an educational consortium be created among AUM, ASU and TSUM to cooperatively provide educational support services to employees of the Air Force and private contractors who would be working on Phase IV. Kenny (2/6/91) 7–8. Subsequent to several discussions among representatives of ASU, AUM and the Air Force, the Air Force set forth its short-term and long-term educational needs for both military and civilian personnel engaged in Phase IV work in a document entitled "Educational Assessment." AUX 971.

1815. Representatives from AUM, ASU and Auburn traveled to Carnegie Melon University to ascertain whether a cooperative educational program among the local institutions and Carnegie Melon's Software Engineering Institute could be reached. The purpose of this cooperative proposal was to help the local institutions meet the educational and training needs of military and civilian personnel working on Phase IV. Kenny (2/6/91) 70–71.

1816. The Educational Services Consortium's purpose, as proposed in a memorandum of agreement by AUM, was to jointly deliver benefits of higher education to employees working on Phase IV. AUX 971. Among the cooperative aspects of the AUM proposal were joint planning among the institutions and the Air Force, developing joint and individual programs in the computer science, information systems, and mathematics areas, and to jointly explore other high-tech educational needs in the Montgomery area which could be met by ASU, TSUM, AU and AUM. AUX 971;

975. After several meetings among the proposed participants, Auburn submitted a subsequent memorandum of agreement to be entered by the institutions. After review of this proposal, Dr. Roosevelt Steptoe, Vice President for Academic Affairs at ASU, wrote to the Dean of ASU's College of Business Administration stating that there was nothing in the proposed agreement with which he disagreed. The memo states that Auburn's "intent is pure." AUX 976.

1817. The proposed educational consortium has failed to materialize due to a dispute over a proposal by Auburn to offer certain courses in Montgomery. The Air Force requested that Auburn provide certain graduate-level computer science and engineering courses in Montgomery for the benefit of those working on Phase IV. ASU and TSUM objected to Auburn offering the courses requested by the Air Force. Kenny (2/6/91) 61–63. Auburn withdrew its proposal to offer these courses in Montgomery.

1818. The economic development potential of privatization is so great that on October 14, 1988, Governor Hunt, by Executive Order Number 24, declared as policy of the state the provision of "the capabilities, facilities, personnel and equipment to encourage the contractors to locate personnel and facilities" in Alabama. ASUX 252.

1819. To achieve the state's policy, the Governor established the Institute for Advanced Information Systems ("IAIS") and designated a Board of Directors for this Institute. ASUX 252. In November of 1988, Governor Hunt appointed Dr. Roosevelt Steptoe of Alabama State University to the Institute's Board of Directors. Dr. Steptoe was subsequently requested to be a member of the Bylaws Subcommittee of the Institute. The Board of Directors of the Institute has had several meetings discussing topics such as opportunities for IAIS and marketing the Institute's services. The Institute's functions include taking appropriate action to meet needs of employers and employees who are coming to Montgomery to perform Phase IV work. Steptoe (1/29/91) 62.

1820. The Alabama Legislature appropriated $500,000 to the Institute to be used for training and educating employees associated with Phase IV.

1821. There is no evidence to suggest that AUM's involvement in the TechnaCenter project, or ASU's more limited role, came about for reasons having anything to do with race. Nor has anyone's participation in the TechnaCenter's formation or activities been restricted on the basis of race.

### ALABAMA'S SYSTEM OF HIGHER EDUCATION

1822. The non-allied Defendants all argue that there is not a "system" of higher education in Alabama as contemplated by Title VI. The facts belie the Defendants' arguments. To be sure, Alabama's mode of governing higher education is one of the most decentralized in the country. In many ways the state's institutions exercise considerable autonomy. That autonomy does not militate against a determination that a system of higher education exists, but rather, is simply a hallmark of that system. The following facts, many of which are more fully developed in the pages which follow conclusively establish that Alabama does indeed have a "system of higher education."

1823. The Legislature of the State of Alabama has indicated in statutes that there is a system of higher education in the state. For example, the statute creating ACHE provides that all members of the Commission are "charged with the responsibility of serving the best interest of the entire system of higher education in the state." Ala.Code § 16–5–2.

1824. In many of its publications, ACHE has repeatedly discussed the system of public higher education in the State. For example, Planning Document No. 1 repeatedly refers to the system of higher education. USX 2. More recent documents published by ACHE, since the 1985, trial have also referred to the system of public higher education. In the 1986 Annual Report of ACHE, the Executive Director wrote:

In 1986 the Alabama Commission of Higher Education completed the 17th year of its commitment to helping build the most effective, efficient and excellent *system of higher education* possible in Alabama.

AAMUX 939, cover letter (emphasis added). In its 1987 Annual Report, ACHE represented that the state has a system of higher education, when its the Executive Director wrote:

During 1987, the Alabama Commission of Higher Education completed the 18th year of its charge to help build the most effective, efficient and excellent *system of higher education* possible in Alabama.

AAMUX 940, Executive Director's Report (emphasis added).

1825. The Governor appoints members of the *governing boards* of all public institutions of higher education in the state, except for the University of Alabama System. The State Senate must approve all members of those governing boards, including the governing board of UAS. Ala. Const. of 1901, Art. XIV, § 264. The Governor serves as *ex officio* president of every public university's Board of Trustees, as well as of the State Board of Education. The Governor is a member of the Alabama Public School and College Authority, and he appoints most members of ACHE.

1826. The following undisputed facts further demonstrate that there is a system of public higher education in the state:

1827. All new academic programs are submitted to ACHE for approval.

1828. Each public university in the state is dependent on funding from the State and obtains that funding through the same process. It submits a proposed budget to ACHE. ACHE uses the same Regular Academic Program budget formula for each such university and makes a recommendation to the Governor and to the Legislature for a unified budget covering the entire system of public higher education. The Governor then recommends to the Legislature a single budget for the entire system of education in the state and that recommendation is applicable to all public univer-

sities. The Legislature then enacts a budget and the Governor approves a single budget.

c. During the budget process, representatives of each public university appear before the same Legislative Committees.

d. All of the public universities in the state offer teacher education certification programs. Those programs are all reviewed and approved by the State Board of Education and the State Department of Education.

e. All public universities have received funding for facilities through the Alabama Public School and College Authority.

1829. Those elements which compel a finding that a system of higher education exists in Alabama have been set out. The constituent members of that system are as follows: the Governor, as *ex officio* president of the board of trustees for every public university in the state; ACHE; APS-CA; the Chancellor of the State Board of Education in his capacity over CSCC and ASC pursuant to his authority as director of the SBE's Postsecondary Education Department; and each of the four-year institutions named as Defendants in this action.

1830. While there is unmistakably a system of higher education in Alabama, that system is not one in which the Court can or should impose "vicarious liability" upon any one institution because of the failings of another. The system in Alabama is much like a grown family with the head of the family being the state and the bonds that bind being the state's money and control. The Court will not impose on the sister the sins of the brother.

1831. In many respects the expansiveness of the Court's Findings of Fact are dictated by the unique structure of higher education in Alabama. The Court has gone to great effort to individually identify those particular aspects of the system which transgress the laws or Constitution of the United States. It will direct its remedial decree to the elimination of these errors and charge those in control of the errant areas to effectuate the changes necessary to bring the practice or policy into compliance with the law. The Court's mandate at

the remedial stage is to formulate a decree which addresses as narrowly as possible the violations uncovered, but yet is sufficiently encompassing so as to correct the condition that offends the Constitution or federal law.

## COOPERATIVE PROGRAMS BETWEEN THE PROXIMATE INSTITUTIONS

### A. Alabama State University and Auburn University At Montgomery

1832. Since the opening of AUM, there have been numerous discussions between ASU and AUM regarding various proposed joint degree programs and other cooperative efforts. Generally, these cooperative efforts have proved less than satisfying.

1833. In September, 1970, as part of a Montgomery Higher Education Consortium, ASU, AUM and Huntington College—a private school located in Montgomery—agreed to pool the resources of the three institutions to make available "a more complete educational program" for Montgomery, without "the loss or reduction of the autonomy or the individual character" of any of the institutions. The institutions agreed to cooperative efforts in the areas of library use, faculty exchange, sharing of facilities, student interchange, the makeup of the governing body of the consortium and other efforts "to cooperate on various cultural, research and service programs." SOF ¶ 797.

1834. As part of the consortium, it was agreed that students from any of the three institutions would be allowed access to any of the library materials in any of the three libraries, with the parent institution guaranteeing financial responsibility for such student use. SOF ¶ 798.

1835. An ROTC cross-enrollment agreement between AUM and ASU originated in the winter quarter of 1973. This agreement, which is still in effect, allows students enrolled at AUM an opportunity to participate at ASU and receive credit for Air Force ROTC. AUM offers the same privileges and benefits for ASU students interested in receiving credit for Army ROTC. Customarily, the ROTC programs

have held a joint commissioning ceremony. SOF ¶ 799.

1836. On June 23, 1975, Dr. Funderburk of AUM wrote Dr. Watkins of ASU, stating that he had received numerous inquiries concerning the possibility of AUM's providing a Master's Degree Program in Psychology, designed to train students for positions with governmental agencies throughout central Alabama. He invited ASU's participation in a cooperative venture, to be "developed so that there would be no loss or reduction of autonomy or the individual character of any participating institution." SOF ¶ 800.

1837. On July 16, 1975, Dr. Watkins responded to the invitation to participate in the cooperative program by writing Dr. Philpott expressing ASU's position that such efforts "should follow a formal statement of principles relating to all cooperative endeavors between our schools" taking into account "the latent plans of others who would litigate to achieve such end." SOF ¶ 801.

1838. On September 9, 1976, Dr. John F. Porter, Jr., Executive Director of ACHE, wrote Dr. Watkins, encouraging ASU's cooperation with AUM in developing a Master's Program in Psychology. AUM's officials had previously indicated to Dr. Porter that they were willing to make that program a cooperative effort with ASU. SOF ¶ 802.

1839. Dr. Watkins wrote Dr. Porter on September 13, 1976, advising him that ASU had decided to "stand by its position on relationships with Auburn University at Montgomery." He advised Dr. Porter that any joint effort between ASU and AUM should follow "mutually acceptable policy and expression of cooperative intent" rather than "mere convenient piecemeal arrangements though such might benefit some component(s) of Alabama State University and/or Auburn University at Montgomery." SOF ¶ 803.

1840. In 1976, The Dean of the AUM School of Business wrote to his counterpart at ASU inviting ASU to participate with AUM in the development of a master's degree program in Information Systems.

AUX 5296. After preliminary discussion, ASU declined to participate. Williams (7/24/85) 5527–56.

1841. In the fall of 1977, a meeting was held between the staff of ACHE and representatives from AUM and ASU. After the meeting AUM sent ASU a proposed cross-enrollment agreement, and a document proposing guidelines for ASU/AUM cooperative programs. Both of these documents were signed by AU's president and contained a signature line for ASU's president. There was no response. AUX 5303, 5304, 5939–F, 7555; Williams (7/24/85) 5540–43.

1842. AUM and ASU have, since 1973, participated in a cross-enrollment agreement whereby AUM students wishing to participate in and receive credit for Air Force ROTC can do so on the ASU campus. AUM offers the same privileges and benefits for ASU students interested in receiving credit for Army ROTC. SOF ¶ 799.

1843. The University of Alabama has a cooperative program with ASU in teacher education directed at students desiring to teach students who suffer from learning disabilities or mild learning handicaps. Teachers in this area of educational expertise are in high demand. Crump (4/4/91) 52.

## B. Troy State University At Montgomery and Alabama State University

1844. Under the terms of the consent decree with the Government, TSUM and ASU are to develop joint graduate degree programs.

## C. Alabama A & M University and the University of Alabama at Huntsville

1845. UA, in cooperation with AAMU and UAH, has developed a new cooperative doctoral degree work in instructional leadership and educational administration and planning under the guidance of the College of Education. This program is now in place as a cooperative doctoral program involving these three institutions. Most of the courses in the Huntsville area are taught on the AAMU campus. The degree

is awarded by UA. Hicks (1/16/91) 24, 37; Sayers (7/25/85) 5703.

1846. UAH and AAMU have had for nearly 15 years a cooperative master's degree program in biology. The program requires students at one institution to take a prescribed number of hours—approximately 25% of the course work—at the other institution. The student may receive a degree from either university. Over the 15 year period, about 25 students have progressed through the program at both institutions. Cook (3/25/91) 30–31; UASX 879, pp. 289–90.

1847. UAH and AAMU are working on the development of a joint Ph.D. program in Biotechnology. Cook (3/25/91) 31.

1848. UAH has a cooperative Army ROTC program with AAMU by which UAH students may enroll in ROTC in the AAMU Department of Military Science. *Ibid.;* UASX 879, p. 64.

1849. UAH and AAMU have a minor cooperative program in commercial or studio art in which students at one institution may fulfill part of their degree requirements through courses taken at the other institution. Cook (3/25/91) p. 31; UASX 879, pp. 180–81; 522, pp. 273–74.

1850. UAH and AAMU have an established visiting student program available on both the undergraduate and graduate levels. UASX 879, pp. 63–64.

1851. After UAH was designated a Space Grant College, it formed the Alabama Space Grant Consortium and invited AAMU to become a member, along with UAB, UA, and Auburn. The Consortium was established to engage in a number of joint programs and projects (seminars, student fellowship programs, state-wide information networks, etc.) designed to promote space-related education and research among member institutions and in Alabama. UASX 877, p. 5; 878, pp. 1, 3; 922, p. 8.

1852. The University of Alabama Institute of Higher Education Research and Service has provided services in assisting AAMU in applying for Title III Institutional Development grants. SOF ¶ 379.

### D. Alabama A & M University and Athens State College/Calhoun State Community College

1853. Under the terms of the consent decree between ASC/CSCC and the United States, Alabama A & M is to receive classroom space at both CSCC in Montgomery and ASC were AAMU can conduct classes and recruit students. Joint graduate degree programs in education are also to be established between Alabama A & M and Athens State.

### E. Extension of Previously Executed Consent Decrees

1854. Before the start of trial, and over the objection of the Knight Plaintiffs, the Court reaffirmed the 1985 consent decrees executed between the United States and the University of South Alabama, the University of Montevallo, Jacksonville University, and Livingston University. In reapproving the consent decrees, the Court indicated that in the event there was a finding of liability, those schools which had entered into consent decrees would possibly be required to participate in the remedy regardless of their independent agreements with the United States. To this end, the Court specifically retained jurisdiction over all previously settling parties as to any remedy following a trial on the merits.

1855. The Court finds as a matter of fact, that those institutions which have settled with the United States must participate in the remedy if the objective of eradicating the vestiges of discrimination from the system of higher education is to be achieved. Accordingly, in the Court's Remedial Decree, it will direct that each of the consent decrees previously approved, even if under its terms it has expired, shall be extended for a period of time consistent with the decree the Court enters this day.

### REMEDIAL OBJECTIVES OF THE KNIGHT PLAINTIFFS

1856. In their Proposed Findings of Fact, the Knight Plaintiffs have included a section entitled "Remedial Issues" which addresses what the private plaintiffs be-

lieve are the important considerations in developing a remedial decree whose objective is the elimination, root and branch, of the remaining vestiges of segregation in Alabama's system of public higher education.

1857. In addition to discussing the framework within which they believe a remedial decree must operate, the Knight Plaintiffs have appended to their post-trial findings a proposed remedial decree. In order to develop the record as fully as possible, and in an effort to provide the higher courts a complete understanding of the issues and allegations made in this case, the Court will set out the salient points of the Knight Plaintiffs' proposed decree and their position with regard to remediation generally.

*A. Knight Plaintiffs' Remedial Issues*

1858. The following paragraphs taken directly from the Knight Plaintiffs' proposed findings are a fair representation of the remedial issues as they see them. The Knight Plaintiffs contend as follows: [155]

It is the *combination* of all these circumstances that continues to institutionalize governmental policies of white supremacy and segregation: the monopoly of the HWUs on higher level programs, research, etc., the absence of black administrators, faculty, students, curricula and culture on HWU campuses; the absence of leadership from the governor; etc. Taken together, all these institutional practices continue their original design of barring blacks from equal access to all levels of higher education and to social, economic and political equality. They were designed to operate in tandem with each other—as a statewide system—to keep blacks in subordinate positions in society. Only systematic, across-the-board change of all these institutions can remedy the past intentional wrong done to blacks.

For example, the remedy for purposefully discriminatory admissions requirements at the HWUs must not focus on admissions

practices alone. They were part of a larger state scheme to limit black citizens' access to higher education, and the remedy must address all components of that scheme. The racially invidious purpose of the HWU admission requirements was to deny black students access to undergraduate, graduate and professional programs reserved for whites. In tandem with other state policies that restricted the academic programs and resources of HBUs, the HWU admission requirements were intended to block all the avenues of access for blacks to the highest levels of educational opportunity. Accordingly, a complete remedy for the discriminatory admissions requirements must not only make the HWUs more accessible to black students, it must expand their academic opportunities at the HBUs as well.

1. The Historically White University

Dr. Aldon Morris succinctly described the kinds of institutional changes that must be made at historically white universities in Alabama's system of public higher education in order to accomplish desegregation:

[ (1) A] truly desegregated university would be one in which black people and other minorities shared the power of that institution and was [sic.] able to determine its priority and its goals and its direction.

[ (2) T]hat the culture, the experiences, and the viewpoints of all those groups were a central part of the university, was on equal footing with the culture, experiences and viewpoints of whites. ...

[ (3) ] And ... certainly that [blacks] would play a significant role on the faculty at all levels, certainly tenured and untenured levels ...

Morris (12/5/90) 58–59.

Fair representation of blacks on the faculties and administrations of HWUs requires more than tokenism. Black citizens will remain isolated and marginalized until there are sufficient numbers of black facul-

---

**155.** The Court has not reproduced each paragraph, but it has reproduced those which represent the heart of the Knight Plaintiffs' position.

ty and administrators to create what Dr. Morris called "critical mass," that is, a "community" that is part of the institution.

The marginalization of black students and faculty through token representation damages them in a variety of ways. It makes it harder for them to study, teach and conduct research. It isolates them socially and intellectually. It impairs their chances of success.

> And so ... because you are a statistical rarity ... you're in a situation in which you represent the race.

> And that is a tremendous burden to put on any young person, whether it be a faculty person or whether it be a student. And it is a burden that the majority has never had to shoulder. They really know nothing about it. They know very little of what it means to be seen as different, as marginal, as an underachiever and so forth. So this is why it is so important to have a critical mass.

Morris (12/5/90) 70–71.

The experience of having black teachers in the classroom not only assists black students, who are more likely to encounter familiar styles and subjects of discourse, but white students as well, who are able to confront their own cultural anxieties about submitting to the authority of a black person and find personal empowerment in the experience of genuine diversity.

Recruiting representative numbers of black faculty members and graduate students at the HWUs requires setting aside significant resources, similar to the kind of resources, ... that athletic departments employ to attract the very best black athletes....

As an example of what might be done by state institutions of higher education to recruit and retain more minority students and faculty, UA's expert, Dr. Linda Bunnell Jones, testified about her own experience as an administrator in the California State system. The California Legislature appropriated $18 million for the period 1985–87 alone to provide grants to disadvantaged Asian, black and hispanic students and to implement a variety of measures designed to make the students feel welcome and help them graduate. Jones (3/25/91) 130–34. Dr. Jones also got $13 million from the legislature to develop partnership programs with elementary-secondary schools designed to improve the preparations of minority students for college work. Jones (3/25/91) 135–36. California had a stated policy goal of having the same proportion of minority students in college as the proportion of minority students who graduate from high school in the state.

African American culture and experience must become organic parts of the curricula at the HWUs.

> [I]f you do not change the curriculum, and if you do not put black culture on an equal footing with white culture, ... there are simply no good reasons to think that any significant change is going to occur over time....

Morris (12/5/90) 74. All students feel empowered when "they can see themselves in the material, when they want to go back to their dorm and open up the book and start reading and studying hard, because they feel they are part of the process...." Morris (12/5/90) 96.

Another critical requirement of effective desegregation, according to Dr. Morris, is that the HWUs confront their racially discriminatory pasts. "[Y]ou cannot understand where you are now and you cannot plan adequately for the future if you do not know your past and if you do not factor that past into your planning." Morris (12/5/90) 73–74, 105–06.

Dr. Blackwell expressed a similar opinion with respect to state policies toward the HBUs:

> [O]ne of the first and foremost requirements [of a remedy] is the acknowledgement of the role that the historic patterns of segregation and discrimination have impacted negatively on the black institutions and the role that the current practices of the state still perpetuate that kind of inequality and badge of inferiority of the black institutions. [T]here must be an acknowledgment of that fact

before one can move forward to rectify the problem. Blackwell (2/4/91) 179.

An important theme Dr. Morris kept returning to is the need for a plan of change emanating from the highest authority if desegregation is to become a reality. He pointed out that the presidents of UA and AU did not know the names of their black faculty and had not committed significant budget resources to a clear-cut plan of change. Morris (12/5/90) 72–73.

> Without a concrete plan that is made clear and public to everybody concerned, then very little will be accomplished. You cannot bring about fundamental change in a haphazard manner, in a manner that is not very well thought through in a direction that is still unchart[ed].

Morris (12/5/90) 107.

> AU needs to make an acknowledgement that it is committed to diversifying the culture.... The leadership for the commitment to diversity must come from the administration, beginning with the Board of Trustees, and end with the student body and touch every part of the university family in between.

Considering the evidence of the past and present, Dr. Morris expressed the opinion that the "sort of centralized clearly formulated plan" needed to bring about genuine, systematic desegregation in higher education will have to come from the same "judges who were courageous, brave enough and smart enough to look at the role that law played, the role that the courts play in trying to channel human behavior in such a direction that it is congruent with the Constitution." Morris (12/5/90) 103.

Dr. Blackwell succinctly defined desegregation in the context of higher education:

> Desegregation means the removal of all state sanctioned barriers to the movement of minority persons into the middle class. It also means the elimination of social barriers that are based upon racial and/or ethnic discrimination.

Blackwell (2/4/91) 45.

Dr. Blackwell emphasized the critical importance of effective desegregation of higher education for the entire black population, not just those who go to college, and for society as a whole. Because higher education "is the *sine qua non* for movement into the middle class" and "the route to upward mobility," failure to desegregate will deny the black community the leaders, role models and mentors needed for their social, economic and political empowerment.... Blackwell (2/4/91) 45–50.

An environment of genuine cultural diversity is a critical prerequisite to overcoming the institutionalized forms of white supremacy that pervade HWU campuses today. Multiculturalism does not mean that the values of Eurocentric western civilization should be diluted or sacrificed to political expediency. It does mean that other values and other cultures, particularly in Alabama African–American culture, must be allowed to enter the academy, to be treated with respect, and to challenge the presumed universalism of Eurocentric culture. Otherwise, blacks will continue to suffer the subordination imposed by the state's historical, white supremacist policy of conditioning academic success on unquestioned acceptance of white cultural values, the persistent notion "that if it is white, it is superior." Blackwell (2/4/91) 51–54.

Dr. Blackwell testified, citing W.J. Cash's famous book, *The Mind of the South*, that as long as blacks are forced to internalize the notion: A white man is still the master no matter who he is, "then it is incumbent upon education to eradicate that kind of notion if we're going to have a truly democratic society." Blackwell (2/4/91) 54.

Very little progress can be made toward creating a genuinely multicultural environment until blacks are fairly represented on the faculties and administrations of the HWUs. As Dr. Blackwell testified:

> [Multiculturalism] cannot be segmental. It has to be a universal integrative synthesized approach that addresses a number of faculty issues, that addresses administrative issues, vis a vis diversity, addresses the curriculum to get people to

begin to think about how do we examine problems of multiculturalism through the kind of curriculum that we construct. Blackwell (2/4/91) 143.

Dr. Blackwell expressed the opinion that in Alabama "desegregation may have ended segregation, but did not end white supremacy." Blackwell (2/4/91) 144.

The issue of multiculturalism has special relevance to states like Alabama that for over a century legally enforced policies of white supremacy and segregation. Such state laws and official policies, past and present, operate to create and reinforce private attitudes of white superiority and black inferiority. Blackwell (2/4/91) 329–31. In the *de jure* segregated states, Eurocentrism and white supremacy are "fundamentally the same ... [that is,] pro[t]ecting the status quo, protecting life as it really is in terms of the pattern of black[-]white relationships." Blackwell (2/4/91) 332. The various paradigms of ethnic accommodation that have characterized American history, ranging from Anglo conformity or Americanization to the notion of the melting pot to ethnic pluralism, have had limited impact in the segregated South, where "the idea was that blacks really could not be assimilated ... [that] [t]hey're an inferior group of people." Blackwell (2/4/91) 333–34.

### 2. The Historically Black Schools

According to Dr. Blackwell, the HBUs should play a crucial role in the process of desegregation. In broad terms, they have two important functions in a truly effective desegregation remedy. One is an instrumental role, the continuance and enhancement of the opportunities the HBUs provide black Alabamians to obtain the benefits of higher education. When the underlying objective of all desegregation remedies is to open the road to middle class life the state kept closed to blacks for two hundred years, the HBUs are an indispensable resource that must be made better use of. The second desegregation role of HBUs addresses the stigma of inferiority the state assigned to black people and to their institutions. Any purported remedy that fails to require the state to make the

HBUs equal in resources and programs to the best of the HWUs—or, worse yet, that closes them or assigns them secondary status in the system of higher education—ratifies Alabama's enduring white supremacist policy that black institutions are inferior and should remain so. Blackwell (2/4/91) 58–64.

In important respects, the historically black universities are already multicultural institutions. As Dr. Walters testified:

> black colleges must be two schools in one. First, they must prepare students for full and efficient participation in a WASP dominated society from whole overpowering influence they cannot escape.... In the second sense, [they] must train [students] for a world of blackness in which they must live.

Walters (12/10/90) 117.

The two fundamental changes that must occur at historically black universities in order to accomplish genuine desegregation, according to Dr. Morris, is the eradication of the stigma of inferiority attached to them by the regime of state enforced segregation and white supremacy.... So that, in Dr. Morris' opinion, desegregation of the HBUs requires providing them all the resources needed to make them "flagship" institutions, that is, an "institution that is more associated with graduate education, giving out Ph.D.'s, more associated with being prestigious, more associated with having power and leverage in the society." Morris (12/5/90) 60–61.

> [A] flagship institution that was considered historically black would send a tremendous message to both blacks and whites alike. It would break out of the old stereotypes that the great institution, the great university is the one that the white people run and the lesser institution is the one that serves the needs of blacks. [I]t would ... for all concerned ... give us a model of what is possible so that you could transcend the traditional racial divisions and racial thinking on these matters.

Morris (12/5/90) 61.

Dr. Blackwell testified that the dual objectives of removing the stigma of inferiori-

ty from the HBUs and enabling them to open the full range of educational opportunities to the black community in particular require "the ability to take bold steps to transfer programs from one institution to another...."

The development of high quality Ph.D. [and first professional] programs at HBUs would assist in remedying the stigma of inferiority affecting those colleges and universities and should assist in developing more blacks with Ph.D. degrees. Walter Allen (1/16/91) 60–61.

### B. Knight Plaintiffs' Proposed Remedial Decree

1859. The proposed remedial decree is reproduced in its virtual entirety so that the position of the Knight Plaintiffs regarding the steps they deem necessary to eliminate the vestiges of segregation are fully known. The proposed decree reads as follows:

#### 1. Design and Intent of This Remedial Decree

The Court concludes that the evidence and this Court's findings warrant the issuance of a remedial decree that acknowledges the historical injustices visited on black citizens of Alabama and requires the State of Alabama fully to desegregate all aspects of public higher education in a manner that is realistic and fair to all citizens of all races and ethnicity.

A major feature of this Remedial Decree is its commitment to a long-term process for developing detailed remedial plans rather than attempting to specify in the remedial decree itself all necessary remedial steps. This Decree identifies the long-range remedial goals of higher education desegregation in Alabama and certain preliminary steps to be taken immediately. This Decree then provides for annual development, evaluation and redevelopment of specific plans for reaching the long-range remedial goals through the regular political and policy-making processes established by the State of Alabama for higher education. These long-range goals or objectives cannot realistically be achieved without providing the governing bodies, administrations, fac-

ulties and students of ASU and AAMU and the black citizens of Alabama the same opportunities as were provided UA, AU and other HWUs to develop institutional plans, implement those plans and adjust them according to learned experience over a period of decades. Similarly, genuine desegregation of the HWUs can only be accomplished through many years of committed action and reevaluation.

It is the intent of this Remedial Decree to order the discontinuance of all official policies, practices and institutional structures in Alabama designed to impair the ability of black citizens to enjoy on an equal basis with white citizens the benefits of public higher education and to correct the present and future adverse effects of these official policies, practices and institutional structures, as well as the adverse effects of previously discontinued discriminatory policies, practices and institutional structures.

In particular, the State of Alabama must finally fulfill its historical promise to its black citizens that the historically black universities should have the authority and resources to offer the full range of educational, research and service programs provided by UAS and AU.

This Remedial Decree uses the following format:

1. Specify the long-range remedial objectives.

2. Identify preliminary immediate steps.

3. Establish a long-term, year-by-year procedure for developing through existing educational and political channels additional measures needed to meet the remedial objectives.

4. Require annual progress reports to the Court, with opportunities for the parties to obtain Court-ordered additional relief to satisfy settlement objectives.

#### Remedial Objectives

All specific steps taken under this Remedial Decree shall be designed to achieve the following remedial objectives as quickly and efficiently as possible. Defendant

State of Alabama, its agencies, political subdivisions, public universities, officers, attorneys, and employees shall give these remedial objectives the highest priority in all their planning, programming and financial appropriations.

1. *Nondiscrimination:* All public institutions of higher education, their student bodies, faculties, staffs and administrations and all their programs, shall be open to all individuals on an equal, racially nondiscriminatory basis. No institution shall implement any requirements for admission to its undergraduate, graduate or professional programs that perpetuate historical racial discrimination or that adversely affect the number or percentage of black students eligible for admission.

2. *Multicultural environments:* All public institutions of higher education in Alabama shall establish environments that genuinely reflect the cultural values, styles and interests of all the racial and ethnic peoples of the State. As one part of this objective, immediate, effective steps shall be taken to ensure that black citizens are fairly represented on the administrations, faculties, and staffs, in the undergraduate, graduate and professional student bodies, and among the baccalaureate, graduate and professional graduates of all public four-year institutions of higher education. This objective shall not require white majorities for administrations, faculty, staffs and student bodies of all institutions.

3. *Identification and eradication of racially discriminatory historical policies:* All vestiges of the State's historical policies that limit the access of black citizens to, and their ability successfully to complete, undergraduate, graduate, professional, service and research programs of higher education shall be identified and eradicated.

4. *Missions of historically black institutions:* Vestiges of Alabama's official policies to segregate and subordinate its black citizens cannot be eradicated unless all persons, black and white, have the choice of the full range of higher education programs in both historically black and historically white public institutions. Equal access of all black citizens to all facets of public higher education in Alabama requires that ASU and AAMU be enhanced and preserved as important components of public higher education and that effective steps be taken to fulfill the following historical obligations of the State of Alabama:

a. ASU shall offer the same types of undergraduate, graduate and professional educational programming and the same types of service and research opportunities as may be offered by UAS.

b. AAMU shall offer the same types of undergraduate, graduate and engineering programming and the same types of land grant services (educational, research and extension) as may be offered by AU.

This objective does not call for mirror-image duplication of UA and AU programs at the HBUs. Rather, it calls for a sharing of the flagship and full land grant missions between the HWUs and HBUs. To accomplish this objective, some duplication may be necessary, but unnecessary duplication should be avoided.

5. *Funding equity:* As their new and existing programs are developed to achieve these remedial objectives, ASU and AAMU shall receive full and adequate funding necessary for existing programs and to implement new programs, including but not limited to developmental, operational, maintenance and capital funding. Equity shall also be established with respect to the salaries of administrators, faculty and staff at ASU and AAMU in relation to those at University of Alabama Systems and Auburn University.

6. *Land grant programs:* AAMU shall operate as a full-fledged land grant university. AAMU shall receive equitable shares of all state and federal land grant appropriations, including Hatch Act and Smith–Lever Act federal appropriations, along with full authority to administer said appropriations.

7. *Physical plants:* The physical facilities and equipment at ASU and AAMU shall be improved, replaced and expanded as necessary to remedy the century of racially discriminatory deprivation practiced

by the State of Alabama against these institutions, consistent with the objectives of this decree.

8. *Unnecessary duplication of programs:* All necessary steps shall be taken to eliminate activities and educational programs at all HWUs, particularly those in Montgomery and Huntsville, that discourage students of all races and ethnic groups from attending the HBUs or that demonstrably deter HBUs from affording black citizens equal access to all public educational programs.

9. *High school articulation:* All necessary steps shall be taken to eliminate the historical practices of counselors and other officials at public secondary schools that fail to encourage prospective college students of all races to attend the HBUs on an equal basis with the HWUs.

10. *Postsecondary articulation:* All necessary steps shall be taken to ensure that black students who choose to enter public four-year institutions of higher education through the state's postsecondary system may do so and may transfer academic credits on the same basis as if they had entered the four-year institution of their choice at the start of their freshman year.

11. *Governance:* Black citizens shall enjoy equal influence with white citizens in the overall governance of public higher education in Alabama. Blacks shall be fairly represented on all institutional governing boards, ACHE and all other bodies exercising authority over higher education. So long as other-race citizens are fairly represented on each governing body, and as long as the political processes leading to their selection are equally open to all citizens, the presence of white majorities on some governing bodies and black majorities on other such bodies shall be deemed consistent with these principles of fair and equal representation.

2. Immediate Preliminary Steps

Preliminary steps shall be taken in fiscal year 1991–92 at ASU and AAUM to begin immediate and substantial progress toward accomplishment of the long-range objectives set out in the preceding section.

These specific preliminary steps shall include, but need not be limited to, the following:

A. The Alabama funding formula shall be revised, effective the beginning of the 1992–93 academic year, to eliminate discrimination based on the missions of the HBUs and HWUs as follows:

1. The high ratios of academic weights between advanced degree programs and undergraduate programs shall be reduced.

2. The weights of remedial programs and courses shall be increased to reflect real costs, and the higher costs of educating less-prepared students (even in non-remedial courses) shall be reflected in the formula.

3. Realistic incentives for enrollment and retention of other-race students shall be included in the formula, and such incentives may differ at the HBUs and HWUs to reflect the greater difficulty of attracting white students to HBUs.

4. Funding outside the Regular Academic Program funding formula (i.e., medical and health professional school funding) shall be reviewed to determine whether it is in line with RAP funding and, in the case of research and public service funding, to eliminate discrimination against the HBUs.

5. Meaningful incentives for desegregation shall be provided.

B. The following new degree programs shall be authorized for planning and funding at AAMU:

1. M.S.W. in Social Work;

2. First professional degrees in Nursing;

3. MS, Dr. Ph and Ph.D. in Public Health;

4. M.A. in International Affairs and Development;

5. M.S. in Public Administration;

6. Ph.D. in Life Sciences;

7. M.S. in Agricultural Economics;

8. Ed.S. in Special Education.

C. $30 million shall be appropriated to AAMU to begin upgrading its facilities and equipment for land grant programs.

1. In addition to this funding, the State, Auburn and UAS shall provide AAMU the funding and assist AAMU in the development of a full-fledged engineering program. This engineering program shall include all basic engineering programs as well as those engineering programs with special importance to AAMU's agricultural program, including but not limited to agricultural engineering.

D. $35 million shall be appropriated to AAMU to begin renovation and construction of its other facilities and equipment, including library acquisitions and facilities needed to support new graduate and professional programs.

E. AAMU shall receive a line-item state appropriation for agriculturally related research in an amount so that the proportion of state and federal funds allocated to AAMU for agriculturally related research shall be the same as the proportion of state and federal research funds granted AU.

F. AAMU shall receive a line-item state appropriation for cooperative extension programs in an amount so that the proportion of state and federal funds allocated to AAMU and AU for cooperative extension work shall be the same.

G. AAMU shall exercise the same autonomy with respect to administration of its land grant programs as does AU. AAMU and AU shall confer and attempt to reach agreement on the precise administrative structures for agricultural education, research and extension services in Alabama. If agreement cannot be reached by the first anniversary of this Remedial Decree, the question shall be presented to the Court for determination.

H. The following preliminary steps shall be taken toward eliminating unnecessary duplication of educational programs in the Huntsville–Florence area:

1. AAMU shall have priority with respect to offering all graduate and undergraduate programs in education, agriculture and business. AAMU, UAH, ASC, CSCC and UNA shall confer and attempt to agree on the specific ways in which unnecessary duplication of these programs shall be eliminated. If agreement cannot be reached by the first anniversary of this Remedial Decree, the question shall be presented to the Court for determination.

2. AAMU shall have priority with respect to offering all graduate and undergraduate programs in engineering that are needed to fulfill AAMU's land grant mission. AAMU and UAH shall confer and attempt to agree on the specific ways in which unnecessary duplication of these programs shall be eliminated. If agreement cannot be reached by the first anniversary of this Remedial Decree, the question shall be presented to the Court for determination.

I. The following new degree programs shall be authorized for planning and funding at ASU:

1. B.S. in Computer Engineering;

2. B.S. in Electrical Engineering;

3. B.S. in Allied Health Professions;

4. M.S. in Computer Science;

5. First professional degree in Nursing;

6. Ph.D. in Special Education L.D., M.R.;

7. Ph.D. in Early Childhood Education.

J. $60 million shall be appropriated to ASU to begin renovation and construction of its facilities and equipment, including library acquisitions and facilities required to support new graduate and professional programs.

K. The following preliminary steps shall be taken toward eliminating unnecessary duplication of educational programs in the Montgomery area:

1. All graduate level programs and courses shall be offered, in the Montgomery area, at ASU only. Neither Auburn University in Montgomery nor any school in the Montgomery area which receives state funds shall offer any graduate level programs or courses.

2. All undergraduate level programs and courses in Education shall be offered, in the Montgomery area, at ASU only. Neither Auburn University in Montgomery nor any school in the Montgomery area which receives state funds shall offer any

undergraduate level programs or courses in Education.

3. AUM may continue to offer baccalaureate degrees in liberal arts and sciences.

4. AUM shall transfer its nursing program to Alabama State University.

5. TSUM shall begin phasing out all of its undergraduate and graduate degree and non-degree programs in Montgomery.

6. Troy State University shall transfer its Nursing School and program to Alabama State University.

7. AUM shall begin the process of transferring to ASU the programs, activities and related matters of the following centers:

The Center for Government and Public Affairs;

The Center for Business and Economic Development;

The testing component of the Center for Psychological Services;

Speech and Hearing Center;

Montgomery Area Community Health Services Institute;

Southeastern Regional Resource Center;

Center for Demographic and Cultural Research;

Transfer of all Centers shall be completed not later than ———.

8. ASU shall have priority with respect to special service programs and contracts operated with the assistance of state funding, including, but not limited to, programs related to business research, community development, in-service training for state personnel, testing for civil service employment, continuing education for state employees, internships for students in applied areas of study, social science services, and biological science services.

L. All public four-year institutions of higher education shall initiate an institutional plan for development of genuinely multicultural environments on all their campuses....

M. All defendants shall immediately establish a joint undertaking to analyze accurately the present ability of students in the state's postsecondary system to enter the public four-year institutions of higher education without loss of credit hours and to eliminate all unnecessary barriers thereto. In addition, feeder arrangements shall be established between all postsecondary institutions and ASU and AAMU to encourage students of all races to attend the HBUs.

3. Long–Term, Annual Procedures

1. In each year, as part of the regular budget preparation process, each public institution of higher education shall present a plan detailing how it will pursue achievement of these remedial objectives during the upcoming fiscal year.

2. The budget recommendations of ACHE to the Governor shall include the proposed institutional plans along with such different or additional institutional plans as may be required to meet the remedial objectives of this Decree.

3. In accordance with her/his responsibilities under this Remedial Decree, the Governor shall include in his/her education budget recommendations to the Legislature the proposed institutional plans and such different or additional plans as may be required to meet the remedial objectives of this Decree.

4. After the Legislature and Governor have acted (or refused to act) on the annual plans and budgets for compliance with this Remedial Decree, said approved plans and budgets shall be filed with the Court by counsel for the State of Alabama. Upon the motion of any party, or on its own motion, the Court may conduct such proceedings as it deems appropriate to determine whether said plans and budgets comply with this Decree and/or whether additional relief should be ordered to achieve the remedial objectives of this Decree.

. . . . .

## CONCLUSIONS OF LAW

### THE MEANING OF "VESTIGES"

1. Precise definitions of the terms "vestige of segregation" or "vestige of racial discrimination" are necessary. These terms, which are used interchangeably, have considerable currency in the modern lexicon of school desegregation cases,

though no court has defined their exact contour. Popularly defined as a trace or visible sign of something lost or vanished, a vestige clearly connotes a remnant or leftover from a prior situation.

2. In the context of a school system which was segregated by law or custom, there may remain vestiges of that system which carry on the racial injuries associated with segregation. When such vestiges are found they must be eliminated. Conversely, there may also be situations where vestiges or traces of the prior system have so transformed their fundamental nature that they can no longer be considered "vestiges" in the sense that they perpetuate or continue the evils associated with the prior segregation, but serve legitimate and necessary functions in the state's system of education wholly unconnected with race or discrimination.

## THE CONSTITUTIONAL DUTY TO DESEGREGATE HIGHER EDUCATION

### A. The Parties' Contentions

#### 1. Plaintiffs

3. The Plaintiffs maintain that the state has failed to fully disestablish vestiges of the prior *de jure* system of segregated higher education in Alabama to the extent required by the Fourteenth Amendment to the Constitution of the United States. The Plaintiffs advance arguments in support of this assertion on essentially two related fronts. Firstly, they assert that the State of Alabama has unlawfully discriminated against its historically black universities in the allocation of resources, the designation of institutional missions, and the approval of academic programs. Secondly, the Plaintiffs seek a greater black presence on the campuses of the predominately white institutions at the student, faculty and administrative levels, as well as in the content of the institutions' curricular offerings. In support of their claims, the Plaintiffs submitted extensive evidence from a variety of sources to establish, either that the state continues to have in place a dual system of education, or that the predominately white

institutions are not receptive to black culture, faculty or students.

4. Drawing their precedent primarily from the jurisprudence of the elementary and secondary school desegregation cases, the Plaintiffs contend that the constitutional duty of the state and its institutions to dismantle the prior *de jure* system of higher education is satisfied only when the vestiges of the dual system are eliminated root and branch. While having removed the cloak of legalized segregation, Alabama is nonetheless still clothed in the garment of discrimination, according to the Plaintiffs.

#### 2. Defendants

5. The non-allied Defendants deny the allegations of the Plaintiffs that vestiges of the dual system remain in Alabama's institutions of higher education. Essentially agreeing that the state has an affirmative duty to disestablish all vestiges of the *de jure* era of segregation, the Defendants maintain they have done so by discontinuing prior discriminatory practices and in their place adopting and implementing good faith race neutral policies and practices with respect to the operation of the state's colleges and universities.

6. As proof of the adoption of race neutral practices and the implementation of affirmative actions designed to remedy past wrongs, the Defendants proffered extensive evidence concerning black student enrollment and retention, the employment of blacks in faculty and administrative positions, and the recruitment efforts directed at increasing black professional and student presence on the campuses of the predominately white institutions. Many of the Defendants also introduced evidence concerning the extent to which African American study and culture is present in their institution's environment and curriculum. Finally, the state offered evidence regarding recent changes in the allocation of financial resources to the HBUs and the manner and process of approving academic programs.

7. The Defendants take strong exception to the Plaintiffs' reliance upon elementary and secondary school desegregation case law to divine the scope of the constitu-

tional duty owed by a state to dismantle vestiges of segregation in higher education. To the Defendants, the differences between higher education on the one hand and elementary and secondary education on the other, counsel against the utilization of secondary school desegregation law in the context of higher education.

**B. An Introduction To The Court's View of the Law**

8. The parties parley back and forth the term "constitutional duty" and argue as to the nature of that duty. Of course, what the debate concerns is not *per se* the duty which the Constitution imposes, but the nature of the remedial obligation necessary to conform one's practices with that duty.

9. When the Defendants argue that the duty to remediate *de jure* segregation does not extend to the elimination of its vestiges, root and branch, they are quarreling with the curative standard which the Supreme Court has consistently applied in the secondary and elementary school cases.

10. On the other hand, the Plaintiffs invoke the root and branch principle like a mantra without consideration of the unique characteristics of higher education, and thus ignoring the fact specific environment in which the principle must operate.

 11. In the area of public education, discrimination based upon race is inherently unconstitutional. It is this doctrine that is the constitutional imperative, the pole star which must guide the Court's deliberations. No party disputes its applicability. The doctrine is silent, however, on the remedy required to achieve the objective. The Supreme Court has decided that the objective is achievable by the elimination of discrimination, root and branch, to the extent possible. The root and branch requirement is not a constitutional imperative in the same sense as the maxim set forth in *Brown (I)*, but rather, a principle

that must be applied in formulating a remedy if a public educational institution is found to either be acting in a discriminatory manner, or if vestiges of the prior *de jure* system impede desegregation. To the extent the root and branch requirement is fact specific, there is within its ambit, ample room to accommodate the unique characteristics of higher education.

**C. The Scope of the Constitutional Duty to Desegregate**

12. In *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*), the Supreme Court unequivocally set the standards for all school desegregation cases when it held:

[I]n the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal [and violate the equal protection of laws guaranteed by the Fourteenth Amendment].

*Id.* at 495, 74 S.Ct. at 692.

 13. The aim of *Brown I* is undeniable: "the elimination of state-mandated or deliberately maintained dual school systems...." *Milliken v. Bradley,* 418 U.S. 717, 737, 94 S.Ct. 3112, 3123, 41 L.Ed.2d 1069 (1974). The Court's declaration in *Brown I* applies to all dual systems of public schooling regardless of whether the system provides primary, secondary, or higher education. It is universally recognized that a state which has operated a racially dual system of public education is under a constitutional obligation to end racial distinctions and dismantle its dual system.[156] *Brown I* did not address the issue of remedy however, and expressly stated that "because of the wide applicability of [the] decision, and because of the great variety of local conditions, the formulation of [remedial] decrees ... presents problems of considerable complexity." The Court, therefore set the matter for reargument so that it could consider the nature of

---

**156.** *See, e.g., Geier v. Alexander,* 801 F.2d 799, 800 (6th Cir.1986); *Geier v. University of Tennessee,* 597 F.2d 1056, 1065 (6th Cir.), *cert. denied,* 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979); *Lee v. Macon County Bd. Educ.,* 453 F.2d 524, 527 (5th Cir.1971); *Norris v. State Council*

*of Higher Educ.,* 327 F.Supp. 1368, 1373 (E.D.Va.) (three-judge court), *aff'd sub nom. Board of Vistors of the College of William & Mary v. Norris,* 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971).

the appropriate relief. *Brown I* 347 U.S. at 495, 74 S.Ct. at 692.

14. The Supreme Court specifically directed the parties to brief the following questions:

> 4. [Applying our decision in *Brown I*] (a) would a decree necessarily follow providing that, within the limits set by geographic school districting, [black] children should forthwith be admitted to schools of their choice, or
>
> (b) may this Court, in the exercise of its equity powers, permit an effective gradual adjustment to be brought about from existing segregated systems to a system not based on color distinctions?
>
> 5. On the assumption on which questions 4(a) and (b) are based, and assuming further that this Court will exercise its equity powers to the end described in question 4(b),
>
> . . . . .
>
> (d) should this Court remand to the courts of first instance with directions to frame decrees ..., and if so what general directions should the decrees of this Court include and what procedures should the courts of first instance follow in arriving at the specific terms of more detailed decrees?

*Brown I*, 347 U.S. at 495–96 n. 13, 74 S.Ct. at 692 n. 13.

15. In *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*), the Supreme Court again reiterated that "racial discrimination in public education is unconstitutional ... [and that a]ll provisions of federal, state, or local law requiring or permitting such discrimination must yield...." *Id.* at 298, 75 S.Ct. at 755. The Court then went on to discuss the nature of the remedy required to bring the school systems operating in derogation of this principle into line with the Constitution. The Court wrote:

> Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to con-

sider whether the actions of school authorities constitutes good faith implementation of the governing constitutional principles....

> In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs....
>
> While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with [*Brown I*].

*Brown II*, 349 U.S. at 299–300, 75 S.Ct. at 755–56.

16. The Court clearly elected the gradual method of effectuating the mandate of *Brown I* and left it to the courts of first instance to define the parameters of the relief necessary to bring school systems into compliance with the Constitution.

17. The *Brown* cases had an immediate impact on college and university desegregation. One week after *Brown I* was decided the Supreme Court consolidated several desegregation cases and entered a *per curiam* decision vacating the judgments below and remanding the cases in light of the Court's ruling in *Brown I*. One of the cases was *Florida ex rel. Hawkins v. Board of Control of Florida*, 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112 (1954) (*Hawkins I*), in which the Supreme Court of Florida had denied a black student admission to the state's law school reserved for whites on the basis that a state law school for blacks existed to which the student could be admitted.

18. Subsequent to the decision in *Brown II*, the Supreme Court revisited *Hawkins*. *Florida ex rel. Hawkins v. Board of Control of Florida*, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486 (1956) (*Hawkins II*). In *Hawkins II* the Court wrote:

> [O]ur second decision in the *Brown* case, ... which implemented [*Brown I*] had no application to a case involving a

[black] applying for admission to a state law school. . . .

As this case involves the admission of a [black] to a graduate professional school, there is no reason for delay. [The applicant] is entitled to prompt admission under the rules and regulations applicable to other qualified candidates.

*Hawkins II*, 350 U.S. at 413–14, 76 S.Ct. at 464.

19. The University of Alabama takes the position that *Hawkins II* clearly shows that "the Court recognized a different ... form and manner of performing the affirmative duty to desegregate than it pronounced under *Brown II* for elementary/secondary education. The Court ... directed that in the case of higher education, the alternative rejected for elementary/secondary schools in *Brown II*, that '[black] children should forthwith be admitted to schools of their choice' was preferable." The university then concludes from this observation that the "Court was confident that the exercise of student choice would serve to desegregate higher education." UAS's Proposed Conclusions of Law, ¶ 31.

■ 20. UA's reading of *Hawkins II* is correct, but only to a limited extent. Based on the strength of its prior precedent in the area of higher education,[157] the Supreme Court saw no need to delay or gradualize the integration of the country's higher education institutions. *Hawkins II* is not concerned, with vestiges of segregation, but rather with dismantling the officially sanctioned ongoing structure of actual *de jure* segregation in colleges and universities. The opening salvo in the dismantling of the structure of black subordination in post-secondary education was the requirement that institutions admit students immediately on a nondiscriminatory basis. By no means does *Hawkins II* stand for the proposition that in the dismantling of formally *de jure* systems of higher education all which is required is the adoption of nondiscriminatory admissions practices.

Nondiscriminatory admissions is the first step on the journey, not its end.

■ 21. What *Hawkins II* does establishes is that the Supreme Court has, from the beginning of federally mandated integration, realized that higher education and secondary education are fundamentally different and that the demands of *Brown I* cannot be achieved at the college level in the same fashion as they can be achieved at the grammar and high school level. In short, the remedial process is, and must be, different. The centrality of student choice and institutional diversity in higher education renders the necessary desegregation methodology inherently and fundamentally different from that needed in elementary and secondary education.

### D. The Constitution Requires Alabama To Eliminate Vestiges of Discrimination Root and Branch To the Extent Practicable

■ 22. Where a state has previously maintained or established by law a dual school system based upon race, the Fourteenth Amendment requires the state to take the necessary steps "to eliminate from the public schools all vestiges of state-imposed segregation." *Swann v. Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971). Applying *Brown II* in *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court made it clear that state authorities had to act affirmatively to dismantle existing vestiges of segregation resulting from the prior dual system "root and branch." *Green*, 391 U.S. at 437–38, 88 S.Ct. at 1694. "The constitutional rights ... articulated in *Brown I* permit no less than this; and it was to this end that *Brown II* commanded school boards to bend their efforts." *Id.* at 438, 88 S.Ct. at 1694 (footnote omitted).

23. The Supreme Court has held steadfast to this categorical imperative. For example, in *Wygant v. Jackson Board of*

---

**157.** In support of its position that qualified black applicants must be admitted to public colleges and universities on the same basis as qualified whites, the Supreme Court cited

*Sweatt v. Painter*, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); *Sipuel v. Board of Regents of the University of Oklahoma*, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948).

*Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), a case involving the propriety of a collective-bargaining agreement intended to retain minority teachers in certain percentages during times of job layoffs, the Court wrote "[p]ublic schools, like other public employers ... are under the clear command from this Court, starting with *[Brown I],* to eliminate every vestige of racial segregation and discrimination in the schools." *Id.* at 277, 106 S.Ct. at 1848–49.

24. The duty to eradicate vestiges of segregation has been repeatedly emphasized not only in school desegregation cases [158] but in other cases as well. *See, e.g., Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) (a voting case in which the Court stated: "the District Court ... has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."); *Gilmore v. City of Montgomery,* 417 U.S. 556, 567, 94 S.Ct. 2416, 2423, 41 L.Ed.2d 304 (1974) ("The city was under an affirmative constitutional duty to eliminate every custom, practice, policy or usage reflecting an impermissible obeisance to the now thoroughly discredited doctrine of separate but equal.... This obviously meant that discriminatory practices in Montgomery parks and recreational facilities were to be eliminated root and branch ...") (internal quotation marks omitted).

25. The Supreme Court has recently explained that a state's duty to terminate its discriminatory practices is complete when the state can show that "the vestiges of past discrimination had been eliminated to the extent practicable." *Board of Education v Dowell,* 498 U.S. ——, ——, 111 S.Ct. 630, 637–38, 112 L.Ed.2d 715, 729 (1991) (footnote omitted). In *Dowell,* the Court went on to state: "[i]n considering whether the vestiges of de jure segregation had been eliminated as far as practicable, the District Court should look ... 'to every facet of school operations—faculty, staff,

transportation, extra-curricular activities and facilities.'" *Id.* at ——, 111 S.Ct. at 638, 112 L.Ed.2d at 730, *quoting, Green v. County School Board,* 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968).

26. This Court believes that requiring the state of Alabama and its institutions to eliminate vestiges of segregation, root and branch, to the extent practicable can be done without doing harm to the unique characteristics of higher education in Alabama. Were this Court to require anything less, it would leaving in place many of the structures created by the former dual system whose object was—and impact continues to be—the subordination of Alabama's African American citizens. Fundamental constitutional principles do not vary with the nature of the activity. A college student is no less entitled to attend a non-racially segregated state institution than is a secondary school student. State action which encourages the racial identity of an institution is simply unconstitutional.

27. The Defendants would identify the issue in this case as being whether the state supported institutions have adopted race neutral practices, irrespective of whether there remain in place vestiges of the legalized era of discrimination that continue to have an impermissible impact based upon race. The error of the Defendants is that they confuse the duty to disestablish vestiges of *de jure* segregation with the means of achieving that disestablishment.

28. This Court cannot conclude as the Defendants would have it do, that the standard for determining if a state has dismantled a racially dual school system differs depending on whether the system involves primary, secondary, or higher education. In each of these contexts, the inquiry is the same: has the state and its institutions ceased intentionally discriminatory conduct and adopted race neutral practices, *and also,* have they eliminated to the extent possible the vestiges of the prior dual system of discrimination, root and branch. Within this standard there is abundant

---

**158.** *See generally, Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 200–01 n. 11, 93 S.Ct. 2686, 2693–94 n. 11, 37 L.Ed.2d 548 (1973) (cases cited therein).

room to provide for the dissimilarities between the various educational services provided by the state, and the necessity of institutional diversity at the college level.[159] Well established remedial principles require this Court to address the continuing effects of *de jure* segregation and "correct, by a balancing of the individual and collective interests, the condition that offends the Constitution." *Swann v. Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

### E. Ayers v. Allain

■■■ 29. The Fifth Circuit Court of Appeals sitting *en banc* recently discussed the standard by which a state is to measure its compliance with the desegregation mandates of the Supreme Court. The case, which arose from a challenge to Mississippi's system of higher education, concerned the scope of the state's duty to remedy the effects of past *de jure* discrimination. The *en banc* court concluded that the principles set forth by Justice White in his concurrence in *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), rather than those enunciated in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) provided the standard for measuring compliance with the desegregation requirement of public universities. *Ayers v. Allain,* 914 F.2d 676, 682–87 (5th Cir.1990) *cert. granted, sub nom. United States v. Mabus,* 499 U.S. ——, 111 S.Ct. 1579, 113 L.Ed.2d 644 (1991). Under the Fifth Circuit's formulation, a state is deemed to have satisfied its constitutional obligation of

disestablish[ing] its prior system of de jure segregation in higher education ... by discontinuing prior discriminatory practices and adopting and implementing good-faith, race-neutral policies and procedures.

*Id.* at 687. In short, the state need not eliminate vestiges of past discrimination, but merely adopt good-faith race-neutral policies. The *en banc* court based its holding upon a determination that universities "differ in character fundamentally from primary and secondary schools." *Id.* at 686. The Fifth Circuit concluded that the Supreme Court's ruling in *Bazemore v. Friday,* compelled its application.

30. *Bazemore* involved the North Carolina Extension Service's obligation to disestablish segregation in its voluntary 4–H and Homemaker Clubs. The record showed that prior to 1965, the Extension Service operated segregated clubs, but since that time had discontinued its segregated club policy and required that all clubs admit eligible persons regardless of race. *Bazemore,* 478 U.S. at 407, 106 S.Ct. at 3012 (White, J., concurring). The plaintiffs alleged that the "new policy" had no appreciable impact on the racial identity of the clubs since many of them remained either majority black or majority white.

31. Over a strong dissent by Justice Brennan, the Court agreed with the trial judge and concluded that "this case presents no current violation of the Fourteenth Amendment since the Service discontinued its prior discriminatory practices and has adopted a wholly neutral admissions policy." *Bazemore,* 478 U.S. at 408, 106 S.Ct. at 3013. Basing their decision on the voluntary nature of club membership, the Court reasoned that its holding in *Green,* supra—that a voluntary choice program is ineffective in dismantling a racially dual school system—had "no application to the voluntary associations supported by the ... Service." *Bazemore,* 478 U.S. at 408, 106 S.Ct. at 3013. The Court noted that "[w]hile school children must go to school, there is no compulsion to join 4–H or Homemaker Clubs." *Ibid.* The Court concluded that "however sound *Green* may have been in the context of public schools, it has no application to this wholly different milieu." *Ibid.*

---

159. While the Court has repeatedly used the term "root and branch" to signify the scope of the state's duty to eliminate vestiges of segregation, the Court does not laden the term with preconceptions or attach to it an immutable standard. In the context of higher education, the constitutional directive embodied within the term is markedly distinct from that required when dismantling vestiges of segregation at the elementary or secondary school level.

32. Judge Higginbotham who concurred in part and dissented in part in the *Ayers* case would have affirmed the District Court's judgement that Mississippi is no longer engaged in purposeful discrimination, but would have remanded so that the trial court could "focus on the causal relationship between the de jure system and the present practices...." *Ayers*, 914 F.2d at 693 n.*. Judge Higginbotham's comments are worth repeating in some detail since they so completely capture the erroneous reasoning of the majority in *Ayers.*

> *Green* rejected freedom of choice plans as a complete response to the state's duty to end segregated schools. Contrary to the implicit assumptions of the majority, ... *Green* is not the genesis of the state's constitutional duty to correct the injuries it has unconstitutionally caused. The duty to undo the wrong springs directly from [*Brown I*]
>
> *Green* rests on a system of mandated education and has little application to a system of higher education that has no compulsory attendance. But concluding that *Green* is inapplicable to higher education does not carry the further conclusion that a state that has maintained a dejure [sic] system does not remain under a continuing obligation to otherwise administer its university programs in ways calculated to undo the injuries of its segregated past.
>
> *Bazemore* ... is not contrary to the position I urge today. In *Bazemore* the court held that, because the students enjoyed the right to choose the club they wished and because the differing makeups of the clubs were not the product of discrimination, the state had done its duty. Here we deal with the delivery by a state of an array of educational services.... Having openly discriminated in the delivery of educational services in virtually all its operations, Mississippi remains under a duty not to perpetuate segregation by its policies....
>
> . . . . .
>
> A state violates its duty to undo its wrong when it makes decisions that di-

rectly reinforce the historical traces of separate post-secondary educational paths for blacks and whites.... This analysis highlights the importance of segregative *effects* and locates the essential causal relationship between a past dejure [sic] dual system and a present de facto one.... [I]t recognizes that the affirmative duty to undo is confronted in the ongoing administration of the schools.

*Id.* at 693–94 (emphasis in original, citations omitted).

## F. Student Choice and the "Root and Branch" Remedy

33. In their proposed conclusions of law, the Knight Plaintiffs and the United States concede that in the college desegregation process the focus is on factors which influence student choice. The position of the United State is that the affirmative duty "of the state in [a] higher education desegregation case is simply [to] ... ensure that ... students have a truly unfettered choice of where to attend school." United States' Proposed Conclusion of Law ¶ 360.

34. The Knight Plaintiffs and allied Defendants do not go quite so far as the United States in specifically detailing the extent to which student choice controls the nature of the remedy. The Knight Plaintiffs write:

> As to free choice, if students are free to choose, the desegregation process must focus on the factors that influence choice, by acting on the schools that are competing for students.... To use a "free market" analogy, if the black schools are to "compete" successfully for white students, they must have the tools to do so. Without these tools, "free choice" is meaningless.

Knight Plaintiffs' and Allied Defendants' Proposed Conclusions of Law ¶ 89.

35. The existence of student choice is the automatic response of the Defendants to those seeking to impose a desegregation plan. To the Defendants, a wave of the magic wand of student choice and all obli-

gations to disestablish the vestiges of *de jure* segregation are satisfied.

36. To be sure, the state and all its institutions have gone well beyond nondiscriminatory admissions policies so that the environment in which students make decisions about educational choices are not so restricted that the full panoply of considerations are unavailable. Nevertheless, in Alabama there continue to survive some vestiges of segregation that impede and unduly restrict the exercise of student choice on the basis of race.

■ 37. The Court agrees that the existence of student choice is a universal and inherent characteristic of higher education. It is a reality that must guide this Court as it searches for the appropriate remedial plan. At the same time, a state may not interfere with choice either directly or indirectly based on the existence of vestiges of the former dual system that operates to fetter choice based upon race. The constitutional obligation is to see that freedom of choice is real, not theoretical. *Ayers,* 914 F.2d at 694 (Higginbotham, J., concurring and dissenting).

■ 38. The beneficiaries of the Equal Protection Clause of the Fourteenth Amendment are the students not the colleges. *City of Richmond v. J.A. Croson, Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (the "rights created by the first section of the Fourteenth Amendment are, by its terms guaranteed to the individual. The rights established are personal rights."), *quoting, Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948). By focusing on the continuing impact which the effects of past unlawful actions have on the exercise of student choice the Court insures that it is not erroneously substituting the rights of individuals for the interests of institutions.

■ 39. In sum, the obligation of the state and its institutions is to eliminate root and branch, to the extent practical, the vestiges of segregation which continue to have an impermissible impact on the exercise of student choice.

### G. ASTA

40. The Defendants rely heavily on *Alabama State Teachers Ass'n v. Alabama Public School and College Authority,* 289 F.Supp. 784 (M.D.Ala.1968), *aff'd per curiam,* 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) ("ASTA"), for the proposition that as long as a state and its institutions of higher education deal with "admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual system ..., to the extent the dual system may be based on race, is satisfied." *Id.* at 789–90.

41. Defendants' reliance on *ASTA* is misplaced. *ASTA* was not concerned with disestablishing the vestiges of a *de jure* statewide system of higher education. The court there dealt only with the question whether to enjoin the construction of AUM. The court refused to grant the injunction emphasizing *inter alia,* that "much of the plaintiff's argument is based on speculation." *ASTA,* 289 F.Supp. at 789. The court concluded that on the record before it, creation of AUM was at least arguably as consistent with the asserted "duty to maximize desegregation" as the plaintiffs' alternative.

42. At any rate, based upon the strength of the precedents previously examined, the Court declines to read *ASTA* as proffered by the Defendants. The Supreme Court's impending decision in *Ayers* will either substantiate this Court's analysis or consign it to the waste can. On the issue of an appropriate standard by which to measure compliance with the desegregation mandate, the arguments advanced upon the basis of *ASTA* are no different than those already discussed.

### THE EQUAL PROTECTION CLAUSE AND MIXED MOTIVE DECISIONS

43. The Defendants rely on the "same decision defense" to rebut many of the Plaintiffs' allegation. According to the Defendants, even if discriminatory motives did impact on many of their actions, the same decision would have resulted absent the impermissible consideration. Most ob-

viously this defense applies in the allocation of land grant funding.

44. As the Supreme Court observed in *Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), "[o]nce racial discrimination is shown to have been a substantial or motivating factor behind enactments of law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* at 228, 105 S.Ct. at 1920 (internal quotation marks omitted). The burden which shifts to the law's defenders is that of showing by a preponderance of the evidence that the same result would have occurred had the illegal purpose not been considered. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566, n. 21, 50 L.Ed.2d 450 (1977); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

45. It is certainly no defense under *Hunter* for the Defendants to merely contend that any original discriminatory motives have been superseded with the passage of time by legitimate educational concerns. This defense has been rejected by the Supreme Court. Where the original adoption of the law or policy was "motivated by a desire to discriminate against blacks on account of race, *and* the [law or policy] continues to this day to have that effect ... it violates equal protection under *Arlington Heights." Hunter,* 471 U.S. at 233, 105 S.Ct. at 1922 (emphasis added).

### DUTY TO DESEGREGATE UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

A. *Title VI and Its Regulatory framework*

46. In addition to their equal protection claims, the Plaintiffs seek relief under Title VI of the Civil Rights Act of 1964 and its implementing regulations. Section 601 of Title VI provides:

No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

47. Section 602 of Title VI directs all federal agencies that extend financial assistance to promulgate regulations to effectuate the purposes of § 601. Section 602 of Title VI provides in relevant part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract ... is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such programs or activity by issuing rules, regulation, or orders of general applicability.

42 U.S.C. § 2000d–1.

48. Supreme Court precedent is badly fragmented as to the standard of proof which must be met to succeed on a Title VI claim. In *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) five of the justice agreed that "Title VI proscribe[s] only those racial classifications that would violate the Equal Protection Clause...." *Id.* at 287, 98 S.Ct. at 2746 (Powell, J.); *id.* 328, 98 S.Ct. at 2767–68 (opinion of Brennan, White, Marshall, and Blackmun, JJ.). Title VI's reach in *Bakke* was specifically limited to acts of intentional discrimination. Approximately five years after the decision in *Bakke,* the Supreme Court again revisited the scope of Title VI. In *Guardians Ass'n v. Civil Service Comm'n, N.Y.C.,* 463 U.S. 582, 589, 103 S.Ct. 3221, 3225–26, 77 L.Ed.2d 866 (1983), the Supreme Court backed away from its pronouncements in *Bakke* or at least changed the debate. Justice White, writing for the plurality in *Guardians* stated:

Even if *Bakke* must be taken as ... holding that the statute itself does not reach disparate impact, none of the five Justices whose opinions arguably compel this result considered whether the statute would permit regulation that clearly reach such discrimination. And no Jus-

tice in *Bakke* took issue with the view of the three concurring Justices in *Lau* [*v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) ], who concluded that even if Title VI itself did not proscribe unintentional racial discrimination, it nevertheless permitted federal agencies to promulgate valid regulation with such effect.

*Id.* at 591–92, 103 S.Ct. at 3226–27.

The result of the Court's reasoning appears to be that the administrative regulations implementing the statute are valid and enforceable even though they proscribe behavior which arguably the Court has said is not prohibited by the statute itself.

49. Justice Powell makes the following cogent comment in his separate opinion concurring in the judgement in *Guardians*

> [The] majority of the Court would hold that proof of discriminatory effect suffices to establish liability only when the suit is brought to enforce the regulations rather than the statute itself. And it would seem that the regulations may be enforced only in a suit pursuant to 42 U.S.C. § 1983; ....

*Guardians*, 463 U.S. at 608, n. 1, 103 S.Ct. at 3235, n. 1 (Powell, J., concurring in judgement).

50. Justice O'Connor concurred in the judgement in *Guardians* but specifically disavowed the assertion that Title VI regulations provide a basis for liability under conduct having only a discriminatory impact. *Guardians*, 463 U.S. at 615, 103 S.Ct. at 3238 (O'Connor, J., concurring in judgement). As Justice O'Connor put it:

> If, as five Members of the Court concluded in *Bakke,* the purpose of Title VI is to proscribe *only* purposeful discrimination in a program receiving federal financial assistance, it is difficult to fathom how the Court could uphold administrative regulation that would proscribe conduct by the recipient having only a discriminatory *effect.* Such regulation do not simply "further" the purpose of Title VI; they go well *beyond* that purpose.

*Id.* at 613, 103 S.Ct. at 3238 (emphases in original).

51. While Justice O'Connor's critique seems the most logical, her argument did not, however, sway the Court and this Tribunal is compelled to follow the reasoning applied by the majority. In commenting on the approach of the majority in discerning the standard of proof required to establish a violation of Title VI, Justice Powell wrote that what the Court did in *Guardians* "will further confuse rather than guide" the lower courts. *Guardians*, 463 U.S. at 608 & n. 1, 103 S.Ct. at 3235 & n. 1 (Powell, J., concurring in judgement). Justice Powell's observation is imminently correct. *See Franklin v. Gwinnett County Public School*, 911 F.2d 617, 620 (11th Cir.1990) ("at the outset, we concede some difficulty in application of *Guardians* ... given the various opinions therein[ ]"), *cert. granted*, —— U.S. ——, 111 S.Ct. 2795, 115 L.Ed.2d 969 (1991).

52. The regulatory regime of Title VI clearly provides for reaching the effects of unintentional discrimination. Though neither the Knight Plaintiffs nor the United States briefed the issue, the Plaintiffs are clearly invoking the regulatory framework of Title VI in support of their various claims. The Department of Education has issued a series of regulations governing compliance with Title VI of the Civil Rights Act of 1964. Given the unquestioned history of enforced educational segregation in Alabama, 34 C.F.R. § 100.3(b)(6)(i) is directly applicable. The regulation provides:

> In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin the recipient must take affirmative action to overcome the effects of prior discrimination.

53. The State of Alabama takes strong exception to the argument that the Knight Plaintiffs or the Government can rely on Title VI regulations to broaden the scope of the statute's coverage. According to the state, *Bakke* alone controls the issue regarding the reach of Title VI with respect to the desegregation of public education. Consequently, Title VI in the desegregation

arena provides no more relief than what is provided under the Equal Protection Clause.

54. There are several problems with the State Defendant's analysis. First, if the state is right, then the regulation quoted in ¶ 52 supra, and promulgated under the authority of Section 601 of Title VI has no force and its application to the very situation it was designed to correct is inappropriate. The regulation is directly addressed to entities such as the institutions in the State of Alabama who practiced intentional discrimination. To strip from the regulation its intended object is to deny the regulatory agency the very power Congress gave it.

55. The second argument is premised on *Bazemore v. Friday*, supra, and proceeds on the assumption that since the *Bazemore* Court concluded the Extension Service had satisfied its obligation under Title VI and its regulations [160] by abandoning its intentional discriminatory club assignments, that no greater duty can be imposed on the State of Alabama as it faces the challenges of disestablishing its dual system of higher education.

56. The *Bazemore* Court found that "the Service has taken affirmative action to change it policy ..." and was thus in compliance with the Constitution and Title VI. *Bazemore*, 478 U.S. at 409, 106 S.Ct. at 3013 (White, J., concurring). The Supreme Court believed that the Service had done all it was required to do. In Alabama, on the other hand, while there has been tremendous progress, there still remain areas where the state has not satisfied its obligation to take "affirmative action" to remove the vestiges of discrimination. The Court never held that the regulations were not applicable, they merely held that the Service had met its obligation under the regulations. On this basis alone, *Bazemore's* holding is distinguishable.

57. Aside from the myriad of fundamental dissimilarities between higher education and 4–H clubs, it should be noted

that in *Bazemore* the United States took the position that the Service was in full compliance with the Title VI regulations. This prompted the Court to observe that "[i]n view of the deference due the Department [of Agriculture's] interpretation of its own regulation, we cannot accept [the submission] that the regulation has been violated." *Bazemore*, 478 U.S. at 409, 106 S.Ct. at 3013 (White, J., concurring). In the case at bar the United States has never taken the position that Alabama is in compliance with Title VI regulations. It position is completely to the contrary.

### B. Program–Specific Proof For Title VI Enforcement and the Civil Rights Restoration Act

58. All of the Defendants, in one way or another, allege the Government's and Knight Plaintiffs' Title VI claims are flawed because the Plaintiffs have failed to specifically identify programs which they believe are operated in derogation of Title VI. The University of Alabama System is the strongest proponent of this view. In the university's opinion, the failure in this regard must result in dismissal of the Title VI claims.

59. The University of Alabama clearly articulates this position when it writes:

> The essence of the Title VI violation that the government claims as the basis of this lawsuit is the failure of the several defendants to vouch for one another's compliance with Title VI, and their reluctance to assume responsibility for non-compliance by other federal fund recipients over whom they have no authority. Clarence Thomas, who as Assistant Secretary for Civil Rights of the Department of Education referred this matter to the Justice Department for litigation, acknowledged that this case was not premised upon any finding of non-compliance by the University or any other federal fund recipient. He testified:

---

**160.** The regulations considered in *Bazemore* were identical to those before this Court. *See Bazemore*, 478 U.S. at 412, 106 S.Ct. at 3015

(Brennan, J., dissenting in part) (quoting the regulation).

Q: Indeed, was anybody or any specific institution culpable in the sense of an overt violation of Title VI?

A: I don't think that was the letter of violation. The letter of violation was the maintenance of a dual school system in the post-secondary—at the post-secondary level, statewide, not institution specific, as you said before.

Q: I am asking you, are you aware of anything that The University of Alabama has done, or any of its officers, agents or employees, which violates Title VI?

A: I think that it is The University of Alabama's one [sic], fault is that it is part of a dual school system.

Q: Now, what can The University of Alabama do to remedy that fault?

A: Get all of your other buddies together and develop a plan.

Q: What if we have no control over our buddies?

A: Then I think that you would have to suffer with your buddies.

University of Alabama System's Conclusions of Law ¶ 67, citing 85 UASX 323, pp. 170–72.

60. While well argued, the Defendants' position is, nevertheless unavailing. Title VI prohibits racial discrimination in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Prior to the Civil Rights Restoration Act of 1987, the term "program or activity" was not defined by the Congress. *Grove City v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), is the leading Supreme Court case on the meaning of the term. The Court in *Grove City* held that Title VI liability is established only when the plaintiff can show discrimination in a particular program or activity specifically supported by federal funds. *Id.* at 570–76, 104 S.Ct. at 1220–23. Thus, the Court ruled that only those programs which received federal funding were subject to federal regulation. For example, if a college or university restricted the use of federal funds to its financial aid program, then only the financial aid program was subject to Title VI anti-discrimination regulations. The other

nonfederally funded programs within the institution remain unregulated. Therefore, *Grove City* required the plaintiff who brought a claim under Title VI to prove that a specific program receiving federal assistance was discriminatory; and moreover, any potential remediation would be limited only to the funded program and could not be implemented institution wide.

61. Congress was displeased with the Supreme Court's narrow construction of the term "program or activity" and over the veto of President Reagan amended Title VI by passage of the Civil Rights Restoration Act of 1987. 42 U.S.C. § 2000d–4a (1988). The purpose of the Restoration Act is to legislatively overturn the majority's holding in *Grove City* and again bring Title VI into line with congressional intent. S.Rep. No. 64, 100th Cong., 1st Sess. 4, *reprinted in* 1988 U.S.Code Cong. & Admin.News, 1, 6.

62. To this end, Congress defined the term "program or activity" to make clear that when federal financial assistance is extended to part of a college or university, or public system of higher education, all the operations of the institution or educational system are covered, not just the program receiving the federal assistance.

63. As this Court has said once before, the inescapable conclusion is that Congress intended Title VI to be given the broadest possible interpretation "to assist in the struggle to eliminate discrimination from our society by ending federal subsides for such discrimination." *Knight v. Alabama*, No. 83–M–1676–S, slip. op. at 16 (N.D.Ala. Mar. 12, 1990) *quoting*, S.Rep. No. 64, 100th Cong., 1st Sess. 7, *reprinted in* 1988 U.S.Code Cong. & Admin.News, 1, 9.

64. Without belaboring the point any further, the Court has specifically found that there is a system of higher education in Alabama, that the members of that system receive federal financial aid and that each of the Defendants belongs to the system. On this basis alone, there is ample authority under the Civil Rights Restoration Act to impose liability upon the Defendants, system wide, notwithstanding

the failure of the Government or the Knight Plaintiffs to point with particularity to any one program.

65. The Defendants cite approvingly to the decision of the Eleventh Circuit in *United States v. Alabama*, 828 F.2d 1532 (11th Cir.1987), *cert. denied, sub nom. Board of Trustees of the Alabama State University v. Auburn University, et al.*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988), which specifically directed that the Knight Plaintiffs and the United States were required upon remand to plead "which particular programs or activities received federal funding and how these programs were discriminatory." *Id.* at 1551. The Court framed the issue before it as "whether the broad systemic approach adopted by the United States is permissible under title VI of the Civil Rights Act of 1964." *Id.* at 1547.

66. As the Circuit saw it, the Government's claims were a "variant on the broad 'associative' theories that have been soundly repudiated by the Supreme Court...." *Alabama*, 828 F.2d at 1547. The Appellate Court cited *Grove City* as authority. The discussion by the Circuit centers on the limitation imposed by the program specific language of the statute. On the authority of the precedent then before the Court, the Eleventh Circuit was concerned that plaintiffs not use broad concepts like the "University of Alabama system to circumvent the program specificity requirement of title VI." *Id.* at 1550 (internal quotation marks omitted).

67. Much of the Circuit Court's analysis has been rendered moot by passage of the Restoration Act. Indeed, it is worth noting that during the floor debates on the Restoration Act, Senator Lowell Weicker of Connecticut commented that the opinion in *United States v. Alabama* regarding Title VI liability was precisely the sort of result which the Restoration Act is intended to reverse. 134 Cong.Rec. S50 (daily ed. Jan. 26, 1988) (statement of Sen. Weicker). The very concerns expressed by the Eleventh Circuit that program specificity not be circumvented are no longer valid in the context of this litigation.

68. As the Court previously stated, it has examined in great detail each of the institutions in Alabama in isolation so that it can formulate a remedial decree that addresses with specificity the improper conditions existing in Alabama's system of higher education. This Court has not gone blindly charging into the system of higher education without a recognition and appreciation for the considerable autonomy each institution exercises. That however, does not negate the fact that each institution in Alabama is a member of a statewide system, the entirety of which receives federal funding, thus bringing it, *as a system*, under the mandate of Title VI. Indeed, several of the Defendants, including among others, the state, the University of Alabama system and Auburn University felt that there were enough issues of commonality that they submitted a post-trial document that titled Proposed Findings of Fact—Statewide Issues.

## THE DEFENSES OF RES JUDICATA AND COLLATERAL ESTOPPEL

### A. Res Judicata

69. Auburn University at Montgomery and the State Board of Education both place considerable reliance on the doctrine of *res judicata* as a bar to the claims of the Knight Plaintiffs. AUM maintains that the *ASTA* ruling affirmatively blocks the claims of the Knight Plaintiffs with respect to the establishment and operation of AUM, including its alleged unlawful effect on the plaintiff class. The SBE asserts that the *Lee v. Macon County* litigation prohibits the private plaintiffs from pursuing their claims against the State Board of Education and institutions under its direction.

70. Under the doctrine of *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under the related doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a

party to the first case, or one in privy with him. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

71. Federal courts apply the law of the state in which they sit with respect to the doctrine of *res judicata.* Under Alabama law, the essential elements of *res judicata* are: (1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits. *N.A.C.C.P. v. Hunt,* 891 F.2d 1555, 1560 (11th Cir.1990). If all these elements are met, any claim that was or could have been adjudicated in the previous action is precluded. *Ibid.* If even one of the four elements is not met, however, the doctrine of *res judicata* is inapplicable. *Ibid.*

72. The federal courts have routinely held that *res judicata* prohibits the relitigation of all issues "which were or could have been raised" in the prior action. *Olmstead v. Amoco Oil Co.,* 725 F.2d 627, 631–32 (11th Cir.1984); *Hunt,* 891 F.2d at 1560. The preclusive effect of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial. *Olmstead,* 725 F.2d at 632.

73. Recognizing the importance of the policies behind the *res judicata* doctrine, the courts have repeatedly held that judgments can bind persons not parties to the litigation in question. *Hunt,* 891 F.2d at 1560–61; *Delta Air Lines, Inc. v. McCoy Restaurants, Inc.,* 708 F.2d 582, 587 (11th Cir.1983). Clearly, *res judicata* applies to persons who were actually parties in the previous litigation. *Lary v. Ansari,* 817 F.2d 1521, 1523 (11th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987). The doctrine also applies to persons who are in privity with the parties to the original suit. *Ibid.* This is true, for example, where the non-parties' "interests were represented adequately by a party in the original suit." *Id.* Put another way, "a person may be bound by a judgement even though not a party to a suit, if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative." *Aerojet–General Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir.), *cert. denied, sub nom., Metropolitan Dade County, Florida v. Aerojet–General Corp.,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); *Hunt,* 891 F.2d at 1560–61. As stated in *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979), "[u]nder the doctrine of *res judicata,* a judgement on the merits in a prior suit bars a second suit involving the same parties or their privies...." The question of whether sufficient privity exists to warrant application of *res judicata* is a question of law.

74. It is well-settled that "the principal test for comparing causes of action is whether the primary right and duty or wrong are the same in each action." *Hunt,* 891 F.2d at 1561. In determining whether causes of action are the same for *res judicata* purposes, the substance of the actions, and not the form, controls. *Ray v. Tennessee Valley Auth.,* 677 F.2d 818, 821 (11th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). The controlling cases further explain that *res judicata* applies to not only the exact legal theories advanced in the prior case, but to all legal theories and claims arising out of the same nucleus of operative facts. *Hunt,* 891 F.2d at 1561.

### B. Collateral Estoppel

75. According to Auburn, *res judicata* is the preclusion doctrine which most clearly controls the Court's analysis of their defense based on *ASTA.* Nevertheless, they also advance the doctrine of collateral estoppel as an additional avenue for analysis based on the contention that the Knight Plaintiffs have asserted new causes of action in the hopes of avoiding the alleged bar of *ASTA.*

76. The Eleventh Circuit has recently discussed the contours of collateral estoppel.

[C]ollateral estoppel or 'issue preclusion,' recognizes that suits addressed to particular claims may present issues relevant to suits on other claims.... In order to effectuate the public policy in favor of minimizing redundant litigation, issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties.... It is insufficient for the invocation of issue preclusion that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.

*Empire Fire & Marine, Ins. Co. v. J. Transport Inc.*, 880 F.2d 1291, 1295 (11th Cir.1989) *quoting, Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530 (5th Cir.1978).

## C. Auburn's Defense Is Of No Avail

77. As a preliminary matter, the claims of the United States are certainly not barred by the *ASTA* litigation. The United States was not a party to the case, and neither is it in privity with the *ASTA* plaintiffs. The claims raised by the United States are distinctly different than those advanced by the *ASTA* plaintiffs.

78. The *ASTA* litigation concerned the rather narrow issue of whether the establishment and operation of AUM would impermissibly retard the desegregation of ASU and frustrate the requirement that the state abolish its former dual system of higher education. On these two issues the three-judge court determined that the plaintiffs did not carry their burden. If, in the case at bar, the United States or the Knight Plaintiffs were attempting to close AUM because it thwarts the desegregation of ASU, then the bar of *res judicata* would prevent them from doing so.

79. The issues in this case concern the elimination of vestiges from the former dual system on a statewide basis. *ASTA*, on the other hand, concerned only the impact which the establishment of AUM would have in the Montgomery area. In essence, what the *ASTA* court determined was that all things being equal, AUM as envisioned in 1968 would not hinder the state in meeting its obligations to eradicate the practices being equal, AUM as envisioned in 1968 would not hinder the state in meeting its obligations to eradicate the practices arising during the period of *de jure* segregation. In scope and purpose, the present litigation is markedly different than the *ASTA* case.

80. Auburn argues that the issues currently pending involving academic program duplication in business and education courses were decided by the *ASTA* court and may not be relitigated in this action. This Court disagrees. First, there is no indication that the issue of program duplication influenced the *ASTA* court's decision or that it even considered the issue. To be sure, the court was aware of the intended initial academic program offerings at AUM. That awareness does not mean, however, that AUM would henceforth be able to offer any approved academic program irrespective of its impact on the state's duty to rid the system of vestiges of discrimination. Second, AUM was in its infancy when the *ASTA* court determine that the state could establish the university. As the three-judge court itself recognized, much of the argument concerning the impact of AUM on the disestablishment of the dual system was based on speculation. Many years have now passed, and this Court need not speculate in order to conclusively determine that program duplication between AUM and ASU in the area of business and education courses detrimentally impedes the desegregation of ASU.

## D. Lee v. Macon Does Not Prevent The Claims Against The SBE

81. The claims raised in *Lee v. Macon*, 267 F.Supp. 458 (M.D.Ala.), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967), are not a bar to the current action against the SBE. *Lee v. Macon* concerned the desegregation of certain institutions under the control of the SBE at the time. It was not concerned with the eradication of vestiges of segregation in the statewide system of higher edu-

cation. At any rate, *Lee v. Macon* certainly did not concern the issue of program duplication and it is only on this question that the Court has found liability against the SBE and Calhoun State Community College.

### SUMMARY OF THE ACTIONABLE VESTIGES OF DISCRIMINATION SURVIVING IN ALABAMA

82. As identified in the Court's Findings Of Fact, and as a matter of law, there is in Alabama a system of higher education as contemplated by Title VI. Though disparate, the system nonetheless exists.

83. The Court has utilized the principles of law previously discussed in identifying the several remaining vestiges of segregation within the system of higher education which violate Title VI of the Civil Rights Act of 1964 and the Constitution of the United States. In particular, the Court finds that vestiges remain within the practices of some Defendants in the following areas: faculty and administrative employment, state funding for higher education, facilities on the HBUs, admissions policies, and program duplication. To the extent that these vestiges of the former *de jure* system impede the desegregation of the state's HBUs, or limit African American access to the predominately white institutions, the Court has formulated a Remedial Decree designed to eliminate these practices root and branch.

84. In its Remedial Decree, the Court has directed that it receive annual reports concerning a number of areas on a system-wide basis. Reports in these areas are important in order to assure overall compliance with the Remedial Decrees objectives and to guarantee that any change in an institution's policy does not frustrate the goals of the Court's decree.

85. As is clear from the Court's Findings Of Fact many of the theories advanced by the Plaintiffs were not supported by the weight of their evidence. For example, the claims with respect to the land grant issues clearly did not survive the rebuttal evidence of Auburn. As a matter of law, and for the reasons set out in the Findings Of Fact, the Court finds that the primary land grant functions would have been provided to Auburn University irrespective of the discrimination existing at the time of Auburn's designation as the recipient of the Hatch Act funds or the Smith–Lever funds.

■ 86. For the reasons set forth in the Findings of Fact, the Court also concludes as a matter of law that the purported nineteenth century promise by the state to ASU's predecessor that it should provide to black students the equivalent academic offerings provided to white students has no force and effect as a basis for liability against the state.

### THE ELEVENTH AMENDMENT AND THE COURT'S REMEDIAL POWERS

#### A. Eleventh Amendment Jurisprudence

87. With great amazement the Court notes that neither the Knight Plaintiffs, the United States nor the State of Alabama briefed, except in the most passing way, the application of the Eleventh Amendment to this case. The remedial objectives of the Knight Plaintiffs and the United States are fraught with Eleventh Amendment complexity which this Court cannot ignore.[161]

88. The Eleventh Amendment to the Constitution changed the result of the Supreme Court's decision in *Chisholm v. Gerogia*, 2 Dall. 419, 1 L.Ed. 440 (1792). In *Chisholm*, the Court held that a state was subject to suit by a citizen of another state

---

**161.** In passing on the motions to dismiss, this Court dealt extensively with Eleventh Amendment challenges to the Knight Plaintiffs' Fourteenth Amendment claims. *See Knight v. Alabama*, No. 83–M–1676–S slip. op. at 65–69 (N.D.Ala. Mar. 12, 1990). Relying on the Supreme Court's holding in *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), this Court held that the private plaintiffs Fourteenth Amendment claims could go forward since the Complaint alleged an ongoing constitutional violation. The issues now, however, are significantly different since the Court is faced with determining the scope and reach of a remedial decree based on the facts established at trial.

or foreign county. This holding literally shocked the nation and provided the impetus behind the ratification of the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 662, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State.

89. While the Amendment had the immediate result of reversing the *Chisholm* holding its real significance lies in its constitutional circumscription of federal court jurisdiction based on the principles of sovereign immunity. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984).

90. A sovereign's immunity is, of course, subject to waiver, and the Supreme Court has said that a state may consent to suit against it in federal court if there is an unequivocal waiver by the state of its constitutional protections under the Eleventh Amendment. *Edelman*, 415 U.S. at 673, 94 S.Ct. at 1361. Similarly, Congress has the authority with respect to rights protected by the Fourteenth Amendment to abrogate a state's Eleventh Amendment immunity, though the expression to do so must be unequivocal.[162] *Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907. The Supreme Court's "reluctance to infer that a State's immunity from suit in federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system." *Ibid.*

91. In addition to the proscription on suit in federal court, the Eleventh Amendment also protects the fisc of the state.

*Edelman*, 415 U.S. at 663, 665, 94 S.Ct. at 355–56. This protection is not however, absolute.

92. In the land mark case of *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held that a suit against an officer of the state directing him to cease unconstitutional conduct is not a suit against the state within the meaning of the Eleventh Amendment. *Id.* at 155–56, 28 S.Ct. at 452. This holding permitted the Fourteenth and Fifteenth Amendments to the Constitution "to serve as a sword, rather than merely as a shield, for those whom they … protect." *Edelman*, 415 U.S. at 664, 94 S.Ct. at 1356. The relief awarded in *Ex parte Young* was prospective only as the state official was enjoined to conform his future conduct to the requirements of the Fourteenth Amendment. "The injunction issued in *Ex parte Young* was not totally without effect on the state's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions." *Id.* at 667, 94 S.Ct. at 1357. The importance of *Ex parte Young* is brought into sharp relief by the holding of *Edelman v. Jordan*.

93. *Edelman* involved a suit for money damages and for injunctive relief. The suit alleged that state officials had improperly withheld disability benefits from the plaintiff and similarly situated class members. Applying the Eleventh Amendment, the Court noted that the suit was barred because it sought "the award of an *accrued* monetary liability …" which represented "retroactive payments." *Edelman*, 415 U.S. at 663–64, 94 S.Ct. at 1355–56, *quoted in, Milliken v. Bradley*, 433 U.S. 267, 289,

---

**162.** The Congress has specifically waived Alabama's Eleventh Amendment immunity for claims arising out of Title VI. In 42 U.S.C. § 2000d–7, it provides in part:

> (a)(1) A State shall not be immune under the Eleventh Amendment of the Constitution … from suits in Federal court for a violation of … title VI….

. . . . .

(b) The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or part after October 21, 1986.

**1370**

97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977) (emphasis in original). Yet, the *Edelman* Court held that the state could be obligated to spend public monies if the expenditure of those monies was "the necessary result of compliance with decrees which by their terms were prospective in nature." *Edelman*, 415 U.S. at 668, 94 S.Ct. at 1358. Chief Justice Rehnquist writing for the majority in *Edelman* observed:

> State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is permissible and often an inevitable consequence of the principles announced in *Ex parte Young*, ....

*Ibid.*

94. The relief permitted by *Ex parte Young* and that barred by *Edelman* is the difference between "prospective relief on the one hand and retrospective relief on the other." *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979). Commenting on the distinction, the *Quern* Court cited the following language from *Edelman*:

> [T]hat portion of the District Court's decree which petitioner challenges on Eleventh Amendment grounds goes much further than [*Ex parte Young* and the cases that had followed it]. It requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard.... It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.

*Id.* at 337–38 n. 6, 99 S.Ct. at 1143 n. 6 (emphasis added).

95. *Ex parte Young* focuses on *ongoing* violations of federal law "as opposed to cases in which federal law has been violated at one time or over a period of time in the past...." *Papasan v. Allain*, 478 U.S. 265, 277–78, 106 S.Ct. 2932, 2939–40, 92 L.Ed.2d 209 (1986). Relief that in essence serves to compensate a party injured by past illegal state conduct is barred by the Eleventh Amendment. Only that relief which is designed to bring an end to a *present* violation of federal law is not barred by the Eleventh Amendment "even though accompanied by a substantial ancillary effect on the state treasury." *Id.* at 278, 106 S.Ct. at 2940.

**B. *The State's Duty To Eradicate Vestiges Existing At The HBU's Facilities***

96. This Court has specifically found that there continues to exist in Alabama vestiges of segregation with regard to the condition of the facilities on the HBUs. These vestiges are a direct result of the failure of the state in the *past* to fund the capital development of its predominately black schools. The Court has also found that since at least 1983, the state has fulfilled its obligation to fund capital development in a nondiscriminatory manner. Therefore, this Court cannot conclude that there is a *present* violation of federal law with regard to *capital funding procedures*.

97. The conclusion that there is no ongoing violation of the funding procedures does not vitiate the fact that the condition of the facilities on the HBUs continues to be a vestige of segregation which must be eliminated by the state if its actions are to comport with the Constitution. In this instance the Eleventh Amendment and the Fourteenth Amendment stand juxtaposed compelling the Court towards opposite conclusions.

98. The Fourteenth Amendment requires the state to eliminate vestiges of discrimination on the HBU campuses root and branch. The state has essentially three methods of so doing. First, it can

eliminate the vestiges in facilities by spending the funds necessary to correct the situation which its past unconstitutional conduct created. Second, it can transfer adequate facilities to the predominately black schools from other institutions, or third, it can take the least desirable and most difficult path and decide to close the institutions.[163]

99. As the Court reads the Eleventh Amendment jurisprudence, it cannot compel the state to expend money from its coffers for facilities in this instance for at least two reasons: First, the state action which caused the current unconditional situation is no longer ongoing. In fact it ended by at least 1983 and there is no indication that the state intends to resume its illegal conduct. *Papasan* clearly teaches that the *Ex parte Young* exception to the Eleventh Amendment has focused on cases where there is an ongoing violation of federal law as opposed to a case where federal law has been violated over a period of time in the past. *Papasan*, 478 U.S. at 277–78, 106 S.Ct. at 2939–40. Second, the amount of money which the Court has found to be necessary to eliminate the vestiges attached to HBUs' facilities is an *accrued* monetary liability arising from a prior breach of a legal duty, viz., the nondiscriminatory funding of capital projects.[164]

100. The Court's determination of the monies needed to eliminate the vestiges of segregation which cling to the HBUs physical plant should be viewed as a benchmark. Given the political paralysis which engulfs the state with regard to this case, the Court feels it important to provide the parties with some guidance. The state may choose any option which will satisfy its obligation to eliminate the vestiges of segregation. The state may not, however, allow the vestiges to remain.

101. This Court has struggled mightily with the manifold difficulties of balancing the state's obligation to eliminate discrimination root and branch and the limitations inherent in the Eleventh Amendment. The Court has considered in great detail the Supreme Court's decision in *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), in an effort to discover the appropriate conclusion to this complex problem. *Milliken* comes the closest to providing a justification for the Court to reach the public fisc of the state in this instance.

102. One of the issues before the Court in *Milliken* concerned whether a trial judge, consistent with the Eleventh Amendment, could require state officials to bear part of the cost associated with a program designed to eradicate vestiges of segregation which arose during a period of *de jure* school segregation. The District Court in *Milliken* had ordered the State of Michigan to pay a portion of the desegregation plan for the City of Detroit. The state objected, arguing that the court's order was "indistinguishable from an award of money damages against the state based upon the asserted prior misconduct of state officials." *Milliken*, 433 U.S. 267, 289, 97 S.Ct. 2749, 2761–62, 53 L.Ed.2d 745 (1977).

103. The Supreme Court rejected the state's position. It found that the District Court's "decree to share the future cost of [the desegregation plan] ... fits squarely within the prospective-compliance exception reaffirmed by *Edelman*." *Milliken*, 433 U.S. at 289, 97 S.Ct. at 2761–62. The Court went on to state that the decree was based on the authority given the federal courts under the holding of *Ex parte Young* to

**163.** The Court does not believe that the third option is viable or necessary. The Court simply must acknowledge that the State of Alabama has no federal constitutional obligation to maintain *any* institution of higher education. It does, however, have the obligation to eliminate vestiges of segregation in those institutions it establishes and operates.

**164.** The best evidence for the amount of money necessary for capital improvements is derived

from the capital needs statement in ACHE's 1990–91 Unified Budget Recommendations. STX 112; *see* Finding of Fact ¶¶ 1372–75. The numbers which are used in the calculation to determine the amount of the critical need are reported data from the institutions concerning the condition of their facilities. The calculus is driven in large measure by the age of the buildings and the state of their deterioration.

"enjoin state officials to conform their conduct to the requirements of federal law...." *Ibid.* The Court was careful to point out that the plan as developed by the District Court was not "intended to wipe the slate clean by one bold stroke ..." as could a retroactive award of money. *Id.* at 290, 97 S.Ct. at 2761–62.

104. This Court, in contrast, has found that the vestiges remaining as a result of the state's prior discriminatory capital funding process can be eliminated in their entirety by the appropriation of the monies the court has indicated. It is not a step along the path but the entire journey. The issues examined by the Court fall more on the *Edelman* side of the Eleventh Amendment equation than on the *Ex parte Young* side.

■ 105. Regardless of the reach of the Eleventh Amendment, the Court has determined the monetary amount necessary to remediate the state's past wrong in its expenditures for facilities at the institutions whose student bodies have historically been and even now are almost exclusively African American.[165]

### THE CONSTITUTIONALITY OF ALABAMA CODE SECTION 16–50–20(a)

■ 106. The United States has challenged the constitutionality of a provision within the Alabama statute creating Alabama State University's Board of Trustees.[166] The provision mandates that "at least one-half of the board shall be from the prevailing minority population of the state...." Ala.Code 16–50–20(a). The Government contends that the provision violates the Equal Protection Clause of the United State's Constitution under the standards set forth in *City of Richmond v. J.A. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The Knight Plaintiffs and Alabama State University dispute the United States' position.

107. In 1887, the Alabama State Legislature created a State Normal School for Colored students in Montgomery under the governance of the all-white State Board of Education. In 1929, the school was named Alabama State Teachers College and for a short while offered a four year course of study.

108. In 1954 Alabama State Teachers College had an all-black student body, faculty and administration. No white person has served as president or in other administrative positions since 1915. The School did not admit white students until 1968. As of the 1989–1990 school year the student body remained over 97% black. 118 of its 181 faculty members and 22 of its 26 administrators were black.

109. In 1969, the name of the school was changed to Alabama State University and in 1975 the school was organized as a public university under its own board of trustees. 1975 Ala.Acts No. 790. Previous to 1975 the school was governed by the State Board of Education, which was composed solely of white persons. After organization of its own Board, control of ASU was in the hands of five whites and four blacks. Between 1975 and 1985 the membership of the Board changed to include

---

**165.** It is well settled that the Eleventh Amendment does not apply to the United States. *See, United States v. Mississippi,* 380 U.S. 128, 140, 85 S.Ct. 808, 814–15, 13 L.Ed.2d 717 (1965) (nothing in the Eleventh Amendment "has ever been seriously supposed to prevent the State's being sued by the United States"). Yet this Court has found no cases where the Government, through judicial order, can compel the state to expend money to remediate vestiges remaining from a prior violations of federal or constitutional law.

In passing, the Supreme Court in a case factually dissimilar from the one at bar observed that the "United States' presence in [a] case for any purpose does not eliminate the State's immunity for all purposes. For example, the fact that the

federal court could award injunctive relief to the United States on federal constitutional claims would not mean that the court could order the State to pay damages to other plaintiffs." *Pennhurst,* 465 U.S. at 103 n. 12, 104 S.Ct. at 909 n. 12.

Because of the absence of authority and the profound implication for our federalist system, the Court does not believe that it should chart these waters. Such efforts more appropriately belong to the appellate courts.

**166.** The United States has raised no challenge to the current composition of the Alabama State University Board of Trustees and the same is not before the Court.

eight blacks and one white. In 1983 an additional member of the Board was added, and in 1986 membership of the Board of Trustees was enlarged from ten to twelve. 1983 Ala.Acts No. 83–573; 1986 Ala.Acts No. 86–540. Alabama State University's present Board of Trustees consists of nine black members and three white members.[167]

110. The statutory plan for the composition of Alabama State University's Board of Trustees follows the general pattern[168] applicable to most[169] public institutions of higher education in the state. The Governor is *ex officio* president of the board. Members are either appointed at large[170] or from a congressional district. Unless a trustee is appointed at large, current residence in the "congressional district" from which one was appointed is a continuing requirement for remaining a trustee. Members appointed at large must reside in different congressional districts on appointment.

111. At its establishment in 1975, ASU's board consisted of the Governor, two at large members and one member from each of Alabama's seven congressional districts. 1975 Ala.Acts No. 790. Subsequently, an additional member was added from "the congressional district in which the institution is located." 1983 Ala.Acts No. 83–573. In 1986, the board was increased by two additional at large members. 1986 Ala.Acts No. 86–540. Thus, the current membership includes the Governor (*ex officio*), eight members from "congressional districts" (two from Montgomery and one from each of the other six districts) and four at large members.

112. The remaining statutory provision governing the composition of Alabama State University's Board of Trustees is the subject of the United State's Constitutional challenge. Codified as Section 16–50–20(a) of the Code of Alabama, the provision requires that: "[T]rustees shall be appointed by the governor, by and with the advice and consent of the senate, in such manner that ... at least one-half of the board shall be from the prevailing minority population of the state according to the last or any succeeding federal census."[171] Since African Americans are the prevailing minority in the state of Alabama it is clear that the purpose, as well as the prospective effect, of the provision is to ensure that one half of the Alabama State University Board of Trustees are black.

113. The United States argues that such a provision is the very evil that the Fourteenth Amendment was designed to prevent. The effect of the provision is to ensure that no Asian American, no American Indian, no Pacific Islander, no person of Hispanic ancestry, nor any white person can be appointed to the ASU board from at least two of the seven "congressional districts."[172] According to the United States, the fact that the provision advantages blacks, a group which has traditionally been the target of discriminatory laws, is of little moment. Under the United States Constitution which race is being denied equal protection is irrelevant. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 494, 109 S.Ct. 706, 721, 102 L.Ed.2d

---

**167.** This figure excludes the governor, who is the *ex officio* President of the Board.

**168.** The State Superintendent of Education is an *ex officio* member of the Board of Trustees of the schools which had independent boards established by 1967 but not a member of either ASU's or AAMU's Board of Trustees.

**169.** Athens State College or Calhoun State Community College is governed by the State Board of Education to this day.

**170.** AU, UA, JSU and TSU have no at large trustees.

**171.** The provision was amended to include the quoted language in 1986. Previous to 1986 the provision had required three members of the board be from the "prevailing minority population of the state."

**172.** This conclusion is obvious when one starts from the proposition that "at least half" means seven of the thirteen members, and thus seven of the twelve members appointed by the governor unless the governor is a member of the "prevailing minority race." Even if each of the four at large members were black and one of the two home district members were black then at least two "congressional districts" may only be represented by black members.

854 (1989). The United States concludes that since the provision requires an absolute racial test for public appointment no rationalization can serve as its justification, and the provision should therefore be stricken as contrary to the Fourteenth Amendment.

114. On the other hand, Alabama State University contends that States which have discriminated in the past are justified in taking steps to overcome that past and to guard against discriminating in the future. ASU points out that the record is replete with instances of discrimination on the part of the State of Alabama directed towards the institution and those it serves. Consequently, ASU maintains that the provisions' goals are justified and the means used are narrowly tailored to achieve that goal.

115. The Knight Plaintiffs, rather than defending the statute, have presented arguments designed to show that the Court should not address the constitutionality of the challenged provision at this time. These arguments, however, are of little merit and are addressed only in passing. The Knight Plaintiffs' first contention is that the Constitutional issues raised by the United States are not ripe for resolution. They argue that the United States did not give adequate notice of its intention to challenge the provision and, thus, neither the Defendants, nor the Knight Plaintiffs, have had an adequate opportunity to adduce evidence on the issue. Moreover, the Knight Plaintiffs argue, since the statute has never been invoked, any potential harm threatened by the statute is purely speculative in nature.

116. These arguments ignore the fact that the United States is challenging the constitutionality of the statute on its face. To prevail the United States must show that "no set of circumstances exists under which the Act would be valid. The fact that [it] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [it] wholly

invalid." *Rust v. Sullivan,* 500 U.S. ——, ——, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233, 249 (1991), *quoting, United States v. Salerno,* 481 U.S. 739, 754, 107 S.Ct. 2095, 2105, 95 L.Ed.2d 697 (1987). This Court can conceive of no evidence, not already contained in the extensive record of this case, which would be relevant to defend against the facial challenge raised by the United States.[173] Additionally this Court is unsympathetic to the suggestion that other parties to this action have not been afforded an adequate time in which to prepare and present a defense of the statute. The contentions raised by the United States have been a part of this case since its inception.

117. The Knight Plaintiffs' second argument against the justiciability of this issue is equally defective. They point out that under Alabama law, where any statute is alleged to be unconstitutional, the State Attorney General shall be served with a copy of the proceeding and entitled to be heard. Section 6–6–227 Code of Alabama. The Knight Plaintiffs contend that the United States has not served the Attorney General with any formal copy of its argument that the challenged provision is unconstitutional. Consequently, they argue, the Alabama Attorney General has not been afforded an opportunity to carry out his responsibilities, and this Court is properly barred from proceeding on this issue. The Knight Plaintiffs are unable, however, to direct the Court to any authority which provides that a state may erect procedural conditions to the ability of a Federal Court to apply the United States Constitution.

118. Having addressed the procedural objections raised by the Knight Plaintiffs, the Court will now address the substantive issue of whether Alabama is entitled, under the Fourteenth Amendment of the United States Constitution, to condition eligibility for one half of the seats on the Alabama State University Board of Trustees on race.

119. The Fourteenth Amendment to the United States Constitution provides that

**173.** For its part, the United States has argued exclusively from facts which were stipulated as

part of the record.

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; ... nor deny to any person within its jurisdiction equal protection of the laws." This amendment protects races and classes of persons by prohibiting any state legislation which has the effect of denying to any race or class, or to any individual, the equal protection of the laws. *The Civil Rights Cases*, 109 U.S. 3, 24, 3 S.Ct. 18, 31, 27 L.Ed. 835 (1883). "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the states." *Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010 (1967). "Over the years, the Supreme Court has consistently repudiated [d]istinctions between citizens solely because of their ancestry as being odious to a free people whose institutions are founded upon the doctrine of equality." *Id.* at 11–12, 87 S.Ct. at 1823; *Brown v. Board of Education*, 347 U.S. 483, 493–495, 74 S.Ct. 686, 691–92, 98 L.Ed. 873 (1954); *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954); *Strauder v. West Virginia*, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880).

120. Although government action based on race is always suspect, *City of Richmond v. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Palmore v. Sidoti*, 466 U.S. 429, 432, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984), it is not always unconstitutional. Nor is race always irrelevant to sound governmental decision making. *See, Wygant v. Jackson Board of Education*, 476 U.S. 267, 314 & n. 7, 106 S.Ct. 1842, 1868 & n. 7, 90 L.Ed.2d 260 (1986) (Stevens, dissenting). Courts have taken race into account in remedying past acts of intentional, unlawful discrimination on the basis of race. *See, United States v. Paradise*, 480 U.S. 149, 166, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987); *Wygant*, 476 U.S. at 286, 106 S.Ct. at 1853 (O'Connor concurring in judgment and concurring part). Government authorities are entitled, likewise, in certain circumstances to take race into account when necessary to remedy prior discrimination. *See, Wygant,*

476 U.S. at 277, 106 S.Ct. at 1848; *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).

121. Where a state or local government adopts a racial or ethnic preference in order to remedy past discrimination, however, such use of race or ethnicity is subject to strict scrutiny. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–495, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). As Justice O'Connor explained,

> Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

*Id.* at 493, 109 S.Ct. at 721. Under the test set forth in *City of Richmond*, the racial classification must be narrowly tailored to achieve a compelling governmental interest. *Id.* 488 U.S. at 494, 109 S.Ct. at 721.

122. The United States contends that the provisions of the Alabama Code which dictate that half of the Board of Trustees of Alabama State University be "of the prevailing minority population" cannot pass the strict scrutiny mandated by the Supreme Court in *City of Richmond*, supra. First, the United States argues that no compelling state interest is served by the provision since blacks have never been discriminated against in the appointment of persons to the ASU Board of Education. According to the stipulated facts of this case, since shortly after its establishment in 1975, the Board of Trustees for ASU has always been majority black. In 1985, just before the adoption of the statute chal-

lenged here, the board was composed of eight blacks and one white.

123. ASU, on the other hand, contends that the goal of the racial minority provision is not only to remedy past racial discrimination in the governance of higher education in Alabama but to prevent a return of discrimination as to ASU. ASU refers broadly to the history of race relations in the United States during the decade of the 1980's as support for the proposition that the advances made by blacks during the 1970's are inherently insecure and must be protected. According to ASU there is no guarantee that future governors and state senators will not revert to discriminating against blacks in appointments to the ASU Board of trustees. ASU concludes that the goal of preventing a resumption of discrimination as to ASU, in conjunction with the goal of remedying the broader pattern of past discrimination in higher education in Alabama as a whole, is a compelling state interest which supports the racial minority provision.

124. In the view of this Court, however, the racial minority provision cannot be justified as a remedy of past discrimination. Although the governance of higher education was reserved to white citizens in the years prior to 1975, that discrimination has ostensibly been rectified. Even had the generalized statewide discrimination not been rectified, however, the provision at issue here is directed at, and limited to, Alabama State University's Board of Trustees. There is no evidence of any past racial discrimination in *appointments* to the Board of Trustees of Alabama State University. Since shortly after its inception in 1975, blacks have been in majority control of ASU's Board. The State of Alabama can have no compelling interest in remedying discrimination which did not occur. *See, Croson*, 488 U.S. at 505, 109 S.Ct. at 727 (Where no evidence of discrimination within the Richmond construction industry, the city of Richmond has no compelling interest in apportioning construction projects on the basis of race).

125. Nor does this Court find that Alabama's interest in preventing a threatened return of discrimination justifies the clear racial preference on the face of the challenged provision. In the context of state or local governmental actions the Supreme Court has, thus far, endorsed only one justification for a racial preference sufficiently compelling to survive strict scrutiny: the governments interest "in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination." *Regents of the University of California v. Bakke*, 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978); *Croson*, 488 U.S. at 493–498, 109 S.Ct. at 721–23; *Roberts v. United States Jaycees*, 468 U.S. 609, 624–625, 104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462 (1984). This Court has not been directed to, nor has it found, any authority for the proposition that racial preferences may be justified by the state's compelling interest in preventing "future discrimination." The Court is not surprised by this dearth of authority. A racial preference adopted without remedial purpose, and to prevent circumstances not yet threatened,[174] is simply too attenuated to withstand strict scrutiny. Such racial preferences are clearly offensive to the Equal Protection Clause of the Fourteenth Amendment unless closely related to a legitimate remedial purpose. As the Supreme Court has observed, "It is far too late to argue that the guarantee of equal protection to *all* persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others." *Bakke*, 438 U.S. at 295, 98 S.Ct. at 2751 (footnote omitted and emphasis in original).

126. Having rejected both of the reasons offered in support of the racial minority provision, this Court must find that the state of Alabama has no compelling interest to support the legislation. At this point, to carry on with a determination of whether the legislation is narrowly tailored to meet that interest would be pointless.

---

**174.** ASU points only to a generalized assertion that race relations in the United States during the decade of the 1980's have become more bitter as evidence that the Alabama State University Board of Trustees is threatened by recidivistic discriminatory animus.

### THE SCOPE OF THE COURT'S REMEDIAL POWER

■ 127. The objective of the remedial decree must be the elimination from Alabama's system of higher education all vestiges of state-imposed segregation. In fashioning a desegregation decree the court will be guided by equitable principles. *Brown II*, 349 U.S. at 300, 75 S.Ct. at 756.

Application of those "equitable principles," ... requires federal courts to focus upon three factors. [F]irst ..., like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. The remedy must therefore be related to "the *condition* alleged to offend the Constitution...." Second, the decree must ... be *remedial* in nature, that is, it must be designed as nearly as possible to "restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." Third, the federal courts in devising a remedy must take into account the interests of state ... authorities in managing their own affairs, consistent with the Constitution. In *Brown II* the Court squarely held that "[s]chool authorities have the *primary* responsibility for elucidating, assessing, and solving these problems...." If, however, "school authorities fail in their affirmative obligations ... judicial authority may be invoked." Once invoked, "the scope of the district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."

*Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (citations omitted and emphasis in original).

■ 128. The requirement that the remedy be no broader than the injury means simply that the decree must address the particular violation itself. This principle is a limitation on the Court's equitable powers. *Milliken*, 433 U.S. at 282, 97 S.Ct. at 2758.

■ Consequently, federal courts exceed the appropriate limits of their equitable powers if they issue decrees "aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation, or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation." *Ibid.* (citations omitted).

129. Though the higher courts have provided particular guidance in the area of school desegregation, such cases do "not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971).

■ 130. Racially identifiable institutions are not offensive to the Constitution unless the state's policies and practices purposely maintain their racial identity for discriminatory reasons. *Swann*, 402 U.S. at 25–26, 91 S.Ct. at 1280–81.

### REMEDIAL DECREE [175]

It is HEREBY ORDERED, ADJUDGED AND DECREED, that each Defendant,

---

**175.** At the Pretrial Conference the parties were advised of the decision not to bifurcate the trial between issues of liability and remedy. At that time, the parties were also informed that if a finding of liability were made, the Court would draft a remedial decree that would set the parameters by which the Defendants were to conduct themselves in achieving compliance with the law. In large measure this decree does just that. It looks to the parties to propose solutions within the bounds established by the Court.

No one should doubt the resolve of the Court to impose very specific and detailed requirements should the parties fail in their efforts to submit viable plans. This Court is obligated to see that vestiges of discrimination are eliminated root and branch and it will brook nothing less. This is a final opportunity for the State of Alabama and its colleges and universities to regain a measure of control over the system of higher education. It is in the interest of *all* parties to cooperate with each other in proposing solutions. The Allied Defendants and Plaintiffs should well note that like the other parties to this action, they would fare far better by reaching a consensus and agreement with the Defendants than by taking their chances with the Court.

their agents, servants, employees, and their successors in office, and all persons in active concert or participation with them, be and they are hereby permanently enjoined and restrained from maintaining vestiges of discrimination in the system of public higher education in the State of Alabama and in each public institution of higher education identified as a party Defendant herein, and their successors. The Defendants are also enjoined from engaging in practices which have the effect of impeding the desegregation of the state's institutions of higher education. In order to implement this injunction the appropriate parties as herein identified and individuals and entities responsible for their actions and conduct shall take the following action:

I

*Faculty and Administrative Employment*

*A.* Consistent with the Court's findings of fact, Auburn University shall review its practices and policies respecting the recruitment and employment of African–American faculty. The university shall augment those practices and policies, where necessary, to bring them up to date. The Court directs the university to apply itself with renewed diligence and financial resources to see that a genuine effort exists to increase the number of black faculty. The Court expects to see material improvement in the employment of black faculty at AU within three years.

Auburn University shall report in writing to the Court within ninety (90) days from this date regarding its intended actions.

*B.* The University of Montevallo and Livingston University shall direct their efforts towards increasing black faculty on their respective campuses in accordance with the consent decrees entered into by them and the United States. The Court expects to see material improvement in the employment of black faculty at these institutions within three years.

*C.* The University of North Alabama shall develop and implement recruiting policies for the employment of black administrators in positions of responsibility at the institution. The Court expects to see material improvement in the employment of black administrators at UNA within three years.

The University of North Alabama shall report in writing to the Court within ninety (90) days from this date regarding its intended actions.

*D.* Troy State University and Calhoun State Community College shall direct their efforts towards increasing African–American administrators on their respective campuses in accordance with the consent decrees entered into by them and the United States. The Court expects to see material improvement in the employment of black faculty at these institutions within three years.

*E.* AU, UA, UAH, and JSU shall individually devise and implement a program designed to increase the number of African–American individuals serving in positions of important administrative responsibility on their respective campuses. Within three years, the Court expects to see material improvement in the employment of black administrators at these universities.

II

*State Funding For Higher Education*

*A.* As currently constituted, the formula-recommended appropriation for each institution is reduced by an amount equal to the average statewide tuition. This method must be changed. It unfairly restricts the funding of institutions providing higher educational opportunities to the less well prepared and poorer segments of Alabama's undergraduate population, who are primarily black, and the formula thus has a disparate impact upon African Americans seeking a post-secondary school education

---

In some areas, the Court has been very specific concerning the nature of the obligation required to conform a Defendant's conduct to the requirements of the law. In situations where only a precise action will eliminate a vestige of discrimination, the Court has detailed the necessary action.

in Alabama's four year colleges and universities.

*B.* The Alabama Commission on Higher Education shall modify its funding formula in the following fashion:

1. ACHE shall modify that portion of its funding formula on tuition adjustment as it is applied to ASU and AAMU so as to determine the average tuition and fees charged by such respective institution for the preceding academic year for an on-campus semester hour of instruction.

After determining the average rate charged each full-time student for tuition and fees, per semester hour, as the FTE is computed by ACHE, no more than ninety (90) percent of the rate charged by ASU and AAMU, respectively, shall be applied to the average of un-weighted on-campus semester credit hours (except military science) to obtain the amount of tuition and fee revenue to be deducted pursuant to the funding formula at Alabama State University and Alabama Agricultural & Mechanical University.

2. The Alabama Commission of Higher Education shall modify its funding formula so that the weighting factors in the academic subdivision groupings shall have an undergraduate weight of two (2) in the complexity indices utilized in its proposed funding budget for remedial courses on the undergraduate level. A remedial course is one defined as such by the institution.

*C.* The modifications to the formula must be in place by July 1, 1992.

### III

*Facilities*

*A.* The Governor of Alabama and the Alabama Commission On Higher Education, and the Alabama Public School and College Authority shall, consistent with the Court's findings of fact, eliminate all vestiges of discrimination remaining in the facilities at Alabama State University and Alabama A & M University.

*B.* The Governor, ACHE and the APS-CA, shall report to the Court within one hundred and twenty days (120) from today's date as to how this requirement shall

be implemented. The Court expects the implementation of this requirement to commence by the start of the next fiscal year.

*C.* Pursuant to the Court's Findings Of Fact, before ASU or AAMU may spend any funds appropriated for facilities under the terms of this Decree, they must secure the approval of the Court, so that it can ensure that the expenditures are directed towards capital projects related to the final dismantling of existing vestiges of discrimination.

### IV

*Admissions Policies*

*A.* Auburn University is to review its current undergraduate admissions policy and modify the same consistent with the Court's findings. The Court directs that the modified admissions policy be in place by the 1993–94 school year. The policy is to be one which, in good faith, Auburn believes will not have, and in fact does not have a disproportionate impact on black applicants.

*B.* Auburn University shall report to the Court within ninety (90) days from this date regarding the proposed modification of its undergraduate admissions policies.

### V

*Program Duplication*

*A.* Consistent with the Court's findings, ACHE, Calhoun State Community College, the Alabama State Board of Education and Alabama A & M University shall convene a meeting of the Consent Decree Monitoring Committee created pursuant to the settlement entered into between the United States, the SBE and CSCC. This committee shall make a written recommendation and plan to the Court within ninety (90) days from this date to accomplish the elimination of unnecessary program duplication in the area of business education between Alabama A & M and Calhoun State's satellite campus in Huntsville.

*B.* There is hereby created a Committee on Cooperation which committee shall consist of three representatives of the Alabama State University's Board of Trustees,

excluding *ex officio* members thereof, three representatives of Auburn University's Board of Trustees, excluding *ex officio* members thereof, the Executive Secretary of ACHE or his representative, and the Governor or his representative. Those individuals selected from the Boards of Trustees shall be elected by their respective board.

1. In a manner consistent with the Court's findings, the Committee is charged with examining the issue of program duplication between Alabama State University and Auburn University at Montgomery. The Committee is to focus on the duplication existing between these two institutions in the area of business and education. The focus of the Committee shall be on the establishment of cooperative programs in these two areas of study with a view towards substantially reducing program duplication in the schools of business and education.

2. Within ninety (90) days from today's date, the Committee shall report its recommendations to the Court.

*C.* Alabama A & M University shall have preference for any new teacher education programs established in the Huntsville area.

*D.* Consistent with the Court's findings, the Alabama Commission On Higher Education shall give Alabama State University and Alabama A & M University preference in the establishment of new high demand programs in the Montgomery and Huntsville area.

*E.* Before final approval of any new academic program in either the Huntsville or Montgomery area, ACHE shall notify the Court and furnish it with sufficient information so that the Court can satisfy itself that the program does not unnecessarily duplicate programs already in place at ASU or AAMU, or impede the desegregation of ASU and AAMU.

## VI

*Alabama Code Section 16–50–20(a)*

*A.* For the reasons set forth in the Court's Conclusions Of Law the following

language from Ala.Code 16–50–20(a) is stricken as unconstitutional: "At least one-half of the board shall be from the prevailing minority population of the state." The remainder of the statute shall continue in full force and effect.

## VII

*Recruitment of White Students at Alabama State University*

*A.* Pursuant to the Court's Findings of Fact, ASU must develop and implement a plan to recruit white students to its campus. The Court expects to see material improvement in ASU's white student enrollment within three years.

## VIII

*Previously Executed Consent Decrees*

*A.* Each and every consent decree entered into between the United States and the various parties to this litigation is hereby reimposed even if under its terms it has expired. These consent decrees are extended to include the same period of time as the Decree entered this day by the Court.

## IX

*Monitoring Committee and Yearly Reporting*

*A.* The Court hereby establishes a statewide Monitoring Committee the purpose of which shall be to make annual reports to the Court concerning compliance with the requirements of this Consent Decree. Additionally, the Committee shall also make reports concerning the following matters for *all* Defendant university and colleges involved in this litigation—including those previously entering into consent decrees with the United States:

1. racial composition of the student body;
2. racial composition of the faculty and administration;
3. minority faculty and administrator recruitment;
4. annual state appropriations;

5. changes in admissions policies;

6. changes in tenure requirements;

7. changes in the ACHE funding formula;

8. changes in ACHE's program approval procedures;

9. minority student recruitment and retention at the undergraduate, graduate and professional level;

10. new appointments to boards of trustees and the Alabama State Board of Education;

11. establishment of cooperative programs between institutions; and

12. new facilities construction.

*B.* The Monitoring Committee shall repose in the already existent Council of Presidents. For purposes of making the annual report, the Council of Presidents shall be augmented by the Governor, the Executive Officer of ACHE, the Executive Officer of the Alabama Public School and College Authority, and the Chancellor of the Alabama State Board of Education in his capacity as director of Athens State College and Calhoun State Community College. Representatives of the technical, junior and community colleges are not to be included as members of the Monitoring Committee.

*C.* The Council of Presidents, as augmented, may elect to establish the Monitoring Committee as a sub-committee if it so chooses. The sub-committee must be biracial and the state's HBU's must be represented as well as the Governor and ACHE. The Committee's first report shall be due July 1, 1992, and each year thereafter on the same date. Each Defendant in this case shall promptly furnish to the Monitoring Committee such information and reports as may be requested by the Committee in order to perform its reporting function.

*D.* The monitoring committees established by the consent decrees previously entered into with the United States need no longer report directly to the Court but should serve their reports on the Statewide Monitoring Committee who shall then incorporate them into a unified annual report.

## X

### *Time Limitation For Objections To Reports*

*A.* The Defendants who are herein called upon to provided the Court with initial written reports must serve copies of the same on all parties. Any objections to the reports shall be filed within thirty (30) days following receipt.

*B.* All annual reports to the Court under the terms of this Decree shall be served on all parties of record. Any objections to the annual reports shall be filed within thirty (30) days following receipt.

## XI

### *Jurisdiction and Term of Decree*

*A.* The Court shall retain jurisdiction of this action for an initial period of ten years to insure compliance with the Decree's terms and objectives. The Decree becomes effective immediately and shall remain effective until July 31, 2002.

*B.* The Court specifically reserves the authority to direct the transfer of funds or the payment thereof to and between any party or parties to this case in order to effectuate this Decree, so long as such action by the Court comports with the Constitution of the United States.

*C.* On July 31, 2002, this Decree shall terminate automatically and without further formality unless a party to this litigation, by motion filed not less than sixty (60) days preceding the expiration date of this Decree, requests the Court to extend the term of the Decree.

*D.* The Court may *sua sponte* extend the term of this Decree by entering the appropriate order if it deems that additional time is required to assure compliance and fully accomplish the Decree's objectives. The Court may also, at anytime, modify or amend the terms and conditions of this Decree as needed to guarantee the elimination of any remaining vestiges of

discrimination within Alabama's system and units of public higher education.

## XII

*Attorneys' Fees*

*A.* The Knight and Sims Plaintiffs are prevailing parties for purposes of an award of their attorneys' fees and expenses with respect to all issues and all stages of this litigation including the parallel action in *Knight v. James.*

*B.* The parties shall attempt to reach an agreement as to the amount of such fees and expenses. If an agreement is not reached with in ninety (90) days from this date, the Plaintiffs may within four months from this date file an appropriate motion for determination of such amounts by the Court.

IT IS SO ORDERED.

## APPENDIX A
### Senior Instituions of Higher Education in Alabama

1. Alabama A&M University
2. Alabama State University
3. Auburn University
4. Auburn University in Montgomery
5. University of North Alabama
6. Jacksonville State University
7. Livingston University
8. Troy State University
9. Troy State University in Montgomery
10. Troy State University in Dothan
11. University of Alabama
12. University of Alabama at Birmingham
13. University of Alabama in Huntsville
14. University of Montevallo
15. University of South Alabama
16. Athens State College

# APPENDIX B

Chart 08

FACULTY AND ADMINISTRATOR DATA FOR 1989-90 ACADEMIC YEAR

FACULTY

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 56 | 65 | 1 | 5 | 4 | 2 | 3 | 2 | 3 | 7 | 13 | 4 | 1 | 1 | 3 |
| % | White | 23 | 28 | 94 | 90 | 85 | 93 | 90 | 87 | 96 | 93 | 87 | 94 | 93 | 92 | 91 |
| | TOTAL # | 245 | 181 | 1039 | 191 | 246 | 887 | 1497 | 245 | 190 | 56 | 141 | 283 | 98 | 143 | 631 |
| # | Black | 138 | 118 | 11 | 9 | 9 | 21 | 44 | 6 | 5 | 4 | 18 | 11 | 1 | 2 | 19 |
| # | White | 57 | 50 | 975 | 172 | 210 | 826 | 1349 | 212 | 183 | 52 | 122 | 266 | 91 | 132 | 572 |
| # | $25,000+ Black | 116 | 85 | 10 | 8 | 9 | 19 | 35 | 5 | 4 | 4 | 18 | 7 | 1 | 1 | 17 |
| | White | 57 | 50 | 975 | 172 | 210 | 826 | 1349 | 212 | 183 | 52 | 122 | 266 | 91 | 132 | 572 |
| % | $25,000+ Black | 84 | 72 | 91 | 89 | 100 | 90 | 80 | 83 | 80 | 100 | 100 | 64 | 100 | 50 | 89 |
| | White | 96 | 80 | 91 | 83 | 97 | 88 | 88 | 92 | 92 | 96 | 96 | 93 | 68 | 86 | 90 |
| % | Tenured Black | 69 | 47 | 9 | 56 | 11 | 38 | 45 | 17 | 60 | 50 | 89 | 9 | 0 | 0 | 37 |
| | White | 70 | 56 | 63 | 60 | 53 | 62 | 55 | 43 | 75 | 71 | 76 | 55 | 42 | 69 | 44 |

ADMINISTRATORS

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 96 | 85 | 1 | 6 | 0 | 3 | 6 | 3 | 0 | 25 | 0 | 2 | 0 | 8 | 3 |
| % | White | 4 | 15 | 98 | 94 | 100 | 97 | 94 | 95 | 100 | 75 | 100 | 95 | 100 | 92 | 96 |
| | TOTAL # | 50 | 26 | 281 | 62 | 21 | 119 | 243 | 66 | 12 | 4 | 9 | 44 | 15 | 26 | 152 |
| # | Black | 48 | 22 | 4 | 4 | 0 | 3 | 14 | 2 | 0 | 1 | 0 | 1 | 0 | 2 | 5 |
| # | White | 2 | 4 | 276 | 58 | 21 | 116 | 228 | 63 | 12 | 3 | 9 | 42 | 15 | 24 | 146 |

Source: EEOC Survey/Higher Education Staff Information (EEO-6)

PARTIAL KEY

$25,000+—Black = The number of Black faculty members who earn $25,000 per year or more

$25,000+—Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

# APPENDIX C

186. [CC 328] [¶ 328] Charts 01–06 attached to this stipulation accurately set forth certain faculty and administrator data as reported by the specified institution to the EEOC on the EEOC Survey/Higher Education Staff Information form (EEO-6) for the year indicated and certain arithmetic calculations based upon those reports. On the charts, certain labels are used. Those labels with their definitions are

## FACULTY

% Black = The percentage of the set of full-time faculty members who are black

% White = The percentage of the set of full-time faculty members who are white

TOTAL# = The number of full-time faculty members

# Black = The number of full-time faculty members who are black

# White = The number of full-time faculty members who are white

# $25,000+

Black = The number of black faculty members who earn $25,000 per year or more

White = The number of white faculty members who earn $25,000 per year or more

% $25,000+

Black = The percentage of the set of black faculty members who earn $25,000 per year or more

White = The percentage of the set of white faculty members who earn $25,000 per year or more

% TENURED

Black = The percentage of the set of black faculty members who are tenured

White = The percentage of the set of white faculty members who are tenured

## ADMINISTRATORS

% Black = The percentage of the set of full-time administrators who are black

% White = The percentage of the set of full-time administrators who are white

TOTAL # = The total number of full-time administrators

# Black = The number of full-time administrators who are black

# White = The number of full-time administrators who are white

## APPENDIX C–i

Chart 01 FACULTY AND ADMINISTRATOR DATA FOR 1975–76 ACADEMIC YEAR

**FACULTY**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 65 | 76 | 0 | 2 | 2 | 1 | 3 | 1 | 2 | 3 | 15 | 2 | 1 | 1 | 3 |
| % | White | 29 | 18 | 98 | 98 | 98 | 96 | 94 | 92 | 97 | 97 | 83 | 96 | 96 | 97 | 95 |
| | TOTAL # | 226 | 161 | 903 | 97 | 238 | 732 | 1033 | 153 | 176 | 38 | 144 | 324 | 72 | 124 | 344 |
| # | Black | 146 | 122 | 4 | 2 | 4 | 10 | 28 | 2 | 3 | 1 | 21 | 6 | 1 | 1 | 10 |
| # | White | 66 | 29 | 888 | 95 | 234 | 702 | 967 | 140 | 170 | 37 | 120 | 312 | 69 | 120 | 328 |
| # | $25,000+ | | | | | | | | | | | | | | | |
| | Black | 3 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White | 1 | 0 | 97 | 1 | 3 | 48 | 266 | 8 | 0 | 0 | 1 | 0 | 1 | 0 | 39 |
| % | $25,000+ | | | | | | | | | | | | | | | |
| | Black | 2 | 1 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White | 2 | 0 | 11 | 1 | 1 | 7 | 28 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 12 |
| % | Tenured | | | | | | | | | | | | | | | |
| | Black | 42 | 37 | 25 | 0 | 0 | 20 | 25 | 50 | 33 | 0 | 90 | 17 | 0 | 100 | 20 |
| | White | 18 | 17 | 52 | 16 | 28 | 65 | 40 | 41 | 71 | 86 | 84 | 36 | 61 | 66 | 49 |

**ADMINISTRATORS**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 100 | 95 | 0 | 0 | 0 | 2 | 11 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 1 |
| % | White | 0 | 5 | 100 | 100 | 100 | 98 | 89 | 98 | 100 | 90 | 100 | 100 | 100 | 100 | 99 |
| | TOTAL # | 25 | 61 | 185 | 16 | 16 | 129 | 531 | 57 | 13 | 10 | 7 | 38 | 16 | 25 | 98 |
| # | Black | 25 | 58 | 0 | 0 | 0 | 2 | 57 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| # | White | 0 | 3 | 185 | 16 | 16 | 127 | 472 | 56 | 13 | 9 | 7 | 38 | 16 | 25 | 97 |

Source: EEOC Survey/Higher Education Staff Information (EEO–6)

PARTIAL KEY

# $25,000+ —Black = The number of Black faculty members who earn $25,000 per year or more

% $25,000+ —Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

## APPENDIX C–ii

Chart 02 FACULTY AND ADMINISTRATOR DATA FOR 1977–78 ACADEMIC YEAR

**FACULTY**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 66 | 70 | 1 | 3 | 2 | 2 | 3 | 1 | 2 | 2 | 9 | 1 | 1 | 1 | 2 |
| % | White | 18 | 21 | 98 | 97 | 98 | 95 | 91 | 89 | 98 | 98 | 89 | 98 | 94 | 96 | 97 |
| | TOTAL # | 247 | 162 | 959 | 132 | 250 | 774 | 1087 | 153 | 207 | 40 | 132 | 265 | 72 | 135 | 388 |
| # | Black | 164 | 114 | 7 | 4 | 5 | 18 | 34 | 2 | 4 | 1 | 13 | 3 | 1 | 2 | 7 |
| # | White | 45 | 34 | 938 | 128 | 244 | 733 | 992 | 136 | 203 | 39 | 117 | 259 | 68 | 130 | 376 |
| # | $25,000+ | | | | | | | | | | | | | | | |
| | Black | 3 | 3 | 0 | 1 | 0 | 2 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White | 0 | 0 | 178 | 12 . | 7 | 158 | 485 | 21 | 23 | 7 | 0 | 1 | 1 | 0 | 70 |
| % | $25,000+ | | | | | | | | | | | | | | | |
| | Black | 2 | 3 | 0 | 25 | 0 | 11 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | White | 0 | 0 | 19 | 9 | 3 | 22 | 49 | 15 | 11 | 18 | 0 | 0 | 2 | 0 | 19 |
| % | Tenured | | | | | | | | | | | | | | | |
| | Black | 32 | 36 | 14 | 25 | 0 | 33 | 12 | 0 | 75 | 0 | 100 | 33 | 0 | 50 | 57 |
| | White | 22 | 44 | 53 | 31 | 33 | 65 | 52 | 42 | 68 | 67 | 69 | 46 | 49 | 62 | 49 |

**ADMINISTRATORS**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 98 | 92 | 0 | 0 | 0 | 1 | 6 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 1 |
| % | White | 2 | 8 | 100 | 100 | 100 | 99 | 94 | 96 | 100 | 100 | 100 | 96 | 100 | 100 | 99 |
| | TOTAL # | 54 | 48 | 232 | 11 | 16 | 139 | 592 | 53 | 12 | 4 | 11 | 45 | 17 | 16 | 100 |
| # | Black | 53 | 44 | 0 | 0 | 0 | 1 | 34 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| # | White | 1 | 4 | 231 | 11` | 16 | 138 | 556 | 51 | 12 | 4 | 11 | 43 | 17 | 16 | 99 |

Source: EEOC Survey/Higher Education Staff Information (EEO–6)

PARTIAL KEY

# $25,000+ —Black = The number of Black faculty members who earn $25,000 per year or more

% $25,000+ —Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

## APPENDIX C–iii

Chart 03 FACULTY AND ADMINISTRATOR DATA FOR 1979–80 ACADEMIC YEAR

**FACULTY**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 64 | 69 | 1 | 5 | 3 | 2 | 3 | 1 | 2 | 8 | 11 | 2 | 2 | 0 | 4 |
| % | White | 33 | 23 | 97 | 95 | 97 | 95 | 91 | 88 | 97 | 92 | 88 | 97 | 92 | 97 | 93 |
| | TOTAL # | 335 | 177 | 998 | 136 | 303 | 816 | 1199 | 164 | 196 | 40 | 141 | 262 | 62 | 146 | 444 |
| # | Black | 213 | 122 | 7 | 7 | 8 | 20 | 35 | 2 | 3 | 3 | 15 | 5 | 1 | 0 | 18 |
| # | White | 110 | 41 | 973 | 129 | 295 | 776 | 1094 | 144 | 191 | 37 | 125 | 255 | 57 | 142 | 413 |

**FACULTY**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # | $25,000+ Black | 23 | 11 | 1 | 1 | 0 | 6 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| | White | 13 | 5 | 294 | 14 | 27 | 215 | 530 | 33 | 40 | 5 | 1 | 78 | 7 | 6 | 92 |
| % | $25,000+ Black | 11 | 9 | 14 | 14 | 0 | 30 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| | White | 12 | 12 | 30 | 11 | 9 | 28 | 48 | 22 | 21 | 14 | 1 | 31 | 12 | 4 | 22 |
| % | Tenured Black | 24 | 40 | 14 | 29 | 0 | 40 | 14 | 0 | 67 | 0 | 80 | 0 | 0 | 0 | 22 |
| | White | 17 | 54 | 54 | 41 | 31 | 62 | 52 | 47 | 76 | 24 | 88 | 46 | 53 | 54 | 51 |

**ADMINISTRATORS**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 93 | 85 | 0 | 3 | 0 | 2 | 6 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 4 |
| % | White | 5 | 15 | 99 | 97 | 100 | 98 | 94 | 96 | 100 | 100 | 100 | 96 | 100 | 100 | 96 |
| | TOTAL # | 55 | 47 | 205 | 29 | 17 | 152 | 241 | 53 | 13 | 4 | 13 | 54 | 18 | 17 | 111 |
| # | Black | 51 | 40 | 0 | 1 | 0 | 3 | 14 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 4 |
| # | White | 3 | 7 | 202 | 28 | 17 | 149 | 226 | 51 | 13 | 4 | 13 | 52 | 18 | 17 | 106 |

Source: EEOC Survey/Higher Education Staff Information (EEO–6)

PARTIAL KEY

# $25,000+ —Black = The number of Black faculty members who earn $25,000 per year or more

% $25,000+ —Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

## APPENDIX C–iiii

Chart 04 FACULTY AND ADMINISTRATOR DATA FOR 1981–82 ACADEMIC YEAR

**FACULTY**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 64 | 70 | 0 | 7 | 1 | 2 | 3 | 2 | 3 | 5 | 11 | 3 | 0 | 1 | 3 |
| % | White | 33 | 21 | 97 | 92 | 99 | 95 | 91 | 90 | 97 | 95 | 88 | 96 | 94 | 96 | 94 |
| | TOTAL # | 252 | 159 | 975 | 167 | 291 | 810 | 1255 | 194 | 197 | 38 | 117 | 256 | 68 | 145 | 489 |
| # | Black | 161 | 111 | 3 | 11 | 4 | 20 | 40 | 3 | 6 | 2 | 13 | 7 | 0 | 2 | 13 |
| # | White | 83 | 34 | 946 | 153 | 286 | 768 | 1141 | 174 | 191 | 36 | 103 | 247 | 64 | 139 | 461 |
| # | $25,000+ Black | 34 | 19 | 1 | 1 | 0 | 3 | 13 | 0 | 1 | 0 | 2 | 2 | 0 | 0 | 2 |
| | White | 21 | 4 | 429 | 35 | 59 | 335 | 708 | 52 | 62 | 12 | 20 | 146 | 10 | 36 | 223 |
| % | $25,000+ Black | 21 | 17 | 33 | 9 | 0 | 15 | 32 | 0 | 17 | 0 | 15 | 29 | 0 | 0 | 15 |
| | White | 25 | 12 | 45 | 23 | 21 | 44 | 62 | 30 | 32 | 33 | 19 | 59 | 16 | 26 | 48 |
| % | Tenured Black | 55 | 41 | 0 | 27 | 0 | 45 | 23 | 33 | 83 | 50 | 92 | 0 | 0 | 0 | 62 |
| | White | 51 | 62 | 60 | 48 | 39 | 63 | 52 | 42 | 77 | 75 | 84 | 54 | 44 | 58 | 52 |

**ADMINISTRATORS**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | 85 | 86 | 1 | 2 | 0 | 3 | 6 | 2 | 0 | 12 | 7 | 2 | 0 | 0 | 2 |
| % | White | 13 | 14 | 98 | 98 | 100 | 97 | 94 | 96 | 100 | 88 | 93 | 96 | 100 | 100 | 97 |
| | TOTAL | 60 | 43 | 238 | 47 | 17 | 127 | 268 | 49 | 12 | 8 | 14 | 48 | 21 | 15 | 136 |
| # | Black | 51 | 37 | 3 | 1 | 0 | 4 | 16 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 3 |
| # | White | 8 | 6 | 234 | 46 | 17 | 123 | 252 | 47 | 12 | 7 | 13 | 46 | 21 | 15 | 132 |

Source: EEOC Survey/Higher Education Staff Information (EEO–6)

PARTIAL KEY

# $25,000 + —Black = The number of Black faculty members who earn $25,000 per year or more

% $25,000 + —Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

## APPENDIX C–iiiii

Chart 05 FACULTY AND ADMINISTRATOR DATA FOR 1983–84 ACADEMIC YEAR

**FACULTY**

| | | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % | Black | | 72 | 1 | 6 | 2 | 2 | 3 | 1 | 4 | 5 | 11 | 3 | 0 | 0 | 3 |
| % | White | | 20 | 95 | 93 | 96 | 93 | 92 | 88 | 96 | 95 | 88 | 96 | 94 | 97 | 93 |
| | TOTAL # | N/A | 177 | 973 | 179 | 271 | 813 | 1259 | 211 | 192 | 40 | 142 | 341 | 70 | 145 | 539 |
| # | Black | | 127 | 7 | 10 | 6 | 20 | 35 | 2 | 7 | 2 | 16 | 10 | 0 | 0 | 15 |
| # | White | | 35 | 924 | 166 | 260 | 758 | 1155 | 186 | 185 | 38 | 125 | 328 | 66 | 141 | 500 |
| # | $25,000+ Black | | 34 | 3 | 1 | 1 | 14 | 21 | 0 | 4 | 0 | 5 | 4 | 0 | 0 | 3 |
| | White | | 13 | 540 | 70 | 91 | 452 | 863 | 86 | 93 | 19 | 31 | 160 | 17 | 53 | 276 |
| % | $25,000+ Black | | 27 | 43 | 10 | 17 | 70 | 60 | 0 | 57 | 0 | 31 | 40 | 0 | 0 | 20 |
| | White | | 37 | 58 | 42 | 35 | 60 | 75 | 46 | 50 | 50 | 25 | 49 | 26 | 38 | 55 |
| % | Tenured Black | | 53 | 14 | 20 | 0 | 64 | 49 | 50 | 86 | 100 | 81 | 10 | 0 | 0 | 53 |
| | White | | 60 | 62 | 46 | 40 | 50 | 57 | 44 | 77 | 84 | 74 | 45 | 38 | 66 | 52 |

ADMINISTRATORS

| | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Black | | 88 | 1 | 0 | 0 | 2 | 6 | 4 | 0 | 0 | 13 | 2 | 0 | 0 | 0 |
| % White | | 12 | 99 | 100 | 100 | 97 | 94 | 95 | 100 | 100 | 87 | 95 | 100 | 100 | 99 |
| TOTAL # | | 34 | 235 | 30 | 14 | 115 | 271 | 55 | 10 | 5 | 38 | 42 | 20 | 16 | 140 |
| # Black | | 30 | 3 | 0 | 0 | 2 | 15 | 2 | 0 | 0 | 5 | 1 | 0 | 0 | 0 |
| # White | | 4 | 232 | 30 | 14 | 112 | 255 | 52 | 10 | 5 | 33 | 40 | 20 | 16 | 139 |

Source: EEOC Survey/Higher Education Staff Information (EEO–6)

PARTIAL KEY

# $25,000+ —Black = The number of Black faculty members who earn $25,000 per year or more

% $25,000+ —Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

## APPENDIX C–iiiiii

Chart 06 — FACULTY AND ADMINISTRATOR DATA FOR 1985–86 ACA-DEMIC YEAR

FACULTY

| | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Black | 62 | 70 | 1 | 7 | 3 | 2 | 2 | 1 | 2 | 2 | 13 | 3 | 0 | 5 | 3 |
| % White | 29 | 23 | 94 | 88 | 96 | 93 | 91 | 88 | 97 | 98 | 86 | 96 | 96 | 91 | 93 |
| TOTAL # | 243 | 184 | 1024 | 164 | 278 | 833 | 1355 | 223 | 192 | 44 | 149 | 277 | 77 | 149 | 600 |
| # Black | 151 | 129 | 11 | 12 | 7 | 17 | 32 | 3 | 4 | 1 | 19 | 7 | 0 | 7 | 19 |
| # White | 70 | 42 | 963 | 144 | 267 | 778 | 1235 | 196 | 187 | 43 | 128 | 266 | 74 | 136 | 556 |
| # $25,000 + Black | 93 | 69 | 3 | 7 | 5 | 13 | 28 | 3 | 4 | 0 | 16 | 5 | 0 | 3 | 11 |
| White | 50 | 31 | 708 | 93 | 171 | 638 | 1036 | 139 | 161 | 34 | 101 | 215 | 45 | 105 | 389 |
| % 25,000 + Black | 62 | 53 | 27 | 58 | 71 | 76 | 72 | 100 | 100 | 0 | 84 | 71 | 0 | 43 | 58 |
| White | 71 | 74 | 74 | 65 | 64 | 82 | 84 | 71 | 86 | 79 | 79 | 81 | 61 | 77 | 70 |
| % Tenured Black | 62 | 45 | 9 | 42 | 0 | 53 | 50 | 33 | 100 | 0 | 79 | 14 | 0 | 0 | 42 |
| White | 73 | 50 | 61 | 50 | 41 | 65 | 57 | 41 | 79 | 88 | 78 | 56 | 41 | 76 | 47 |

ADMINISTRATORS

| | A & M | ASU | AU | AUM | TSU | UA | UAB | UAH | UNA | ASC | CSCC | JSU | LU | UM | U.So.Ala. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Black | 98 | 93 | 1 | 0 | 0 | 1 | 4 | 3 | 0 | 0 | 0 | 3 | 0 | 0 | 2 |
| % White | 2 | 7 | 99 | 100 | 100 | 98 | 96 | 95 | 100 | 100 | 100 | 95 | 100 | 100 | 98 |
| TOTAL # | 45 | 30 | 240 | 55 | 10 | 124 | 230 | 61 | 11 | 3 | 6 | 39 | 17 | 11 | 132 |
| # Black | 44 | 28 | 2 | 0 | 0 | 1 | 10 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| # White | 1 | 2 | 238 | 55 | 10 | 122 | 220 | 58 | 11 | 3 | 6 | 37 | 17 | 11 | 129 |

Source: EEOC Survey/Higher Education Staff Information (EEO–6)

PARTIAL KEY

# $25,000+ —Black = The number of Black faculty members who earn $25,000 per year or more

% $25,000+ —Black = of the set of Black faculty members, the percentage of persons who earn $25,000 per year or more

1388

APPENDIX D
AUBURN UNIVERSITY ORGANIZATIONAL CHART

0985584
1576

APPENDIX E

## Comparison of Black Enrollment at UAS Institutions with Black Enrollment in Public Out–of–State Doctoral Institutions Fall 1988

| Institution | % Blacks |
|---|---|
| U of Tennessee, Memphis | 6.32 |
| Florida State | 6.26 |
| Georgia Tech. | 6.15 |
| Michigan State University | 6.14 |
| U of California, Berkley | 6.13 |
| College of William and Mary | 5.87 |
| U of Florida | 5.82 |
| U of Michigan | 5.71 |
| State U of N.Y., Buffalo | 5.6 |
| Clemson University | 5.33 |
| UAH | 5.1 |
| Kent State University | 5.01 |
| U of Northern Illinois | 4.93 |
| George Mason University | 4.77 |
| Illinois State | 4.71 |
| Ohio University | 4.7 |
| U of Georgia | 4.7 |
| U of Illinois | 4.7 |
| State U of N.Y., Binghampton | 4.64 |
| Western Michigan University | 4.62 |
| U of Tennessee | 4.52 |
| Ohio State University | 4.5 |
| U of Texas, Dallas | 4.4 |
| U of Oklahoma | 4.39 |
| U of Delaware | 4.33 |
| U of California, San Francisco | 4.12 |
| Penn State University | 3.93 |
| Indiana University | 3.8 |
| VPI | 3.58 |
| U of Texas, Austin | 3.55 |
| U of California, Riverside | 3.5 |
| Bowling Green St. Univ. (Ohio) | 3.5 |

Source: UAS 1108; UAS 1112

APPENDIX E-i

## Comparison of Black Enrollment at UAS Institutions with Black Enrollment in Public Out–of–State Doctoral Institutions Fall 1988

| Institution | % Blacks |
|---|---|
| U of California, Davis | 3.5 |
| O of Connecticut | 3.46 |
| U of Missouri | 3.43 |
| Ball State University | 3.38 |
| U of Kentucky | 3.15 |
| U of Washington | 3.1 |
| U of California, San Diego | 2.96 |
| Kansas State University | 2.94 |
| U of California, Santa Barbara | 2.77 |
| Texas A&M | 2.74 |
| U of California, Santa Cruz | 2.72 |
| U of California, Irvine | 2.71 |
| Oklahoma State University | 2.7 |
| U of Massachusetts, Amherst | 2.66 |
| U of Kansas | 2.59 |
| U of Wisconsin, Milwaukee | 2.57 |
| U of Missouri, Rolla | 2.45 |
| Texas Tech. | 2.41 |
| Arizona State | 2.19 |
| U of Iowa | 2.17 |
| Iowa State | 2.14 |
| U of Nevado, Reno | 1.88 |
| Washington State University | 1.83 |
| U of Rhode Island | 1.74 |
| U of Wisconsin, Madison | 1.7 |
| U of New Mexico | 1.6 |
| U of Arizona | 1.59 |
| U of Minnesota, Twin Cities | 1.57 |
| U of Nebraska | 1.56 |
| U of Colorado | 1.55 |
| New Mexico State | 1.39 |
| Colorado State Univ. | 1.25 |

Source: UAS 1108; UAS 1112

APPENDIX E-ii

## Comparison of Black Enrollment at UAS Institutions with Black Enrollment in Public Out–of–State Doctoral Institutions Fall 1988

| Institution | % Blacks |
| --- | --- |
| Wayne State University | 21.86 |
| Memphis State University | 16.79 |
| UAB | 15.79 |
| Temple University | 14.16 |
| Texas Women's University | 13.73 |
| Southern Mississippi University | 13.36 |
| Virginia Commonwealth Univ. | 13.13 |
| U of South Carolina | 12.35 |
| U of Maryland, Baltimore | 11.97 |
| Mississippi State University | 11.1 |
| The University of Alabama System | 10.42 |
| U of Arkansas | 9.78 |
| U of Missouri, St. Louis | 9.47 |
| North Carolina State | 9.33 |
| U of Illinois, Chicago | 9.02 |
| U of Maryland | 8.6 |
| UA | 8.54 |
| LSU | 8.45 |
| U of Louisville | 8.38 |
| U of Pittsburgh | 8.16 |
| U of North Carolina, Chapel Hill | 7.8 |
| U of Virginia | 7.6 |
| Rutgers, St. Univ. of N.J. | 7.41 |
| U of Houston | 7.2 |
| State U of N.Y., Stoney Brook | 6.93 |
| Indiana State University | 6.91 |
| U of Texas, Arlington | 6.83 |
| U of Missouri, Kansas City | 6.66 |
| U of Mississippi | 6.65 |
| State U of N.Y., Albany | 6.5 |
| U of North Texas | 6.45 |
| U of California at Los Angeles | 6.43 |

Source: UAS 1108; UAS 1112

# APPENDIX F
## SUMMARY OF FINDINGS AND CONCLUSIONS REGARDING
## A UNITARY OR DUAL CURRICULUM STRUCTURE IN ALABAMA

Clifton F. Conrad

October 3, 1990

\* This material has been adapted from Clifton F. Conrad, <u>Study of Academic Programs in Alabama's Colleges and Universities,</u> October 1, 1990.

### APPENDIX F-i

#### UNITARY CURRICULUM STRUCTURE

In a unitary curriculum structure, there is not a substantial amount of overall program duplication (I) and unnecessary program duplication (II) between those institutions being compared, such that there is a relatively high degree of uniqueness—including "meaningful uniquess" (III)—in the degree programs offered in BOTH sets of institutions. [Note: Given that colleges and universities can be expected to offer a number of the same core programs, some program duplication is expected in a unitary structure.]

PROGRAMS IN ONE SET [PWIs]

PROGRAMS IN ONE SET [PBIs]

Non-Core (Non-Essential) Programs

II. UNNECESSARY DUPLICATION

Core Programs

Duplicated Programs
I. OVERALL DUPLICATION

Non-Core (Non-Essential) Programs

III. MEANINGFUL PROGRAM UNIQUENESS
(High-Demand Programs)

Core Programs

Non-Duplicated
(Unique) Programs

Non-Core (Non-Essential) Programs

II. UNNECESSARY DUPLICATION

Core Programs

Duplicated Programs
I. OVERALL DUPLICATION

Non-Core (Non-Essential) Programs

III. MEANINGFUL PROGRAM UNIQUENESS
(High-Demand Programs)

Core Programs

Non-Duplicated
(Unique) Programs

<u>Definition of Core Programs</u>: Those programs necessary for the provision of general and specialized education in the liberal arts and sciences and, in land-grant institutions, for the provision of opportunities essential to the fulfillment of the land-grant mission.

<u>Definition of Meaningful Program Uniqueness</u>: The conspicuous presence of a significant number of non-duplicated (unique), non-core, <u>high-demand</u> programs. [Note: Meaningful distinctions in terms of unique program offerings—whatever the number of such programs—are what provide the programmatic foundation for distinguishing one institution (or set of institutions) from another. Without meaningful program distinctions there is no programmatic incentive for students to attend one institution as opposed to another and, in turn, they are likely to select institutions on the basis of considerations other than the availability of desired programs.]

## APPENDIX F-ii

### DUAL CURRICULUM STRUCTURE

In a dual curriculum structure, there is a substantial amount of overall program duplication (I) and unnecessary duplication (II) between those institutions being compared. Further, there is not a substantial number of unique (non-duplicated) programs in both sets that are non-core, high-demand programs--for example, in such fields as education, business, and engineering--such that there is not a relatively high degree of "meaningful uniqueness" (III) in the degree program offerings of both sets of institutions.

PROGRAMS IN ONE SET [SUIs]

Non-Core (Non-Essential) Programs

 II. UNNECESSARY DUPLICATION

Core Programs

 Duplicated Programs
 I. OVERALL DUPLICATION

Non-Core (Non-Essential) Programs

 III. MEANINGFUL PROGRAM UNIQUENESS
 (High-Demand Programs)

Core Programs

 Non-Duplicated
 (Unique) Programs

PROGRAMS IN ONE SET [PRIs]

Non-Core (Non-Essential) Programs

 II. UNNECESSARY DUPLICATION

Core Programs

 Duplicated Programs
 I. OVERALL DUPLICATION

Non-Core (Non-Essential) Programs

 III. MEANINGFUL PROGRAM UNIQUENESS
 (High-Demand Programs)

Core Programs

 Non-Duplicated
 (Unique) Programs

APPENDIX F–iii

## COMPARISONS BETWEEN THE PWIs AND THE PBIs: STATEWIDE AND PAIRED COMPARISONS

*Institutions Included in Statewide, Grouped Comparisons*

7 PWIs: UAH, AUM, UA, AU, UAB, UNA, TSU

2 PBIs: A & M, ASU

*Pairs of Comparative Institutions (8)*

1. UAH and A & M
2. UNA and A & M
3. UA and A & M
4. AU and A & M
5. AUM and ASU
6. TSU (Main Campus) and ASU
7. AU and ASU
8. UA and ASU

### FINDINGS

I. *Substantial Amount of Overall Duplication*

The findings show that there is an extensive amount of overall program duplication between the PWIs and the PBIs in Alabama, both in the grouped (statewide) comparisons and in the eight paired comparisons:

a. *Grouped (Statewide) Comparisons*

At the bachelor's level, over two-thirds (70%) of the CIP programs offered at one or both of the PBIs are also offered at one or more of the PWIs; at the master's level, over four-fifths (84%) of the programs in the PBIs are also offered in the PWIs; and at the specialist level all but one (88%) of the programs offered in one or more of the PBIs are also offered in one or more of the PWIs. Across degree levels, 83 of the 109 programs (75%) offered in at least one of the PBIs are also offered in at least one of the PWIs.

b. *Paired Comparisons (8)*

Across the eight sets of paired comparisons, the average percentage of duplicated programs at the PBIs is 59 percent at the bachelor's level, 49 percent at the master's level, and 58 percent at the specialist level. While there is considerable variation across the eight sets—with the least amount of program duplication in two paired comparisons (UAH and A & M, UNA and A & M)—the overall pattern is one of substantial program duplication. For example, 83 percent of the bachelor's, 69 percent of the master's, and 83 percent of the specialist programs at Alabama State University are also offered at Auburn University; and 59 percent of the bachelor's, 36 percent of the master's, and 80 percent of the specialist programs at Auburn University in Montgomery are also offered at Alabama State University.

II. *Substantial Amount of Unnecessary (Non–Essential) Program Duplication*

The findings show that there is an extensive amount of unnecessary program duplication between the PWIs and the PBIs in Alabama, both in the grouped (statewide) comparisons and in the eight paired comparisons:

a. *Grouped (Statewide) Comparisons*

At the bachelor's level, about one-third (32%) of the CIP programs offered at one or both of the PBIs are also offered at one or more of the PWIs; at the master's level, over four-fifths (84%) of the programs in the PBIs are also offered in the PWIs; and at the specialist level all but one (88%) of the programs offered in one or more of the PBIs are also offered in one or more of the PWIs. Across degree levels, 56 of the 109 programs (51%) offered in at least one of the PBIs are also offered in at least one of the PWIs.

b. *Paired Comparisons (8)*

Across the eight sets, the average percentage of unnecessarily duplicated programs at the PBIs is 29 percent at the bachelor's level, 49 percent at the master's level, and 58 percent at the specialist level. While there is considerable variation across the eight sets—with the least amount of program duplication in two paired comparisons (UAH and A & M, UNA and A & M)—six

of the eight sets have a substantial amount of unnecessary program duplication. For example, 37 percent of the bachelor's and 77 percent of the master's programs at Alabama State University are unnecessarily duplicated at the University of Alabama, and 41 percent of the baccalaureate and 69 percent of the master's programs at Alabama State University are unnecessarily duplicated at Auburn University.

III. *Not a Substantial Number of Unique (Non–Duplicated), Non–Core, High–Demand Programs in Both Sets—Hence there is Not Meaningful Program Uniqueness in Both the PWIs and PBIs*

On the one hand, the findings from the grouped comparisons and in five of the eight paired comparisons show that there is a substantial number of unique non-core, high-demand programs in the PWIs. Thus, there are meaningful programmatic differences between the PWIs as compared to the PBIs. On the other, the findings from the grouped comparisons and all but one of the eight paired comparisons show that there are relatively few unique non-core, high-demand programs in the PBIs. Thus, there are not meaningful programmatic differences between the PBIs as compared to the PWIs. Put another way, the programs in the PBIs are not meaningfully distinguished from those in the PWIs. Overall, in the grouped comparisons and in all but one of the eight paired comparisons, there is not a substantial number of unique non-core, high-demand programs in both the PBIs and the PBIs.

a. *Group (Statewide) Comparisons*

At the bachelor's level, the PWIs offer a total of 18 unique non-core, high-demand CIP programs while the PBIs do not offer a single such program. For example, the PWIs offer such non-core high-demand programs as mechanical engineering (UA, UAB, UAH), management information systems (UAH, UNA), and nursing (AU, AUM, TSU, UA, UAB, UAH, UNA) that are not offered in the PBIs.

At the master's level, the PWIs offer a total of 42 non-core, high-demand programs that are not offered in the PBIs. Meanwhile, the PBIs offer a total of 2 non-core, high-demand programs at the master's level that are not offered in the PWIs: Alabama A & M offers a master's program in trade and industrial education, and Alabama State offers a master's program in the liberal arts and sciences. At the doctoral level, the PWIs offer a total of 59 unique non-core, high-demand programs— while the PBIs offer none. Further, all six of the first professional programs (such as law and medicine) are offered in the PWIs.

To summarize, the PWIs offer a substantial number of non-core, high-demand programs that are not offered in the PBIs— while the PBIs offer very few such programs. Across three degree levels (bachelor's, master's, doctoral), the PWIs offer a total of 129 non-core, high-demand programs that are not offered in the PBIs; in addition, they offer all of the first professional programs. Meanwhile, the PBIs offer a combined total of 2 non-core, high-demand programs that are not offered in the PWIs.

b. *Paired Comparisons (8)*

In four of the eight sets (UA and A & M, AU and A & M, AU and ASU, UA and ASU), the PWIs offer a large number of unique non-core, high-demand programs— across degree levels—while the PBIs offer few such programs. In the UA and A & M paired comparison, for example, UA offers a total of 81 non-core, high-demand programs that are not offered at A & M: 15 at the bachelor's level, 35 at the master's level, and 31 at the doctoral level. Meanwhile A & M offers a total of 3 non-core, high-demand programs that are not offered at UA: 1 at the bachelor's level, 2 at the master's level, and none at the doctoral level.

▆▆▆▆▆▆▆▆

In the four remaining sets, there are some unique non-core high-demand programs in both the PWIs and PBIs, with the number varying as follows: In one set (UAH and A & M) there is a substantial number of high-demand programs in both of the comparative institutions, but in the other three (UNA and A & M, AUM and ASU, TSU and ASU) there are relatively few high-demand programs in either the PWI or the PBI.

To summarize, in all but one of the eight paired comparisons there is not a substantial number of unique non-core, high-demand programs in the PBIs—such that there are not meaningful program differences between the PBIs as compared to the PWIs. However, in five of the eight paired comparisons there is a substantial number of unique non-core, high-demand programs in the PWIs—such that there are meaningful differences between the PWIs as compared to the PBIs.

Overall, across the eight paired comparisons, the findings show that in only one set (UAH and A & M) is there a substantial number of unique non-core, high-demand programs in each of the paired institutions. In the remaining seven paired comparisons, there is not a substantial number of unique non-core high-demand programs in both the PWIs and the PBIs.

CONCLUSION

Given the substantial amount of overall program duplication and unnecessary duplication found here—coupled with the prominent finding that there is not a substantial number of unique non-core, high-demand programs in both the PWIs and PBIs that meaningfully differentiate the two sets (in particular, the PBIs are not meaningfully differentiated from the PWIs)—it is concluded that there currently exists a dual curriculum structure between the PWIs and PBIs.